*In the*

# United States Court of Appeals
### *for the*
## District of Columbia Circuit

INSTITUTIONAL SHAREHOLDER SERVICES, INC.,
*Plaintiff-Appellee,*

— v. —

SECURITIES & EXCHANGE COMMISSION,
and MARK T. UYEDA, in his official capacity as Acting Chair of the SEC
*Defendant-Appellant,*

NATIONAL ASSOCIATION OF MANUFACTURERS,
*Intervenor-Appellant.*

On Appeal from the United States District Court
for the District of Columbia
Case No. 19-cv-3275, Hon. Amit P. Mehta, United States District Judge

## JOINT APPENDIX
## VOL. 2 OF 4

ERICA T. KLENICKI
MICHAEL A. TILGHMAN II
 *NAM Legal Center*
 *733 10th Street NW*
 *Suite 700*
 *Washington, DC 20001*
 *(202) 637-3000*

PAUL W. HUGHES
ANDREW A. LYONS-BERG
EMMETT WITKOVSKY-ELDRED
 *McDermott Will & Emery LLP*
 *500 North Capitol Street NW*
 *Washington, DC 20001*
 *(202) 756-8000*

*Counsel for Intervenor-Appellant*
*Additional Counsel Cont.*

JEFFREY MATTHEW HARRIS
JAMES HASSON
  *Consovoy McCarthy PLLC*
  1600 Wilson Boulevard
  Suite 700
  Arlington, VA 22209
  (703) 243-9423

MARI-ANNE PISARRI
  *Pickard Djinis and Pisarri LLP*
  1818 N Street, NW
  Suite 515
  Washington, DC 20036
  (202) 223-4418

*Counsel for Plaintiff-Appellee*
*Institutional Shareholder Services, Inc.*

# TABLE OF CONTENTS

**Volume 1**

District Court Docket Entries ................................................. JA 1

Complaint (Dkt. 1) .............................................................. JA 13

Amended Complaint (Dkt. 19) ............................................ JA 43

Netram Declaration (Dkt. 27-2) .......................................... JA 74

Administrative Record Index (Dkt. 30) ................................ JA 81

SEC Cross Motion for Summary Judgment (Dkt. 35-1) ...................... JA 116

Opinion (Dkt. 69) .............................................................. JA 169

Order re Motions for Summary Judgment (Dkt. 70) ........................... JA 203

NAM Notice of Appeal (Dkt. 72) ......................................... JA 204

SEC Notice of Appeal (Dkt. 74) .......................................... JA 205

Statement of Commissioner Allison Herren Lee (Aug. 21, 2019) ........ JA 206

Commission Interpretation and Guidance Regarding the Applicability of the Proxy Rules to Proxy Voting Advice, 84 Fed. Reg. 47,416 (Sept. 10, 2019) ............................................................................... JA 214

Paul Rose Comment (Nov. 14, 2019) ................................... JA 219

Proposed Rule (Dec. 4, 2019) .............................................. JA 232

**Volume 2**

Garmin Comment (Jan. 27, 2020) ....................................... JA 274

CII Comment (Jan. 30, 2020) .............................................. JA 277

ISS Comment (Jan. 31, 2020) .............................................. JA 342

Chamber of Commerce Comment (Jan. 31, 2020) ................................ JA 431

Braemar Hotel Comment (Feb. 1, 2020) ................................................ JA 447

Florida State Board of Administration Comment (Feb. 3, 2020) ......... JA 502

**Volume 3**

National Association of Manufacturers Comment (Feb. 3, 2020) ........ JA 507

Center on Executive Compensation Comment (Feb. 3, 2020) ............. JA 526

ExxonMobil Comment (Feb. 3, 2020) ..................................................... JA 563

New York State Comptroller Comment (Feb. 3, 2020) ......................... JA 644

Ohio Public Employees Retirement System Comment (Feb. 3, 2020) ................................................................................................... JA 665

Colorado Public Employees Retirement System Comment (Feb. 3, 2020) ................................................................................................... JA 677

California Public Employees Retirement System (Feb. 3, 2020) ......... JA 689

Glass Lewis Comment (Feb. 3, 2020) ..................................................... JA700

CII Letter re Data Analysis (Feb. 4, 2020) ............................................ JA 778

**Volume 4**

Statement of Commissioner Allison Herren Lee (July 22, 2020) ........ JA 797

Final Rule (Sept. 3, 2020) ....................................................................... JA 808

District Court Hearing Transcript (July 27, 2022) ............................... JA 882



Garmin Ltd.
Mühlentalstrasse 2
8200 Schaffhausen
Switzerland
P: 41.52.630.1600  F: 41.52.630.1601

January 27, 2020


Vanessa A. Countryman
Secretary
Securities and Exchange Commission
100 F Street NE
Washington, DC 20549-1090

Re:     File No. S7-22-19: *Amendments to Exemptions from the Proxy Rules for Proxy Voting Advice*

Dear Ms. Countryman:

Garmin Ltd. appreciates the opportunity to provide comments to the Securities and Exchange Commission on File No. S7-22-19, Amendments to Exemptions from the Proxy Rules for Proxy Voting Advice (the "Proposed Rule").

For nearly 30 years, Garmin Ltd. and its subsidiaries (collectively, "Garmin") have pioneered new Global Positioning System (GPS) navigation and wireless devices and applications that are designed for people who live active lifestyles. Garmin serves five primary business units: automotive, aviation, fitness, marine, and outdoor recreation. Garmin reported gross revenue of over $3.3 billion in 2018, and we recently celebrated a milestone in delivering our 200 millionth product since the inception of the business.

Garmin Ltd.'s shares have traded on The Nasdaq Stock Market, LLC under the symbol "GRMN" since its initial public offering on December 8, 2000. Garmin Ltd.'s market capitalization is nearly $19 billion as of the date of this letter. We have a great appreciation for our shareholders, many of whom own their shares indirectly through their brokers or through their investments in large institutional funds.

Garmin understands that large institutional funds make investments in many different companies, and that it can be a challenge for them to fully process the proxy materials for each of the companies they invest in before deciding how to vote their shares. We believe proxy advisors can play a valuable role to streamline the process by helping those funds make informed voting decisions on behalf of their investors. Indeed, proxy advisors currently play such a major role in the proxy voting process that we believe they should be regulated to ensure the services and recommendations they provide are provided in a reliable, consistent, ethical and transparent manner.

There are inherent flaws in the way proxy advisory firms currently provide their services and recommendations, which have been well-documented. Examples include:

(1) Proxy advisory firms employ a rigid one-size-fits-all approach to corporate governance that does not consider differences in companies' businesses, markets, employees, philosophies, values and cultures;

1

(2) Proxy advisory firms have significant conflicts of interest (which we discuss in further detail below);

(3) Proxy advisory firms do not have fulsome, consistent and transparent processes in place to ensure that the information they publish has been reviewed for errors, misstatements, uninformed biases, and inaccuracies; and

(4) Proxy advisory firms facilitate "robo-voting" on behalf of their institutional investor clients, thereby completely cutting their clients out of the voting process and depriving companies a chance to engage in discussions with the them before their shares are voted. This uninformed process has the potential to negatively and unnecessarily impact the assets of many investors who rely on institutional investors to vote in an informed and thoughtful manner.

Accordingly, Garmin supports the core provisions of the Proposed Rule, and we are pleased that there is a momentum building to make sure proxy advisory firms are held accountable for their services and recommendations. However, in our view the Proposed Rule does not go far enough.

The proxy advisory space is dominated by two large providers, one of which has two sides to its business. One side provides proxy advisory services to institutional investors, and the other side offers fee-based consulting services to rated companies related to the very corporate practices on which the advisory side of the business makes voting recommendations. The conflict of interest between the two sides of the business is obvious. The conflict is self-serving and could negatively impact investors. Permitting the conflict to remain in place so long as it is disclosed won't mitigate the impacts of the conflict and potential harm to investors.

Garmin believes proxy advisory firms should not be allowed to have that conflict of interest *at all*, whether disclosed or not. It seems doubtful that institutional investors using advisory services will have the time to carefully read and evaluate disclosures about conflicts of interest. Furthermore, institutional investors using "robo-voting" to automatically vote their shares in accordance with the proxy advisory firm's recommendations likely won't see the disclosures before their shares are voted.

In Garmin's case, the consulting side of one of the two large proxy advisory firms assigns ratings on matters such as environmental, social and governance (ESG). Ratings are often influenced by a lack of understanding, faulty assumptions, inaccurate information, biases, or one size fits all approaches. The resulting ratings are used as a tool to sell consulting services to purportedly fix the ratings. The firm is unwilling to provide us any constructive information or details about our ratings unless we pay them a large fee.

This raises some serious concerns and questions, such as:

(1) Is the consulting side of the business incentivized to provide low ratings in order to help sell their services? Are they incentivized to provide improved ratings after a company pays for their services?

(2) Is a company that declines to engage the consulting services side of a firm's business treated fairly by the proxy advisory side of the firm when that side of firm is making its voting recommendations? Conversely, do companies that engage the firm to provide consulting services get favorable treatment by the

voting recommendations side of the firm's business? How could anyone ever know for certain?

(3) We have noticed that in some instances the consulting side of a firm's business rated us poorly on governance and compensation practices (much to our surprise and contrary to all available evidence, and for reasons they wouldn't divulge unless we agreed to pay them a large fee), while at the same time the proxy advisory side of the business recommended that shareholders vote *for* all of our governance and compensation related proposals. If there is no correlation at all between a firm's ratings and their voting recommendations, as seems to be the case for Garmin, then what does that say about the reliability or sincerity of the ratings and/or the voting recommendations?

We respectfully urge the Commission to consider requiring firms to separate their proxy advisory businesses from their consulting businesses. In our view, these businesses should not be permitted to be provided by the same firm.

In addition, we encourage the Commission to consider whether firms that provide ESG ratings and reports should be subjected to oversight and regulation, as a follow on to the Proposed Rule. There are an abundance of firms that provide ESG rankings, but they operate without any standards. Shareholders have no clear and consistent way to judge if a company is doing a good job or not. This leads to further confusion and misunderstandings about the impact a company has on society.

* * * * *

Garmin applauds the SEC for proposing a rule to reform the proxy solicitation rules and institute targeted oversight of and reforms to the practices of proxy advisory firms. We support the core principles of the Proposed Rule, and we encourage you to also consider taking the additional steps of (1) requiring proxy advisory firms to separate their voting recommendations business from their consulting business, and (2) evaluating whether firms that provide ESG reports and ratings should also be accountable and subjected to SEC oversight and regulation.

Thank you for considering our comments.

Sincerely,

Clifton A. Pemble
President and Chief Executive Officer



January 30, 2020

Vanessa A. Countryman
Secretary
Securities and Exchange Commission
100 F Street NE
Washington, DC 20549

*Re: File No. S7–22–19*

Dear Madam Secretary:

The Council of Institutional Investors (CII), appreciates the opportunity to provide comments to the United States (U.S.) Securities and Exchange Commission (SEC or Commission) in response to proposed amendments to the federal proxy rules published on December 4, 2019, in SEC Release No. 34–87457, *Amendments to Exemptions From the Proxy Rules for Proxy Voting Advice* (Release).[1]

CII is a nonprofit, nonpartisan association of U.S. public, corporate and union employee benefit funds, other employee benefit plans, state and local entities charged with investing public assets, and foundations and endowments with combined assets under management of approximately $4 trillion. Our member funds include major long-term shareowners with a duty to protect the retirement savings of millions of workers and their families, including public pension funds with more than 15 million participants – true "Main Street" investors through their pension funds. Our associate members include non-U.S. asset owners with about $4 trillion in assets, and a range of asset managers with more than $35 trillion in assets under management.[2]

CII strongly opposes the Release in its entirety. We present a general summary of key issues in the Release (page 2), and then responses to the specific questions the SEC poses in the Release (page 6).

We sought to provide as much response to the SEC's questions as we could within the limited time provided for comments on the Release and the SEC's proposal to limit shareholder

---

[1] Amendments to Exemptions From the Proxy Rules for Proxy Voting Advice, Exchange Act Release No. 87,457, 84 Fed. Reg. 66,518 (proposed rule December 4, 2019), https://www.govinfo.gov/content/pkg/FR-2019-12-04/pdf/2019-24475.pdf (Release).

[2] For more information about the Council of Institutional Investors ("CII"), including its board and members, please visit CII's website at http://www.cii.org. We note that the two largest U.S. proxy advisory firms, Glass Lewis & Co. (Glass Lewis) and Institutional Shareholder Services (ISS), are non-voting associate members of CII, paying an aggregate of $18,000 in annual dues—less than 1.0 percent of CII's membership revenues. In addition, CII is a client of ISS, paying approximately $19,600 annually to ISS for its proxy research. In this letter, the terms "shareowner" and "shareholder" are used interchangeably.

proposals. (Both proposals were announced the same day and have the same limited comment period). We believe the two proposals together (1) are the most significant SEC attempt to limit shareholder rights since the Commission was created; (2) are fundamentally flawed and should be withdrawn so that the SEC can re-think key elements of the proposals and also spend time on credible cost-benefit analysis, should the Commission decide to re-propose changes; and (3) introduce substantial new complexity and micromanagement to proxy voting, while not addressing the major problems in the system.

The SEC poses a total of 345 questions in the two releases. We and 90 investors and investor organizations requested longer comment periods, but never received any response to these requests from the SEC.[3] Therefore, we submit these comments now in anticipation of the February 3 comment deadline. We would note that SEC staff has told us they would welcome comments after February 3 but were equivocal about when might be too late; we may offer further comment at a later date.

In addition to this letter, we anticipate filing an additional letter in coming days focused particularly on unsubstantiated claims of errors by proxy advisors.[4]

The following is a brief summary of our responses to some of the key issues raised in the Release.

**Proposed Codification of the Commission's Interpretation of "Solicitation" Under Rule 14a-1(1) and Section 14(a)**

We do not support the proposed codification of the Commission's interpretation of "solicitation." It is unclear to us and many legal experts that the SEC has the authority to regulate proxy advisors as solicitors under Section 14(a) of the Exchange Act. We believe this issue ultimately will be decided by the courts.

We also note that the proposed codification undergirds a new proposed regulatory framework that disrupts the existing proxy advisory business model. Most institutional investor clients of proxy advisors do not support the framework; the framework is not based on reliable evidence; and its implementation would not benefit investors generally, including Main Street investors.

---

[3] Letter from CII and 74 investors and investor organizations, Nov. 15, 2019, at
https://www.cii.org/files/issues_and_advocacy/correspondence/2019/11_15_19_SEC_request_for_comment_period_extension_final.pdf; and letter from CII and 16 additional investors and investor organizations, Nov. 22, 2019, at
https://www.cii.org/files/issues_and_advocacy/correspondence/2019/11_22_19_SEC_request_for_comment_period_extension_final.pdf.

[4] Related to this effort: On Nov. 7, 2019, CII requested that Securities and Exchange Commission (SEC) staff provide its underlying data used for Table 2 in the Release. In Table 2, the SEC staff described and categorized company claims of proxy advisor report errors. CII repeatedly re-requested this information after November 7, including through filing a Freedom of Information Act (FOIA) request. On Jan. 16, 2019 (70 days after our initial request and only 18 days before the end of the comment period for this proposal), SEC staff published a Memorandum with limited additional information. However, the SEC staff did not provide the key data sought by CII. See SEC Division of Economic and Risk Analysis, Memorandum Regarding Data Analysis of Additional Definitive Proxy Materials Filed by Registrants in Response to Proxy Voting Advice at
https://www.sec.gov/comments/s7-22-19/s72219-6660914-203861.pdf.

**Conflicts of Interest**

We generally support the proposed requirements to elicit disclosure of proxy voting advice businesses' conflicts of interest to its clients. We agree that conflict of interest disclosure is important for all major participants in the securities markets, including proxy advisors' businesses. We do not believe, however, that the SEC needs to create an elaborate and expensive (at least for investors) new regulatory structure to accomplish this.

We do not believe the Release provides reliable evidence indicating that the conflict of interest disclosures currently provided by proxy advisors are inadequate to meet the information needs of their institutional investor clients. Despite the lack of reliable evidence in the Release, we have historically supported and continue to support requiring proxy advisors to disclose details of potential conflicts in their research reports to clients. We generally believe the proposed requirements, subject to some modifications and enforced through existing SEC authority over registered investment advisors, could provide clients of proxy voting advice businesses with adequate and appropriate information about the proxy advisors' conflicts of interest when making their voting determinations.

**Registrants' and Other Soliciting Persons' Review of Proxy Voting Advice and Response**

We oppose the proposed required review and notice periods of proxy voting advice and response. We believe the proposed requirements would significantly and negatively impact the ability of institutional investors to obtain independent, timely, and cost-effective research and advice from our proxy advisors.

We also believe the proposed requirements are largely premised on the incidence of factual errors and methodical weaknesses in proxy voting advice businesses' analyses. The Release, however, fails to provide reliable evidence to support that premise.

Setting aside our strong principles-based objections, the rules as proposed are simply unworkable. If, despite our strong opposition, the Commission insists on a government-mandated review of proxy voting advice and response, we believe any requirements should include the following:

- To be eligible for review of draft proxy voting advice and response an issuer shall:
  - File the definitive proxy statement at least 50 calendar days before the shareholder meeting
  - Reimburse the proxy advisor for reasonable expenses associated with the required review and response
- The government mandate for the issuer management review and response period be limited to a maximum of two business days, with no "final notice" period (a proxy advisor could provide more time if it chooses)
- The government mandate for provision in advance of draft reports to subject issuer management be limited to factual information and data only (a proxy advisor could provide more if it chooses, notwithstanding that doing so would be contrary to the FINRA rules for analysts)

- The proxy advisor be permitted (if it chooses) to provide any such draft data report to clients at the same time it is provided to the issuer for review, as long as it is labeled a draft and as long as the proxy advisor and its clients subject to the SEC's jurisdiction do not execute votes during the draft review period
- The proxy advisor is eligible for a safe harbor from liability under Rule 14a-9 if it complies with the proposed requirements.

We believe a rule based on the stipulations above would produce far better outcomes than the rule as proposed in the Release. It would not worsen the very substantial time crunch challenges faced by our members and other investors in voting proxies (particularly during the spring proxy season), and would set a baseline for issuer review (as the Commission seeks in the Release), but leave room for firms to go beyond that baseline if there is market demand.

**Proposed Amendments to Rule 14a-9**

We do not support the proposed amendments to Rule 14a-9. We do not believe the Release provides a reliable basis for the assertion that proxy advice business reports lack clear disclosure when they use criteria that differs from the criteria approved or set by the Commission. We include three examples as appendices to this letter that support our view.

**Transition Period**

We support revising the proposed "one-year transition period after the publication of a final rule in the Federal Register" to at least an 18-month transition period after the publication of a final rule in the Federal Register. The proposed revision is intended to address concerns about limited time and resources for transition during the spring proxy season.

**General Considerations**

We support permitting, but not requiring, smaller proxy voting advice businesses from complying with the proposed amendments. More specifically, we would propose that proxy advisors that have annual gross receipts in an amount that is not more than $5,000,000, and/or that are 501(c)(3) organizations, be exempt from the proposed additional conditions to the exemptions.

**Economic Analysis**

We believe the provisions of the Release are anti-market, and would damage integrity and quality of proxy voting and impose a potentially substantial net cost on investors for at least four reasons.

First, CII staff performed a detailed review of the alleged errors in proxy voting advice business research reports and found a factual error rate on a report basis of 0.057 to 0.123%. We believe an error rate of that magnitude does not provide a reliable basis for imposing a costly new regulatory framework that will constrain competition.

We note that the only quantitative evidence presented in the Release on the reliability of voting advice is a table that provides data of registrant allegations of errors. SEC staff members told us that they made no effort to verify the company assertions. Even assuming the accuracy of company assertions and the SEC's classification of complaints (about which the SEC declined to show its work), the number of possible factual errors identified by companies in their proxy supplements amounted to 0.3% of proxy reports. Despite repeated CII staff requests, the SEC declined to provide us and other market participants with all of the underlying information the SEC used to generate the table. Thus, we and other commentators are unable to judge the accuracy of the allegations as classified by the SEC (although we anticipate submitting a supplemental letter doing our best, with the limited information provided by the SEC, to examine SEC claims about issuer claims in 2018).

Second, even assuming the Commission believes a 0.3% error rate for proxy voting advice business research reports is too high and should be reduced, the proposed timeframe available for the proxy voting advice businesses to undertake their research and draft their recommendations, and, importantly, for institutional investor clients to review the advice, would generally decrease. Institutional Shareholder Services (ISS) estimates a decrease of nine to 13 calendar days; it says that on average it currently delivers reports just under 20 days in advance of meetings. We believe this shorter timeframe would reduce the reliability and completeness of voting advice, and substantially damage the ability of investors to consider proxy voting issues with the benefit of proxy voting advice that they pay for. The SEC also is proposing requirements for early filing of proxy statements ostensibly to create more time for review of proxy voting issues, but the SEC did not provide adequate justification for the dates it chose, and we believe this "incentive" will be ineffective as proposed by the Commission.

Third, the SEC rules will damage the independence of proxy voting advice. We note that the shorter time frame is largely created by the proposed requirements for proxy voting advice businesses to share draft research reports with companies for a review and feedback period. We believe that those requirements likely violate the First Amendment of the U.S. Constitution (the First Amendment). The requirements impair the independence of the proxy advisor research for at least two reasons: (1) the proxy advisor is required to seek review and receive feedback from the self-interested company *before* sharing the draft report with their own paying institutional investors clients; and (2) the proxy advisor advice to clients is subject to heightened liability to the issuer under SEC Rule 14a-9. We believe the impairment of the independence of the proxy advisor would reduce the reliability and completeness of voting advice.

Fourth, the highly prescriptive and expensive regulatory approach taken by the Commission is almost certain to damage the market for proxy voting advice, serving as a formidable barrier to entry and potentially putting out of business some firms identified by the SEC as existing proxy advisors. The market itself is an important source of pressure for accuracy and quality in proxy advisor reports. Our members generally would like to have more than two dominant providers, not fewer. The Release seems to entirely ignore the value of market-based solutions, and overvalues highly prescriptive regulation.

We do not possess the data necessary to determine all of the costs resulting from the proposed requirements of the Release. However, we understand that at least two of the proxy voting advice

businesses have indicated that the SEC has substantially understated the costs. One of those businesses estimated that the burden imposed by the provisions would be 240x the Commission's estimate.

The direct costs borne by proxy voting advice businesses resulting from the provisions of the Release would inevitably have to be passed on to their institutional investor clients and the beneficiaries of those client's funds, including pension fund beneficiaries and other Main Street investors.

For those proxy voting advice businesses that do not currently have any issuer review procedures and processes in place, it is understandable that those businesses would be disproportionally affected by the provisions of the Release. We support measures to mitigate the effects on those businesses. For example, we would exempt businesses that do not routinely issue research reports to clients in advance of shareholder meetings.

**Initial Regulatory Flexibility Analysis**

We believe that there are a number of small proxy voting agents and research providers that have not been identified in the Release, but are likely to come within the broad sweep of the proposal. We also believe the cost to those firms as a result of the provisions of the Release will likely be significant and potentially cause some or all to exit the business. The SEC should have done additional analysis on smaller firms before making the proposal, including engaging with them about their business models and the impact on their business of potential regulatory schemes (which we understand the SEC did not do at all).

**\*\*\*\***

Our detailed responses to the requests for comment in the Release are set forth below. The SEC questions to which we are responding appear in italics.

*I. Proposed Codification of the Commission's Interpretation of "Solicitation" Under Rule 14a-1(1) and Section 14(a)*

*SEC Request for Comment 1. Should we codify the Commission interpretation on proxy voting advice and the Commission view about unprompted requests for proxy voting advice? Would the proposed codification (adding paragraph (A) to Rule 14a–1(l)(iii) and paragraph (v) to Rule 14a–1(l)(2)) provide market participants with better notice as to the applicability of the federal proxy rules?*

*CII Response*. CII does not believe that the SEC should codify the Commission interpretation on proxy voting advice. Codifying the Commission's interpretation creates a new proxy voting advice regulatory framework that (1) most of the institutional investor clients of proxy voting advice businesses do not want and have not asked for,[5] and (2) is based on a questionable

---

[5] *See, e.g.,* Letter from Kenneth A. Bertsch, Executive Director, Council of Institutional Investors et al. to The Honorable Jay Clayton, Chairman, Securities and Exchange Commission 3 (Oct. 15, 2019), https://www.cii.org/files/issues_and_advocacy/correspondence/2019/201910015proxy_advisor_sign_on_final.pdf

interpretation about the SEC's authority to regulate proxy advisors as solicitors under the federal proxy rules.[6]

### _The SEC Lacks the Authority to Regulate Proxy Advisors as Solicitors_

Proxy solicitation is different than proxy advice. Proxy solicitors generally play an advocacy role, requesting proxies as, or on behalf of, an interested party, the company or a shareholder proponent. In contrast, proxy advisors have no stake in the outcome and are hired by shareholders to give objective advice as a disinterested party.

The proposal depends on treating proxy advisors as if they were engaged in proxy solicitation and then, because they are not, affording them an exemption if they satisfy conditions that would impair their independence and harm investors. In our view, there is no economic or legal basis for this approach.

Institutional investors solicit research, analysis and recommendations from proxy advisors, and pay for those services. The SEC believes that because proxy advisors market their services to institutional investors, "solicitation" of business somehow makes their work product proxy solicitation. In competitive free markets, firms do market their services; this is a key element in how most markets work.

We believe from our members that there is clear market demand for proxy advisory services even beyond vote execution, as the cost of proxy voting analysis would be vastly more expensive if done from scratch by each investor individually. Proxy advisors make efforts to sell their service offerings mainly because they are competing with each other.[7]

As Nell Minow, an expert on corporate governance and the proxy advisor industry, has commented.

> The reference to proxy solicitation rules is so inapposite as to be absurd. The proxy solicitation rules are a safeguard against the advocacy of parties with a clear incentive to provide only one side of the story on matters that are fundamental to a company's continuing operations and structure. Proxy advisors are independent third parties who sell a product no one has to buy with recommendations no one has to follow.[8]

(letter signed by a coalition of investors confirming that "[t]he experience of the investor community with proxy advisors has developed over decades and has been positive[] [and] there is no current call from the investment community for regulatory intrusion on proxy advisors' business.") (CII October 15 Letter).

[6] _See, e.g.,_ Richard A. Kirby et al., A Step Too Far: The SEC's Attempt to Regulate Proxy Advisory Services Violates the First Amendment, R|K Invest Law, PBC 1 (Jan. 2020) (on file with CII) (commenting that the interpretation "reverses years of interpretation and industry understanding , and conflicts with the regulatory exemption for proxy advisory firms imbedded into the proxy rules themselves.")

[7] Ironically, if new SEC regulations create a monopoly provider, as we think is possible, it may no longer be necessary for that monopoly provider to market its services, and the SEC would lose a key linchpin for its attempt to define proxy advice as "solicitation."

[8] Ted Allen & Gary LaBranche, A "Draft Review" as a Safeguard on Proxy Advisors, Harv. L. Sch. F. on Corp. Governance (May 18, 2019), https://corpgov.law.harvard.edu/2019/05/18/roundtable-on-proxy-voting-process/ (comment by Nell Minow posted June 3, 2019).

A letter endorsed by 62 prominent academics, led by Stanford Graduate School of Business Professor Anat Admati and University of Chicago Booth School of Business Professor Luigi Zingales (Admati Letter), states that they believe the Commission should not "treat[] opinions on proxies as proxy solicitations."[9]

The Release acknowledges that the "breadth of the Commission's definition of a solicitation could raise questions."[10] The Investor-as-Owner Subcommittee of the SEC Investor Advisory Committee (IAC) recommendation addressing the Release (IAC Recommendation) indicates that it not only raises questions but raises "confusion among many investors."[11]

In addition to questions and confusion, the SEC's overly broad interpretation of solicitation is an element of litigation against the SEC in the United States District Court for the District of Columbia (Federal Court).[12] The complaint, filed by Institutional Shareholder Services (ISS), alleges, among other claims, that "SEC's Historic Interpretation of 'Solicit' Under Section 14(a)[13] Of The Exchange Act Has Never Applied To Proxy Vote Recommendations and Analysis Furnished in The Course Of A Fiduciary Relationship."[14] While the litigation is currently in abeyance,[15] it is unclear to us whether the Federal Court ultimately will agree with the Commission that Section 14(a) applies to proxy advisors whose activities are not intended to solicit proxies and who do not solicit proxies, but instead provide advice requested and contracted for by institutional investor clients.

---

[9] Letter from Anat Admati, George G.C. Parker Professor of Finance and Economics, Stanford Graduate School of Business et al. to Chairman, Jay Clayton, Securities and Exchange Commission et al. at 1 (Jan. 15, 2020) https://www.sec.gov/comments/s7-22-19/s72219-6668185-203962.pdf.

[10] Release at 66,518.

[11] *See, e.g.,* Recommendation of the Investor-as-Owner Subcommittee of the SEC Investor Advisory Committee (IAC), Relating to SEC Guidance and Rule Proposals on Proxy Advisors and Shareholder Proposals 2 (Jan. 16, 2020), https://www.sec.gov/spotlight/investor-advisory-committee-2012/iac-recommendation-proxy-advisors-shareholder-proposals.pdf.

[12] Complaint for Institutional Shareholder Services at 10-14, ISS v. SEC (Case 1:19-cv.-03275) (filed Oct. 31, 2019), https://www.issgovernance.com/file/duediligence/iss-oct-31-2019-complaint.pdf ("The SEC's Historic Interpretation Of "Solicit" Under Section 14(a) Of The Exchange Act Has Never Applied To Proxy Vote Recommendations And Analysis Furnished In The Course Of A Fiduciary Relationship. The complaint also includes three counts of claims for relief under the Administrative Procedure Act. *Id.* at 19-24.

[13] Proxies, 15 U.S.C. § 78n(a) (1934), *available at* https://www.law.cornell.edu/uscode/text/15/78n.

[14] Complaint for Institutional Shareholder Services at 10; *see* Letter from Lorraine Kelly, Head of Governance Business, ISS to Valued Client (Jan. 16, 2020) (on file with CII) ("ISS will be submitting its own comments on the proposed rule and a key point we will be making is that there is no legal basis for any aspect of the rulemaking because Congress never authorized the SEC to regulate proxy advisers as solicitors under the proxy rules.").

[15] *See* Letter from Gary Retelny, President & CEO, Institutional Shareholder Services to Valued Client (Jan. 20, 2020), http://app.info.issgovernance.com/e/es?s=575090836&e=46591&elqTrackId=8e31b9354d51459d861cf78d47de138a&elq=49cebd6329f74d3886b099241bfa1804&elqaid=2709&elqat=1 ("ISS . . . agreed to a temporary stay in this case in light of the SEC's representations that the guidance does not have the force and effect of law and will not be invoked while the litigation is stayed."); *see also* Cydney Posner, SEC Calls "TimeOut" on Proxy Advisor Guidance and ISS Litigation, CooleyPubCo (Jan. 30, 2020), https://cooleypubco.com/2020/01/30/time-out-on-proxy-advisor-guidance-iss-litigation/ ( "the SEC has now filed an Unopposed Motion to Hold Case in Abeyance, which would stay the litigation until the earlier of January 1, 2021 or the promulgation of final rules in the SEC's proxy advisor rulemaking [and] . . . companies should *not* expect proxy advisory firms to feel compelled to comply with the SEC interpretation and guidance, including advice to proxy advisors to provide certain disclosures . . . .").

In commenting on the lawsuit, one prominent corporate law firm recently has opined that: "The Commission surely expects that any final rule is destined for the U.S. Court of Appeals for the D.C. Circuit, a venue that has not always been receptive to Commission rulemakings. Expect this rulemaking to be a difficult one."[16]

### *Most Institutional Investor Clients of Proxy Advisors Do Not Support the Proposed New Regulatory Framework*

As indicated, most of the paying customers of proxy voting advice businesses —institutional investors—have not asked for and do not support the SEC establishing a new regulatory framework and forcing a significant change to the industry's business model.[17] While omitted from the Release, we believe it is highly relevant that at the end of the SEC's November 15, 2018, public roundtable on the proxy process (Roundtable) when the SEC staff asked: "Is there anyone on the panel that thinks there should be additional regulation?"[18] No panelist—including those speaking on behalf of the corporate community—voiced any need for new regulations of proxy advisory firms.[19]

One of the panelists at the Roundtable was Patti Brammer, Corporate Governance Officer, Ohio Public Employees Retirement System (OPERS) and a current CII board member.[20] Consistent with her comments at the Roundtable,[21] an OPERS letter in response to the Release (OPERS Letter) stated:

---

[16] Ropes & Gray, Alert, SEC Proposes Amendments to Regulate Proxy Voting Advice and Modernize the Shareholder Proposal Rules (Nov. 11, 2019), https://www.ropesgray.com/en/newsroom/alerts/2019/11/SEC-Proposes-Amendments-to-Regulate-Proxy-Voting-Advice-and-Modernize-the-Shareholder-Proposal-Rule?utm_source=alert&utm_medium=email&utm_campaign=SEC-Proposes-Amendments-to-Regulate-Proxy-Voting-Advice-and-Modernize-the-Shareholder-Proposal-Rule.

[17] *See, e.g.,* CII October 15 Letter at 3.

[18] U.S. Securities and Exchange Commission, Roundtable on the Proxy Process Transcript 250 (Nov. 15, 2018), https://www.sec.gov/files/proxy-round-table-transcript-111518.pdf (SEC Staff Michelle Anderson).

[19] *See id.* at 250-57; *see generally* Securities Exchange Board of India, Report of Working Group on Issues Concerning Proxy Advisors-Seeking Public Comment 17 (July 29, 2019), https://www.sebi.gov.in/reports/reports/jul-2019/report-of-working-group-on-issues-concerning-proxy-advisors-seeking-public-comments_43710.html ("It is difficult to justify taking [regulatory] action to limit . . . [proxy advisory firm] influence if that influence exists mostly in the mind of companies."); Matt Egan, Corporate America Loves Deregulation. Then Why Is It Pushing For These Rules?, CNN Bus., Mar. 29, 2019, https://www.cnn.com/2019/03/29/investing/regulation-proxy-advisory-reform-sec/index.html (commenting that some "say business groups are going after proxy advisers to silence shareholders by cutting them off from rigorous research needed to scrutinize gaudy pay packages and evaluate complicated proposals on topics such as climate change and minimum wage hikes"). Notably, the SEC release for its proposal to amend Rule 14a-8 prominently describes (in a labeled subsection) the November 2018 roundtable discussion on shareholder proposals. In that roundtable panel on shareholder proposals, some participants articulated views that could be seen as broadly consistent with the SEC's subsequent November 5, 2019, proposals on that issue. None of the participants in the separate roundtable panel on proxy advisors supported additional regulation of proxy advisors, as the SEC has proposed in the Release. It is striking that the Release consigns the roundtable panel discussion to indirect (at most) reference in a footnote, suggesting bias in the Release presentation.

[20] U.S. Securities and Exchange Commission, Roundtable on the Proxy Process Transcript at 8.

[21] *Id.* at 238 ("In terms of whether additional regulation is needed, I would just offer, it has not been our experience that there's a compelling need for additional regulation.").

> In spite of . . . pleas from institutional investors, the Commission has chosen to release a proposed rule. . . . [T]here is at least a threat that the Commission's proposal and preceding guidance "opens the door to . . . potential claims by issuers who disagree with the client voting guidelines…"
>
> . . . Frustratingly, the SEC has proposed these sweeping changes to the business relationships between PAFs and their clients based on a minimal amount of evidence, and instead has relied on speculation and anecdotes to draw and support its conclusions.[22]

Another of the Roundtable panelists was former Committee on Banking, Housing, and Urban Affairs (Banking Committee) Chairman, and current Visiting Scholar at the American Enterprise Institute, Phil Gramm.[23] In testimony at a post-Roundtable Banking Committee hearing, Senator Gramm said:

> [M]y dealings with proxy advisors basically have been good. I think they listen [and] . . . the problem is not proxy advisors.[24]

Moreover, additional regulation of proxy advisory firms appears to be in direct conflict with the views and priorities of the SEC's own Investor Advocate Rick Fleming.[25] In an April speech, Mr. Fleming stated:

> In my view . . . the simple fact of the matter seems to be that proxy advisors have given asset managers an efficient way to exercise much closer oversight of the companies in their portfolios, and those companies don't like it. That's understandable, and it is also understandable that companies, rather than directly asking the SEC to suppress shareholder voting . . . would try to cloak their arguments under the mantle of investor protection. But the investors themselves— again, the ones paying for proxy advice—are not asking for protection. In fact, I keep hearing opposition from investors to proposals that might lead to interference in the proxy voting process.
>
> . . . .
>
> Again, no one is claiming that proxy advisors are perfect, but in light of all the important things that the Commission could spend its time on . . . I would

---

[22] Letter from Patti Brammer, Corporate Governance Officer, Ohio Public Employees Retirement System et al. to The Honorable Michael Crapo, Chairman, Committee on Banking, Housing, and Urban Affairs et al. 2 (Dec. 10, 2019) (on file with CII).

[23] U.S. Securities and Exchange Commission, Roundtable on the Proxy Process Transcript at 8.

[24] Transcript of Senate Banking, Housing and Urban Affairs Committee, hearing on The Application of Environmental, Social, and Governance Principles in Investing and the Role of Asset Managers, Proxy Advisors, and Other Intermediaries, Bloomberg Gov't 14 (Apr. 2, 2019) (registration required & on file with CII).

[25] Rick Fleming, Speech at The SEC Speaks in 2019: Important Issues for Investors in 2019 (Apr. 8, 2019), https://www.sec.gov/news/speech/fleming-important-issues-investors-2019.

respectfully suggest that imposing new regulations on proxy advisers should be given a low priority.[26]

## Proposed New Regulatory Framework Would Likely Harm Main Street Investors

We believe the Release, if adopted, would harm Main Street investors because it would likely increase litigation, staffing and insurance and other costs of proxy advisors. These costs are almost certainly going to be passed on to institutional investors and ultimately their underlying beneficiaries – who, by definition, are at least indirect Main Street investors through pension funds, mutual funds and ETFs in which they are invested.[27]

**Request for Comment 2.** *Does the proposed amendment inadvertently include certain communications made by proxy voting advice businesses or other parties, such as investment advisers, that should not fall within the definition of ''solicitation''? If so, which communications, and how? Are there any revisions that we should consider that would better address these concerns or provide greater clarity?*

**CII Response**. As indicated in our response to Request for Comment 1 (Response #1), the proposed amendment depends on collapsing the distinction between proxy solicitors and proxy advisors and essentially treating proxy advice as a proxy solicitation. We believe the breadth of the proposed definition of "solicitation," combined with the lack of a conceptual underpinning, makes it likely that the proposed amendment will inadvertently include a broad range of communications made by proxy voting advice businesses or other parties.

In our view, the attempt to distinguish whether communications fall within the definition of solicitation based on whether the communications "present significantly less risk to investor protection"[28] appears to be unworkable. But even accepting the distinction, the Commission has failed to provide reliable evidence indicating that the existing proxy advisor communications with their institutional investor clients presents a significant risk to investor protection to justify the proposed amendment.

**Request for Comment 3**. *For example, the proposed amendment seeks to distinguish proxy voting advice businesses from investment advisers who provide voting advice as part of a broader advisory business that already is subject to an array of investor protection regulations by referring to proxy voting advice that is marketed and sold separately from other forms of investment advice. Instead of the proposed approach, should we refer to proxy voting advice that*

---

[26] *Id.*

[27] *See* Letter from Nichol Garzon-Mitchell, Senior Vice President, General Counsel, Glass Lewis to Mr. Alex Goodenough, Desk Officer for the U.S. Securities and Exchange Commission, Office of Information and Regulatory Affairs, Office of Management (Jan. 7, 2019), https://www.sec.gov/comments/s7-22-19/s72219-6617071-202957.pdf?utm_source=1-23-20+-+Weekly+Governance+Alert+Vol+25+Issue+4&utm_campaign=1-23-20+-+Weekly+Governance+Alert+Vol+25+Issue+4&utm_medium=email ("The costs of these excessive paperwork burdens would be borne by proxy advisors and would inevitably have to be passed on to their institutional investor clients, who, in turn, may have to pass these costs on to their individual investor participants and beneficiaries."); CII October 15 Letter at 2 ("increased litigation, staffing and insurance costs that are almost certainly going to be passed on to institutional investors and their underlying retail clients").

[28] Release at 66,523.

*is marketed as a ''standalone service''? What would be the advantages and disadvantages of this approach? Would any further clarification of ''standalone services'' be required?*

**CII Response**. We have no response on this request for comment, except to note that commentators would be in a better position to comment if the SEC defined "standalone services" in the Release. We do not believe this term is used except in this request for comment.

**Request for Comment 4.** *Is there a different, more appropriate way of distinguishing proxy voting advice from other forms of investment advice?*

**CII Response**. As indicated in Response #1 and Response #2, we do not believe there is an appropriate way to distinguish proxy voting advice from other forms of investment advice as a result of the breadth of the proposed solicitation definition.

**Request for Comment 5.** *Should the proposed amendment be expanded to specify any other type of activity as constituting a solicitation?*

**CII Response**. We do not believe the proposed amendment should be expanded. See Response #1 and Response #2.

**Request for Comment 6**. *Should the proposed amendment clarifying that proxy voting advice provided by a person only in response to an unprompted request from his or her client be limited to persons who are registered broker-dealers or investment advisers? Should there be other limits on the types of persons who should fall outside the definition of a solicitation?*

**CII Response**. As indicated in Response #1, the proposed amendment should be limited to persons who solicit proxies. Those who provide proxy voting advice should fall outside the definition of a solicitation.

## II. Conflicts of Interest

**Request for Comment 7.** *Is the text of proposed Rule 14a–2(b)(9)(i) sufficient to elicit appropriate disclosure of a proxy voting advice business's conflicts of interest to its clients? Are there other examples of conflicts of interest that the Commission should take into account in considering the text of proposed Rule 14a–2(b)(9)(i)? Is the principles-based requirement in Rule 14a–2(b)(9)(i)(C) sufficient to capture material information about conflicts of interest not otherwise included within the scope of paragraphs (9)(i)(A) and (B)? Is there additional material information that should be required?*

**CII Response**. We support the intent of the text of proposed Rule 14a– 2(b)(9)(i) to elicit disclosure of proxy voting advice business's conflicts of interest to its clients (which we believe is sufficient). We agree that conflict of interest disclosure is important for all major participants in the securities markets, including proxy voting advice businesses.[29]

---

[29] *See* Recommendation of the Investor-as-Owner Subcommittee of the IAC, Relating to SEC Guidance and Rule Proposals on Proxy Advisors and Shareholder Proposals at 3 ("We agree that conflict of interest disclosure is important for all major participants in the securities markets, including proxy advisors").

At the outset, we believe the Release does not provide reliable evidence indicating that the conflict of interest disclosures currently provided by proxy voting advice businesses are inadequate to meet the information needs of the primary customer of proxy advisors— institutional investors. For example, Patti Brammer of OPERS stated at the Roundtable that:

> [O]ur experience has been that yes, the conflict disclosure is very easy to understand. It's not boilerplate language. It does provide sufficient detail, and it is an element that we use and consider. But again, ultimately our own guidelines and policy are going to be what drives our voting decision.[30]

We also generally agree with the Roundtable comments of Adam Kokas, Executive Vice President, General Counsel, and Secretary, Atlas Air World, who as an issuer representative said:

> I think the disclosure in the reports has gotten a lot better. . . . For a company like ours, while it is somewhat of an issue for us, things like voting recommendations . . . are a lot more important to us.[31]

Despite the lack of reliable evidence in the Release that the proxy advice business's conflicts of interest disclosure needs to be improved, we have historically supported and continue to support requiring proxy advisors to disclose details of potential conflicts in the applicable research reports.[32]

We note that ISS does not disclose details of potential conflicts in its research reports because of concerns about its potential impact on the firewalls it uses to prevent conflicts of interest with its consulting business.[33] We understand and appreciate ISS's concern, but on balance continue to support the transparency resulting from requiring proxy advisory firms to disclose details of potential conflicts in their research reports.

We do not believe that the SEC needs to create an elaborate and expensive (for investors) new regulatory structure to accomplish this. This issue appears to apply only or mainly to ISS, which already is regulated as a registered investment advisor.

In response to the last question on additional material information that the SEC should require: If the SEC mandates that proxy advisors provide issuer management with the opportunity to pre-

---

[30] U.S. Securities and Exchange Commission, Roundtable on the Proxy Process Transcript at 212.

[31] *Id.* at 214.

[32] *See, e.g.,* Examining the Market Power and Impact of Proxy Advisory Firms; Hearing Before the Subcomm. on Capital Mrts. & Gov't Sponsored Enters. of the Comm. on Fin. Servs., 113th Cong. (June 5, 2013) (Statement of Ann Yerger, Exec. Dir., CII at 4), https://www.cii.org/files/publications/misc/06_05_13_cii_proxy_advisor_hearing_submission_ann_yerger.pdf ("CII believes that proxy advisory firms should . . . disclose details of potential conflicts, including those involving companies or resolution sponsors, in the applicable meeting report").

[33] *See* Release at 66,527 n.91 ("ISS has stated that it maintains a strict firewall between itself and its subsidiary, ICS, in order to control the risk that a conflict of interest might jeopardize the independence of its proxy voting advice business."); Recommendation of the Investor-as-Owner Subcommittee of the SEC, Relating to SEC Guidance and Rule Proposals on Proxy Advisors and Shareholder Proposals at 10 ("For example, their staff may be better prevented from engaging in conflicted behavior if the policies and procedures were not widely available.").

review reports, analysis and recommendations, it is essential that the Commission consider principles-based or prescriptive rules governing how the proxy advisor manages the conflict of interest created by such review by the subjects of the reports, analysis and recommendations.

Issuer executives have substantial interests at stake in shareholder meeting agenda items, such as votes on executive compensation and on equity compensation plans, and on election of directors. It is imperative that proxy advisors carefully manage conflicts of interest that arise from pre-publication review by the subjects of the research. The issues would be less severe if drafts are concurrently provided to clients (so changes resulting from pressure from issuer management are transparent), and/or if the review is of facts only. We discuss this further in Response #22.

***Request for Comment 8.*** *Would the proposed disclosures provide clients of proxy voting advice businesses with adequate and appropriate information about the businesses' conflicts of interest when making their voting determinations?*

**CII Response**. We generally believe the proposed disclosures, subject to the modifications described below, could provide clients of proxy voting advice businesses with adequate and appropriate information about the businesses' conflicts of interest when making their voting determinations.

We believe at least two modifications to the proposed requirements are necessary. First, we would not require that every research report include a disclosure of *"[a]ny policies and procedures* used to identify, . . . any such material conflicts of interest arising from such interest, transaction, or relationship."[34] We believe such a provision is overly broad and may in fact detract from the more important conflict information currently provided by proxy advisors.

Second, we have some concerns about the overly broad language for determining whether an entity is a "registrant, another soliciting person, shareholder proponent, or affiliates" of the proxy voting advice business.[35] We believe the cost of this provision may exceed the benefits of any resulting disclosure.[36] We, therefore, believe the Commission should work with the affected proxy voting advice businesses to develop a narrower, more cost-effective, definition of affiliates for purposes of the proposed requirements.

***Request for Comment 9.*** *To what extent do existing disclosures address the concerns discussed in this release? What additional information may be required to ensure that they provide clients with the information clients need?*

---

[34] Release at 66,526 (emphasis added).

[35] *Id.* at 66,558.

[36] *See* Letter from Nichol Garzon-Mitchell, Senior Vice President, General Counsel, Glass Lewis to Mr. Alex Goodenough, Desk Officer for the U.S. Securities and Exchange Commission, Office of Information and Regulatory Affairs, Office of Management and Budget (Jan. 7, 2019), https://www.sec.gov/comments/s7-22-19/s72219-6617071-202957.pdf?utm_source=1-23-20+-+Weekly+Governance+Alert+Vol+25+Issue+4&utm_campaign=1-23-20+-+Weekly+Governance+Alert+Vol+25+Issue+4&utm_medium=email (Glass Lewis commenting that the Securities and Exchange Commission Paperwork Reduction Act analysis "contains no discussion or estimates of basic elements of how the proposed rules would affect proxy advisors, such as - 1. How many conflict disclosures would have to be made a year and how many burden hours it would take proxy advisors to identify and disclose those conflicts in accordance with the rules").

***CII Response***. As indicated in Response #7, while we believe the existing disclosures generally address the concerns discussed in the release, we generally support the proposed disclosures.

***Request for Comment 10.*** *Is there specific information, whether qualitative or quantitative, about proxy voting advice businesses' conflicts of interest that they should be required to disclose? For example, should proxy voting advice businesses be required to disclose the specific amounts that they receive from the relationships or interests covered by the proposed conflicts of interests disclosures?*

***CII Response***. We do not believe that proxy voting advice businesses should be required to disclose the specific amounts that they receive from the relationships or interests covered by the proposed conflicts of interest disclosures. As indicated in Response #7, there is no reliable evidence indicating that institutional investor clients believe that level of detail is necessary in all circumstances. To the extent that investors want this information, they are at liberty to seek it from the proxy advisory firm(s) they hire, and make it a condition for hiring a proxy advisor.

***Request for Comment 11.*** *Would requiring specific disclosure of this sort raise competitive or other concerns for proxy voting advice businesses? For example, would the proposed disclosures be incompatible with firewalls or other mechanisms used by proxy voting advice businesses to prevent conflicts of interest from affecting the advice these businesses provide?*

We generally agree with the Commission that "some proxy voting advice businesses may have compelling and legitimate reasons for limiting the dissemination" of disclosure of conflicts of interest. [37] This is particularly true for the argument that this disclosure will compromise the firewall to prevent conflicts of interest. However, we believe this valid concern and cost is outweighed by benefit to readers of proxy advisor reports having easy and immediate access to information on conflicts of interest.

Some concerns on these disclosures may be heightened to the extent the requirements mandate the widespread distribution of the specific disclosures to thousands of clients "in its proxy voting advice." [38] Again, though, on balance we support requiring proxy advisors to disclose details of potential conflicts in their research reports to clients. However, we would not object to the SEC permitting the proxy voting advice businesses flexibility in the vehicle used to disseminate the disclosures to clients if the Commission believes such flexibility is appropriate to limit the competitive or other concerns that could accompany the widespread distribution of the information.

***Request for Comment 12.*** *What information would be most relevant to an investment adviser or other client of a proxy voting advice business in seeking to understand how the proxy voting advice business identifies and addresses conflicts of interest?*

***CII Response***. See Response #8.

---

[37] Release at 66,527 n.91.
[38] *Id.* at 66,558.

***Request for Comment 13.*** *Do proxy voting advice businesses consult on particular matters where their input influences the substance of the matter to be voted on (e.g., providing consulting services to a hedge fund with respect to transformative transactions, such as a proxy contest where the fund is presenting a competing slate of directors)? If so, what type of disclosure would help investors to understand the proxy voting advice business's role and potential conflicts of interest regarding these situations? Is the text of proposed Rule 14a–2(b)(9)(i) sufficient to elicit disclosure of material conflicts of interest of this type?*

***CII Response***. We are not aware of proxy voting advice businesses providing consulting services to a hedge fund, or other institutional investors, with respect to transformative transactions or similar matters, such as a proxy contest where the fund or other investor is presenting a competing slate of directors. However, we generally believe that if such a relationship did exist at a proxy voting advice business, proposed Rule 14a-2(b)(9)(i) would elicit sufficient disclosure about potential conflicts of interest regarding this type of matter.

***Request for Comment 14.*** *Currently, Rule 14a–2(b)(3) requires disclosure to the recipient of the voting advice of ''any significant relationship'' with the registrants and other parties as well as ''any material interests'' of the advisor in the matter. By contrast, disclosure under proposed Rule 14a–2(b)(9)(i) would be required only to the extent that the information would be material to assessing the objectivity of the proxy voting advice. Is the terminology in each provision sufficiently clear with respect to the types of relationships or interests that are covered by each requirement? For example, is there sufficient clarity on how to assess whether a relationship is ''material,'' or is additional guidance needed? Should we consider alternative thresholds or language for the proposed conflicts of interests disclosure requirement of Rule 14a–2(b)(9)(i)? If so, what language should we consider? As an alternative, should we use the same terminology as Rule 14a–2(b)(3)? Should we look instead to Item 404 of Regulation S–K, which requires disclosure of a ''direct or indirect material interest''? Is Item 5 of Schedule 14A, which requires disclosures of ''any substantial interest'' of the covered persons, an alternative that we should consider?*

***CII Response***. We generally believe the Commission should use the same terminology for disclosure thresholds as contained in current Rule 14a-2(b)(3). As indicated in Response #7, there is no reliable evidence in the Release indicating that institutional investor clients believe that the current terminology needs to be revised.

***Request for Comment 15.*** *Should proposed Rule 14a–2(b)(9)(i) limit the matters which a proxy voting advice business must disclose to those that occurred on or after a certain date, or is a more principles-based disclosure requirement preferable?*

***CII Response***. We generally believe a more principles-based disclosure requirement is preferable. As indicated in Response #7 there is no reliable evidence in the Release indicating that institutional investor clients believe the proposed Rule 14a–2(b)(9)(i) should explicitly limit the matters which a proxy voting advice business must disclose to those that occurred on or after a certain date.

***Request for Comment 16.*** *Proposed Rule 14a–2(b)(9)(i) is a principles-based requirement that does not specify the manner in which conflicts of interest should be disclosed, so long as the disclosure is included in the proxy voting advice business's voting advice and, if applicable, conveyed through any electronic medium that the proxy voting advice business uses in lieu of or in addition to a written report. Should proposed Rule 14a–2(b)(9)(i) be more prescriptive regarding the presentation of conflicts of interest disclosure, or is it preferable to let the proxy voting advice business and its client determine how this information will be presented to the client?*

***CII Response***. We generally do not support a more prescriptive requirement regarding the presentation of conflicts of interest disclosure. See Response #15.

***Request for Comment 17.*** *Is it important that the conflicts of interest disclosure required by proposed Rule 14a–2(b)(9)(i) be included in the proxy voting advice, or would providing it separately suffice?*

***CII Response***. See Response #11.

***Request for Comment 18.*** *To the extent that a proxy voting advice business uses a voting platform or other electronic medium to convey its voting advice, should we require that the conflicts of interest disclosure be conveyed in the same manner?*

***CII Response***. We believe that to the extent that a proxy voting advice business uses a voting platform or other electronic medium to convey its voting advice, the SEC should permit the conflicts of interest disclosure be conveyed in the same manner. See Response #11.

***Request for Comment 19.*** *Should we require the conflicts of interest disclosure that a proxy voting advice business provides to its clients be made public? If public disclosure were required, when and in what manner should the disclosures be released to the public? Would this raise competitive or other concerns for proxy voting advice businesses?*

***CII Response***. We believe requiring the conflicts of interest disclosure that a proxy voting advice business provides to its clients be made public is unnecessary and may increase the competitive or other concerns that could accompany the widespread distribution of the information. See Response #11.

***Request for Comment 20.*** *The proposed amendments are intended to promote consistency in the disclosures proxy voting advice businesses make about their conflicts of interest. Is the consistency of this information an important consideration?*

***CII Response***. We believe there may be some benefit to promoting consistency in the disclosures that proxy voting advice businesses make about their conflicts of interests. As noted in response #7, we have historically and continue to support disclosure in the research reports, in part, to provide some consistency in the location of the disclosures. However, as also indicated in Response #7 and Response #15, we believe that the conflict of interest disclosures that are

currently provided are generally meeting the information needs of institutional investor clients and, therefore, a principle-based approach to the proposed amendments is appropriate.

***Request for Comment 21.*** *Should we require proxy voting advice businesses to include in their disclosure to clients a discussion of the policies and procedures used to identify, as well as the steps taken to address, any conflicts of interest, as proposed? Do proxy voting advice businesses have sufficient incentive to include this disclosure on their own?*

See Response #8.

***Request for Comment 22.*** *What are the anticipated costs to proxy voting advice businesses and their clients associated with requiring additional conflicts of interest disclosure, as proposed? For example, what are the costs for proxy voting advice businesses to determine whether an entity is an affiliate of a registrant, another soliciting person, or shareholder proponent? Should we impose structural requirements (e.g., like the structural reforms in the global analyst research settlements) in addition to disclosure requirements?*

***CII Response***. See Response #8. In addition, we are struck by the reference in this request to the "structural reforms in the global analyst research settlements" ("Settlements"). As the Commission is aware, one result of the Settlements[39] was the subsequent enactment of FINRA Rule 2241, Research Analysts and Research Reports (FINRA Rule 2241). FINRA Rule 2241, which became effective in 2016 and "prohibits review of [an analyst's] research report by a subject company for purposes other than factual verification."[40]

We note that FINRA Rule 2241 appears to be in direct conflict with the Release's proposed requirement that the proxy adviser provide company management with a "copy of its proxy voting advice . . . for a review and feedback period" prior to the distribution of the final research report to its paying clients.[41] As SEC Commissioner Allison Herren Lee explained in her dissent to the Release:

> FINRA Rule 2241 promotes objective and reliable research by, among other things, seeking to limit any prepublication review by issuers to a verification of facts.
>
> By contrast, today's proposal isn't limited to a review of just the facts, and it doesn't just permit issuer review of proxy advisors' recommendations; it requires it. Issuers are given not one, but two opportunities to review each recommendation. We do this without even addressing the concerns expressed by investment advisers that

---

[39] *See* Ze'-ev Eiger & Anna T. Pinedo, Partners, Morrison & Foerster LLP, Teleconference Presenters: Final FINRA Research Rules 2-6 (Feb. 9, 2016), https://media2.mofo.com/documents/160202finraresearchrules.pdf (providing information demonstrating the relationship between the global analyst research settlements and FINRA Rule 2241, Research Analysts and Research Report.).

[40] Ze'-ev Eiger & Anna T. Pinedo at 19; *See* FINRA, 2241. Research Analysts and Research Reports §.05 (Dec. 24, 2015), https://www.finra.org/rules-guidance/rulebooks/finra-rules/2241(supplementary materials describing requirements for "**Submission of Sections of a Draft Research Reports for Factual Review**.").

[41] Release at 66,558 (§ 240.14a-2(9)(ii)(A)(1)).

greater issuer involvement would undermine the reliability and independence of voting recommendations.[42]

We believe this question is apt in discussing conflicts of interest, as the proposed requirement for a period for management review and feedback clearly will greatly expand a conflict of interest that to our knowledge is a problem now only for one proxy advisor (ISS), which voluntary provides some companies the opportunity to pre-review reports. We address this in Response #25 (page 24), but also comment here.

Inexplicably, the Release fails to request comment on whether the proposed requirement for registrants to review the proxy voting advice businesses' research reports should be subject to the reforms, including FINRA Rule 2241, resulting from the Settlements.[43] The omission is even more striking given SEC Chairman Jay Clayton's statement at the open meeting announcing the Release where he compared the services of proxy voting advice businesses to that of "research analysts."[44] We believe that before enacting a requirement for management pre-review of reports, the SEC should consider and explain how this requirement squares with a prohibition on the same thing by analysts under Rule 2241.

We would note also that credit rating agencies may provide precedents for how to handle conflicts of interest on pre-review from management of subject company reporting and analysis. We would note for SEC consideration a policy that has been enunciated, at least in the past, by Moody's Investors Service (MIS):

> Although Credit Rating Announcements may be provided to Issuers for such review, MIS retains ultimate editorial control over the form and content of all of its publications. As a result, Analysts may not accept changes from the Issuer that would alter the meaning or tone of the MIS opinion or the Credit Rating Announcement, except where such changes are necessary to correct factual errors or prevent the disclosure of confidential information. The Lead Analyst should inform the Issuer that the Issuer will only have a very limited amount of time for such review.[45]

---

[42] Commissioner Allison Herren Lee, Statement on Shareholder Rights (Nov. 5, 2019), https://www.sec.gov/news/public-statement/statement-lee-2019-11-05-shareholder-rights.

[43] Ze'-ev Eiger & Anna T. Pinedo at 19; *See* FINRA, 2241 at §.05 (supplementary materials describing requirements for "Submission of Sections of a Draft Research Reports for Factual Review.").

[44] Chairman Jay Clayton, Statement of Chairman Jay Clayton on Proposals to Enhance the Accuracy, Transparency and Effectiveness of Our Proxy Voting System (Nov. 5, 2018), thttps://www.sec.gov/news/public-statement/statement-clayton-2019-11-05-open-meeting.

[45] Moody's Investors Service, Moody's Investors Service Best Practices Guidance for the Credit Rating Process, Oct. 29, 2010, at https://www.moodys.com/uploadpage/MiscAnon/best_practice_guidance.pdf. We also would note this Moody's policy statement:

As a matter of policy, and in keeping with its role as an independent and objective publisher of opinions, MIS retains complete editorial control over the content of its Credit Ratings, credit opinions, commentary, and all related publications. MIS reserves the right at any time to suspend, modify, lower, raise or withdraw a Credit Rating, or place a rating on review in accordance with MIS policies and procedures. MIS editorial control includes its right to decide whether, and when, to issue a Credit Rating or publish any information or commentary, except in those rare instances where the public disclosure of a Credit Rating has been contractually limited (see Provision 3.4 below) or limited by applicable laws and regulations.

We are uncertain whether this policy in fact prevents management of issuers from inappropriate pressure to "alter the meaning or tone" of an opinion or announcement (if in practice issuer management is able to do so if such issuer efforts are elevated to a credit rating committee). But in any case, we believe the credit rating agency experience and precedents are important for the SEC to consider with reference to proxy advisor management of this conflict of interest.

***Request for Comment 23***. *Are there existing regulatory models of conflicts of interest disclosure that would be useful for us to consider? If so, what are the alternatives that we should consider in lieu of proposed Rule 14a–2(b)(9)(i)? For example, should we require all proxy voting advice businesses to disclose conflicts to the same extent that their clients (e.g., an investment adviser) would be reasonably expected to disclose such conflicts to their own clients (e.g., the funds or retail investor clients to whom the investment adviser provides advice)?*

***CII Response***. See Response #8 and Response #22.

### III.  Registrants' and Other Soliciting Persons' Review of Proxy Voting Advice and Response

***Request for Comment 24.*** *How prevalent are factual errors or methodological weaknesses in proxy voting advice businesses' analyses? To what extent do those errors or weaknesses materially affect a proxy voting advice business's voting recommendations? To what extent are disputes between proxy voting advice businesses and registrants about issues that are factual in nature versus differences of opinion about methodology, assumptions, or analytical approaches?*

***CII Response***. We do not believe factual errors or methodological weaknesses in proxy voting advice businesses' analyses are prevalent or that they materially affect proxy voting advice businesses voting recommendations. The Release's footnote citations to sources asserting otherwise are, at best, misleading.[46] We discuss the cited sources in the order in which they appear in the Release (with the discussion of the last two related sources combined). [47] As noted above, we also expect to submit a separate letter addressing this topic.

<u>*Letter from Maria Ghazal, Senior Vice President and Counsel, Business Roundtable (Nov. 9, 2018) (BRT Letter)*</u>[48]

The Release states that the BRT Letter discusses "examples of errors in voting advice and registrants' interactions with proxy advisory firms to address perceived errors."[49] The BRT Letter, however, does not provide a single example of an alleged error in a proxy advisory firm recommendation. Instead, it relies on member survey results indicating "factual errors in

---

Moody's Investors Service, Code of Professional Conduct, Exhibit 2 Procedures and Methodologies Used to Determine Credit Ratings, page 18, at https://www.moodys.com/sites/products/ProductAttachments/Exhibit2.pdf.
[46] Release at 66,528 n.94.
[47] *Id.*
[48] *Id.*
[49] *Id.*

reports." [50] Neither examples of the factual errors nor the member survey results are provided in, or are accessible from, the BRT Letter.

The BRT Letter does provide two specific situations that members "express concern" about proxy advisor recommendations: (1) "proxy advisory firms have their own guidelines for determining independence of directors . . . [resulting] in situations where the proxy advisory firm recommends against the election of a director because it has determined that the director is not independent under its standards, despite that the fact that the company's board of directors, carrying out its fiduciary duties, determined that the director in question was independent under the requirements of the Commission and the company's stock exchange listing rules and corporate governance guidelines;"[51] and (2) "Glass Lewis . . . may recommend a vote against members of a company's governance committee if the company excludes shareholder proposals through a valid use of the no-action process."[52]

Institutional investor clients retain proxy advisors, in part, to report critically on the independence of corporate board members when they fail to meet high standards of independence and when board members oppose certain shareholder proposals. We are unaware of any institutional investor customers of proxy advisors that would view the two instances described in the BRT Letter as "factual errors" or "methodological weaknesses."

Moreover, we have reviewed a number of reports from two proxy advisors – ISS and Glass Lewis & Co. (Glass Lewis) – with reference to item (1) above. In our view, the reports and related policies are crystal clear that the opinions on independence are those of the advisor (and both clearly present how the board views its own members' independence under relevant stock exchange standards). Seemingly, BRT members simply want to suppress views on director independence that differ in any way from a board's view. We think there is zero merit in that idea for suppression of speech.

In any event, the BRT Letter does not provide any transparency on its members' allegations of "factual errors in reports" so we cannot verify or challenge them.[53] On this point, we agree with SEC Commissioner Lee who observed:

> Further, the proposal relies in large part not on specific instances of material factual inaccuracies, but on generalized, unsubstantiated allegations of inaccuracies. For example, footnote 94 in today's proposal describes a letter from Business

---

[50] Letter from Maria Ghazal, Senior Vice President and Counsel, Business Roundtable to Mr. Brent J. Fields, Secretary, Securities and Exchange Commission 11 (Nov. 9, 2018), https://s3.amazonaws.com/brt.org/2018.11.09-BRT.SECProxyRoundtableCommentLetter.pdf.

[51] *Id.* at 12.

[52] We found the same lack of transparency in the June 3, 2019 letter from Maria Ghazal, Senior Vice President and Counsel, Business Roundtable to the Ms. Vanessa Countryman, Acting Secretary, Securities and Exchange Commission on the same topic. *See* Letter from Kenneth A. Bertsch, Executive Director, Council of Institutional Investors to The Honorable Jay Clayton, Chairman, Securities and Exchange Commission et al. 4 (Oct. 24, 2019), https://www.cii.org/files/issues_and_advocacy/correspondence/2019/20191024%20SEC%20comment%20letter%20proxy%20advisor%20accuracy.pdf (Noting that in the June 3, 2019 letter the "BRT does not provide any transparency on its members' allegations, so we cannot verify or challenge them.") (CII October 24 Letter).

[53] Letter from Maria Ghazal, Senior Vice President and Counsel, Business Roundtable to Mr. Brent J. Fields, Secretary, Securities and Exchange Commission at 12.

Roundtable as "discussing *examples* of errors in voting advice and registrants' interactions with proxy advisory firms to address perceived errors" (emphasis added). But a review of the letter shows that, in fact, it provides no such examples and contains only generalized allegations. . . . Business Roundtable's only source for those allegations appears to be a 2013 survey of its own members, to which they received only 20 responses.[54]

*Letter from Neil Hansen, Vice President, Investor Relations and Corporate Secretary, Exxon Mobil Corporation (Exxon)(June 26, 2019) (Exxon Letter)*[55]

The Release states that the Exxon Letter discusses "perceived methodological limitations of proxy advisory firms' evaluation of executive compensation structures."[56] In our view, the Exxon Letter does not support a conclusion that there are prevalent factual errors or methodological weaknesses in proxy voting advice businesses' analyses in proxy advisor reports.

With respect to "factual errors," the Exxon Letter appears to concede that to the extent that ISS reports contain factual errors, their prompt correction supports "client confidence in the quality control applied to ISS reports"[57] In that regard, we would observe that we have been told by a CII member that if the member did not have an alternative proxy advice firm to which they could go (if there was only one provider), lack of confidence in reports from one or the other dominant proxy advice firms would mean less; the investor would have limited leverage, other than dropping proxy advice altogether, at considerable expense. That is one concern we have on likely damage from the SEC proposal to the market for proxy advisory services.

With respect to "methodological weaknesses," the Exxon Letter criticizes "Proxy Advisor Analysis [as a] . . . One-Size-Fits All Compensation Model for All Companies That is Inadequate for Multifaceted Shareholder Decisions Like the Say-On-Pay Vote."[58] That criticism is, at best, an overstatement, and ignores the view of many institutional investor clients of the proxy voting advice businesses who believe that proxy advisors have generally adopted thoughtful and relatively detailed approaches to assessing compensation issues at subject companies.[59] Simply put, Exxon has a different perspective from that of the largest proxy advisors and many of their institutional investor clients on how executive pay should be analyzed.[60]

---

[54] Commissioner Allison Herren Lee, Statement on Shareholder Rights at n.4.

[55] Release at 66,528-29 n.94.

[56] *Id.* at 66,529 n.94.

[57] Letter from Neil A. Hansen, Vice President, Investor Relations and Corporate Secretary, ExxonMobil to Vanessa Countryman, Acting Secretary, U.S. Securities and Exchange Commission 6 (July 26, 2019), https://www.sec.gov/comments/4-725/4725-5879063-188728.pdf.,

[58] *Id.* at 4.

[59] *See* ISS, U.S. Compensation Policies, Frequently Asked Questions (updated Dec. 20, 2018), https://www.issgovernance.com/file/policy/active/americas/US-Compensation-Policies-FAQ.pdf; Glass Lewis, Understanding Glass Lewis' Approach to Say on Pay Analysis (last visited Dec. 30, 2019), https://www.glasslewis.com/say-on-pay/.

[60] For the record, CII's policies on executive compensation (encompassed within CII Policies on Corporate Governance) are open to Exxon-type compensation programs. See Section 5 of CII Policies on Corporate Governance, available at https://www.cii.org/corp_gov_policies. It could be argued that CII's position on the specific compensation practice issues that Exxon Letter appears to be concerned about is closer to Exxon than to

If Exxon's board and/or management ultimately does not agree with the perspective of the proxy voting advice businesses on the CEO's pay or other matters, they can engage with their shareowners on the issue. In addition, if proxy voting advice businesses' customers—institutional investors—do not agree with the proxy advisors' perspective, they can ignore it. At the end of the day, Exxon's shareholders, not Exxon's board or management, or the proxy advisors, are going to vote on Exxon's non-binding say-on-pay proposal by applying their own proxy voting guidelines.

Finally, it should be noted that institutional investors retain proxy advisors, in part, to report critically on executive compensation plan design, practices, and outcomes, and we would anticipate that companies, particularly the CEOs of those companies, would not always welcome analytical frameworks that are different than their own and that might result in criticism of their pay. And if a proxy advisor were to agree with and endorse every CEO's compensation package, without critical comments in any case, it is not clear that the advisor would be providing any value. Critical analysis does not automatically equal "error."

*Richard Levick, 'Vinny' and the Proxy Advisors: A Five Trillion Dollar Debate, Forbes.com (Dec. 17, 2018) (Levick Article) & Frank Placenti, Are Proxy Advisors Really A Problem?, American Council for Capital Formation (ACCF) (Oct. 2018) (ACCF Study)*. [61]

The Levick Article repeats the allegation that "advisors' reports can be factually inaccurate and analytically flawed."[62] The only evidence that the Levick Article cites in support of the allegation is the October 2018 ACCF Study.[63]

As you are aware, CII performed a detailed analysis of the data underlying the ACCF Study and provided the results to the Commission on October 24, 2019 (CII October 24 Letter).[64] That analysis concludes:

> The ACCF study is highly inaccurate and otherwise flawed, and is not a reliable basis on which to impose new regulation.
>
> . . . .
>
> [F]or the SEC to impose a costly new regulatory structure that will constrain competition based either on (1) claims of error utterly lacking in documentation; or (2) a factual error rate on a report basis of 0.057% to 0.123% (18 to 39 reports with

---

ISS, to the extent there are differences between Exxon and ISS. Nonetheless, we do not think ISS is obligated to agree with either Exxon or CII. ISS is paid by its investor clients for independent advice.
[61] Release at 66,528 n.94.
[62] Richard Levick, "'Vinny' And The Proxy Advisors: A Five Trillion Dollar Debate, Forbes, Dec. 17, 2018, https://www.forbes.com/sites/richardlevick/2018/12/17/vinny-and-the-proxy-advisors-a-five-trillion-dollar-debate/#4e2834882f4b.
[63] Frank Placenti, Are Proxy Advisors Really A Problem?, American Council for Capital Formation (Oct. 2018), https://accfcorpgov.org/wp-content/uploads/2018/10/ACCF_ProxyProblemReport_FINAL.pdf.
[64] CII October 24 at 2-4.

one or more factual errors in 31,830 reports [over three years]) is completely unsupportable.[65]

To our knowledge, neither ACCF, Frank Placenti, Richard Levick, nor the SEC staff has successfully challenged CII's analysis.[66]

***Request for Comment 25.*** *As a condition to the exemptions in Rules 14a–2(b)(1) and 14a–2(b)(3), should registrants and certain other soliciting persons be permitted an opportunity to review proxy voting advice and provide feedback to the proxy voting advice businesses before the businesses provide the advice to clients, as proposed? If yes, how much time should be given to review and provide feedback on proxy voting advice? Are the timeframes set forth in proposed Rule 14a–2(b)(9)(ii) appropriate? What would the impact of those proposed timeframes be on registrants, proxy voting advice businesses, and their clients? Are there alternative timeframes that would be more appropriate? Should we allow a proxy voting advice business to provide its final notice of voting advice to the registrant at any time after the registrant has provided its comments during the review and feedback period, regardless of whether the review and feedback period has expired? Are there alternative conditions to the exemptions that the Commission should consider to address the concerns regarding inaccuracies and the ability for investors to get information that is accurate and complete in all material respects?*

***CII Response***. We do not believe that government should mandate that registrants receive an opportunity to review proxy voting advice and provide feedback to the proxy voting advice businesses before the clients get that advice, as proposed. The basis for our view was aptly summarized in the OPERS Letter:

> We have communicated this information to the SEC on several occasions, including as a participant in the Commission's recent Roundtable on the Proxy Process. In each instance, our request has been respectful and consistent: *that the SEC preserve our access to independent timely,* and cost-effective research and advice from our PAF.[67]

<u>Independence</u>

The proposed provisions of the Release requiring proxy voting advice businesses to share draft research reports with registrants is not limited to a review and feedback of the underlying facts contained in the research.[68] As a result, we believe the proposed requirement will be reasonably perceived as impairing the independence of the proxy advisor research, particularly since the

---

[65] *Id.* at 2-3.

[66] Commissioner Allison Herren Lee, Statement on Shareholder Rights ("as the comment file shows, assertions of widespread factual errors have been methodically analyzed and largely disproven.").

[67] Letter from Patti Brammer, Corporate Governance Officer, Ohio Public Employees Retirement System et al. at 2 (emphasis added).

[68] *See* Release at 66,534 ("Proxy voting advice business provides the registrant . . . with the voting advice that the business intends to deliver to its clients").

proxy advisor is required to seek review and receive feedback from self-interested companies *before* sharing the draft report with their own paying clients.[69]

As indicated in Response #22, the Commission inexplicitly fails to even consider whether any of the requirements of FINRA Rule 2241 should be applicable to the proposed requirement for company review and feedback of the research reports of proxy advisors. FINRA Rule 2241, which was intended to prevent the impairment of the independence of analyst research reports, establishes specific procedures for providing "sections of a draft research report . . . to the subject company for factual review . . . ."[70]

The Release also inexplicitly fails to even consider the potential implications of the First Amendment on the independence of the research reports of proxy advisors if subject to required company review and feedback.[71] In fact, so far as we can see, the Release never even mentions the First Amendment. The omission of any discussion of the First Amendment in this context is particularly surprising given the following discussion of the issue by the Commission in its 1992 release entitled "Regulation of Communications Among Shareholders" (1992 Release): "'[a] regulatory scheme that inserted . . . corporate management into every exchange and conversation among shareholders [and] their advisors . . . on matters subject to a vote certainly would raise serious questions under the free speech clause of the First Amendment . . . .'"[72]

As the Commission is aware, First Amendment concerns are an element of litigation against the SEC in Federal Court.[73] In the complaint, ISS alleges among its "Claims for Relief" that:

> The SEC's Proxy Adviser Release raises serious First Amendment concerns to the extent it opens firms providing proxy advice to liability under Rule 14a-9 based on the opinions or recommendations they provide to their clients. Imposing Rule 14a-9 liability on an investment adviser's mere opinions, reasons, recommendations, and beliefs would have the effect of encouraging investment advisers to insert content that advances management's interests into fiduciary communications between the proxy adviser and its shareholder clients in order to minimize litigation risk, thereby undermining the credibility of the proxy adviser's work product. Accordingly, *the Proxy Adviser Release would chill—and potentially alter the content of—investment advisers' protected speech, thereby threatening the*

---

[69] *See* Recommendation of the Investor-as-Owner Subcommittee of the IAC, Relating to SEC Guidance and Rule Proposals on Proxy Advisors and Shareholder Proposals at 7 ("The requirement to share all opinions with one side of a debate in secret creates the obvious one-sided risk that proxy advisors will lose their independence (or be reasonably perceived to do so) by virtue of their routinely hearing directly from the patently self-interested and conflicted company directors before hearing from other market participants, including their own clients.").

[70] *See* FINRA, 2241 at §.05.

[71] *See, e.g.,* Richard A. Kirby et al., A Step Too Far: The SEC's Attempt to Regulate Proxy Advisory Services Violates the First Amendment, R|K Invest Law, PBC at 2 ("It is the free speech issue that we believe merits further analysis and is missing from the SEC's reasoning in support of its proposed rulemaking.").

[72] Regulation of Communications Among Shareholders, Exchange Act Release No. 31,326, 57 Fed. Reg. 48,276, 48,279 (Oct. 22, 1992) (on file with CII).

[73] *See* Complaint for Institutional Shareholder Services at 20-21.

*independence of the advice that shareholders rely on to ensure they have an effective voice in corporate governance.*[74]

As indicated in Response #1, the litigation is currently in abeyance. It is, however, currently unclear to us whether the Federal Court would find that the provisions of the Release (1) granting registrants the right to review proxy voting advice and provide feedback, and (2) subjecting proxy advisors to Rule 14a-9 liability for such advice is unconstitutional, since it appears to infringe on proxy advisors' First Amendment rights of free speech.

<u>Timeliness</u>

We believe the proposed company review and feedback period and notice requirements[75] will substantially detract from the timeliness of the final publication of the research reports and, as a result, will likely be highly disruptive to institutional investors voting of their shares.[76]

Proxy advisory firms on average deliver their proxy advice to clients approximately 20 days prior to a shareholders' meeting[77] in order to allow the institutional investor clients sufficient time to review the research reports and make informed voting decisions based on their own voting guidelines. Some reports are delivered at shorter intervals before the meeting, particularly at the peak of the highly seasonal spring proxy season. We believe the ability of institutional investors to review the research reports and determine whether they are "complete in all material respects"[78] and make well considered voting decisions would be impaired if this period of time were shortened to add the proposed company review and final notice periods prior to the delivery of research reports by the proxy advisors to their investor clients.

More specifically, as recently estimated by ISS:

> In sum and if the rule is adopted as proposed, resulting delays in publication of reports to our clients would equate to between approximately 9-13 calendar days from the current timeline, which now stands at just under 20 days in advance of the meeting on average for Russell 3,000 companies. This estimation is not inclusive of the time that would be required to negotiate confidentiality agreements with all issuers and to co-ordinate issuer hyperlinks for inclusion in reports and in platform

---

[74] *Id.; see* Letter from Lorraine Kelly, Head of Governance Business, ISS to Valued Client ("ISS will further show that the proposal to grant public companies the right to review, comment on and insert content into our proxy advice is unconstitutional, since it infringes on proxy advisers' First Amendment rights of free speech.").

[75] Release at 66,534 (setting forth the proposed Rule 14a-2(b)(9)(i) actions and timing in a summary table).

[76] *See, e.g.,* Letter from Lars Dijkstra, Chief Investment Officer, Kempen Capital Management et al. to the Honorable Jay Clayton, Chairman, Securities and Exchange Commission 2 (Jan. 26, 20120), https://www.sec.gov/comments/s7-22-19/s72219-6611632-202932.pdf?utm_source=1-23-20+-+Weekly+Governance+Alert+Vol+25+Issue+4&utm_campaign=1-23-20+-+Weekly+Governance+Alert+Vol+25+Issue+4&utm_medium=email ("The proposed right for registrants to review and provide feedback on proxy voting advice before it is issued makes the already tight deadlines practically unworkable.").

[77] *See* Letter from Lorraine Kelly, Head of Governance Business, ISS to Valued Client (ISS estimating that current delivery of research reports at "just under 20 days in advance of the meeting on average for Russell 3000 companies.").

[78] Release at 66,535.

delivery systems. It also does not include any estimate for the considerable additional administrative requirements to manage the various different timeframes and number of draft reviews dependent on issuer proxy filing dates under the proposed rules. These aspects will however all take substantial additional time and resources, although hard to estimate at this time.[79]

Assuming ISS's current estimates are correct, we believe the result of implementing the provisions of the Release is inconsistent with the Commission's stated goal (albeit unsupported by reliable evidence) to "address the concerns regarding inaccuracies and the ability for investors to get information that is accurate and complete in all material respects." [80] In contrast, as described in a recent memorandum by PJT Camberview, the more likely result is that the implementation of the provisions:

> [W]ould give investors less time to review reports prior to the vote deadline. This could limit investors' ability to engage with companies to resolve any concerns or seek additional information which would allow them to make case-by-case determinations and potentially override existing voting guidelines[81]

*Alternative timeframes*

If the Commission decides to implement some form of issuer review period, the first step should be to collect and analyze the relevant data available to the SEC before proposing a specific timeline. This includes both concentration of meetings in the proxy season (which our members universally say poses very difficult timing challenges now in voting proxies). We think the SEC also provided an only cursory look at the length of time between filing dates and meeting dates, relying on casual outside sources, rather than looking at data the SEC had easily available in-house. We formed the impression from the Release that the peak period now for proxy filings was 35 to 40 days before the annual meeting. This appears to be incorrect from data analysis we undertook.

CII staff recently requested and obtained the following information (including our comments) from Broadridge Financial Solutions about the timing of 2019 proxy statement filings. The first data set we obtained from Broadridge covered 4,190 shareholder meetings after we screened out meetings of investment companies (for which the data were problematic because the data set does not have the original meeting date, only the final meeting date, and it appeared that a significant number of investment company meetings were postponed). After our screen, we analyzed 4,190 annual meetings (including 19 with dual designation as "annual" and "special". Of these meetings, we found the following:

- Heavy concentration of meetings: 64.9% of meetings occurred from April 24 to June 18

---

[79] Letter from Lorraine Kelly, Head of Governance Business, ISS to Valued Client.
[80] Release at 66,535.
[81] Abe Friedman, Partner and Head, PJT CamberView et al., SEC Proposed Rule Amendments on Shareholder Proposals and Proxy Advisors: Implications for Issuers, Investors and Proxy Advisors, Harv. L. Sch. F. on Corp. Governance (Dec. 9, 2019), https://corpgov.law.harvard.edu/2019/12/09/sec-proposed-rule-amendments-on-shareholder-proposals-and-proxy-advisors-implications-for-issuers-investors-and-proxy-advisors/.

- Median for proxy statement filing: 42 days before Annual General Meeting (AGM)
- 57.4% of registrants filed in the peak period (40 to 48 days before AGM)
- 90.2% of registrants filed in the peak or shoulder periods (28 to 56 days before AGM)
- 97.1% of registrants filed at least 25 days before AGM (so virtually all would qualify for review and the one-week-plus delay with no change in proxy publication date with no change in existing practice)
- 38.4% of registrants filed 41 to 44 days before the AGM (we think it plausible that some of these registrants would work to file several days earlier to capture the extra two days for the review and feedback period, but believe the SEC should provide some evidence that this would be the case)
- 13.3% are filed 50 or more days before AGM

We subsequently received a second data set from Broadridge, and may provide the SEC with additional information from analysis of that data set.

Based on the above data and the data from ISS described earlier, we believe that if, despite our strong objections, the Commission insists on a government-mandated issuer review period, it should require all issuers who wish to avail themselves of such review periods to file their proxy statements much further in advance of the meeting than is currently contemplated by the proposal. More time is needed to provide proxy advisory firms the ability time to undertake their analysis. And, importantly, more time is also needed to provide institutional investor clients the ability to review the research reports, determine whether they are complete, and make well considered voting decisions consistent with their fiduciary duties.

In our view, if an issuer wishes to avail itself of any review period *up to a maximum of two business days*, the issuer should be required to file its proxy statement at *least 50 days prior to the meeting,* under all circumstances. Current time constraints already limit the effectiveness of proxy advisory firms; additional review requirements within the already short time period previously discussed will prove unduly burdensome for proxy advisory firms and their institutional investor clients.

We note that our proposed review period is generally consistent with: (1) the 48-hour period Glass Lewis currently provides [certain] registrants "to review the draft analysis and provide corrections;" [82] and (2) the "one to two business days [ISS currently provides certain registrants] to review draft proxy voting advice and provide feedback before ISS disseminates the voting advice to clients." [83] In addition, we believe our proposal that requires filing at least 50 days before the meeting is not unreasonable since it is already being complied with by more than 13% of companies. The additional eight days (compared to the 42-day median) provide an offset to the low end of the ISS estimate of an approximately nine to 13 calendar day delay created by the proposed requirements.

Combined, we believe revisions we have proposed would address, at least in part, institutional investor concerns about timeliness raised by the Release.

---

[82] Release at 66,545.

[83] *Id.*

*Alternative conditions to the exemptions*

If, despite our strong objections, the Commission insists on a government-mandated form of issuer review period, there are three additional conditions to the exemptions that the Commission should consider to address the aforementioned concerns regarding independence.

First, we believe the SEC should limit the required sharing of proxy advisor draft reports with subject companies to  only the factual information and data used by the proxy advisor in preparing its report and recommendations.[84] We note that this proposed condition is generally consistent with a current Glass Lewis program "that allows registrants who participate to receive a data-only version of its voting advice before publication to clients [and its] . . . pilot program . . . which offers U.S. public companies and shareholder proponents the opportunity to express differences of opinion they may have with Glass Lewis' research."[85]

We believe this proposed condition would limit the potential bias and related reduction in independence of proxy advisors that the proposal otherwise creates.[86] Moreover, it would be also address, in part, the FINRA Rule 2241 and related First Amendment exposure that is also created by the proposal.

If the SEC decides to move forward with an issuer review period requirement, the SEC could permit proxy advisors to provide drafts that include more than factual information and data. This still would conflict with FINRA Rule 2241 (which for good reason prohibits such advance clearance of analysis and opinion by the subjects of that analysis and opinion), but would provide some flexibility for market-based responses from proxy advisors, and in theory could permit ISS to continue to provide reports including analysis to some companies.

Second, we believe the SEC should lessen the risk of biasing proxy advice and impairing its independence by permitting (1) proxy advisors to disclose a draft of their reports to subject companies simultaneously with disclosing them to their institutional investor clients; and (2) a waiting period before proxy advisors and clients subject to the SEC's jurisdiction could act on the advice.[87] This condition would permit a proxy advisor to give company managers and institutional investors equal time to respond or correct any factual errors before investors and asset managers subject to the SEC's jurisdiction would be permitted to act on the reports.[88]

---

[84] *See, e.g.,* Recommendation of the Investor-as-Owner Subcommittee of the IAC, Relating to SEC Guidance and Rule Proposals on Proxy Advisors and Shareholder Proposals at 8 ("A . . . example of an alternative not discussed by the SEC would be to limit the requirement to share draft reports with corporate managers to "facts" and not opinion or mixed fact/opinion statements.").

[85] Release at 66,529.

[86] *See, e.g.,* Recommendation of the Investor-as-Owner Subcommittee of the IAC, Relating to SEC Guidance and Rule Proposals on Proxy Advisors and Shareholder Proposals at 8 ("This alternative would impose fewer costs and limit the potential bias and reduction in independence of proxy advisors that the actual proposal creates").

[87] *Id.* at 9 ("A . . .  example of an alternative not analyzed by the SEC that would have less risk of biasing proxy advice would be to require proxy advisors to disclose a draft of their reports or recommendations to company managers simultaneously with or somewhat after they disclose them to proxy advisor clients, and to impose a waiting period before clients subject to the SEC's jurisdiction could act on the advice or recommendations.")

[88] *Id.* ("This alternative would give company managers time to respond or correct errors, or argue for changes in opinions, before the public received the reports, and before asset managers acted on the reports.").

Third, we believe the SEC should limit impairing the independence of proxy advisor research by establishing a safe harbor for proxy advisors to shield them from liability under Rule 14a-9[89] if they comply with all of the proposed requirements. We understand the Commission has established safe harbors from liability in this manner in other contexts.

We note that the recent SEC guidance, which established at a Commission level or at least specifically underscored the applicability of Rule 14a–9 to proxy voting advice, appears intended to impose accountability of proxy voting advice businesses to company management rather than to their paying clients—institutional investors.[90] As Michael Cappucci of the Harvard Management Company observed: "[C]orporate interests have sought to make it more difficult for institutional investors to vote independently of management by urging measures that would hamstring their proxy service providers."[91] We believe a safe harbor would fairly shield proxy advisors from undue pressure to insert biased content into their research that advances the company interests in order to minimize litigation risk.[92]

Combined, we believe the three proposed conditions would address, at least in part, institutional investor concerns about independence raised by the Release.

*Request for Comment 26. Should the number of days for the review and feedback period be contingent on the date that the registrant files its definitive proxy statement? For example, should there be a longer period (e.g., five business days instead of three) if the registrant files its definitive proxy statement some minimum number of days before the shareholder meeting at which proxies will be voted, as proposed? Would registrants and other soliciting persons be likely to take advantage of the additional time by filing their definitive proxy statements early enough to qualify for this treatment?*

*CII Response*. We believe the number of days for the review and feedback period should be contingent on the date that registrant files its definitive proxy statement in order to preserve institutional investor access to timely research and avoid disrupting the voting process. As indicated in Response #25, we believe the maximum number of days for the proposed review and feedback period should be two business days. In order to provide an offset to the estimated nine to 13 calendar day delay created by the proposal, we believe the issuer should be required to file its definitive proxy statement at least 50 calendar days before the shareholder meeting at which proxies will be voted.

---

[89] False or Misleading Statement 17 U.S.C. § 240.14a-9 (Jan. 1966), *available at* https://www.law.cornell.edu/cfr/text/17/240.14a-9.
[90] Commission Interpretation and Guidance Regarding the Applicability of the Proxy Rules to Proxy Voting Advice, Exchange Act Release No. 86,721, 84 Fed. Reg. at 47,416, 47,419 (Set. 10, 2019), https://www.govinfo.gov/content/pkg/FR-2019-09-10/pdf/2019-18355.pdf ("the provider of the proxy voting advice should consider whether, depending on the particular statement, it may need to disclose the following types of information in order to avoid a potential violation of Rule 14a–9").
[91] Michael Cappucci, The Proxy War on Proxy Against Proxy Advisors 1 (Nov. 16, 2019), https://papers.ssrn.com/sol3/papers.cfm?abstract_id=3488427.
[92] *See, e.g.,* Complaint for Institutional Shareholder Services at 20 ("Imposing Rule 14a-9 liability on an investment adviser's mere opinions, reasons, recommendations, and beliefs would have the effect of encouraging investment advisers to insert content that advances management's interests into fiduciary communications between the proxy adviser and its shareholder clients in order to minimize litigation risk, thereby undermining the credibility of the proxy adviser's work product.").

*Request for Comment 27. What impact would the proposed review and feedback period and final notice of voting advice have on the ability of proxy voting advice businesses to complete the formulation of their voting advice and deliver such advice to their clients in a timely manner? Are there additional timing considerations or logistical challenges that we should take into account?*

*CII Response*. As indicated in Response #25, we believe that the proposed review and feedback period, particularly as combined with the second proposed "final notice" period, would adversely affect (and possibly destroy at least in some cases) the ability of the proxy voting advice businesses to complete the formulation of their voting advice and deliver such advice to their institutional investor clients in a timely manner. This is the single concern we hear expressed most broadly by our investor members, including both asset owner members of CII and asset manager associate members.

The SEC should take into account any delays from proxy intermediaries such that proxy voting deadlines are earlier than the day before the shareholder meeting. This may particularly impact shareholders outside the United States.

The SEC also should evaluate to what extent its proposal may reduce shareholder voting, and whether in some cases (particularly at smaller companies with more limited solicitation budgets, for companies with annual meetings at the peak of proxy season and for special meetings) this may lead to challenges to companies in getting quorum for meetings. We see no analysis of this possibility whatsoever in the Release.

*Request for Comment 28. Should there generally be a review and feedback period and a final notice of voting advice, as proposed? Should we allow registrants (and certain other soliciting persons) more or fewer opportunities to review the voting advice than proposed? Should a proxy voting advice business be required to provide the final notice of voting advice only if the registrant (or certain other soliciting person) provides comments to the proxy voting advice business during the review and feedback period and the proxy voting advice business's revisions are pertinent to such comments? Should the period allotted for the final notice of voting advice be two business days, as proposed? Should it be longer or shorter?*

*CII Response*. We oppose regulatory requirements for review and feedback and final notice periods, for reasons discussed above. If the SEC decides to move forward despite concerns from CII and many investors, as discussed in Response #25, we believe any such period should be a one-time opportunity of up to a maximum of two business days. A one-time, two-business-day review period (with no final notice period) would be less destructive to investors' proxy voting processes, and lessen the Commission's valid concerns about the "potential disruptions and costs that the proposed review . . . could have imposed on the current practices of proxy voting advice businesses and their [institutional investor] clients."[93]

*Request for Comment 29. Are there specific ways in which, if we allow the opportunity for registrants and certain other soliciting persons to review and provide feedback on the proxy voting advice, questions may arise about possible influencing of the proxy voting advice by the*

---

[93] *Id.* at 66,532.

*reviewing parties? How, if at all, could the independence of the advice be called into question if other parties reviewed and commented on it? How could we address such concerns? For example, would disclosure of the specific comments raised by the reviewing party and the proxy voting advice businesses' responses to this feedback help alleviate concerns about the independence of the advice?*

**CII Response**. Yes, we expect the SEC's proposed government-mandated pre-review requirements would potentially compromise the independence of proxy voting advice.

In fact, a significant reason some of our members switched from ISS to Glass Lewis once Glass Lewis began offering a competitive choice is because they believed ISS's practice of providing management of some companies (essentially the 500 largest U.S. public companies) the right to pre-review reports, including analysis and recommendations, compromised the independence of the ISS analysis. The SEC proposal will eliminate this market choice, forcing all investors who wish to avail themselves of outside proxy advice no choice – if they want it, they must pay for what they view as inferior, conflicted advice.

We believe competition and free markets are useful, including in promoting quality and accuracy of analysis. The SEC regulatory scheme as proposed will force all market participants into the same business model with regard to pre-publication review. We think it could go further. The pre-review requirements clearly will be costly for proxy advice firms – entailing much more time than three minutes for reports, as implicitly the SEC assumed for purposes of its cost/benefit analysis. As discussed in Response #30, these costs are likely to preclude new entrants, eliminate one or more incumbents, and potentially lead any survivor to follow a business model that includes providing consulting services to issuers, compounding concerns on influencing of proxy advisor reports (which has been another reason some of our members and other investors have chosen Glass Lewis, which does not provide consulting services, over ISS.)

We believe this dynamic of undue influence by issuer management and reduced market competition may be particularly pronounced because the proposal both requires the opportunity for management pre-review, and codifies that the research product is subject to Rule 14a-9 liability. We believe the Commission should address those concerns by revising the proposal to (1) limit the required sharing of proxy advisor draft reports with issuers to only the factual data used by the proxy advisor in preparing its report and recommendations, (2) disclose the draft reports to subject companies simultaneously with disclosing the report to the institutional investor clients, and (3) establish a safe harbor for proxy advisors to shield them from liability under Rule 14a-9 if they comply with all of the proposed requirements.

**Request for Comment 30.** *What effect will the proposals, if adopted, have on proxy voting advice businesses' ability to provide timely voting advice to their clients? What are the anticipated compliance burdens and corresponding costs that proxy voting advice businesses are expected to incur as a result of the proposed new conditions? What impact will these burdens and costs have on proxy voting advice businesses' clients?*

**CII Response**. We believe the burdens and costs imposed as a result of the proposed new conditions would likely lead to one or more of the five proxy voting advice businesses identified

in the Release[94] to exit the industry, along with others that the SEC does not identify and about which it seems unaware.[95] We also believe the new burdens and corresponding costs would discourage new entry into the proxy advisory market and exacerbate the problem of market concentration in the industry.[96] Those who remain would likely be forced to hire more staff, including in-house or external lawyers, to handle the increased regulatory burden imposed by the Releases' provisions. Those additional costs would almost certainly be passed on to their institutional investor clients and those funds' underlying beneficiaries, including pension beneficiaries and other Main Street investors.[97] As Euan Stirling, head of stewardship at Aberdeen Standard Investments recently stated:

> '"We think [the Release] is not helpful to us as institutional investors when holding companies to account . . . . It will make the job more difficult and add costs. It will be the ordinary savers who have to pay the costs.'"[98]

Moreover, as noted above, the new regulation may lead to one-size-fits-all results, with all firms pushed toward the same economic model, potentially involving more conflicts of interest. The

---

[94] *See* Release at 66,542 n.190 (The five firms identified are "(1) Institutional Shareholder Services ('ISS'), (2) Glass Lewis & Co. ("Glass Lewis'), (3) Egan-Jones Proxy Services ("Egan-Jones'), (4) Segal Marco Advisors, and (5) ProxyVote Plus.").

[95] *See* Letter from Jeffrey P. Mahoney, General Counsel, Council of Institutional Investors et al. to The Honorable Jay Clayton, Chairman, Securities and Exchange Commission 3 (Nov. 14, 2019), https://www.cii.org/files/issues_and_advocacy/correspondence/2019/November%2014%202019%20letter%20to%20SEC%20Chairman.pdf ("As indicated at the November 7 meeting, Segal Marco, ProxyVote Plus and other smaller proxy voting agents and research providers may exit the voting advice business if they come within the sweep of the new regulation.") (CII November 14 Letter); *see also* Letter from Craig Rosenberg, Pres., ProxyVote Plus, LLC to Office of Management and Budget 1 (Jan. 3, 2020), https://www.sec.gov/comments/s7-22-19/s72219-6608625-202800.pdf?utm_source=1-23-20+-+Weekly+Governance+Alert+Vol+25+Issue+4&utm_campaign=1-23-20+-+Weekly+Governance+Alert+Vol+25+Issue+4&utm_medium=email (commenting that the proposal "will result in significant increases in costs that ProxyVote will incur; an increase in client fees that we may unfortunately be forced to implement; and, ironically, may compel us to seek a sale to one of the dominant firms in the field.").

[96] *See* Letter from Anat Admati, George G.C. Parker Professor of Finance and Economics, Stanford Graduate School of Business et al. to Chairman, Jay Clayton, Securities and Exchange Commission et al. 1 ("By increasing the cost of opining on proxy statements such proposals will only discourage new entry into the proxy advisory market and exacerbate the problem of market concentration in this sector."); Letter from Sarah Wilson, Chief Executive, Minerva Analytics to Hon. Jay Clayton, Chairman, U.S. Securities and Exchange Commission 2 (Jan. 2, 2020), https://www.sec.gov/comments/s7-22-19/s72219-6615792-202950.pdf?utm_source=1-23-20+-+Weekly+Governance+Alert+Vol+25+Issue+4&utm_campaign=1-23-20+-+Weekly+Governance+Alert+Vol+25+Issue+4&utm_medium=email ("In respect of the SEC's proposals, our reasons for opposing the proposed regulations that they will: . . . • Damage much-needed competition and unfairly prejudice the business chances of challenger service providers like Minerva and present impossible competition hurdles . . . "); Commissioner Robert J. Jackson Jr., Statement on Proposals to Restrict Shareholder Voting (Nov. 5, 2019), https://www.sec.gov/news/public-statement/statement-jackson-2019-11-05-open-meeting (noting that the proposals "will have consequences—including reducing the already-scant competition among proxy advisors").

[97] *Id.; see* Letter from Nichol Garzon-Mitchell, Senior Vice President, General Counsel, Glass Lewis to Mr. Alex Goodenough, Desk Officer for the U.S. Securities and Exchange Commission, Office of Information and Regulatory Affairs, Office of Management and Budget ("The costs . . . would be borne by proxy advisors and would inevitably have to be passed on to their institutional investor clients, who, in turn, may have to pass these costs on to their individual investor participants and beneficiaries.").

[98] Attracta Mooney & Patrick Temple-West, Battle Royale, SEC Locks Horns with Investors Over Proxy Advisors, Financial Times, Dec. 9, 2019, https://www.ft.com/content/d1a88874-1686-11ea-8d73-6303645ac406 (registration required & on file with CII).

direct financial and time burdens also are likely to lead to lower quality reports and, potentially, less accuracy. If we eventually end up with a monopoly on proxy advice, we would expect the quality, accuracy and timeliness of advice to decline further.

Of particular concern, as indicated in Response #25, the timeframe available under the proposal for the firms to undertake research and draft their recommendations and for their institutional investor clients to responsibly vote their shares would decrease by an ISS estimate of approximately nine to 13 calendar days. (The SEC did not do analysis on this before proposing the new regulations, which is a lapse of major concern to CII and our members.) The resulting shorter timeline for providing proxy voting advice would undermine the Commission's stated goal of addressing concerns about the accuracy of the work of the proxy advisory firms[99] (albeit unsupported by reliable evidence), and it runs counter to the Commission's mandate to protect (and not harm) investors.[100]

*Request for Comment 31. Should the proposed amendments allow a proxy voting advice business to seek reimbursement from registrants and other soliciting persons of reasonable expenses associated with the review and feedback period and final notice of voting advice in proposed Rule 14a–2(b)(9)(ii)? If so, what would constitute reasonable expenses and how should these amounts be calculated? Should the calculation of these amounts be dependent on the size or other attributes of the proxy voting advice business, or on the size of the registrant, or number of recommendations? Should there be limits on the amount beyond reasonable expenses for which a proxy voting advice business can seek to be reimbursed?*

*CII Response.* Yes, we believe the proposed amendments should include a provision that allows a proxy voting advice business to seek reimbursement from registrants and other soliciting persons of the reasonable expenses associated with any required review and feedback period. The potential costs of the proposed amendments are one of the primary concerns for many institutional investor clients of proxy voting advice businesses.[101]

*Request for Comment 32. We proposed to limit the review and feedback period and final notice of voting advice requirements to only registrants and soliciting persons conducting non-exempt solicitations. Should the opportunity to review and provide feedback and receive final notice of voting advice also be given to other parties, such as shareholder proponents or persons engaged in exempt solicitations, such as in ''vote no'' or withhold campaigns?*

*CII Response.* We believe that, if despite our strong objections the Commission insists on a government-mandated review and feedback and final notice periods, those requirements should be applied on an even-handed basis with, equal treatment between soliciting persons conducting non-exempt solicitations and those engaged in exempt solicitations. CII believes it is a first principle that regulatory rules provide an even playing field with regard to items contested at

---

[99] *See* Release at 66,518 (indicating that purpose of proposed new conditions is to "help ensure that investors who use proxy voting advice receive more accurate, transparent, and complete information").

[100] U.S. Securities and Exchange Commission, About the SEC (last visited Dec. 28, 2019) https://www.sec.gov/about.shtml ("The mission of the SEC is to protect investors").

[101] *See, e.g.,* Letter from Patti Brammer, Corporate Governance Officer, Ohio Public Employees Retirement System et al. to The Honorable Michael Crapo, Chairman, Committee on Banking, Housing, and Urban Affairs at al. 3 ("We humbly ask that you encourage the Commission to not take actions that will increase our costs . . . .").

shareholder meetings. We recognize that keeping the process fair adds to the complexity of the SEC's mandated review process, which is one reason why the government mandate is a bad idea.

***Request for Comment 33***. *Should the voting advice formulated under the custom policies established by clients whose specialized needs are not addressed by a proxy voting advice business's benchmark or specialty policies be subject to the proposed review and feedback period and final notice of voting advice requirements? Are there any confidentiality concerns, such as the revelation of the client's investment strategies, which would arise from the ability of registrants or others to review the advice formulated under these customized policies? If so, is there a need for a method for distinguishing voting advice formulated under a proxy voting advice business's benchmark or specialty policy from advice formulated under a client's custom policy, and what would be the appropriate method for making this distinction? We note, for example, at least one major proxy voting advice business asserts that it is not the "norm" for its clients to adopt all or some of the business's benchmark policy, with the "vast majority of institutional investors" opting for "increasingly more detailed policies with specific views" on the issues presented for a vote in the proxy materials.*

***CII Response***. We do not believe voting advice formulated under the custom policies established by clients should be subject to the proposed review and feedback and final notice periods. It is our understanding that many of the larger clients of ISS and Glass Lewis pay for custom policies. It also is our understanding that clients of custom reports have confidentiality concerns with respect to those reports. Those concerns include that sharing those reports with unauthorized third parties would reveal confidential investment strategies and voting information before the votes are cast. As a result, neither ISS nor Glass Lewis currently provide drafts of custom policies to the subject companies.

It also is our understanding that custom reports are generated based on the institutional investor clients' policies, rather than the policies of the proxy voting advice businesses. Thus, we believe the proposed review and feedback and final notice periods would be pointless for custom reports since the report is based on the client's policies, not those of the proxy advisor.

It also is our understanding that a proposed review and feedback and final notice periods requirement that includes client custom policies would likely dramatically impact the timeliness concerns discussed in Response #25. As indicated in the Release, ISS has more than 400 custom policies for clients.[102] And currently those reports are prepared after the preparation of related benchmark reports.

Finally, per discussion with SEC staff about this issue, [103] we believe there may be some confusion about the differences among voting advice formulated under a proxy voting advice businesses' benchmark, specialty and custom policies.

---

[102] *See, e.g.,* Release at 66,540 n.176 ("ISS implements more than 400 custom voting policies on behalf of institutional investor clients [and], approximately 87% of the total shares processed by ISS on behalf of clients globally were linked to such policies.").

[103] CII November 14 Letter at 2 ("Other aspects of the PA proposal on which we seek supplemental, clarifying information include the following: . . . It is CII's understanding that ISS produces a number of custom reports [and] [i]t is not clear whether the SEC would require ISS to provide registrants with all of these draft reports.").

For all of the above reasons, we believe there may be a legitimate need for a method distinguishing voting advice formulated under a proxy voting advice business's benchmark, or specialty, policy from advice formulated under a client's custom policy. If the SEC insists on a government mandate for issuer management pre-review of reports, we encourage the SEC staff to work with ISS, Glass Lewis and the other interested proxy voting advice businesses to determine what would be the appropriate method for making the distinction.

***Request for Comment 34.*** *Should the review and feedback period and final notice of voting advice requirements be a condition to the exemptions in all cases, as proposed, or should they be required only where a proxy voting advice business's voting recommendations are adverse to the reviewing party? In a proxy contest, should we require the review and feedback period and final notice of voting advice requirements only if voting recommendations are adverse to the reviewing party? In the case of a split vote recommendation, who should have the right to review the voting advice?*

***CII Response***. We agree that if, despite our strong objections, the Commission insists on a government-mandated review and feedback and final notice periods, those requirements should be applicable even if a proxy voting advice business's voting recommendation are not adverse to the reviewing party. On this point we generally agree with the Commission's conclusion that:

> For ease of administration, we do not think that our proposed requirement should put the burden on the proxy voting advice business, registrant, or certain other soliciting person to determine whether proxy voting advice is ''adverse'' to another person's voting recommendation. . . . Making a determination whether such advice would be adverse to the registrant or the dissident shareholder could be difficult and highly subjective. . . . Requiring the proxy voting advice business to separate its written report so that only adverse recommendations would be presented for review could require additional time, burden, and cost for the proxy voting advice business.[104]

That said, if the SEC implements a mandated pre-review, it should clarify that this does not apply in any way to what it labels as proxy advice firms in the release that do not publish research and reports for clients. The Release does not demonstrate an understanding of the business models pursued by Segal Marco or ProxyPlus, which the Release identifies as proxy advice firms. We understand that SEC staff did not talk at all with those firms, and its research pertinent to the Release seems to have been limited to looking at their web sites, notwithstanding the fact that both are registered investment advisors. Nor does the Release indicate awareness of other firms that have similar business models. Insofar as these firms are concerned, the Release appears to have been developed completely in the dark, which is not a good basis on which to form regulations that impact not only proxy voting and corporate governance, but also small businesses and livelihoods.

***Request for Comment 35.*** *Would the proposed review and feedback period and final notice of voting advice requirements work effectively in the context of a contested solicitation? Are there*

---

[104] Release at 66,530-31 n.112.

*unique challenges or specific issues with the parties' compliance with these proposed
requirements that are foreseeable in contested solicitations?*

**CII Response**. We believe there may be unique challenges or specific issues with the parties'
compliance with the proposed requirements that are foreseeable in contested solicitations and in
some M&A situations. For example, we understand that the proposed requirements may be
potentially unworkable in the context of a merger and acquisition because the terms of the deal
often change after the first definitive proxy statement is filed and the proxy advisor either needs
to hold back its advice as long as possible or amend the advice after it is first issued, making
timely compliance with the proposed process challenging.

In contested and M&A situations, among others, developments at a company or otherwise can
alter analysis in material ways. For example, if an acquirer increases an offer price not long
before a meeting of shareholders of the target company, that can affect whether shareholders
would want to support the deal, and whether a proxy advisor would recommend voting for sale
of the company. We believe the intent behind the SEC proposal is to permit a proxy advisor to
change its research, analysis and recommendation in any way that it chooses after providing its
initial research, analysis and recommendation. In Note 1 to paragraph (b)(9)(ii), the proposed
rule stipulates: "Once the two business day period specified in paragraph (B) of this section has
expired, the proxy voting advice business will be under no further obligation to provide the
registrant or any other soliciting person with additional opportunities to review its proxy voting
advice with respect to the same meeting." The Commission should specify in the rule that this
includes any changes in the advice or recommendations.

We also would note that in its highly prescriptive rule that the proxy voting advice business
provide to the registrant and certain other soliciting persons "as copy of the proxy voting advice
that the proxy voting advice business *will deliver* to its clients" (emphasis added), the SEC is
setting up some confusing situations in which the advice and (at times) recommendation that the
proxy advisor wishes to deliver to its clients will have changed by the time that it must send its
(outdated) recommendations. Perhaps the original registrant-vetted report could be delivered at
the same time as (and bundled with) the timely advice that actually reflects the proxy advisor's
view at the time it was delivered. Would it be permissible for the advisor to watermark the
version vetted by the registrant and other soliciting parties with "please disregard" or some other
such notification? The SEC should explore this concern if it moves ahead with its proposed
vetting and final notice requirements. Given that the SEC seeks to micro-manage the process, it
is important for the Commission to clarify this and other situations, rather than rely on
clarification through litigation between registrants and other soliciting parties and proxy advisory
firms.

**Request for Comment 36.** *Should we require the entirety of the proxy voting advice, including
separate specialty reports, to be provided to the reviewing party or only excerpts or certain
reports? If the latter, which excerpts or reports? How should the scope of any such excerpts or
reports be determined? Should only the portions of the voting advice that are adverse to the
registrant or certain other soliciting persons be subject to the review and feedback period and
final notice of voting advice requirements? Should we require only the factual information
and/or data underlying the advice to be provided to the reviewing party?*

*CII Response*. As described in Response #25, we oppose the government-mandated review, but argue that if the SEC goes ahead with it, the Commission should require only factual information and data underlying the advice to be provided to the reviewing party. If the SEC goes ahead with the government-mandated review by registrants that includes analysis, opinion and recommendations, it should exclude sections of the report covering shareholder proposals unless it also provides the same factual information, data, analysis, opinion and recommendations to the proponents of a shareholder proposal.

*Request for Comment 37. Should proxy voting advice on certain topics or kinds of proposals be excluded from the proposed review and feedback period and final notice of voting advice requirements? If so, which ones? If some are excluded, are there topics or kinds of proposals for which proxy voting advice should always be subject to the proposed requirements?*

*CII Response*. If the SEC goes ahead with the mandated review and feedback and final notice periods, it should exclude special meetings. It is common for there to be meaningful changes to the definitive proxy statement close in time to meeting deadlines, and so that aspect of the SEC proposal is even more unworkable than the rest of the proposal.

As noted above, if the SEC goes ahead with the government-mandated review by registrants that includes analysis, opinion and recommendations, it should exclude sections of the report covering shareholder proposals unless it also provides the same factual information, data, analysis, opinion and recommendations to the proponents of a shareholder proposal. We also believe the SEC should exclude executive compensation matters from any review by company management, given strong direct financial conflicts of interest in such review of pay by the recipients of that pay.

*Request for Comment 38. Are there any risks raised by proxy voting advice businesses providing advance copies of voting advice (e.g., misuse of material, nonpublic information, or misappropriation of proprietary information), and if so, how can such risks be managed?*

*CII Response*. We believe there are risks raised by proxy voting advice businesses providing advance copies of voting advice. As one example, we noted in our November 14, 2019, letter to the SEC (CII November 14 Letter), the following concern about whether the proposal could elevate the risk of insider trading:

> It is not clear whether the PA Proposal creates the potential for insider trading on certain market-moving recommendations and related analysis, particularly in connection with mergers and acquisitions (M&A), and how the SEC staff thought about such a risk in proposing the five-day review and "final notice" periods.[105]

We note that one way to manage the risks raised by proxy voting advice businesses providing advance copies of voting advice is by adopting our proposed revisions to limit both the time for review and feedback, and the content of the advance copies of voting advice. See Response #25.

---

[105] CII November 14 Letter at 3.

*Request for Comment 39. Should we allow proxy voting advice businesses to require registrants and other soliciting persons to enter into confidentiality agreements prior to providing their proxy voting advice? If so, should we specify any terms or parameters of the required confidentiality agreement? For example should the rule stipulate that the terms of the confidentiality agreement may be no more restrictive than similar types of confidentiality agreements the proxy voting advice business uses with its clients, as proposed? Should we stipulate in the rule that a proxy voting advice business is not required to comply with the proposed review and feedback period and final notice of voting advice requirements unless the reviewing party has entered into an agreement to keep the information received confidential? Are there similar types of confidentiality agreements between proxy voting advice businesses and their clients? If so, what are the terms of those agreements? Is it appropriate for the rule to address the nature of a private contract between two parties?*

**CII Response**. We support allowing proxy voting advice businesses to require registrants and other soliciting persons to enter into confidentiality agreements prior to providing their proxy voting advice. We generally agree with the Commission that such a provision may provide "a means for proxy voting advice businesses to maintain control over the dissemination of their proxy voting advice and minimize the risk of unintentional or unauthorized release, our proposed amendment would allow a proxy voting advice business to require that registrants and certain other soliciting persons, as applicable, agree to keep the information confidential, and refrain from commenting publicly on the information, as a condition of receiving the proxy voting advice."[106]

As indicated, however, in the CII November 14 Letter, we believe it may be helpful for the SEC to give more consideration to at least two issues regarding the proposed confidentiality agreements: (1) proxy voting advice businesses' continuing rights to protect its intellectual property subsequent to providing proxy voting advice to its clients; and (2) proxy voting advice businesses' permitted recourse when there is a violation of the agreement by the registrant or other soliciting persons.[107]

*Request for Comment 40. Can the confidentiality of information that a proxy voting advice business would provide to registrants and other soliciting persons under the proposal be effectively safeguarded? Would it be feasible for a proxy voting advice business to obtain a confidentiality agreement from the numerous registrants or soliciting persons with whom it interacts? Could confidentiality be assured through other means?*

**CII Response**. As indicated in Response #39, we believe it would be helpful for the SEC to give more consideration to whether the proposed confidentially agreement can be effectively safeguarded.

*Request for Comment 41. Should proxy voting advice businesses be required to include in their voting advice to clients a hyperlink (or other analogous electronic medium) to the response by the registrant and certain other soliciting persons, as a condition to the exemptions in Rules*

---

[106] Release at 66,532.
[107] *See* CII November 14 Letter at 2 ("The PA Proposal is not clear what is being proposed regarding confidentiality agreements.").

*14a–2(b)(1) and 14a–2(b)(3)? Are there better methods of making the response available to the clients of proxy voting advice businesses? Should the proposed rule provide certain guidelines or limitations on the responses (e.g., responses may cover only certain topics, such as disagreements on facts used to formulate the proxy voting advice?*

**CII Response**. We do not believe that proxy voting advice businesses should be required to include in their voting advice to clients a hyperlink (or other analogous electronic medium) to the response by the registrant and certain other soliciting persons without first evaluating whether the proposed requirement may interfere with free speech rights under the First Amendment. We understand that compelled speech is particularly problematic from a First Amendment standpoint. As indicated in Response #25, in light of the 1992 Release discussing First Amendment issues with regard to regulation that inserts companies between shareholders and their advisors, we believe it is appropriate for the SEC give some consideration of First Amendment issues before requiring the hyperlink.

As one possible alternative method for making the response available to the clients of proxy voting advice businesses, we believe the SEC should explore a less intrusive system similar to that already adopted by Glass Lewis and described in the Release as follows:

> "[Glass Lewis has a resource center on its website designed specifically for the issuer community via which public companies, their directors and advisors can, among other things: (i) Submit company filings or supplementary publicly available information; (ii) participate in Glass Lewis' Issuer Data Report ('IDR') program, prior to Glass Lewis completing and publishing its analysis to its investor clients; and (iii) report a purported factual error or omission in a research report, the receipt of which is acknowledged immediately by Glass Lewis, then reviewed, tracked and dealt with internally prior to responding to the company in a timely manner.''[108]

**Request for Comment 42.** *Would the proposed condition that proxy voting advice businesses include a hyperlink (or other analogous electronic medium) directing their clients to the registrant's (or certain other soliciting person's) statement impact clients of proxy voting advice businesses, such as investment advisers? If so, how?*

**CII Response**. We believe the proposed condition that proxy voting advice businesses include a hyperlink directing their clients to the registrant's statement would impact clients of proxy voting advice businesses. Setting aside the First Amendment issues discussed in Response #41, we note that the Commission appears to acknowledge that the proposed condition may (1) delay the timely receipt of the advice for voting purposes because of the need for the proxy voting advice businesses to coordinate with the registrant the timing of the filing of supplementary proxy materials,[109] and (2) increase the proxy voting advice businesses' direct costs[110] which likely

---

[108] Release at 66,548 n.253.

[109] *See id.* at 66,549 ("registrants and other soliciting persons would incur costs of . . . coordinating timing with proxy voting advice businesses for the filing of supplementary proxy materials.")

[110] *Id.* ("The proxy voting advice business would also incur a direct cost of including that hyperlink or other analogous electronic mechanism."); *see* Letter from Nichol Garzon-Mitchell, Senior Vice President, General

would be passed on to the clients and the beneficiaries of clients' funds, including Main Street investors.

**Request for Comment 43.** *In our view, proxy voting advice businesses would not be liable for the content of the registrant's (or certain other soliciting person's) statement solely due to inclusion of a hyperlink (or other analogous electronic medium) to such a statement in their voting advice. Should we codify this view in the text of proposed Rule 14a–2(b)(9)?*

**CII Response**. We believe the Commission should codify its view that proxy voting advice businesses would not be liable for the content of the registrant's statement solely due to inclusion of a hyperlink to such a statement in their voting advice. The codification may be particularly helpful in this instance given that the Commission's view appears to be subject to multiple, legalistic qualifications.[111]

**Request for Comment 44.** *In instances where proxy voting advice businesses provide voting execution services (pre-population and automatic submission) to clients, are clients likely to review a registrant's response to voting advice? Should we amend Rules 14a–2(b)(1) and 14a– 2(b)(3) so that the availability of the exemptions is conditioned on a proxy voting advice business structuring its electronic voting platform to disable the automatic submission of votes in instances where a registrant has submitted a response to the voting advice? Should we require proxy voting advice businesses to disable the automatic submission of votes unless a client clicks on the hyperlink and/or accesses the registrant's (or certain other soliciting persons') response, or otherwise confirms any pre-populated voting choices before the proxy advisor submits the votes to be counted? What would be the impact and costs to clients of proxy voting advice businesses of disabling pre-population or automatic submission of votes? Could there be effects on registrants? For example, if a proxy voting advice business were to disable the automatic submission of clients' votes, could that deter some clients from submitting votes at all, thereby affecting a registrant's ability to achieve quorum for an annual meeting? If we were to adopt such a condition, what transitional challenges or logistical issues would disabling pre- population or automatic submission of votes present for proxy voting advice businesses, and how could those challenges or issues be mitigated?*

**CII Response**. We would strongly oppose amending Rules 14a–2(b)(1) and 14a– 2(b)(3) so that the availability of the proposed exemptions is conditioned on a proxy voting advice businesses' structuring its electronic voting platform to disable the automatic submission of votes in instances where a registrant has submitted a response to the voting advice. We are stunned that the Commission would even consider preventing shareowners from exercising their voting rights because they have chosen a proxy voting advice business to execute their votes. The question itself suggests a fundamental misunderstanding of how and why some institutional investors use

---

Counsel, Glass Lewis to Mr. Alex Goodenough, Desk Officer for the U.S. Securities and Exchange Commission, Office of Information and Regulatory Affairs, Office of Management and Budget (Noting the costs in terms of the "many burden hours it would take proxy advisors to process, review and implement each of the SEC-estimated 261 annual requests by companies for a hyperlinked response to be included in the proxy advice and any electronic medium used to deliver the proxy voting advice.").

[111] *See* Release at 66,553 n.140 (in explaining the Commission's "view" that that the hyperlink would not expose the proxy advice businesses to liability the SEC used a number of legalistic qualifiers, including "[[i]n general," "would not, by itself," "implicitly endorsed," "would likely," and "would not likely").

proxy voting advice businesses' execution services and a disregard for evidence based rule-making.

For some institutional investors, execution services provide the ability to carry out their fiduciary responsibilities for voting in a more cost-effective manner. While some registrant's have alleged that proxy voting advice business' vote automatically in a manner that is inconsistent with their client's proxy voting guidelines, the Release provides no reliable evidence to support the allegation. Moreover, as this request for comment indicates, a disabling of the automatic submission of clients' votes could have a number of negative consequences, including a registrant's ability to achieve quorum for an annual meeting.

We note that the suggested requirement that a client click the hyperlink before being permitted to vote is a surprisingly intrusive, Big Brother-like, suggestion.[112] Also, we are aware of no requirement that an investor receiving proxy materials electronically must click the link to the proxy statement before voting.

**Request for Comment 45.** *Should we permit proxy voting advice businesses to cure any unintentional or immaterial failure to comply with the proposed conditions so long as they make a good faith and reasonable effort, as proposed? We have proposed that the determination of whether a good faith and reasonable effort has been made should depend on the particular facts and circumstances. Is there a need for further clarity on the actions that may be needed to satisfy this standard? If so, what would be appropriate to consider in satisfying this standard?*

**CII Response**. We generally support the Release's provision permitting proxy voting advice businesses to cure any unintentional or immaterial failure to comply with the proposed conditions so long as they make a good faith and reasonable effort. We generally agree with the Commission that such a provision "would serve to mitigate the risk of any unintended adverse consequences for proxy voting advice businesses as they seek to comply with the review and feedback and other provisions . . . ."[113] However, as indicated in Response #25, we believe the Commission should also establish a safe harbor for proxy advisors to shield them from liability under Rule 14a-9 if they comply with all of the requirements of the proposed requirements.

**Request for Comment 46.** *Should we prescribe a more detailed framework or establish procedural guidelines to help proxy voting advice businesses manage their interactions with registrants and certain other soliciting persons under proposed Rules 14a–2(b)(9)(ii) and (iii)? If so, what would be the appropriate framework?*

**CII Response**. As noted in Response #7, if the SEC insists on going through with its already highly prescriptive and intrusive regulatory scheme including the review and feedback and final notice periods, it also should at least provide guidance on how a proxy advisor should handle the conflicts of interest created by the scheme.

---

[112] The "click the hyperlink" suggestion arguably is only one step removed from using technology to disable voting subject to a scan of whether client personnel of the appropriate rank (using facial recognition technology) spent appropriate time reading the registrant's (or certain other soliciting persons') writing.
[113] Release at 66,535.

*Request for Comment 47. What steps would proxy voting advice businesses need to take to update their systems and procedures such that they would reasonably be able to comply with the new conditions of proposed Rule 14a–2(b)(9)? Are there other steps that proxy voting advice businesses would need to take, such as re-negotiating contracts with their clients? What are the associated costs that proxy voting advice businesses would be anticipated to incur as a result? If the proposal is adopted, how much preparatory time would a proxy voting advice business require following adoption of the proposed amendments, to ensure that its systems and procedures are equipped to facilitate the business's compliance with the new rules?*

**CII Response**. We generally agree with the Commission that among the steps the proxy voting advice businesses would need to take to update their systems and procedures such that they would reasonably be able to comply with the new conditions of proposed Rule 14a–2(b)(9) include the following:

> (i) Modifying current systems, or developing and maintaining systems to track the timing associated with these new requirements; (ii) modifying current systems and methods, or developing and maintaining new systems and methods to share the proxy voting advice with registrants and other soliciting persons; and (iii) delivering draft voting advice to registrants and other soliciting persons for their review and feedback.[114]

Not surprisingly, the associated costs that proxy voting advice businesses would be anticipated to incur to update their systems and procedures such that they would reasonably be able to comply with the new proposed conditions are likely to vary based in the size of the business. As ProxyVote Plus, LLC (ProxyVote) recently commented: "Unlike ISS, Glass Lewis and Egan-Jones, the first-year costs will be dramatically higher for our small company to create new systems to permit registrants to review and provide feedback on the proxy votes we cast on behalf of our clients."[115]

At a minimum, we believe the preparatory time needed to ensure that systems and procedures are equipped to facilitate compliance with any new rule would need to take into account that during the proxy season the proxy voting advice businesses' will have less time and resources to provide proxy voting advice *and* update their systems and procedures to reasonably comply with the new conditions.

*Request for Comment 48. Should proxy voting advice businesses be required to disclose the nature (e.g., frequency, format, substance, etc.) of their communication with registrants (and certain other soliciting persons) to their clients or publicly?*

**CII Response**. As noted in Response #7, if the SEC insists on going through with its already highly-prescriptive and intrusive regulatory scheme including the review and feedback and final

---

[114] *Id.* at 66,548.
[115] Letter from Craig Rosenberg, Pres., ProxyVote Plus, LLC to Office of Management and Budget 2 (Jan. 3, 2020), https://www.sec.gov/comments/s7-22-19/s72219-6608625-202800.pdf?utm_source=1-23-20+-+Weekly+Governance+Alert+Vol+25+Issue+4&utm_campaign=1-23-20+-+Weekly+Governance+Alert+Vol+25+Issue+4&utm_medium=email.

notice periods, it also should at least provide guidance on how a proxy advisor should handle the conflicts of interest created by the scheme. We presume at a minimum this would include disclosure on those contacts to clients.

**Request for Comment 49.** *What factors and/or conditions are primarily responsible for the incidence of factual errors and methodological weaknesses in proxy voting advice businesses' analyses? How effective would our proposal for standardized review and feedback and opportunity to include responses to the proxy voting advice be in addressing these factual errors and methodological weaknesses?*

**CII Response.** This question exposes a fundamental flaw of the proposal. The proposal's provisions requiring a standardized review and feedback and opportunity to include responses to the proxy voting advice is largely premised on an assumed (but not substantiated) high rate of factual errors and methodical weaknesses in proxy voting advice businesses' analyses.[116] For example, consider the following five paragraphs from the Release providing a direct link between alleged factual and methodical weaknesses in proxy voting advice and the Release provisions providing for a standardized review and feedback and opportunity to include responses to the proxy voting advice:

> [1] We believe that our proposed rule amendments would . . . establish effective measures to reduce the likelihood of *factual errors or methodological weaknesses in proxy voting advice* . . . .[[117]]

> [2] However, in recent years concerns have been expressed by a number of commentators, particularly within the registrant community, that there could be *factual errors, incompleteness, or methodological weaknesses* in proxy voting advice businesses' analysis and information underlying their voting advice that could materially affect the reliability of their voting recommendations and could affect voting outcomes, and that processes currently in place to mitigate these risks are insufficient. These concerns are coupled with the perception of many registrants that . . . there are not meaningful opportunities to engage with the proxy voting advice businesses and *rectify potential factual errors or methodological weaknesses* in the analysis underlying the proxy voting advice before votes are cast, particularly for registrants that do not meet certain criteria . . . and . . . once the voting advice is delivered to the proxy voting advice business's clients, which typically occurs very shortly before a significant percentage of votes are cast and the meeting held, it is often not possible for the registrant to inform investors in a timely and effective way of its contrary views *or errors* it has identified in the voting advice. Although communication between proxy voting advice businesses and registrants may have improved over time, recent feedback and studies suggest that many registrants remain concerned about the limited ability of registrants to provide input that might address *errors, incompleteness, or methodological weaknesses in proxy voting advice.* . . . Although we recognize that some proxy voting advice businesses have policies in which they would issue alerts informing

---

[116] *See* Release at 66,525, 66,529-30, 66,533, 66,545, 66,547.
[117] *Id.* at 66,525 (emphasis added).

their clients of *errors* in their voting advice or updated information released by the registrant, such policies result in the proxy voting advice businesses, not the client, determining whether the *errors* or information are material to a voting decision and sharing such information only after their advice has already been published. . . . Although we recognize that some proxy voting advice businesses have policies in which they would issue alerts informing their clients of *errors* in their voting advice or updated information released by the registrant, such policies result in the proxy voting advice businesses, not the client, determining whether the *errors* or information are material to a voting decision and sharing such information only after their advice has already been published.[118]

[3] We believe that establishing a process that allows registrants and other soliciting persons a meaningful opportunity to review proxy voting advice in advance of its publication and provide their corrections or responses would reduce the likelihood of *errors*, provide more complete information for assessing proxy voting advice businesses' recommendations, and ultimately improve the reliability of the voting advice utilized by investment advisers and others who make voting determinations, to the ultimate benefit of investors.[119]

[4] In formulating the proposed review and feedback period and notice of voting advice requirements, we have sought to improve the quality of information available to investors while balancing, on the one hand, the need for registrants and certain soliciting persons to conduct a meaningful assessment of the advice and communicate any concerns or *errors* regarding the advice with, on the other hand, the concerns about imposing an undue delay or otherwise jeopardizing the ability of proxy voting advice businesses to meet their contractual commitments to clients and their clients' ability to make timely and informed voting decisions.[120]

[5] These amendments are intended to give registrants and other soliciting persons an opportunity to engage with the proxy voting advice business and identify *factual errors or methodological weaknesses* in the proxy voting advice before it is disseminated to clients.[121]

As discussed in Response #24, the Release fails to provide a reliable basis for the SEC to conclude that factual errors or methodological weaknesses are prevalent or materially affect a proxy voting advice business's voting recommendation. As a result, the proposal for standardized review and feedback and opportunity to include responses to the proxy voting advice can be not be justified by the need to address factual errors and methodological weaknesses. As explained by SEC Commissioner Lee in her dissent to the Release:

I agree with the stated goal in the proposal that proxy advice should be based on the "most accurate information reasonably available." What is missing in this

---

[118] *Id.* at 66,528-30 (footnotes omitted & emphasis added).
[119] *Id.* at 66,530 (emphasis added).
[120] *Id.* at 66,533 (emphasis added).
[121] *Id.* at 66,545 (emphasis added).

proposal, however, are . . . critical underpinnings for the policy choices it reflects. . . . [I]t is missing data demonstrating an error rate in proxy advice sufficient to warrant a rulemaking. In fact, as the comment file shows, assertions of widespread factual errors have been methodically analyzed and largely disproven.[122]

More recently, the IAC Recommendation provided the following views about the incidence of factual errors and methodical weaknesses in proxy voting advice businesses' analyses:

We recommend the SEC cite evidence of a problem of the kind that might be addressed by the key elements of the proxy advisor proposal – specifically, the part of the proposal mandating preclearance of draft reports with corporate managers and silencing advisors from speaking to their clients for at least a week while managers review the reports. Instead, the SEC notes that some private interests, such as some corporate managers and their lawyers and trade group representatives, claim problems with proxy advisors exist, such as errors in advice given. The most the SEC says is that such problems "may" or "could" exist.

It is true the SEC cites to sources that assert that errors in proxy advisor reports exist. But a brief review of those sources shows that they provide no reliable basis for concluding material problems actually do exist . . . .

. . . .

From over 17,000 shareholder votes over three years, the number of possible factual errors identified by companies themselves in their proxy supplements amounts to 0.3% of proxy statements – and none of those is shown to be material or to have affected the outcome of the related vote.[123]

***Request for Comment 50.*** *Are there better approaches for addressing factual errors and methodological weaknesses in proxy voting advice businesses' analyses?*

***CII Response****.* As discussed in Response #24, the Release fails to provide a reliable basis for the SEC to conclude that "factual errors or methodological weaknesses" are prevalent or materially affect a proxy voting advice business's voting recommendations. Better approaches for addressing alleged factual errors and methodological weaknesses in proxy voting advice businesses' analyses should be explored only to the extent the SEC first develops reliable evidence on the issue.[124] As we explained in the CII October 24 Letter:

While most assertions of pervasive proxy advisor inaccuracy are mere assertions and entirely undocumented, we have seen some attempts to provide evidence. But that **evidence on accuracy is extraordinarily weak, and clearly an insufficient basis for rulemaking.** We believe that the SEC should not regulate proxy advisors

---

[122] Commissioner Allison Herren Lee, Statement on Shareholder Rights (footnotes omitted).
[123] Recommendation of the Investor-as-Owner Subcommittee of the IAC, Relating to SEC Guidance and Rule Proposals on Proxy Advisors and Shareholder Proposals at 5 (footnotes omitted).
[124] *See, e.g.,* CII October 24 Letter at 1-2.

in the absence of good evidence. **The SEC itself should develop reliable, meaningful evidence on this question before moving forward with any additional new regulation.**

**We submit that advocates of proxy advisor regulation base their case importantly on allegations of pervasive inaccuracy in proxy advisor reports.** But they have not provided evidence that stands up to any scrutiny, as we detail below. Before the SEC proposes further rulemaking, it should do its homework to establish the predicates for regulation.[125]

To the extent the SEC does develop reliable evidence on the issue, one potential "better approach" would be to take actions that promote more competition in the proxy voting advice business. As indicated in Response #30, we believe the burdens and corresponding costs imposed by the proposal, if adopted, would likely lead one or more proxy voting advice businesses identified in the Release (and others) to exit the industry, and would increase barriers to entry for other potential competitors. As SEC Commissioner Robert J. Jackson Jr. explained

> Those concerned about the influence of the two-principal proxy-advisory firms should consider that today's actions may lead to further consolidation in the industry—handing even more power to the largest player. . . . Unfortunately, the economic analysis in today's release fails to address this concern—or even cite an important recent paper showing the benefits of competition in this area for investors and issuers alike. *See* Tao Li, *Outsourcing Corporate Governance: Conflicts of Interest Within the Proxy Advisory Industry*, 64 Mgmt. Sci. 2951 (2018).[126]

*Request for Comment 51. To what extent have factual errors or methodological weaknesses in proxy voting advice businesses' analyses resulted in impaired voting advice or adversely affected the ability of proxy voting advice businesses' clients to vote securities effectively?*

**CII Response**. As described in Response #24 and Response #50, the Release fails to provide reliable evidence that factual errors or methodological weaknesses are prevalent or materially affect a proxy voting advice business's voting recommendation. We do not believe that factual errors or methodological weaknesses in proxy voting advice businesses' analyses have resulted in impaired voting advice or has adversely affected the ability of proxy voting advice businesses' clients to vote securities effectively.

## IV.     Proposed Amendments to Rule 14a-9

*Request for Comment 52. Is the proposal to amend the list of examples in Rule 14a-9 necessary in light of the Commission's recent guidance specifically underscoring the applicability of Rule 14a–9 to proxy voting advice? Should the proposal to amend Rule 14a–9 list different or additional examples and, if so, which examples?*

---

[125] *Id.*
[126] Commissioner Robert J. Jackson, Jr., Public Statement, Statement on Proposals to Restrict Shareholder Voting at n.6.

*CII Response*. We do not believe the proposed list of examples in Rule 14a-9 are necessary because we do not believe the SEC has a reliable basis for amending the list. More specifically, we note that the Release asserts that "due to the lack of clear disclosures, clients are led to mistakenly believe that the unique criteria used by the proxy voting advice businesses were approved or set by the Commission."[127] The Release then provides two specific examples: (1)"if a proxy voting advice business were to recommend against the election of a director who serves on the registrant's audit committee on the basis that the director is not independent under the proxy voting advice business's independence standard for audit committee members, and the standard applied by the proxy voting advice business is more limiting than the Commission's rules, it may be necessary for the proxy voting advice business to make clear that the business's recommendation is based on a misapprehension that a registrant is not in compliance with the Commission's standards or requirements[; and . . . (2)] "if a proxy voting advice business recommends that clients vote against a reporting company (''SRC'') that provides scaled executive compensation disclosure in compliance with Commission rules for SRCs, rather than the expanded disclosure required of larger registrants [t]o the extent that such a proxy voting advice business does not make clear to its clients that it is making a negative voting recommendation based on its disclosure criteria, notwithstanding that the registrant has complied with the compensation disclosure standards established by the Commission."[128]

In an effort to evaluate the SEC's allegations of the lack of clear disclosures for the two specific examples provided, CII staff reviewed a number of recent relevant ISS and Glass Lewis research reports. The results of that review are described below:

*Example 1*

Per our review, we believe that when ISS or Glass Lewis recommends against the election of a director on the basis that the director is not independent under the proxy voting advice business's independence standard and the standard applied by the proxy voting advice business is more limiting than the Commission's rules, the disclosure that is currently provided by ISS and Glass Lewis is clear. Appendices I and II to this letter provide examples of "against" recommendations by ISS for Tutor Perini Corporation board member Peter Arkley (Appendix I), and by Glass Lewis for Cypress Semiconductor Corporation board member J. Daniel McCraine (Appendix II). We challenge the SEC to describe why these disclosures are not clear. We asked Commission staff members to otherwise show us examples of what the Release asserts in this regard, and they did not do so, giving us the impression that they did not have any examples (notwithstanding the assertion of one Commissioner that he had seen examples, which were not presented in the Release or otherwise shown to us).

*Example 2*

Per our review, we believe that when ISS and Glass Lewis recommends that clients vote against a reporting company that provides scaled executive compensation disclosure in compliance with Commission rules for smaller reporting companies, the ISS and Glass Lewis reports clearly indicate that the company is exercising its authority to provide this reduced level of disclosure.

---

[127] Release 66,538.
[128] Release at 66,538 (footnotes omitted).

Appendix III to this letter provides an analogous example of an "against" recommendation by Glass Lewis for the compensation committee members of Independence Contract Drilling, Inc.—an emerging growth status company which was not required to present a say-on-pay proposal. We challenge the SEC to describe why this disclosure is not clear.

In addition, CII staff reviewed the ISS research reports on U.S. companies not in the Russell 3000 that received an against recommendation by ISS on their say-on-pay proposal in 2019 and the proposal received less than 50% support from shareholders. For those companies with under $100 million in revenue, we did not find a single company where the ISS report indicated that the scaled executive compensation disclosure was a basis for the ISS negative recommendation.

Finally, even assuming the SEC has some reliable evidence to support the two examples, we note that for the 2019 proxy season ISS recommended against only 9% of uncontested board nominees[129] and 12.7% of say-on-pay proposals at Russell 3000 companies.[130]

For all the above reasons, we do not believe the Release provides a reliable basis for amending the list of examples for Rule 14a–9.

***Request for Comment 53.*** *To what extent do proxy voting advice businesses currently apply their own standards or criteria that materially differ from those set or approved by the Commission, and how well do they alert clients to these differences when it may impact their voting advice?*

***CII Response***. Clients of proxy advice businesses expect their advisor to use its own judgment, expertise and methodologies (and generally expect some degree of consistency between companies). As indicated in Response #52, the Release does not provide reliable evidence indicating that proxy voting advice businesses are failing to provide clear disclosure that alerts clients to differences between their own standards or criteria that materially differ from those set or approved by the Commission when it may impact their voting advice.

***Request for Comment 54.*** *Should the proposed amendment refer only to standards or requirements that the Commission sets or approves or is a wider scope (i.e., rules of other legal or regulatory bodies) more appropriate? If a wider scope is preferable, should the regulatory standards of state or foreign regulatory bodies also be referenced?*

***CII Response***. We do not believe the Commission should consider a wider scope unless and until it can establish a reliable basis for amending the list of examples for Rule 14a–9.

---

[129] Sullivan & Cromwell, 2019 Proxy Season: Part 2, ISS Negative Recommendations Against Directors 1 (July 25, 2019), https://www.sullcrom.com/files/upload/SC-Publication-2019-Proxy-Season-Review-Part-2-ISS-Negative-Recommendations-Against-Directors.pdf ("ISS issued negative recommendations against 9% of directors in uncontested elections for meetings through June 1, 2019 among the Russell 3000, totaling about 1,100 directors and affecting 411 companies . . . .").

[130] Semler Brossy, 2019 Say on Pay and Proxy Results 2 (Oct. 3, 2019), https://www.semlerbrossy.com/wp-content/uploads/SBCG-2019-SOP-Report-2019-10-03.pdf ("The 'Against' recommendation rate in 2019 (12.7%) is 140 basis points lower than the 2018 rate (13.9%); and is in line with the historical average observed since 2011 (12.8%)").

*Request for Comment 55. Alternatively, instead of amending Rule 14a–9 as proposed, should we require, as an additional condition under proposed Rule 14a–2(b)(9), that a proxy voting advice business include in its voting advice (and in any electronic medium used to deliver the proxy voting advice) disclosure of its use or application, in connection with such proxy voting advice, of standards that materially differ from standards or requirements that the Commission sets or approves?*

**CII Response**. We are indifferent as to which alternative is selected for requiring that a proxy voting advice business include in its voting advice disclosure of its use or application, in connection with such proxy voting advice, of standards that materially differ from standards or requirements that the Commission sets or approves. Before considering alternatives, the Commission should first gather evidence establishing a reliable basis supporting the alternatives under consideration. We believe the Release fails to provide such evidence.

## V. *Transition Period*

*Request for Comment 56. Are there any challenges that proxy voting advice businesses, their clients, or registrants anticipate in undertaking to develop systems and processes to implement the proposed amendments? If so, what are those challenges, and how could they be mitigated?*

**CII Response**. As indicated in Response #47, it is our understanding that one significant challenge to implementing the proposed amendments is that during the proxy season it may be difficult to devote resources to develop new systems and processes that would be required to implement the proposed amendments. We believe that those challenges may be mitigated, at least in part, by revising the proposed "one-year transition period after the publication of a final rule in the Federal Register"[131] to, at a minimum, an "18-month transition period after the publication of a final rule in the Federal Register."

The challenges could also be mitigated by adopting our suggested revisions to the proposed amendments. See Response #25.

*Request for Comment 57. Is the proposed transition period appropriate? If not, how long should the transition period be and why? Please be specific.*

**CII Response**. See Response #56.

*Request for Comment 58. Are there any other accommodations that we should consider for particular types of proxy voting advice businesses, registrants, or circumstances? Are there other transition issues or accommodations that we should consider?*

**CII Response**. We currently do not have any additional comments on "other transition issues or accommodations" that should be considered.

---

[131] Release at 66,539.

## VI.    *General Considerations*

***Request for Comment 59.*** *How effective would the proposed amendments be in facilitating the ability of proxy voting advice businesses' clients to obtain the information they need to make informed voting determinations, including for investment advisers that are exercising voting authority on behalf of clients?*

***CII Response***. As described in Response #1, the Commission is well aware that most of the clients of proxy voting advice businesses have not asked for the proposed amendments and do not believe the amendments are needed to facilitate their ability to obtain the information they need to make informed voting decisions. In our view, the proposed amendments would pose substantial harm to the ability of proxy voting advice businesses' clients to obtain the information they need to make informed voting determinations, including for investment advisors that are exercising voting authority on behalf of clients.

***Request for Comment 60.*** *Are there any other conditions that should apply to proxy voting advice businesses seeking to rely on the exemptions in Rules 14a–2(b)(1) and (b)(3)? If so, what are these conditions?*

***CII Response***. As indicated in Response #25, if, despite our strong objections, the Commission insists on a government-mandated review of proxy voting advice and response, we believe the conditions should: (1) limit the required sharing of proxy advisor draft reports with subject companies to only the factual information and data used by the proxy advisor in preparing its report and recommendations; (2) permit proxy advisors to provide drafts that include more than factual information and data; (3) permit proxy advisors to disclose a draft of their reports to subject companies simultaneously with disclosing them to their institutional investor clients; and (4) provide a waiting period before proxy advisors and clients subject to the SEC's jurisdiction could act on the advice; and (5) establish a safe harbor for proxy advisors to shield them from liability under Rule 14a-9[132] if they comply with all of the proposed requirements.

In addition, as indicated in Response #31, we believe the proposed amendments should include a provision that allows a proxy voting advice business to seek reimbursement from registrants and other soliciting persons of the reasonable expenses associated with any required review and feedback period.

Before the Commission considers any conditions that should apply to proxy voting advice businesses seeking to rely on the exemptions in Rules 14a–2(b)(1) and (b)(3), the SEC should first evaluate whether there is reliable basis to support the conditions.

***Request for Comment 61.*** *Are there other approaches that are better suited to accomplish the Commission's objectives? For example, should proxy voting advice businesses be required to develop policies and procedures to help ensure that conflicts of interest are dealt with appropriately and to improve the accuracy of the information on which their proxy voting advice is based?*

---

[132] False or Misleading Statement 17 U.S.C. § 240.14a-9 (Jan. 1966), *available at* https://www.law.cornell.edu/cfr/text/17/240.14a-9.

*CII Response*. Response #7 describes our views on "conflicts of interest and responses," and Response #24 and Response #25 describe our views on the "accuracy of the information." Before the Commission considers any approaches on those issues, the SEC should first evaluate whether there is reliable basis to support the approaches contemplated.

***Request for Comment 62.*** *What effect would these proposals, if adopted, have on competition in the proxy advisory industry? Would adoption of the proposals increase barriers to entry into the market for potential competitors or lead to unhealthy market concentration within the proxy advisory industry or, ultimately, lead to decline in the quality of proxy voting advice provided to investors?*

*CII Response*. As described in Response #30 and Response #50, we believe the adoption of the proposals would, among other negative effects, increase barriers to entry into the market for potential competitors, lead to unhealthy market concentration (with at least one o of the five businesses identified by the SEC likely to exit the industry), and likely lead to a decline in the quality of proxy voting advice provided to investors. We note that our view is consistent with the following view expressed in the Admati Letter:

> We share the Commission's concerns about *concentration in the proxy advisory market.* Yet, we disagree with the following proposed remedies: 1) forcing proxy advisors to share their opinions with managers ahead of time and 2) treating opinions on proxies as proxy solicitations. By increasing the cost of opining on proxy statements such proposals *will only discourage new entry into the proxy advisory market and exacerbate the problem of market concentration in this sector.* We ask the Commission to strike these proposed changes [133]

***Request for Comment 63.*** *To the extent that adoption of the proposed amendments would limit the ability of smaller proxy voting advice businesses or potential new market entrants to operate and compete in the market for these services, should they be subject to the additional conditions in proposed Rule 14a–2(b)(9) in order to rely on the exemptions in Rules 14a– 2(b)(1) and (b)(3)? If not, what should the criteria be for determining who is not subject to Rule 14a– 2(b)(9)? For example, should we base the availability of an accommodation for smaller proxy voting advice businesses on annual revenues, number of clients or market share? Would investment advisers or other institutional investors be less likely to hire proxy voting advice businesses that take advantage of such an accommodation? Are there other accommodations we should consider in lieu of or in addition to this exemption for certain proxy voting advice businesses?*

*CII Response*. As described in Response #30, Response #50, and Response #62, we believe the adoption of the proposed amendments would limit the ability of smaller proxy voting advice businesses or potential new market entrants to operate and compete in the market for proxy voting advice services. As we described in the CII November 14 Letter:

---

[133] Letter from Anat Admati, George G.C. Parker Professor of Finance and Economics, Stanford Graduate School of Business et al. to Chairman, Jay Clayton, Securities and Exchange Commission et al. at 1 (emphasis added).

As indicated at the November 7 meeting, Segal Marco, ProxyVote Plus and other smaller proxy voting agents and research providers may exit the voting advice business if they come within the sweep of the new regulation. We also know of at least one provider that is (or was) contemplating entering the U.S. market for proxy advice; even if as a mature business it could be profitable in the proposed new regulatory structure, we believe that structure would make it particularly challenging to weather a start-up period. We would be interested in obtaining supplemental information on whether the SEC staff considered a carve out for smaller providers and potential new entrants.[134]

More recently, ProxyVote's comment letter states:

We are proud of the fact that we have not sought fee increases from our clients because we recognize the extraordinary pressures faced by these Taft-Hartley pension plans as they seek to protect the retirement income of tens of thousands of retired working men and women. *If faced with the Proposed Rulemaking's enormous paperwork burden imposed on our small company, we may have little choice other than to increase fees or seek to sell our business.* We believe this will have a very negative effect on our clients as well as their participants and beneficiaries[135].

We also note that similar negative views about the Release were expressed by Minerva Analytics (Minerva Letter), which we observe could be a credible potential entrant to the U.S. proxy voting advice business.[136] The Minevera Letter states:

In respect of the SEC's proposals, our reasons for opposing the proposed regulations [are] that they will:

. . . .

- Damage much-needed competition and unfairly prejudice the business chances of challenger service providers like Minerva and present impossible competition hurdles . . . .[137]

For all the above reasons, we would support permitting, but not requiring, smaller proxy voting advice entities from complying with the proposed amendments.[138] More specifically, we would propose, consistent with the bi-partisan U.S. Senate legislation to regulate proxy advisors

---

[134] CII November 14 Letter at 3.

[135] *Id.* at 2.

[136] Letter from Sarah Wilson, Chief Executive, Minerva Analytics to Hon. Jay Clayton, Chairman, U.S. Securities and Exchange Commission.

[137] *Id.* at 2.

[138] *See* News Release, Senator Jack Reed, SEC Evaluates Proxy Process, U.S. Senators Introduce Corporate Governance Fairness Act (Nov. 14, 2018), https://www.reed.senate.gov/news/releases/as-sec-evaluates-proxy-process-us-senators-introduce-corporate-governance-fairness-act (bi-partisan registrant supported bill to regulate proxy advisory firms bill "provides smaller proxy advisory firms the choice to voluntarily register . . . but does not require them to do so").

introduced by Senator Jack Reed in 2018,[139] that proxy voting advice businesses that have annual "gross receipts from the clients of the person in an amount that is not more than $5,000,000"[140] be exempt from the proposed amendments. . In addition, we would also support an exemption for tax exempt proxy voting advice businesses that are established under section 501(c)(3) of the Internal Revenue Code (IRC).

## VII.    *Economic Analysis*

***Economic Analysis [EA] Request for Comment 1:***  *Have we correctly characterized the demand for the services of proxy voting advice businesses? What alternatives are available, if any, to the advice of proxy voting advice businesses?*

***CII Response***. We do not believe the Release correctly characterizes the demand for the services of proxy voting advice in its discussion of why investment advisers and other institutional investors may retain proxy voting advice businesses to perform execution of proxy votes.[141] We note that the Release describes such service as [(1)] "voting the shares in accordance with a customized proxy voting policy resulting from consultation between a proxy voting advice business and its client, [(2)] the proxy voting advice businesses' proxy voting policies, *or* [(3)] the client's own voting policy."[142] We believe this description is, at best, misleading because it implies that the execution of votes under scenario (1) and (2) results in the execution of proxy votes that are not based the client's own voting policies—this is a mischaracterization unsupported by reliable evidence. See also Response #44.

One alternative available to the advice of proxy voting advice businesses is for the clients of those businesses to use their own resources to independently conduct the work necessary to analyze voting issues. As the Release fairly describes:

> In the absence of the services offered by proxy voting advice businesses, investment advisers and other clients of these businesses may require considerable resources to independently conduct the work necessary to analyze and make voting determinations. Proxy voting advice businesses generally are compensated on a fee basis for their services, and they are able to capture economies of scale for several of the services they provide, including supplying voting advice to clients. As a consequence, investment advisers and other institutional investors have found

---

[139] Corporate Governance Fairness Act, S. 3614, 115th Cong. (Nov. 13, 2018), https://www.congress.gov/bill/115th-congress/senate-bill/3614/text?q=%7B%22search%22%3A%5B%22Corporate+Governance+Fairness+Act%22%5D%7D&r=1.

[140] *Id.* § 2(32)(A)(II) ("(ii) does not include any person described in clause (i) that, together with the parent, subsidiaries, and affiliates of the person, receives on a consolidated basis in a fiscal year gross receipts from the clients of the person in an amount that is not more than $5,000,000, as adjusted annually by the Commission to reflect the percentage change for the previous calendar year in the gross domestic product of the United States, as calculated by the Bureau of Economic Analysis of the Department of Commerce, except that a person described in this clause may choose to be considered a proxy advisory firm for the purposes of this Act.").

[141] *See* Release at 66,540.

[142] Release at 66, 540 (emphasis added).

efficiencies in hiring these businesses to perform voting-related services, rather than performing them in-house.[143]

***EA Request for Comment 2:*** *To what extent would the benefits of more reliable and complete voting advice being provided to investment advisers and other clients of proxy voting advice businesses benefit investors? Please provide supportive data to the extent available.*

***CII Response****.* We believe the provisions of the Release would not provide a net benefit to investors in terms of more reliable and complete voting advice for at least three reasons. First, as detailed in the CII October 24 Letter and described in Response #24, CII staff performed a detailed review of the alleged errors in proxy voting advice business research reports and found a "factual error rate on a report basis of 0.057% to 0.123% (18 to 39 reports with one or more factual errors in 31,830 reports)"[144] We believe an error rate of that magnitude is insufficient "to impose a costly new regulatory structure that will constrain competition . . . ."[145]

We note that the only quantitative evidence presented in the Release on the reliability of voting advice is "Table 2" that provides data of registrant allegations of errors.[146] As indicated in Response #49 the number of possible factual errors identified by companies themselves in their proxy supplements amounts to 0.3% of proxy statements. Despite repeated CII requests detailed in footnote 4 of this letter (page 2), the SEC has to-date failed to provide us with their underlying analysis so that we and other commentators can determine the accuracy of the allegations.

Second, as indicated in Response #25, even assuming the Commission believes a 0.3% error rate for proxy voting advice business research reports is too high and should be lowered, the proposed timeframe available for the proxy voting advice businesses to undertake their research and draft their recommendations, and, importantly, for institutional investor clients to review the advice, will generally decrease by at least 5 days with ISS estimating a decline of "9-13 calendar days."[147] We believe the shorter timeframe would not increase the reliability and completeness of voting advice.

Finally, as also indicated in Response #25, the shorter time frame is largely created by the provisions of the Release requiring proxy voting advice businesses to share draft research reports with registrants for a review and feedback period. Those proposed requirements can be reasonably perceived as impairing the independence of the proxy voting advice, particularly since (1) the proxy advisor is required to seek review and receive feedback from the self-interested company management *before* sharing the draft report with their own paying clients, and (2) the proxy advisor opinions and recommendations are subject to liability to registrants under Rule 14a-9. We believe this impairment of the independence of proxy voting advice would not increase the reliability and completeness of voting advice.

---

[143] *Id.* at 66,540-41.
[144] CII October 24 Letter at 3.
[145] *Id.*
[146] Release at 66,546.
[147] Letter from Lorraine Kelly, Head of Governance Business, ISS to Valued Client.

***EA Request for Comment 3.*** *The benefits of the proposed amendments for institutional investors and their clients are linked to the extent to which current practices of proxy voting advice businesses would meet the requirements of the proposed conditions. Have we correctly characterized the extent to which the current practices of proxy voting advice businesses would meet such requirements?*

***CII Response***. As an initial matter, we do not believe the Release provides a reliable basis for asserting that the proposed amendments provide "benefits" to institutional investors and their clients. More specifically, we believe the characterization of the extent to which the current practices of proxy voting advice businesses would meet the requirements of the proposed conditions is not sufficiently detailed to be useful for most commentators.

For example, the section on "Certain Industry Practices"[148] describes the proposed conditions as an "augment [to] existing obligations."[149] If the Release, however, had provided a more detailed description of each of the proposed conditions and the corresponding scope of the current practices (or lack thereof) of ISS and Glass Lewis, it would have been clearer to most commentators as to whether the use of the word "augment" is a correct characterization.

***EA Request for Comment 4.*** *We discuss the possibility that proxy voting advice businesses could attempt to mitigate the delay in delivering advice to clients caused by registrant and other soliciting persons' review by committing additional resources to producing proxy voting advice earlier than they do currently. Would proxy voting advice businesses take these steps? How costly would it be for proxy voting advice businesses to produce proxy voting advice faster than they do currently? Please provide supportive data to the extent available.*

***CII Response.*** We believe it is unclear whether proxy voting advice businesses can provide voting advice earlier than they do currently, particularly if that advice is subject to the proposed review and feedback requirements. In addition, speeding up the proxy voting advice would also risk the quality of the research and advice, both in the sense of the depth of analysis that could be done on complicated issues like executive compensation or shareholder proposals, and potentially introducing errors which is contrary to the SEC's stated goal. Finally, we note that if the proxy voting advice businesses are required to commit additional resources to producing voting advice those costs, which may be substantial, will likely be passed on to its paying customers, institutional investors and the beneficiaries of their funds, many of whom are Main Street investors.

As you are aware, "proxy advisors effectively serve as collective research providers for large numbers of institutional investors, providing these investors an affordable alternative to the high costs of individually performing the requisite analysis for literally hundreds of thousands of ballot proposals at thousands of shareholder meetings each proxy season."[150] While we do not have the data necessary to determine how less affordable proxy voting advice would become if those businesses were required to produce proxy voting advice faster than they currently do, we do know that Glass Lewis has provided the Office of Management and Budget a preliminary,

---

[148] Release at 66,544.
[149] *Id.*
[150] CII October 15 Letter at 2.

rough estimate of annual burden under the provisions of the Release (Glass Letter).[151] That analysis found that their burden would be "240x the Commission's estimate."[152] Glass Lewis explains that the Commission's analysis:

> [S]ummarily concludes that, after the initial year, compliance with the new disclosure and review requirements would take proxy advisors an average of 250 hours per year -- or somewhat less than three minutes for each US public company on which Glass Lewis publishes a research report.[153]

***EA Request for Comment 5.*** *We expect that the costs of the proposed review and feedback period and final notice of voting advice would be lower for proxy voting advice businesses that currently provide registrants with a mechanism for reviewing draft documents prior to proxy voting advice businesses issuing final drafts to their clients. Are we correct in that characterization? If other proxy voting advice businesses would be disproportionately affected, to what extent, and how would such effects manifest? What, if any, additional measures could help mitigate any such disproportionate effects? Please provide supportive data to the extent available.*

***CII Response.*** We believe the costs of the proposed review and feedback period and final notice of voting advice may be lower for proxy voting advice businesses that currently provide registrants with a mechanism for reviewing draft documents prior to proxy voting advice businesses issuing final drafts to their clients. However, as described in Response EA #4, it appears that the Commission has vastly understated the costs of the proposed review and feedback period and final notice of voting advice.

For those proxy voting advice businesses that do not currently have any registrant review procedures and processes in place, it is understandable that their businesses would be disproportionally affected by the provisions of the Release. As explained in the ProxyVote comment letter:

> Note 261 of the Proposed Rulemaking cites a letter from Egan-Jones, the third largest proxy advisory firm, for the proposition that "the costs associated with the review and feedback process would not disproportionately affect certain proxy voting advice businesses." Proposed Rulemaking at p. 112. This assumption is inaccurate for small businesses such as ours that do not have any registrant review procedures or processes in place. Unlike ISS, Glass Lewis and Egan-Jones, the first-year costs will be dramatically higher for our small company to create new systems to permit registrants to review and provide feedback on the proxy votes we cast on behalf of our clients.

> The disproportionate regulatory burden on our firm is magnified by the fact that our companies' business model is substantially different from ISS, Glass Lewis and

---

[151] Letter from Nichol Garzon-Mitchell, Senior Vice President, General Counsel to Mr. Alex Goodenough, Policy Analyst, Office of Information and Regulatory Affairs, Office of Management and Budget.
[152] *Id.*
[153] *Id.*

Egan-Jones. Each of these three firms issue research reports that recommend how to vote proxies. In contrast, ProxyVote does not issue research reports or recommendations to our clients in advance of shareholder meetings. Rather, ProxyVote casts votes as an ERISA fiduciary on behalf of our clients. Our clients receive a detailed written report on all proxy votes that we cast on their behalf after the shareholder meetings have taken place. Because the Proposed Rulemaking explicitly contemplates that it will apply to our company, our business model may well need to change dramatically. To comply with the Proposed Rulemaking, our company may need to create a new registrant-specific report for each registrant to review prior to casting proxy votes on behalf of our clients.[154]

As suggested by the ProxyVote comment letter, one measure that might be taken to mitigate the disproportion effects of proxy voting advice businesses that do not currently provide registrants with a mechanism for reviewing draft documents is to exempt businesses that do not routinely issue research reports to clients in advance of shareholder meetings.

In addition, as indicated in Response #31, we would support including a provision in the proposed amendments that allows proxy voting advice businesses to seek reimbursement from registrants and other soliciting persons of the reasonable expenses associated with any required review and feedback period.

Finally, as indicated in Response #63, we would support permitting, but not requiring, smaller proxy voting advice businesses that have annual gross receipts from clients that is not more than $5,000,000 to be exempt from the proposed conditions. In addition, we would also support an exemption for tax exempt proxy voting advice businesses established under section 501(c)(3) of the IRC.

**EA Request for Comment 6.** *To what extent might the increased burdens to proxy voting advice businesses to comply with the proposed conditions be borne by proxy voting advice businesses clients?*

**CII Response.** As described in EA Response #4, and throughout this letter, we believe the increased burdens to proxy voting advice businesses to comply with the proposed conditions would be incurred by the proxy voting advice businesses' clients—institutional investors—and the beneficiaries of their funds—many of whom are Main Street investors. Our belief was confirmed in the Glass Letter when they observed: "The costs . . . would be borne by proxy advisors and would inevitably have to be passed on to their institutional investor clients, who, in turn, may have to pass these costs on to their individual investor participants and beneficiaries."[155]

**EA Request for Comment 7.** *In response to the Commission's recent releases on proxy voting responsibilities and proxy voting advice, one commenter argued that the Commission's*

---

[154] Letter from Craig Rosenberg, Pres., ProxyVote Plus, LLC to Office of Management and Budget at 2.
[155] Letter from Nichol Garzon-Mitchell, Senior Vice President, President, Glass Lewis to Mr. Alex Goodenough, Policy Analyst, Desk Officer of the U.S. Securities and Exchange Commission, Office of Information and Regulatory Affairs, Office of Management and Budget.

*interpretation and guidance would likely create substantially increased costs and unnecessary burdens on the process by which proxy voting advice businesses render their advice. According to that commenter, proxy voting advice businesses would face increased litigation, staffing and insurance costs that could be passed on to their institutional investor clients and their underlying retail clients. Would these concerns similarly apply to aspects of the proposed amendments, or is this concern overstated in that the aspects of the interpretation and guidance that are encompassed in the proposed amendments reflect current legal obligations regarding solicitation activities?*

**CII Response.** We continue to have concerns that proxy voting advice businesses face increased litigation, staffing and insurance costs that would be passed on to their institutional investor clients. The original concern had been expressed not by "one commentator," but a coalition of 61 investors in connection with Commission's interpretation and guidance. That concern has only increased with the proposed amendments. As the Glass Letter explained:

> [T]he SEC has explicitly warned proxy advisors that do not take company suggestions during [the proposed] . . . review process that their failure to do so could precipitate litigation. In the Proposing Release's words, while the proposed rule "does not require proxy voting advice businesses to accept any such suggested revisions. *It is equally important to recognize, however, that proxy voting advice subject to the Rule 14a-2(b) exemptions is not exempt from Rule 14a-9 liability, which prohibits materially misleading misstatements or omissions in proxy solicitations."* This not-too-subtle threat means that proxy advisors will have to review company feedback with an eye on the SEC's invitation, should they not take all company comments, for companies to sue them.[156]

**EA Request for Comment 8.** *If registrants and other soliciting persons choose to provide a statement regarding the proxy voting advice, registrants and other soliciting persons would incur costs of drafting a statement, providing a hyperlink (or other analogous electronic medium) to the proxy voting advice business, maintaining their statement online, and coordinating timing with proxy voting advice businesses for the filing of supplementary proxy materials. Please provide data with respect to these costs.*

**CII Response.** As described in Response #42, the SEC appears to acknowledge, and the Glass Letter confirms, that providing a hyperlink and the related coordinating timing with proxy voting advice businesses for the filing of supplementary proxy materials may delay the timely receipt of the advice. It will also increase the proxy voting advice businesses' costs which likely would be passed on to the clients and the beneficiaries of clients' funds, including Main Street investors.

**EA Request for Comment 9.** *To what extent do investors change their votes? To what extent do investors change their votes in response to a registrant filing additional definitive proxy materials? Please provide supportive data to the extent available.*

**CII Response.** We suggest the proxy voting advice businesses are in a better position to respond to this question.

---

[156] *Id.*

*VIII. Initial Regulatory Flexibility Analysis*

*Request for Comment Regarding:*

*Initial Regulatory Flexibility Analysis [IRFA] Request for Comment 1. How the proposed amendments can achieve their objective while lowering the burden on small entities;*

**CII Response.** As described in Response #63 and EA Response #5, we would support permitting, but not requiring, smaller proxy voting advice entities from being subject to the provisions of the Release.

*IRFA Request for Comment 2. The number of small entity companies that may be affected by the proposed amendments;*

**CII Response.** As indicated in the CII November 14 Letter, in addition to ProxyVote, we believe that there are a number of other small proxy voting agents and research providers that are not identified in the Release but come within the broad sweep of the proposed amendments.

*IRFA Request for Comment 3. The existence or nature of the potential effects of the proposed amendments on small entities discussed in the analysis;*

**CII Response.** See Response EA #5 for a description of the potential effects of the proposed amendments from the perspective of ProxyVote.

*IRFA Request for Comment 4. How to quantify the effects of the proposed amendments.*

**CII Response.** We note that the ProxyVote comment letter provides some quantification of the effects of the proposed amendments as follows:

> The Proposed Rulemaking also estimates that one-fourth of this 1,000 hours will be for outside counsel at a rate of $400 (ProxyVote's actual outside legal fees are approximately $650 per hour).
>
> . . . .
>
> Our company's clients require that we vote all of their holdings, not one-third of their holdings. Accordingly, the appropriate number of registrants that should be subject to the Proposed Rulemaking's estimates should be 5,690 registrants, not 1,897 registrants. Under the Proposed Rulemaking, each of these registrants will be given the opportunity to review our proxy votes, provide comments to us, and then review our proxy votes a second time. This is a significant, non-trivial expense for any company, let alone a small business such as ProxyVote.[157]

\*\*\*\*

---

[157] Letter from Craig Rosenberg, Pres., ProxyVote Plus, LLC to Office of Management and Budget at 2-3.

CII appreciates the opportunity to submit comments on this important matter and is available to provide any additional information the Commission requests.

Sincerely,

Kenneth A. Bertsch
Executive Director

Jeffrey P. Mahoney
General Counsel

# APPENDIX I
## EXCERPT FROM ISS 2018 PROXY REPORT ON TUTOR PERINI

**Tutor Perini Corporation (TPC)**        Meeting Date: **23 May 2018**
POLICY: United States        Meeting ID: 1227644

## Board Profile (after upcoming meeting)

### Director Independence & Affiliations

#### EXECUTIVE DIRECTORS

| Item On Ballot | Name | Affiliation | Independence Classification Company | Independence Classification ISS | Attend <75% | Gen-der | Age | Tenure | Term Ends | Outside Boards | Outside CEO | Audit | Comp | Nom | Gov |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 1.1 | **Ronald Tutor** | CEO/Chair | Non-Independent | Executive Director | | M | 77 | 21 | 2019 | 0 | | | | | |
| 1.4 | **James (Jack) Frost** | President | Non-Independent | Executive Director | | M | 65 | 3 | 2019 | 0 | | | | | |

#### NON-EXECUTIVE DIRECTORS

| Item On Ballot | Name | Affiliation | Independence Classification Company | Independence Classification ISS | Attend <75% | Gen-der | Age | Tenure | Term Ends | Outside Boards | Outside CEO | Audit | Comp | Nom | Gov |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 1.6 | **Michael Klein** | Lead Director | Independent | Independent | | M | 76 | 21 | 2019 | 1 | | F | M | C | C |
| 1.2 | **Peter Arkley** | Professional Relationship | Independent | Non-Independent | | M | 63 | 18 | 2019 | 0 | | | M | M | M |
| 1.3 | **Sidney (Sid) Feltenstein** | Transactional Relationship, Relative of Employee | N/D | Non-Independent | | M | 77 | 4 | 2019 | 0 | | | | | |
| 1.5 | **Michael Horodniceanu** | | Independent | Independent | | M | 73 | 0* | 2019 | 0 | | | | | |
| 1.7 | **Robert Lieber** | | Independent | Independent | | M | 63 | 3 | 2019 | 1 | ✓ | F | | M | M |
| 1.8 | **Dennis Oklak** | | Independent | Independent | | M | 64 | 1 | 2019 | 1 | | F | | | |
| 1.9 | **Raymond Oneglia** | | Independent | Independent | | M | 70 | 18 | 2019 | 0 | | | | M | M |
| 1.10 | **Dale Reiss** | | Independent | Independent | | F | 70 | 4 | 2019 | 2 | | C F | | | |
| 1.11 | **Donald Snyder** | | Independent | Independent | | M | 70 | 10 | 2019 | 1 | | | C | M | M |
| 1.12 | **Dickran Tevrizian Jr.** | | Independent | Independent | | M | 77 | 6 | 2019 | 0 | | | | M | M |

Shaded cells indicate that company and ISS independence classifications differ.      M = Member | C = Chair | F = Financial Expert
*Indicates director not previously submitted to shareholders for election.

## Director Notes

| | |
|---|---|
| Ronald Tutor | 1) Ronald Tutor is the son-in-law of non-employee director Sidney J. Feltenstein. 2) The company leases certain facilities from an entity indirectly owned and controlled by R. Tutor at market lease rates. Under these leases, the company paid $2.8 million and recognized expense of $3.2 million during fiscal year ended Dec. 31, 2017. (Source: DEF14A, 4/13/18, pp. 4, 9, 16.) |
| Peter Arkley | The company uses Alliant Insurance Services, Inc. for various insurance related services. The associated expenses for services provided for the years ended Dec. 31, 2017, 2016, and 2015 were $17.6 million, $8.9 million, and $9.8 million, respectively. Peter Arkley is a senior managing director for construction services group of Alliant. (Source: DEF14A, 4/13/18, pp. 4, 8; 10-K, 2/27/18, p. F-35.) |
| Sidney (Sid) Feltenstein | 1) Sidney J. Feltenstein is the father-in-law of Chairman and CEO Ronald Tutor. 2) Feltenstein is a designated director of Tutor pursuant to the amended shareholders agreement. 3) The company leases certain facilities from an entity indirectly owned and controlled by R. Tutor at market lease rates. Under these leases, the company paid $2.8 million and recognized expense of $3.2 million during fiscal year ended Dec. 31, 2017. (Source: DEF14A, 4/13/18, pp. 4, 9, 16.) |
| Dennis Oklak | Deloitte & Touche LLP serves as the company's independent registered public accounting firm and was paid $4,493,933 and $4,392,330 during Dec. 31, 2017 and 2016, respectively. Dennis D. Oklak previously served for nine years at Deloitte. (Source: DEF14A, 4/13/18, pp. 6, 18.) |
| Raymond Oneglia | During the year ended Dec. 31, 2017, the company had three active joint ventures with O&G Industries, Inc. including two infrastructure projects in the northeastern United States that are both complete, and one for a project in Los Angeles, California in which the company's and O&G's joint venture interests are 75 percent and 25 percent, respectively. Payments totaling less than $1 million were made to O&G by the joint ventures during 2017. Raymond R. Oneglia is the vice chairman of the board of O&G. (Source: DEF14A, 4/13/17, pp. 6, 9, 16.) |

## Director Employment, Compensation & Ownership

| Name | Primary Employment | Outside Boards | Total Compensation* | Shares Held | 60-day Options | Total | Voting Power (%) |
|---|---|---|---|---|---|---|---|
| **Ronald Tutor** | CEO, Chairman - Tutor Perini Corporation | | ** | 8,844,856 | 1,393,408 | 10,238,264 | 20.00 |
| **Michael Klein** | Other | CoStar Group, Inc. | 274,100 | 423,703 | 0 | 423,703 | <1 |
| **Peter Arkley** | Financial Services | | 236,300 | 54,357 | 0 | 54,357 | <1 |
| **Sidney (Sid) Feltenstein** | Financial Services | | 233,600 | 25,993 | 0 | 25,993 | <1 |
| **James (Jack) Frost** | COO, President - Tutor Perini Corporation | | ** | 577,276 | 572,136 | 1,149,412 | 2.30 |
| **Michael Horodniceanu** | Consultant | | N/A | 0 | 0 | 0 | 0.00 |
| **Robert Lieber** | CEO, President - Resource Capital Corp. | ACRE Realty Investors Inc. | 247,500 | 33,969 | 0 | 33,969 | <1 |
| **Dennis Oklak** | Prof Director | Xenia Hotels & Resorts, Inc. | 237,700 | 5,725 | 0 | 5,725 | <1 |
| **Raymond Oneglia** | Retired | | 240,400 | 568,947 | 0 | 568,947 | 1.10 |
| **Dale Reiss** | Consultant | iStar Inc., CYS Investments, Inc. | 263,600 | 20,625 | 0 | 20,625 | <1 |
| **Donald Snyder** | Other | Western Alliance Bancorporation | 254,100 | 36,567 | 0 | 36,567 | <1 |
| **Dickran Tevrizian Jr.** | Retired | | 237,500 | 51,993 | 0 | 51,993 | <1 |

*Local market currency
**For executive director data, please refer to Executive Pay Overview.

**APPENDIX II**
**EXCERPT FROM 2018 GLASS LEWIS REPORT ON CYPRESS SEMICONDUCTOR**

## 1.00: ELECTION OF DIRECTORS

SPLIT

---

**PROPOSAL REQUEST:** Election of nine directors      **ELECTION METHOD:** Majority

**RECOMMENDATIONS & CONCERNS:**

     **AGAINST:** **J. McCranie** (Affiliate/Insider on nominating/governance committee)

     **FOR:** **W. Albrecht ; H. El-Khoury ; O. Kwon ; C. Lego ; C. Martino ; J. Owens ; J. Sargent ; M. Wishart**

## ■ BOARD OF DIRECTORS

| UP | NAME | AGE | GENDER | GLASS LEWIS CLASSIFICATION | COMPANY CLASSIFICATION | OWNERSHIP** | AUDIT | COMP | GOV | NOM | TERM START | TERM END | YEARS ON BOARD |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| ✔ | Hassane El-Khoury* ·CEO | 38 | M | Insider [1] | Not Independent | Yes | | | | | 2016 | 2018 | 2 |
| ▬ | J. Daniel McCranie | 74 | M | Affiliated [2] | Independent | Yes | | | ✔ | ✔ | 2017 | 2018 | 1 |
| ✔ | W. Steve Albrecht ·Chair | 71 | M | Independent [3] | Independent | Yes | C | | ✔ | ✔ | 2003 | 2018 | 15 |
| ✔ | Oh Chul Kwon | 59 | M | Independent | Independent | Yes | | | | | 2015 | 2018 | 3 |
| ✔ | Catherine P. Lego | 61 | F | Independent | Independent | Yes | ✔ | | | | 2017 | 2018 | 1 |
| ✔ | Camillo Martino | 56 | M | Independent | Independent | Yes | ✔ | C | | | 2017 | 2018 | 1 |
| ✔ | Jeffrey J. Owens | 63 | M | Independent | Independent | Yes | | ✔ | | | 2017 | 2018 | 1 |
| ✔ | Jeannine Sargent | 54 | F | Independent | Independent | Yes | | ✔ | | | 2017 | 2018 | 1 |
| ✔ | Michael S. Wishart | 63 | M | Independent | Independent | Yes | ✔ | ✔ | C | C | 2015 | 2018 | 3 |

C = Chair, * = Public Company Executive, ▬ = Withhold or Against Recommendation

     1. President and CEO.
     2. Former executive vice president of Sales and Applications (until April 2015).
     3. Chair.

*\*\*Percentages displayed for ownership above 5%, when available*

# APPENDIX III
# EXCERPT FROM 2018 ISS PROXY REPORT ON INDEPENDENCE CONTRACT DRILLING

**Independence Contract Drilling, Inc. (ICD)**                    **Meeting Date: 24 May 2018**
POLICY: United States                                             Meeting ID: 1226047

- ✖ *Increased grant size*
- ✖ *Alternate vesting provision*

**LTI is majority time-based; performance shares have alternate vesting provision.** The CEO's long-term awards consisted of 81,567 performance-based restricted stock units (PRSUs) valued at $469,010 and 190,324 time-based restricted stock units (RSUs) valued at $1.1 million. Collectively, the awards were valued at $1.6 million and, when measured by grant value, were 30 percent performance-based and 70 percent time-based. The proxy statement does not disclose any factors considered in determining grant size or a target equity award opportunity. The RSUs vest ratably over three years. In regard to PRSUs, the proxy states "Such awards are subject to a performance period and a performance achievement (either earnings before interest, taxes, depreciation and amortization ("EBITDA") or Total Shareholder Return)." TSR is measured relative to the company's peer group and earned PRSUs cliff vest at the end of the three-year measurement period (FY2017-2019). The proxy does not disclose the specific EBITDA or relative TSR targets. Moreover, the PRSUs appear to include an "alternate vesting" provision as the disclosure provides the awards are subject to EBITDA *or* TSR goals.

## OTHER NOTABLE FACTORS

**Outsized company-selected peers.** The company includes outsized peers in its peer group, which may have an augmenting effect on executive compensation without a strong link to company performance.

## CONCLUSION

The company's peer group contains a number of peers that are much larger than the company, as measured by revenue. The use of outsized peers may have an increasing effect on pay without requiring a commensurate increase in performance. Indeed, we highlight that the CEO's total pay increased for the year in review, amid short- and mid-term TSR underperformance and mixed operational results, and that his total pay of $2.4 million is relatively high when compared to the median total CEO pay from ISS' selected peers of $642,000. In addition to pay magnitude concerns, there are concerns in regard to the annual incentive and long-term awards. While the annual incentive is heavily weighted toward objective measures, for the year in review, the portion applicable to subjective personal goals constituted most of the payout, yet disclosure of how the subjective component was assessed is lacking. In regard to long-term awards, over 50 percent of the CEO's equity awards were subject to time-based vesting and the proxy provides no disclosure of factors considered in determining grant sizes, which increased for the year in review. Finally, the goals for performance-based equity awards are not disclosed and such awards contain an alternate vesting provision to provide multiple opportunities to earn the same award, which diminishes the at-risk nature of the award.

Based on these factors, support for compensation committee members is not warranted as the company is not required to present a say-on-pay proposal. While not required given the company's emerging growth status, shareholders would benefit from additional compensation-related disclosure to understand the rationale for pay amounts and to better asses the pay for performance linkage of the overall program.




Institutional Shareholder Services Inc.
1177 Avenue of Americas, 2nd Floor
New York, NY 10036
T: +1.646.680.6300 | F: +1.646.417.6090

-------------------------------------------------------------------------------------------------

**Filed Electronically**

January 31, 2020

Ms. Vanessa A. Countryman, Secretary
U.S. Securities and Exchange Commission
100 F Street, NE
Washington, D.C. 20549-1090

      Re: Amendments to Exemptions from the Proxy Rules for Proxy Voting Advice;
         *File No. S7-22-19*

Dear Ms. Countryman:

Institutional Shareholder Services Inc. (ISS) submits these comments in response to the above-referenced proposal to regulate proxy advice as a proxy solicitation under the Securities Exchange Act of 1934 (Exchange Act).[1]

Over the past several years, proxy advisers have become surrogates in the debate over how much say shareholders should have in the companies they own. On one side of this debate are shareholders and their representatives, who see proxy voting as an integral part of their fiduciary responsibilities and a duty of good corporate citizenship and who believe proxy advisers play a critical role in aggregating and synthesizing the vast array of data found in proxy statements and providing independent research, analysis and advice that help shareholders make well-informed voting decisions. On the other side are certain corporate representatives who appear to resent shareholders' ability to disagree with management and who have launched a volley of attacks against proxy advisers based mostly on anecdote, faulty reasoning and the occasional fabricated news. In issuing the current rule proposal, the SEC has put its finger firmly on the issuers' side of the scale, a departure from its stated mission. Distilled to its essence, the proposal would give the managers of U.S. public companies an unprecedented and unconstitutional editorial role in the production of the research and vote recommendations that institutional investors engage proxy advisers to provide.

The proposal has three core components.

The first is a definitional component. Here, the Commission proposes to amend Exchange Act Rule 14a-1(*l*) to classify expert proxy voting advice, including advice rendered by investors' fiduciaries, as a "solicitation" subject to the Exchange Act proxy rules, depending on how the adviser markets its services and structures its fees. The proposed changes to Rule 14a-1(*l*) would codify a modified version of the new definition of solicitation the SEC adopted this past August when it issued an "Interpretation and Guidance" regarding proxy advisers.[2] Concluding that the SEC lacks the

---

[1] *Amendments to Exemptions from the Proxy Rules for Proxy Voting Advice,* Exchange Act Rel. No. 87457 (Nov. 5, 2019), 84 Fed. Reg. 66518 (Dec. 4, 2019), available at https://www.sec.gov/rules/proposed/2019/34-87457.pdf.

[2] *Commission Interpretation and Guidance Regarding the Applicability of the Proxy Rules to Proxy Voting Advice,* Exchange Act Rel. No. 86721 (Aug. 21, 2019), 84 Fed. Reg. 47416 (Sept. 10, 2019), available at https://www.sec.gov/rules/interp/2019/34-86721.pdf (Interpretation and Guidance).



authority to regulate proxy voting advice as though it were a solicitation, ISS has asked a federal court to invalidate the Interpretation and Guidance on both substantive and procedural grounds.[3]

The second component of the proposal is exemptive. Here, the Commission proposes to amend two exemptions from the information and filing requirements of the proxy solicitation rules. One exemption, found in Rule 14a-2(b)(1), was originally designed for certain shareholders and other parties who do not seek to act as a proxy for a security holder and who have a limited interest in the outcome of a shareholder vote, consent or authorization. The other exemption, found in Rule 14a-2(b)(3), was designed for certain financial advisors who voluntarily supply proxy voting advice to parties who have not asked for it, which the SEC traditionally has called "unsolicited" advice. Under the current proposal, a proxy adviser seeking to rely on either exemption would be required to provide the subject of its advice with a review and feedback right, the timing of which would vary depending on when the company files its definitive proxy statement. In addition, no later than two business days prior to delivery of the proxy advice to its clients, the proxy adviser would be obliged to provide the subject of the research and advice with a final notice of voting advice, which would have to contain a copy of the proxy voting advice that will be delivered to its clients. If the subject of the advice is not satisfied with the proxy adviser's finished product, it could force the adviser to include in the proxy advice (and on any electronic medium used to distribute the advice), a hyperlink directing the recipient of the advice to the subject's views on the advice. The adviser would effectively be barred from responding to the subject's statement, regardless of how objectionable, baseless or inaccurate it might be. These review, feedback and content-insertion benefits would be guaranteed to issuers of securities registered under Section 12 of the Exchange Act and certain other parties engaging in a solicitation, but not to shareholder proponents of ballot proposals.

The Commission also proposes to duplicate the substance of proxy advisers' existing conflict of interest disclosures, but with additional twists: Now advisers would have to disclose the new conflicts created by the unprecedented editorial rights the proposal would grant to the subjects of the proxy voting advice. In addition, the prescriptive requirements in the proposal for how disclosure is made do not align with the disclosure requirements in existing regulations.

The third aspect of the SEC's proposal is a litigation risk component. In this regard, the SEC seeks to build on the new liability theory it adopted in the Interpretation and Guidance with regard to Exchange Act Rule 14a-9, which prohibits material misstatements or omissions of fact in proxy solicitations. There, the Commission said that proxy advisers' "opinions, reasons, recommendations, or beliefs" can be "statements of material facts" actionable under 14a-9.[4] In a nod to those public companies who do not want to be judged by anything other than the lowest standards required by law, the Commission now proposes to force proxy advisers to make granular disclosure about how the voting guidelines their clients create or select differ from minimum market standards the SEC sets or approves.

ISS submits that there is no legal basis for any aspect of the proposal and that Congress never authorized the SEC to regulate either proxy advisers or proxy advice under the Exchange Act proxy rules. ISS further submits that the proposal to grant public companies and certain other solicitors the right to review, comment on and insert content into the advice proxy advisers render

---

[3] *ISS v. SEC et al.,* 1:19-cv-03275 (D. D.C. filed 10/31/19). This case has been held in abeyance until the earlier of January 1, 2021 or the promulgation of final rules in this rulemaking.

[4] Interpretation and Guidance, *supra* note 2, at 11, 84 Fed. Reg. at 47419.





Institutional Shareholder Services Inc.
1177 Avenue of Americas, 2nd Floor
New York, NY 10036
T: +1.646.680.6300 | F: +1.646.417.6090

to their clients is unconstitutional, since it infringes on advisers' First Amendment rights of free speech. By forcing proxy advisers to give their intellectual property to the subjects of their advice, the proposal also violates the Takings Clause of the Fifth Amendment of the Constitution and destroys ISS' reliance interests in maintaining the independence and integrity of its adviser-client relationships.

Furthermore, the proposal rests on the erroneous assertion that there are problems with the accuracy and integrity of proxy voting advice and ignores statements by the consumers of proxy advice that contradict that baseless assertion. The reality is that we at ISS go to great lengths to ensure the accuracy of the information that underpins our proxy research and recommendations and it is clear to us—after looking at the unsupported claims of "evidence" of pervasive errors— that most "errors" are actually differences over subjective interpretations or differing opinions on methodological frameworks.

The proposal is also unworkable. The suggested review, feedback and response-insertion provisions would severely impede proxy advisers' ability to deliver research and voting recommendations for U.S. corporations to investor clients in a timely fashion. We estimate that the review and feedback rights provided to registrants and certain other soliciting parties alone could reduce our report delivery time by between 45 and 65 percent, thus reducing the time available for shareholders to make the well-informed decisions that the proposals purport to encourage.

The proposal arbitrarily fails to explain why investors cannot be adequately protected under the fiduciary regime established under the Investment Advisers Act of 1940 (Advisers Act); nor does the proposal acknowledge, as it should have, that the suggested amendments to the proxy rules would duplicate, overlap and conflict with applicable Advisers Act rules.

The proposal's cost/benefit analysis is also seriously deficient. Among other things, it selects as a baseline the Interpretation and Guidance that the Commission adopted last August without undertaking any cost-benefit analysis, and without assessing the proposal's effect on competition. The proposal underestimates the operational costs of complying with the revised proxy rule exemptions and fails to calculate the costs to proxy advisers and their clients of managing and monitoring the new requirements resulting from the review, feedback and content-insertion provisions. The proposal also ignores the costs to proxy advisers of having to defend baseless lawsuits by disgruntled registrants under Rule 14a-9. With regard to impact on the capital markets, the proposal fails to recognize the likely diminution of competition and loss of diverse thought among proxy advisers, and the increased insider trading risks caused by proxy advisers' forced disclosure of material nonpublic information to registrants and certain other solicitors. On the other hand, the proposal's benefits, which are largely illusory, are grossly overstated.

The attached appendix examines these legal, factual, and economic deficiencies in detail. Because of these deficiencies, ISS strongly urges the Commission to withdraw this flawed proposal.

3

We would be happy to supply the Commission or the staff with additional information regarding any of the matters discussed herein.  Please direct questions about these comments to the undersigned, to our General Counsel, Steven Friedman, who can be reached at ███████████, or to our outside counsel, Mari-Anne Pisarri, who can be reached at ███████████.

Respectfully submitted,

Gary Retelny
President and CEO


cc:    The Honorable Jay Clayton, Chairman
        The Honorable Robert J. Jackson, Jr.
        The Honorable Hester M. Peirce
        The Honorable Elad L. Roisman
        The Honorable Allison H. Lee
        Dalia Blass, Director, Division of Investment Management
        William Hinman, Director, Division of Corporation Finance
        Rick Fleming, Office of the Investor Advocate

4



Comments on Proposed Amendments to Exemptions from the
Proxy Rules for Proxy Voting Advice, File No. S7-22-19

January 31, 2020

**TABLE OF CONTENTS**<sup>*</sup>

BACKGROUND.................................................................................................................1

    A. ISS' Proxy Voting Services ........................................................................................1

    B.  ISS' Regulatory Status .........................................................................................3

ANALYSIS .....................................................................................................................4

    A.  The Definitional Component;
    Proposed Changes to Rule 14a-1(*l*) .........................................................................4

        1. Congress did not authorize the SEC to
        regulate proxy advice as a proxy solicitation. ........................................................5

            a.  The Plain Meaning of "Solicit" ...........................................................6

            b.  Legislative History ..............................................................................8

            c.  Case Law .........................................................................................9

        2.  The SEC has historically acknowledged that applying the
        term "solicit" to disinterested persons who do not
        intend to ask shareholders to grant, revoke or with-
        hold a proxy leads to a "distortion of the purposes
        of the proxy rules." ...............................................................................11

        3.  Proxy advisers are properly regulated
        under the Advisers Act. .......................................................................16

            a.  General Definition of Investment Adviser ...............................................16

            b.  Exceptions to the Definition of Investment Adviser .............................18

            c.  Qualifying for Registration with the Commission .................................19

        4.  The proposal's perfunctory treatment of the Advisers Act
        is inconsistent with existing law, rules and prior Commission
        statements, and is antithetical to the professed objectives
        of this rulemaking. ...............................................................................19

            ❍  How the Advisers Act Addresses the
            Professed Objectives of this Rulemaking .................................................21

31 January 2020

5.  In seeking to justify the proposed rule amendments, the Commission seems to have ignored the findings of its own Roundtable and relied on fraudulent public comments ..........................................23

6.  Additional Comments on Proposed Changes to Rule 14a-1(*l*)........................27

B.  The Exemptive Component; Proposed Changes to Rule 14a-2(b)......................................................................30

1.  This rulemaking is a solution in search of a problem..........................................31

a.  Conflicts of Interest  ................................................................................31

i. Conflicts of Interest in Connection with Affiliated Corporate Services  ........................................................32

ii. Conflicts of Interest in Connection with ISS' Owner and Directors  ..............................................................33

iii. Conflicts of Interest Within the Institutional Advisory Business  ...................................................33

iv. Conflicts of Interest at the Employee Level  ............................33

v.  Conflicts of Interest in Connection with Issuers' Review of Draft Reports  ....................................................34

vi. Disclosure Regarding Potential Conflicts of Interest  ...............34

b.  Accuracy  ............................................................................................38

2.  The proposal is unconstitutional.....................................................................43

a.  Proxy advisers' research, analysis, opinions and recommendations are core speech protected by the First Amendment...................................43

b.  The inserted response provision of proposed Rule 14a-2(b)(9) imposes content-, speaker- and viewpoint-based burdens on protected speech that cannot satisfy any level of First Amendment scrutiny  ......................................................................44

c.  The review and feedback provisions of proposed Rule 14a-2(b)(9) also cannot satisfy any level of First Amendment scrutiny.........................................................................50

31 January 2020

d.   The review, feedback and response provisions of the proposed rule amendments cannot be saved from unconstitutionality on the ground that they involve merely eligibility for an "exemption" .......................................................................53

e.   The review and feedback provisions violate the Takings Clause of the Fifth Amendment and interfere with proxy advisers' client relationships and legitimate reliance interests ...........................................................54

f.   At a minimum, the Exchange Act should not be construed to authorize the Commission's constitutionally defective proposed rule amendments ........................................................56

3.   The proposal upends almost ninety years of federal securities regulation....................................................................56

4.   The proposal is inconsistent with proxy advisers' existing regulatory obligations ........................................................59

5.   The proposal is unworkable. ......................................................62

6.   Additional Comments on Proposed Rule 14a-2(b)(9)(i) ...................62

7.   Additional Comments on Proposed Rule 14a-2(b)(9)(ii) and (iii).....................66

C.   The Liability Component; Proposed Changes to Rule 14a-9 .............................................................70

❍   Additional Comments on Proposed Changes to Rule 14a-9 ...........................72

D.   The Economic Analysis ......................................................................72

1.   The economic analysis uses the wrong baseline .............................................72

2.   The benefits of the proposed rule amendments are illusory at best. ......................................................................73

3.   The costs of the proposal on proxy advisers have been grossly underestimated ...........................................................76

a.   The costs of satisfying the review, feedback and response provisions.................................................76

b.   The costs of amending existing compliance programs ...............................................................77

c.   Litigation costs ................................................................78

4.  The costs of the proposal on consumers
of proxy advice have been grossly underestimated ..............................................78

5.  The proposal's burdens on the U.S.
capital markets have been grossly underestimated. ............................................79

E.  Reasonable Alternatives  ...................................................................................80

CONCLUSION  .......................................................................................................80

<sup>*</sup>  **Note on citations and terminology:**  Unless otherwise indicated, references to the Securities Exchange Act of 1934 ("Exchange Act") mean 15 U.S.C. § 78a of the United States Code, where the Exchange Act is codified and references to Exchange Act Rules mean Title 17, Part 240 of the Code of Federal Regulations [17 CFR 240].  References to the Investment Advisers Act of 1940 ("Advisers Act") mean 15 U.S.C. § 80b, where the Advisers Act is codified, and references to Advisers Act rules mean Title 17, Part 275 of the Code of Federal Regulations [17 CFR 275].

As used in these comments, the term "adviser" refers to a fiduciary adviser, such as a proxy adviser or other registered investment adviser.  "Advisor" is a broader term, encompassing both fiduciary advisers and non-discretionary financial professionals, including broker-dealers.

31 January 2020

ISS submits that the Commission's proposal to amend certain Exchange Act proxy rules in order to regulate proxy advice as though it were a proxy solicitation[1]—like the "Interpretation and Guidance" on which this rulemaking is based[2] —is defective in many respects. ISS urges the Commission to withdraw this proposal in its entirety.

## BACKGROUND

### A. ISS' Proxy Voting Services

ISS is a full-service proxy adviser, whose services help institutional investors make informed proxy voting decisions, manage the complex process of voting their shares, and report their votes to their stakeholders and regulators. The company was founded in 1985, in an era of aggressive corporate practices such as raiding, greenmail and poison pills, when investors were seeking a meaningful voice in corporate governance. Today, ISS covers approximately 44,000 shareholder meetings a year in over 110 developed and emerging markets worldwide.

As part of its core offerings, ISS provides extensive corporate governance data and research as well as proxy voting recommendations. These voting recommendations are based on specific policy frameworks created or selected by institutional investors. ISS currently implements more than 400 custom voting policies on behalf of its clients. As of October 1, 2019, approximately 88% of ISS' top 100 clients used a custom proxy voting policy. Investors who choose not to create their own proxy voting policies may select among a range of policy options offered by ISS. These include benchmark policies focused on promoting long-term shareholder value creation, good governance and risk mitigation at public companies, and thematic policies that evaluate governance and voting issues from the perspective of sustainability, socially responsible investing, public funds, labor unions or mission and faith-based investing. By offering research and voting recommendations based on these different policies, ISS enables investors who may not have the need or resources to craft custom policies to tailor their proxy voting

---

[1] *Amendments to Exemptions from the Proxy Rules for Proxy Voting Advice,* Exchange Act Rel. No. 87457 (Nov. 5, 2019), 84 Fed. Reg. 66518 (Dec. 4, 2019), available at https://www.sec.gov/rules/proposed/2019/34-87457.pdf ("PA Proposal").

[2] *Commission Interpretation and Guidance Regarding the Applicability of the Proxy Rules to Proxy Voting Advice,* Exchange Act Rel. No. 86721 (Aug. 21, 2019), 84 Fed. Reg. 47416 (Sept.10, 2019), available at https://www.sec.gov/rules/interp/2019/34-86721.pdf ("Interpretation and Guidance").

decisions to the specific investment objectives of their clients, thereby satisfying their fiduciary duty to act in their clients' best interests.  Just as investors may have different investment time horizons, risk tolerances and investment strategies, so too, they may have different ways of assessing how proxy voting serves their investment goals.  Although certain public companies seem to think otherwise, there is no "correct" way to vote a proxy; a shareholder's vote necessarily turns on that shareholder's particular goals and priorities.

ISS does not provide proxy voting advice to any shareholder who has not specifically engaged us for this purpose and selected the policy(ies) and services they require.  Once engaged, we are obliged, by contract, to analyze and provide a voting recommendation for each agenda item related to every equity security held in the client's portfolio, and to do so in accordance with the policy or policies the client designates.  ISS does not determine which issues appear on a proxy ballot, nor does it choose the ballots or agenda items on which it renders advice.  It does not furnish research or make vote recommendations at the behest of any issuer or shareholder proponent of a ballot proposal.  ISS is agnostic as to whether its clients support a proposal, reject a proposal or abstain from voting altogether.  In sum, ISS' role is not to advocate for the passage or defeat of any particular ballot proposal but instead to help its clients make fully informed voting decisions in light of their chosen voting policies and their own goals and priorities.

Due to the diversity of policies and guidelines its clients employ, ISS may issue different recommendations to different clients on any given issue.  For example, ISS may advise clients using its benchmark voting policy guidelines to vote "FOR" a certain proposal, while advising clients who employ faith-based or sustainability-based voting criteria to vote "AGAINST" that same proposal. ISS may also furnish divergent recommendations to investors on different sides of a proposed transaction such as a merger, with a "FOR" recommendation made to investors in one party to the merger, and an "AGAINST" recommendation made to investors in the other party, if ISS concludes that the former would benefit from the transaction, but the latter would not.[3]

In addition to supplying data, research and vote recommendations, ISS also provides an electronic platform that automates the operational aspects of proxy voting and allows institutional investors to focus their resources on the fiduciary task of making their voting decisions. In this regard, ISS' ProxyExchange platform enables investors to prepopulate their custom or other selected voting guidelines, flag issues of their choosing for manual review, override any particular vote recommendation and, notably, change any vote already cast, up to the issuer's vote cut-off deadline

---

[3] *See* U.S. Gov't. Accountability Office*, GAO-17-47, CORPORATE SHAREHOLDER MEETINGS, Proxy Advisory Firms' Role in Voting and Corporate Governance Practices, 27* (2016) ("2016 GAO Report").

(which, for U.S. issuers, is typically the day of the shareholder meeting). ProxyExchange also provides clients with issuer-specific information about potential conflicts of interest and does so in a way that protects the firewall ISS has established to mitigate such conflicts.[4] Moreover, ProxyExchange's sophisticated recordkeeping and reporting features facilitate an investor's testing of its own proxy voting decisions and practices and compliance with its vote disclosure obligations.

## B. ISS' Regulatory Status

ISS has been registered with the SEC as an investment adviser since 1997. In this capacity, the company is subject to the extensive fiduciary regulatory regime established under the Advisers Act. This entails a range of requirements reasonably designed to ensure that ISS renders advice in its clients' best interests and that it does not place its own interests ahead of those of its clients. These requirements include (i) an obligation to maintain and regularly test a comprehensive compliance program, including policies and procedures relating to proxy voting, and policies and procedures designed to eliminate, or manage and disclose, conflicts of interest;[5] (ii) a duty to make full disclosure to clients of the methodologies it uses in rendering advice and any actual or potential conflicts of interest it might have;[6] and (iii) a duty to maintain a comprehensive set of books and records and to submit to the SEC's periodic examination of same.[7]

Where ISS renders advice to clients who are subject to the Employee Retirement Income Security Act of 1974 ("ERISA"), ISS has a fiduciary obligation to discharge its duties solely in the interest of the ERISA plan's participants and their beneficiaries, and to act with the care, skill, prudence and diligence under the circumstances that a prudent person acting in a like capacity would use in a similar situation.[8]

ISS is proud of the fiduciary bond it has forged with its investor clients over the years. Unfortunately, the current rule proposal would corrode that bond in several ways, as explained below.

---

[4] See *infra* at 32.

[5] *See* Advisers Act Rules 206(4)-7 and 206(4)-6.

[6] Advisers Act Rules 203-1 and 204A-1 and Form ADV. *See infra* at 31-37 for more information on ISS' conflict of interest procedures and disclosures.

[7] Advisers Act Rule 204-2.

[8] ERISA § 404(a), 29 U.S.C. § 1104(a).

# ANALYSIS

## A. The Definitional Component; Proposed Changes to Rule 14a-1(*l*)

In the Interpretation and Guidance, the SEC redefined the term proxy "solicitation" under the Exchange Act proxy rules, without giving the public notice and an opportunity to comment. In so doing, the Commission, for the first time ever, decreed that the proxy voting advice that a professional adviser renders in the course of a fiduciary relationship with a shareholder is the type of "unsolicited" advice that constitutes a proxy solicitation. This novel reading of the Exchange Act was premised on the illogical assertion that because proxy advisers "[market] . . . their expertise in researching and analyzing proxy issues for purposes of helping clients make proxy voting determinations",[9] they should be regulated like parties who communicate with shareholders for the purpose of effectuating a particular outcome in a matter requiring a shareholder vote, consent or authorization. This is so, said the Commission, even where the fiduciary voting advice is based on "the client's own tailored voting guidelines."[10] In the current rule proposal, the Commission cites the Interpretation and Guidance (which ISS is currently challenging in court)[11] as an articulation of the existing state of the law.[12]

Perhaps recognizing that this expansive approach could capture any financial advisor who holds itself out as being willing and able to provide proxy voting advice to its clients,[13] the Commission proposes to codify a modified version of the definition of "solicitation" it adopted in the Interpretation and Guidance. The proposed definition would narrow the earlier definition so that it captures only a handful of firms—most notably, ISS and Glass, Lewis & Co., LLC ("Glass Lewis")—who have been the subject of a long-running campaign by certain issuers and their

---

[9] Interpretation and Guidance, *supra* note 2, at 10, 84 Fed. Reg. at 47419.

[10] *Id.*, at 9, 84 Fed. Reg. at 47418.

[11] *ISS v. SEC et al.,* 1:19-cv-03275 (D. D.C. filed 10/31/19). This case is being held in abeyance until the earlier of January 1, 2021 or the promulgation of final rules in this rulemaking.

[12] PA Proposal, *supr*a note 1 at 11 n. 21, 84 Fed. Reg. at 66520 n. 21 and accompanying text.

[13] For example, registered investment advisers who manage client portfolios frequently undertake to vote proxies on their clients' behalf. Those who do not offer this service may instead offer to make voting recommendations to clients so they can vote their own proxies. All registered investment advisers willing to provide these services must publicly say so, which could be construed as "marketing their expertise" in providing this type of investment advice. *See* Advisers Act, § 203(c), Rule 203-1 and Form ADV, Part 2A, Item 17. Full-service broker-dealers, although not fiduciaries, may also let clients know that they are willing and able to make proxy vote recommendations about securities held in clients' accounts. Where retail investors are involved, this service may be described in the broker's Form CRS, a public disclosure document that will be implemented in May 2020. *See* Exchange Act Rule 17a-14.

representatives to muzzle proxy advisers and hinder shareholders' ability to have a meaningful voice in corporate governance. In order to ring-fence this targeted subset of advisers, the Commission proposes to rebrand such firms—traditionally known as "proxy advisers" or "proxy advisory firms"—as "proxy voting advice businesses," a term that has never been used in law or commerce.

As proposed, the definitions of "solicit" and "solicitation" under Exchange Act Rule 14a-1(*l*) would be amended to include any

> *proxy voting advice that makes a recommendation to a security holder as to its vote, consent, or authorization on a specific matter for which security holder approval is solicited, and that is furnished by a person that markets its expertise as a provider of such proxy voting advice, separately from other forms of investment advice, and sells such proxy voting advice for a fee.*[14]

For purposes of this definition, "proxy voting advice" would include proxy advisers' vote recommendations, along with the research and analysis they provide to enable their clients to evaluate the recommendations and make informed voting decisions. The term would not include advice furnished in response to an "unprompted" request, which seems to be a new twist on the Commission's historic concept of "unsolicited" advice, as discussed in more detail below.[15]

Although the SEC cites various provisions of the Exchange Act as the legal basis for its proposed amendment of Rule 14a-1(*l*),[16] none of the cited provisions authorizes the Commission to regulate proxy advice as a proxy solicitation. For example, while Section 3(b) generally authorizes the SEC to define terms, this power must be exercised "consistently with the provisions and purposes of this title." Likewise, Section 23(a) authorizes the agency to promulgate rules and regulations classifying persons, statements or reports, but only "as may be necessary or appropriate to implement the provisions of this title." The Commission's authority to define "solicit" or "solicitation" in this rulemaking, therefore, turns solely on the scope of the authority conferred by Section 14(a). This authority is nowhere near as broad as the Commission suggests.

## 1. Congress did not authorize the SEC to regulate proxy advice as a proxy solicitation.

A federal agency "literally has no power to act . . . unless and until Congress confers power upon it."[17] Here, Congress simply has not authorized the Commission to regulate proxy advice as

---

[14] Proposed Rule 14a-1(*l*)(1)(iii)(A).

[15] Proposed Rule 14a-1(*l*)(2)(v). *See infra* at 12–13 and 29-30.

[16] PA Proposal at 129, 84 Fed. Reg. at 66655.

[17] *La. Pub. Svc. Comm'n v. FCC*, 476 U.S. 355, 374 (1986).

a proxy solicitation. Section 14(a) of the Exchange Act makes it unlawful to solicit or to permit the use of one's name to solicit a proxy, consent or authorization in contravention of the rules and regulations prescribed by the SEC. The statute does not define the term "solicit."

In an effort to demonstrate that Congress authorized the Commission to define "solicit" to mean "advise," the proposal disregards the statute's plain text, distorts the legislative history, mischaracterizes the case law, and offers a highly curated rendition of the SEC's own rulemaking in this area over the years.

We are pleased to address each of these topics.

### a. The Plain Meaning of "Solicit"

In the absence of a statutory definition of the term "solicit," the word must be construed in light of its ordinary meaning at the time Section 14(a) was enacted.[18] Under a plain-text interpretation of the Exchange Act, a person who "solicits" a proxy is distinct from a person who "advises" about a proxy. At the time Congress enacted Section 14(a), "solicit" meant "[t]o ask for with earnestness, to make petition to, to endeavor to obtain, to awake or excite to action, to appeal to, or to invite"; and "solicitation" was defined as, "[a]sking; enticing; urgent request."[19] These definitions make clear that a solicitor necessarily has a certain *objective* or *goal* (*e.g.*, make a sale, win a vote, raise money for charity) and engages in solicitation (*e.g.*, appeals, requests, petitions, campaigns, etc.) in an attempt to *achieve* that objective. The phrase "solicit any proxy" thus has a clear and unambiguous meaning: to seek authority or ask a shareholder to vote a certain way in order to achieve a specific outcome in a matter requiring shareholder approval.

No reasonable user of the English language would confuse the concepts of "solicitation" and "advice." Whereas a solicitor urges another person to action to achieve a certain outcome or result, an adviser provides advice or counsel merely to help inform another person's decision. The contemporaneous definition of "advise" was "[t]o give an opinion or counsel, or recommend a plan or course of action. . . . 'Advise' imports that it is discretionary or optional with the person addressed

---

[18] *Perrin v. United States,* 444 U.S. 37, 42 (1979) ("A fundamental canon of statutory construction is that, unless otherwise defined, words will be interpreted as taking their ordinary, contemporary, common meaning . . . at the time Congress enacted the statute ….").

[19] Black's Law Dictionary 1639 (3d ed. 1933); see also the Concise Oxford Dictionary of Current English 1150 (1931) (defining "solicit" as "[i]nvite, make appeals or requests to, importune"); Funk and Wagnalls New Standard Dictionary of the English Language 2315 (1932) (defining "solicit" as "[t]o ask for with some degree of earnestness; seek to obtain by persuasion or entreaty"). The proposal quotes an alternative definition of "solicit" in the Funk and Wagnalls Dictionary as "influence to action" [PA Proposal at 19 n. 48, 84 Fed. Reg. at 66523 n.48], but neglects to add the rest of this definition: "specif., to entice (one) to an unlawful act." ISS hopes that both sides of the corporate governance debate can agree that proxy voting is not such an act.

whether he will act on such advice or not."[20]  The distinction between soliciting and advising is just as strong today as it was in the 1930s.  Contemporary synonyms for "solicit" are "beg," "beseech," "implore" and "supplicate," while synonyms for "advise" include "caution," "point out" "recommend" and "suggest."[21]

The distinction between a person who solicits and one who advises is reflected in industry custom and usage as well.  According to the 2016 GAO Report, a proxy solicitor is commonly understood to mean a "[s]pecialist (firm) hired to gather proxy votes," whose role is to "[h]elp public companies identify, locate, and communicate with shareholders to secure votes."[22]  A proxy advisory firm, by contrast, is commonly understood to mean a "[t]hird-party that provides services to institutional investors that include research and vote recommendations on proposals."[23]

The Commission asserts that proxy advisers are engaged in solicitation because they "[market] . . . their expertise in researching and analyzing proxy issues for purposes of helping clients make proxy voting determinations."[24]  But that theory is doubly flawed as a textual matter.  First, the statutory text applies only to persons who "solicit any proxy."  To the extent ISS markets its expertise to potential clients, ISS may be soliciting new clients and business, but it is not soliciting "any proxy."  ISS' business marketing activities thus provide no basis for the Commission to assert jurisdiction over ISS under Section 14(a). Second, even assuming the Commission had some statutory authority to regulate proxy advisers based on their solicitation of new clients (which it does not), that still could not be used to justify aspects of this proposal, such as the issuer pre-review and response requirements.  Those aspects have nothing to do with ISS' marketing of its expertise and everything to do with directly regulating (and interfering with) ISS' provision of fiduciary advice and recommendations to its clients.  Thus, even under the Commission's own theory, there is a fundamental mismatch between the statutory authority it claims and the rules it has proposed.

---

[20] *Black's Law Dictionary, supra* at 68 (internal citations omitted); *see also The Concise Oxford Dictionary of Current English* (1931) (defining "advise" as "[o]ffer counsel to" and "adviser" as a "person habitually consulted").

[21] *Roget's 21st Century Thesaurus* (3d ed. 2013), *available at* https://www.thesaurus.com/browse/solicit?s=t.

[22] 2016 GAO Report, *supra* note 3 at 6.

[23] *Id.*

[24] Interpretation and Guidance, *supra* note 2, at 10, 84 Fed. Reg. at 47419; *see also* PA Proposal at 16, 84 Fed. Reg. at 66522.

By the same token, the fact that proxy advisers, for a fee, provide vote recommendations and analysis to investors in advance of shareholder meetings does not make them proxy solicitors.[25] As noted above, a proxy adviser has no interest (financial or otherwise) in the outcome of any proxy vote and is indifferent to how its clients ultimately vote; indeed, a proxy adviser may offer different recommendations to different clients about the same vote depending on each investor's particular voting criteria and investing goals. These activities may be related to proxy votes, but they emphatically do not involve a "solicitation" under the ordinary meaning of that word.

The Commission's attempt to stretch the phrase "solicit any proxy" to cover independent, disinterested proxy voting advice contravenes not only the plain text the statute but also Congress' clearly-stated intent in enacting Section 14(a).

### b. Legislative History

Selectively quoting words and phrases from congressional reports, the SEC contends that Congress gave the Commission the broad power to regulate *any* communication directed at shareholders concerning a matter as to which shareholder approval is required. ISS respectfully submits that looking at those words and phrases in context tells a much different story.

Congress enacted Section 14(a) in 1934 to eliminate the kinds of abuses that were deemed to have contributed to the stock market crash of 1929 and the Great Depression. Section 14(a) reflects the lawmakers' belief that, "A renewal of investors' confidence in the exchange markets can be effected only by a clearer recognition upon the part of the corporate managers of companies whose securities are publicly held of their responsibilities as trustees for their corporations."[26] Under the heading, "CONTROL OF UNFAIR PRACTICES BY CORPORATE INSIDERS," the House Committee on Interstate and Foreign Commerce said:

> Fair corporate suffrage is an important right that should attach to every equity security bought on a public exchange. Managements of properties owned by the investing public should not be permitted to perpetuate themselves by the misuse of corporate proxies. Insiders having little or no substantial interest in the properties they manage have often retained their control without an **adequate disclosure** of their interest and without an adequate **explanation** of the management policies they intend to pursue. Insiders have at times solicited proxies without fairly informing the stockholders of the purposes for which the proxies are to be used and have used such proxies to take from the stockholders for their own selfish advantage valuable property rights. Inasmuch as only the exchanges make it possible for securities to be widely distributed among the investing public, it follows as a corollary that the use of the exchanges should involve a corresponding duty of according to shareholders fair suffrage. For this reason the proposed bill gives the [Commission] **power to control the conditions under which proxies may be solicited** with a view to preventing

---

[25]  *Id.* at 16, 84 Fed. Reg. at 66522.

[26] H.R. Rep. No. 73-1383, at 13 (1934).

the recurrence of abuses which have frustrated the free exercise of the voting rights of stockholders.[27]

(Emphasis indicates the portions of this paragraph that are quoted in the proposal.)[28]  The congressional record is replete with tales of such abuses, including instances in which proxies solicited ostensibly for a benign purpose were used for a nefarious purpose instead.[29]

The only parties other than corporate insiders who were on Congress' radar when it adopted Section 14(a) were outsiders who might misuse the proxy process to gain control over public companies:

> It is contemplated that the rules and regulations promulgated by the Commission will protect investors from promiscuous solicitation of their proxies, on the one hand, by irresponsible outsiders seeking to wrest control of a corporation away from honest and conscientious corporation officials; and, on the other hand, by unscrupulous corporate officials seeking to retain control of the management by concealing and distorting facts.[30]

There is not one shred of evidence in the congressional record to suggest that Congress authorized the SEC to use Section 14(a) to regulate persons who were not seeking to achieve a particular outcome in a proxy vote, such as independent, third-party advisers.  Examining what the courts have said about this provision leads to the same conclusion.

### c. Case Law

Over the years, the courts have confirmed that Congress designed Section 14(a) to cover persons who seek "to maintain or gain control of a corporation through solicitation of the corporate voting rights of the shareholders."[31] The courts have further recognized the purpose of this provision

---

[27] *Id.* at 13-14.

[28] PA Proposal at 13 nn. 27 and 28, 84 Fed. Reg. at 66521 nn. 27 and 28.

[29] *See e.g.,* 78 Cong. Rec. 7923 (1934) (discussing abuses at American Tobacco; "His stockholders had no idea of what they were doing when they authorized proxies to vote to approve a plan which permitted [self-dealing by the president].  It is such things as that that this bill is designed to prevent."); S. Rep. No. 73-1455 at 74-75 (1934) (discussing abuses at American Commercial Alcohol Corporation).  Although the PA Proposal quotes this Senate Report's statement about the importance of enlightening shareholders "as to the major questions of policy, which are decided at stockholders' meetings" [PA Proposal at 13 n. 27], the quotation omits the follow-on sentence, *viz.* "Too often proxies are solicited without explanation to the stockholder of the real nature of the matters for which authority to cast his vote is sought."  S. Rep. No. 73-1455 at 74.  An omitted discussion of the same corporate malfeasance precedes the proposal's quotation of another Senate Report for the proposition that "The committee recommends that the solicitation and issuance of proxies be left to regulation by the Commission."  S. Rep. No. 73-792 at 12 (1934) *quoted in* PA Proposal at 13 n. 28, 84 Fed. Reg. 66521 n. 28.

[30] S. Rep. No. 73-1455 at 77.

[31] *Greater Iowa Corp. v. McLendon,* 378 F.2d 783, 795 (8th Cir. 1967).

is "to protect a shareholder's investment from self-serving designs of those at odds with the best interests of the corporation."[32]   Although courts have adopted a broad reading of the term "solicitation" in a vertical sense—covering a chain of communications leading to a request for shareholder action by a party whose ultimate goal was to effect a particular outcome for the corporation[33]—courts have never stretched the concept horizontally to encompass parties who were completely indifferent to the outcome of the matter as to which shareholder approval was sought.

The Commission cites *Union Pacific R.R. Co. v. Chicago and North Western Ry. Co.*,[34] for the proposition that the proxy rules can lawfully be applied to financial advisers' reports, but reliance on this case is misplaced.   The report at issue in *Union Pacific,* which favored the bid of one suitor over another in a contested merger, was written by an analyst employed by a broker-dealer that owned stock in the target company.   The analyst prepared the report with the assistance of the favored suitor, and gave a draft of the report to that suitor for review and comment before its release.   The report was mass-distributed to shareholders of the target company, including customers of the broker-dealer who issued the report and customers of other broker-dealers.   The favored suitor and its proxy solicitors also distributed copies of the report, but did not file the report with the SEC.   On these facts a Section 14(a) violation was alleged *not* against the broker, but against the suitor, who "candidly and repeatedly admitted in open court" that its use of the report violated the proxy rules.[35]   Absolutely nothing about this case supports the proposal's treatment of independent proxy advice as a proxy solicitation under the Exchange Act.

In all cases where a proxy solicitation has been found, the "solicitor" had an identifiable interest in the outcome of the shareholder action.[36]   This is so even where the communication in

---

[32] *Cowin v. Bresler*, 741 F.2d 410, 427 (D.C. Cir. 1984). *See also Lynch v. Fulks*, 1980 U.S. Dist. LEXIS 16099 at *9 (D. Kan. 1980) ("The more fundamental purpose of [Section 14(a)] is to protect the investment of the corporate shareholder from those whose inclination to use the corporation for their own selfish ends conflict with the best interests of the corporation and its owners as a whole").

[33] *See Long Island Lighting Co. v. Barbash*, 779 F.2d 793 (2d Cir. 1985) (advertisement backed by parties interested in effecting changes at a public utility could be a solicitation if it constituted a step in a chain leading to a request to furnish, revoke or withhold proxies);   *SEC v. Okin*, 132 F.2d 784, 786 (2d Cir. 1943) (letter by shareholder asking fellow shareholders to withhold or revoke proxies so he could get himself elected as an officer of the company held to be a solicitation because it was "part of a continuous plan ending in solicitation and which [prepared] the way for its success").

[34] 226 F. Supp. 400 (E.D. Ill. 1964), cited in PA Proposal at 14 n. 31.

[35] 226 F. Supp. at 408.

[36] *See Bender v. Jordan*, 439 F. Supp. 2d 139 (D. D.C. 2006) (solicitation made by bank employee who sent a letter to shareholders to reject a dissident shareholder); *Canadian Javelin, Ltd. v. Brooks*, 462 F. Supp. 190, 194 (S.D.N.Y. 1978) (solicitation made by shareholders' committee formed to oust current management).

question was authored by a disinterested party.[37]  While an issuer's deliberate misstatement of a proxy advisory firm's vote recommendation has formed the basis for a Section 14(a) claim against the company and its nominees for the board of directors,[38] no court has ever found a proxy adviser or other independent fiduciary itself to have "solicited" a proxy within the meaning of Section 14(a) and related rules.

In fact, no court has ever suggested that *any* party who advises one shareholder to vote for, and another shareholder to vote against, the same ballot proposal could be engaged in a solicitation. On the contrary, because solicitors communicate for the purpose of effecting a particular outcome, all the recommendations at issue in the Section 14(a) cases were unidirectional.  Finally, no court has ever found that a shareholder was "solicited" by a communication he or she selected and paid to receive.

### 2. The SEC has historically acknowledged that applying the term "solicit" to disinterested persons who do not intend to ask shareholders to grant, revoke or withhold a proxy leads to a "distortion of the purposes of the proxy rules."

The SEC characterizes the proposal as a natural progression of the evolution of proxy regulation under the Exchange Act.  ISS respectfully disagrees.

The Commission initially exercised its authority under Section 14(a) by adopting a narrow definition of "solicitation" that covered only a request to shareholders for a proxy, consent or authorization, or the furnishing of any form of proxy.[39]  The Commission gradually expanded this definition to include a request for a proxy, whether or not such request was accompanied by or included in a form of proxy,[40] and a request not to execute or to revoke a proxy.[41]  In 1956, the Commission adopted the current definition of "solicitation," which includes the furnishing of any "communication to security holders under circumstances reasonably calculated to result in the procurement, withholding or revocation of a proxy.[42]

---

[37] *See Crouch v. Prior,* 905 F. Supp. 248 (D. V.I. 1995) (research analyst note imputed to member of the board of directors seeking shareholder consent to change the composition of the board; author of the note not alleged to have solicited a proxy or to have permitted the use of her name for that purpose).

[38] *Burkle v. OTK Assocs., LLC*, 2 F. Supp. 3d 519 (S.D.N.Y. 2014).

[39] Exchange Act Rel. No. 378 (Sep. 24, 1935), 1935 SEC LEXIS 1877.

[40] Exchange Act Rel. No. 1823 (Aug. 11, 1938), 3 Fed. Reg. 1991-92 (Aug. 13, 1938).

[41] *Solicitation of Proxies Under the Act,* Exchange Act Rel. No. 3347 (Dec. 18, 1942), 7 Fed. Reg. 10653, 10656 (Dec. 22, 1942).

[42] *Adoption of Amendments to Proxy Rules,* Exchange Act Rel. No. 5276 (Jan. 17, 1956), 21 Fed. Reg. 577 (Jan. 26, 1956) ("1956 Release").  This definition is now found in Exchange Act Rule 14a-1(*l*).

Although the proposal suggests that the 1956 amendment did away with the notion that a person who solicits a proxy must have some interest in the outcome of the action requiring shareholder approval,[43] that is not so.   When it adopted this amendment, the Commission made it clear that it was expanding the *range of communications* covered by the definition, but not the *class of people* considered to be solicitors.  In this regard, the Commission explained that

> statements made for the purpose of inducing security holders to give, revoke, or withhold a proxy with respect to a matter to be acted upon by security holders of an issuer, including an election of directors, *by any person who has solicited or intends to solicit proxies*, whether or not such statements are accompanied by an express request to give, revoke, or withhold a proxy may involve a solicitation within the meaning of the regulation, depending upon the particular facts and circumstances.[44]

The use of the word "procurement" in the 1956 definition confirms that a party who "solicits" has an interest in the outcome of the vote, because "procure" means "to get possession of," "obtain by particular care and effort," "to bring about" or "achieve."[45]  Although a literal reading of the 1956 amendment thus comports with Congress' intent that a "solicitation" involves a concerted effort to achieve a desired result, the SEC eventually realized that the amendment could also be misread "potentially to turn almost every expression of opinion concerning a publicly-traded corporation into a regulated proxy solicitation", which would distort the purpose of Section 14(a).[46]  The path to this realization was as follows:

In 1964, the Commission released an opinion addressing whether the participation of broker-dealers in the proxy process could constitute a solicitation under the 1956 definition.[47]  This opinion stated that the proxy rules might, under appropriate circumstances, apply to any person, not just management or the opposition engaged in a struggle for corporate control.  Noting that broker-dealers are "particularly likely to become involved in proxy solicitations both because they may have an interest in the matters to be voted on and because they may have connections with management, opposition, or other participants", the opinion suggested that a broker-dealer who

---

[43]  PA Proposal at 14-15, 84 Fed. Reg. at 66521.

[44]  1956 Release, 21 Fed. Reg. at 577 (emphasis supplied).

[45]  *Webster's Ninth New Collegiate Dictionary* 938 (1987); *see also Black's Law Dictionary* 1372 (4th ed. 1951) (defining "procuration" as "[t]he act by which one person gives power to another to act in his place, as he could do himself").

[46]  *Regulation of Communications Among Shareholders,* Exchange Act Rel. No. 31326 (Oct. 16, 1992) 57 Fed. Reg. at 48276, 48278 (Oct. 22, 1992) ("1992 Release").

[47]  *Broker-Dealer Participation in Proxy Solicitations*, Exchange Act Rel. No. 7208 (Jan. 7, 1964), 29 Fed. Reg. 341 (Jan. 15, 1964) ("1964 Release").

"goes beyond [his] advisory function" and "voluntarily" distributes solicitation-type material "to persons who have not asked for it"—which the SEC called "unsolicited" advice—could be subject to the proxy rules.[48]  On the other hand, the rules would not apply to a broker-dealer who merely gave proxy voting advice "in his capacity as adviser to the customer."[49]

Recognizing that it would be inconsistent with the purpose of Section 14(a) to subject all financial professionals who furnish unsolicited proxy advice to the full panoply of the proxy rules, the Commission in 1979 exempted certain financial advisors from the information and filing requirements of the proxy rules under specified conditions.[50]  The purpose of this exemption, which today resides in Exchange Act Rule 14a-2(b)(3), was "to provide greater opportunities for shareholders to exercise their right of suffrage and to obtain information and advice with respect to matters on which they vote."[51]

In adopting this exemption, the Commission confirmed that not all persons who furnish proxy voting advice need relief from the proxy rules, because the rules apply only to "those who participate in the solicitation of proxies."[52]  Under ordinary circumstances, this population excludes those who render advice in the course of a fiduciary relationship with an investor, such as attorneys or accountants.  Furthermore, by titling its discussion of the exemption "Unsolicited Voting Advice Furnished by Financial Advisors,"[53] the SEC confirmed that the exemption was designed for those who "voluntarily" distribute soliciting material "to persons who have not asked for it," because those who in act in their "capacity as adviser to the customer" are not proxy solicitors in the first place.[54]

In 1992, recognizing that its reading of the solicitation definition was still too broad, the Commission adopted another package of reforms designed to remove "unnecessary government interference in discussions among shareholders" and to make it easier for shareholders to challenge

---

[48]  *Id.*

[49]  *Id.*

[50]  Shareholder Communications, Shareholder Participation in the Corporate Electoral Process and Corporate Governance Generally, Exchange Act Rel. No. 16356 (Nov. 21, 1979), 44 Fed. Reg. 68764 (Nov. 29, 1979) ("1979 Release").

[51]  1979 Release, 44 Fed. Reg. at 68764.

[52]  *Id.* at 68767 n. 11.

[53]  *Id.* at 68766.

[54]  1964 Release, *supra* note 47.

management through the proxy voting process.[55] The Commission took this action with the support of the shareholder community and over the objections of the corporate community.

In undertaking these reforms, the Commission traced the history of its definition of "solicitation," starting with a recognition of the agency's mandate "'to prevent management or others from obtaining authorization for corporate action by means of deceptive or inadequate disclosure in proxy solicitations.'"[56] The Commission singled out the 1956 amendment of the solicitation definition as the point at which the proxy rules began to have unintended consequences:

> In adopting the sweeping 1956 definition, the Commission sought to address abuses by persons who were actually engaging in solicitations of proxy authority in connection with election contests.[fn] The Commission does not seem to have been aware, or to have intended, that the new definition might also sweep within all the regulatory requirements persons who did not 'request' a shareholder to grant or to revoke or deny a proxy, but whose expressed opinions might be found to have been reasonably calculated to affect the views of other shareholders positively or negatively toward a particular company and its management or directors.[57]

The SEC candidly acknowledged the "excessive regulatory reach" of this construction of the term "solicitation" and admitted that this construction led to a "distortion of the purposes of the proxy rules."[58] However, instead of amending the definition to make sure it aligned with Congress's intent, the Commission simply adopted another limited exemption from the information and filing requirements of the proxy rules. This exemption covers a person who does not seek proxy authority and who does not have a substantial interest in the matter subject to shareholder action, other than a general interest as a shareholder (including a shareholder proponent of a ballot proposal), and, in some cases, an employee of the registrant.[59]

Recognizing that the parties for whom the exemption was designed may not be engaged in proxy solicitations at all, the Commission confirmed that the existence of the exemption was not meant to broaden the pool of communications subject to the proxy rules. Instead, the Commission explained, the exemption was intended to protect a person who does not seek proxy authority and

---

[55] 1992 Release, *supra* note 46, 57 Fed. Reg. at 48276.

[56] *Id.* 57 Fed. Reg. at 48277, *quoting J.I. Case v. Borak*, 377 U.S. 426, 431 (1964).

[57] *Id.* 57 Fed. Reg. at 48277-78. The internal citation in this passage explains that in 1956, "the Commission was principally concerned with communications 'by any person who has solicited or intends to solicit proxies' prior to the formal commencement of the solicitation." *Id.* at 48277 n. 22. In other words, this was intended to be a vertical expansion of the concept of "solicitation," not a horizontal one.

[58] *Id.* 57 Fed. Reg. at 48278.

[59] Rule 14a-2(b)(1).

who does not have a substantial interest in the matter subject to shareholder action from the vagaries of an imprecise and overly broad definition that exposed them to the risk of baseless litigation for criticizing the quality of a company's management, thereby chilling discussion of management performance, in contravention of Congress's intent.[60]

It was not until the SEC adopted the Interpretation and Guidance in August 2019, that the proxy rules were ever deemed to apply to a financial advisor who did not go beyond its advisory function and distribute solicitation-type material to shareholders who did not ask for it.[61]   Nor, until then, had the SEC ever said that the proxy rules apply to advice rendered by a disinterested party in the context of a fiduciary relationship.   Therefore, the Interpretation and Guidance was not part of the natural evolution of proxy regulation but was a jarring break with the past instead.

The SEC cites four factors to justify its determination that independent proxy advice is a proxy solicitation for purposes of Section 14(a): (i) proxy advisers typically provide a vote recommendation for specific proposals that will be presented at a shareholder meeting; (ii) proxy advisers market their expertise in researching and analyzing shareholder ballot proposals in order to help investors make informed voting decisions; (iii) institutional investors engage proxy advisers to render expert proxy advice for a fee; and (iv) proxy advisers make vote recommendations to shareholders shortly before a shareholder meeting or authorization vote.[62]   None of these factors, alone or in combination, has any grounding in the statutory text or any bearing whatsoever on the proper application of the proxy rules.   In fact, they highlight just how inapposite these rules are to proxy advisers.

"Unscrupulous corporate officials" and "irresponsible outsiders seeking to wrest control of a corporation" from honest management[63] do not market their expertise in researching and analyzing shareholder ballot proposals.    Parties who seek to use the proxy process to "maintain or gain control" of a company[64] do not provide vote recommendations for every ballot proposal relating to

---

[60] 1992 Release, 57 Fed. Reg. at 48279.

[61]   The proposal cites the *Concept Release on the U.S. Proxy System*, Exchange Act Rel. No. 62495 (July 14, 2010), 75 Fed. Reg. 42982 (July 22, 2010) ("Concept Release") as an earlier articulation of the possibility that the proxy rules could apply to proxy advisers.  PA Proposal, *supra* note 1 at 15 n. 37. However, the brief discussion of the proxy rules in the Concept Release was premised on the 1964 Release, which indicates that the discussion was limited to proxy advice that is voluntarily distributed to shareholders who have not asked for it. Concept Release at 108, 75 Fed. Reg. at 43009 and n. 244.

[62]   PA Proposal at 16, 84 Fed. Reg. at 66522.

[63]   S. Rep. No. 73-1455 *supra* note 29 at 77.

[64]   *Greater Iowa Corp. v. McLendon, supra* note 31, 378 F.2d at 795.

an investor's entire securities portfolio, and certainly do not provide different vote recommendations to different investors based on each investor's chosen voting criteria. And institutional investors do not engage such self-interested parties to render expert proxy advice for a fee. No matter which path you take—legislative, judicial or administrative—the conclusion is the same: Congress did not authorize the SEC to regulate proxy advisers or proxy advice under Section 14(a).

That does not mean, however, that proxy advice is free from SEC oversight. On the contrary, Congress provided a specific way to regulate those who perform this important function.

### 3. Proxy advisers are properly regulated under the Advisers Act.

The last in the series of post-Depression-era statutes governing the U.S. financial markets, the Advisers Act addressed concerns about the nascent investment counsel industry. The increased complexity of the securities markets following World War I and concomitant rise in demand for professional advisory services led to the development and explosive growth of this new industry.[65] Congress designed the Advisers Act to eliminate "tipster" services who masqueraded as bona fide investment counsellors rendering competent and impartial investment advice.[66]

In particular, the Advisers Act established a federal fiduciary standard of conduct for investment advisers based on equitable common law principles.[67] This fiduciary standard is comprised of duties of care and loyalty, which, taken together, oblige an adviser to act in the best interests of its clients and not to place its own interests ahead of its clients' interests.

The first step in analyzing whether proxy advisers are subject to regulation under the Advisers Act is to determine whether such firms fit the general statutory definition of "investment adviser." If the answer is yes, the second step is to determine if proxy advisers qualify for a statutory exception to the investment adviser definition. If that answer is no, the final step is to determine whether such advisers are properly regulated by the SEC or the states.

#### a. General Definition of Investment Adviser

Section 202(a)(11) of the Advisers Act defines the term "investment adviser" to mean "any person who, for compensation, engages in the business of advising others, either directly or through publications or writings, as to the value of securities or as to the advisability of investing in, purchasing, or selling securities, or who, for compensation and as part of a regular business, issues

---

[65] SEC, "Investment Counsel, Investment Management, Investment Supervisory, and Investment Advisory Services," H.R. Doc. No. 76-477 at 1, 23 (1939).

[66] *Id.* at 28.

[67] *Transamerica Mortg. Advisors, Inc. v. Lewis,* 444 U.S. 11, 17 (1979); *SEC v. Capital Gains Research Bureau, Inc.,* 375 U.S. 180, 194 (1963) ("Capital Gains").

or promulgates analyses or reports concerning securities." This broad definition encompasses not only those who manage client portfolios, but anyone who is paid to provide advice about securities, unless an exception applies.

A proxy vote appurtenant to shares held in a portfolio is itself an asset to be managed with the same care and skill as any other portfolio asset.[68] The SEC has long recognized that through their proxy voting authority, investment managers are in a position "to significantly affect the future of corporations and, as a result, the future value of corporate securities held by their clients."[69] Proxy advisers render advice *as to the value of securities* when they advise their clients on ballot measures that could affect share prices, such as mergers and acquisitions and director elections, particularly in contested director elections. In addition, when proxy advisers opine on ballot items such as mergers or acquisitions, they may render advice as to the *advisability of purchasing* (for the acquiring company) *or selling* (for the company being acquired) *securities.*

Proxy advisers also issue research reports about companies, their boards and management and their securities, so that their investor clients can understand and assess the vote recommendations. In so doing, proxy advisers *issue or promulgate analyses or reports concerning securities.* The SEC has recognized that in addition to assisting in the making of proxy voting determinations, these reports and analyses may also assist in the making of investment decisions, which is a core function of investment advisers.[70]

Although performing any one of the functions described in Section 202(a)(11) is enough to characterize a party as an investment adviser, proxy advisers perform all three. Because they do so for compensation and as part of a regular business, there is no doubt that proxy advisory firms fit the general definition of "investment adviser" for purposes of the Advisers Act. The Commission reached the same conclusion in the 2010 Concept Release, when it said:

---

[68] Letter from Alan D. Lebowitz, Deputy Assistant Secretary, U.S. Dept. of Labor to Mr. Helmuth Fandl, Chairman of the Retirement Board, Avon Products, Inc. (February 23, 1988), 1988 ERISA LEXIS 19, *5-6, *codified* in 29 C.F.R 2509.2016-01 ("The fiduciary act of managing plan assets which are shares of corporate stock would include the voting of proxies appurtenant to those shares of stock").

[69] *Proxy Voting by Investment Advisers,* Advisers Act Rel. No. IA-2106 (Jan. 31, 2003) at 2, 68 Fed. Reg. 6585, 6586 (Feb. 7, 2003) ("Advisers Act Proxy Rule Release"). *See also Disclosure of Proxy Voting Policies and Proxy Voting Records by Registered Management Investment Companies,* Investment Company Act Rel. No. 25922, 68 Fed. Reg. 6564, 6566 (Feb. 7, 2003) ("Proxy voting decisions by funds can play an important role in maximizing the value of the funds' investments").

[70] *Commission Guidance Regarding Client Commission Practices Under Section 28(e) of the Securities Exchange Act of 1934,* Exchange Act Rel. No. 54165 (July 18, 2006) at 37, 71 Fed. Reg. 41978, 41988 (July 24, 2006).

*[P]roxy advisory firms receive compensation for providing voting recommendations and analysis on matters submitted for a vote at shareholder meetings. . . . We understand that typically proxy advisory firms represent that they provide their clients with advice designed to enable institutional clients to maximize the value of their investments. In other words, proxy advisory firms provide analyses of shareholder proposals, director candidacies or corporate actions and provide advice concerning particular votes in a manner that is intended to assist their institutional clients in achieving their investment goals with respect to the voting securities they hold. In that way, proxy advisory firms meet the definition of investment adviser because they, for compensation, engage in the business of issuing reports or analyses concerning securities and providing advice to others as to the value of securities.*[71]

### b. Exceptions to the Definition of Investment Adviser

Over the years, it has been suggested that proxy advisers might qualify for a statutory exception to the investment adviser definition, thereby relieving them of the need to register under the Advisers Act. The exception most often cited—for "the publisher of any *bona fide* newspaper, news magazine or business or financial publication of general and regular circulation"[72]—does not apply.

The Supreme Court has interpreted the "publisher's" exception to require, among other things, that the publication render *impersonal* advice, as opposed to advice tailored to the specific needs or objectives of the subscriber.[73] In applying this interpretation the SEC staff has taken the view that interactive communication between the provider and recipient of investment advice is not "impersonal" and that interactivity destroys the availability of the publisher's exception.[74]

Judged by this standard, proxy advisers are clearly not publishers. As part of their suite of services, proxy advisory firms help institutions adopt and implement proxy voting policies that best serve the needs of their underlying investor clients.[75] Furthermore, in addition to issuing research reports and vote recommendations based on the different, proprietary proxy voting guidelines that can be selected by their clients, proxy advisers provide many clients with

---

[71] Concept Release, *supra* note 61 at 109-110, 75 Fed. Reg. at 43010.

[72] Advisers Act, § 202(a)(11)(D).

[73] *Lowe v. SEC*, 472 U.S. 181 (1985).

[74] *See* Reuters Information Services, Inc. 1991 SEC No-Act. LEXIS 96 (Jan. 17, 1991).

[75] *See, e.g., Egan-Jones Proxy Services*, https://www.ejproxy.com/services/ (last visited Jan.22, 2020) ("Egan-Jones reviews the client's research and voting requirements including voting guidelines. If desired, Egan-Jones suggests modification to the client's proxy voting guidelines to facilitate fulfillment of fiduciary obligations.")

individually customized vote recommendations based on a client's specific (or custom) voting guidelines.[76]  Not only are custom vote recommendations "personalized" by their very nature, but they also entail a high degree of interactive discussion between proxy advisers and their investor clients.  Moreover, because a custom vote recommendation is provided only to the client who owns the policy on which the recommendation is based, it is abundantly clear that such recommendations fail to satisfy the publisher's exception requirement that advice be of "general and regular circulation."[77]

### c.  Qualifying for Registration with the Commission

By virtue of the National Securities Markets Improvement Act of 1996 ("NSMIA"),[78] an investment adviser is precluded from registering with the SEC, and is subject instead to state jurisdiction, unless that adviser qualifies for federal registration under Section 203A of the Advisers Act or Rule 203A-2 thereunder.  Today, three of the five U.S. proxy advisers, including ISS, are registered as investment advisers with the SEC in reliance on the category for pension consultants found in Rule 203A-2(a).[79]  While the other two proxy advisers are not registered at either the federal or state level, at least one, and possibly both, of these firms also qualify for SEC registration under this NSMIA category.[80]

This three-part analysis leaves no room for doubt that the proper regulatory regime for proxy advisory firms is the one Congress created in the Advisers Act.

### 4.  The proposal's perfunctory treatment of the Advisers Act is inconsistent with existing law, rules and prior Commission statements, and is antithetical to the professed objectives of this rulemaking.

---

[76] *See* 2016 GAO Report, *supra* n. 3; Transcript of the Roundtable on the Proxy Process at 193 (Nov. 15, 2018) *available at* https://www.sec.gov/files/proxy-round-table-transcript-111518.pdf, ("2018 Roundtable Transcript").

[77] The definitional exception for Nationally Recognized Statistical Rating Organizations (NRSROs), found in Advisers Act § 202(a)(11)(F) is also unavailable to proxy advisers.  This exception, adopted in 2006, was designed to relieve credit rating agencies who opt to register under a voluntary regulatory regime found in Section 15E of the Exchange Act from the need also to register as investment advisers under the Advisers Act.  By its terms, the exception is limited to credit rating activities.  An NRSRO that also makes recommendations as to purchasing or selling securities—such as a proxy adviser—cannot avail itself of the NRSRO exception.

[78] Pub. L. No. 104-290, 110 Stat. 3416 (1996).

[79] PA Proposal, *supra* note 1 at 86, 88-89, 84 Fed. Reg. at 66543.

[80] *Id.* at 10 n. 18, 84 Fed. Reg. 66520 n. 18.  Note that § 203A(c) of the Advisers Act authorizes the Commission to exempt advisers from the prohibition on registration if the prohibition would be "unfair, a burden on interstate commerce, or otherwise inconsistent with the purposes" of NSMIA. This provides another avenue for SEC registration.

While the proposal acknowledges that the Commission already regulates a majority of U.S. proxy advisers as investment advisers,[81] the proposal is devoid of any substantive discussion of the applicability of the Advisers Act regulatory regime to proxy advisory firms. Nor is there any discussion of the ability of this regime to address the concerns that purportedly underlie this rulemaking. The Commission's silence here is inexplicable, given the agency's previous determination that proxy advisers meet the statutory definition of "investment adviser," and given the proposal's focus on investor protection.[82]

The proposal dismisses the relevance of the Advisers Act to the question of whether the proxy rules serve as a legitimate basis for regulating proxy advisers by noting that "it is not unusual for a registrant under one provision of the securities laws to be subject to other provisions of the securities laws when engaging in conduct that falls within the other provisions."[83] ISS does not find this observation applicable to the question at hand. While different activities may be governed by different provisions of the securities laws, the SEC does not regulate a single activity twice.[84] In fact, the Advisers Act has been designed expressly to avoid such regulatory overlap.

In this regard, the statute provides exceptions to the definition of "investment adviser" and an exemption from the registration requirements for parties whose advisory activities are already governed by, or are incidental to financial services governed by, another regulatory regime.[85] Furthermore, in adopting NSMIA, Congress divided jurisdiction over investment advisers between the SEC and the states for the express purpose of eliminating duplicative regulation.[86] And the SEC itself has taken steps to mitigate duplication with regard to investment advisers who are also registered as broker-dealers.[87]

---

[81] *Supra* note 79.

[82] PA Proposal at 27, 84 Fed. Reg. at 66525.

[83] *Id.* at 18 n. 47, 84 Fed. Reg. at 66522 n.47.

[84] For example, a firm that both effects securities transactions and provides more than incidental investment advice may be governed by the Exchange Act for its brokerage business and the Advisers Act for its advisory business, but neither statute broadly regulates both activities.

[85] The Advisers Act provides such definitional exceptions to banks (Section 202(a)(11)(A)); broker-dealers (Section 202(a)(11)(C)); and registered credit rating agencies (Section 202(a)(11)(F)). A registration exemption is provided to certain advisers who are registered as commodity trading advisers with the Commodity Futures Trading Commission. Section 203(b)(6).

[86] *See supra* note 78.

[87] *See e.g.* Advisers Act Rule 204-2(h).

Respecting the boundaries between different provisions of the securities laws is not the exclusive province of the Advisers Act. In 1992, the SEC rejected calls by the issuer community to regulate certain shareholder communications under the proxy rules because Congress provided another Exchange Act provision for that purpose:

> When and under what circumstances a large shareholder, or group of shareholders acting together, must reveal to the SEC, the company, other shareholders, and the market its plans and proposals regarding the company has been addressed by Congress, but not through the provisions governing proxy solicitations. Section 13(d) of the Exchange Act, as implemented by the Commission in its regulations adopted thereunder, sets forth the circumstances when public disclosure of plans and proposals by significant shareholders, as well as agreements among shareholders to act together with respect to voting matters, must be disclosed to the market.[88]

By parity of reasoning, it is inappropriate to regulate the advice rendered by proxy advisers under Section 14(a) of the Exchange Act because Congress provided the Advisers Act for that purpose.

- o **How the Advisers Act Addresses the Professed Objectives of this Rulemaking**

In proposing this package of rule amendments, the Commission emphasizes its interest in protecting investors and says that "concerns" have been expressed about the "accuracy and soundness" of proxy advisers' vote recommendations, as well as conflicts of interest that could potentially affect those recommendations.[89] Given this motivation, the short shrift the proposal gives to the Advisers Act is puzzling, because these are precisely the types of issues this regulatory regime was designed to address.

As previously explained, the Advisers Act establishes a federal fiduciary standard of conduct that imposes duties of care and loyalty on investment advisers; obliges advisers to act in the best interests of their clients; and forbids advisers to place their own interests ahead of the interests of their clients.[90] The Commission has previously acknowledged the applicability of this standard to proxy advisers, saying that "[a]s investment advisers, proxy advisory firms owe fiduciary duties to their advisory clients."[91]

In the 2019 Fiduciary Standard Release, the Commission confirmed that the fiduciary duty of care obliges an adviser to reasonably ensure the accuracy and soundness of the advice it

---

[88]  1992 Release, *supra* note 46, 57 Fed. Reg. at 48278 (internal citation omitted).

[89]  PA Proposal at 10-11, 84 Fed. Reg. at 66520.

[90]  *See supra* at 16.

[91]  Concept Release, *supra* note 59 at 110, 75 Fed. Reg. at 43010.

renders.  In this regard, the Commission cited the Concept Release, which said,

> [A]s a fiduciary, the proxy advisory firm has a duty of care requiring it to make a reasonable investigation to determine that it is not basing its recommendations on materially inaccurate or incomplete information.[92]

The Commission further explained that the duty of loyalty requires an adviser to "eliminate or at least expose through full and fair disclosure all conflicts of interest which might incline [the] investment adviser – consciously or unconsciously -- to render advice [that is] not disinterested."[93]

In order to enforce these duties, the Advisers Act regulatory regime imposes a host of specific obligations on advisers.  These include a requirement to implement and maintain a comprehensive compliance program and to test the sufficiency and effectiveness of that program at least annually;[94] a requirement to implement procedures to prevent the misuse of material nonpublic information as well as a written code of ethics;[95] and a requirement to disclose both the methods of analysis and policies and procedures used in formulating proxy voting advice, along with meaningful information about conflicts of interest and their mitigation.[96]

The Advisers Act further prohibits advisers from engaging in fraudulent or deceptive conduct.[97]  This antifraud provision and the SEC's rules thereunder apply to any person who falls within the definition of investment adviser, whether that person is required to register under the statute or not.[98]

Registered investment advisers also have extensive recordkeeping requirements,[99] and they must make those records available for inspection by the SEC's Office of Compliance Inspections and Examinations (OCIE).  In 2015, this office designated proxy advisers as a priority

---

[92] *Id.* at 119, 75 Fed. Reg. at 43012 cited in *Commission Interpretation Regarding Standard of Conduct for Investment Advisers*, Advisers Act Rel. No. 5248 (June 5, 2019) at 16 and n. 40, 84 Fed. Reg. 33669, 33674 and n. 40 (July 12, 2019) ("Fiduciary Standard Release").

[93] *Id.* at 23, 84 Fed. Reg. at 33676, *citing Capital Gains, supra* note 67, 375 U.S. at 191.

[94] Rule 206(4)-7.

[95] Section 204A and Rule 204A-1.

[96] Rule 203-1; Form ADV.

[97] Section 206.

[98] Concept Release *supra* note 61 at 110, 75 Fed. Reg. at 43010; *Applicability of the Investment Advisers Act to Financial Planners, Pension Consultants, and Other Persons Who Provide Investment Advisory Services as a Component of Other Financial Services,* Advisers Act Rel. No. 1092 (Oct. 8, 1987), 52 Fed. Reg. 38400 (Oct. 16, 1987).

[99] Rule 204-2.

in its National Examination Program.  Among the issues OCIE identified for inspection were how proxy advisers make recommendations on proxy voting and how they disclose and mitigate potential conflicts of interest.[100]

Other than noting that proxy advisers "that are investment advisers are already required to identify conflicts and to eliminate or make full and fair disclosure of those conflicts,"[101] the proposal ignores the relevance of the Advisers Act regime and makes no attempt to explain why this framework is inadequate to address the Commission's purported concerns about proxy advice.  ISS respectfully submits that this silence does a disservice to investors, who deserve sound, accurate and independent proxy voting advice from appropriately regulated sources.  It also undercuts the purported justification for this regulatory undertaking, as do questions about the integrity of the public record on this issue to date.

###### 5. In seeking to justify the proposed rule amendments, the Commission seems to have ignored the findings of its own Roundtable and relied on fraudulent public comments.

In the 2018 Roundtable on the Proxy Process, the Commission convened a special panel to address issues relating to proxy advisers.  Participating in this panel were institutional investors who use proxy advisory services, public company representatives, proxy advisers themselves, a law professor and a former U.S. Senator.  A few striking aspects of this session of the roundtable merit attention.

First, there was no discussion whatsoever of whether proxy *advice* constitutes a proxy *solicitation* or whether a proxy *adviser* should be regulated as a proxy *solicitor*.  The issue never came up, just as it never came up at the roundtable on proxy adviser issues the SEC hosted in 2013.[102]  Second, as discussed more fully below, none of the investors on the panel expressed the conflict-of-interest and accuracy concerns the Commission cites to justify the proposed rule amendments.  Finally, and relatedly, not one single participant at this session saw a need to impose

---

[100] SEC, OCIE, National Exam Program, *Examination Priorities for 2015 at 4*, available at https://www.sec.gov/ about/offices/ocie/national-examination-program-priorities-2015.pdf.

[101] PA Proposal at 105, 84 Fed. Reg. at 66548.

[102] Transcript of the Roundtable on Proxy Advisory Services (Dec. 5, 2013) *available at* www.sec.gov/spotlight/proxy-advisory-services/proxy-advisory-services-transcript.txt ("2013 Roundtable Transcript").

additional regulation on proxy advisers, a fact that seemed to surprise the SEC staff moderating the panel.[103]

Lacking any support for change from the panel it convened to examine proxy adviser issues, the Commission turns instead to some written comments it received in connection with the roundtable. Here, the most vocal advocates for new regulation were public companies and their well-financed representatives.[104] Given that Congress enacted 14(a) of the Exchange Act to control unfair practices by corporate insiders, these parties are odd spokespersons indeed for the shareholder community. The Commission also relies on comments it received from groups calling themselves "Main Street Investors Coalition" and "60 Plus Association" and a handful of individuals claiming to be retail investors with grave concerns about proxy advisers.

The provenance of these investor comments was called into question in a November 19, 2019 Bloomberg article.[105] According to this article, the "Main Street Investors Coalition" was formed in part and funded in large measure by the National Association of Manufacturers, while the 60 Plus Association, a member of the Main Street Investors Coalition, "routinely takes money from corporations and advocates for their causes."[106] The legitimacy of the individual investor letters cited in the proposal is also in doubt. Most or all of these letters reportedly were orchestrated by these disguised corporate advocates, and some investors have disavowed any knowledge of letters submitted in their names.[107]

The problem of "astroturf" comments was the subject of a recent U.S. Senate Staff report.[108] Noting that it "is a federal crime to 'knowingly and willfully' make 'any materially false,

---

[103] Remarks of Michelle Anderson, Moderator, 2018 Roundtable Transcript, *supra* note 76 at 250 ("I can't believe [it]. Is there anyone on the panel that thinks there should be additional regulation? I haven't heard it yet, and I'm kind of surprised").

[104] PA Proposal at 11 n. 24 and 26 n. 70. These include the Society for Corporate Governance, Center on Executive Compensation, Wachtell Lipton, Rosen & Katz, the National Association of Manufacturers, the Business Roundtable, the National Investor Relations Institute, the U.S. Chamber of Commerce and Exxon Mobil Corporation.

[105] Zachary R. Mider & Benjamin Elgin, <u>SEC Chairman Cites Fishy Letters in Support of Policy Change,</u> Bloomberg (Nov. 19, 2019).

[106] *Id.*

[107] *Id.*

[108] Staff of S. Perm. Subcomm. On Investigations, Comm. On Homeland Sec. and Gov'tal. Affairs, 116th Cong., Rep. on, *Abuses of the Federal Notice-and-Comment Rulemaking Process* (Subcomm. Print 2019) The report defines "astroturfing" as "organized activity that is intended to create a false impression of a widespread, spontaneously arising, grassroots movement in support of or in opposition to something . . .

fictitious, or fraudulent statement or representation' to the federal government,"[109] the report recommends that federal agencies refer allegations of fraudulent comments to the appropriate law enforcement agencies, and that they not make such comments available for public viewing.[110]

ISS believes that the cynical misuse of the public comment process in the instant matter should not go unaddressed. We urge the Commission to undertake a thorough investigation into the allegations made in the Bloomberg article and take whatever steps are necessary to safeguard the integrity of the agency's rulemaking.

If the Commission is looking for honest input on the best way to protect retail investors, it need look no further than its own Office of the Investor Advocate ("OIA"). Created in 2014 under Section 915 of the Dodd-Frank Wall Street Reform and Consumer Protection Act, the OIA is charged with identifying areas in which investors would benefit from changes in the regulations of the Commission; identifying problems that investors have with financial service providers and investment products; analyzing the effects of rulemaking on investors; and, where practicable, proposing to the Commission any legislative, administrative, or personnel changes that may be appropriate to promote the interests of investors.[111]

In its "Report on Objectives" for Fiscal Year 2020,[112] the OIA confirmed that it is "very focused" on issues related to proxy voting. While it recognized a general consensus regarding reforms in areas such as accurate vote counts, vote reconciliations and vote confirmations—popularly known as "proxy plumbing" issues—the OIA was much less sanguine about rulemaking developments relating to proxy advisory firms. In this latter regard, it noted investors' concerns that efforts to give companies more input into the advice rendered by proxy advisory firms could weaken the integrity of that advice.[113]

---

but that is in reality initiated and controlled by a concealed group or organization . . . ." *Id.* at 6 n. 12, quoting Merriam-Webster, https://www.merriam-webster.com/dictionary/astroturfing.

[109] *Id.* at 17, *quoting* 18 U.S.C. § 1001(a) (2018).

[110] Id. at 3-4. See also U.S. Gov't. Accountability Office, GAO-19-483, Federal Rulemaking: Selected Agencies Should Clearly Communicate Practices Associated with Identity Information in the Public Comment Process 27(June 2019) ("if [SEC] officials are able to confirm that a comment was submitted by someone falsely claiming to be the commenter . . . the comment may not be made available to the public").

[111] 15 U.S.C. § 78d(g)(4).

[112] SEC Investor Advocate Rep. on Objectives for FY 2020 (June 27, 2019), *available at* https://www.sec.gov/files/sec-office-investor-advocate-report-on-objectives-fy2020.pdf ("OIA Objectives Report"). Section 4(g) of the Exchange Act requires the Investor Advocate to file an annual Report on Objectives and an annual Report on Activities with the Senate Committee on Banking, Housing and Urban Affairs and the Committee on Financial Services of the House of Representatives.

[113] OIA Objectives Report at 7.

The OIA addressed these issues again in its recent "Report on Activities" for Fiscal Year 2019.[114]  Here the Investor Advocate described the controversy over the role of proxy advisory firms as follows:

> [C]orporate executives sometimes disagree with the voting recommendations of proxy advisory firms that institutional investors have engaged to provide research and assistance with voting in annual and special meetings. Corporate lobbying groups calling for greater regulation of proxy advisory firms claim that those firms' voting recommendations contain errors and undisclosed conflicts of interest.  In an April 8, 2019 speech, the Investor Advocate summarized the prevailing view of institutional investors, which is that the proxy advisory firms perform essential services relatively well, and that there is no market failure warranting further regulatory intervention. . . . Nevertheless, the Commission waded into the fray.  On August 21, 2019, the Commission published guidance clarifying the fiduciary obligations of investment advisers in fulfilling their proxy-voting responsibilities. The Commission also published an interpretation concluding that proxy-voting advice provided by proxy advisory firms generally constitutes a "solicitation" under the federal proxy rules, and providing related guidance about the application of the antifraud rule to voting advice. We believe that these interpretive releases may have the effect of inhibiting investment advisers' engagement in proxy voting and, arguably, should have been subject to a notice and comment process.[115]

ISS is troubled by the fact that the proposal completely ignores the views the Investor Advocate expressed in his April 2019 speech and in the OIA Objectives Report.  We urge the Commission to rectify this oversight and accord the Investor Advocate's assessment of investor protection in the proxy adviser context the consideration and respect that Congress intended.

Likewise, we ask the Commission to consider carefully the views of the  Investor Advisory Committee ("IAC") which has recommended that the Commission reconsider the Interpretation and Guidance and that it revise and republish this rule proposal to make it more balanced and compliant with the agency's guidance on economic cost-benefit analysis in  rulemaking.[116]

* * * * *

---

[114] SEC Office of the Investor Advocate, Rep. on Activities for FY 2019, (Dec. 19, 2019), *available at* https://www.sec.gov/advocate/reportspubs/annual-reports/sec-investor-advocate-report-on-activities-2019.pdf  ("OIA Activities Report").

[115]  *Id.* at 5-6 (internal citations omitted).

[116] Recommendation from the SEC Investor Advisory Committee (IAC) Relating to SEC Guidance and Rule Proposals on Proxy Advisors and Shareholder Proposals (Jan. 24, 2020) at 5, *available at* https://www.sec.gov/comments/s7-22-19/s72219-6698769-206000.pdf (noting that instead of showing that a problem with proxy advisers does exist, the PA Proposal merely suggests that problems may or could exist because "some corporate managers and their lawyers and trade group representatives" claim that to be the case).  Also created by the Dodd-Frank Act, the IAC is tasked with advising and consulting with the Commission on initiatives to protect investor interests, Exchange Act § 39(a), 15 U.S.C. § 78pp(a).

The text, purpose, history and structure of the Exchange Act and the Advisers Act confirm that proxy advice and proxy solicitation are fundamentally distinct activities that are regulated in different ways. The Commission lacks authority to regulate proxy advice as though it were a solicitation, and its proposed amendment of Exchange Act Rule 14a-1(*l*) is contrary to law. ISS urges the Commission to withdraw this proposal.

### 6. Additional Comments on Proposed Changes to Rule 14a-1(*l*)

Without waiving or diminishing our challenge to the Commission's authority to regulate proxy advisers under Section 14(a), ISS offers the following comments on certain questions the Commission has asked about its proposed amendment of Rule 14a-1(*l*):[117]

2. The SEC proposes to define "proxy voting advice" to include the analysis and research that underlie a vote recommendation and that are delivered to the proxy adviser's clients. However, this term is proposed to exclude research reports and data that are not used to formulate the voting recommendations.[118] It is unclear how the proposal would treat data and research that may inform a proxy analysis and which may be described in a proxy voting research report but are marketed separately to investors. For example, ISS' analytics arm provides investment and governance professionals with a range of content and tools to identify and manage extra-financial risk and fulfill fiduciary obligations involved in active ownership, while its responsible investment arm provides services that help clients integrate responsible investing policies and practices into their strategy and shareholder voting decisions.[119] It would be highly inappropriate to include these stand-alone products and services in the proposed definition of "proxy voting advice" whether or not they play a role in ISS' formulation of vote recommendations.

It is also unclear whether the SEC proposes to stretch the definition of proxy solicitation to cover only advice based on a proxy adviser's benchmark and specialty voting policies, or whether the Commission also intends to cover advice based on investors' custom voting policies. On the one hand, the proposal seems to suggest that

---

[117] PA Proposal at 22 - 23, 84 Fed. Reg. at 66523-24. The numbers herein correspond to the numbering used in the proposal.

[118] *Id.* at 8, n. 11, 84 Fed. Reg. at 66519, n. 11.

[119] These services are described in ISS' Form ADV, which is available through the SEC's website at www.adviserinfo.sec.gov/IAPD/Content/Common/crd_iapd_Brochure.aspx?BRCHR_VRSN_ID=579250.

only the benchmark and specialty policies would be swept into the new definition,[120] but the proposal's statements about the importance of advice based on a client's custom voting policy guidelines suggest that the Commission might have a broader interpretation in mind.[121]

Subjecting to issuer oversight our clients' proprietary proxy voting policies and the custom vote recommendations that flow from those policies would add a new dimension to our already strenuous objection to this rulemaking. ISS does not own, and is prohibited from disclosing, clients' proprietary custom voting policies and the recommendations based thereon. Furthermore, there is not even an imaginary trace of investor protection to be gained by allowing issuers to vet the methodologies and assumptions institutional investors choose to implement for their own portfolios. If this ill-advised rulemaking goes forward, we urge the Commission to confirm that proxy voting recommendations and reports based on clients' custom policies are excluded from Rule 14a-1(*l*)(1)(iii)(A).

4. All forms of fiduciary investment advice, including proxy voting advice, should be governed exclusively by the Advisers Act regulatory regime, unless the advice is expressly excepted or exempted from that regime. The Commission's failure to enforce the Advisers Act against a minority of proxy advisers does not justify applying the Exchange Act proxy rules to the whole industry.

5. As explained earlier in this letter, a proxy "solicitation" involves a concerted effort by an interested party to achieve a desired outcome in a matter that is subject to a shareholder vote, consent or authorization. Consequently, the definition of "solicit" and "solicitation" in Rule 14a-1(*l*) should exclude any advice that is rendered to advance the best interest of the shareholder being advised and not to achieve a particular outcome for the corporation in question. This would exclude any voting recommendation made in the context of a fiduciary relationship, including a recommendation that is incidental to an investment adviser's management of a client's portfolio. It also would exclude a recommendation made by a non-fiduciary financial advisor, including a broker-dealer, if that advisor is acting in the customer's best interest. On the other hand, a recommendation made with the intent or purpose of advancing the speaker's own interests

---

[120] PA Proposal at 18, 84 Fed. Reg. at 66522.

[121] *Id.* at 8, 84 Fed. Reg. at 66519.

or the interests of a third party seeking to "maintain or gain control" of the company, should be treated as a "solicitation" for purposes of Rule 14a-1(*l*).

6. In the Interpretation and Guidance, the Commission tried to reconcile its desire to regulate proxy advisers under Section 14(a) with its long-standing view that a financial advisor acts as a proxy solicitor only if it issues "unsolicited" vote recommendations. Although "unsolicited" in this context has always been defined to mean "over-the-transom" (*i.e.,* advice given to people who have not asked for it), the Interpretation and Guidance said that whether advice is "unsolicited" should depend instead on whether the party rendering that advice markets its expertise in the matter at hand.[122] Perhaps realizing that this construction is at odds with the transactional approach the SEC takes to identifying unsolicited communications in other contexts under the Exchange Act,[123] the Commission now proposes to abandon the concept of unsolicited proxy advice altogether. In its place, the Commission introduces the concept of "unprompted" advice and proposes to except such advice from the definition of "solicitation" under the proxy rules.[124] There are at least three problems with this idea.

First, it is unnecessary, because a party that furnishes voting advice only in response to an "unprompted" client request would not fall under the revised solicitation definition in the first place. Stated otherwise, a party that advises solely in response to unprompted requests, does not market its expertise and sell voting advice for a fee.

Second, it is unworkable, because an investment adviser who announces its willingness to provide voting advice to its managed accounts (as Form ADV requires it to do), or a broker-dealer who makes a similar disclosure to retail investors in Form CRS, would run the risk of having the SEC determine that it has "invited and encouraged" its clients to ask for advice.

---

[122] Interpretation and Guidance, *supra* note 2 at 10, 84 Fed. Reg. 47419.

[123] For example, Regulation Best Interest imposes a heightened standard of conduct on a broker-dealer who recommends securities transactions to retail customers. Exchange Act Rule 15*l*-1. In adopting this rule, the Commission confirmed that the duty to act in a retail customer's best interest does not apply to "unsolicited orders," even if the broker has made other recommendations to the same client. *Regulation Best Interest: The Broker-Dealer Standard of Conduct,* Exchange Act Rel. No. 86031 (June 5, 2019) at 76-77, 84 Fed. Reg. 33318, 33334-33335 (July 12, 2019). The Commission did not condition this position on a broker's eliminating or restricting its sales and marketing activities. Likewise, certain Exchange Act transaction reporting requirements differentiate between "solicited" and "unsolicited" customer orders without regard to how the customer relationship was established. Rule 17a-25(a)(2)(ii).

[124] Proposed Rule 14a-1(*l*)(2)(v); PA Proposal at 20, 84 Fed. Reg. at 66523.

Finally, it is counterproductive. Subjecting experts who have the skill and resources to provide accurate and independent proxy advice to additional regulation, while allowing others, with no relevant expertise, to furnish *ad hoc*, "drive-by" advice belies the asserted investor protection goal of this rulemaking,

For these reasons, the proposed amendment of Rule 14a-1(*l*)(2) should be dropped.

## B. The Exemptive Component;
### Proposed Changes to Rule 14a-2(b)

The Commission proposes to add three new conditions to two existing exemptions from the filing and information requirements of the proxy rules. The first exemption (found in Rule 14a-2(b)(1)) is the one the SEC adopted in 1992 as a safe harbor for shareholders and others who do not seek proxy authority on their own or another's behalf and who do not have a substantial interest in the matter subject to shareholder action beyond their interest as shareholders or employees.[125] The second exemption (found in Rule 14a-2(b)(3)) is the one the Commission adopted in 1979 for financial advisors who go beyond their advisory function and voluntarily distribute proxy voting advice to persons who have not asked for it.[126] Although the SEC contends that proxy advisers have traditionally relied on these exemptions, that is not so. Until the Commission issued the contested Interpretation and Guidance in August 2019, fiduciary proxy advice furnished to investors pursuant to contract and for a fee was not deemed to be a proxy solicitation. Thus, proxy advisers have never needed an exemption from the filing and information requirements of the proxy rules.

The conditions the Commission proposes to add to these exemptions would apply exclusively to proxy advisers and would be housed in a new subsection (b)(9) of Rule 14a-2. The first condition—to be added as 14a-2(b)(9)(i)—relates to conflict of interest disclosures. The second condition—to be added as 14a-2(b)(9)(ii)—would give public companies two opportunities to review proxy advisers' advice and one opportunity for feedback before that advice is delivered to the clients who paid for it. The final condition—to be added as 14a-2(b)(9)(iii)—would give public companies the right to have hyperlinks to their own views on the proxy advice inserted into the body of that advice and any electronic medium used to deliver the advice. The condition on conflicts largely duplicates existing requirements under the Advisers Act. The issuer review and

---

[125] *See supra* at 13 -15.

[126] *Supra* at 13.

content insertion are the real purposes of this rulemaking, and are designed to provide corporate insiders with the editorial control over proxy advice they have sought for so long.

Although the SEC claims that these changes are necessary to address "concerns" about the integrity and accuracy of proxy advisers' analyses and recommendations, there are no legitimate concerns in either of these areas.

### 1. This rulemaking is a solution in search of a problem.

#### a. Conflicts of Interest

ISS strongly agrees that proxy advisers should take meaningful steps either to eliminate, or to manage and disclose all conflicts of interest that might incline the proxy adviser to render advice that is not disinterested.  As discussed above, conflict elimination, management and disclosure are the heart and soul of an investment adviser's fiduciary duty of loyalty.[127]  The SEC addressed the application of this duty in the context of proxy voting and the use of third-party proxy advisers when it adopted Advisers Act proxy rule in 2003[128] and again in 2019 when it issued extensive guidance on this topic.[129]

ISS addresses conflicts of interest, first and foremost, by being a transparent, policy-based organization.  Its use of a series of published voting policies provides a very practical check and balance that ensures the integrity and independence of ISS' research and vote recommendations. The existence of a published analytical framework, coupled with the fact that vote recommendations are based on publicly-available information, allows ISS clients to continuously monitor the integrity and consistency of ISS advice.

Furthermore, ISS has undertaken comprehensive risk assessments to identify specific conflicts of interest related to its operations and has adopted controls reasonably designed to

---

[127] *Supra* at 22.

[128] Advisers Act Proxy Rule Release, *supra* note 69.

[129] *Commission Guidance Regarding Proxy Voting Responsibilities of Investment Advisers,* Advisers Act Rel. No. 5325 (Aug. 21, 2019), 84 Fed. Reg. 47420 (Sept. 10, 2019), available at http://www.sec.gov/rules/interp/2019/ia-5325.pdf.  Over the years, the SEC Staff have also provided guidance on investment advisers' obligations to address conflicts in connection with proxy advisory services.  Letter from Douglas Scheidt, Assoc. Dir., SEC Div. of Inv. Mgmt. to Mari-Anne Pisarri, Pickard and Djinis LLP, Counsel for Institutional Shareholder Services Inc., 2004 SEC No-Act. LEXIS 736 (Sept. 15, 2004) at *4-5, *withdrawn by* IM Information Update, Statement Regarding Staff Proxy Advisory Letters, IM-INFO 2018-02 (Sept. 2018) available at: https://www.sec.gov/divisions/investment/imannouncements/im-info-2018-02.pdf; SEC Div. of Inv. Mgmt., Div .of Corp. Fin., *Proxy Voting:  Proxy Voting Responsibilities of Investment Advisers and Availability of Exemptions from the Proxy Rules for Proxy Advisory Firms,* Staff Legal bulletin No. 20 (June 30, 2014), *available at* http://www.sec.gov/interps/legal/cfslb20.htm.

manage each of those risks.[130] ISS conducts a range of transactional and forensic tests to assess the sufficiency of its compliance procedures and the effectiveness of their implementation.

### i. Conflicts of Interest in Connection with Affiliated Corporate Services

The most talked-about ISS potential conflict of interest relates to the fact that one of our subsidiaries, ISS Corporate Solutions, Inc. ("ICS"), provides governance tools and services to corporate issuer clients. Without adequate safeguards, this could potentially result in vote recommendations that are biased in favor of corporate management. However, the fact that the most vocal critics of ISS in this area are those who speak on behalf of corporate management, and not the investors who rely on ISS' research and vote recommendations, indicates that ISS is managing this potential conflict extremely well. The primary control for this risk is the firewall ISS maintains between the core institutional business and the ICS business. This firewall includes the physical and functional separation between ICS and ISS, with a particular focus on the separation of ICS from the ISS Global Research team. A key goal of the firewall is to keep the ISS Global Research team from knowing the identity of ICS' clients, thereby ensuring the objectivity and independence of ISS' research process and vote recommendations. The firewall mitigates potential conflicts via several layers of separation:

- ❍ ICS is a separate legal entity from ISS.
- ❍ ICS is physically separated from ISS, and its daily operations are separately managed.
- ❍ ISS Global Research team works independently from ICS.
- ❍ ICS and ISS staff are forbidden to discuss the identity of ICS clients.
- ❍ Institutional analysts' salaries, bonuses and other forms of compensation are not linked to any specific ICS activity or sale.
- ❍ ICS explicitly tells its corporate clients and indicates in their contracts that ISS will not give preferential treatment to, and is under no obligation to support, any proxy proposal of an ICS client. ICS further informs its clients that ISS' Global Research team prepares its research and vote recommendations independently of, and with no involvement from, ICS.

ISS maintains a robust training and monitoring program regarding the firewall. This program includes quarterly tests of the firewall's integrity, new-hire orientation, and review of certain marketing materials and disclosures. There also is an ethics hotline available to both ICS and ISS staff for reporting issues of potential concern.

---

[130] See Advisers Act Rule 206(4)-7; *Compliance Programs of Investment Companies and Investment Advisers,* Advisers Act Rel. No. 2204 (Dec. 17, 2003) at 5, 68 Fed. Reg. 74714, 74716 (Dec. 24, 2003) ("Each adviser, in designing its policies and procedures, should first identify conflicts and other compliance factors creating risk exposure for the firm and its clients in light of the firm's particular operations, and then design policies and procedures that address those risks"). *See also* 2016 GAO Report, *supra* note 3 at 9.

### ii. Conflicts of Interest in Connection with ISS' Owner and Directors

ISS is a privately-held company, whose owner, along with company management, is Genstar Capital, LLC, a private equity firm. ISS has complete independence from Genstar Capital in the development and application of its voting policies, the preparation of proxy research and the formulation of vote recommendations. The Board of Directors of ISS has formally adopted a Policy on Potential Conflicts of Interest Related to Genstar Capital and its affiliated funds.[131]

In addition, as a private equity firm that owns or controls a number of operating companies, some of which may become publicly traded and may thereafter be the subject of ISS research, actual or potential conflicts of interest, or the appearance of conflicts, could arise in the production of research and vote recommendations with respect to coverage of such a Genstar company (i.e., a "Genstar Affiliated Company"). ISS therefore provides disclosure of these relationships on its website and will include information about any such relationship in the research report for an issuer that is a Genstar Affiliated Company. Similarly, the ISS Board of Directors has adopted procedures and safeguards to identify and disclose any actual or potential conflict of interest situations involving service by an ISS Director on the board of a publicly-traded issuer, or in another capacity (relative to an issuer), that could present the potential for a conflict.[132]

### iii. Conflicts of Interest Within the Institutional Advisory Business

Potential conflicts of interest also may arise where an ISS institutional investor client is, itself, a public company whose shareholder meetings are the subject of research and voting recommendations or where ISS is called upon to analyze and make vote recommendations on shareholder proposals propounded by an ISS client. ISS' fiduciary commitment to act in the best interests of each investor client, its development of vote recommendations in accordance with applicable published or custom voting policies, and the ongoing scrutiny it receives from its institutional clients effectively address this potential conflict, as does the disclosure of "significant relationships" as described in more detail below.

### iv. Conflicts of Interest at the Employee Level

Potential conflicts of interest also may arise in connection with an employee's personal securities investments, the receipt or giving of gifts and entertainment, or contacts with proxy solicitors and other interested parties. ISS has implemented specific policies and procedures in each of these areas to manage any potential conflicts. These include procedures for preclearance of

---

[131] https://www.issgovernance.com/file/duediligence/ISS-Conflicts-Policy-Regarding-Genstar.pdf.

[132] https://www.issgovernance.com/file/duediligence/ISS-Board-of-Directors-Conflicts-Policy.pdf.

personal trades, blackout periods for trading in stocks of issuers whose meetings are currently being analyzed or acted upon, and extensive personal trade reporting requirements.[133] ISS also restricts employees' ability to give or receive business-related gifts and entertainment, and it has a strict policy addressing interactions between ISS staff and proxy solicitors or other parties that represent issuers, dissident shareholders or other external parties soliciting proxies from shareholders, in order to ensure that such interactions do not compromise the independence of the advice ISS renders to its clients.[134]

### v. Conflicts of Interest in Connection with Issuers' Review of Draft Reports

In select markets and under certain circumstances, ISS currently and voluntarily affords some issuers an opportunity to review draft reports for factual accuracy prior to publication. This practice presents a risk (which would be magnified many times over by the proposed rule amendments) that the subjects of ISS' advice will have an undue influence on the content of that advice. In order to ensure the propriety of all such interactions between an issuer and ISS analysts, any decision by an analyst to change a draft vote recommendation based on an issuer's notification of one or more factual errors in a draft report must be reviewed by a senior analyst and appropriate records must be kept of the communication from the issuer and the voting decision. These records are subject to the Chief Compliance Officer's periodic review.

### vi. Disclosure Regarding Potential Conflicts of Interest

ISS already provides its investor clients with an extensive array of information to ensure that they are fully informed of potential conflicts and the steps ISS has taken to address them. In addition to making full disclosure in the Form ADV brochure it delivers to each client, ISS supplies a comprehensive due diligence compliance package on the "Compliance" section of its web site to assist clients and prospective clients in fulfilling their own obligations regarding the use of proxy advisory services.[135] This package includes a copy of ISS' Code of Ethics, a description of other policies, procedures and practices regarding potential conflicts of interest and a description of the ICS business.

---

[133] *See Personal Trading Policy* in ISS Code of Ethics at 8, *available at* https://www.issgovernance.com/file/duediligence/code-of-ethics-nov-2019.pdf.

[134] See ISS, Policy on Interactions and Communications with Proxy Solicitors and Other Proxy Advisory Companies, Id. at 14.

[135] *See* ISS, *Due Diligence Package: Proxy Research and Voting Services* (last updated October 14, 2019) available at: https://www.issgovernance.com/compliance/due-diligence-materials/ ("Due Diligence Package").

Moreover, each proxy analysis and research report ISS issues contains a legend indicating that the subject of the analysis or report may be a client of or affiliated with a client of ISS, ICS or another ISS subsidiary. Each analysis and report also notes that one or more proponents of a shareholder proposal may be a client of ISS or one of its affiliates, or may be affiliated with such a party. Although investment advisers typically disclose conflict of interest information at a macro level,[136] ISS goes further. Any institutional client that wishes to learn more about the relationship, if any, between ICS and the subject of a particular report may access this information through the ProxyExchange platform and/or by contacting ISS' Legal and Compliance Department for relevant details. These processes allow ISS' proxy voting clients to receive the names of ICS clients, the amount that any ICS client has paid ICS and the particular products/services they purchased, and all this is done without revealing that information to ISS' research analysts as they prepare the research and vote recommendations. Were the ICS relationship identified on the face of a proxy research report, this critical information barrier would be destroyed.

Research reports also contain disclosure regarding any engagement ISS may have had with the company or other relevant market participant as part of the analysis. This may include key information disclosed in dialogue with companies, shareholder proponents or other stakeholders, including the date(s) of dialogue, the topic(s) covered, the initiator of the dialogue and the outcome of the dialogue.

Furthermore, detailed disclosure of potential conflicts of interest is available to clients through ISS' ProxyExchange platform in a way that both seamlessly integrates with clients' workflows and protects the critical firewall between ISS and its ICS subsidiary. In this regard, the platform reveals the existence of any "significant relationship" between ISS and a registrant, an institutional client affiliated with a registrant or a primary shareholder proponent of a proposal subject to ISS' advice, and users can click through on a link to get more information about that relationship. For purposes of this disclosure, ISS deems any paying client relationship between ICS and a corporate issuer, where ISS provides proxy vote recommendations and research regarding that issuer to be "significant." A relationship with an ISS institutional client who is itself, or who is related to, a corporate issuer will be deemed "significant" if annual revenues from that client are in excess of 5% of ISS' total, consolidated revenues for the most recently completed fiscal year. The same 5% test applies in the case of relationships with clients who act as primary filers of shareholder proposals.

In addition to obtaining report-by-report conflict information, institutional clients of ISS can obtain lists of all ICS clients. Some clients receive such lists on a monthly basis, while others receive

---

[136] *See, e.g.* Form ADV, Part 2A, Item 11.

the lists on a quarterly or annual basis. This is just one of the many steps institutional investors take to reassure themselves that ISS is appropriately mitigating conflicts. They also obtain a range of additional information regarding our information barriers, our information security program, and other aspects of our operations. Many clients meet with ISS staff on an annual basis to discuss conflict mitigation policies and practices and other due diligence matters.

ISS' careful attention to conflict mitigation and disclosure appears to be effective.

The issue of proxy adviser conflicts of interest was extensively discussed at the 2018 Roundtable on the Proxy Process. Participants acknowledged the importance of monitoring the steps proxy advisory firms take to ensure the integrity of their reports and recommendations, and the consensus among the consumers of proxy advice was that this process is working as it should. For example, Jonathan Bailey, Managing Director and Head of ESG Investing, Neuberger Berman, LLC, said:

> *We have seen no evidence that there has been any impact from conflicts of interest on the services provided to us, and we feel comfortable with the level of disclosure that we get. And on an annual basis, we review that with our chosen service providers, and will continue to do so.*[137]

Likewise, Patti Brammer, Corporate Governance Officer, Ohio Public Employees Retirement System said:

> *I would just say that I can speak to -- our experience has been that yes, the conflict disclosure is very easy to understand. It's not boilerplate language. It does provide sufficient detail, and it is an element that we use and consider.*[138]

And Scot Draeger, Vice President, Director of Wealth Management, General Counsel and Chief Compliance Officer, R.M. Davis Private Wealth Management agreed, noting:

> *I would say, as a practical matter, to speak as a user of the service, for a proxy advisory firm service, the disclosures are ones that are easy to understand at present, and aren't dissimilar from an auditor independence.*
> *……*
>
> *[T]he transparency of the conflicts themselves are disclosed seemingly pretty well. If you're a user -- for ISS, anyway, is what I can speak to -- there's a dashboard that you go into. It's a very technical point. But when you're looking down and you're making decisions about votes or categories of votes, with respect to every issuer there's a box on the dashboard that says "Conflict" that you can literally click on and get the information that was described.*[139]

---

[137] 2018 Roundtable Transcript, *supra* note 76 at 212.

[138] *Id.* at 213.

[139] *Id.* at 211.

Although the SEC acknowledges that proxy advisers have implemented extensive policies and procedures to identify, manage and disclose conflicts of interest, and that proxy advisers' clients have expressed satisfaction with advisers' practices in this regard, the agency says more regulation is needed because certain issuers and their paid representatives are still not satisfied.[140]  It is an understatement to say that public companies' views on conflicts of interest in this context should be taken with a grain of salt.

Unlike institutional investors who choose to use proxy advisory services to help fulfill their fiduciary duties to shareholders and beneficiaries, certain public companies view proxy advisers as adversaries whose vote recommendations can sometimes interfere with management's views or economic self-interest.  Furthermore, because investor subscribers to proxy advisory services have access to detailed disclosures of potential conflicts of interest and the opportunity to conduct comprehensive due diligence on their proxy advisers' policies and procedures, they are far better equipped than issuers are to assess whether existing regulations are sufficient to protect investors.

Finally, given that certain issuers, their corporate advisers and lobbyists are the source and most vocal advocates of the proposal to inject a grave new conflict of interest into proxy advisers' research and advice through compelled issuer review of not only factual statements but also of proxy advisers' methodologies and opinions, issuers' "concern" about conflicts of interest has a hollow ring.  And their much-ballyhooed interest in transparency is belied by the apparent orchestration by some of a campaign of sham comments from "retail investors."

The SEC states that its primary concern in proposing these amendments is with the recipients of proxy voting advice,[141] but then it largely ignores the views of those parties (and the fact that such advice is already regulated under the Advisers Act).  ISS respectfully submits that basing this rulemaking on concerns expressed by a group of self-interested corporate insiders and their lobbyists, while dismissing the views of the fiduciaries who use proxy advice to serve the best interests of their shareholder clients would be arbitrary, capricious and an abuse of the Commission's discretion.

---

[140]  PA Proposal at 28, n. 76, 29 n. 78 and 30 n. 82, 84 Fed. Reg. at 66525 n. 76 and 66526 nn. 78 & 82.  The Commission also asserts that new regulation under the Exchange Act is necessary because there is "no uniform set of standards" applicable to the policies and procedures proxy advisers adopt to address the risks posed by conflicts of interest.  *Id.* at 28 n. 76, 84 Fed. Reg. 66525 n. 76.  This statement assiduously ignores the robust set of fiduciary standards that today govern 60% of U.S. proxy advisers and should be applied to the whole industry.  As amply demonstrated above, the regulatory regime established under the Advisers Act needs no help from the Exchange Act proxy rules.

[141]  *Id.* at 34, n. 91, 84 Fed. Reg. at 66527, n.91.

### b. Accuracy

As it stands today, the overwhelming majority of proxy votes are cast in favor of corporate management. Certain public companies seek to close even the modest window of dissent by urging the Commission to let them play an active role in crafting the advice investors receive from their chosen proxy advisory firms. In order to justify this extraordinary request, these members of the registrant community and their cadre of overt and concealed representatives have launched a campaign of concern about "factual errors, incompleteness, or methodological weaknesses" in the advice proxy advisers render to their clients.[142] These concerns are no more legitimate than are issuers' claims of concerns about proxy advisers' conflicts of interest.

In 2016, the GAO examined the issue of accuracy at the behest of Congress and reported:

> *Both corporate issuers and institutional investors we interviewed said that the data errors they found in the proxy reports were mostly minor.*[143]

The consumers of proxy voting advice offered the same assessment at the 2018 Roundtable, with one participant saying:

> *I think there's a very important distinction to be made between objective factual errors and subjective interpretation and policy. And we find a small, very small, number of objective factual errors, and we think those are dealt with and need to be dealt with.*[144]

The SEC's Investor Advocate recently told Congress:

> [W]*e reviewed many of the alleged 'errors' and determined that most would be more appropriately characterized as differences of opinion.*[145]

And one corporate issuer, who also operates in the financial services industry, echoed similar sentiments:

> *Proponents of additional regulatory requirements for proxy advisory firms have raised concerns regarding the accuracy of proxy advisor reports, and suggested that issuers should be permitted to review and comment on proxy reports before the reports are shared with the proxy advisors' clients. From T. Rowe Price's perspective as a corporate issuer, we appreciate having effective ways to address factual errors in proxy advisor research reports and find current practices, including the ability to file amended proxy*

---

[142] *Id.* at 39, 84 Fed. Reg. at 66528.

[143] 2016 GAO Report, *supra* note 3 at 29.

[144] Remarks of Jonathan Bailey, 2018 Roundtable Transcript, *supra* note 76 at 238.

[145] OIA Activities Report, *supra* note 114 at 5 - 6. *See also* Remarks of Anne Sheehan, Director of Corporate Governance, CalSTRS, 2013 Roundtable Transcript, *supra* note 102 at 155 ("What I have found, that many times the errors are really differences of opinion").

*statements with the SEC, to be sufficient. As described during the roundtable, both ISS and Glass Lewis, the largest proxy advisory firms operating in the US, have transparent mechanisms in place for issuers to address any factual errors in their data analyses.*[146]

The extremely low error rate for proxy advice is not an accident. As with conflict mitigation and disclosure, proxy advisers go to great lengths to ensure the accuracy of the information that underpins their advice; it is in their interest to do so. Among the many steps ISS has taken to ensure quality and minimize errors in its published research are the following:

o Reports and recommendations are driven by publicly available information and based on publicly disclosed and detailed voting policy guidelines.

o Issuer data used by ISS is consistently collected, classified and subject to quality control review before it is used by ISS' analysts.

o Prior to finalization and delivery to clients, each proxy research report is subject to internal review for accuracy, quality and to ensure that the relevant voting policy has been correctly applied.

o ISS maintains a data verification platform which allows issuers to verify key data underlying ISS' evaluation of equity-based compensation plans, thereby providing ISS clients with greater assurance of data integrity.

o In select markets and under certain circumstances, companies may receive an opportunity to review a draft analysis for factual accuracy prior to publication of the analysis.[147]

o All issuers may request and receive, at no charge, a copy of the published ISS benchmark research report, including the vote recommendations in advance of its shareholder meeting.

o In the event new material public information becomes available or if ISS finds that a report contains a material error, ISS promptly issues a Proxy Alert ("Alert") to inform clients of any corrections and, if necessary, any resulting changes in the vote recommendations. Alerts are distributed to ISS' investor clients through the same ProxyExchange platform used to distribute the regular research and voting recommendations. This ensures that the clients who received an original report will also receive the related Alert, which is attached to the relevant original company meeting report. Even if a client has cast its vote before receiving an Alert, the client may cancel and change its vote at any time before the meeting cut-off date, if the client determines that such a change is warranted by the new information.

---

[146] Letter from Donna F. Anderson and Eric Veil, T. Rowe Price, to Brent J. Fields, Esq., Secretary, SEC (Dec. 13, 2018) ("2018 T. Rowe Price Letter") at 2.

[147] See *infra* at 61-62.

o ISS maintains a Feedback Review Board ("FRB"), which I oversee as ISS' President and CEO. The FRB serves as an additional channel for issuers or others to communicate with ISS any unresolved concerns regarding accuracy of research, accuracy of data, policy application and general fairness of ISS policies, research, and recommendations.

o ISS conducts regular SSAE 18 audits to check compliance with internal control processes. Controls around ISS' research process are included in these audits.

Many supporters of the proposed rulemaking rely on a 2018 study by the American Council on Capital Formation ("ACCF") to bolster their "concerns" about inaccurate proxy advice,[148] but this study has been thoroughly discredited. After painstakingly analyzing each of the 139 purported "proxy advisor errors" identified by the ACCF, the Council of Institutional Investors ("CII")—a nonprofit, nonpartisan association of U.S. asset owners with combined assets of $4 trillion—concluded that:

> [I]t is clear that most of the claimed 'errors' actually are disagreements on analysis and methodologies, and that some other alleged proxy advisory firm errors derive from errors in the company proxy statements.[149]

The CII also reviewed claims about inaccurate proxy advice made by parties such as the Business Roundtable, the National Investor Relations Institute, the National Association of Manufacturers and the U.S. Chamber of Commerce Center for Capital Markets Competitiveness and found "evidence of pervasive proxy advisor inaccuracy [to be] extraordinarily weak."[150]

On the subject of errors, we note the January 16, 2020 Memorandum from the SEC's Division of Economic and Risk Analysis ("DERA") which explains the methodology behind a table DERA purportedly created to "provide a tabular approximation of the number of instances registrants indicated 'concerns' over the 2016-2018 period with respect to proxy voting advice in the additional soliciting materials reviewed by the staff."[151] The DERA Memorandum rightfully

---

[148] Frank Placenti, *Are Proxy Advisors Really A Problem?,* American Council for Capital Formation (Oct. 29, 2018) 10-11 *available at* http://accf.org/2018/10/29/are-proxy-advisors-really-a-problem/. Even taken at face value, this study identifies an error rate of only 0.4%, which hardly justifies this rulemaking.

[149] Letter from Kenneth A. Bertsch, Executive Director, CII (Oct. 24, 2019, incorporating Oct. 25, 2019 corrections) ("2019 CII Letter"), at 2.

[150] *Id.* at 7.

[151] DERA, Memorandum to File S-7-22-19 regarding "Data analysis of additional definitive proxy materials filed by registrants in response to proxy voting advice" (Jan. 16, 2020), *available at* https://www.sec.gov/comments/s7-22-19/s72219-6660914-203861.pdf ("DERA Memorandum").

recognizes that reviewers of the various filings may reach different conclusions about the classifications of the concerns. This critical observation underscores a key point that we have witnessed directly at ISS and which other commentators have expressed as noted above, namely the critical distinction between objective factual errors and issues of subjective interpretation or differences of opinions on methodological frameworks. To test this observation in the context of the table in the rulemaking proposal and given the limited time afforded to us after the issuance of the DERA Memorandum, ISS performed a focused assessment of the 84 filings cited by DERA that were made in 2018. Of the 84 filings, five related exclusively to proxy research reports issued by Glass Lewis and so we did not assess those. Of the remaining 79, over 90% of the cited filings did not even state a claim of factual errors but instead reflected an issuer's disagreement with the opinions reached by ISS and/or the methodological framework(s) used by ISS to analyze the issue at hand. In fact, only 4 of the identified filings articulated a clear claim by an issuer of a factual error or inaccuracy on the part of ISS; after carefully reviewing those claims, ISS respectfully disagrees with those issuers' assertions.

Issuers' argument that without the ability to intervene in the production of proxy advice they have no "timely and effective way" to express their disagreement with that advice[152] is also extraordinarily weak. Companies make their views known to investors in a myriad of ways, including in initial and supplemental proxy statements,[153] by hiring proxy solicitors and through individual engagements. As professor John C. Coates, a member of the SEC's Investor Advisory Committee, remarked at a hearing before the Senate Committee on Banking, Housing and Urban Affairs, "[The issuer] has its own mouth too."[154]

Professor Coates went on to rebut the contention that issuer oversight of proxy research is necessary to ensure that accurate information enters the marketplace, saying:

---

[152] PA Proposal at 39, 84 Fed. Reg. at 66529.

[153] In fact, issuers "get unlimited space in the proxy statement" to voice their opposition to shareholder proposals, while the proponents of such proposals have a maximum of 500 words to explain their point of view. Remarks of Michael Garland, Assistant Comptroller, Office of the New York City Comptroller, 2018 Roundtable Transcript *supra* note 76 at 160; 17 CFR § 240.14a-8(d).

[154] *Legislative Proposals to Examine Corporate Governance:* Hearing Before the S. Comm. on Banking Housing, and Urban Affairs, 115th Cong. (2018) (Statement of John C. Coates).

*Anyone giving advice in a public way . . . is subject to anti-fraud rules enforced by the SEC. So, if ISS were to put out a report knowingly falsely, or negligently falsely, they would have liability for it. So I just want to be clear that if they deliberately misrepresent facts, they are going to be subject to liability. . . . On basic factual disputes we have an amply robust system for getting the information out there for investors.*[155]

This is not the first time some issuers have tried to interfere with shareholders' ability to communicate about their proxy votes. In opposing the Commission's 1992 shareholder-friendly package of reforms, the corporate community argued that management should have "'a role to play' in rebutting any misstatements or mischaracterization" in shareholder communications in order to ensure "that proxies are executed on the basis of 'correct' information." The Commission rejected that argument, observing that

*much commentary concerning corporate performance, management capability or directorial qualifications or the desirability of a particular initiative subject to a shareholder vote is by its nature judgmental. As such opinions, there typically is not a 'correct' viewpoint.*[156]

The proposal addresses this inconvenient truth by admitting that this rulemaking is not really about accuracy after all, but about giving registrants a say in the methodologies proxy advisers use and the opinions they express:

*The registrant and certain other soliciting person [sic] may have disagreements that extend beyond the accuracy of the data used, such as differing views about the proxy advisor's methodological approach or other differences of opinion that they believe are relevant to the voting advice.*[157]

This admission reveals a far more serious infirmity with the proposal, which the Commission also identified in 1992:

*A regulatory scheme that inserted the Commission staff and corporate management into every exchange and conversation among shareholders, their advisors and other parties on matters subject to a vote certainly would raise serious questions under the free speech clause of the First Amendment, particularly where no proxy authority is being solicited by such persons.*[158]

It is not clear why the SEC has had such a radical change of heart between 1992 and now, but one thing is certain: Proposed Rules 14a-2(b)(9)(ii) and (iii) are blatantly unconstitutional.

---

[155] *Id.*

[156] 1992 Release, supra note 46, 57 Fed. Reg. at 48278.

[157] PA Proposal at 43-44, 52, 84 Fed. Reg. at 66530, 66533.

[158] 1992 Release, 57 Fed. Reg. at 48279.

## 2. The proposal is unconstitutional.

Proxy advisers engage in speech at the core of the First Amendment by offering research, analysis, opinions, and recommendations to their clients about matters of critical public importance. Yet the proposal—which, remarkably, does not even *mention* the First Amendment—would commandeer proxy advisers' speech to serve the interests of issuers, and would grant issuers an extraordinary right to review proxy advisers' speech *before they communicate to their own clients*. The proposal also violates the Fifth Amendment's Takings Clause and eviscerates advisers' (and their clients') reliance interests by forcing proxy advisers to share valuable, confidential intellectual property with companies and other parties who have not paid for this information and have no contractual or other relationship with the advisers. The proposed rule amendments flout bedrock constitutional principles and would never pass judicial review if they were to be adopted. The government "may not, under the guise of prohibiting professional misconduct, ignore constitutional rights;"[159] yet that is precisely what the Commission proposes to do.

### a. Proxy advisers' research, analysis, opinions and recommendations are core speech protected by the First Amendment.

When proxy advisers provide independent research, analysis, opinions and recommendations to their clients, they engage in speech and expressive activity protected by the First Amendment. The Supreme Court has made clear that "professional speech"—expert advice that clients receive from regulated entities—is not "a separate category of speech that is subject to different rules."[160] The Court's "precedents have long protected the First Amendment rights of professionals."[161] Because professionals may have "a host of good-faith disagreements, both with each other and with the government, on many topics in their respective fields," the government cannot pick winners and losers by burdening only one type of speech or speaker it deems disfavored.[162] Moreover, "when the government polices the content of professional speech," it unconstitutionally stifles the "'uninhibited marketplace of ideas in which truth will ultimately prevail.'"[163]

---

[159] *NAACP v. Button*, 371 U.S. 415, 439 (1963).

[160] *NIFLA v. Becerra*, 138 S. Ct. 2361, 2371 (2018).

[161] *Id.* at 2374.

[162] *Id.* at 2374-75.

[163] *Id.* at 2374 (quoting *McCullen v. Coakley*, 573 U.S. 464, 476 (2014)).

Proxy advisers' speech and expression are at the core of the First Amendment's protections. Before proxy advisers like ISS entered the market, institutional investors often followed the so-called Wall Street Rule ("vote with management or sell") because it was too expensive and time-consuming to inform themselves about thousands of shareholder votes across all the companies in their investment portfolios.[164] Proxy advisers offer investors independent research, analysis, and recommendations to empower them to make better-informed decisions about how to vote on matters requiring shareholder approval, and to ensure they have "the information needed to hold corporations … accountable."[165]

Proxy advisers' speech, research, analysis, opinions and recommendations address matters of critical importance, including corporate transactions such as mergers and acquisitions, executive compensation, and a company's corporate governance policies. Proxy advisers may also offer their views about the extent to which corporate ballot measures comport with an investor's selected voting priorities regarding sustainability, labor relations, social responsibility, or other investor-specific criteria. In short, proxy advisers' research, analysis, opinions, recommendations and advice to their clients regarding corporate ballot proposals are unquestionably "form[s] of expression protected by the Free Speech Clause of the First Amendment."[166]

### b. The inserted response provision of proposed Rule 14a-2(b)(9) imposes content-, speaker- and viewpoint-based burdens on protected speech that cannot satisfy any level of First Amendment scrutiny.

Proposed Rule 14a-2(b)(9)(iii) would force proxy advisers to include a hyperlink in their advice to clients directing the client to "a written statement prepared by the registrant that sets forth its views on the advice."[167] The assumption behind this proposal is that the issuer's views

---

[164] George W. Dent, Jr., *A Defense of Proxy Advisors*, 2014 Mich. St. L. Rev. 1287, 1288 (2014).

[165] *Citizens United v. FEC*, 558 U.S. 310, 370 (2010).

[166] *Sorrell v. IMS Health*, 564 U.S. 552, 557 (2011); *see also NIFLA*, 138 S. Ct. at 2371-75 (crisis pregnancy centers had First Amendment right in the messages they conveyed, or did not convey, to their patients); *Button*, 371 U.S. at 438 (First Amendment protects advice from attorneys to potential litigants about seeking legal assistance); *Legal Svcs. Corp. v. Velasquez*, 531 U.S. 533, 545 (2001) (a ban on "the analysis of certain legal issues" effectively "prohibits speech and expression"); *id.* at 546 (First Amendment implicated by law that impaired "the adequacy and fairness of professional representations"); *Bhd. of R.R. Trainmen v. Va. State Bar*, 377 U.S. 1, 7 (1964) (injunction prohibiting union from advising injured workers to obtain legal advice violated First Amendment); *Conant v. Walters*, 309 F.3d 629, 636 (9th Cir. 2002) ("physician speech is entitled to First Amendment protection").

[167] PA Proposal at 53, 84 Fed. Reg. at 66533.

will *contradict* those of the proxy adviser; after all, the issuer would have no incentive to add a statement to advice it agreed with. The Commission expressly anticipates that publicly traded companies will use the hyperlink to voice "disagreements over facts and opinions" and to address purported "factual errors and methodological weaknesses" in the proxy adviser's advice.[168] The purpose of the hyperlink requirement, the Commission explains, is "ensuring that [investors] are able to consider registrants' views.[169] The Commission's attempt to commandeer proxy advisers' reports and systems in order to relay information that *contradicts* the advisers' own recommendations is an extraordinary burden on protected speech that cannot withstand any level of First Amendment scrutiny.

The First Amendment "requires heightened scrutiny whenever the government creates 'a regulation of speech because of disagreement with the message that it conveys.'"[170]  Similarly, a law must satisfy strict scrutiny if it is "directed at certain content" or "aimed at particular speakers."[171] Strict scrutiny of the proposed response provision would be warranted because the provision targets particular *speakers* (proxy advisers) and particular *content* (proxy research and voting recommendations) based on the Commission's disagreement with the *message* or *viewpoint* of that speech (*e.g.*, its assumption that proxy advisers' speech is somehow inaccurate or insufficient and needs to be corrected or supplemented by issuers and certain other solicitors). That is the very definition of a content-based and speaker-based restriction on speech.[172] The fact that the regulated speech "results from an economic motive," does not reduce the level of scrutiny that applies to a content- and speaker-based restriction.[173]

Moreover, the Supreme Court has held that laws or regulations that force speakers to include supplemental notices or disclaimers are "content-based regulation[s] of speech."[174] "By compelling individuals to speak a particular message," such requirements "'alte[r] the content of

---

[168] *Id.* at 56, 67, 84 Fed. Reg. 66534, 66537.

[169] *Id.* at 53, 84 Fed. Reg. at 66333.

[170] *Sorrell*, 564 U.S. at 566, (quoting *Ward v. Rock Against Racism,* 491 U.S. 781, 791 (1989)).

[171] *Id.* at 567.

[172] *Id.*; *see also Reed v. Town of Gilbert*, 135 S. Ct. 2218, 2226, 2227 (2015) (law is content-based if it "target[s] speech based on its communicative content" or "defin[es] regulated speech by particular subject matter").

[173] *Sorrell*, 564 U.S. at 567.

[174] *NIFLA*, 138 S. Ct. at 2371.

… speech.'"[175]  Coerced speech is every bit as unconstitutional as coerced silence, as "the First Amendment guarantees … the decision of both what to say and what *not* to say."[176]  "Whenever the Federal Government … compels [individuals] to voice ideas with which they disagree," it "undermines" both "our democratic form of government" and "the search for truth."[177]  Indeed, coercive disclosure requirements are particularly suspect under the First Amendment because they allow the government to favor certain speakers or messages over others.[178]  Requirements that speakers convey certain messages also "impermissibly require[] [individuals] to associate with speech [and speakers] with which [they] may disagree."[179]

Content-based disclosure requirements such as the one the SEC proposes to add to Rule 14a-2(b) must satisfy "strict scrutiny."[180]  Such laws "'are presumptively unconstitutional and may be justified only if the government proves that they are narrowly tailored to serve compelling state interests.'"[181]  Forcing a speaker to include *opposing viewpoints* within its own speech could never satisfy strict scrutiny. Because a "[g]overnment-enforced right of access inescapably 'dampens the vigor and limits the variety of public debate,'" "any such compulsion" to "print that which [the speaker] would not otherwise print" is "unconstitutional."[182]

Forcing proxy advisers to facilitate the distribution of issuers' opposing views alongside their own speech is strikingly similar to other laws and regulations that courts have struck down under the First Amendment.  The government can no more require proxy advisers to include within their own speech criticisms of their advice than it can

---

[175] *Id.* (*quoting Riley v. Nat'l Fed'n of the Blind of N.C., Inc.*, 487 U.S. 781, 795 (1988)).

[176] *Riley*, 487 U.S. at 796-97.

[177] *Janus v. AFSCME*, 138 S. Ct. 2448, 2464 (2018).

[178] *NIFLA*, 138 S. Ct. at 2378; *Reed*, 135 S. Ct. at 2229.

[179] *Pac. Gas & Elec. Co. v. Pub. Utilities Comm'n of Calif.*, 475 U.S. 1, 15 (1986).

[180] *NIFLA*, 138 S. Ct. at 2371 (citing *Reed*, 135 S. Ct. at 2226); *accord Turner Broad. Sys., Inc. v. FCC*, 512 U.S. 622, 642 (1994) ("Laws that compel speakers to utter or distribute speech bearing a particular message are subject to [strict] scrutiny.").  Note that compelling proxy advisers to disclose dissenting views in their proxy voting research reports is readily distinguishable from mandating conflict of interest disclosures under the federal securities, which, under some circumstances, may receive a lower level of First Amendment scrutiny. *SEC v. Wall Street Publishing Institute,* 851 F.2d 365, 372-73 (D.C. Cir. 1988).

[181] *NIFLA*, 138 S. Ct. at 2371 (quoting *Reed*, 135 S. Ct. at 2226).

[182] *Miami Herald Pub. Co. v. Tornillo*, 418 U.S. 241, 256-57 (1974).

- require a utility company to "include in its billing envelopes speech of a third party with which the utility disagrees;" [183]

- require a newspaper to "grant[] a political candidate a right to equal space to reply to [its] criticism and attacks on his record."[184]

As Justice Kennedy emphasized in *NIFLA*, "[g]overnments must not be allowed to force persons to express a message contrary to their deepest convictions," and "it is not forward thinking to force individuals to 'be an instrument for fostering public adherence to an ideological point of view [they] fin[d] unacceptable."[185]

The Commission's goal of "offer[ing] … a greater variety of views" by "assist[ing] groups … that challenge" proxy advisers' advice is not a compelling state interest; it is unconstitutional viewpoint discrimination.[186] That is because "[t]he variety of views that the Commission seeks to foster cannot be obtained by including speakers whose speech agrees with [the proxy adviser's]. [It] exists only where the relevant groups … disagree with [the proxy adviser's] views."[187] While the government might have a legitimate interest in "making a variety of views available" via regulations that are "content neutral," it does not have a legitimate interest in "abridg[ing] [one side's] rights in order to 'enhance the relative voice' of its opponents."[188]

The response provision cannot be justified on the grounds that it merely requires proxy advisers to publish *additional* or *supplemental* information provided by issuers and thus does not limit their *own* speech. The Supreme Court has flatly rejected the notion that coerced speech can be justified on the ground that the compelled speaker "'is not prevented … from saying anything it wishe[s].'"[189] As the Court explained, a law that requires speakers to include certain messages within their speech "operates as a command in the same sense as a statute or regulation forbidding [the speaker] to publish specified matter."[190]

---

[183] *Pac. Gas*, 475 U.S. at 4.

[184] *Miami Herald*, 418 U.S. at 243.

[185] *NIFLA*, 138 S. Ct. at 2379 (Kennedy, J., concurring).

[186] *Pac. Gas*, 475 U.S. at 12-13.

[187] *Id.* at 13.

[188] *Id.* at 20, 14.

[189] *Miami Herald*, 418 U.S. at 256.

[190] Id.

Nor can the response provision be saved by analogizing it to the so-called "fairness doctrine," a now-defunct policy imposed by the Federal Communications Commission that required broadcasters to present both sides of controversial issues.[191] The fairness doctrine was premised on the "scarcity" of broadcast frequencies at the time.[192] This "scarcity rationale" has been "criticized … since its inception."[193] Abridging First Amendment rights based on the scarcity of frequencies rests on "a distinction without a difference;"[194] "makes no sense" in light of technological developments;[195] and "lacks any textual basis in the Constitution."[196]

Many government entities over the years have attempted to expand the fairness doctrine to contexts other than over-the-air broadcasting, but the Supreme Court has consistently rejected those requests.[197] As the Court explained, the "special justifications for regulation of the broadcast media" are simply "not applicable to other speakers."[198]

The First Amendment would not tolerate the Commission's attempt to impose a "fairness doctrine" for proxy advice because "the rationale for applying a less rigorous standard of First Amendment scrutiny to broadcast regulation, whatever its validity in the cases elaborating it, does not apply in [this] context."[199] No "scarcity" problem exists here, because there is "no requirement to buy [proxy advisers'] services; [investors] can buy from one, all, or none."[200] Thus, unlike regulations of broadcasters, regulations of proxy advisers are subject to the "settled principles of

---

[191] *Red Lion Broad. Co. v. FCC*, 395 U.S. 367, 369 (1969).

[192] *Id.* at 390.

[193] *Turner Broad.* 512 U.S. at 638 & n.5.

[194] *Telecomm'ns Res. & Action Ctr. v. FCC*, 801 F.2d 501, 508 (D.C. Cir. 1986) (Bork, J.).

[195] *Action for Children's Television v. FCC*, 58 F.3d 654, 673 (D.C. Cir. 1995) (Edwards, C.J., dissenting).

[196] *FCC v. Fox Television Stations, Inc.*, 556 U.S. 502, 532 (2009) (Thomas, J., concurring).

[197] *See, e.g., Miami Herald*, 418 U.S. at 256-58 (print media); *Riley*, 487 U.S. at 795-98 (personal solicitation); *Pac. Gas*, 475 U.S. at 10 (mail); *Sable Comm'ns of Cal., Inc. v. FCC*, 492 U.S. 115, 127-28 (1989) (telephone); *Turner Broad.*, 512 U.S. at 637 (cable television); *Reno v. ACLU*, 521 U.S. 844, 867-70 (1997) (internet).

[198] *Reno*, 521 U.S. at 868.

[199] *Turner Broad.*, 512 U.S. at 637.

[200] Nell Minow, *Regulating Proxy Advisors Is Anticompetitive, Counterproductive, and Possibly Unconstitutional*, Harv. L. Sch. Forum on Corp. Governance & Fin. Reg. (Mar. 2, 2018), bit.ly/2tYfGMZ.

our First Amendment jurisprudence"—including "the fundamental rule of protection under the First Amendment, that a speaker has the autonomy to choose the content of his own message."[201]

Any attempt to defend proposed Rule 14a-2(b)(9)(iii) under the more lenient First Amendment standard of *Zauderer v. Office of Disciplinary Counsel of Supreme Court of Ohio* must also fail. The *Zauderer* standard, which applies to laws that require disclosures of "purely factual and uncontroversial information about the terms under which … services will be available,"[202] is confined to "'commercial speech'"[203]—*i.e.*, "'speech that does no more than propose a commercial transaction.'"[204] Because proxy advice "does much more than that,"[205] it is not the kind of purely commercial speech subject to *Zauderer*.[206] Nor is the proposed response provision under 14a-2(b)(9) limited to disclosures of "purely factual and uncontroversial information."[207] To the contrary, it requires proxy advisers to include within their speech issuers' *disagreements* with proxy advisers' research, analysis, and recommendations about how their clients should vote in upcoming shareholder votes. These disclosures are thus neither "factual" nor "uncontroversial." Even if the response provision were subject to the *Zauderer* standard rather than strict scrutiny, *Zauderer* could not justify a rule forcing a speaker to supplement its own speech with another party's contradictory opinions on sharply contested issues.

Finally, regardless of the level of scrutiny that applies here, the proposal to allow issuers to insert content into independent proxy advice would violate the First Amendment because "more benign and narrowly tailored options are available."[208] As explained at length elsewhere in these comments,[209] proxy advice is already regulated exhaustively under the Advisers Act, which imposes the highest fiduciary duties of care and loyalty on investment advice. The Commission

---

[201] *Turner Broad.*, 512 U.S. at 639; *Hurley v. Irish-Am. Gay, Lesbian & Bisexual Grp. of Bos.*, 515 U.S. 557, 573 (1995).

[202] 471 U.S. 626, 651 (1985).

[203] *NIFLA*, 138 S. Ct. at 2372.

[204] *Harris v. Quinn*, 573 U.S. 616, 648 (2014).

[205] *Id.*

[206] *See NIFLA*, 138 S. Ct. at 2372; *Riley*, 487 U.S. at 796; *Pac. Gas*, 475 U.S. at 8-9.

[207] *Zauderer*, 471 U.S. at 651.

[208] *Riley*, 487 U.S. at 800.

[209] *Supra* at 21-23.

has not even tried to explain why robust enforcement of those requirements is insufficient to address any alleged concerns about the quality or accuracy of proxy advice without the need for coercive and burdensome restrictions on speech.

The Commission argues that its proposal is justified because it is "more efficient and timely" than other alternatives, such as having issuers communicate directly with shareholders if they disagree with a proxy adviser's analysis or recommendation.[210] But the Supreme Court has rejected an almost-identical argument even under intermediate scrutiny. As the Court explained in *McCullen v. Coakley*,[211] regardless of the level of scrutiny, there must be "a close fit between ends and means," and the government may not "too readily 'sacrific[e] speech for efficiency.'" The Commission's invocation of "efficiency" thus provides no basis for commandeering proxy advisers' speech. Supreme Court precedent is clear that the government may not "co-opt" a person's speech "to deliver [a] message" from someone else.[212] In sum, the Commission's "prophylactic, imprecise, and unduly burdensome rule … to reduce its alleged [investor] misperception,"[213] cannot survive tailoring analysis under any level of First Amendment scrutiny.

### c. The review and feedback provisions of proposed Rule 14a-2(b)(9) also cannot satisfy any level of First Amendment scrutiny.

To facilitate issuers' and certain other parties' ability to rebut proxy advisers' speech, the Commission also proposes to impose not one, but two, issuer reviews—a draft review and feedback period and a final review opportunity—on the proxy advice process.[214] These requirements would force proxy advisers to delay giving their research and recommendations to their clients until the issuer and certain other types of solicitors can first review and provide feedback on the draft advice, and then for another two business days so they can review the final research report and voting advice. The Commission hopes that these extraordinary intrusions and delays will improve the "accuracy and soundness of the information and methodologies used

---

[210]  PA Proposal at 53, 84 Fed. Reg. at 66533.

[211] 573 U.S. at 486.

[212] *NIFLA*, 138 S. Ct. at 2376; *see also Mills v. Alabama*, 384 U.S. 214, 219-20 (1966) (rejecting the state's complaint that "'as a practical matter, because of lack of time, [inaccurate statements] cannot be answered or their truth determined until after the election is over'").

[213]  *Riley*, 487 U.S. at 800.

[214]  PA Proposal at 44-53, 84 Fed. Reg. at 66530-33.

to formulate proxy [advisers'] recommendations"—or at least give companies and other covered solicitors enough time to prepare the response that the proxy adviser must include in its report.[215]

Like proposed Rule 14a-2(b)(9)(iii), the review and feedback provisions proposed to be added as 14a-2(b)(9)(ii) impose speaker-based, content-based, and viewpoint-based burdens on protected speech and association. This provision imposes unique burdens on one category of speech (proxy advice) and speakers (proxy advisers) based on the Commission's belief that this speech needs to be improved to public companies' (and the Commission's) satisfaction. Proposed 14a-2(b)(9)(ii) is thus a mechanism through which the Commission seeks to *alter the message and content* of one specific category of speech provided by one category of disfavored speakers. This is unquestionably a content-based restriction under cases such as *Reed*, *NIFLA*, and *Sorrell*.[216]

The review and feedback provisions would also unconstitutionally compel speech and association by forcing proxy advisers to share their confidential research reports, analysis, opinions, and recommendations with issuers and other covered solicitors *before they may share it with their own clients.* This information is typically kept confidential because it contains not only the proxy adviser's proprietary analysis and methodologies, but also the client's confidential information (in the case of client custom voting criteria or policies). Under the First Amendment, a person's decisions whether to speak and with whom are beyond the government's control.[217] And "'forced associations that burden protected speech are impermissible.'"[218]

Proposed Rule 14a-2(b)((9)(ii) is a paradigmatic example of compelled speech and association, as it would force a speaker to *share* confidential, sensitive, draft information with a third party while *withholding* that information from the parties with whom the speaker does wish to communicate. The Commission's proposal is no different analytically from a patently unconstitutional law requiring that all news stories be shown to the subject of those stories anywhere from 5-7 business days before publication to improve "accuracy" and facilitate "review and feedback."

The review and feedback provisions would severely burden proxy advisers' speech and association in other ways as well. By forcing advisers to submit their draft proxy research and

---

[215] *Id.* at 11, 84 Fed. Reg. at 66520.

[216] *See supra* at 44 *et seq.*

[217] *Janus*, 138 S. Ct. at 2463.

[218] *Id.* (quoting *Pac. Gas*, 475 U.S. at 12).

recommendations for review by companies who are the subject of that research, this requirement "necessarily burdens [proxy advisers'] expression."[219] "[T]here can be little doubt that [proxy advisers] will feel compelled to respond to arguments and allegations made by [the companies]" and, thus, "alter [their] own message as a consequence of the government's coercive action."[220] "That kind of forced response is antithetical to the free discussion that the First Amendment seeks to foster."[221]

Even beyond this chilling compulsion for "feedback", the proposal would directly restrict proxy advisers' own speech and association. The proposed requirements would ban proxy advisers from releasing their research reports and recommendations to their clients for a set period of time—*i.e.*, until the issuer who is the subject of the research and voting recommendation first has the opportunity to review and critique the proxy adviser's draft report over either 3 or 5 business days, and then again until it has had a further two business days to review the finished report. But the First Amendment puts the decision of "when to speak" in the hands of the speaker, not the government.[222]

The burden on proxy advisers' First Amendment rights is further magnified by the fact that, under the proposal, proxy advisers would be forbidden to *change* or update their advice after the final review without starting the two-step review process all over again (which, of course, would be totally impracticable)—even to respond to the criticisms in the company's hyperlinked statement.[223] By "singl[ing] out [proxy advisers] and den[ying] them the right to address their chosen audience on matters of public importance," the proposed requirements are "'the purest example of a "law … abridging the freedom of speech."'"[224] Ironically, this would also lead to less accurate advice in cases where underlying facts changed during the lengthy and prescriptive process proposed. Proxy advisers would be at worst prohibited from, and at best hindered in, providing updates to their advice.

---

[219] *Pac. Gas*, 475 U.S. at 15.

[220] *Id.* at 16.

[221] Id.

[222] *Telescope Media Grp. v. Lucero*, 936 F.3d 740, 747 (8th Cir. 2019); *see, e.g.*, *Mills,* 384 U.S. at 219 (invalidating law that prohibited electioneering on election day).

[223] PA Proposal at 48, 84 Fed. Reg. at 66531 n.121; *see Mills*, 384 U.S. at 220; *Ariz. Right to Life PAC v. Bayless*, 320 F.3d 1002, 1008-09 (9th Cir. 2003); *Catholic Leadership Coal. of Tex. v. Reisman*, 764 F.3d 409, 431 (5th Cir. 2014).

[224] *FCC v. League of Women Voters of Calif.*, 468 U.S. 364, 384 (1984).

The proposed review and feedback provisions fail any level of First Amendment scrutiny, as there are numerous less-restrictive alternatives that do not require the compulsion or suppression of speech. Issuers are free to communicate as much information as they would like to investors to urge them to support or oppose a certain proposal.[225] To the extent an issuer's analysis or recommendations diverge from the analysis or recommendations provided by a proxy adviser, the investor can review the competing information and decide for itself which recommendation and analysis to follow. The Supreme Court has rejected the "highly paternalistic notion" that the government should be deciding how information is presented to the public.[226] The First Amendment assumes "that people will perceive their own best interests if only they are well enough informed, and that the best means to that end is to open the channels of communication rather than to close them."[227] If issuers and the Commission dislike the content of proxy advisers' speech, the answer is more direct speech from issuers and the Commission, not a misguided attempt to manipulate the content or timing of proxy advisers' speech.

Moreover, as noted above, any purported concerns about the quality of proxy advice (although still unburdened by any reasonable proof or evidence) can be fully addressed through the Advisers Act's duties of care and loyalty without imposing a convoluted and burdensome preclearance requirement on proxy advisers' speech. Because these "more benign and narrowly tailored options are available," the Commission's "prophylactic, imprecise, and unduly burdensome rule … to reduce its alleged [investor] misperception" cannot survive scrutiny.[228]

> **d. The review, feedback and response provisions of the proposed rule amendments cannot be saved from unconstitutionality on the ground that they involve merely eligibility for an "exemption."**

This rulemaking cannot be salvaged by the fact that proxy advisers are not *required* to claim exemptions under 14a-2(b)(1) and (b)(3). The Supreme Court "has made clear that even though a person has no 'right' to a valuable governmental benefit and even though the government may deny him the benefit for any number of reasons, there are some reasons upon which the government may not rely."[229] Most notably, the government "may not deny a benefit to

---

[225] *See supra* at 41.

[226] Virginia Bd. of Pharmacy v. Virginia Citizens Consumer Council, Inc., 425 U.S. 748, 770 (1976).

[227] Id.

[228] *Riley*, 487 U.S. at 800.

[229] *Perry v. Sindermann*, 408 U.S. 593, 597 (1972).

person on a basis that infringes his constitutionally protected interests—especially, his interest in freedom of speech."[230] In other words, the government cannot withhold an otherwise available benefit in order to "produce a result which it could not command directly."[231]

Those principles squarely control here. For all the reasons set forth above, the First Amendment flatly prohibits the Commission from adopting Rule 14a-2(b)(9)(ii) and (iii). The Commission cannot circumvent that constitutional prohibition by depriving proxy advisers of a valuable exemption unless they "voluntarily" give up their First Amendment rights. In sum, nothing about the First Amendment defects with the proposal changes depending on whether the speech restrictions are set forth in a mandatory "rule" or as preconditions to obtaining an "exemption."

### e. The review and feedback provisions violate the Takings Clause of the Fifth Amendment and interfere with proxy advisers' client relationships and legitimate reliance interests.

In addition to violating the First Amendment, proposed Rule 14a-2(b)(9)(ii) violates the Takings Clause and flouts proxy advisers' legitimate reliance interests in their longstanding advisory relationships with their clients. "A regulation" that "impedes the use of property" can be "so burdensome as to become a taking," even "without depriving the owner of all economically beneficial use."[232] The constitutional inquiry turns on "'a complex of factors,' including (1) the economic impact of the regulation on the claimant; (2) the extent to which the regulation has interfered with distinct investment-backed expectations; and (3) the character of the governmental action."[233]

Those factors all point to a regulatory taking here. Proxy advisers like ISS have developed proprietary methods for researching, analyzing, and providing voting recommendations on a variety of proxy issues, and taking a variety of different approaches reflecting different investor requirements—methods that are implemented and revealed in their advice to clients.[234] This research and advice (and the proprietary information it contains) is normally subject to confidentiality agreements between the proxy adviser and its clients. The proposal, however, would force proxy advisers to share this valuable, proprietary, confidential information with the

---

[230] *Id.*

[231] *Id.* (cleaned up).

[232] *Murr v. Wisconsin*, 137 S. Ct. 1933, 1943 (2017).

[233] *Id.* (quoting *Palazzolo v. Rhode Island*, 533 U.S. 606, 617 (2001)).

[234] *See Ruckelshaus v. Monsanto Co.*, 467 U.S. 986, 1003 (1984) (holding that "trade secrets" and "other kinds of intangible interests" are "property for purposes of the Fifth Amendment's Taking Clause").

subject of the adviser's analysis. That company or other covered solicitor is not only outside the professional relationship between the proxy adviser and client, but, as the Commission recognizes, may *disagree* with the proxy adviser. The commenter thus has every incentive to attack and discredit its recommendations (especially when those recommendations differ from those of management).

The Takings concerns with this proposal are profound: The Commission would be ordering advisers to share confidential, proprietary information with potentially disagreeing (and sometimes hostile) third parties who are the subjects of the research and therefore inherently conflicted before sharing it with their own clients, thereby destroying the confidentiality of this information and interfering with the adviser-client relationship. The proposal also severely upsets proxy advisers' legitimate reliance interests.[235] If finalized, the proposal would undermine the independence of proxy advice by injecting interested third parties in between the adviser and its clients. In this way, the proposal would not only mandate the disclosure of sensitive and confidential information but could also undermine proxy advisers' independence and threaten their ability to offer neutral, disinterested and independent advice to their clients. Those provisions would harm proxy advisers' ability to compete and upend their longstanding reliance interests and investment-backed expectations.[236]

That the proposal would allow proxy advisers to insist that companies sign confidentiality agreements does not in any way alleviate these concerns. The confidentiality agreements would "cease to apply once the proxy [adviser] provides its advice to one or more recipients."[237] And, regardless, courts refuse to presume that confidentiality agreements will protect sensitive business information "when the person to whom the information is disclosed is involved in 'competitive decision-making.'"[238] Proxy advisers and companies are in that competitive position, as the Commission concedes. Thus, the risk that the proposed regulations will expose proxy advisers' proprietary, confidential information presents a grave risk of an unconstitutional taking and interferes with proxy advisers' legitimate reliance interests in their adviser-client relations.

---

[235] *See, e.g.*, *Encino Motorcars v. Navarro*, 136 S. Ct. 2117, 2126-27 (2016) (holding that agency acted arbitrarily and capriciously in violation of the APA and was entitled to no deference where it failed to give due consideration to regulated industry's "serious reliance interests at stake").

[236] *See Philip Morris, Inc. v. Harshbarger*, 159 F.3d 670 (1st Cir. 1998).

[237] PA Proposal at 140, 84 Fed. Reg. at 66558. The proposal remarkably makes no provision for the subject of the advice to return or destroy the furnished draft and final proxy reports or to refrain from using them for the recipient's own purposes once the confidentiality agreement expires.

[238] *McAirlaids, Inc. v. Kimberly-Clark Corp.*, 299 F.R.D. 498, 500 (W.D. Va. 2014) (collecting cases).

**f. At a minimum, the Exchange Act should not be construed to authorize the Commission's constitutionally defective proposed rule amendments.**

At a minimum, the constitutional concerns about the proposed amendments to exemptions from the proxy rules for proxy voting advice are sufficiently serious that the Commission would not be deemed to have statutory authority to implement these regulations. For all the reasons set forth above, the best interpretation of the statute is that the Commission lacks *any* authority to regulate proxy advice as proxy solicitation.[239] But even if the Commission has some statutory authority in this area, any such authority would not extend to regulations that require compelled speech, the taking of valuable intellectual property, and the commandeering of proxy advisers' communications with their clients.

The judiciary "must rightly presume that Congress acts consistent with its duty to uphold the Constitution," and "courts must make every effort to construe statutes so as to find their constitutional foundations and thus avoid needless constitutional confrontations."[240] As the D.C. Circuit has explained, "[t]his canon of constitutional avoidance trumps *Chevron* deference, and we will not submit to an agency's interpretation of a statute if it 'presents serious constitutional difficulties[.]'[241]

The constitutional avoidance canon applies with full force here. Even assuming—contrary to the plain text of the statute—the Commission has some limited authority to regulate proxy advice as proxy solicitation, there is not the slightest indication in the relevant statutes that Congress intended to grant the agency authority to push the constitutional bounds of the First Amendment and Takings Clause by micromanaging proxy advisers' speech and destroying their valuable intellectual property.

**3. The proposal upends almost ninety years of federal securities regulation.**

In response to the "perception of many registrants" that "they lack an adequate opportunity to review proxy voting advice before it is disseminated" to shareholders, and that they "need" to "conduct a meaningful assessment of the advice and communicate any concerns or errors regarding the advice,"[242] the Commission proposes to force proxy advisers to give registrants and

---

[239] See *supra* at 5-16.

[240] Nat'l Mining Ass'n v. Kempthorne, 512 F.3d 702, 711 (D.C. Cir. 2008) (quoting Edward J. DeBartolo Corp. v. Fla. Gulf Coast Bldg. & Constr. Trades Council, 485 U.S. 568, 575 (1988); Ashwander v. Tenn. Valley Auth., 297 U.S. 288, 348 (1936) (Brandeis, J., concurring)).

[241] *Nat'l Mining Ass'n*, 512 F.3d at 711.

[242] PA Proposal at 39 and 52, 84 Fed. Reg. at 66529, 66533.

certain other parties two chances to review research and voting advice before it is disseminated to shareholders, along with mandatory opportunities to provide feedback and to insert a link to the affected party's assessment of that advice into the advice and any electronic medium used to deliver the advice.[243]  In making this proposal, the SEC accepts without question the corporate community's contention that blatantly self-interested parties should have a say in the methodologies a proxy adviser employs and the opinions it conveys to the investors who are its clients.  Despite the SEC's efforts to normalize this astounding thesis, it is anything but normal.

As Commissioner Peirce has recognized, Congress' decision 87 years ago to create a disclosure-based regime over a merit-based regime is "[o]ne of the foundational principles of our federal securities laws."[244]  Thus, the Commission does not review securities offerings for fairness, conflicts of interest, or other merit-based elements, but requires issuers to make accurate disclosure of material information so offerings may be judged by investors.[245]  Likewise, the Commission does not regulate the "substance of credit ratings or the procedures and methodologies by which any [registered credit rating agency] determines credit ratings,"[246] and there is no role for merit-based review under the Advisers Act.  While the Commission does not propose to review the merits of proxy voting advice directly, it does propose to deputize registrants and certain other parties for that purpose, and to interpose them between advisers and their clients.  In this respect, the proposal is without precedent.

The U.S. securities laws have never required a financial advisor to have its research, opinions and recommendations reviewed by the subjects of its advice, nor have the securities laws ever given the subjects of advice the right to provide "feedback" to the advisor.  In fact, the opposite is true.  As explained below, broker-dealers are forbidden by FINRA Rule 2241 to afford subject companies the right of prepublication review of analyst reports for any purpose other than verification of facts.[247]  Before a draft report can be delivered to the subject company for a factual review, the research summary, research rating and price target must be removed, and a copy of the complete

---

[243] Proposed Rule 14a-2(b)(9)(ii) and (iii).  The first review would cover the proxy adviser's draft proxy advice, while the second would cover the final advice.

[244] Commissioner Hester S. Peirce, *Wolves and Wolverines: Remarks at the University of Michigan Law School* (September 24, 2018).

[245] See Commissioner Daniel M. Gallagher, *Remarks at Society of Corporate Secretaries & Governance Professionals* (July 11, 2013).

[246] Exchange Act, § 15E(c)(2),

[247] *See infra* at 65.

draft must be delivered to the firm's legal or compliance department.  If the research department decides to change the proposed rating or price target after the subject company's review, the research department must provide written justification to, and receive written authorization from, legal or compliance personnel for the change.[248]

At the 2019 SEC Speaks program, the SEC's Investor Advocate noted the parallel between protecting the independence of sell-side recommendations and protecting the independence of proxy voting recommendations, saying:

> *Consider, for example, the rules currently in place for sell-side research, which generally aim to prevent issuers from influencing the research produced by investment firms. . . . I ask, why should the principle be any different when it comes to the independence of voting recommendations?"[249]*

Institutional investors who use proxy advisory services have said the same thing and have observed that allowing issuers to "police" proxy advisers would destroy the accuracy, independence and objectivity the institutions need to fulfill their own fiduciary responsibilities.[250]

The Commission's proposal to upend almost 90 years of federal securities regulation is a slippery slope to a dangerous place.

Imagine that three investment advisers—a proxy adviser, an adviser that furnishes non-discretionary investment advice, and a discretionary portfolio manager—all determine that the management of Company X is making bad decisions.  The proxy adviser decides to recommend that its clients vote against the election of one or more of Company X's directors.  The non-discretionary adviser decides to recommend that its clients refrain from buying shares of

---

[248] Supplementary Material .05 to FINRA Rule 2241.

[249] Statement of Rick Fleming, SEC Investor Advocate (April 8, 2019) at note 18.

[250] 2018 T. Rowe Price Letter, *supra* note 146 at 3 ("We fail to see why the independence of sell side recommendations should be afforded greater protection than the independence of proxy recommendations"). *See also*  letter from Paul Schott Stevens, President and CEO, Investment Company Institute to Vanessa Countryman, Acting Secretary, SEC (March 15, 2019) at 13 ("Fund advisers expect and must receive independent, objective, and accurate information from proxy advisory firms"); and letter from Jeff Mahoney, General Counsel, Council of Institutional Investors, *et al.,* to Jeb Hensarling and Maxine Waters, Committee on Financial Services, Re: Proposed Legislation Relating to Proxy Advisory Firms, (November 9, 2017) at 3 ("Currently, proxy advisors provide equity holders of U.S. corporations with independent advice. [Proposed bills to regulate proxy advisory firms] threaten to abrogate that very independence, which is a hallmark of ownership and accountability").

Likewise, the Investment Adviser Association—a non-profit association with more than 650 federally-registered investment adviser members managing more than $25 trillion—recently characterized the Interpretation and Guidance and this rulemaking "not just as bad policy, but as a major step backwards for corporate governance and the independence of proxy advice."  IAA Newsletter, Issue Number 325, January 2020 at 3.

Company X and sell the shares they already hold. The discretionary manager decides to rid its managed accounts of all Company X securities. If the management of Company X has the right to review and provide feedback on the proxy adviser's vote recommendations before they are made to investors, why should management not have the same rights in the case of the other advisers? What is to protect the non-discretionary manager from having to clear its research and investment recommendations through the company? What is to protect the discretionary manager from having to submit its investment committee's decisions to the company for review and feedback before it is allowed to trade its clients' portfolios? The Commission's differential treatment of these highly analogous scenarios would be a clear example of arbitrary decision-making if the proposed rules were finalized.

ISS urges the SEC to take a hard look at the implications of proposed Rule 14a-2(b)(9)(ii) and (iii) and to eliminate these sections from further consideration.

### 4. The proposal is inconsistent with proxy advisers' existing regulatory obligations.

Another problem with the proposal is that compliance with Rule 14a-2(b)(9)(ii) and (iii) would interfere with a proxy adviser's obligations under the Advisers Act and, where applicable, ERISA. As explained above, investment advisers have a fiduciary duty of loyalty which obliges them to act in their clients' best interests and not to put their own interests ahead of those of their clients. Subjecting a proxy adviser's methodologies, research and opinions to pre-release review and comment by the subjects of the advice introduces a new conflict of interest that would be challenging and costly to mitigate.

Although the Commission says that the proposal merely empowers registrants and certain other interested parties to "suggest revisions before the distribution of the advice" and does not require proxy advisers "to accept such suggested revisions," the Commission couples this statement with a warning that failure to accept "suggested revisions" could expose the proxy adviser to liability under Rule 14a-9.[251] This rule (about which, more below) prohibits materially misleading statements or omissions in proxy solicitations. While the rule historically has been used in cases of factual misstatements and omissions and not for disputes over honestly-held opinions, the Commission last year expressed the unprecedented view that "opinions, reasons, recommendations, or beliefs" can be "statements of material fact" actionable under Rule 14a-9.[252]

---

[251] PA Proposal at 51, 84 Fed. Reg. 66532.

[252] Interpretation and Guidance, *supra* note 2 at 11, 84 Fed. Reg. at 47419.

Since the instant rulemaking is a thinly-veiled effort to give public companies control over proxy advice in order to quell shareholder dissent,[253] it does not take much imagination to connect the dots between a proxy adviser's rejection of a registrant's "suggested revisions" and 14a-9 litigation. Incentivizing advisers to skew their vote recommendations in management's favor in order to avoid the costs of defending baseless lawsuits contravenes the fiduciary principles that underpin the Advisers Act.

Not only would the proposal force proxy advisers to design new compliance procedures to evaluate "suggested revisions" to their benchmark, specialty and (presumably) custom[254] advice to somehow balance issuer dissatisfaction with their responsibilities to their investor clients, but the proposal would also force advisers to mitigate and disclose their own, new self-interest conflict in not getting sued for upsetting management or other interested parties.

In addition to interfering with proxy advisers' fiduciary responsibilities under the Advisers Act, the proposal also conflicts with advisers' obligation to implement reasonably effective insider trading compliance procedures.[255] Depending on the matter requiring shareholder action, a proxy vote recommendation might constitute material, nonpublic information ("MNPI"), the selective disclosure of which could diminish the fairness of the securities markets and harm investors. The SEC dismisses such concerns by pointing to a provision in the proposal that would allow proxy advisers to condition the selective release of their draft proxy research reports and vote recommendations on the recipients' agreeing to keep the materials confidential and to refrain from commenting on them until the advice has been provided to one or more of the adviser's clients. The SEC analogizes this situation to the use of confidentiality agreements to exempt the communication of MNPI from triggering the public disclosure requirements of Regulation FD.[256]

ISS does not share the Commission's confidence in this safeguard.

---

[253] In this regard, we note that one of the loudest proponents of giving registrants review and feedback rights and the right to insert content into proxy advisory reports also urged the SEC to create a fiduciary safe harbor for any portfolio manager who either votes all proxies in favor of management or refrains from voting altogether. Letter from Neil A. Hansen, Vice President, Investor Relations and Corporate Secretary, ExxonMobil, to Vanessa Countryman, Secretary, SEC (July 26, 2019), available at https://www.sec.gov/comments/4-725/4725-5879063-188728.pdf ("ExxonMobil Letter").

[254] As indicated above, it is not clear whether the SEC intends to subject advice based on clients' custom proxy voting policies to the proposed rule revisions. *See supra* at 27-28.

[255] Advisers Act, § 204A, added by the Insider Trading and Securities Fraud Enforcement Act of 1988, Pub. Law 100-704, 102 Stat. 4677.

[256] PA Proposal at note 126 and accompanying text.

The distribution to management and certain dissident shareholders of multiple vote recommendations for each ballot item on each proxy for each public company in the United States will inevitably lead to the deliberate or accidental misuse of MNPI, regardless of any non-disclosure agreements. The Regulation FD safe harbor is not analogous to the proposal, because public companies are not compelled to selectively disclose confidential, market-moving information, but rather can assess the risks of disclosure on a case-by-case basis.

By contrast, proposed Rule 14a-2(b)(9)(ii) would force a proxy adviser to disclose MNPI to any issuer or covered dissident shareholder who signs a confidentiality agreement, even if that party is a known insider trader. Forcing disclosure in such cases would interfere with the adviser's obligation under the Advisers Act to establish, maintain and enforce policies and procedures reasonably designed to ensure compliance with the insider trading laws. It also would interfere with the adviser's duty to periodically test the sufficiency of its procedures and the effectiveness of their implementation, because even if the adviser determines that its pre-published proxy advice has been misused, it must continue to selectively disclose that information to the offending party(ies).[257]

The fact that ISS currently voluntarily provides certain issuers with a limited right to review the factual accuracy of data included in pending proxy research reports does not make the proposal any less objectionable. In order to protect the integrity of ISS' proxy advice and our singular focus on the best interests of our investor clients, the existing review process remains under the control of ISS and does not elicit feedback on ISS voting policies or the interpretation and application thereof.[258] Because substantially the same data are used to produce all ISS proxy voting reports, only benchmark reports, and not specialty or custom reports are available for pre-review, thereby further safeguarding the independence of our proxy advice, and enabling timely delivery of the research and recommendations to our clients.

ISS also takes steps to safeguard MNPI by not pre-releasing potentially market-moving draft reports and vote recommendations. In this regard, ISS allows selected issuers a limited review right of draft reports only for annual meetings, not special meetings. Furthermore, drafts are not provided for any annual meeting where the agenda includes a merger or acquisition

---

[257] Advisers Act Rule 206(4)-7. The Commission does not say whether it expects proxy advisers to enforce their confidentiality agreements through litigation or otherwise, but if that is the expectation, the cost of such actions must also be factored into the Commission's economic analysis of this proposal.

[258] ISS does, however, invite issuer engagement during the formulation of annual proxy voting policies and guidelines. ISS' transparent policy development process includes a Policy Survey to identify issues that merit attention, as well as a notice and comment period designed to elicit feedback on the practical implementation of proposed policies.

proposal or proxy fight, or where it involves a situation that ISS, in its discretion, considers to be of a controversial or potentially market-moving nature, such as a "vote-no" campaign. ISS also makes it clear that any public release or redistribution of a draft analysis or the information contained therein may result in forfeiture of eligibility to review future draft reports. The proposal would mandate draft reviews in all such situations, raising significant concerns about confidentiality, selective disclosure of material non-public information, and the ability of proxy advice to be appropriately responsive to important and often fast-moving situations such as proxy fights and contested mergers and acquisitions.

### 5. The proposal is unworkable.

The proposed review, feedback and response-insertion provisions would impede proxy advisers' ability to deliver research and voting recommendations on U.S. corporations in a timely fashion. ISS estimates that the proposed review and feedback rights for registrants and certain other soliciting parties alone could reduce our report delivery time to our clients by between 45 and 65 percent. Getting confidentiality agreements in place with each registrant and other soliciting party who will have access to ISS' advice before it is transmitted to clients and arranging for active and appropriately co-ordinated hyperlinks where necessary will cause further delays. As a result, it is highly unlikely that ISS will be able to meet the high expectations of its clients to deliver research reports and vote recommendations to them sufficiently in advance of shareholder meetings to allow them ample time to review and consider our reports as they make their voting decisions. This would also reduce the time shareholders have to engage with companies after reviewing the research reports and before the meeting. These are both ironic results, given the importance the Commission places on having institutional investors carefully consider proxy advisers' recommendations before deciding to act on them.

### 6. Additional Comments on Proposed Rule 14a-2(b)(9)(i)

Without waiving or diminishing our challenge to the Commission's authority to regulate proxy advisers under Section 14(a), or any other argument made herein, ISS offers the following comments on certain questions the Commission has asked about its proposed adoption of Rule 14a-2(b)(9)(i):[259]

7. The text of proposed Rule 14a-2(b)(9)(i) is unnecessarily complicated and confusing. Material transactions and relationships described in subsection (B) are

---

[259] *Id.* at 35 *et seq.*, 84 Fed. Reg. at 66527 - 66528.

subsumed in the direct or indirect material interests described in subsection (A). And both (A) and (B) can be folded into subsection (C) by eliminating the word "other" in the first line. As so revised, the provision would require disclosure of "Any information regarding the interest, transaction, or relationship of the proxy adviser (or its affiliates) that is material to assessing the objectivity of the proxy voting advice in light of the circumstances of the particular interest, transaction, or relationship."

ISS further urges the SEC to drop the use of the term "proxy voting advice businesses" and refer to these entities as "proxy advisers" or "proxy advisory firms" instead. There is no reason to create a new nomenclature when the marketplace already knows these entities by another name.

9. As explained above, the feedback we receive from many of our clients and that others have commented on is that most users of proxy advisory services believe that existing disclosures address all the concerns discussed in this release. The release does not identify any type of proxy adviser conflict that is not already being effectively disclosed.

10. Proxy advisers should be governed by a principles-based regulatory regime. For this reason, the Commission should not require such firms to disclose specific qualitative or quantitative information or impose prescriptive standards regarding the method of conflict disclosure. There is no reason to treat conflict disclosure by proxy advisers any differently from the way conflict disclosure by portfolio managers or any other type of investment adviser is treated. The guiding principle for all advisers should be "full and fair" disclosure, as that concept was described in the Fiduciary Standard Release:

> In order for disclosure to be full and fair, it should be sufficiently specific so that a client is able to understand the material fact or conflict of interest and make an informed decision whether to provide consent. . . .

> Whether the disclosure is full and fair will depend upon, among other things, the nature of the client, the scope of the services, and the material fact or conflict. Full and fair disclosure for an institutional client (including the specificity, level or detail, and explanation of terminology) can differ, in some cases significantly, from full and fair disclosure for a retail client because institutional clients generally have a greater capacity and more resources than retail clients to analyze and understand complex conflicts and their ramifications.[260]

11., 16. & 17. Another key reason to avoid overly prescriptive conflict disclosure requirements is to avoid interfering with proxy advisers' existing conflict management

---

[260] Fiduciary Standard Release, *supra* note 92 at 24-26, 84 Fed. Reg. at 33676-77.

policies and procedures.  As explained above, ISS has implemented a comprehensive and robust set of conflict controls designed to meet the fiduciary standards of the Advisers Act.  These controls include a firewall which would be compromised if conflict information were required to be publicly disclosed, or if disclosure were required to be displayed in or on a research report, instead of "around" the report as is currently the case.   Proxy advisers do not need to embed their conflict disclosures or their conflict mitigation policies and procedures in their advice to make those disclosures full, fair and readily accessible to the users of our reports.

14.  If the SEC adds subsection (b)(9) to Rule 14a-2, there is no reason to subject proxy advisers to the "significant relationship" disclosure requirement under subsection (b)(3)(ii).  As explained above, the Commission adopted that exemption for financial advisors who provide voting advice to shareholders who have not asked for it, and not for proxy advisers, whom the SEC has characterized as fiduciaries.  Introducing other random or disparate standards from the proxy rules or Regulation S-K would add nothing but confusion. The standard for identifying disclosable proxy adviser conflicts should simply be "materiality" — a standard both proxy advisers and their investor clients fully understand.

19.  Registered proxy advisers are already obliged to make full and fair conflict disclosure in their ADV Forms which are publicly available through the SEC's Investment Adviser Public Disclosure ("IAPD") database. The SEC should not mandate public disclosure beyond that. Furthermore, many proxy advisers voluntarily post information about their conflict mitigation practices on their websites.  In so doing, they are able to decide for themselves how best to safeguard their sensitive business information.  Forcing advisers to publicly disclose granular information about product sales and revenue would be anti-competitive.

20. & 21. Registered proxy advisers are already required to make conflict disclosures to clients in response to designated questions in the Form ADV; to describe their Codes of Ethics and to offer copies of those Codes to clients and prospective clients upon request.  There is no reason to subject advisers who furnish non-discretionary proxy research and vote recommendations to more stringent standards than those that apply to advisers who make buy/sell recommendations or advisers who exercise investment discretion over client assets.

22.  As noted above, ISS believes that proposed subsection (b)(9)(i)(B) should be eliminated, because the principles-based language in subsection (b)(9)(i)(C) is sufficient to protect investors.  ISS also strongly objects to the proposed requirement in (b)(9)(i)(B) that proxy advisers search publicly available information to identify possible affiliates of registrants, shareholder proponents and other "soliciting persons" to determine whether or not the adviser might have a relationship, or be engaged in a transaction, with such parties. If such a search uncovers a possible affiliation ISS was not otherwise aware of, there would be no benefit to offset the cost and delay because any such relationship could not have compromised the integrity of the proxy advice in the first place.

Furthermore, ISS does not support the imposition of mandatory structural "reforms."  While ISS already has separated its proxy research/analysis activities from its other business lines, this type of separation might not be feasible or appropriate for all proxy advisory firms.  Proxy advisers come in many shapes and sizes and a one-size-fits-all approach would have a negative effect on competition and on investor choice.

Finally, ISS cannot help but note the irony of the proposal's reference to the global analyst research settlements.[261]  These settlements resulted from a series of turn-of-the century scandals involving conflicted reports by research analysts at investment banks. In addition to structural reforms, the settling defendants agreed to make independent research available to their customers for a period of five years.  Apart from the settlement, the Commission approved a package of self-regulatory organization rules (now consolidated in FINRA Rule 2241) in order to "restore investor confidence in the analysts' work" by requiring independence in research and recommendations.[262]  In this regard, Rule 2241 requires FINRA members to establish, maintain and enforce written policies and procedures designed to identify and effectively manage conflicts of interest related to the preparation, content and distribution of research reports.  Such policies and procedures must, among other things, "*prohibit* prepublication review of a research report by the subject company for purposes other than verification of facts."[263]

The proposal to *mandate* prepublication review by the subject companies not just of

---

[261] PA Proposal at 38, n. 92 and accompanying text, 84 Fed. Reg. at 66528.

[262] Lori Richards, Director, Office of Compliance Inspections & Examinations, SEC, Speech by SEC Staff: Analysts Conflicts of Interest—Taking Steps to Remove Bias (May 8, 2002); *See also* Order Approving Proposed Rule Changes by the NASD and NYSE, Exchange Act Release No. 45908, 67 Fed. Reg. 34968 (May 15, 2002).

[263]  FINRA Rule 2241(b)(2)(N) (emphasis supplied).

facts, but also of the research, analysis, opinions and recommendations in all proxy research reports, and to afford such companies the right to insert their own content into the proxy reports would put the provision of "independent research" to the proxy advice marketplace significantly at risk, because every proxy advisory report would carry an issuer taint.

23. Proxy voting advice is a form of investment advice. A proxy adviser is a type of investment adviser. Investment advisers are regulated under the Advisers Act, a regime that addresses the identification, management and disclosure of conflicts of interest. Consequently, the SEC should regulate all proxy advisers under the Advisers Act in lieu of adopting proposed Rule 14a-2(b)(9)(i). Doing so would align proxy advisers' duties with the duties that their investment adviser clients owe to their own clients, thus providing the ultimate investors and their beneficiaries with two layers of fiduciary protection.

## 7. Additional Comments on Proposed Rules 14a-2(b)(9)(ii) and (iii)

Without waiving or diminishing our challenge to the Commission's authority to regulate proxy advisers under Section 14(a), or any other argument made herein, ISS offers the following additional comments on certain questions the Commission has asked about its proposed adoption of Rule 14a-2(b)(9)(ii) and (iii).[264]

25. Because there are no legitimate concerns about investors' ability to get accurate and complete proxy voting advice, there is no justification for adding the proposed conditions to the exemptions in Rules 14a-2(b)(1) and 14a-2(b)(3).

29. Tinkering with the details of this proposal cannot rehabilitate it. Allowing an inherently self-interested party to have a say in a proxy adviser's opinions about that party is insupportable, regardless of any ancillary disclosure about the details of the intrusion.

31. Neither proxy advisers nor their shareholder clients should be expected to pay for issuers' intrusion into their relationship. Having issuers pay for the privilege of influencing proxy advice would make the intrusion all the more dangerous. The best way to protect investors is to remove the intrusion altogether.

---

[264] PA Proposal at 60 *et seq.*, 84 Fed. Reg. at 66535 *et seq.*

32.  Congress enacted Exchange Act Section 14(a) to control unfair practices by corporate insiders.[265]  Using this provision to give issuers an inappropriate and inherently conflicted role in the production of proxy advice, while denying the same rights to shareholder proponents and persons engaged in exempt solicitations flips the congressional intent behind this provision on its head.  But to be clear, ISS does not believe that any of these parties should have a mandated say in the methodologies ISS uses or the research and opinions it renders to its clients.

33.  It is even more inappropriate to give issuers or other interested parties the right to review, comment on and insert content into proxy advice based on clients' own proprietary custom guidelines.[266]

36.  If the Commission insists on pursuing rulemaking in this area, ISS urges the Commission to harmonize the issuer pre-release review provisions with the equity analyst review provisions found FINRA Rule 2241, and with existing requirements under the Advisers Act.   For the Commission's convenience, we offer the following suggestion:

1.  *Proxy Advisory Research Reports; Identifying and Managing Conflicts of Interest*

(a) A proxy advisory firm must establish, maintain and enforce written policies and procedures reasonably designed to identify and effectively manage and disclose conflicts of interest related to the interaction between research analysts and those outside of the research department, including subject companies or other interested parties.

(b) A proxy advisory firm's written policies and procedures must be reasonably designed to promote objective and reliable research that reflects the truly held opinions of research analysts and the rendering of proxy voting advice that is in the best interests of the proxy advisory firm's clients.  Such policies and procedures must prohibit prepublication review of a proxy voting research report by a subject company or other interested party for purposes other than verification of facts.

2.  *Submission of Sections of a Draft Research Reports for Factual Review*

Consistent with the requirements of paragraph 1.(b) above, sections of a draft research report may be, but are not required to be, provided to the subject company or other interested party for factual review so long as:

---

[265] *See supra* at 8-9.

[266] *See supra* at 27-28.

(a)    the sections of the report submitted do not contain the vote recommendation, or substantive analysis affecting the recommendation;

(b)  a complete draft of the report is provided to legal or compliance personnel before sections of the report are submitted to the subject company or other interested party; and

(c)  if, after submitting sections of the report to the subject company, the research department intends to change the proposed vote recommendation, it must first provide written justification to, and receive written authorization from a senior analyst, or legal or compliance personnel for the change. The proxy adviser must retain copies of any pre-reviewed draft and the final version of such report for five years after publication.

39.  Although confidentiality agreements may be of limited utility in the case of compulsory disclosure, proxy advisers nevertheless should be allowed to require them as a condition to giving interested parties an advance look at proxy advice.   However, requiring the terms of a confidentiality agreement with a registrant or other interested party to be no more restrictive than those of similar types of confidentiality agreements the proxy adviser uses with its clients, is unworkable, because ISS does not selectively disclose its pre-published reports and recommendations to clients.  The confidentiality arrangements ISS has with its clients are for a different purpose and not a suitable model for the pre-release of MNPI to the subjects of the proxy advice.

40.  As explained above, it is constitutionally impermissible to compel proxy advisers to link their advice to contrary (or any) statements by registrants or other interested parties.

43.  If this rulemaking does move forward, the Commission should codify the view that a proxy adviser is not liable for the content of a registrant's or other soliciting party's statement hyperlinked or otherwise inserted into proxy advice. The Commission also should affirm that a proxy adviser will not be liable if the recipient of pre-publication proxy advice misuses MNPI contained therein.  Proxy advisers who are compelled to release drafts of their advice should not be responsible for enforcing confidentiality agreements with the recipients of those drafts. The moral hazard here lies squarely on the Commission's shoulders.

44.    The Commission should not require proxy advisers to disable automated features of their voting platforms in instances where a registrant has

responded to voting advice or otherwise. This is another bad idea from a vocal corporation seeking to stifle shareholder dissent.[267] The principles-based regulatory regime established under the Advisers Act is flexible enough to enforce investment advisers' fiduciary duties even in a fully automated environment.[268] The Commission should not micromanage institutional investors' operations or dictate the tools and services they use in serving their clients.

46. & 48. Likewise, the Commission should refrain from micromanaging the interactions between proxy advisers and registrants or other covered soliciting parties. Proxy advisers should have the flexibility to determine the best way to manage any engagement with, or review of information by, issuers—if at all—while satisfying their fiduciary duties to their clients.

47. As discussed below, implementation of the proposed rules would require significant changes to the systems and processes currently used to prepare and deliver proxy research reports and voting recommendations.[269] For several reasons, the current draft review process which ISS has voluntarily implemented is not an appropriate or relevant benchmark for assessing the potential impact of the fundamentally different regime that would be required under the rulemaking. In addition to the unprecedented two-step issuer review process, a key distinguishing factor is the sheer increase in the number of proxy research reports which would be eligible for the pre-review rights. Administering this vastly expanded and prescriptive process would necessitate increased personnel and technology enhancements. This would include everything from the new work associated with identifying and communicating with eligible issuers, negotiating and implementing confidentiality agreements, tracking and processing the multiple rounds of issuer feedback which would vary based on issuer filing dates, and facilitating the hyperlinks to issuers' statements in response to a proxy advisors proxy research reports.

---

[267] ExxonMobil Letter, *supra* note 253 at 21.

[268] Fiduciary Standard Release, *supra* note 92 at note 27, citing Division of Investment Management, "Robo-Advisers," IM Guidance Update No. 2017-02 (February 2017), available at https://www.sec.gov/investment/im-guidance-2017-02.pdf.

[269] *See infra* at 76-77.

49. - 51.  These questions assume facts not in evidence.  There is no credible evidence of factual errors or methodological weaknesses in proxy advisers' research and advice.

## C. The Liability Component;
## Proposed Changes to Rule 14a-9

The SEC further proposes to amend Rule 14a-9 to include examples of information that, if omitted from proxy advice, could serve as the basis of anti-fraud claims against the proxy adviser.   Such information would include: the proxy adviser's methodology, sources of information, conflicts of interest or use of standards that materially differ from relevant standards or requirements that the Commission sets or approves.[270]   This obligation presumably would apply even where the methodologies and standards the proxy adviser uses in formulating its advice are dictated by its investor clients on a proprietary, custom basis.

The Commission bases this part of the proposal on the very shaky foundation of the Interpretation and Guidance which, in an unprecedented bending of the plain meaning of "fact," indicated that a proxy adviser could be sued for its "opinions, reasons, recommendations, or beliefs."[271]   In staking out this novel position, the Commission sought support from cases that are factually inapposite to the circumstances around proxy advisory firms.  For example, the Commission cited *Virginia Bankshares v. Sandberg,*[272] but in that case, the court confined its discussion to statements of belief and opinion that corporate directors made about a recommended course of action, knowing they did not hold the beliefs and opinions they expressed. Courts applying *Virginia Bankshares* have said, "While material statements of fact are false if they are contradicted by true facts, material statements of opinion are false only if the opinion was not sincerely held."[273]   Other courts have held that "quibbles" with the methodology used in a fairness opinion summarized in a proxy statement "cannot be the basis of a disclosure claim."[274]

Moreover, the First Amendment prohibits any rule that would impose liability based on an adviser's "opinions," "beliefs," or "recommendations," including an adviser's decision to use

---

[270] *See* proposed note (e) to Rule 14a-9.

[271] *See supra,* note 252.

[272] 501 U.S. 1083, 1090, 115 L.Ed. 2d 929, 944, 111 S. Ct. 2749, 2757 (1991).

[273] *Bond Opportunity Fund v. Unilab Corp.,* 2003 U.S. Dist. LEXIS 7838 (S.D.N.Y. 2003) at *16, *quoting In re McKesson HBOC, Inc. Securities Litigation,* 128 F. Supp. 2d 1248, 1265 (N.D. Cal. 2000).

[274] *Ridler v. Hutchinson Tech., Inc.,* 216 F. Supp. 3d 982, 989 (D. Minn. 2016) *quoting In re 3Com,* 2009 Del. Ch. LEXIS 215 (2009) at *6.

standards different from the ones set or approved by the SEC. By definition, an opinion or recommendation cannot be proven true or false. Courts have thus consistently rejected attempts to impose liability on speakers for non-factual statements of opinion or belief.[275] A speaker's opinion, belief, or recommendation is at the very core of protected expression and cannot, consistent with the First Amendment, be subject to liability on the ground that it is somehow inaccurate or incomplete.

Undeterred by the dearth of legal support for its new interpretation or the serious constitutional concerns it entails, the Commission now proposes to use the litigation hammer of Rule 14a-9 to allay concerns expressed by the corporate community that they may be judged by anything other than the minimum corporate governance standards allowed by law. The examples the SEC cites – director independence and the frequency of shareholder votes on executive compensation-- are at the top of registrants' list of pet peeves regarding shareholders and the parties who advise them.[276]

On the other hand, the SEC does not suggest that the clients of proxy advisory services have asked for this change, which is not surprising. As explained above, these investors already receive extensive information about proxy advisers' conflicts of interest, and the information and methodologies they use in formulating their advice.[277] This is certainly the case for clients of ISS. Indeed, because the consumers of proxy advice either design or select the methodologies that underlie that advice, it is they who decide whether the companies they own should be held to higher standards and requirements than the ones set or approved by the SEC. Finally, investors who engage proxy advisory services are fully protected by the anti-fraud provision of the Advisers Act, which applies to all proxy advisers whether they are registered with the SEC or not.[278]

The Commission itself admits that proxy advisers may already be making the kinds of disclosures covered by proposed note (e) to Rule 14a-9,[279] which is yet another factor that calls the

---

[275] *See*, *e.g.*, *Hustler Magazine v. Falwell*, 485 U.S. 46, 57 (1988) (speech could not be actionable because it could not "reasonably be understood as describing actual facts"); *Leidholt v. L.F.P., Inc.*, 860 F.2d 894 (9th Cir. 1988) (article not actionable where it "telegraph[ed] to the reader that the article presents opinions, not allegations of fact"); *Jewell v. NYP Holdings*, 23 F. Supp. 2d 348 (S.D.N.Y. 1998);

[276] PA Proposal at note 160. *See also* Interpretation and Guidance *supra* note 2 at note 34, suggesting that in order to avoid liability under Rule 14a-9 a proxy adviser might have to explain why the peer group the adviser uses in assessing executive compensation proposals differs from the one selected by the registrant. Peer group selection is another sore point with the corporate community.

[277] *See supra* at 22.

[278] *Supra* note 98 and accompanying text.

[279] PA Proposal at note 166.

need for this rulemaking into question. Although the Commission confirms that proxy advisers and their clients "may use any standards or criteria for proxy voting advice" they choose,[280] the proposed amendment of Rule 14a-9 appears designed to have an *in terrorem* effect, the ultimate goal of which is to free public companies from even minor dissenting views, thereby hindering effective shareholder oversight.

ISS urges the Commission to withdraw this part of the proposal.

   o   **Additional Comments on Proposed Changes to Rule 14a-9**

Without waiving or diminishing our challenge to the Commission's authority to regulate proxy advisers under Section 14(a), or any other argument made herein, ISS offers the following comments on certain questions the Commission has asked about its proposed adoption of Rule 14a-9.[281]

54. If the Commission believes that shareholders have the right to decide which standards or criteria to apply to their proxy voting decisions, the Commission should refrain from erecting obstacles to their decision-making process. This means, among other things, that they and their fiduciary proxy advisers should not be constrained by standards or requirements set or approved by the SEC or any other legal or regulatory body.

55. There is no justification for adding additional "standards or criteria" disclosure requirements to Rule 14a-2(b)(9), because adequate disclosure is already mandated by, and being provided under, the Advisers Act.

**D. The Economic Analysis**

Although the Commission appends a lengthy economic analysis to its proposal, this discussion only further confirms the deficiencies with this regulatory endeavor.

**1. The economic analysis uses the wrong baseline.**

The Commission cites "current regulatory requirements" applicable to proxy advisers, their clients and issuers and "current industry practices" as forming the baseline against which benefits, costs and other economic impacts of the proposal are to be measured.[282] However, the "current

---

[280] *Id.* at 72, 84 Fed. Reg. at 66539.

[281] PA Proposal at 73, 84 Fed. Reg. at 66539.

[282] PA Proposal at 83, 84 Fed. Reg. at 66542.

regulatory requirements" the Commission identifies for proxy advisers are the ones articulated in the Interpretation and Guidance which the Commission adopted without the benefit of public comment or any economic analysis whatsoever.[283]  As explained above, prior to the adoption of the Interpretation and Guidance in August 2019, proxy voting advice rendered in the course of a fiduciary relationship was governed exclusively by the Advisers Act.  The only voting advice governed by the proxy rules at that time was advice voluntarily supplied to persons who did not ask for it.[284]  ISS submits, therefore, that the economic consequences of this proposal should be judged against the requirements and industry practices that exist under the Advisers Act, not the post-August 2019 version of the Exchange Act proxy rules.

### 2.  The benefits of the proposed rule amendments are illusory at best.

The Commission opines that the proposed amendment to the definition of "solicitation" in Rule 14a-1(*l*) may benefit proxy advisers and their clients by codifying the definition the Commission adopted in the Interpretation and Guidance.[285]  ISS assures the Commission that having its fiduciary activities subjected to a regulatory regime that was created to protect investors from "unscrupulous corporate officials" and "irresponsible outsiders" seeking to retain or wrest control of a corporation is no benefit at all.[286]  This is especially so since the whole purpose of redefining "solicitation" apparently is to subject proxy advisers' independent research, analyses, recommendations and opinions to editorial oversight by issuers and other self-interested parties, under a threat of litigation.  For their part, many investors who are proxy advisers' clients have made it clear that they do not see any benefits—only risks and downside— in the interposition of the subjects of proxy advice into the fiduciary relationship between the clients and their proxy advisers.[287]

The Commission next describes the proposed amendment of Rule 14a-2(b) regarding conflict of interest disclosures as an enhancement of existing requirements that could benefit proxy advisers' clients by enabling them to better judge the objectivity of proxy advice.[288]  This

---

[283] *Id.* at  85, 98, 103, 104, 109,  84 Fed. Reg. at 66542-66543, 66546, 66548, 66549 .

[284]  *Supra* at 12-13.

[285] PA Proposal at 98, 84 Fed. Reg. at 66546.

[286] *Supra* at 9.

[287] *Id.* at note 250.

[288] PA Proposal at 98 - 99, 84 Fed. Reg. at 66546.

faulty assessment illustrates the importance of selecting the correct baseline for the economic analysis of this rulemaking, because while proposed Rule 14a-2(b)(9)(i) may enhance the existing requirements under the proxy rules, judged by the fiduciary standards of the Advisers Act, it is no enhancement at all.

Furthermore, while the Commission acknowledges that "some" proxy advisers have "asserted" that they have conflict of interest practices and procedures,[289] and that proxy advisers "may already provide conflicts disclosure" to their investment adviser clients,[290] the Commission grossly understates the evidence on this issue. Proxy advisers' existing disclosures in their Forms ADV and their websites, along with the transcript from the 2018 Roundtable on the Proxy Process leave no room for doubt that proxy advisers currently provide information that meets or exceeds the information covered by 14a-2(b)(9)(i).[291] The benefits of this proposal are not just "limited," as the Commission admits;[292] they are non-existent.

The same can be said for the purported benefits to be derived from the proposed review, feedback and response provisions. The SEC suggests that these provisions would benefit proxy advisers' clients by "enhancing the overall mix of information" available to them as they make their voting decisions.[293] However, if that really were the intent of this rulemaking, shareholders and others with dissenting views would be given an equal opportunity to review, provide feedback on and insert responses into proxy statements and other communications circulated by or on behalf of issuers.

The Commission also theorizes that the consumers of proxy advice could benefit if proxy advisers alter their advice in response to issuers' and other soliciting parties' feedback because such altered advice could be "more accurate and complete."[294] The SEC does not address the fact that accurate and complete advice is already provided to the general satisfaction of the clients of proxy advisers. Nor does the SEC address the possibility that the feedback from such self-

---

[289] *Id.* at 100, 84 Fed. Reg. at 66547.

[290] *Id.* at 105, 84 Fed. Reg. at 66548.

[291] *Supra* at 36. ISS questions the use of the word "may" in discussing current conflict of interest disclosure practices in light of the SEC's recent instruction that that word should not be used to describe a situation that already exists. Fiduciary Standard Release, *supra* note 92 at 25, 84 Fed. Reg. at 33676.

[292] PA Proposal at 100, 84 Fed. Reg. at 66547.

[293] *Id.* at 101, 84 Fed. Reg. at 66547.

[294] Id.

interested parties might be inaccurate or even fraudulent, or that the alteration of draft proxy advice to err on the "safe side" in complex or contentious situations might just be a response to a threat of costly litigation.

Moreover, the SEC does not even try to reconcile its estimation of the benefits of Rule 14a-2(b)(9)(ii) and (iii) with the very clear statements by investors and their legitimate representatives that they do not want their proxy advice filtered through the subject of that advice.[295] Issuers and other soliciting parties already have effective channels to communicate with shareholders.[296] It is independent thought that investors seek from their proxy advisers.

The real beneficiaries of the proposed review, feedback and response provisions would be many self-interested corporate insiders, who, after decades of trying, will finally have a "role to play" in vetting the sources of independent information shareholders use in making their proxy voting decisions.[297] The subjects of proxy voting advice are also the only ones who stand to benefit from the proposed change to Rule 14a-9, because that change will codify the Interpretation and Guidance's unprecedented and unconstitutional view that proxy advisers can be sued for their "opinions, reasons, recommendations or beliefs." Moreover, by forcing granular disclosure of any standards or requirements that materially differ from ones the SEC sets or approves, the proposal also incentivizes proxy advisers and shareholders to hold companies accountable only to the lowest standards and requirements mandated by law.

Like the rest of the proposal, the proposed amendment of Rule 14a-9 would not confer any benefit on the investors who are clients of proxy advisers, for they are already protected by the anti-fraud provision of the Advisers Act.[298] And because it is they who create or otherwise select the standards and requirements proxy advisers use in the formulation of voting advice, clients would derive no benefit from duplicative disclosure of those standards. Finally, from the proxy advisers' perspective, the proposed amendment of Rule 14a-9 is nothing more than an SEC-sanctioned weapon bestowed on the issuers who are subjects of proxy advice, to deter the issuance of any views, opinions or vote recommendations that might deviate from those of corporate management.

None of the benefits the Commission has identified justifies this rulemaking.

---

[295] *See supra* at 25-26, 58.

[296] *Id.* at 41-42.

[297] *Id.* at 42.

[298] *Id.* at 21.

### 3. The costs of the proposal on proxy advisers have been grossly underestimated.

The Commission candidly concedes that it lacks the data necessary to quantify many of the costs associated with its proposal.[299]   Given the fact that the proposal would not confer any benefits whatsoever on investors or proxy advisers, it is not necessary to calculate the costs with precision in order to conclude that the proposal is not economically justified.   Nevertheless, ISS offers the following thoughts on the real costs that the proposal has failed properly to consider.

#### a. The costs of satisfying the review, feedback and response provisions

During calendar year 2019, ISS voluntarily provided approximately 450 draft reports to issuers in the United States for one round of fact-checking.   ISS estimates that the number of reports potentially required under proposed Rule 14a-2(b)(9)(ii) could range from approximately 6,500 to close to 25,000.[300]   Those extraordinary numbers would be even higher by an extreme magnitude if custom reports were also included.   Either way, ISS would incur substantial administrative costs just to track two rounds of distribution and resulting feedback for this large volume of reports.   It is completely inappropriate and off-base to suggest that the current draft review process—that ISS voluntarily implemented and for which ISS has established parameters and controls—can somehow be scaled to meet the comprehensive new requirements outlined in the proposed rule.

ISS would also incur substantial costs, including legal expenses, in creating, negotiating and implementing at least 6,000 confidentiality agreements with registrants and other soliciting parties.[301]

In addition to the 5 to 7 *business* days proposed to be given to issuers under Rule 14a-2(b)(9)(ii) (which could represent as many as 11 *calendar* days, depending when weekends fall in the process), ISS estimates that it would take an average of 2-3 additional ISS analyst working days per report for our research production team to thoroughly ingest, review, validate and address feedback on each report.   Because feedback would now cover not just factual accuracy, but also methodology, opinions and judgments, with the threat of legal liability hanging over the

---

[299] PA Proposal at 105-109, 84 Fed. Reg. at 66548-49.

[300]  In the case of ISS, including specialty draft reports in the proposed review and feedback provisions would expand the total number of reports covered by the new requirements by up to a factor of 5 per company.

[301] Because ISS does not currently pre-release reports containing material, non-public information, ISS does not have such agreements in place.

process, an unknowable number of feedback reviews would involve ISS' legal and compliance teams, and possibly outside counsel, in order to safeguard the independence and integrity of our fiduciary advice, while at the same time protecting ourselves against the threat of litigation under Rule 14a-9. Registrants or other solicitors who are not satisfied with ISS' final proxy advice could force ISS to incur additional research, administrative, compliance and IT expenses related to the insertion of a link to their response in our reports, for which we would have no right of reply.

As noted above, the delays created by the review and feedback provisions in an already compressed time period could seriously impede ISS' ability to meet its contractual commitments to clients.[302] While the Commission acknowledges that proxy advisers may incur costs in renegotiating client contracts,[303] the Commission does not also acknowledge the possibility that clients will terminate their contracts altogether if they find their diminished review period unacceptable.[304]

On the other hand, the Commission does acknowledge that the review, feedback and response provisions may dissuade clients from using proxy advisory services because of concerns regarding the objectivity and integrity of advice that has been vetted by its subjects. The Commission leaves it to the proxy advisers to find a way to deal with this problem, without acknowledging either the substantial costs involved or the inappropriate nature of that potential outcome, which would be directly contrary to the stated objectives of the proposal.

### b. The costs of amending existing compliance programs

As reflected throughout these comments, the Commission's proposal would interfere with proxy advisers' existing obligations under the Advisers Act and, possibly, ERISA. The proposed amendments would require ISS to amend its compliance program in at least the following respects:

> o Embedding conflict disclosures in the proxy reports, as currently proposed in Rule 14a-2(b)(9)(i), would compromise the firewall ISS has erected between its proxy advisory service and its corporate services subsidiary.[305] ISS has gone to great expense in creating this safeguard and would incur substantial costs in developing an alternative.

---

[302] *Supra* at 62.

[303] PA Proposal at 107, 84 Fed. Reg. at 66549.

[304] If the Commission intends to include reports based on clients' custom guidelines in the review, feedback and response provisions, ISS will also be required to renegotiate its confidentiality agreements with the clients who utilize such guidelines. These clients also may choose to terminate their agreements rather than have their private information disclosed to issuers and other soliciting parties.

[305] *Supra* at 32.

o Giving the subjects of ISS' proxy advice the ability to vet the methodologies, opinions, and judgments reflected in that advice would create a substantial new conflict of interest that ISS would have to expend substantial resources to manage and disclose.

o Subjecting proxy advisers to litigation risk under Rule 14a-9 for their "opinions, reasons, recommendations and beliefs" could potentially incentivize proxy advisers to alter their advice in accordance with the feedback they receive from the subjects of that advice. This creates another new conflict of interest that ISS would have to expend resources to manage and disclose.

o The disclosure of draft proxy reports containing MNPI would require changes to ISS' existing insider trading procedures. It is unclear how ISS would satisfy its duty to enforce a new procedure in this regard, since the proposal does not permit a proxy adviser to withhold MNPI from any registrant or other solicitor who has signed a confidentiality agreement, even if that party is a known insider trader.

o Every change to ISS' compliance program would necessitate additional training, documentation, and ongoing testing, all of which would further increase ISS' costs.

o The Commission's assertion that,"[t]here is no specified retention period for any information maintained, disclosed or provided pursuant to the proposed amendments" is inaccurate.[306] Advisers Act Rule 204-2 would require ISS and other proxy advisers to maintain, at a minimum, the following records for a period of five years: (i) the new confidentiality agreements, (ii) communications with issuers or other covered solicitors about proxy advice, (iii) new compliance procedures, training thereon and testing thereof, and (iv) disclosures to clients.

### c. Litigation costs

The Commission's aggressive interpretation of Rule 14a-9, coupled with the review and feedback provisions, substantially increases the litigation risk of any proxy adviser that refuses to compromise the independence of its advice. While it is impossible to put a dollar figure on insuring against this risk, ISS is disappointed that the Commission ignores this cost altogether.[307]

### 4. The costs of the proposal on consumers of proxy advice have been grossly underestimated.

As the Commission acknowledges, some or all of the costs this proposal would impose on proxy advisers may be passed through to the investors who use their services.[308] Those

---

[306] PA Proposal at 122, 84 Fed. Reg. at 66553.

[307] *Id.* at 109, 84 Fed. Reg. at 66549.

[308] *Id.* at 108, 84 Fed. Reg. at 66549.

investors also are likely to be burdened by the fact that the time they currently have to review proxy research reports and recommendations and to make their voting decisions will be reduced, with time instead diverted to give two rounds of review to the subjects of the advice. While hard to quantify in dollars, the cost of lost time may be the greatest cost imposed on consumers by this proposal, severely compressing the time that investors have to process and use proxy research reports, to engage with the companies in which they are invested, and to thoughtfully exercise their proxy voting responsibilities.

These costs, while significant, pale in comparison with the possible loss of diverse thought in the marketplace for proxy advice. As it stands today, each proxy adviser is free to analyze corporate governance and other voting matters in accordance with methodologies and criteria of its and its clients' choosing. So long as these methodologies and criteria are properly disclosed, clients themselves can assess whether they are appropriate for their own goals and objectives. Forcing every U.S. proxy adviser to vet their methodologies, criteria, opinions and judgments through the subjects of their advice—under threat of litigation—could diminish proxy advisers' willingness to recommend votes against management or other soliciting parties, or to stray too far from corporate managements' points of view. This would substantially diminish the independent information available to shareholders, as well as their ability to hold management of public companies accountable for their actions.

### 5. The proposal's burdens on the U.S. capital markets have been grossly underestimated.

Using the proxy rules to try to keep proxy advisers from voicing opinions not acceptable to management, and reducing the availability and timeliness of independent research and advice that helps investors carry out their fiduciary duties has implications beyond any individual shareholder or ballot proposal. Silencing dissenting views on corporate governance matters like executive compensation, board independence, *etc.* would likely lead to the proliferation of unfair corporate practices that harm investors generally, which would be a tragically ironic result of the proposed rulemaking under Section 14(a).[309]

The proposed rule amendments would also discourage and diminish competition in the market for proxy advice. This is so for two reasons. First, only the largest proxy advisers would have sufficient human and financial resources to comply with the proposed review, feedback and response-insertion provisions, and to defend themselves against baseless claims by disgruntled

---

[309] See *supra* at 8.

registrants or other solicitors.  Furthermore, if every adviser's opinions and recommendations are vetted by the same parties, there would be an inherent stifling of different views, even if all equally valid.[310]  Taken to its absurd conclusion, there may not be a need for any proxy advisers, since what the Commission seemingly considers to be an "accurate and complete" analysis can be supplied by the issuer or other solicitor itself.[311]

Finally, the SEC's economic analysis fails to assess the market effects of the misuse of MNPI that would have to be supplied to registrants and other parties under the review and feedback provisions.  As discussed earlier,[312] given the volume of potentially market-moving information that will be released every year, it is likely that some parties will be unable to resist the temptation to trade on, or otherwise misuse, this information, whether it is covered by a confidentiality agreement or not.  The moral hazard of such a consequence would lie squarely with the SEC.

Even without a precise calculation of costs, therefore, it is clear that this rulemaking is economically unjustified.

## E.  Reasonable Alternatives

For the many reasons stated above, the only reasonable alternative to this proposal is to regulate all proxy advisers under the Advisers Act.  That approach will constitutionally, lawfully and effectively address any legitimate concerns there may be regarding the accuracy and integrity of proxy voting advice.

## CONCLUSION

This rulemaking exceeds the Commission's statutory authority, is unconstitutional, upends almost 90 years of U.S. securities regulation, cannot be reconciled with past Commission statements about, or existing legal requirements applicable to, proxy advisers, is impracticable, and thoroughly lacks economic justification.  ISS urges the Commission to take its fingers off the issuers' side of the scale, and—in the interests of investors and the capital markets—withdraw these proposed rule amendments.

---

[310] As things stand today, many large institutional investors subscribe to more than one proxy advisory service. *See e.g.* Remarks of Jonathan Bailey, 2018 Roundtable Transcript, *supra* note 76 at 184.

[311] If the subjects of the advice have the right to establish the "correct" methodology, there certainly would not be any need for an adviser to maintain multiple specialty voting policies.

[312] *Supra* at 60-61.



**TOM QUAADMAN**
EXECUTIVE VICE PRESIDENT

1615 H STREET, NW
WASHINGTON, DC 20062-2000

January 31, 2020

Ms. Vanessa A. Countryman
Secretary
U.S. Securities and Exchange Commission
100 F Street, NE
Washington, DC 20549

Re:     **Amendments to Exemptions from the Proxy Rules for
        Proxy Voting Advice
        17 CFR Part 240; Release No. 34-87457; RIN 3235-AM50
        File No. S7-22-19**

Dear Secretary Countryman:

The U.S. Chamber of Commerce's Center for Capital Markets Competitiveness ("CCMC") commends the Commission for its ongoing efforts to review and, when warranted, attempt to modernize securities regulation. We also appreciate the opportunity to comment on the proposed rules issued by the Securities and Exchange Commission (the "SEC" or "Commission") on November 5, 2019, entitled "Amendments to Exemptions from the Proxy Rules for Proxy Voting Advice" (the "Proposing Release").

Despite being plagued by conflicts of interest, a lack of transparency, and significant errors in voting recommendations, proxy advisory firms continue to carry a significant amount of influence over corporate governance at America's public companies. The two dominant proxy firms—Institutional Shareholder Services (ISS) and Glass Lewis —control roughly 97% of the proxy advisory industry, constituting a duopoly that have become the de facto standard setters for corporate governance in the U.S., with some estimates that the two firms can "control" up to 38% of the shareholder vote as some clients automatically follow their vote recommendations.[1]

---

[1] ISS 24.7% Glass Lewis 12.9% Source: Ertimur, Yonca, Ferri, Fabrizio, and Oesch, David *Shareholder Votes and Proxy Advisors: Estimates from Say on Pay (February 25, 2013).*

Yet neither of these firms is an actual shareowner, has any financial interest in the companies for which they provide vote recommendations for or has a fiduciary responsibility to shareholders. This has created an agency problem over time that needs to be addressed, with only a patchwork of exceptions, exemptions and no-action relief from the Commission staff to address it. Only recently has the proxy advisory industry come under any kind of regulatory attention. For these reasons, it is long overdue for proxy advisor firms to be subject to a more comprehensive regulatory oversight regime like the one the SEC is currently proposing.

Due to the historical lack of federal regulation, proxy advisors are an anomaly which are unlike every other participant in the proxy voting and solicitation process—from issuers, to shareholders, to banks, to broker-dealers, to exchanges, to custodians, to transfer agents—who are subject to substantial federal regulation and scrutiny.[2]

Nevertheless, proxy advisors' recommendations impact the vote on substantial blocks of stock at public companies of every size, and as the Proposing Release notes, the firms provide voting advice to several thousand investor clients managing tens of trillions of dollars in shareholder wealth. As stewards of countless retail investors' retirement savings, the proxy voting activities of institutional investors ultimately impacts each and every Main Street investor. To illustrate this point, a recent survey conducted by Spectrem Group found significant concern among retail investors over the current role of proxy advisory firms, with retail investor support of the SEC proposal at 75% and support for disabling robo-voting when a hyperlink to additional information is included in proxy advisor reports at 90%.[3]

For many years, problems with the proxy advisory industry have garnered the attention of regulators, Congress, institutional investors, academics, and others. Proxy

---

[2] While it is true that ISS has registered with the Commission as an investment adviser, Glass Lewis has not, and investment adviser registration has had little observable effect on ISS's activities, save and except for a single SEC enforcement action against it for failing to safeguard the confidential proxy voting information of clients participating in a number of significant proxy contests. *See In the Matter of Institutional Shareholder Services Inc.,* Release No. IA-3611, File No. 3-15331 (May 23, 2013), *available at* https://www.sec.gov/litigation/admin/2013/ia-3611.pdf. Of the other proxy advisory firms, a search of the Division of Investment Management's Investment Adviser Public Disclosure website reveals a mixed record of investment adviser registration.

[3] https://www.prnewswire.com/news-releases/spectrem-group-study-reveals-wide-retail-investor-support-for-proposed-sec-amendments--january-10-2020-300984956.html

advisory firms have been criticized on a number of issues. Though well-known and well-documented, these issues bear repeating for the official record:

- Rampant conflicts of interest that impact the objectivity of voting recommendations made to institutional investors.

- A one-size-fits-all approach to voting recommendations that ignores the unique characteristics and operations of individual companies and industries.

- A lack of willingness to constructively engage with issuers, particularly small and midsize issuers that are disproportionately impacted by proxy advisory firms.

- A lack of transparency throughout the research, methodology and development of voting recommendations.

- Frequent and significant errors in analysis and methodology as well as a persistent unwillingness to address those errors.

- Automatic voting procedures that compound mistakes and frustrate meaningful engagement with issuers.

Such disruptive behavior of an unregulated capital markets participant should not continue, and lack of regulatory action has allowed these issues to persist over time. The proxy advisory industry should not be permitted special exemptions to laws generally applicable to other business enterprises.

These issues with the proxy advisory industry are often cited as one of the many challenges to the willingness of businesses to go and stay public. The U.S. is home to roughly half the number of public companies that existed 20 years ago, and reform of the proxy advisor industry is essential to reversing this troublesome trend. Having fewer public companies not only jeopardizes the growth prospects of businesses, but it also limits the investment opportunities for Main Street investors who depend on vibrant public markets to create and sustain wealth.

As in past years, the CCMC partnered with Nasdaq to conduct a survey of public company experiences with proxy advisory firms during the 2019 proxy season. A record 172 companies participated in the survey, and the full survey results

accompany this comment letter as Appendix A. The data we collected is highly relevant to the Proposing Release.

A notable finding from this year's survey is that fewer issuers are requesting previews of vote recommendations or asking for opportunities to meet with proxy advisory firms on matters subject to a shareholder vote. This development has occurred at the same time proxy advisory firms are less likely than in previous years to grant such requests. Many of our member companies have reaffirmed this trend by stating they no longer request previews or meetings as prior experiences has led them to believe that any attempt to correct factual errors or engage in substantive dialogue with proxy advisory firms is futile and a waste of effort.

The survey also highlights the increasing awareness that issuers have regarding conflicts of interest at proxy advisory firms. Nearly twice as many companies identified significant conflicts at proxy advisory firms, with some bringing them to the attention of institutional investors.

Notably, 58% of issuers reported that they have been approached by the corporate consulting arm of ISS in the same year that the company received a negative vote recommendation. As the Chamber, Nasdaq, and many others have long pointed out, the ISS business model—in which the company provides corporate governance consulting to the very issuers that it is issuing vote recommendations on—is inherently conflicted and creates the potential for biased voting advice. The SEC should be at the forefront ensuring that these conflicts ultimately do not harm the institutional investors who rely on proxy advisors' voting advice to create long-term value for the millions of Main Street investors whose wealth they manage.

Against this backdrop, the CCMC enthusiastically supports the Commission's effort to provide some measure of oversight to this largely unregulated industry. In brief:

- We support the proposed amendments to Rule 14a-1(*l*) to formalize that the term "solicitation" includes any proxy voting advice that makes a recommendation to a shareholder as to its vote on a specific matter for which shareholder approval is solicited, and that is furnished by a person who markets its expertise as a provider of such advice, separately from other forms of investment advice, for a fee. We do not see how such an amendment—which is

consistent with long-standing SEC interpretation of the term "solicitation"—could at all be objectionable because it simply places proxy advisors on equal footing with all other market participants who must comply with the SEC's proxy rules.

- We support the proposed amendments to Rules 14a-2(b)(1) and 14a-2(b)(3) concerning advisor conflicts of interest, which we view as rational, well-measured responses to proxy advisors' widespread and egregious conflicts.

- We believe the review period contemplated in the Proposing Release is a reasonable and non-invasive solution to address the problem that many registrants have had in communicating with proxy advisory firms and ensuring that shareholders receive accurate information, particularly to correct errors that regularly appear in advisors' reports and recommendations, provided that the Commission also addresses robo-voting practices, as contemplated in the Release's "Reasonable Alternatives" section.

- Finally, we agree that the proposed amendment to Rule 14a-9, the anti-fraud rule, is appropriate.

## Discussion

## I. Proposed Codification of the Commission's Interpretation of "Solicitation"

The concept of "solicitation" under the federal securities laws is a broad one, and, likewise, the Commission's interpretation of the concept has historically been expansive. The federal proxy rules make it illegal for anyone to solicit votes with respect to publicly-held securities without complying with the SEC's information and filing requirements. The Proposing Release would revise Rule 14a-1 to formalize the Commission's view that the term "solicitation" includes any proxy voting advice that makes a recommendation to a shareholder as to its vote, consent or authorization on a specific matter for which shareholder approval is solicited, and that is furnished by a person who markets its expertise as a provider of such advice, separately from other forms of investment advice, and sells such proxy voting advice for a fee. The proposed amendments also provide an explicit exception for the furnishing of proxy

voting advice by a person who furnishes such advice only in response to an "unprompted request".

We support the proposed amendments to Rule 14a-1(*l*) and believe they are entirely consistent with the notion that any communication reasonably calculated to result in a proxy voting decision is a solicitation. As the Commission notes in the Proposing Release, such a formal codification is likewise consistent with the Commission's long-standing interpretation of the term solicitation, going back to at least 1956. It is also entirely consistent with protecting investors insofar as it seeks to prevent inadequate or materially misleading disclosures as contemplated in Section 14(a) of the Exchange Act.

Candidly, we do not see how this amendment could at all be objectionable because it simply places proxy advisors on equal footing with all other market participants who must comply with the proxy rules. The kind of advice they provide is clearly the kind of information Congress intended to capture when it enacted Section 14(a). It is inconsistent with Section 14(a) for persons whose business is to offer and sell voting advice broadly to large numbers of shareholders, with the expectation that their advice will factor into voting decisions, to be entirely beyond the SEC's reach. Congress could not have reasonably expected key participants in the proxy solicitation process to be beyond the scope of the proxy rules.

The CCMC also supports the incorporation of an exception to Rule 14a-1(*l*) in the case of persons who provide proxy voting advice in response to an "unprompted request". We do not believe that this exception should be limited only to registered broker-dealers or investment advisers. There are numerous other commercial or fiduciary relationships in which the unprompted request scenario may surface, such as in the trustee-beneficiary relationship, attorney-client relationship, and accountant-client relationship. In such situations, the provision of occasional proxy voting advice in response to an unprompted request is part of a broader commercial or contractual arrangement, and is typically incidental to other activities. We concur with the Commission's observation in the Proposing Release that these types of relationships do not present the same investor protection concerns, and that if such advice were considered a solicitation, the requirement to file a proxy statement would chill the broader professional relationship between the parties.

## II.     Conflicts of Interest

Proxy advisory firms have entirely avoided compliance with the information and filing requirements under the proxy solicitation rules applicable to every other market participant by relying on exemptions contained in current SEC Rules 14a-2(b)(1) and 14a-2(b)(3). The Proposing Release would revise Rules 14a-2(b)(1) and 14a-2(b)(3) to specify that these exemptions are available to proxy advisory firms only if they provide specified disclosures regarding material conflicts of interest in issuing their proxy voting advice. A discussion of policies and procedures used to address potential and actual conflicts of interest would also be required under the proposed rules, and boilerplate disclosures regarding conflicts would not be permitted.

Conflicts of interest are a prominent feature of the duopolists' business models. ISS, through its Corporate Solutions division, markets corporate governance consulting services to the same public companies the ISS organization purports to rate for their corporate governance practices, and Glass Lewis is a portfolio company of two large Canadian institutional investors. The CCMC-Nasdaq Survey shows that proxy advisor conflicts of interest are also a significant concern for public companies:

- Nearly twice as many companies identified conflicts of interest at proxy advisory firms in 2019 than in 2018. Of companies, 19% identified significant conflicts of interest, up from 10% in 2018. While 16% of those companies that found conflicts brought them to the attention of institutional investors, a smaller number brought them to the attention of SEC staff (7%) and the proxy advisory firms themselves (8%).

- A striking 58% of companies reported being approached by ISS Corporate Solutions during the same year in which the company received a negative vote recommendation. Of companies, 19% reported that they have hired ISS Corporate Solutions for advice on structuring executive compensation plans, improving ESG ratings, gauging proxy advisory outcomes, or other corporate governance matters.  Many companies feel that ISS has created a business model where in order to improve scores on corporate governance issues, such as executive compensation and ESG ratings, then they have to subscribe to their consulting services.

We support the proposed amendments to Rules 14a-2(b)(1) and 14a-2(b)(3) as rational, well-measured responses to these widespread and egregious conflicts. Such conflicts of interest can severely undermine the proxy advisory firms' ability to provide fair and balanced vote recommendations, to the detriment of ultimately main street investors, and disclosure will help provide more decision useful information in order to better inform proxy voting. The proposed amendments to Rules 14a-2(b)(1) and 14a-2(b)(3) are entirely consistent with the disclosure model that currently exists under the federal securities laws.

## III.     Review of Proxy Voting Advice

As an additional limitation on the exemptions found in Rules 14a-2(b)(1) and 14a-2(b)(3), the proposed amendments would, for definitive proxy statements filed less than 45 but at least 25 days before the date of a shareholder meeting, require a proxy advisor to provide a company or other soliciting person no fewer than three business days to review the proxy voting advice and provide feedback. For definitive proxy statements filed 45 days or more before the shareholder meeting, a proxy advisory firm would be required to provide a company or other soliciting person no fewer than five business days for such review. Further, to rely on the exemptions, a proxy advisor would be required to provide a company or other soliciting person with a final, two-business day notice period prior to the delivery of proxy voting advice to its clients. This final notice would permit a company or other soliciting person to determine whether to provide a statement in response to the advice and request that a hyperlink to this response be included in the voting advice delivered to the proxy advisors' clients. The hyperlinked statement would itself also constitute a solicitation and be subject to the proxy rules' filing requirements and antifraud provisions.

*Review of Erroneous Reports*

Our members report numerous factors that contribute to the high incidence of factual and analytical errors in proxy advisor reports. Portions of the proxy advisors' review process appear to be highly automated, and members attribute some mistakes to faulty algorithms and similar defects in the data analysis process. Proxy advisors often misinterpret issuer disclosures, especially in the compensation discussion and analysis narrative, and use incorrect data to populate the advisors' own proprietary

models. In other cases, the advisors make simple computational errors in their arithmetic.

Other types of analytical errors include the determination as to whether a particular director is independent or whether a particular company is in a given issuer's peer group, with proxy advisors conjuring their own peer groups that diverge significantly from those identified by issuers or from the proxy advisor's own guidelines. Members have found that the proxy advisors often misunderstand basic business fundamentals and market realities in certain industries (including energy, high technology, manufacturing, real estate and financial services), and that the proxy advisors' one-size-fits-all criteria do not adequately account for differences among individual firms or industries. Our members have even experienced analytical errors by the proxy advisors when applying the advisors' own publicly disclosed guidance.

Furthermore, proxy advisors often base their analyses on flawed assumptions about issuers' businesses. In many cases the advisors appear to make determinations based on a single year's financial and operational information, disregarding broader trend lines over longer periods of time. In other cases, the advisors rely on outdated information or incorrect versions of material issuer contracts and compensation plans. Our members have also experienced situations in which the proxy advisors misinterpret stock exchange listing standards or provisions of state corporate law.

We believe the tailored review period contemplated in the Proposing Release is a reasonable and non-invasive solution to address the problem that many issuers have had in communicating with the advisory firms, particularly to correct errors that regularly appear in advisors' reports and recommendations. While we support the proposal's inclusion of two separate reviews as a way to provide investors with complete and accurate information, including the issuer's response, some of our asset manager members have expressed concern generally that the review process could leave less time to engage with issuers following receipt of the proxy advisor's report. This is an important part of the proxy process that benefits both investors and issuers. We know that the SEC through its proposal has been carefully considering the balancing act of providing companies time to review while also allowing time for shareholder engagement.

Additionally, our members report that currently proxy advisors generally do not permit small- and mid-cap issuers to review advisor reports. Large-cap issuers are

sometimes permitted to review reports, but it is not uncommon for proxy advisors to provide a review period of 24 hours or less, in many cases over weekends or holidays.

In addition to companies being given little time to respond, there have been other reported issues with the current process for viewing draft reports. One of our members reported receiving a draft report from ISS with recommendations that were favorable on a director's say-on-pay proposal. However, the company observed vote totals on the proposal ultimately decline as a different specialized ESG report from ISS ultimately contained a negative recommendation on the issue, which the company was unaware of even with their interactions with ISS. Separately, the same company reported that when they reached out to Glass Lewis asking to see a report from the previous proxy season to see how they were graded on these issues, they were told that they would have to pay $3,500 in order to see the report, even though it was from the previous proxy season.

Indeed, the CCMC-Nasdaq survey found that issuers of all sizes continue to find it difficult to engage constructively with proxy advisory firms:

- Of companies surveyed, 87% had a proxy advisory firm make a recommendation on an issue included in their proxy statements.

- Of companies, 80% carefully monitored proxy advisory firm recommendations for accuracy or reliance on outdated information, lower than in 2018 (83%) and 2017 (91%).

- Of companies, only 39% believed that proxy advisory firms carefully researched and took into account all relevant aspects of a particular issue on which the firms provided advice, the same number as in 2018.

- Of companies, 17% formally requested that proxy advisory firms provide them with a preview of vote recommendations, down from 21% in 2018 and 30% in 2017. For companies that did request a preview, proxy advisory firms provided them only 39% of the time, down 5% from 2018.

- The number of companies asking proxy advisory firms for opportunities to provide input both before and after the firms' recommendations were finalized

continues to decline. In 2019, 30% of companies made such requests, down from 38% in 2018 and 51% in 2017. Once again, companies commonly reported that, if such a request was granted, they were often only given only one to two days (and sometimes only hours) to provide input.

- The number of companies pursuing opportunities to meet with proxy advisory firms on issues subject to shareholder votes also continues to decline. Of companies, 21% pursued meeting opportunities in 2019, down from 29% in 2018 and 52% in 2017. For companies that asked for a meeting, their request was denied 60% of the time, a number that continues to grow from 2018 (57%) and 2017 (38%).

Many of our member companies report feeling disillusioned by the inconsistent process of providing input resulting in infrequent changes by proxy advisor firms regarding recommendations. Overall, this has left many companies to feel that such efforts are ultimately wasted resources, and they instead choose to use that time to communicate directly with shareholders or prepare supplemental proxy materials.

*Confidentiality*

While we appreciate the potential need to maintain the confidentiality of certain materials supplied to registrants or soliciting persons during the review period, we are concerned that the proposed Note 2 to paragraph (b)(9)(ii) of Rule 14a-2, which allows a proxy advisor to require a registrant or other soliciting person to enter into a confidentiality agreement regarding draft materials, may prove unwieldy and problematic in practice. Misuse of this confidentiality provision could stymy the entire review mechanism. To mitigate this risk, Note 2 should make clear that, notwithstanding any confidentiality obligation, a registrant or other soliciting person is permitted to share the draft materials with its professional advisors and outside counsel (including professional advisors and outside counsel to the board of directors and any committee of the board), as well as the Commission, the Department of Justice, Congress, the office of any state attorney general, any blue sky regulator, any stock exchange or self-regulatory organization, any state or federal court, and any other state and federal regulatory agencies or legislative bodies.

*Hyperlinked Statement and Robo-Voting*

We believe it is sensible for proxy advisors to be required to include a hyperlink (or other analogous electronic medium) directing readers to the response by the registrant or other soliciting persons, and accordingly support the proposed amendment. We agree that a proxy advisor should have no liability under the federal securities laws for the content of such a hyperlink. We note that registrant or other soliciting person who has authored the hyperlinked statement would be liable under Rule 14a-9 for any material misstatements or omissions. Accordingly, we see no reason for the Commission to limit the content of the hyperlink through any guidelines or limitations on the responses

The CCMC-Nasdaq survey also found—as did last year's survey—that many companies report a significant portion of their shares are "robo-voted" by institutional investors in line with proxy advisory firm recommendations within two days after an ISS or Glass Lewis vote recommendation is issued. Specifically, when an ISS recommendation was issued, several companies reported that between 15% and 40% of their outstanding shares were voted in line with the recommendation within two days. The same issue arose with Glass Lewis, though on a smaller scale (perhaps reflecting the fact that Glass Lewis, while a significant player in this space, is the smaller of the duopolists), with several companies reporting that between 5% and 10% of their shares voted automatically with a Glass Lewis recommendation. Such automatic voting of shares fundamentally calls into question whether these investors have actually read registrants' proxy statements to form their own conclusions, or whether instead there is an overreliance on proxy advisory firm recommendations.

Apropos to this issue, the Proposing Release seeks comment on whether amended Rules 14a-2(b)(1) and 14a-2(b)(3) should condition the relevant exemptions on a proxy advisor structuring its electronic voting platform to disable the automatic submission of votes in instances where a registrant has submitted a response to the voting advice. In light of the significant evidence of robo-voting uncovered in the CCMC-Nasdaq survey, we agree that the Commission should require proxy advisors to disable the automatic submission of votes until the client affirmatively acknowledges that it has been provided access to the registrant or other soliciting person's response to the proxy advisor's report.

Additionally, one of our member companies shared the below case study showing the immediate impact that the ISS vote recommendation had on one of their vote totals regarding a shareholder proposal. In this case, the ISS report was released 13 days prior to the annual meeting recommending a vote for the shareholder proposal, where Glass Lewis had already recommended a vote against. Series 1 shows the percentage of shares voted, excluding broker-non-votes, and Series 2 shows the percentage of votes cast in favor of the shareholder proposal, both of which see a substantial spike following the ISS recommendation despite a conflicting recommendation from Glass Lewis.



**Representative Shareholder Proposal**
**Case study of actual voting**

ISS report released on T-13 with recommendation: FOR[2]

T = Annual General Meeting Date

[1]Excludes Broker Non-Votes as shareholder proposals are considered a non-routine item
[2]Glass Lewis report released earlier with recommendation: AGAINST

According to the Council of Institutional Investors, in 89% of the more than 21,000 ballots cast in 2018 on director elections, auditor ratifications, say-on-pay votes, and on employee and director equity plans at Russell 3000 companies, ISS ultimately endorsed management's proposals. Additionally, with the 420 shareholder

proposals voted on in 2018, there was a split as ISS vote recommendations conflicted with management in 79% of cases.[4]

Without the disabling of automatic submissions of votes, many of the other components of the proposed rule would be far less impactful, with added disclosures, the review and feedback mechanism and the inclusion of the hyperlink by the registrant ultimately not providing any benefit if investors ultimately don't consider this additional information. While large asset managers perform their own research and analysis related to proxy voting, it is likely in other cases that ultimately Main Street investors whose shares are being voted on will suffer if relevant information is not being used to inform the proxy vote.

## IV.    Amendments to Rule 14a-9

Although proxy voting advice may be exempt from filing under the Rule 14a-2(b) exemptions, such advice is not exempt from the antifraud prohibitions of Rule 14a-9. Rule 14a-9 prohibits materially misleading misstatements or omissions in proxy solicitations. The Proposing Release would add to the four examples of what is considered misleading under the rule the following additional text: "Failure to disclose material information regarding proxy voting advice . . . such as the proxy voting advice business's methodology, sources of information, conflicts of interest or use of standards that materially differ from relevant standards or requirements that the Commission sets or approves." As part of the disclosure of methodology, proxy advisors should be required to disclose the economic analysis, if any, used to arrive at their voting recommendation, which will help align the recommendation to the interest of Main Street investors. Additionally, proxy advisor firms should be required to show the impact on the pay for performance quantitative analysis when a peer group or compensation value is used that differs from those used by the issuer, and provide a rationale for any such differences.

We agree that the proposed amendment to Rule 14a-9 is appropriate notwithstanding the Commission's recent interpretive guidance. We would expand the "relevant standards or requirements" to also include those set by any relevant stock exchange. As another example, we would also list a proxy advisor's failure to disclose whether a registrant disputes any findings in the proxy advisor's report or whether a

---

[4] https://www.cii.org/op_ed_response_proxy_firms

proxy advisor diverges from its own publicly disclosed guidelines. Additionally, disclosures should be made where a recommendation favors one of several options that have been recognized as equally appropriate by the SEC or allowed under Congressional statute (such as say-on-pay frequency) or whether the recommendation fills a void created by the SEC, such as if a proxy advisor firm recommends votes against directors when a company excludes a shareholder proposal when the SEC declines to state a view with respect to a no-action request.

## Conclusion

The metastization of the proxy advisory industry is a case study in the unintended consequences of unchecked government regulation. A series of seemingly benign regulatory decisions in the early 1990s spawned an unregulated juggernaut that now, more than 25 years later, wields greater influence over American corporate governance than any state legislature, stock exchange or even the Commission itself. Despite owning no stock themselves, proxy advisors have become a force unto themselves in the capital markets, hopelessly conflicted and accountable to no one.

The Proposing Release is a necessary step in restoring some measure of accountability and balance to proxy voting, and as detailed above we support the Commission's efforts wholeheartedly. Additionally, the Proposing Release will help align vote recommendations and proxy voting decisions with the economic interests of Main Street investors by providing enhanced disclosures and more decision useful information. We appreciate your consideration of our comments, and we remain available at your convenience to discuss them with the Commissioners and Staff.

Sincerely,

Tom Quaadman

cc:     The Honorable Jay Clayton
        The Honorable Robert J. Jackson, Jr.
        The Honorable Hester M. Peirce
        The Honorable Elad L. Roisman
        The Honorable Allison Herren Lee

**Appendix A**
**2019 Proxy Season Survey**

**BRAEMAR HOTELS & RESORTS INC.**
14185 Dallas Parkway, Suite 1100
Dallas, Texas 75254

February 3, 2020

**VIA E-MAIL (rule-comments @ sec.gov)**

Ms. Vanessa A. Countryman, Secretary
U.S. Securities and Exchange Commission
100 F Street, N.E.
Washington, D.C. 20549-1090

> *Re:   S7-22-19 Amendments to Exemptions from the Proxy Rules for Proxy*
> *Voting Advice*

Dear Secretary Countryman:

On behalf of Braemar Hotels & Resorts Inc. (the "Company", "we", "us" or "our"), I am writing
in response to the invitation and request for comment by the Securities and Exchange Commission
(the "Commission") in connection with the rule proposal released on November 5, 2019 in Release
No. 34-87457 *Amendments to Exemptions from the Proxy Rules for Proxy Voting Advice* (File
number S7-22-19). The Commission's efforts in such proposal to ensure that proxy advisory firms
are held accountable is an important step in the process to promote greater transparency and
accuracy in the voting recommendations provided by proxy advisory firms. Specifically, the
requirement to grant issuers an opportunity to review and comment on vote recommendations is
critical to ensuring that such reports are factually correct. As demonstrated by our experience with
Institutional Shareholders Services ("ISS") in 2018, factual errors in these reports and statements
that are materially misleading can cause substantial harm to public companies who are forced to
expend substantial amounts of time and expense to correct these inaccuracies. Please find attached
as Exhibit 1 our letter dated November 27, 2018 which we submitted in advance of the
Commission Staff Roundtable on the Proxy Process and which provides further details on the
ramifications for us when ISS published voting recommendations that were false and misleading.

We appreciate the opportunity to provide this information regarding our experience with the proxy
advisory firms, and we hope that our insights will prove to be instructive and helpful. We hope
the rule will be finalized soon so that meaningful changes can be implemented to ensure
accountability for proxy advisory firms. Please do not hesitate to contact us if you have any
questions regarding the foregoing or would like any additional information. We wish you
continued success in your efforts to support this important rule proposal.

Very truly yours,

**BRAEMAR HOTELS & RESORTS INC.**

Robert G. Haiman
EVP, General Counsel and Secretary

**EXHIBIT 1**

RECEIVED

NOV 29 2018

OFFICE OF THE SECRETARY

**BRAEMAR HOTELS & RESORTS INC.**
14185 Dallas Parkway, Suite 1100
Dallas, Texas 75254

November 27, 2018

**Robert G. Haiman**
*Executive Vice President,*
*General Counsel and Secretary*

**VIA E-MAIL (rule-comments@sec.gov)**

Mr. Brent J. Fields, Secretary
U.S. Securities and Exchange Commission
100 F Street, N.E.
Washington, D.C. 20549-1090

        *Re:    File Number 4-725 – SEC Staff Roundtable on the Proxy Process*

Dear Secretary Fields:

On behalf of Braemar Hotels & Resorts Inc. (the "Company", "we", "us" or "our"), I am writing
in response to the invitation and request for comment by the Securities and Exchange
Commission (the "Commission") in connection with the SEC Staff Roundtable on the Proxy
Process (the "Roundtable"). In the Commission's statement announcing the Roundtable,
Chairman Clayton observed that "accuracy, reliability, transparency, accountability and
integrity" are among the fundamental values that both shareholders and companies should expect
from the U.S. proxy system. Yet, in our experience, these are precisely the attributes that proxy
advisory firms lack. As a result, we are joining the numerous others who have emphasized the
obvious need for oversight and regulation of proxy advisory firms. We write this letter in order
to share our perspective, to provide additional information in support of regulation and to offer
suggestions to improve upon the *status quo*, and in particular to provide a first-hand example of
the costs and burdens inflicted on public companies by highly influential, and yet entirely
unregulated, proxy advisory firms. Our recent interactions with Institutional Shareholders
Services ("ISS"), the largest of the proxy advisory firms, are instructive.

**Recent Experience with ISS**

On June 20, 2018, ISS issued its voting recommendation relating to the Company's 2018 annual
meeting, which involved an uncontested election of directors. ISS recommended withhold votes
for five of the Company's six directors (the sole exception being a recently-appointed director)
and opined in summary "WITHHOLD votes are warranted for incumbent directors for a material
governance failure. The [board]. . . demonstrated a willingness to entrench existing leadership
rather than prioritizing all shareholders' interests." The ISS report is attached to this letter as
Exhibit 1.

The ISS report, to put it bluntly, was factually incorrect and materially misleading. It strongly
suggested that the Company had unfairly treated two directors who had joined the board in

connection with a settlement agreement between the Company and an activist shareholder. In particular, the ISS report, among other things: (1) erroneously stated that after entering the settlement agreement, the Company amended existing director confidentiality agreements (it did not); (2) erroneously suggested the form of confidentiality agreement contained onerous terms (it did not); (3) erroneously stated that the Company "used the refusal [of the activist designees] to execute these confidentiality agreements as grounds for demanding their resignation" (it did not); and (4) erroneously suggested that the Company had not complied with the terms of the settlement agreement to appoint an activist designee to its Nominating and Corporate Governance Committee (the designee had, in fact, been appointed to the committee).

Moreover, the ISS report explicitly attributed bad motive to the Company – stating that "the company withheld the proposed changes [to the confidentiality agreements] from the remaining shareholder base and implemented the changes on the day of the [2017] annual meeting, thereby ensuring that shareholders would not have the opportunity to voice their opinions on the board's actions until the 2018 annual meeting."

Condemnation by a purportedly competent and impartial proxy advisor can powerfully impact the market's perception of a company and the individual members of its board. But ISS is under no regulatory obligation to, and typically does not, meet with issuers to discuss negative recommendations such that an issuer could correct ISS' factual errors before ISS distributes them widely. Nor does ISS provide draft copies of its reports prior to publication for fact-checking (other than for S&P 500 companies); Glass Lewis doesn't provide drafts even to the S&P 500 companies. This is so even in cases, such as ours, that were highly contentious (our relations with this particular activist had included multiple rounds of litigation and a contentious settlement, all of which were a matter of public record). Under such circumstances in particular, we think it ought to be incumbent on proxy advisory firms to be extremely careful with their sources of information, to perform competent due diligence, and to have legal responsibility for their misstatements. In our case, ISS gave us neither the opportunity to meet, nor the opportunity to review their error-filled report; and as a result, we were left with no reasonable recourse for the damage caused to our reputation.

In order to correct the public record, the Company was forced to file a Current Report on Form 8-K providing extensive detail with respect to its interactions with the directors who had been appointed in connection with an activist settlement. That 8-K is attached to this letter as Exhibit 2, and we urge the Commission to review it carefully since it describes the relevant issues in great detail. In short, under the settlement agreement, the activist had explicitly agreed that its designees would execute the same confidentiality agreement as other directors (the Company had no prior confidentiality agreements with directors); the activist specifically declined the opportunity to negotiate the confidentiality agreement prior to executing the settlement agreement; the activist directors stated they were not aware of the terms of the settlement agreement, which required them to execute the confidentiality agreement (despite it having been publicly filed, despite the fact that the settlement agreement was the instrument by which they had been appointed, despite the fact that such settlement agreements customarily require execution of confidentiality arrangements, and despite the fact that the directors informed management, before they joined the board, that they were aware of the requirement to sign a confidentiality agreement); the proposed confidentiality agreement clearly stated (in response to the activist directors' expressed concerns) that its terms would not take precedence over

directors' fiduciary duties under Maryland law; one of the activist directors was named to the Nominating and Governance Committee, as required by the settlement agreement, even after that director's refusal to execute the confidentiality agreement; and, finally, the activist directors' resignation was entirely voluntarily, and the Company did neither request nor demand it.

Carefully correcting the public record – particularly in a contentious and potentially litigious context – involved significant legal fees and diverted management focus and attention. These costs and risks would have been avoided had ISS exercised due care in sourcing its information, performed competent diligence, and/or discussed its erroneous assertions with us ahead of issuing a negative report. That such influential components of the U.S. proxy system are under no obligation even to provide issuers an opportunity to review negative recommendations in order to correct manifest error and factual inaccuracies is grossly unfair and undermines confidence in the proxy system.

On June 26, 2018 – one day after the Company filed the 8-K and after ISS agreed to discuss the matter with the Company – ISS reversed its position and voting recommendation and no longer recommended a vote against the five directors for a material governance failure.[1] The ISS revised recommendation is set forth as Exhibit 3. While we were pleased to have ultimately been vindicated, the entire episode should not have happened.

As our experience demonstrates, ISS' internal procedures fail to provide an adequate opportunity for most issuers to address concerns and lack sufficient transparency regarding its voting policies and recommendation process. These inadequacies allow significant risk of errors in recommendations; accordingly, we believe the following regulatory action is warranted.

## Recommendations for Regulatory Action and Guidance

We believe an appropriate regulatory regime for proxy advisory firms would, at the very least, include each of the following elements:

- **Proxy advisors should be required to allow all issuers and participants in contested elections to access reports prior to publication or distribution to investors**. All issuers and participants in contested elections, upon request, should be entitled to receive an advance copy of a proxy advisor's report and voting recommendation. The protocol for making this request should be clear and unambiguous, uniform for all issuers and proxy contest participants and should not be unduly burdensome.

- **The Commission should implement a mandatory waiting period to allow sufficient time to review and respond**. In order to avoid the dissemination of erroneous, materially misleading or outdated information, all issuers should be permitted a reasonable and appropriate time period (*i.e.*, no less than five (5) business days) after receipt of a proxy advisor's preliminary report, and prior to publication, so that issuers can adequately correct any errors and address other concerns. If proxy advisors make any material substantive changes to their draft preliminary reports after delivery to issuers for review, either as a result

---

[1] ISS continued to recommend no votes for two directors who were members of the Nominating and Governance Committee on other grounds.

of input from issuers or otherwise, issuers should be entitled to additional time (*i.e.*, no less than two (2) business days) to review such changes. The procedures for issuers to respond to preliminary reports and communicate with proxy advisors regarding their concerns should be clear and unambiguous, publicly disclosed and consistently applied to all issuers.

- **In connection with all contested elections and negative voting recommendations, if requested by the issuer, proxy advisors should be required to include in their published report an unedited issuer statement.** An issuer's ability to review and address errors in proxy advisor reports or otherwise communicate its concerns would be useless without some mechanism to require proxy advisors to implement corrections. Otherwise, proxy advisors could ignore any and all legitimate feedback from issuers. We believe the opportunity for issuers to include these statements is the appropriate mechanism for addressing errors or issuer concerns (rather than requiring a proxy advisor to make specific substantive edits to the body of its report), since it would: (i) obviate the need to develop or apply inevitably vague substantive standards of materiality or accuracy; (ii) avoid/minimize the substantive censorship of a proxy advisor's right to produce its own substantive recommendation based on their subjective determination; (iii) allow issuers an unfettered ability to "set the record straight"; (iv) avoid disagreement between proxy advisor and issuer over accuracy—i.e., what is objectively true/false and what is subjective; and (v) avoid brinksmanship, stalemates or delays due to unnecessary back-and-forth. The issuer statement should be limited in length (*e.g.*, no longer than five (5) pages or a reasonable word limit) but may include a reference to a website and should be clearly marked in the table of contents and included without alteration as a separate section of the proxy advisor report. The issuer should not be entitled to unlimited "bites at the apple", but should be afforded the opportunity to revise the issuer statement if the preliminary draft report shared with the issuer is thereafter substantively revised.

- **The Commission should mandate disclosure of communications between proxy advisors and interested parties.** All proxy advisor reports should be required to disclose with specificity, a detailed, accurate and complete account of all communications between the proxy advisor and activists, issuers or other interested parties, regardless of whether or not the proxy advisor believes such communications influenced its voting recommendation.

- **The Commission should expressly reaffirm existing guidance that investment advisors are not required to vote proxies and may abstain from voting altogether if such practice is disclosed to clients.** As the Commission has previously observed, the responsibility to vote proxies is typically delegated to an investment advisor by contract and the scope of that delegation determined by the disclosures and policies maintained by the advisor in executing its investment strategy.[2] The Commission has also astutely observed that a cost-benefit analysis may support an investment advisor's decision to abstain from voting in certain

---

[2] Proxy Voting by Investment Advisers, Release No. IA-2106, at n. 19 and accompanying text (Jan. 31, 2003) ("The scope of an advisor's responsibilities with respect to voting proxies would ordinarily be determined by the advisor's contracts with its clients, the disclosures it has made to its clients, and the investment policies and objectives of its clients.")

cases.[3] These observations support the Commission's existing guidance, articulated in Staff Legal Bulletin No. 20, (June 30, 2014):

> "investment advisors and their clients may agree that the time and costs associated with the mechanics of voting proxies with respect to certain types of proposals or issuers may not be in the client's best interest. . . . An investment advisor and its client may agree that the investment advisor will abstain from voting any proxies at all, regardless of whether the client undertakes to vote the proxies itself."[4]

The observation that certain investors and various investment strategies may be best served by eschewing the time and costs of proxy voting remains true today, and the guidance remains equally appropriate. The Commission should therefore expressly reaffirm its existing guidance that an investment advisor may, consistent with its fiduciary duties, opt not to exercise its authority to vote in any particular election or maintain a general policy of abstaining from all elections, provided that such determination or policy is clearly disclosed by the investment advisor to its clients.

Though not intended to be an exhaustive list, we believe the proposals listed above are appropriate, minimally intrusive and reasonably tailored to remedy the current failures of the proxy advisory recommendation business. Furthermore, we believe that the proxy advisors cannot credibly resist these proposed reforms. ISS, for instance, has been providing S&P 500 companies and certain foreign issuers the opportunity to review and comment on advance copies of their reports for years. In fact, ISS acknowledges the benefits of this advance review process and promotes it on its website, stating:

> "ISS believes that this review process helps improving the accuracy and quality of its analyses, an outcome that is in the best interests of both the institutional investors for whom the analyses are prepared, as well as for the issuers that are the subject of these reports."[5]

## Conclusion

We feel it important to emphasize what we believe is at stake. The recommendations of ISS, Glass Lewis and similar proxy advisory firms are communications expressly intended to influence how investors vote their securities, often in the context of contested proxy campaigns for the control of publicly-traded companies. These recommendations are published and sold for profit to institutional investors who purchase the reports with the belief that the proxy advisors are better able to assess how to vote in these costly and contentious campaigns. These recommendations are then relied on by institutional investors in making voting decisions involving trillions of dollars in the aggregate. Yet, in the case of smaller public issuers at least,

---

[3] *Id.* ("There may even be times when refraining from voting a proxy is in the client's best interest, such as when the advisor determines that the cost of voting the proxy exceeds the expected benefit to the client.")

[4] Proxy Voting: Proxy Voting Responsibilities of Investment Advisors and Availability of Exemptions from the Proxy Rules for Proxy Advisory Firms, Staff Legal Bulletin No. 20 (June 30, 2014)

[5] ISS Website: https://www.issgovernance.com/iss-draft-review-process-u-s-issuers/ (last accessed October 22, 2018)

ISS and Glass Lewis categorically prohibit input from the subject companies themselves – even to correct factual inaccuracies before they are widely disseminated.

We believe our experience exposes failures of the *status quo* and reveals the threat posed by the current proxy system to the values of accuracy, reliability, transparency, accountability and integrity that the Commission has articulated as fundamental to the U.S. proxy system. We do not believe we are alone in our experience. The current system needs to be improved to ensure reasonable accountability in light of the critical role proxy advisors play in the U.S. proxy system. We believe the proposals outlined above are vital to the creation of an effective regulatory regime.

*     *     *

Again, we appreciate the opportunity to provide additional context and information regarding our experience with the proxy advisory firms, and we hope that our insights will prove to be instructive and helpful. Please do not hesitate to contact us if you have any questions or would like additional information. We wish you continued success in your efforts to support this important regulatory initiative.

Very truly yours,

**BRAEMAR HOTELS & RESORTS INC.**

Robert G. Haiman
Executive Vice President, General Counsel and
Secretary

EXHIBIT 1

Report generated by JJaegers@Mackenziepartners.com Unauthorized distribution of this report is prohibited



ISS Proxy Analysis & Benchmark Policy Voting Recommendations

# Braemar Hotels & Resorts, Inc.

QualityScore

Governance

🏛 S

Environment

✓ 8

Social

○ 6

**Meeting Type:** Annual
**Meeting Date:** 3 July 2018
**Record Date:** 15 May 2018
**Meeting ID:** 1242685

**New York Stock Exchange:** BHR
**Index:** Russell 3000
**Sector:** Hotel & Resort REITs
**GICS:** 60101030

**Primary Contact**
Andrew Maletz
Andrew.d.maletz@issgovernance.com

## Key Takeaways

The board's actions in connection with the settlement agreement with Sessa Capital demonstrated a willingness to entrench existing leadership rather than prioritizing all shareholders' interests.

The company's governing documents do not permit shareholders to amend the bylaws.

## Agenda & Recommendations

**Policy: United States**
**Incorporated:** Maryland, USA

| Item | Code | Proposal | Board Rec. | ISS Rec. |
|------|------|----------|------------|----------|
| **MANAGEMENT PROPOSALS** | | | | |
| 1.1 | M0201 | Elect Director Monty J. Bennett | FOR | WITHHOLD |
| 1.2 | M0201 | Elect Director Stefani D. Carter | FOR | WITHHOLD |
| 1.3 | M0201 | Elect Director Kenneth H. Fearn | FOR | WITHHOLD |
| 1.4 | M0201 | Elect Director Curtis B. McWilliams | FOR | WITHHOLD |
| 1.5 | M0201 | Elect Director Matthew D. Rinaldi | FOR | WITHHOLD |
| 1.6 | M0201 | Elect Director Abteen Vaziri | FOR | FOR |
| 2 | M0101 | Ratify BDO USA, LLP as Auditors | FOR | FOR |

Shading indicates that ISS recommendation differs from Board recommendation

▶ Items deserving attention due to contentious issues or controversy

## Report Contents

| | | | |
|---|---|---|---|
| Financial Highlights | 3 | Vote Results | 9 |
| Corporate Governance Profile | 4 | Meeting Agenda and Proposals | 11 |
| Board Profile | 5 | Equity Ownership Profile | 17 |
| Compensation Profile | 6 | Additional Information | 17 |
| QualityScore | 8 | | |

* ISS Environmental and Social QualityScore is newly introduced for 2018 and is based on company disclosure and transparency practices.

© 2018 Institutional Shareholder Services Inc. All Rights Reserved. This proxy analysis and the information herein may not be reproduced or disseminated in whole or in part without prior written permission from ISS.

154013

*Report generated by JJaegers@Mackenziepartners.com. Unauthorized distribution of this report is prohibited.*

## Material Company Updates

| Item | Summary |
|------|---------|
| **Board and Management Updates** | On July 6, 2017, Daniel B. Silvers and Lawrence A. Cunningham resigned from the board following receipt of notice from the company that they were in violation of its Corporate Governance Guidelines, specifically requiring all directors to enter into a confidentiality agreement. Both directors refused to enter into such agreement with the company. The agreement, as amended on June 9, 2017, provides that, among other things, each director agrees (i) not to make any statement or announcement that disparages, or could reasonably be expected to damage the reputation of the company, (ii) not to publicly comment on any matter discussed at any board or committee meeting, and (iii) not to become a party to any agreement with any person other than the company with respect to any compensation, reimbursement or indemnification in connection with such director's service as a company director. |
| | Effective Oct. 1, 2017, Abteen Vaziri was appointed to the board. On the same date, Sarah Zubiate Darrouzet resigned from the board. |
| | On March 9, 2018, Jeremy J. Welter succeeded David A. Brooks as COO. On the same date, Brooks was appointed as chief transactions officer, general counsel and secretary. Brooks passed away on March 29, 2018. |
| **Name Change** | On April 23, 2018, the company changed its name from Ashford Hospitality Prime, Inc. to Braemar Hotels & Resorts Inc. |

Copyright © 2018 Institutional Shareholder Services Inc. All Rights Reserved. This proxy analysis and the information herein may not be reproduced or disseminated in whole or in part without prior written permission from ISS.

JA 458

154013

*Report generated by JJaegers@Mackenziepartners.com. Unauthorized distribution of this report is prohibited.*

## Financial Highlights

**Company Description:** Braemar Hotels & Resorts is a REIT that invests primarily in high RevPAR, full-service luxury hotels and resorts. It is listed on the New York Stock Exchange under the symbol BHR and is externally-advised by Ashford Inc.

STOCK PRICE PERFORMANCE



Braemar Hotels & Resorts, Inc.  
MSCI ACWI: Equity Real Estate Investment Trusts (REITs) (GICS: 601010)  
Russell 3000

TOTAL SHAREHOLDER RETURNS

|  | 1 Yr | 3 Yr | 5 Yr |
|---|---|---|---|
| Company TSR (%) | -24.05 | -13.82 | N/A |
| GICS 6010 TSR (%) | 5.04 | 6.09 | 10.73 |
| Russell 3000 TSR (%) | 21.13 | 11.12 | 15.58 |

Source: Compustat. As of last day of company FY end month. 12/31/2017

COMPANY SNAPSHOT

| Market Cap (M) | 333.2 |
|---|---|
| Closing Price | 10.25 |
| Annual Dividend | 0.64 |
| 52-Week High | 11.34 |
| 52-Week Low | 8.44 |
| Shares Outstanding (M) | 32.51 |
| Average daily trading volume (prior mo)* | 256.96 |

As of May 15, 2018 (All currency in USD)  
* Trading Volume in thousands of shares

FINANCIAL & OPERATIONAL PERFORMANCE

|  | Historical Performance (FY ending) | | | | | Compared to Peers (Compustat FY*) – 2017 | | | | |
|---|---|---|---|---|---|---|---|---|---|---|
| **All currency in USD** | 12/2013 | 12/2014 | 12/2015 | 12/2016 | 12/2017 | HT | CLDT | CHSP | INN | DRH |
| **Earnings** | | | | | | Hersha Hospitality Trust | Chatham Lodging Trust | Chesapeake Lodging Trust | Summit Hotel Properties, Inc. | DiamondRock Hospitality Company |
| Revenue (M) | 234 | 307 | 347 | 403 | 415 | 496 | 300 | 598 | 515 | 872 |
| Net Income (M) | -12 | 2 | -7 | 19 | 23 | 100 | 29 | 76 | 99 | 92 |
| EBITDA (M) | 33 | 44 | 43 | 45 | 45 | N/A | N/A | N/A | N/A | 138 |
| EPS (USD) | -0.73 | 0.08 | -0.34 | 0.57 | 0.52 | 1.82 | 0.73 | 1.12 | 0.79 | 0.46 |
| EPS Y/Y Growth (%) | -161 | N/A | N/A | N/A | -9 | -18 | -11 | -1 | -21 | -19 |
| **Profitability** | | | | | | | | | | |
| Pretax Net Margin (%) | -7 | 2 | -1 | 6 | 7 | 22 | 10 | 13 | 20 | 12 |
| EBITDA Margin (%) | 14 | 14 | 13 | 11 | 11 | N/A | N/A | N/A | N/A | 16 |
| Return on Equity (%) | -8 | 1 | -3 | 5 | 4 | 9 | 4 | 7 | 6 | 5 |
| Return on Assets (%) | -1 | 0 | -1 | 1 | 1 | 4 | 2 | 4 | 4 | 3 |
| ROIC (%) | -1 | 0 | -1 | 3 | 1 | 4 | 2 | 4 | 4 | 3 |
| **Leverage** | | | | | | | | | | |
| Debt/Assets | 65 | 62 | 62 | 61 | 58 | 51 | 39 | 42 | 39 | 30 |
| Debt/Equity | 426 | 274 | 208 | 204 | 168 | 131 | 67 | 79 | 68 | 51 |
| **Cash Flows** | | | | | | | | | | |
| Operating (M) | 34 | 55 | 9 | 57 | 71 | 108 | 87 | 144 | 147 | 205 |
| Investing (M) | -28 | -213 | -183 | 100 | -174 | -100 | -161 | -4 | -516 | -179 |
| Financing (M) | 118 | 186 | 107 | -136 | 124 | -177 | 71 | -139 | 370 | -85 |
| Net Change (M) | 123 | 28 | -66 | 22 | 21 | -168 | -3 | 1 | 2 | -60 |
| **Valuation & Performance** | | | | | | | | | | |
| Price/Earnings | N/A | 214.50 | N/A | 23.90 | 18.70 | 9.60 | 31.20 | 24.20 | 19.30 | 24.50 |
| Annual TSR (%) | N/A | -4.54 | -13.48 | -2.59 | -24.05 | -13.34 | 18.04 | 11.47 | -0.86 | 2.41 |

Source: Compustat. *Note: Compustat standardizes financial data and fiscal year designations to allow for meaningful comparison across companies. Compustat data may differ from companies' disclosed financials and does not incorporate non-trading equity units. Peers shown here represent closest industry peers drawn from those peers used in ISS' pay-for-performance analysis. See www.issgovernance.com/policy-gateway/company-financials-faq/ for more information.

Copyright © 2018 Institutional Shareholder Services Inc. All Rights Reserved. This proxy analysis and the information herein may not be reproduced or disseminated in whole or in part without prior written permission from ISS.

JA 459

154013

*Report generated by JJaegers@Mackenziepartners.com. Unauthorized distribution of this report is prohibited.*

## Corporate Governance Profile

### BOARD & COMMITTEE SUMMARY

|  | Independence | Members | Meetings |
|---|---|---|---|
| Full Board | 83% | 6 | 14 |
| Audit | 100% | 3 | 5 |
| Compensation | 100% | 3 | 4 |
| Nominating | 100% | 3 | 10 |

| Chairman classification | Executive Director |
|---|---|
| Separate chair/CEO | Yes |
| Independent lead director | Yes |
| Voting standard | Majority |
| Plurality carveout for contested elections | Yes |
| Resignation policy | Yes |
| Total director ownership (000 shares) | 1,879 |
| Total director ownership (%) | 5.4 |
| Percentage of directors owning stock | 100% |
| Number of directors attending < 75% of meetings | 0 |
| Number of directors on excessive number of outside boards | 0 |
| Average director age | 48 years |
| Average director tenure | 3 years |
| Percentage of women on board | 17% |

### SHAREHOLDER RIGHTS SUMMARY

| | |
|---|---|
| Controlled company | No |
| Classified board | No |
| Dual-class stock | No |
| Vote standard for mergers/acquisitions | Majority |
| Vote standard for charter amendment | 66.67% |
| Vote standard for bylaw amendment | N/A |
| Shareholder right to call special meetings | Yes, 50.01% |
| Material restrictions on right to call special meetings | No |
| Shareholder right to act by written consent | Unanimous |
| Cumulative voting | No |
| Board authorized to issue blank-check preferred stock | Yes |
| Poison pill | No |
| Proxy Access | Yes |
| -   Ownership requirement (%) | 3 |
| -   Time requirement (years) | 3 |
| -   Nomination limit (% of seats) | 20 |
| -   Nomination limit (# of nominees) | 2 |
| -   Aggregation cap (# of nominators) | 20 |

## Director tenure



0      1      2      3      4      5      6      7

Copyright © 2018 Institutional Shareholder Services Inc. All Rights Reserved. This proxy analysis and the information herein may not be reproduced or disseminated in whole or in part without prior written permission from ISS.

JA 460

154013

*Report generated by JJaegers@Mackenziepartners.com. Unauthorized distribution of this report is prohibited.*

## Board Profile (after upcoming meeting)

### Director Independence & Affiliations

NON-EXECUTIVE DIRECTORS

| Item On Ballot | Name | Affiliation | Independence Classification | | Attend <75% | Gen-der | Age | Tenure | Term Ends | Outside | | Key Committees | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | Company | ISS | | | | | | Boards | CEO | Audit | Comp | Nom | Gov |
| 1.1 | **Monty Bennett** | Chair | Non-Independent | Executive Director | | M | 53 | 5 | 2019 | 2 | ✓ | | | | |
| 1.4 | **Curtis McWilliams** | Lead Director | Independent | Independent | | M | 62 | 4 | 2019 | 1 | | C F | | | |
| 1.2 | **Stefani Carter** | | Independent | Independent | | F | 40 | 4 | 2019 | 0 | | | M | C | C |
| 1.3 | **Kenneth Fearn Jr.** | | Independent | Independent | | M | 52 | 1 | 2019 | 0 | | F | M | | |
| 1.5 | **Matthew Rinaldi** | | Independent | Independent | | M | 42 | 4 | 2019 | 0 | | | C | M | M |
| 1.6 | **Abteen Vaziri** | | Independent | Independent | | M | 39 | 0* | 2019 | 0 | | M | | M | M |

*Indicates director not previously submitted to shareholders for election

M = Member | C = Chair | F = Financial Expert

### Director Notes

Monty Bennett    1) Monty J. Bennett is the founder of the company. 2) Bennett serves as CEO and chairman of Ashford Inc., which together with Ashford Hospitality Advisors LLC, a subsidiary of Ashford Inc., serve as advisors of the company. 3) Bennett served as CEO of the company until Nov. 14, 2016. 4) The company entered into a management agreement with Remington Lodging and Hospitality, LLC (Remington), pursuant to which the company has agreed to engage Remington for the property management, project management, development and certain other work for all hotels that the company acquires. In 2017, the company paid Remington $1.7 million in fees related to the agreement. Bennett is the CEO of Remington and, together with his father, beneficially owns 100 percent of Remington. 5) The company entered into a mutual exclusivity agreement with Remington, in which the company has a first right of refusal to purchase any lodging-related investments identified by Remington and any of its affiliates that meet the company's investment criteria. (Source: DEF14A, 5/23/18, pp. 1, 7, 48, and under "Founder and Chairman Letter" section; 8-K, 11/2/16, under "ITEM 5.02" section.)

Copyright © 2018 Institutional Shareholder Services Inc. All Rights Reserved. This proxy analysis and the information herein may not be reproduced or disseminated in whole or in part without prior written permission from ISS.

JA 461

154013

Report generated by JJaegers@Mackenziepartners.com. Unauthorized distribution of this report is prohibited.

## Director Employment, Compensation & Ownership

| Name | Primary Employment | Outside Boards | Total Compensation* | Shares Held | 60-day Options | Total | Voting Power (%) |
|------|--------------------|----------------|--------------------:|------------:|---------------:|------:|-----------------:|
| **Monty Bennett** | CEO, Chairman - Ashford Inc. | Ashford Hospitality Trust, Inc., Ashford Inc. | N/D | 1,822,256 | 0 | 1,822,256 | 5.40 |
| **Curtis McWilliams** | Prof Director | Ardmore Shipping Corporation | 233,360 | 21,481 | 0 | 21,481 | <1 |
| **Stefani Carter** | Attorney | | 154,370 | 9,600 | 0 | 9,600 | <1 |
| **Kenneth Fearn Jr.** | Real Estate Services | | 176,044 | 6,400 | 0 | 6,400 | <1 |
| **Matthew Rinaldi** | Other | | 145,478 | 16,800 | 0 | 16,800 | <1 |
| **Abteen Vaziri** | Retired | | 55,764 | 2,133 | 0 | 2,133 | <1 |

* Local market currency

## Compensation Profile

### EXECUTIVE PAY OVERVIEW

| Executive | Title | Base Salary | Change in Pension, Deferred Comp, All Other Comp | Bonus & Non-equity Incentives | Restricted Stock | Option Grant | Total |
|-----------|-------|------------:|------------------------------------------------:|------------------------------:|-----------------:|-------------:|------:|
| **R. Stockton** | Chief Executive Officer and President | 0 | 0 | 0 | 194 | 0 | 194 |
| **D. Brooks** | Former Chief Transaction Officer, General Counsel and Secretary | 0 | 0 | 0 | 1,117 | 0 | 1,117 |
| **J. Hays III** | Chief Strategy Officer | 0 | 0 | 0 | 745 | 0 | 745 |
| **J. Welter** | Chief Operating Officer | 0 | 0 | 0 | 745 | 0 | 745 |
| **D. Eubanks** | Chief Financial Officer and Treasurer | 0 | 0 | 0 | 745 | 0 | 745 |
| **Median CEO Pay** | ISS Selected Peer Group | 713 | 47 | 944 | 2,191 | 0 | 3,931 |
| | Company Defined Peers | N/A | N/A | N/A | N/A | N/A | N/A |

Source: ISS. Pay in $thousands. Total pay is sum of all reported pay elements, using ISS' Black-Scholes estimate for option grant-date values. Note: Median total pay will not equal sum of pay elements medians. Company Defined Peers are as disclosed. More information on ISS' peer group methodology at www.issgovernance.com/policy-gateway/us-compensation-policy-guidance/.

Copyright © 2018 Institutional Shareholder Services Inc. All Rights Reserved. This proxy analysis and the information herein may not be reproduced or disseminated in whole or in part without prior written permission from ISS.

JA 462

154013

*Report generated by JJaegers@Mackenziepartners.com. Unauthorized distribution of this report is prohibited.*

OPTION VALUATION ASSUMPTIONS

| For CEO's last FY Grant* | Company | ISS |
|---|---|---|
| Volatility (%) | N/A | N/A |
| Dividend Yield (%) | N/A | N/A |
| Term (yrs) | N/A | N/A |
| Risk-free Rate (%) | N/A | N/A |
| Grant date fair value per option | N/A | N/A |
| Grant Date Fair Value ($ in 000) | N/A | N/A |

*The CEO did not receive stock options in the most recent fiscal year.

CEO PAY MULTIPLES

| Compared to | Multiple |
|---|---|
| 2nd highest active executive | 0.17 |
| Average active NEO | 0.23 |
| ISS peer median | 0.05 |
| Company peer median | N/A |
| Median of employees (CEO Pay Ratio) | N/A |

CEO TALLY SHEET

| CEO | R. Stockton |
|---|---|
| CEO tenure at FYE: | 1.1 years |
| Present value of all accumulated pension: | N/A |
| Value of CEO stock owned (excluding options): | $3,168,654 |
| **Potential Termination Payments** | |
| Involuntary termination without cause: | N/D |
| Termination after a change in control: | N/D |

Source: DEF 14A

Copyright © 2018 Institutional Shareholder Services Inc. All Rights Reserved. This proxy analysis and the information herein may not be reproduced or disseminated in whole or in part without prior written permission from ISS.

JA 463

154013

*Report generated by JJaegers@Mackenziepartners.com. Unauthorized distribution of this report is prohibited.*

## Dilution & Burn Rate

### DILUTION

| | Dilution (%) |
|---|---|
| Braemar Hotels & Resorts, Inc. | 11.61 |
| Peer group median | 2.73 |
| Peer group weighted average | 5.38 |
| Peer group 75th percentile | 6.46 |

Dilution is the sum of the total amount of shares available for grant and outstanding under options and other equity awards (vested and unvested) expressed as a percentage of total basic common shares outstanding as of the record date. The dilution figure typically excludes employee stock purchase plans (ESPPs) and 401(k) shares. The underlying information for the company is based on the company's equity compensation table in the most recent proxy statement or 10-K.

### BURN RATE

| | Non-Adjusted (%) | Adjusted (%) |
|---|---|---|
| 1-year | 0.98 | 1.97 |
| 3-year average | 0.72 | 1.44 |

Burn rate equals the number of shares granted in each fiscal year, including stock options, restricted stock (units), actual performance shares delivered under the long-term incentive plan or earned deferred shares, to employees and directors divided by weighted average common shares outstanding. The adjusted burn rate places a premium on grants of full-value awards using a multiplier based on the company's annual volatility.

Copyright © 2018 Institutional Shareholder Services Inc. All Rights Reserved. This proxy analysis and the information herein may not be reproduced or disseminated in whole or in part without prior written permission from ISS.

JA 464

154013

*Report generated by JJaegers@Mackenziepartners.com. Unauthorized distribution of this report is prohibited.*

# Quality**Score**



| 🏛 Governance | **5** | ✔ Environment | **8** | ◔ Social | **6** |
|---|---|---|---|---|---|
| Lower Risk          Higher Risk | | Higher Disclosure   Lower Disclosure | | Higher Disclosure   Lower Disclosure | |
| Board Structure | **8** | Management of Environmental Risks and Opportunities | **6** | Human Rights | **4** |
| Compensation | **1** | Carbon and Climate | **6** | Labor, Health, and Safety | **6** |
| Shareholder Rights | **4** | Natural Resources | **4** | Stakeholders and Society | **7** |
| Audit & Risk Oversight | **1** | Waste and Toxicity | **5** | Product Safety, Quality, and Brand | **N/A** |

Governance Scores As Of: June 20, 2018
Last Data Profile Update: June 20, 2018

Environmental and Social Scores As Of: June 20, 2018
Last Data Profile Update: May 17, 2018

ISS Governance QualityScore is derived from publicly disclosed data and reporting on company governance disclosure, risk and performance. ISS Environmental and Social QualityScore is based on company disclosure and transparency practices. Scores indicate decile rank among relative index, region (Governance QualityScore), or industry group (Environmental and Social QualityScore). Scores are calculated at each pillar by summing the factor scores in that pillar. Not all factors and not all subcategories have equal weight.

For more information on ISS Governance QualityScore, visit www.issgovernance.com/solutions/qualityscore/governance. For questions, please contact: QualityScore@issgovernance.com.

For more information on ISS-Ethix Environmental and Social QualityScore, visit www.issgovernance.com/solutions/qualityscore/environmental-social. For questions, please contact: ESGHelpdesk@issethix.com.

## Vote Results

### ANNUAL MEETING 9 JUNE 2017

| Proposal | Board Rec | ISS Rec | Disclosed Result | Support Including Abstains (%)[1] | Support Excluding Abstains (%)[2] |
|---|---|---|---|---|---|
| 1.1 Elect Director Monty J. Bennett | For | **For** | **Pass** | 92.0 | 92.0 |
| 1.2 Elect Director Stefani D. Carter | For | **Withhold** | **Pass** | 79.4 | 79.4 |
| 1.3 Elect Director Lawrence A. Cunningham | For | **For** | **Pass** | 94.4 | 94.4 |
| 1.4 Elect Director Sarah Zubiate Darrouzet | For | **For** | **Pass** | 96.1 | 96.1 |
| 1.5 Elect Director Kenneth H. Fearn | For | **For** | **Pass** | 96.2 | 96.2 |
| 1.6 Elect Director Curtis B. McWilliams | For | **For** | **Pass** | 93.9 | 93.9 |
| 1.7 Elect Director Matthew D. Rinaldi | For | **For** | **Pass** | 93.8 | 93.8 |
| 1.8 Elect Director Daniel B. Silvers | For | **For** | **Pass** | 94.1 | 94.1 |
| 2 Adopt Majority Voting for Uncontested Election of Directors | For | **For** | **Pass** | 56.7* | 56.7* |
| 3 Amend Omnibus Stock Plan | For | **Against** | **Pass** | 74.3 | 74.7 |
| 4 Amend Investment Advisory Agreement | For | **For** | **Pass** | 95.5 | 96.3 |
| 5 Ratify BDO USA LLP as Auditors | For | **For** | **Pass** | 99.7 | 99.7 |

Shaded results reflect a majority of votes cast FOR shareholder proposal or AGAINST management proposal or director election

[1]Support Including Abstains is defined as %FOR/(For + Against + Abstain), as expressed as a percentage.

[2]Support Excluding Abstains is defined as %FOR/(For + Against), as expressed as a percentage, provided if different from For + Against + Abstain.

*Support as a percentage of outstanding shares.

Copyright © 2018 Institutional Shareholder Services Inc. All Rights Reserved. This proxy analysis and the information herein may not be reproduced or disseminated in whole or in part without prior written permission from ISS.

154013

Report generated by JJaegers@Mackenziepartners.com. Unauthorized distribution of this report is prohibited

Copyright © 2018 Institutional Shareholder Services Inc. All Rights Reserved. This proxy analysis and the information herein may not be reproduced or disseminated in whole or in part without prior written permission from ISS.

JA 466

*Report generated by JJaegers@Mackenziepartners.com. Unauthorized distribution of this report is prohibited.*

## Meeting Agenda & Proposals

### Items 1.1-1.6. Elect Directors　　　　　　　　　　　　　　`SPLIT`

#### VOTE RECOMMENDATION

WITHHOLD votes are warranted for incumbent director nominees Monty J. Bennett, Stefani D. Carter, Kenneth H. Fearn, Curtis B. McWilliams, and Matthew D. Rinaldi for a material governance failure. The board's actions following the entry into a settlement agreement with Sessa Capital demonstrated a willingness to entrench existing leadership rather than prioritizing all shareholders' interests.

WITHHOLD votes are warranted for incumbent Governance Committee members Stefani Carter and Matthew Rinaldi for a material governance failure. The company's governing documents prohibit or restrict shareholders' ability to amend the company bylaws.

A vote FOR Abteen Vaziri is warranted.

#### BACKGROUND INFORMATION

Policies: Board Accountability | Board Responsiveness | Director Competence | Director Independence | Election of Directors | ISS Categorization of Directors | Vote No campaigns

**Vote Requirement:** The company has adopted a majority vote standard (of shares cast) for the election of directors with a plurality carve-out for contested elections, and has a director resignation policy in its governance guidelines.

#### Discussion

Please see the Board Profile section above for more information on director nominees.

#### CHANGES TO THE BOARD OF DIRECTORS

On Feb. 16, 2017, the company entered into a settlement agreement with then-8.5 percent shareholder Sessa Capital L.P., which ran a proxy contest prior to the 2016 annual meeting. Pursuant to the agreement, the company agreed to appoint two of Sessa's director nominees, and that two of the incumbent directors would not stand for re-election at the 2017 annual meeting. The settlement agreement included a provision that the Sessa directors would sign the same confidentiality agreements as the other directors.

On March 3, 2017, Daniel Silvers and Lawrence Cunningham were appointed to the board and each was subsequently elected at the 2017 annual meeting with more than 90 percent support. Additionally, Sarah Zubiate Darrouzet was appointed to the board on April 27, 2017 and also elected with greater than 90 percent support. On June 9, 2017, the day of the 2017 annual meeting, the company amended its corporate governance guidelines to stipulate that each director must sign a confidentiality agreement. However, the confidentiality agreements presented to directors contained provisions that were problematic for the Sessa directors. On July 7, 2017, Silvers and Cunningham each received letters stating that they were not in compliance with the corporate governance guidelines and both directors elected to resign from the board.

The board of directors at Braemar took other concerning actions in regard to the agreement signed with Sessa. The agreement with Sessa stipulated that one of Sessa's two designees would be appointed to the Nominating and Corporate Governance Committee "as promptly as practicable following the execution of [the] agreement." However, at the time of the annual meeting (according the to the company's 2017 proxy statement) and the amendments to the corporate governance guidelines, neither director had been appointed to the committee. Second, the company amended its standard confidentiality agreement after the settlement date of the Sessa agreement. Specifically, the amended confidentiality agreement contained the following provisions (as summarized in a company filing):

"The Confidentiality Agreement requires, subject to certain limited exceptions, that each director maintain the

Copyright © 2018 Institutional Shareholder Services Inc. All Rights Reserved. This proxy analysis and the information herein may not be reproduced or disseminated in whole or in part without prior written permission from ISS.

154013

confidentiality of information relating to the Company, Ashford Hospitality Trust, Inc., Ashford Inc. and their affiliates (collectively, the "Ashford Entities") and use such information solely for the purpose of serving on the Board and in connection with the Company's business. Pursuant to the Confidentiality Agreement, each director agrees (a) not to directly or indirectly make any statement or announcement that disparages, or could reasonably be expected to damage the reputation of, any of the Ashford Entities, (b) not to publicly comment on any matter discussed or deliberated at any meeting of the Board or at any meeting of any committee of the Board, (c) to comply with any and all policies and procedures of the Company, (d) not to make any commitment as to how such director will act or vote on any issue or question in his or her capacity as a director of the Company, and (e) not to become a party to any agreement, arrangement or understanding with any person other than the Company with respect to any direct or indirect compensation, reimbursement or indemnification in connection with such director's service as a director of the Company. The Confidentiality Agreement states that no provision thereof shall require any director to violate his or her fiduciary duties to the Company."

In the 8-K announcing the resignation of Cunningham and Silvers, the company discloses that Cunningham was a member of the Nominating and Corporate Governance Committee; however, it is not disclosed when he was appointed to the committee. Cunningham and Silvers each disclosed their concerns to the board (but the board does not disclose the specific concerns to shareholders) over several of the contractual provisions in the amended confidentiality agreements. The board stated that the directors' refusal to sign the confidentiality agreements constituted a breach of the Sessa agreement.

*Conclusion*

The board's actions following its entry into the Sessa agreement are of concern to shareholders. The board amended the confidentiality agreements and implemented them into the corporate governance guidelines after signing the Sessa agreement – over the apparent objection of the Sessa designees – and then used the refusal of the Sessa designees to execute these confidentiality agreements as grounds for demanding their resignation despite overwhelming shareholder support for their election. One of the two Sessa directors was supposed to have been promptly appointed to the Nominating and Corporate Governance Committee, but as of the 2017 proxy statement, the company had elected to not abide by this provision of the agreement. Further, the company withheld the proposed changes from the remaining shareholder base and implemented the changes on the day of the annual meeting, thereby ensuring that shareholders would not have the opportunity to voice their opinions on the board's actions until the 2018 annual meeting. These actions demonstrate a willingness by the board to entrench itself and work to the directors' self-interest rather than to prioritize the unaffiliated shareholders' interests. These actions represent a material governance failure and as such, support for the incumbent director nominees is not warranted. Abteen Vaziri was appointed to the board in October 2017, after the actions in question, and may not have had sufficient time to address the ongoing governance concerns.

### RESTRICTION ON BINDING SHAREHOLDER PROPOSALS

Shareholders' ability to amend corporate bylaws is a fundamental right, which is enshrined in most states' corporation statutes. A limited number of states permit companies to adopt provisions within their governing documents that prohibit shareholders from submitting binding bylaw amendments. In this case, the company stipulates in its governing documents that the right to amend the bylaws is reserved solely to the board of directors. Under current ISS policy, such a prohibition on binding shareholder amendments materially diminishes shareholder rights and represents an ongoing governance failure. As such, with the exception of new director nominee Abteen Vaziri, withhold votes for all Governance Committee members.

### REVIEW OF EXECUTIVE COMPENSATION PRACTICES

*Components of Pay*

The chart below summarizes year-over-year CEO pay changes and provides a comparison to the median of a peer group based on industry and size criteria. Aggregate pay for all other named executive officers (NEOs) is also shown, along with the ratio of most recent CEO and NEO pay to the company's net income and revenue. Please also refer to the Compensation Profile earlier in the report.

Copyright © 2018 Institutional Shareholder Services Inc. All Rights Reserved. This proxy analysis and the information herein may not be reproduced or disseminated in whole or in part without prior written permission from ISS.

154013

*Report generated by JJaegers@Mackenziepartners.com. Unauthorized distribution of this report is prohibited.*

**Braemar Hotels & Resorts, Inc. (BHR)**
POLICY: United States

**Meeting Date: 3 July 2018**
Meeting ID: 1242685

| ($ in thousands) | CEO | | | | CEO Peer Median | Other NEOs |
|---|---|---|---|---|---|---|
| | R. Stockton | | R. Stockton | M. Bennett | | |
| | 2017 | Change | 2016 | 2015 | 2017 | 2017 |
| Base salary | 0 | | 0 | 0 | 712 | 0 |
| Deferred comp & pension | 0 | | 0 | 0 | 0 | 0 |
| All other comp | 0 | | 0 | 0 | 34 | 0 |
| Bonus | 0 | | 0 | 0 | 0 | 0 |
| Non-equity incentives | 0 | | 0 | 0 | 879 | 0 |
| Restricted stock | 194 | -93.4% | 2,955 | 2,169 | 2,191 | 3,351 |
| Option grant | 0 | | 0 | 0 | 0 | 0 |
| **Total** | **194** | **-93.4%** | **2,955** | **2,169** | **3,931** | **3,351** |
| % of Net Income | 0.8% | | | | | 14.6% |
| % of Revenue | N/A | | | | | 0.8% |

CEO equity pay mix (by value)*          Performance-conditioned: 66.7%; Time-based: 33.3%

*Performance shares, if any, are counted and valued at target

## PAY-FOR-PERFORMANCE QUANTITATIVE SCREEN

The pay-for-performance quantitative screen uses four measures that together evaluate the alignment of CEO pay and company performance. The screen measures alignment over multiple time horizons, on both an absolute and relative basis, using multiple performance measures. The screen is designed to identify outlier companies that demonstrate a significant quantitative misalignment over time.



| Measure | Result |
|---|---|
| Relative Degree of Alignment | -6 |
| Multiple of Median | 0.05 |
| Absolute Pay-TSR Alignment | 24 |
| **Initial Quantitative Concern** | Low |
| Financial Performance Assessment | 14.5 |
| **Overall Quantitative Concern** | Low |

### RELATIVE DEGREE OF ALIGNMENT

The chart plots percentiles of the annualized 3-year performance and pay rankings for the company (▲) and ISS' derived peers (◆). The gray band generally indicates alignment

### MULTIPLE OF MEDIAN

Pay in $thousands. The gray band represents 25th to 75th percentile of CEO pay of ISS' selected peer group, and the blue line represents the 50th percentile.



**CEO total pay is 0.05 times the median of peers.**



Copyright © 2018 Institutional Shareholder Services Inc. All Rights Reserved. This proxy analysis and the information herein may not be reproduced or disseminated in whole or in part without prior written permission from ISS.

JA 469

154013

*Report generated by JJaegers@Mackenziepartners.com. Unauthorized distribution of this report is prohibited.*

## ABSOLUTE PAY-TSR ALIGNMENT

CEO granted pay trends versus value of a $100 investment made on the first day of the five-year period.



|  | 2013 | 2014 | 2015 | 2016 | 2017 |
|---|---|---|---|---|---|
| Pay($000) |  | 2,456 | 2,169 | 2,955 | 194 |
| Indexed TSR | 100.00 | 90.61 | 75.56 | 76.84 | 56.66 |
| CEO |  | Monty Bennett | Monty Bennett | Richard Stockton | Richard Stockton |

## FINANCIAL PERFORMANCE ASSESSMENT

Blue boxes indicate the company's quartile rankings compared to ISS' selected peer group in the applicable measure/metric, measured over three years. The leftmost box indicates bottom quartile and rightmost box indicates top quartile.



| Measure | | Quartile Ranking vs. Peers |
|---|---|---|
| Pay | | |
| Weighted Performance | | |

| Metrics (ranked by weight) | Long-Term Performance | Quartile Ranking vs. Peers |
|---|---|---|
| ROIC | 1.0 | |
| Return on Assets | 0.6 | |
| Return on Equity | 2.2 | |
| Cash Flow Growth | 843.7 | |

## ISS AND COMPANY PEER GROUPS

| | |
|---|---|
| **ISS Selected (18)** | Alexander & Baldwin, Inc.<br>Chatham Lodging Trust<br>Columbia Property Trust, Inc.<br>Equity Commonwealth<br>Hersha Hospitality Trust<br>Lexington Realty Trust<br>Pennsylvania Real Estate Investment Trust<br>QTS Realty Trust, Inc.<br>Summit Hotel Properties, Inc. | Armada Hoffler Properties, Inc.<br>Chesapeake Lodging Trust<br>DiamondRock Hospitality Company<br>First Industrial Realty Trust, Inc.<br>Kite Realty Group Trust<br>Pebblebrook Hotel Trust<br>PS Business Parks, Inc.<br>Select Income REIT<br>Tanger Factory Outlet Centers, Inc. |
| **Shared (0)** | |
| **Company-Disclosed (0)** | None disclosed. |

For more information on the ISS peer group methodology, visit
https://www.issgovernance.com/policy-gateway/voting-policies/

## PEER GROUP SIZE

Size (by revenue) of the ISS, company and overlap peer groups. The gray area represents 0.4 - 2.5 times the company's revenue.

- ♦ Braemar Hotels & Resorts, Inc.
- ■ ISS Only
- ▲ Shared
- ● Company Only

Data for ISS' pay-for-performance tests are sourced from proxy disclosures for pay and from Compustat for TSR and financial performance. For more information on ISS' quantitative pay-for-performance evaluation, visit https://www.issgovernance.com/policy-gateway/voting-policies/

Copyright © 2018 Institutional Shareholder Services Inc. All Rights Reserved. This proxy analysis and the information herein may not be reproduced or disseminated in whole or in part without prior written permission from ISS.

JA 470

*Report generated by JJaegers@Mackenziepartners.com. Unauthorized distribution of this report is prohibited.*

## Executive Summary

| Evaluation Component | Level of Concern |
| --- | --- |
| *Non-Performance-Based Pay Elements* | Low |
| *Peer Group Benchmarking* | Low |
| *Severance/CIC Arrangements* | Low |
| *Comp Committee Communication/Responsiveness* | Low |
| *Pay for Performance Evaluation* | Low |

### Conclusion

Pay and performance are reasonably aligned and no significant compensation concerns are identified at this time.

Copyright © 2018 Institutional Shareholder Services Inc. All Rights Reserved. This proxy analysis and the information herein may not be reproduced or disseminated in whole or in part without prior written permission from ISS.

154013

*Report generated by JJaegers@Mackenziepartners.com. Unauthorized distribution of this report is prohibited*

## Item 2. Ratify BDO USA, LLP as Auditors | FOR

### VOTE RECOMMENDATION

A vote FOR this proposal to ratify the auditor is warranted.

### BACKGROUND INFORMATION

Policies: Auditor Ratification

**Vote Requirement:** Majority of votes cast (abstentions not counted)

### Discussion

#### AUDIT FIRM INFORMATION

The board recommends that BDO USA, LLP be reappointed as the company's independent audit firm.

| Audit firm name | BDO USA, LLP |
|---|---|
| Audit firm since (as disclosed) | 2015 |
| Audit opinion for the last fiscal year | Unqualified |
| Term to serve if reappointed | 1 year |

#### FEES PAID DURING THE LAST FISCAL YEAR

| Audit firm name | BDO USA, LLP |
|---|---|
| Fees currency | USD |
| Total fees paid to the audit firm | 887,066 |
| **Audit fees** | **887,066** |
| **Audit-related fees** | **0** |
| Total transaction-related fees | 0 |
| Total tax fees | 0 |
| Other fees | 0 |
| **Total non-audit fees\*** | **0** |
| Total non-audit fees as a percentage of total fees | 0.0% |

\*Total non-audit fees include other fees, tax advice fees, and certain transaction-related fees. Non-audit fees will also include any tax-related fees not identified as tax compliance or tax preparation.

The auditor's report contained in the annual report is unqualified, meaning that in the opinion of the auditor, the company's financial statements are fairly presented in accordance with generally accepted accounting principles.

### Analysis

This request to ratify the auditor does not raise any exceptional issues, as the auditor is independent, there are no non-audit fees, and there is no reason to believe the auditor has rendered an inaccurate opinion or engaged in poor accounting practices.

Copyright © 2018 Institutional Shareholder Services Inc. All Rights Reserved. This proxy analysis and the information herein may not be reproduced or disseminated in whole or in part without prior written permission from ISS.

JA 472

Report generated by JJaegers@Mackenziepartners.com. Unauthorized distribution of this report is prohibited

## Equity Ownership Profile

| Type | Votes per share | Issued |
|------|-----------------|--------|
| Common Stock | 1.00 | 32,505,238 |

| Ownership - Common Stock | Number of Shares | % of Class |
|--------------------------|------------------|------------|
| The Vanguard Group, Inc. | 3,054,491 | 9.51 |
| BlackRock Fund Advisors | 2,280,017 | 7.10 |
| Sessa Capital IM LP | 2,210,427 | 6.88 |
| Fidelity Management & Research Co. | 1,350,052 | 4.20 |
| Invesco PowerShares Capital Management LLC | 1,238,120 | 3.86 |
| SSgA Funds Management, Inc. | 964,905 | 3.00 |
| Millennium Management LLC | 936,017 | 2.91 |
| Quantitative Management Associates LLC | 922,186 | 2.87 |
| LSV Asset Management | 846,441 | 2.64 |
| AJO LP | 591,447 | 1.84 |
| JPMorgan Investment Management, Inc. | 492,289 | 1.53 |
| Dimensional Fund Advisors LP | 476,696 | 1.48 |
| Charles Schwab Investment Management, Inc. | 391,917 | 1.22 |
| ClariVest Asset Management LLC | 378,096 | 1.18 |
| WEISMAN LYLE | 376,402 | 1.17 |
| Ranger Global Real Estate Advisors LLC | 349,676 | 1.09 |
| Geode Capital Management LLC | 328,939 | 1.02 |
| BENNETT MONTGOMERY JACK | 321,048 | 1.00 |
| STOCKTON RICHARD J | 309,137 | 0.96 |
| Northern Trust Investments, Inc. | 286,729 | 0.89 |

© 2018 Factset Research Systems, Inc. All Rights Reserved. As of: 31 Mar 2018

## Additional Information

| | |
|---|---|
| Meeting Location | Dallas/Fort Worth Airport Marriott<br>8440 Airport Freeway<br>Irving, Texas |
| Meeting Time | 9:00 a.m. Central Time |
| Shareholder Proposal Deadline | January 22, 2019 |
| Solicitor | Mackenzie Partners, Inc. |
| Security IDs | 10482B101(CUSIP) |

Copyright © 2018 Institutional Shareholder Services Inc. All Rights Reserved. This proxy analysis and the information herein may not be reproduced or disseminated in whole or in part without prior written permission from ISS.

JA 473

154013

*Report generated by JJaegers@Mackenziepartners.com. Unauthorized distribution of this report is prohibited*

ISS' experienced research team provides comprehensive proxy analyses and complete vote recommendations for approximately 40,000 meetings annually in around 117 markets worldwide. With a team of more than 370 research and/or data professionals, fluent in 25 languages, ISS covers every holding within a client's portfolio in both developed and emerging markets.

Our Research Analysts are located in financial centers worldwide, offering local insight and global breadth. Research office locations include Berlin, Brussels, London, Manila, Paris, San Francisco, Sydney, Singapore, Tokyo, Toronto, and Rockville, Maryland.

ISS has long been committed to engagement and transparency. There are several long-established channels for engaging with ISS, outlined at http://www.issgovernance.com/contact/faqs-engagement-on-proxy-research/. In addition to these long-established channels, investors and issuers and other market constituents can submit comments, concerns and feedback to the ISS Feedback Review Board through www.issgovernance.com/frb.



*The issuer that is the subject of this analysis may have purchased self-assessment tools and publications from ISS Corporate Solutions, Inc. (formerly known as ISS Corporate Services, Inc. and referred to as "ICS"), a wholly-owned subsidiary of ISS, or ICS may have provided advisory or analytical services to the issuer in connection with the proxies described in this report. These tools and services may have utilized preliminary peer groups generated by ISS' institutional research group. No employee of ICS played a role in the preparation of this report. If you are an ISS institutional client, you may inquire about any issuer's use of products and services from ICS by emailing disclosure@issgovernance.com.*

This proxy analysis and vote recommendation has not been submitted to, nor received approval from, the United States Securities and Exchange Commission or any other regulatory body. While ISS exercised due care in compiling this analysis, it makes no warranty, express or implied, regarding the accuracy, completeness or usefulness of this information and assumes no liability with respect to the consequences of relying on this information for investment or other purposes. In particular, the research and voting recommendations provided are not intended to constitute an offer, solicitation or advice to buy or sell securities nor are they intended to solicit votes or proxies.

ISS is an independent company owned by entities affiliated with Genstar Capital ("Genstar"). ISS and Genstar have established policies and procedures to restrict the involvement of Genstar and any of Genstar's employees in the content of ISS' analyses. Neither Genstar nor their employees are informed of the contents of any of ISS' analyses or recommendations prior to their publication or dissemination.

The issuer that is the subject of this proxy analysis may be a client of ISS or ICS, or the parent of, or affiliated with, a client of ISS or ICS.

One or more of the proponents of a shareholder proposal at an upcoming meeting may be a client of ISS or ICS, or the parent of, or affiliated with, a client of ISS or ICS. None of the sponsors of any shareholder proposal(s) played a role in this report.

ISS may in some circumstances afford issuers, whether or not they are clients of ICS, the right to review draft research analyses so that factual inaccuracies may be corrected before the report and recommendations are finalized. Control of research analyses and voting recommendations remains, at all times, with ISS.

ISS makes its proxy voting policy formation process and summary proxy voting policies readily available to issuers, investors and others on its public website: http://www.issgovernance.com/policy.

Copyright © 2018 Institutional Shareholder Services Inc. All Rights Reserved. This proxy analysis and the information herein may not be reproduced or disseminated in whole or in part without prior written permission from ISS.

Copyright © 2018 Institutional Shareholder Services Inc. All Rights Reserved. This proxy analysis and the information herein may not be reproduced or disseminated in whole or in part without prior written permission from ISS.

JA 474

EXHIBIT 2

# UNITED STATES
# SECURITIES AND EXCHANGE COMMISSION

Washington, D.C. 20549

# FORM 8-K

CURRENT REPORT
**PURSUANT TO SECTION 13 OR 15(d) OF THE**
**SECURITIES EXCHANGE ACT OF 1934**
Date of Report (date of earliest event reported): **June 25, 2018**

# BRAEMAR HOTELS & RESORTS INC.

(Exact name of registrant as specified in its charter)

| **Maryland** | **001-35972** | **46-2488594** |
|---|---|---|
| (State or other jurisdiction of incorporation) | (Commission File Number) | (IRS Employer Identification No.) |

**14185 Dallas Parkway, Suite 1100**
**Dallas, Texas**                                                                 **75254**
(Address of principal executive offices)                              (Zip Code)

Registrant's telephone number, including area code: **(972) 490-9600**

Check the appropriate box if the Form 8-K filing is intended to simultaneously satisfy the filing obligation of the Company under any of the following provisions:

☐ Written communications pursuant to Rule 425 under the Securities Act (17 CFR 230.425)

☐ Soliciting material pursuant to Rule 14a-12 under the Exchange Act (17 CFR 240.14a-12)

☐ Pre-commencement communications pursuant to Rule 14d-2(b) under the Exchange Act (17 CFR 240.14d-2(b))

☐ Pre-commencement communications pursuant to Rule 13e-4(c) under the Exchange Act (17 CFR 240.13e-4(c))

Indicate by check mark whether the registrant is an emerging growth company as defined in Rule 405 of the Securities Act of 1933(§230.405 of this chapter) or Rule 12b-2 of the Securities Exchange Act of 1934 (§240.12b-2 of this chapter).
Emerging growth company ☑

If an emerging growth company, indicate by check mark if the registrant has elected not to use the extended transition period for complying with any new or revised financial accounting standards provided pursuant to Section 13(a) of the Exchange Act. ☐

**Item 7.01 Regulation FD Disclosure**

The following statement by Braemar Hotels & Resorts Inc. (the "Company") is in response to recent inquiries from stockholders and members of the investment community about the circumstances surrounding the resignations of Daniel B. Silvers and Lawrence A. Cunningham from the Board of Directors of the Company (the "Board") last year:

- On February 16, 2017, in order to settle pending litigation and avoid the unnecessary cost and expense of a proxy contest, the Company and certain related entities entered into a Settlement Agreement (the "Settlement Agreement") with Sessa Capital (Master), L.P., Sessa Capital GP, LLC, Sessa Capital IM, L.P., Sessa Capital IM GP, LLC and John Petry (collectively, "Sessa") pursuant to which, among other things, the Company agreed to appoint to the Board two of the five individuals Sessa previously sought to nominate as directors of the Company.

- The Settlement Agreement was publicly filed by the Company with the Securities and Exchange Commission on February 17, 2017. As part of the Settlement Agreement, Sessa agreed that its designees would comply with all Company policies and procedures applicable to all members of the Board and would execute a confidentiality agreement with the Company that would be similar in all material respects to the confidentiality agreement to be executed by the Company's other directors. At the time the Settlement Agreement was signed, none of the members of the Board had signed confidentiality agreements. The Company offered during its negotiations with Sessa to agree upon the form of confidentiality agreement, but Sessa's counsel declined to do so, and Sessa agreed that its designees would instead sign a form of confidentiality agreement that would be entered into by all other directors.

- On March 3, 2017, the Board appointed Daniel B. Silvers and Lawrence A. Cunningham to the Board. Following their appointment to the Board, Messrs. Silvers and Cunningham were provided with a draft director confidentiality agreement that had previously been prepared by the Nominating and Corporate Governance Committee ("Governance Committee") with Company counsel and that all other directors were prepared to execute. In response, Messrs. Silvers and Cunningham stated that they were unaware of the requirement to execute the confidentiality agreement because they had not read the provisions of the Settlement Agreement pursuant to which they had been appointed to the Board. The Settlement Agreement had been executed and made publicly available two weeks prior to their appointment.

- The Board and members of management made repeated attempts to accommodate the concerns raised by Messrs. Silvers and Cunningham regarding the draft director confidentiality agreement. Members of the Company's management, other directors and the Company's counsel participated in several phone calls with Messrs. Silvers and Cunningham attempting to understand and address any concerns they had with the director confidentiality agreement. The Board requested on multiple occasions that Messrs. Silvers and Cunningham provide written comments to the draft confidentiality agreement but they declined to do so. In response to oral comments from Messrs. Silvers and Cunningham, the draft confidentiality agreement was revised to expressly provide that no provision of the confidentiality agreement requires a director to violate his or her duties to the Company under Maryland law in order to make clear that, if a director's fiduciary duties and a director's obligations under the confidentiality agreement were in conflict, the director would not be bound by the confidentiality agreement.

- On April 6, 2018, the draft confidentiality agreement was presented for the Board's consideration. Maryland counsel presented on legal matters relating to Board confidentiality. In response to oral concerns raised by Messrs. Silvers and Cunningham at the meeting, the draft confidentiality agreement was further revised to address the concerns raised. Following discussion at the meeting and agreement to make further additional changes, the Board voted to approve the director confidentiality agreement with Messrs. Silvers and Cunningham voting against approval. Mr. Silvers stated multiple times prior to and following this meeting that he had no intention of signing any confidentiality agreement.

- Despite the Board's determination, Messrs. Silvers and Cunningham refused to execute the confidentiality agreement.
- On May 14, 2017, the Company sent a letter to Sessa advising Sessa that Messrs. Silvers and Cunningham refused to sign the director confidentiality agreement and reminding Sessa of its obligations under the Settlement Agreement.
- At a meeting of the Board conducted on June 9, 2017 immediately following the annual shareholder meeting, the amended and restated Corporate Governance Guidelines were presented for the Board's consideration as part of the Company's regular annual review of its governance documents. Messrs. Silvers and Cunningham expressed concerns over the Corporate Governance Guidelines. When asked to provide specific comments, Mr. Silvers provided a comment regarding director access to management, which the Board agreed to address. All members of the Board, other than Messrs. Silvers and Cunningham, voted in favor of the Corporate Governance Guidelines. Messrs. Silvers and Cunningham also confirmed at the meeting that they did not intend to execute the director confidentiality agreement. Consistent with its obligations under applicable stock exchange rules, the Corporate Governance Guidelines were promptly made available on the Company's investor website.
- Also at the June 9, 2017 meeting, and despite the fact that he refused to sign the confidentiality agreement, Mr. Cunningham was appointed to the Governance Committee. The adoption of the Corporate Governance Guidelines, and Mr. Cunningham's appointment to the Governance Committee, occurred at the regular annual meeting of the Board where governance matters and Board committee appointments are often approved. The Board appointed Mr. Cunningham to the Governance Committee at the time of the Board's annual meeting despite his non-compliance with the terms of the Settlement Agreement.
- On June 30, 2017, the Company delivered letters to Messrs. Silvers and Cunningham reminding them that the Settlement Agreement required Sessa's designees to enter into the confidentiality agreement and also noting that they were in breach of the Company's Corporate Governance Guidelines. The Company encouraged Messrs. Silvers and Cunningham to sign the confidentiality agreement required of all directors of the Company. The letter did not request that Messrs. Silvers or Cunningham resign from the Board, and the Board did not at any time request that Messrs. Silvers or Cunningham resign from the Board.
- On July 6, 2017, the Company entered into director confidentiality agreements with each director other than Messrs. Silvers and Cunningham. Also on July 6, 2017, Messrs. Silvers and Cunningham voluntarily resigned from the Board. In their resignation letters, Messrs. Silvers and Cunningham stated that they had received notices from the Company that they were in violation of the Company's policies due to their refusal to enter into the confidentiality agreement, referring to the Company's June 30, 2017 letters. Neither director stated in his resignation that he had been asked to resign.
- The Board believes that maintaining confidentiality is extremely important and these views were expressed in the negotiations with Sessa, as a result of which Sessa agreed that its designees would enter into the confidentiality agreement entered into by all other directors. The Board believes that the director confidentiality agreement and the related provisions set forth in the Corporate Governance Guidelines are important for protecting the Company's confidential information from misuse, including insider trading, and that maintaining confidentiality facilitates open and collaborative Board deliberations. At no point during their tenure on the Board were Messrs. Silvers and Cunningham asked to abide by any policy to which the other members of the Board were not also subject. The director confidentiality agreement that Messrs. Silvers and Cunningham were asked to sign, a copy of which is available in the Company's public filings, has been signed by each current member of the Board.

## SIGNATURE

Pursuant to the requirements of the Securities Exchange Act of 1934, the registrant has duly caused this report to be signed on its behalf by the undersigned hereunto duly authorized.

Dated: June 25, 2018

BRAEMAR HOTELS & RESORTS INC.

By: /s/ ROBERT G. HAIMAN

Robert G. Haiman
Executive Vice President, General Counsel &
Secretary

EXHIBIT 3

Report generated by jdemarco@mackenziepartners.com. Unauthorized distribution of this report is prohibited.

ISS Proxy Analysis & Benchmark Policy Voting Recommendations



# Braemar Hotels & Resorts, Inc.

**Meeting Type:** Annual
**Meeting Date:** 3 July 2018
**Record Date:** 15 May 2018
**Meeting ID:** 1242685

**New York Stock Exchange:** BHR
**Index:** Russell 3000
**Sector:** Hotel & Resort REITs
**GICS:** 60101030

## Proxy Alert

Alert Date: 26 June 2018
Original Publication Date: 20 June 2018

This alert is being issued in order to update the analysis and vote recommendations on Item 1: Elect Directors. On June 25, 2018, the company filed an 8-K providing comprehensive detail into the resignation of two directors, Daniel Silvers and Lawrence Cunningham, in July 2017. The previous analysis recommended that shareholders withhold votes from all incumbent director nominees due to concerns about the resignation of Silvers and Cunningham. However, in discussions with ISS and in the filing, the company disclosed that Sessa Capital had agreed that its director designees would sign a confidentiality agreement (the company had no previously existing agreements with directors) but declined the opportunity to specifically negotiate the term of the agreement. Subsequently, two Sessa-selected nominees, Silvers and Cunningham, were appointed to the board on March 3, 2017 with the understanding that Cunningham would also be appointed to the Governance Committee. At that time, Silvers and Cunningham were presented with confidentiality agreements. Both directors stated that they had not known they would be required to sign confidentiality agreements and stated they were not willing to sign any agreements. The company discloses that efforts were made to address Silvers' and Cunningham's objections (though the specific objections are not disclosed), and that the agreements were amended to clarify that they would not take precedence over directors' fiduciary duties under Maryland law. The filing discloses that Silvers and Cunningham voted in opposition to both the confidentiality agreement and the new corporate governance guidelines requiring directors to sign the agreements. Despite not signing the confidentiality agreement, Cunningham was appointed to the Governance Committee on June 9, 2017. The company states that on June 30, it reminded Silvers and Cunningham that the Sessa agreement required all directors to sign the confidentiality agreement. On July 6, all directors with the exception of Silvers and Cunningham signed the confidentiality agreement. On the same date, Silvers and Cunningham voluntarily submitted their resignations.

Given the additional information disclosed in the filing, support for Monty Bennett, Kenneth Fearn, and Curtis McWilliams is warranted. All other vote recommendations remain unchanged.

## Agenda & Recommendations

**Policy:** United States
Incorporated: Maryland, USA

| Item | Code | Proposal | Board Rec. | ISS Rec. |
|------|------|----------|------------|----------|
| **MANAGEMENT PROPOSALS** | | | | |
| 1.1 | M0201 | Elect Director Monty J. Bennett | FOR | FOR |
| 1.2 | M0201 | Elect Director Stefani D. Carter | FOR | WITHHOLD |
| 1.3 | M0201 | Elect Director Kenneth H. Fearn | FOR | FOR |
| 1.4 | M0201 | Elect Director Curtis B. McWilliams | FOR | FOR |
| 1.5 | M0201 | Elect Director Matthew D. Rinaldi | FOR | WITHHOLD |
| 1.6 | M0201 | Elect Director Abteen Vaziri | FOR | FOR |
| 2 | M0101 | Ratify BDO USA, LLP as Auditors | FOR | FOR |

* ISS Environmental and Social QualityScore is newly introduced for 2018 and is based on company disclosure and transparency practices.

© 2018 Institutional Shareholder Services Inc. All Rights Reserved. This proxy analysis and the information herein may not be reproduced or disseminated in whole or in part without prior written permission from ISS.

153927

*Report generated by jdemarco@mackenziepartners.com. Unauthorized distribution of this report is prohibited.*

## Meeting Agenda and Proposals

### Items 1.1-1.6. Elect Directors                          `SPLIT`

#### VOTE RECOMMENDATION

WITHHOLD votes are warranted for incumbent Governance Committee members Stefani Carter and Matthew Rinaldi for a material governance failure. The company's governing documents prohibit or restrict shareholders' ability to amend the company bylaws.

A vote FOR the remaining director nominees is warranted.

#### BACKGROUND INFORMATION

**Policies:** Board Accountability | Board Responsiveness | Director Competence | Director Independence | Election of Directors | ISS Categorization of Directors | Vote No campaigns

**Vote Requirement:** The company has adopted a majority vote standard (of shares cast) for the election of directors with a plurality carve-out for contested elections, and has a director resignation policy in its governance guidelines.

#### Discussion

Please see the Board Profile section above for more information on director nominees.

#### RESTRICTION ON BINDING SHAREHOLDER PROPOSALS

Shareholders' ability to amend corporate bylaws is a fundamental right, which is enshrined in most states' corporation statutes. A limited number of states permit companies to adopt provisions within their governing documents that prohibit shareholders from submitting binding bylaw amendments. In this case, the company stipulates in its governing documents that the right to amend the bylaws is reserved solely to the board of directors. Under current ISS policy, such a prohibition on binding shareholder amendments materially diminishes shareholder rights and represents an ongoing governance failure. As such, withhold votes are warranted for incumbent Governance Committee members Stefani Carter and Matthew Rinaldi are warranted. Abteen Varizi is a newly appointed director and member of the committee and may not have had sufficient time to address ongoing governance concerns.

#### REVIEW OF EXECUTIVE COMPENSATION PRACTICES

*Components of Pay*

The chart below summarizes year-over-year CEO pay changes and provides a comparison to the median of a peer group based on industry and size criteria. Aggregate pay for all other named executive officers (NEOs) is also shown, along with the ratio of most recent CEO and NEO pay to the company's net income and revenue. Please also refer to the Compensation Profile earlier in the report.

Copyright © 2018 Institutional Shareholder Services Inc. All Rights Reserved. This proxy analysis and the information herein may not be reproduced or disseminated in whole or in part without prior written permission from ISS.

JA 482

153927

*Report generated by jdemarco@mackenziepartners.com. Unauthorized distribution of this report is prohibited.*

| ($ in thousands) | CEO | | | | CEO Peer Median | Other NEOs |
| --- | --- | --- | --- | --- | --- | --- |
| | R. Stockton | | R. Stockton | M. Bennett | | |
| | 2017 | Change | 2016 | 2015 | 2017 | 2017 |
| Base salary | 0 | | 0 | 0 | 712 | 0 |
| Deferred comp & pension | 0 | | 0 | 0 | 0 | 0 |
| All other comp | 0 | | 0 | 0 | 34 | 0 |
| Bonus | 0 | | 0 | 0 | 0 | 0 |
| Non-equity incentives | 0 | | 0 | 0 | 879 | 0 |
| Restricted stock | 194 | -93.4% | 2,955 | 2,169 | 2,191 | 3,351 |
| Option grant | 0 | | 0 | 0 | 0 | 0 |
| **Total** | **194** | **-93.4%** | **2,955** | **2,169** | **3,931** | **3,351** |
| % of Net Income | 0.8% | | | | | 14.6% |
| % of Revenue | N/A | | | | | 0.8% |

CEO equity pay mix (by value)*          Performance-conditioned: 66.7%; Time-based: 33.3%

*Performance shares, if any, are counted and valued at target

## PAY-FOR-PERFORMANCE QUANTITATIVE SCREEN

The **pay-for-performance quantitative screen** uses four measures that together evaluate the alignment of CEO pay and company performance. The screen measures alignment over multiple time horizons, on both an absolute and relative basis, using multiple performance measures. The screen is designed to identify outlier companies that demonstrate a significant quantitative misalignment over time.

| Measure | Result |
| --- | --- |
| Relative Degree of Alignment | -6 |
| Multiple of Median | 0.05 |
| Absolute Pay-TSR Alignment | 24 |
| Initial Quantitative Concern | Low |
| Financial Performance Assessment | 14.5 |
| **Overall Quantitative Concern** | Low |

### RELATIVE DEGREE OF ALIGNMENT

The chart plots percentiles of the annualized 3-year performance and pay rankings for the company (▲) and ISS' derived peers (◆). The gray band generally indicates alignment



### MULTIPLE OF MEDIAN

Pay in $thousands. The gray band represents 25th to 75th percentile of CEO pay of ISS' select peer group, and the blue line represents the 50th percentile.

CEO total pay is 0.05 times the median of peers.



Copyright © 2018 Institutional Shareholder Services Inc. All Rights Reserved. This proxy analysis and the information herein may not be reproduced or disseminated in whole or in part without prior written permission from ISS.

JA 483

*Report generated by jdemarco@mackenziepartners.com. Unauthorized distribution of this report is prohibited.*

## ABSOLUTE PAY-TSR ALIGNMENT

CEO granted pay trends versus value of a $100 investment made on the first day of the five-year period.



| | 2013 | 2014 | 2015 | 2016 | 2017 |
|---|---|---|---|---|---|
| Pay($000) | | 2,456 | 2,169 | 2,955 | 194 |
| Indexed TSR | 100.00 | 90.61 | 75.56 | 76.84 | 56.66 |
| CEO | | Monty Bennett | Monty Bennett | Richard Stockton | Richard Stockton |

## FINANCIAL PERFORMANCE ASSESSMENT

Blue boxes indicate the company's quartile rankings compared to ISS' selected peer group in applicable measure/metric, measured over three years. The leftmost box indicates bottom quartile and rightmost box indicates top quartile.

| Measure | | Quartile Ranking vs. Peers | | |
|---|---|---|---|---|
| Pay | | ◻ | | |
| Weighted Performance | | ◻ | | |

| Metrics (ranked by weight) | Long-Term Performance | Quartile Ranking vs. Peers | | |
|---|---|---|---|---|
| ROIC | 1.0 | ◻ | | |
| Return on Assets | 0.6 | ◻ | | |
| Return on Equity | 2.2 | ◻ | | |
| Cash Flow Growth | 843.7 | | | ◻ |

## ISS AND COMPANY PEER GROUPS

| | |
|---|---|
| ISS Selected (18) | Alexander & Baldwin, Inc. <br> Chatham Lodging Trust <br> Columbia Property Trust, Inc. <br> Equity Commonwealth <br> Hersha Hospitality Trust <br> Lexington Realty Trust <br> Pennsylvania Real Estate Investment Trust <br> QTS Realty Trust, Inc. <br> Summit Hotel Properties, Inc. | Armada Hoffler Properties, Inc. <br> Chesapeake Lodging Trust <br> DiamondRock Hospitality Company <br> First Industrial Realty Trust, Inc. <br> Kite Realty Group Trust <br> Pebblebrook Hotel Trust <br> PS Business Parks, Inc. <br> Select Income REIT <br> Tanger Factory Outlet Centers, Inc. |
| Shared (0) | |
| Company-Disclosed (0) | None disclosed. |

For more information on the ISS peer group methodology, visit https://www.issgovernance.com/policy-gateway/voting-policies/

Data for ISS' pay-for-performance tests are sourced from proxy disclosures for pay and from Compustat for TSR and financial performance. For more information on ISS' quantit pay-for-performance evaluation, visit https://www.issgovernance.com/policy-gateway/voting-policies/

## PEER GROUP SIZE

Size (by revenue) of the ISS, company and overlap peer groups. gray area represents 0.4 - 2.5 times the company's revenue.



- ◆ Braemar Hotels & Resorts, Inc.
- ■ ISS Only
- ▲ Shared
- ● Company Only

Copyright © 2018 Institutional Shareholder Services Inc. All Rights Reserved. This proxy analysis and the information herein may not be reproduced or disseminated in whole or in part without prior written permission from ISS.

JA 484

153927

*Report generated by jdemarco@mackenziepartners.com. Unauthorized distribution of this report is prohibited.*

## Executive Summary

| Evaluation Component | Level of Concern |
|---|---|
| *Non-Performance-Based Pay Elements* | Low |
| *Peer Group Benchmarking* | Low |
| *Severance/CIC Arrangements* | Low |
| *Comp Committee Communication/Responsiveness* | Low |
| *Pay for Performance Evaluation* | Low |

### Conclusion

Pay and performance are reasonably aligned and no significant compensation concerns are identified at this time.

# Braemar Hotels & Resorts, Inc.


QualityScore

## Key Takeaways

The board's actions in connection with the settlement agreement with Sessa Capital demonstrated a willingness to entrench existing leadership rather than prioritizing all shareholders' interests.

The company's governing documents do not permit shareholders to amend the bylaws.

**Meeting Type:** Annual
**Meeting Date:** 3 July 2018
**Record Date:** 15 May 2018
**Meeting ID:** 1242685

**New York Stock Exchange:** BHR
**Index:** Russell 3000
**Sector:** Hotel & Resort REITs
**GICS:** 60101030

**Primary Contact**
Andrew Maletz
Andrew.d.maletz@issgovernance.com

## Agenda & Recommendations

**Policy: United States**
**Incorporated:** Maryland, USA

| Item | Code | Proposal | Board Rec. | ISS Rec. |
|---|---|---|---|---|
| **MANAGEMENT PROPOSALS** | | | | |
| 1.1 | M0201 | **Elect Director Monty J.** Bennett | FOR | **WITHHOLD** |
| 1.2 | M0201 | **Elect Director Stefani** D. Carter | FOR | **WITHHOLD** |
| 1.3 | M0201 | **Elect Director** Kenneth H. Fearn | FOR | **WITHHOLD** |
| 1.4 | M0201 | **Elect Director Curtis B.** McWilliams | FOR | **WITHHOLD** |
| 1.5 | M0201 | **Elect Director Matthew D.** Rinaldi | FOR | **WITHHOLD** |
| 1.6 | M0201 | **Elect Director Abteen Vaziri** | FOR | FOR |
| 2 | M0101 | **Ratify BDO USA, LLP as Auditors** | FOR | FOR |

Shading indicates that ISS recommendation differs from Board recommendation
▶ Items deserving attention due to contentious issues or controversy

Copyright © 2018 Institutional Shareholder Services Inc. All Rights Reserved. This proxy analysis and the information herein may not be reproduced or disseminated in whole or in part without prior written permission from ISS.

153927

*Report generated by jdemarco@mackenziepartners.com. Unauthorized distribution of this report is prohibited.*

## Material Company Updates

| Item | Summary |
|------|---------|
| **Board and Management Updates** | On July 6, 2017, Daniel B. Silvers and Lawrence A. Cunningham resigned from the board following receipt of notice from the company that they were in violation of its Corporate Governance Guidelines, specifically requiring all directors to enter into a confidentiality agreement. Both directors refused to enter into such agreement with the company. The agreement, as amended on June 9, 2017, provides that, among other things, each director agrees (i) not to make any statement or announcement that disparages, or could reasonably be expected to damage the reputation of the company, (ii) not to publicly comment on any matter discussed at any board or committee meeting, and (iii) not to become a party to any agreement with any person other than the company with respect to any compensation, reimbursement or indemnification in connection with such director's service as a company director. |
| | Effective Oct. 1, 2017, Abteen Vaziri was appointed to the board. On the same date, Sarah Zubiate Darrouzet resigned from the board. |
| | On March 9, 2018, Jeremy J. Welter succeeded David A. Brooks as COO. On the same date, Brooks was appointed as chief transactions officer, general counsel and secretary. Brooks passed away on March 29, 2018. |
| **Name Change** | On April 23, 2018, the company changed its name from Ashford Hospitality Prime, Inc. to Braemar Hotels & Resorts Inc. |

Copyright © 2018 Institutional Shareholder Services Inc. All Rights Reserved. This proxy analysis and the information herein may not be reproduced or disseminated in whole or in part without prior written permission from ISS.

153927

*Report generated by jdemarco@mackenziepartners.com. Unauthorized distribution of this report is prohibited.*

## Financial Highlights

**Company Description:** Braemar Hotels & Resorts is a REIT that invests primarily in high RevPAR, full-service luxury hotels and resorts. It is listed on the New York Stock Exchange under the symbol BHR and is externally-advised by Ashford Inc.

### STOCK PRICE PERFORMANCE



Braemar Hotels & Resorts, Inc.
MSCI ACWI: Equity Real Estate Investment Trusts (REITs) (GICS: 601010)
Russell 3000

### TOTAL SHAREHOLDER RETURNS

|  | 1 Yr | 3 Yr | 5 Yr |
|---|---|---|---|
| Company TSR (%) | -24.05 | -13.82 | N/A |
| GICS 6010 TSR (%) | 5.04 | 6.09 | 10.73 |
| Russell 3000 TSR (%) | 21.13 | 11.12 | 15.58 |

Source: Compustat. As of last day of company FY end month: 12/31/2017

### COMPANY SNAPSHOT

| | |
|---|---|
| Market Cap (M) | 333.2 |
| Closing Price | 10.25 |
| Annual Dividend | 0.64 |
| 52-Week High | 11.34 |
| 52-Week Low | 8.44 |
| Shares Outstanding (M) | 32.51 |
| Average daily trading volume (prior mo)* | 256.96 |

As of May 15, 2018 (All currency in USD)
* Trading Volume in thousands of shares

### FINANCIAL & OPERATIONAL PERFORMANCE

| | Historical Performance (FY ending) | | | | | Compared to Peers (Compustat FY*) – **2017** | | | | |
|---|---|---|---|---|---|---|---|---|---|---|
| All currency in USD | 12/2013 | 12/2014 | 12/2015 | 12/2016 | 12/2017 | HT | CLDT | CHSP | INN | DRH |
| **Earnings** | | | | | | Hersha Hospitality Trust | Chatham Lodging Trust | Chesapeake Lodging Trust | Summit Hotel Properties, Inc. | DiamondRock Hospitality Company |
| Revenue (M) | 234 | 307 | 347 | 403 | 415 | 496 | 300 | 598 | 515 | 872 |
| Net Income (M) | -12 | 2 | -7 | 19 | 23 | 100 | 29 | 76 | 99 | 92 |
| EBITDA (M) | 33 | 44 | 43 | 45 | 45 | N/A | N/A | N/A | N/A | 138 |
| EPS (USD) | -0.73 | 0.08 | -0.34 | 0.57 | 0.52 | 1.82 | 0.73 | 1.12 | 0.79 | 0.46 |
| EPS Y/Y Growth (%) | -161 | N/A | N/A | N/A | -9 | -18 | -11 | -1 | -21 | -19 |
| **Profitability** | | | | | | | | | | |
| Pretax Net Margin (%) | -7 | 2 | -1 | 6 | 7 | 22 | 10 | 13 | 20 | 12 |
| EBITDA Margin (%) | 14 | 14 | 13 | 11 | 11 | N/A | N/A | N/A | N/A | 16 |
| Return on Equity (%) | -8 | 1 | -3 | 5 | 4 | 9 | 4 | 7 | 6 | 5 |
| Return on Assets (%) | -1 | 0 | -1 | 1 | 1 | 4 | 2 | 4 | 4 | 3 |
| ROIC (%) | -1 | 0 | -1 | 3 | 1 | 4 | 2 | 4 | 4 | 3 |
| **Leverage** | | | | | | | | | | |
| Debt/Assets | 65 | 62 | 62 | 61 | 58 | 51 | 39 | 42 | 39 | 30 |
| Debt/Equity | 426 | 274 | 208 | 204 | 168 | 131 | 67 | 79 | 68 | 51 |
| **Cash Flows** | | | | | | | | | | |
| Operating (M) | 34 | 55 | 9 | 57 | 71 | 108 | 87 | 144 | 147 | 205 |
| Investing (M) | -28 | -213 | -183 | 100 | -174 | -100 | -161 | -4 | -516 | -179 |
| Financing (M) | 118 | 186 | 107 | -136 | 124 | -177 | 71 | -139 | 370 | -85 |
| Net Change (M) | 123 | 28 | -66 | 22 | 21 | -168 | -3 | 1 | 2 | -60 |
| **Valuation & Performance** | | | | | | | | | | |
| Price/Earnings | N/A | 214.50 | N/A | 23.90 | 18.70 | 9.60 | 31.20 | 24.20 | 19.30 | 24.50 |
| Annual TSR (%) | N/A | -4.54 | -13.48 | -2.59 | -24.05 | -13.34 | 18.04 | 11.47 | -0.86 | 2.41 |

Source: Compustat. *Note: Compustat standardizes financial data and fiscal year designations to allow for meaningful comparison across companies. Compustat data may differ from companies' disclosed financials and does not incorporate non-trading equity units. Peers shown here represent closest industry peers drawn from those peers used in ISS' pay-for-performance analysis. See www.issgovernance.com/policy-gateway/company-financials-faq/ for more information.

Publication Date: 26 June 2018

Page 7

Copyright © 2018 Institutional Shareholder Services Inc. All Rights Reserved. This proxy analysis and the information herein may not be reproduced or disseminated in whole or in part without prior written permission from ISS.

JA 487

153927

*Report generated by jdemarco@mackenziepartners.com. Unauthorized distribution of this report is prohibited.*

## Corporate Governance Profile

### BOARD & COMMITTEE SUMMARY

|  | Independence | Members | Meetings |
|---|---|---|---|
| Full Board | 83% | 6 | 14 |
| Audit | 100% | 3 | 5 |
| Compensation | 100% | 3 | 4 |
| Nominating | 100% | 3 | 10 |

| | |
|---|---|
| Chairman classification | Executive Director |
| Separate chair/CEO | Yes |
| Independent lead director | Yes |
| Voting standard | Majority |
| Plurality carveout for contested elections | Yes |
| Resignation policy | Yes |
| Total director ownership (000 shares) | 1,879 |
| Total director ownership (%) | 5.4 |
| Percentage of directors owning stock | 100% |
| Number of directors attending < 75% of meetings | 0 |
| Number of directors on excessive number of outside boards | 0 |
| Average director age | 48 years |
| Average director tenure | 3 years |
| Percentage of women on board | 17% |

### SHAREHOLDER RIGHTS SUMMARY

| | |
|---|---|
| Controlled company | No |
| Classified board | No |
| Dual-class stock | No |
| Vote standard for mergers/acquisitions | Majority |
| Vote standard for charter amendment | 66.67% |
| Vote standard for bylaw amendment | N/A |
| Shareholder right to call special meetings | Yes, 50.01% |
| Material restrictions on right to call special meetings | No |
| Shareholder right to act by written consent | Unanimous |
| Cumulative voting | No |
| Board authorized to issue blank-check preferred stock | Yes |
| Poison pill | No |
| Proxy Access | Yes |
| - Ownership requirement (%) | 3 |
| - Time requirement (years) | 3 |
| - Nomination limit (% of seats) | 20 |
| - Nomination limit (# of nominees) | 2 |
| - Aggregation cap (# of nominators) | 20 |

## Director tenure



| 0 | 1 | 2 | 3 | 4 | 5 | 6 | 7 |

Copyright © 2018 Institutional Shareholder Services Inc. All Rights Reserved. This proxy analysis and the information herein may not be reproduced or disseminated in whole or in part without prior written permission from ISS.

JA 488

153927

*Report generated by jdemarco@mackenziepartners.com. Unauthorized distribution of this report is prohibited.*

## Board Profile (after upcoming meeting)

### Director Independence & Affiliations

#### NON-EXECUTIVE DIRECTORS

| Item On Ballot | Name | Affiliation | Independence Classification | | Attend <75% | Gen-der | Age | Tenure | Term Ends | Outside | | Key Committees | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | Company | ISS | | | | | | Boards | CEO | Audit | Comp | Nom | Gov | |
| 1.1 | **Monty Bennett** | Chair | Non-Independent | Executive Director | | M | 53 | 5 | 2019 | 2 | ✓ | | | | | |
| 1.4 | **Curtis McWilliams** | Lead Director | Independent | Independent | | M | 62 | 4 | 2019 | 1 | | C F | | | | |
| 1.2 | **Stefani Carter** | | Independent | Independent | | F | 40 | 4 | 2019 | 0 | | | M | C | C | |
| 1.3 | **Kenneth Fearn Jr.** | | Independent | Independent | | M | 52 | 1 | 2019 | 0 | | F | M | | | |
| 1.5 | **Matthew Rinaldi** | | Independent | Independent | | M | 42 | 4 | 2019 | 0 | | | C | M | M | |
| 1.6 | **Abteen Vaziri** | | Independent | Independent | | M | 39 | 0* | 2019 | 0 | | M | | | M | M |

*Indicates director not previously submitted to shareholders for election.

M = Member | C = Chair | F = Financial Expert

### Director Notes

Monty Bennett

1) Monty J. Bennett is the founder of the company. 2) Bennett serves as CEO and chairman of Ashford Inc., which together with Ashford Hospitality Advisors LLC, a subsidiary of Ashford Inc., serve as advisors of the company. 3) Bennett served as CEO of the company until Nov. 14, 2016. 4) The company entered into a management agreement with Remington Lodging and Hospitality, LLC (Remington), pursuant to which the company has agreed to engage Remington for the property management, project management, development and certain other work for all hotels that the company acquires. In 2017, the company paid Remington $1.7 million in fees related to the agreement. Bennett is the CEO of Remington and, together with his father, beneficially owns 100 percent of Remington. 5) The company entered into a mutual exclusivity agreement with Remington, in which the company has a first right of refusal to purchase any lodging-related investments identified by Remington and any of its affiliates that meet the company's investment criteria. (Source: DEF14A, 5/23/18, pp. 1, 7, 48, and under "Founder and Chairman Letter" section; 8-K, 11/2/16, under "ITEM 5.02" section.)

Copyright © 2018 Institutional Shareholder Services Inc. All Rights Reserved. This proxy analysis and the information herein may not be reproduced or disseminated in whole or in part without prior written permission from ISS.

JA 489

153827

*Report generated by jdemarco@mackenziepartners.com. Unauthorized distribution of this report is prohibited.*

## Director Employment, Compensation & Ownership

| Name | Primary Employment | Outside Boards | Total Compensation* | Shares Held | 60-day Options | Total | Voting Power (%) |
|---|---|---|---|---|---|---|---|
| **Monty Bennett** | CEO, Chairman - Ashford Inc. | Ashford Hospitality Trust, Inc., Ashford Inc. | N/D | 1,822,256 | 0 | 1,822,256 | 5.40 |
| **Curtis McWilliams** | Prof Director | Ardmore Shipping Corporation | 233,360 | 21,481 | 0 | 21,481 | <1 |
| **Stefani Carter** | Attorney | | 154,370 | 9,600 | 0 | 9,600 | <1 |
| **Kenneth Fearn Jr.** | Real Estate Services | | 176,044 | 6,400 | 0 | 6,400 | <1 |
| **Matthew Rinaldi** | Other | | 145,478 | 16,800 | 0 | 16,800 | <1 |
| **Abteen Vaziri** | Retired | | 55,764 | 2,133 | 0 | 2,133 | <1 |

*Local market currency

## Compensation Profile

### EXECUTIVE PAY OVERVIEW

| Executive | Title | Base Salary | Change in Pension, Deferred Comp, All Other Comp | Bonus & Non-equity Incentives | Restricted Stock | Option Grant | Total |
|---|---|---|---|---|---|---|---|
| **R. Stockton** | Chief Executive Officer and President | 0 | 0 | 0 | 194 | 0 | 194 |
| **D. Brooks** | Former Chief Transaction Officer, General Counsel and Secretary | 0 | 0 | 0 | 1,117 | 0 | 1,117 |
| **J. Hays III** | Chief Strategy Officer | 0 | 0 | 0 | 745 | 0 | 745 |
| **J. Welter** | Chief Operating Officer | 0 | 0 | 0 | 745 | 0 | 745 |
| **D. Eubanks** | Chief Financial Officer and Treasurer | 0 | 0 | 0 | 745 | 0 | 745 |
| **Median CEO Pay** | ISS Selected Peer Group | 713 | 47 | 944 | 2,191 | 0 | 3,931 |
| | Company Defined Peers | N/A | N/A | N/A | N/A | N/A | N/A |

Source: ISS. Pay in $thousands. Total pay is sum of all reported pay elements, using ISS' Black-Scholes estimate for option grant-date values. Note: Median total pay will not equal sum of pay elements medians. Company Defined Peers are as disclosed. More information on ISS' peer group methodology at www.issgovernance.com/policy-gateway/us-compensation-policy-guidance/.

Copyright © 2018 Institutional Shareholder Services Inc. All Rights Reserved. This proxy analysis and the information herein may not be reproduced or disseminated in whole or in part without prior written permission from ISS.

JA 490

*Report generated by jdemarco@mackenziepartners.com. Unauthorized distribution of this report is prohibited.*

## OPTION VALUATION ASSUMPTIONS

| For CEO's last FY Grant* | Company | ISS |
|---|---|---|
| Volatility (%) | N/A | N/A |
| Dividend Yield (%) | N/A | N/A |
| Term (yrs) | N/A | N/A |
| Risk-free Rate (%) | N/A | N/A |
| Grant date fair value per option | N/A | N/A |
| Grant Date Fair Value ($ in 000) | N/A | N/A |

*The CEO did not receive stock options in the most recent fiscal year.

## CEO PAY MULTIPLES

| Compared to | Multiple |
|---|---|
| 2nd highest active executive | 0.17 |
| Average active NEO | 0.23 |
| ISS peer median | 0.05 |
| Company peer median | N/A |
| Median of employees (CEO Pay Ratio) | N/A |

## CEO TALLY SHEET

| CEO | R. Stockton |
|---|---|
| CEO tenure at FYE: | 1.1 years |
| Present value of all accumulated pension: | N/A |
| Value of CEO stock owned (excluding options): | $3,168,654 |
| **Potential Termination Payments** | |
| Involuntary termination without cause: | N/D |
| Termination after a change in control: | N/D |

Source: DEF14A

Copyright © 2018 Institutional Shareholder Services Inc. All Rights Reserved. This proxy analysis and the information herein may not be reproduced or disseminated in whole or in part without prior written permission from ISS.

JA 491

153927

*Report generated by jdemarco@mackenziepartners.com. Unauthorized distribution of this report is prohibited.*

## Dilution & Burn Rate

### DILUTION

|  | Dilution (%) |
|---|---|
| Braemar Hotels & Resorts, Inc. | 11.61 |
| Peer group median | 2.73 |
| Peer group weighted average | 5.38 |
| Peer group 75th percentile | 6.46 |

Dilution is the sum of the total amount of shares available for grant and outstanding under options and other equity awards (vested and unvested) expressed as a percentage of total basic common shares outstanding as of the record date. The dilution figure typically excludes employee stock purchase plans (ESPPs) and 401(k) shares. The underlying information for the company is based on the company's equity compensation table in the most recent proxy statement or 10-K.

### BURN RATE

|  | Non-Adjusted (%) | Adjusted (%) |
|---|---|---|
| 1-year | 0.98 | 1.97 |
| 3-year average | 0.72 | 1.44 |

Burn rate equals the number of shares granted in each fiscal year, including stock options, restricted stock (units), actual performance shares delivered under the long-term incentive plan or earned deferred shares, to employees and directors divided by weighted average common shares outstanding. The adjusted burn rate places a premium on grants of full-value awards using a multiplier based on the company's annual volatility.

Copyright © 2018 Institutional Shareholder Services Inc. All Rights Reserved. This proxy analysis and the information herein may not be reproduced or disseminated in whole or in part without prior written permission from ISS.

JA 492

*Report generated by jdemarco@mackenziepartners.com. Unauthorized distribution of this report is prohibited.*

**Braemar Hotels & Resorts, Inc. (BHR)**
POLICY: United States

Meeting Date: **3 July 2018**
Meeting ID: 1242685

# QualityScore



| 🏛 Governance | **5** | ✅ Environment | **8** | 🔄 Social | **6** |
|---|---|---|---|---|---|
| Lower Risk · Higher Risk | | Higher Disclosure · Lower Disclosure | | Higher Disclosure · Lower Disclosure | |
| Board Structure | **8** | Management of Environmental Risks and Opportunities | **6** | Human Rights | **4** |
| Compensation | **1** | Carbon and Climate | **6** | Labor, Health, and Safety | **6** |
| Shareholder Rights | **4** | Natural Resources | **4** | Stakeholders and Society | **7** |
| Audit & Risk Oversight | **1** | Waste and Toxicity | **5** | Product Safety, Quality, and Brand | **N/A** |

Governance Scores As Of: June 20, 2018
Last Data Profile Update: June 20, 2018

Environmental and Social Scores As Of: June 20, 2018
Last Data Profile Update: May 17, 2018

**ISS Governance QualityScore is derived from publicly disclosed data and reporting on company governance disclosure, risk and performance. ISS Environmental and Social QualityScore is based on company disclosure and transparency practices. Scores indicate decile rank among relative index, region (Governance QualityScore), or industry group (Environmental and Social QualityScore). Scores are calculated at each pillar by summing the factor scores in that pillar. Not all factors and not all subcategories have equal weight.**

**For more information on ISS Governance QualityScore, visit www.issgovernance.com/solutions/qualityscore/governance. For questions, please contact:** QualityScore@issgovernance.com.

**For more information on ISS-Ethix Environmental and Social QualityScore, visit www.issgovernance.com/solutions/qualityscore/environmental-social. For questions, please contact:** ESGHelpdesk@Issethix.com.

## Vote Results

### ANNUAL MEETING 9 JUNE 2017

| Proposal | Board Rec | ISS Rec | Disclosed Result | Support Including Abstains (%)[1] | Support Excluding Abstains (%)[2] |
|---|---|---|---|---|---|
| 1.1 Elect Director Monty J. Bennett | For | For | Pass | 92.0 | 92.0 |
| 1.2 Elect Director Stefani D. Carter | For | Withhold | Pass | 79.4 | 79.4 |
| 1.3 Elect Director Lawrence A. Cunningham | For | For | Pass | 94.4 | 94.4 |
| 1.4 Elect Director Sarah Zubiate Darrouzet | For | For | Pass | 96.1 | 96.1 |
| 1.5 Elect Director Kenneth H. Fearn | For | For | Pass | 96.2 | 96.2 |
| 1.6 Elect Director Curtis B. McWilliams | For | For | Pass | 93.9 | 93.9 |
| 1.7 Elect Director Matthew D. Rinaldi | For | For | Pass | 93.8 | 93.8 |
| 1.8 Elect Director Daniel B. Silvers | For | For | Pass | 94.1 | 94.1 |
| 2 Adopt Majority Voting for Uncontested Election of Directors | For | For | Pass | 56.7* | 56.7* |
| 3 Amend Omnibus Stock Plan | For | Against | Pass | 74.3 | 74.7 |
| 4 Amend Investment Advisory Agreement | For | For | Pass | 95.5 | 96.3 |
| 5 Ratify BDO USA LLP as Auditors | For | For | Pass | 99.7 | 99.7 |

Shaded results reflect a majority of votes cast FOR shareholder proposal or AGAINST management proposal or director election

[1]Support Including Abstains is defined as %FOR/(For + Against + Abstain), as expressed as a percentage.
[2]Support Excluding Abstains is defined as %FOR/(For + Against), as expressed as a percentage, provided if different from For + Against + Abstain.
*Support as a percentage of outstanding shares.

Publication Date: 26 June 2018

Copyright © 2018 Institutional Shareholder Services Inc. All Rights Reserved. This proxy analysis and the information herein may not be reproduced or disseminated in whole or in part without prior written permission from ISS.

153927

Report generated by jdemarco@mackenziepartners.com. Unauthorized distribution of this report is prohibited.

Meeting Agenda & Proposals

## Items 1.1-1.6. Elect Directors

SPLIT

### VOTE RECOMMENDATION

WITHHOLD votes are warranted for incumbent director nominees Monty J. Bennett, Stefani D. Carter, Kenneth H. Fearn, Curtis B. McWilliams, and Matthew D. Rinaldi for a material governance failure. The board's actions following the entry into a settlement agreement with Sessa Capital demonstrated a willingness to entrench existing leadership rather than prioritizing all shareholders' interests.

WITHHOLD votes are warranted for incumbent Governance Committee members Stefani Carter and Matthew Rinaldi for a material governance failure. The company's governing documents prohibit or restrict shareholders' ability to amend the company bylaws.

A vote FOR Abteen Vaziri is warranted.

### BACKGROUND INFORMATION

**Policies:** Board Accountability | Board Responsiveness | Director Competence | Director Independence | Election of Directors | ISS Categorization of Directors | Vote No campaigns

**Vote Requirement:** The company has adopted a majority vote standard (of shares cast) for the election of directors with a plurality carve-out for contested elections, and has a director resignation policy in its governance guidelines.

### Discussion

Please see the Board Profile section above for more information on director nominees.

### CHANGES TO THE BOARD OF DIRECTORS

On Feb. 16, 2017, the company entered into a settlement agreement with then-8.5 percent shareholder Sessa Capital L.P., which ran a proxy contest prior to the 2016 annual meeting. Pursuant to the agreement, the company agreed to appoint two of Sessa's director nominees, and that two of the incumbent directors would not stand for re-election at the 2017 annual meeting. The settlement agreement included a provision that the Sessa directors would sign the same confidentiality agreements as the other directors.

On March 3, 2017, Daniel Silvers and Lawrence Cunningham were appointed to the board and each was subsequently elected at the 2017 annual meeting with more than 90 percent support. Additionally, Sarah Zubiate Darrouzet was appointed to the board on April 27, 2017 and also elected with greater than 90 percent support. On June 9, 2017, the day of the 2017 annual meeting, the company amended its corporate governance guidelines to stipulate that each director must sign a confidentiality agreement. However, the confidentiality agreements presented to directors contained provisions that were problematic for the Sessa directors. On July 7, 2017, Silvers and Cunningham each received letters stating that they were not in compliance with the corporate governance guidelines and both directors elected to resign from the board.

The board of directors at Braemar took other concerning actions in regard to the agreement signed with Sessa. The agreement with Sessa stipulated that one of Sessa's two designees would be appointed to the Nominating and Corporate Governance Committee "as promptly as practicable following the execution of [the] agreement." However, at the time of the annual meeting (according the to the company's 2017 proxy statement) and the amendments to the corporate governance guidelines, neither director had been appointed to the committee. Second, the company amended its standard confidentiality agreement after the settlement date of the Sessa agreement. Specifically, the amended confidentiality agreement contained the following provisions (as summarized in a company filing):

"The Confidentiality Agreement requires, subject to certain limited exceptions, that each director maintain the confidentiality of information relating to the Company, Ashford Hospitality Trust, Inc., Ashford Inc. and their affiliates (collectively, the "Ashford Entities") and use such information solely for the purpose of serving on the Board and in connection with the Company's business. Pursuant to the Confidentiality Agreement, each director agrees (a) not to directly or indirectly make any statement or

Copyright © 2018 Institutional Shareholder Services Inc. All Rights Reserved. This proxy analysis and the information herein may not be reproduced or disseminated in whole or in part without prior written permission from ISS.

JA 494

153927

Report generated by jdemarco@mackenziepartners.com. Unauthorized distribution of this report is prohibited.

announcement that disparages, or could reasonably be expected to damage the reputation of, any of the Ashford Entities, (b) not to publicly comment on any matter discussed or deliberated at any meeting of the Board or at any meeting of any committee of the Board, (c) to comply with any and all policies and procedures of the Company, (d) not to make any commitment as to how such director will act or vote on any issue or question in his or her capacity as a director of the Company, and (e) not to become a party to any agreement, arrangement or understanding with any person other than the Company with respect to any direct or indirect compensation, reimbursement or indemnification in connection with such director's service as a director of the Company. The Confidentiality Agreement states that no provision thereof shall require any director to violate his or her fiduciary duties to the Company."

In the 8-K announcing the resignation of Cunnigham and Silvers, the company discloses that Cunningham was a member of the Nominating and Corporate Governance Committee; however, it is not disclosed when he was appointed to the committee. Cunningham and Silvers each disclosed their concerns to the board (but the board does not disclose the specific concerns to shareholders) over several of the contractual provisions in the amended confidentiality agreements. The board stated that the directors' refusal to sign the confidentiality agreements constituted a breach of the Sessa agreement.

### Conclusion

The board's actions following its entry into the Sessa agreement are of concern to shareholders. The board amended the confidentiality agreements and implemented them into the corporate governance guidelines after signing the Sessa agreement – over the apparent objection of the Sessa designees – and then used the refusal of the Sessa designees to execute these confidentiality agreements as grounds for demanding their resignation despite overwhelming shareholder support for their election. One of the two Sessa directors was supposed to have been promptly appointed to the Nominating and Corporate Governance Committee, but as of the 2017 proxy statement, the company had elected to not abide by this provision of the agreement. Further, the company withheld the proposed changes from the remaining shareholder base and implemented the changes on the day of the annual meeting, thereby ensuring that shareholders would not have the opportunity to voice their opinions on the board's actions until the 2018 annual meeting. These actions demonstrate a willingness by the board to entrench itself and work to the directors' self-interest rather than to prioritize the unaffiliated shareholders' interests. These actions represent a material governance failure and as such, support for the incumbent director nominees is not warranted. Abteen Vaziri was appointed to the board in October 2017, after the actions in question, and may not have had sufficient time to address the ongoing governance concerns.

### RESTRICTION ON BINDING SHAREHOLDER PROPOSALS

Shareholders' ability to amend corporate bylaws is a fundamental right, which is enshrined in most states' corporation statutes. A limited number of states permit companies to adopt provisions within their governing documents that prohibit shareholders from submitting binding bylaw amendments. In this case, the company stipulates in its governing documents that the right to amend the bylaws is reserved solely to the board of directors. Under current ISS policy, such a prohibition on binding shareholder amendments materially diminishes shareholder rights and represents an ongoing governance failure. As such, with the exception of new director nominee Abteen Vaziri, withhold votes for all Governance Committee members.

### REVIEW OF EXECUTIVE COMPENSATION PRACTICES

#### Components of Pay

The chart below summarizes year-over-year CEO pay changes and provides a comparison to the median of a peer group based on industry and size criteria. Aggregate pay for all other named executive officers (NEOs) is also shown, along with the ratio of most recent CEO and NEO pay to the company's net income and revenue. Please also refer to the Compensation Profile earlier in the report.

Copyright © 2018 Institutional Shareholder Services Inc. All Rights Reserved. This proxy analysis and the information herein may not be reproduced or disseminated in whole or in part without prior written permission from ISS.

JA 495

153927

*Report generated by jdemarco@mackenziepartners.com. Unauthorized distribution of this report is prohibited.*

| ($ in thousands) | CEO | | | | CEO Peer Median | Other NEOs |
|---|---|---|---|---|---|---|
| | R. Stockton | | R. Stockton | M. Bennett | | |
| | 2017 | Change | 2016 | 2015 | 2017 | 2017 |
| Base salary | 0 | | 0 | 0 | 712 | 0 |
| Deferred comp & pension | 0 | | 0 | 0 | 0 | 0 |
| All other comp | 0 | | 0 | 0 | 34 | 0 |
| Bonus | 0 | | 0 | 0 | 0 | 0 |
| Non-equity incentives | 0 | | 0 | 0 | 879 | 0 |
| Restricted stock | 194 | -93.4% | 2,955 | 2,169 | 2,191 | 3,351 |
| Option grant | 0 | | 0 | 0 | 0 | 0 |
| **Total** | **194** | **-93.4%** | **2,955** | **2,169** | **3,931** | **3,351** |
| % of Net Income | 0.8% | | | | | 14.6% |
| % of Revenue | N/A | | | | | 0.8% |

CEO equity pay mix (by value)*        Performance-conditioned: 66.7%; Time-based: 33.3%

*Performance shares, if any, are counted and valued at target

## PAY-FOR-PERFORMANCE QUANTITATIVE SCREEN

The pay-for-performance quantitative screen uses four measures that together evaluate the alignment of CEO pay and company performance. The screen measures alignment over multiple time horizons, on both an absolute and relative basis, using multiple performance measures. The screen is designed to identify outlier companies that demonstrate a significant quantitative misalignment over time.

| Measure | Result |
|---|---|
| Relative Degree of Alignment | -6 |
| Multiple of Median | 0.05 |
| Absolute Pay-TSR Alignment | 24 |
| Initial Quantitative Concern | Low |
| Financial Performance Assessment | 14.5 |
| Overall Quantitative Concern | Low |

### RELATIVE DEGREE OF ALIGNMENT

The chart plots percentiles of the annualized 3-year performance and pay rankings for the company (▲) and ISS' derived peers (◆). The gray band generally indicates alignment



### MULTIPLE OF MEDIAN

Pay in $thousands. The gray band represents 25th to 75th percentile of CEO pay of ISS' select peer group, and the blue line represents the 50th percentile.

**CEO total pay is 0.05 times the median of peers.**



Copyright © 2018 Institutional Shareholder Services Inc. All Rights Reserved. This proxy analysis and the information herein may not be reproduced or disseminated in whole or in part without prior written permission from ISS.

JA 496

153927

**Braemar Hotels & Resorts, Inc. (BHR)**
POLICY: United States

**Meeting Date: 3 July 2018**
Meeting ID: 1242685

## ABSOLUTE PAY-TSR ALIGNMENT

CEO granted pay trends versus value of a $100 investment made on the first day of the five-year period.



| | 2013 | 2014 | 2015 | 2016 | 2017 |
|---|---|---|---|---|---|
| Pay($000) | | 2,456 | 2,169 | 2,955 | 194 |
| Indexed TSR | 100.00 | 90.61 | 75.56 | 76.84 | 56.66 |
| CEO | | Monty Bennett | Monty Bennett | Richard Stockton | Richard Stockton |

## FINANCIAL PERFORMANCE ASSESSMENT

Blue boxes indicate the company's quartile rankings compared to ISS' selected peer group in applicable measure/metric, measured over three years. The leftmost box indicates bottom quartile and rightmost box indicates top quartile.

| Measure | | Quartile Ranking vs. Peers |
|---|---|---|
| Pay | | ▇ ▢ ▢ ▢ |
| Weighted Performance | | ▇ ▢ ▢ ▢ |

| Metrics (ranked by weight) | Long-Term Performance | Quartile Ranking vs. Peers |
|---|---|---|
| ROIC | 1.0 | ▇ ▢ ▢ ▢ |
| Return on Assets | 0.6 | ▇ ▢ ▢ ▢ |
| Return on Equity | 2.2 | ▇ ▢ ▢ ▢ |
| Cash Flow Growth | 843.7 | ▢ ▢ ▢ ▇ |

## ISS AND COMPANY PEER GROUPS

| | |
|---|---|
| ISS Selected (18) | Alexander & Baldwin, Inc. Chatham Lodging Trust Columbia Property Trust, Inc. Equity Commonwealth Hersha Hospitality Trust Lexington Realty Trust Pennsylvania Real Estate Investment Trust QTS Realty Trust, Inc. Summit Hotel Properties, Inc. — Armada Hoffler Properties, Inc. Chesapeake Lodging Trust DiamondRock Hospitality Company First Industrial Realty Trust, Inc. Kite Realty Group Trust Pebblebrook Hotel Trust PS Business Parks, Inc. Select Income REIT Tanger Factory Outlet Centers, Inc. |
| Shared (0) Company-Disclosed (0) | None disclosed. |

For more information on the ISS peer group methodology, visit https://www.issgovernance.com/policy-gateway/voting-policies/

Data for ISS' pay-for-performance tests are sourced from proxy disclosures for pay and from Compustat for TSR and financial performance. For more information on ISS quantit pay-for-performance evaluation, visit https://www.issgovernance.com/policy-gateway/voting-policies/

## PEER GROUP SIZE

Size (by revenue) of the ISS, company and overlap peer groups. The gray area represents 0.4 - 2.5 times the company's revenue.



- ◆ Braemar Hotels & Resorts, Inc.
- ▇ ISS Only
- ▲ Shared
- ● Company Only

Copyright © 2018 Institutional Shareholder Services Inc. All Rights Reserved. This proxy analysis and the information herein may not be reproduced or disseminated in whole or in part without prior written permission from ISS.

JA 497

153927

Report generated by jdemarco@mackenziepartners.com. Unauthorized distribution of this report is prohibited.

## Executive Summary

| Evaluation Component | Level of Concern |
|---|---|
| *Non-Performance-Based Pay Elements* | Low |
| *Peer Group Benchmarking* | Low |
| *Severance/CIC Arrangements* | Low |
| *Comp Committee Communication/Responsiveness* | Low |
| *Pay for Performance Evaluation* | Low |

## Conclusion

Pay and performance are reasonably aligned and no significant compensation concerns are identified at this time.

Copyright © 2018 Institutional Shareholder Services Inc. All Rights Reserved. This proxy analysis and the information herein may not be reproduced or disseminated in whole or in part without prior written permission from ISS.

JA 498

153027

*Report generated by jdemarco@mackenziepartners.com. Unauthorized distribution of this report is prohibited.*

## Item 2. Ratify BDO USA, LLP as Auditors

**FOR**

VOTE RECOMMENDATION

A vote FOR this proposal to ratify the auditor is warranted.

BACKGROUND INFORMATION

Policies: Auditor Ratification

**Vote Requirement:** Majority of votes cast (abstentions not counted)

## Discussion

### AUDIT FIRM INFORMATION

The board recommends that BDO USA, LLP be reappointed as the company's independent audit firm.

| Audit firm name | BDO USA, LLP |
|---|---|
| Audit firm since (as disclosed) | 2015 |
| Audit opinion for the last fiscal year | Unqualified |
| Term to serve if reappointed | 1 year |

### FEES PAID DURING THE LAST FISCAL YEAR

| Audit firm name | BDO USA, LLP |
|---|---|
| Fees currency | USD |
| Total fees paid to the audit firm | 887,066 |
| **Audit fees** | **887,066** |
| **Audit-related fees** | **0** |
| Total transaction-related fees | 0 |
| Total tax fees | 0 |
| Other fees | 0 |
| **Total non-audit fees\*** | **0** |
| Total non-audit fees as a percentage of total fees | **0.0%** |

\*Total non-audit fees include other fees, tax advice fees, and certain transaction-related fees. Non-audit fees will also include any tax-related fees not identified as tax compliance or tax preparation.

The auditor's report contained in the annual report is unqualified, meaning that in the opinion of the auditor, the company's financial statements are fairly presented in accordance with generally accepted accounting principles.

## Analysis

This request to ratify the auditor does not raise any exceptional issues, as the auditor is independent, there are no non-audit fees, and there is no reason to believe the auditor has rendered an inaccurate opinion or engaged in poor accounting practices.

Copyright © 2018 Institutional Shareholder Services Inc. All Rights Reserved. This proxy analysis and the information herein may not be reproduced or disseminated in whole or in part without prior written permission from ISS.

JA 499

153927

*Report generated by jdemarco@mackenziepartners.com. Unauthorized distribution of this report is prohibited.*

## Equity Ownership Profile

| Type | Votes per share | Issued |
|---|---|---|
| Common Stock | 1.00 | 32,505,238 |

| Ownership - Common Stock | Number of Shares | % of Class |
|---|---|---|
| The Vanguard Group, Inc. | 3,054,491 | 9.51 |
| BlackRock Fund Advisors | 2,280,017 | 7.10 |
| Sessa Capital IM LP | 2,210,427 | 6.88 |
| Fidelity Management & Research Co. | 1,350,052 | 4.20 |
| Invesco PowerShares Capital Management LLC | 1,238,120 | 3.86 |
| SSgA Funds Management, Inc. | 964,905 | 3.00 |
| Millennium Management LLC | 936,017 | 2.91 |
| Quantitative Management Associates LLC | 922,186 | 2.87 |
| LSV Asset Management | 846,441 | 2.64 |
| AJO LP | 591,447 | 1.84 |
| JPMorgan Investment Management, Inc. | 492,289 | 1.53 |
| Dimensional Fund Advisors LP | 476,696 | 1.48 |
| Charles Schwab Investment Management, Inc. | 391,917 | 1.22 |
| ClariVest Asset Management LLC | 378,096 | 1.18 |
| WEISMAN LYLE | 376,402 | 1.17 |
| Ranger Global Real Estate Advisors LLC | 349,676 | 1.09 |
| Geode Capital Management LLC | 328,939 | 1.02 |
| BENNETT MONTGOMERY JACK | 321,048 | 1.00 |
| STOCKTON RICHARD J | 309,137 | 0.96 |
| Northern Trust Investments, Inc. | 286,729 | 0.89 |

© 2018 Factset Research Systems, Inc. All Rights Reserved. As of: 31 Mar 2018

## Additional Information

| | |
|---|---|
| Meeting Location | Dallas/Fort Worth Airport Marriott<br>8440 Airport Freeway<br>Irving, Texas |
| Meeting Time | 9:00 a.m. Central Time |
| Shareholder Proposal Deadline | January 22, 2019 |
| Solicitor | Mackenzie Partners, Inc. |
| Security IDs | 10482B101(CUSIP) |

Copyright © 2018 Institutional Shareholder Services Inc. All Rights Reserved. This proxy analysis and the information herein may not be reproduced or disseminated in whole or in part without prior written permission from ISS.

JA 500

153927

*Report generated by jdemarco@mackenziepartners.com  Unauthorized distribution of this report is prohibited*

ISS' experienced research team provides comprehensive proxy analyses and complete vote recommendations for approximately 40,000 meetings annually in around 117 markets worldwide. With a team of more than 370 research and/or data professionals, fluent in 25 languages, ISS covers every holding within a client's portfolio in both developed and emerging markets.

**Our Research Analysts are located in financial centers worldwide, offering local insight and global breadth.** Research office locations include Berlin, Brussels, London, Manila, Paris, San Francisco, Sydney, Singapore, Tokyo, Toronto, and Rockville, Maryland.

ISS has long been committed to engagement and transparency. There are several long-established channels for engaging with ISS, outlined at http://www.issgovernance.com/contact/faqs-engagement-on-proxy-research/. In addition to these long-established channels, investors and issuers and other market constituents can submit comments, concerns and feedback to the ISS Feedback Review Board through www.issgovernance.com/frb.



*The issuer that is the subject of this analysis may have purchased self-assessment tools and publications from ISS Corporate Solutions, Inc. (formerly known as ISS Corporate Services, Inc. and referred to as "ICS"), a wholly-owned subsidiary of ISS, or ICS may have provided advisory or analytical services to the issuer in connection with the proxies described in this report. These tools and services may have utilized preliminary peer groups generated by ISS' institutional research group. No employee of ICS played a role in the preparation of this report. If you are an ISS institutional client, you may inquire about any issuer's use of products and services from ICS by emailing disclosure@issgovernance.com.*

This proxy analysis and vote recommendation has not been submitted to, nor received approval from, the United States Securities and Exchange Commission or any other regulatory body. While ISS exercised due care in compiling this analysis, it makes no warranty, express or implied, regarding the accuracy, completeness or usefulness of this information and assumes no liability with respect to the consequences of relying on this information for investment or other purposes. In particular, the research and voting recommendations provided are not intended to constitute an offer, solicitation or advice to buy or sell securities nor are they intended to solicit votes or proxies.

ISS is an independent company owned by entities affiliated with Genstar Capital ("Genstar"). ISS and Genstar have established policies and procedures to restrict the involvement of Genstar and any of Genstar's employees in the content of ISS' analyses. Neither Genstar nor their employees are informed of the contents of any of ISS' analyses or recommendations prior to their publication or dissemination.

The issuer that is the subject of this proxy analysis may be a client of ISS or ICS, or the parent of, or affiliated with, a client of ISS or ICS.

One or more of the proponents of a shareholder proposal at an upcoming meeting may be a client of ISS or ICS, or the parent of, or affiliated with, a client of ISS or ICS. None of the sponsors of any shareholder proposal(s) played a role in preparing this report.

ISS may in some circumstances afford issuers, whether or not they are clients of ICS, the right to review draft research analyses so that factual inaccuracies may be corrected before the report and recommendations are finalized. Control of research analyses and voting recommendations remains, at all times, with ISS.

ISS makes its proxy voting policy formation process and summary proxy voting policies readily available to issuers, investors and others on its public website: http://www.issgovernance.com/policy.

Copyright © 2018 Institutional Shareholder Services Inc. All Rights Reserved. This proxy analysis and the information herein may not be reproduced or disseminated in whole or in part without prior written permission from ISS.

Copyright © 2018 Institutional Shareholder Services Inc. All Rights Reserved. This proxy analysis and the information herein may not be reproduced or disseminated in whole or in part without prior written permission from ISS.

**JA 501**

153927



**STATE BOARD OF ADMINISTRATION
OF FLORIDA**

**1801 HERMITAGE BOULEVARD, SUITE 100
TALLAHASSEE, FLORIDA 32308
(850) 488-4406**

**POST OFFICE BOX 13300
32317-3300**

**RON DESANTIS
GOVERNOR
CHAIR**

**JIMMY PATRONIS
CHIEF FINANCIAL OFFICER**

**ASHLEY MOODY
ATTORNEY GENERAL**

**ASHBEL C. WILLIAMS
EXECUTIVE DIRECTOR &
CHIEF INVESTMENT OFFICER**

February 3, 2020

Sent via email to [rule-comments@sec.gov](mailto:rule-comments@sec.gov)

Vanessa A. Countryman
Secretary, Securities and Exchange Commission
100 F Street NE
Washington DC 20549-1090

Re: Comments concerning S7-22-19

Dear Secretary Countryman:

The State Board of Administration (SBA) of Florida is writing with comments concerning the Commission's proposed rules on shareowner proposal resubmission thresholds. **In sum, we feel that both proposals S7-22-19 and S7-23-19 represent a hindrance to improving corporate governance and our ability as investors to perform oversight of our investments and our fiduciary duty.** These proposals devote attention to areas we feel function quite well while other aspects of the proxy voting system are in desperate need of attention.

The SBA manages the assets of the Florida Retirement System (FRS), one of the largest public pension plans in the United States with 1.1 million beneficiaries and retirees. The SBA's investment and corporate governance activities focus on enhancing share value and ensuring that public companies are accountable to their shareowners with independent boards of directors, transparent disclosures, accurate financial reporting, and ethical business practices. The SBA takes steps on behalf of its participants, beneficiaries, retirees, and other clients to strengthen shareowner rights and promote leading corporate governance practices among its equity investments in both U.S. and international capital markets.

As a fiduciary, we strive to vote in a manner that maximizes value for our beneficiaries. We do not default to proxy advisory recommendations, nor do we default to the recommendations of management. We use both ISS and Glass Lewis as advisors but we make our own voting decisions, and we deviate substantially from both advisors' recommendations in our voting pattern. We have read their thoughts and comments on these proposed rules, which we endorse. We also urge you to closely consider the comments from the CFA Institute and the Council of Institutional Investors (CII), of which we are a member, as well as their request to delay implementation of these rules for further study and comments. We also echo the eloquent comments made by T. Rowe Price[1], and we appreciate their comments in that they are both a corporate issuer and client of proxy advisory firms.

---

[1] [https://www.sec.gov/comments/s7-22-19/s72219-6721059-206207.pdf](https://www.sec.gov/comments/s7-22-19/s72219-6721059-206207.pdf)

As a client of the proxy advisory service providers, we expect that the provisions in these proposed rules will impede our ability to obtain cost-effective services on a timely basis. We do not expect any commensurate benefit or positive impact that would offset these burdens. Further, the near entirety of institutional investor commentary has indicated that these rules would in fact interfere with our right to contract with proxy advisors and not bring relief of any actual problems in the voting process. We urge you instead to focus on the issues the investing community raised in comments to the 2010 Concept Release on the U.S. Proxy System (Concept Release). Nearly 10 years ago, the Commission outlined concerns regarding the accuracy, reliability, transparency, accountability, and integrity of the system, as well as possible regulatory responses to these concerns. Many investors weighed in asking the Commission to assist in areas like vote confirmation, securities lending, investor communication, and transparency of share counting and vote tabulation. These problems, of substantial importance to investors, still exist, and are waiting to be addressed.

Today, BlackRock, Vanguard, StateStreet, T. Rowe Price and Fidelity often hold shares totaling well in excess of 20 to 40% of the voted capital. In 2010, Blackrock wrote a comment letter[2] asking for vote confirmation and XBRL. They also discussed OBO/NOBO and securities lending and record dates. Here's the entirety of what they said about proxy advisors in their eleven-page comments:

> *"Issuers sometimes raise concerns about inaccurate or incomplete data appearing in a proxy advisory firm's report. In our experience we have sometimes found this to be an issue, though the quality of proxy research, in our view, has generally improved over time. This is also an issue on which investors regularly engage and provide feedback to the proxy advisory firms. We believe that substantial additional regulation of proxy advisory firms would likely impose costs that will ultimately be borne by investors. We encourage the Commission to allow investors, and the market for proxy research, to impose discipline on providers. In our view, improvements in the quality of proxy research over the past several years suggest that the discipline of the market is working.*

> *We believe that comparing proxy advisory firms to Nationally Recognized Statistical Rating Organization[7] ("NRSROs" also known as credit rating agencies) accords greater significance to the marketplace than proxy advisory firms actually represent. Unlike NRSROs, whose evaluations of an issuer are required for certain securities offerings and whose ratings are closely tied to changes in security valuations, we believe that proxy advisory firms are less influential. In addition, investors have greater flexibility in acting on the judgments of a proxy recommendation than they typically do when considering a credit rating."*

State Street also asked for vote confirmation and discussed shareowner communication and securities lending.[3] State Street didn't even mention proxy advisory firms in their letter. Fidelity discussed Client-directed voting, OBO/NOBO and shareowner communications, and XBRL data tagging. Fidelity also did not mention proxy advisory services at all. In our review, we did not find comments from Vanguard and

---

[2] https://www.sec.gov/comments/s7-14-10/s71410-254.pdf
[3] https://www.sec.gov/comments/s7-14-10/s71410-175.pdf

T. Rowe Price to the 2010 Concept Release. **These investors vote a substantial portion of the shares in the market, and none of them submitted comments to voice concern about proxy advisors.**

In contrast, the 2010 letter submitted by the chair of the Business Roundtable concerning the concept release contains over a page of recommended regulations for proxy advisors that match almost completely to those in this current rule proposal. The 2010 letter states in part, "As a result, at many of our companies a single proxy advisory firm controls 20-35% of the vote. Moreover, many proxy advisory firms do not evaluate the facts and circumstances of particular companies in making their recommendations." **Both of these statements are false.** Just because 20-35% of certain voting item outcomes *coincide* with the proxy advisor recommendations does not mean they are "controlled". The analysis done by proxy advisors often reaches the same conclusions as the broader market. But importantly, sometimes just two to three percent of the votes correspond to the recommendations of any single proxy advisor, making it evident that there is no "control". The Business Roundtable also falsely asserted that the advisory firms do not evaluate the individual circumstances of companies. As a purchaser and consumer of these reports, I can assure you that they do. The problems, attention and importance that the Business Roundtable ascribed to the proxy advisors is simply not shared by the largest investors in the marketplace.

It is tragic and avoidable that we are no closer to vote confirmation, despite continued technological improvements in the market. Investors still have problems recalling loaned shares due to late disclosure of record dates. We still lack transparency on a variety of aspects of the voting chain, which lead to real consequences and failures in the market. Consider the Yahoo! vote from 2008, when a massive error was found only by happenstance, due to the discrepancy occurring in an unusually large holding.[4] This is inexcusable in a modern system. These are the areas to which the Commission should be dedicating its efforts.

Much is made of the collective action problem underlying the choice of institutional investors in hiring proxy advisors, but companies hire advisors in similar capacities routinely. They hire compensation consultants who aggregate market data and practices and produce compensation plan guidance, they hire lawyers that advise them on what matters to put forth on the proxy including language and management recommendations, and they hire accounting teams to assist with not just audits, but a myriad of non-audit accounting functions and to provide advice. Companies and investors hire advisors because it is an efficient and effective way to get information and context in making decisions. Our advisors don't make our decisions for us any more than theirs do. Rules inhibiting the collection of information and advice for analysis of proxy statements are unnecessary on either side. These rules will interfere with our ability to make timely decisions, and we join with many other commenters in expressing significant concern that they will drive up the prices of these services without commensurate benefit.

Much of the proposal concentrates on the analysis process of the advisors and its quality. As the clients of this research, we have found the quality to be quite robust and unproblematic. In the course of our engagements with company management and board members, SBA staff has often heard about

---

[4] https://www.wsj.com/articles/SB121795327814413747

purported "errors" in the advisory reports, and yet we have not encountered a single error that was either significant in its impact or one that would have changed our vote outcome.

The Commission attempted to highlight registrant concerns with advisors in Table 2 in the proposed rules. We have also reviewed the Commission's memorandum of January 16, 2020 (issued in response to a request for the underlying data from the Council of Institutional Investors). It appears that the criteria used by the Commission to discern a factual error, a methodological deficiency or both is overly broad, and it is grossly inadequate as a basis to support these rules. The second criteria noted in the memo explicitly includes an additional DEF 14A filed by an issuer citing disagreement with an adverse voting recommendation; this is neither an error nor deficiency. [5] This type of disagreement is quite routine and constitutes a significant amount of the engagement that the SBA conducts with issuers.

The third and fourth criteria from the memo that imply the proxy advisor committed an error are equally problematic. The table is counting instances when the issuer has filed additional information concerning changes made in the current year (criteria 3) or a change in circumstances (criteria 4) *in response to* an "adverse" voting recommendation as errors or at least valid concerns (the data underlying the table discussed in the memorandum is incomplete). These are *updates* on the issuer side, not errors in analysis or judgment by the advisors. Further, the proxy advisors already regularly alert us when there are changes in the information the company provides. Indeed there are times that new information causes our advisors to change their recommendation, so the current system works quite well.

The additional DEF 14a filings that the Commission provides in the memorandum show that issuers already have a mechanism for expressing concern with proxy advisory recommendations and further obviate the need for these rules. In our review of additional DEF 14A filings in the data file underlying Table 2, we saw the arguments that companies make every day in our engagement with them: they do not agree with the peer groups chosen for them, they didn't agree with an accounting measure being GAAP or Non-GAAP, or they disliked the timing over which performance was assessed or how compensation metrics were assessed for disclosure levels. These are not actual mistakes; they are simply judgments the company did not agree with. They contained language such as, "For these reasons, Glass Lewis was mistaken in supporting proponent's proposal."[6] The company American Outdoor Brands submitted this quote when they filed an additional DEF 14A on September 6, 2018. They filed similar additional proxy materials on September 10, 2018 charging that ISS also was "mistaken" in supporting the proposal; therefore, this company's filings represent two of the 2018 "errors" cited in Table 2. These filings concerned a shareowner proposal made on gun safety which passed with 52% of the vote, and SBA voted in support of that proposal. We weighed the arguments made by both sides, carefully. These types of filings do not show alleged errors made by advisors and certainly do not justify the additional regulation proposed in these rules.

The proposed rules are arbitrary and capricious in their scope, design, and impact on our ability to cast timely votes in a cost-effective manner. We strongly urge the Commission to heed the views of the

[5] https://www.sec.gov/comments/s7-22-19/s72219-6660914-203861.pdf
[6] https://www.sec.gov/Archives/edgar/data/1092796/000119312518267792/d620794ddefa14a.htm

Council of Institutional Investors, the SEC's own Investor Advisory Committee and the many investors who are recommending the Commission not move forward with these rules, but instead focus on more important and problematic aspects of the proxy voting process. **These rules will impose real cost on investors and will introduce delays in our voting process.** The Commission has not made a sufficient or compelling case for this proposal.

The following quotes by Allison Lee, SEC Commissioner, and Rick Fleming, Investor Advocate at the SEC, illustrate our thoughts on the proposed rules. Please consider them as you move forward in your deliberations.

> "Today's proxy voting release, however, creates significant risks to the free and full exercise of shareholder voting rights. First, it introduces increased costs and time pressure into an already byzantine and highly compressed process. Second, it calls for more issuer involvement in the process despite widespread agreement among institutional investors and investment advisers that greater involvement would undermine the reliability and independence of voting recommendations. Significantly, we are creating these risks without notice and comment, without justifying the choices made to affected parties and the public, and without weighing the costs and benefits of the chosen course." - SEC Commissioner Allison Lee, August 21, 2019

> "Indeed, at the roundtable on the proxy process that the commission held last November, I think the investors made it pretty clear they are relatively happy with the services they receive from proxy advisers. This is not to suggest that proxy advisers are perfect, but to the extent that any problems exist, it seems that their paying customers should be the ones to raise them. Investors certainly don't want those problems to be *solved* by injecting costly inefficiencies into an already-cumbersome process or by giving companies more opportunities to influence the advice that is given to investors about how they should vote." - Rick Fleming[7]

Thank you for your consideration of these significant issues. If you have any questions, please contact Michael McCauley, Senior Officer—Investment Programs and Governance, at █████████, or ████████████████.

Sincerely,

Ashbel C. Williams
Executive Director & CIO

---

[7] https://www.irmagazine.com/regulation/sec-investor-advocate-cautions-proxy-adviser-controls