_In the_

# United States Court of Appeals

### _for the_

## District of Columbia Circuit

INSTITUTIONAL SHAREHOLDER SERVICES, INC.,
_Plaintiff-Appellee,_

— v. —

SECURITIES & EXCHANGE COMMISSION,
and MARK T. UYEDA, in his official capacity as Acting Chair of the SEC
_Defendant-Appellant,_

NATIONAL ASSOCIATION OF MANUFACTURERS,
_Intervenor-Appellant._

On Appeal from the United States District Court
for the District of Columbia
Case No. 19-cv-3275, Hon. Amit P. Mehta, United States District Judge

**JOINT APPENDIX
VOL. 3 OF 4**

ERICA T. KLENICKI
MICHAEL A. TILGHMAN II
 _NAM Legal Center_
 _733 10th Street NW_
 _Suite 700_
 _Washington, DC 20001_
 _(202) 637-3000_

PAUL W. HUGHES
ANDREW A. LYONS-BERG
EMMETT WITKOVSKY-ELDRED
 _McDermott Will & Emery LLP_
 _500 North Capitol Street NW_
 _Washington, DC 20001_
 _(202) 756-8000_

_Counsel for Intervenor-Appellant_
_Additional Counsel Cont._

JEFFREY MATTHEW HARRIS
JAMES HASSON
  *Consovoy McCarthy PLLC*
  1600 Wilson Boulevard
  Suite 700
  Arlington, VA 22209
  (703) 243-9423

MARI-ANNE PISARRI
  *Pickard Djinis and Pisarri LLP*
  1818 N Street, NW
  Suite 515
  Washington, DC 20036
  (202) 223-4418

*Counsel for Plaintiff-Appellee*
*Institutional Shareholder Services, Inc.*

# TABLE OF CONTENTS

**Volume 1**

District Court Docket Entries ..................................................... JA 1

Complaint (Dkt. 1) ................................................................. JA 13

Amended Complaint (Dkt. 19) .................................................. JA 43

Netram Declaration (Dkt. 27-2) ............................................... JA 74

Administrative Record Index (Dkt. 30) ..................................... JA 81

SEC Cross Motion for Summary Judgment (Dkt. 35-1) ...................... JA 116

Opinion (Dkt. 69) ................................................................. JA 169

Order re Motions for Summary Judgment (Dkt. 70) ........................... JA 203

NAM Notice of Appeal (Dkt. 72) ............................................... JA 204

SEC Notice of Appeal (Dkt. 74) ............................................... JA 205

Statement of Commissioner Allison Herren Lee (Aug. 21, 2019) ........ JA 206

Commission Interpretation and Guidance Regarding the Applicability
of the Proxy Rules to Proxy Voting Advice, 84 Fed. Reg. 47,416 (Sept.
10, 2019) ............................................................................ JA 214

Paul Rose Comment (Nov. 14, 2019) ........................................ JA 219

Proposed Rule (Dec. 4, 2019) ................................................. JA 232

**Volume 2**

Garmin Comment (Jan. 27, 2020) ............................................. JA 274

CII Comment (Jan. 30, 2020) .................................................. JA 277

ISS Comment (Jan. 31, 2020) ................................................. JA 342

Chamber of Commerce Comment (Jan. 31, 2020) ........................... JA 431

Braemar Hotel Comment (Feb. 1, 2020) ................................................ JA 447

Florida State Board of Administration Comment (Feb. 3, 2020) ......... JA 502

**Volume 3**

National Association of Manufacturers Comment (Feb. 3, 2020) ........ JA 507

Center on Executive Compensation Comment (Feb. 3, 2020) ............. JA 526

ExxonMobil Comment (Feb. 3, 2020) .................................................... JA 563

New York State Comptroller Comment (Feb. 3, 2020) ......................... JA 644

Ohio Public Employees Retirement System Comment (Feb. 3, 2020) ..................................................................................................... JA 665

Colorado Public Employees Retirement System Comment (Feb. 3, 2020) ..................................................................................................... JA 677

California Public Employees Retirement System (Feb. 3, 2020) ......... JA 689

Glass Lewis Comment (Feb. 3, 2020) .................................................... JA700

CII Letter re Data Analysis (Feb. 4, 2020) ........................................... JA 778

**Volume 4**

Statement of Commissioner Allison Herren Lee (July 22, 2020) ........ JA 797

Final Rule (Sept. 3, 2020) ...................................................................... JA 808

District Court Hearing Transcript (July 27, 2022) ............................... JA 882



**Chris Netram**

*Vice President,*
*Tax and Domestic Economic Policy*


February 3, 2020

Vanessa A. Countryman
Secretary
Securities and Exchange Commission
100 F Street NE
Washington, DC 20549-1090

      Re:      File No. S7-22-19: *Amendments to Exemptions from the Proxy Rules for Proxy*
                 *Voting Advice*

Dear Ms. Countryman:

The National Association of Manufacturers appreciates the opportunity to provide comments to the Securities and Exchange Commission on File No. S7-22-19, Amendments to Exemptions from the Proxy Rules for Proxy Voting Advice.[1]

The NAM is the largest manufacturing trade association in the United States, representing small and large manufacturers in every industrial sector. These businesses often turn to the public market to finance the significant investments in equipment and research necessary for manufacturing success. The public market also empowers manufacturers to drive economic expansion and job creation across the country, enabling the industry to employ 13 million Americans across all 50 states. Millions of these Americans enjoy competitive retirement benefits that also depend on the public market, as 67 percent of manufacturing workers participate in a workplace retirement plan.[2]

It is clear that the sustained success of innovative manufacturers in the United States and the investment returns valued by millions of hard-working Americans depend on a vibrant public market that supports capital formation and long-term growth. Manufacturers know that a central factor to their success as publicly traded companies is a proxy process that enables smart business growth and strong investor returns. A well-calibrated proxy process allows company management to engage in a productive dialogue with investors, who are of course the ultimate owners of any publicly traded corporation, about key aspects of the business. The NAM is committed to supporting a proxy process that enables, rather than impedes, this vital investor-management dialogue, and we applaud the SEC's ongoing efforts to institute proxy reforms that benefit investors and issuers alike.

In particular, we are encouraged that the SEC has over the last two years made several notable reforms to right-size the role that proxy advisory firms play in the marketplace, and that the Commission's recently proposed rule would, if finalized, build on this momentum.

---

[1] *Amendments to Exemptions from the Proxy Rules for Proxy Voting Advice*, 84 Fed. Reg. 66518 (4 December 2019). Release No. 34-87457, *available at* https://www.sec.gov/rules/proposed/2019/34-87457.pdf. Hereinafter "proposed rule," "proposing release," "proposal," or "rule proposal."

[2] *National Compensation Survey: Employee Benefits.* Bureau of Labor Statistics, March 2018. *Available at* https://www.bls.gov/ncs/ebs/benefits/2018/ownership/private/table02a.pdf.

JA 507

***The SEC's Deliberate Approach to Proxy Firm Rulemaking***

Manufacturers greeted with enthusiasm the September 2018 withdrawal[3] of two no-action letters issued to ISS and Egan-Jones in 2004, as the letters had entrenched and empowered proxy advisory firms for more than a decade.[4] We also appreciated that the SEC's November 2018 Roundtable on the Proxy Process gathered a diverse group of voices to discuss these important issues. The NAM submitted a comment letter[5] in October 2018 in conjunction with the roundtable and later submitted follow-up comments[6] in March 2019 specifically calling for "targeted reforms and effective oversight" of proxy advisory firms. Subsequently, in August 2019, the Commission issued guidance clarifying that investment advisers have a substantial due diligence requirement when relying on proxy firms,[7] and that the firms themselves are subject to the federal proxy rules.[8]

As we consider the proposed rule, which would build on the last two years' progress by making welcome amendments to the way in which the proxy rules and the exemptions therefrom apply to proxy advisory firms, the NAM applauds the deliberative, iterative process by which the Commission has considered, and ultimately proposed, these important reforms. The breadth and depth of stakeholder input considered (ranging from the 2010 Concept Release on the U.S. Proxy System[9] and the 2013 Roundtable on Proxy Advisory Services to the last two years of feedback and deliberation) provides a strong foundation for the rule proposal, and the proposing release offers justifications for the proposed reforms grounded in the last decade of stakeholder engagement.

If finalized, the proposed rule would represent a significant change in how issuers and investors experience the influence of proxy advisory firms. The firms would still be able to provide research and voting recommendations to their institutional investor clients, filling a market need that the NAM understands and appreciates. However, they would do so with enhanced transparency around their conflicts of interest, methodologies, and sources of information, as well as a new process for issuer engagement that will improve the accuracy and reliability of their recommendations.

The NAM applauds the SEC for proposing a comprehensive rule updating the proxy voting ecosystem. We support the core provisions of the proposal, including the clarification that furnishing proxy voting advice constitutes a solicitation, the amendments to Rule 14a-2(b) conditioning its exemptions on proxy firms disclosing their conflicts of interest and more fulsomely engaging with issuers, and the enhancements to Rule 14a-9's antifraud rules. For reasons discussed in greater

---

[3] *Statement Regarding Staff Proxy Advisory Letters*. SEC Division of Investment Management, 13 September 2018. *Available at* https://www.sec.gov/news/public-statement/statement-regarding-staff-proxy-advisory-letters.

[4] As NAM President and CEO Jay Timmons stated when the letters were withdrawn: "For far too long, proxy advisory firms have exerted undue influence over manufacturing companies, trying to force business decisions without any regard to investors' best interests. This is a threat not only to manufacturing growth, but also to the savings of millions of American workers." *See SEC Ruling Puts Manufacturers First* (13 September 2018), *available at* https://www.nam.org/sec-ruling-puts-manufacturers-first-1013/.

[5] NAM Comments on File No. 4-725, 30 October 2018. *Available at* https://www.sec.gov/comments/4-725/4725-4581799-176285.pdf.

[6] NAM Comments on File No. 4-725, 5 March 2019. *Available at* https://www.sec.gov/comments/4-725/4725-5020171-182986.pdf.

[7] *Commission Guidance Regarding Proxy Voting Responsibilities of Investment Advisers*, 84 Fed. Reg. 47420 (10 September 2019). Release Nos. IA-5325; IC-33605, *available at* https://www.sec.gov/rules/interp/2019/ia-5325.pdf.

[8] *Commission Interpretation and Guidance Regarding the Applicability of the Proxy Rules to Proxy Voting Advice*, 84 Fed. Reg. 47416 (10 September 2019). Release No. 34-86721, *available at* https://www.sec.gov/rules/interp/2019/34-86721.pdf.

[9] *Concept Release on the U.S. Proxy System*, 75 Fed. Reg. 42982 (22 July 2010). Release Nos. 34-62495; IA-3052; IC-29340, *available at* https://www.sec.gov/rules/concept/2010/34-62495.pdf.

detail below, we also would appreciate the Commission's further consideration of amendments to appropriately regulate the practice of automatic vote submission in order to ensure that the reforms reflected in the proposed rule are meaningful and effective. We respectfully urge the Commission to expeditiously issue a final rule that maintains the proposed reforms while also implementing targeted enhancements that we believe would further protect investors and improve the proxy process. If finalized effectively, the proposed rule will bolster capital formation by allowing issuers to grow their business and ultimately generate long-term returns that will enable millions of hard-working Americans to invest for a new home, a child's education, or a secure retirement.

## I.     Impact of Proxy Advisory Firms

Proxy advisory firms have risen to prominence in the wake of increased institutional ownership of American stocks. According to one recent report, institutional investors now control nearly 80 percent of market value on U.S. exchanges.[10] Fund managers at institutions, charged with voting an ever-increasing number of proxies on their clients' behalf, have turned to proxy firms to shape, and sometimes even cast, their votes. As a result, proxy advisory firms have enormous influence over the corporate governance policies of U.S. public companies – decisions that impact the direction of a business and the life savings of millions of investors.

To be clear, the NAM does not object to proxy firms playing a role in providing accurate information to the marketplace. To the extent that their relationships with institutional investors result in more fair, balanced, and complete information being made available to the market, thereby enabling these institutions to better serve their Main Street investor clients, the NAM believes that proxy firms can be constructive and provide a useful service. A neutral, fact-based process that results in helpful recommendations presented alongside management proposals can only benefit investors and issuers. However, the current paradigm is far from a neutral, fact-based process, and the recommendations produced are often problematic in a variety of ways. Indeed, the flaws embedded into the business model of proxy advisory firms are at this point well-documented:

- Proxy firms insist upon a one-size-fits-all approach to corporate governance that does not take into account differences in companies' business models and the flexibility allowed under securities law. Increasingly, they also advocate for a normative agenda that seeks to shape rather than analyze and report on corporate behavior, particularly as it relates to environmental, social, and governance (ESG) priorities.

- The process by which proxy firm recommendations are developed lacks transparency, and the firms' one-size-fits-all policy guidelines are likewise established out of the public eye (unlike the SEC rules with which public companies must comply, which are of course subject to a rigorous notice-and-comment process). In addition, the firms issue specialty reports developed using vague methodologies that depart from their standard benchmark policies.

- Proxy firm reports and recommendations feature a profusion of errors and misleading statements, ranging from specific incorrect facts to disingenuous assumptions about, for instance, a company's peer group or compensation practices. The recommendations also feature terms with common market meanings like "total shareholder return" but often use opaque calculation methodologies that vary from traditional market practice.

- Proxy firms have been steadfastly resistant to engaging in a productive dialogue with issuers to correct errors and misunderstandings; indeed, one of the firms will only engage with

---

[10] McGrath, Charles. *80% of equity market cap held by institutions.* Pensions & Investments, 25 April 2017. http://www.pionline.com/article/20170425/INTERACTIVE/170429926/80-of-equity-market-cap-held-by-institutions.

companies in the S&P 500, while another charges issuers a fee to review their draft recommendations.

- Proxy firms often engage in the automatic submission of proxy votes (a practice sometimes known as "robo-voting") on behalf of their clients, meaning that the flaws intrinsic to their recommendations are translated immediately into voting power, completely cutting investment advisers and their clients out of the process and depriving issuers of a chance to correct the record or provide investors with additional information.

In addition to the flawed process described above, proxy advisory firms also have *prima facie* conflicts of interest. Of the two leading firms in the space, Glass Lewis is owned by an investor that engages in proxy contests, while ISS operates a consulting business that counsels companies on the very corporate governance policies on which the advisory side of the firm makes recommendations. The ISS consulting service is particularly concerning to manufacturers and their investors given that the complexity and lack of transparency inherent in ISS's proxy voting advice and ESG ratings provides a strong incentive for companies to purchase consulting services in order to model and predict the impact of ISS's standards – all the while generating revenue for ISS.

Despite this profusion of "red flags," the proposing release notes that the proxy firms' advice "is often an important factor in the[ir] clients' proxy voting decisions"[11] and, in many cases, as mentioned, the firms actually cast proxy votes on their clients' behalf without client interaction or confirmation. This level of influence gives the proxy firms significant power over proxy results, forcing issuers to contort their policies to meet the proxy firms' guidelines or risk an adverse recommendation and corresponding vote against the company on the proxy ballot. Studies have found that the proxy firms can control up to 25 percent of the shareholder vote[12] – much of which is submitted (often automatically) shortly after the proxy firm report is published, limiting issuers' ability to engage in a productive dialogue with their shareholders about an issue.

Proxy advisory firms' significant influence on corporate policies and shareholder voting decisions amplifies the flaws in their business model, including their significant conflicts of interest, errors and methodological mistakes, one-size-fits-all policies, and lack of engagement with issuers. Reform is clearly necessary to protect the life savings of the millions of manufacturing workers whose investments are affected by proxy firms.

II.  **Proposed Codification of the Commission's Interpretation of "Solicitation" Under Rule 14a-1(l) and Section 14(a)**

The significant influence that the proxy firms wield, and their substantial impact on the market, provides clear justification for the proposed rule's codification of the Commission's August 2019 interpretation and guidance, which clarified that the furnishing of proxy voting advice, as practiced by proxy advisory firms, generally constitutes a "solicitation" under Exchange Act Section 14(a).[13] As the proposing relates states:

> "[A]n overarching purpose of Section 14(a) is to ensure that communications to shareholders about their proxy voting decisions contain materially complete and accurate information. It would be inconsistent with that goal if persons whose business is to offer and sell voting

---

[11] Proposing Release, *supra* note 1, at 8.

[12] Malenko, Nadya and Yao Shen. "The Role of Proxy Advisory Firms: Evidence from a Regression-Discontinuity Design." *The Review of Financial Studies*, Volume 29, Issue 12. December 2016.

[13] August 2019 Interpretation and Guidance, *supra* note 8.

*advice broadly to large numbers of shareholders, with the expectation that their advice will factor into shareholders' voting decisions, were beyond the reach of Section 14(a)."[14]*

The NAM has consistently called for clarification that proxy firm recommendations constitute a solicitation and thus subject the firms to Rule 14a-9's antifraud provisions and necessitate their reliance on the Rule 14a-2(b) exemptions from the relevant information and filing requirements. In our October 2018 comment letter, we called for "targeted reforms" to the Schedule 14A regulatory regime in order to "ensure that investors are receiving accurate, conflict-free information" from proxy advisory firms.[15] Similarly, in March 2019 we called for "SEC clarification that the furnishing of proxy voting advice as practiced by proxy firms does indeed qualify as proxy solicitation."[16] We applaud the SEC for identifying the impact on investors that proxy firms can have, and we strongly agree that proxy firm recommendations represent the "type of activity that raises the investor protection concerns about inadequate or materially misleading disclosures that Section 14(a) and the Commission's proxy rules are intended to address."[17] As such, we strongly support the proposed rule's clarification that proxy voting advice generally constitutes a solicitation. The proposed rule would place proxy firms and issuers on equal regulatory footing – both would face a mandate to avoid false, misleading, and deceptive communications to investors.

Furthermore, it is abundantly clear that the SEC has the authority to classify proxy voting advice as a solicitation, and that the definition promulgated in the proposed rule is appropriate. Given that the Exchange Act does not provide a specific definition for actions that constitute a solicitation, the Commission has historically, as it proposes to do again in this case, "exercised its rulemaking authority…to define what communications are solicitations and to prescribe rules and regulations when necessary and appropriate to protect investors."[18] In this context, the proposed rule is appropriate and in line with historical updates to the definition.

As the proposing release notes, (i) proxy advisory firms disseminate proxy voting advice that is specific to a registrant's upcoming meeting and generally includes a vote recommendation for each proposal, (ii) proxy firms market this specific expertise and analysis, (iii) proxy firm clients pay for the use of the firms' expertise and analysis, which is specifically relevant to upcoming shareholder meetings, and (iv) the advice is disseminated shortly before the proxy firm clients cast shareholder votes. These are all significant, relevant factors making clear that proxy voting advice is "a communication to security holders under circumstances reasonably calculated to result in the procurement, withholding, or revocation of a proxy."[19] The NAM strongly supports the clarification that proxy voting advice generally constitutes a solicitation, and we respectfully urge the SEC to retain the codification of the Commission's recent interpretation and guidance on this topic as the linchpin to any final rule.

<u>Application of the Solicitation Definition</u>

Additionally, the NAM strongly supports the Commission's additional clarifications regarding the types of proxy firm reports and actions that would be classified as a solicitation. Specifically, the proposing release makes clear that each and every voting recommendation offered by a proxy advisory firm would be considered "separate communications of proxy voting advice" and thus fall

---

[14] Proposing Release, *supra* note 1, at 19.

[15] NAM October 2018 Letter, *supra* note 5, at 5.

[16] NAM March 2019 Letter, *supra* note 6, at 6.

[17] Proposing Release, *supra* note 1, at 17.

[18] *Id.* at 13.

[19] *Id.* at 16.

under the definition of solicitation.[20] This is an important clarification because, as the proposing release notes, proxy firms often use more than one set of guidelines to formulate their voting recommendations, and subsequently disseminate differentiated recommendations based on the distinct sets of guidelines.

Shareholders can subscribe to the benchmark policy guidelines and/or a number of specialty reports related to, for example, sustainability, social, or labor policy. Some proxy firm clients also have custom, tailored policy guidelines prepared in certain circumstances. The proposed rule would, appropriately, classify each of these reports as acts of solicitation. In bringing these reports under Section 14(a), the SEC proposes a comprehensive regulatory regime that would ensure the important reforms included in the proposing release (e.g., the amendments to the exemptions from Section 14(a)'s information and filing requirements that would allow issuers to provide feedback on draft recommendations) apply to all the reports developed by the proxy advisory firms. Given the influence that proxy firm reports outside the benchmark policy can have, the NAM strongly supports clarifying that the proxy firms' benchmark, specialty, and tailored reports, as well as any other proxy voting advice promulgated, are all subject to Schedule 14A.

Furthermore, the proposing release clarifies that the furnishing of proxy voting advice qualifies as a solicitation even if a proxy firm is ultimately indifferent to the result of a given shareholder vote or if a proxy firm client ultimately chooses not to follow a specific vote recommendation. This clarification is key, as the proxy firms have in the past claimed that their supposed indifference to voting outcomes should exempt them from Section 14(a). Ultimately, all proxy firm recommendations are reasonably calculated to result in a proxy voting decision and, as such, all voting recommendations should be clearly within the scope of Section 14(a) even in instances when a proxy firm may be indifferent to the result or a client may choose not to follow the firm's advice.

<u>Proxy Firm ESG Ratings</u>

In addition to the voting recommendations for which the proxy firms are most well-known, they also publish ratings scoring companies' adherence to certain environmental, social, and governance standards. Most notably, ISS offers a range of ESG ratings, including its QualityScore product, that evaluate companies based on certain ESG metrics. Similar ratings are offered by other entities outside of the traditional proxy firm duopoly, including ratings agencies like Sustainalytics, RepRisk, MSCI, and SASB. In manufacturers' experience, these unregulated actors all share a similar methodology: boiling a complex issue (or, often, multiple complex issues) down into a single numerical score or letter grade with little to no disclosure as to how such score or grade is calculated.

As with proxy firm recommendations, these one-size-fits-all ratings do not take into account the individual circumstances of a given company nor provide any context for a company's ESG work outside of the check-the-box approach favored by the ratings firms. Furthermore, it is often unclear to issuers and investors alike exactly what data went into calculating a given rating. Companies report receiving dozens of surveys from proxy ratings agencies asking for information, but it is unclear how and if their responses are utilized and what the impact would be of choosing not to respond to a given survey. As such, management is forced to make a choice between spending time and resources providing information to a black box in the hopes of achieving a "good" score and ignoring the cavalcade of incoming surveys from these unregulated firms and risking a "bad" score.

As the SEC works to finalize the proposed rule's codification of the Commission's interpretation of the definition of solicitation, the NAM would encourage a close look at the increasingly significant role that ESG ratings are having on investment and voting decisions. As the August 2019

---

[20] *Id.* at 18.

interpretation and guidance notes, the SEC "has previously stated that the federal proxy rules apply to any person seeking to influence the voting of proxies by shareholders, regardless of whether the person itself is seeking authorization to act as a proxy."[21] As with proxy firm recommendations, ESG ratings are clearly designed to influence proxy voting, and manufacturers have found that institutional investors' reliance on these ratings is increasing. The NAM would welcome clarification about the status that ESG ratings have in the updated solicitation regime, as well as appropriate oversight from the SEC on ESG ratings agencies' methodologies, sources of information, and influence on proxy voting decisions.

## III.    Proposed Amendments to Rule 14a-2(b)

Having clarified that the furnishing of proxy voting advice qualifies as a solicitation under Section 14(a), the proposing release next makes vital reforms that rely on this clarification by amending the Rule 14a-2(b) exemptions from Schedule 14A's filing and information requirements on which the proxy firms rely. The NAM has consistently called for amendments to Rule 14a-2(b) to "ensure that proxy advisory firms furnish advice to institutional investors that is developed with the best interests of Main Street investors in mind."[22] Specifically, we have called for the 14a-2(b) exemptions to "address the key structural flaws endemic to the proxy firms' business model – namely, their one-size-fits-all policies, lack of transparency, propensity for errors, misleading assumptions about key benchmarks like peer groups, lack of dialogue with issuers, problematic robo-voting policies, and significant conflicts of interest."[23]

The NAM agrees with the SEC that "it is unnecessary for [proxy advisory firms] to comply with the filing and information requirements of the proxy rules to the same extent as non-exempt soliciting persons, *provided other measures are in place to protect investors*."[24] As the proposing release notes, concerns have been raised, by the NAM and others, about the firms' conflicts of interest impacting the "objectivity of the proxy voting advice," the "accuracy and material completeness" of the firms' research, and the lack of investor access to "information and views from the registrant" about which the proxy firm is making recommendations.[25] These significant concerns provide a clear justification for the targeted amendments that the SEC has proposed to Rules 14a-2(b)(1) and 14a-2(b)(3), which will allow proxy firms to remain exempt from the filing and information requirements while instituting important measures to protect investors.[26]

### *Conflicts of Interest*

Enhanced Conflicts Disclosures

The conflicts of interest endemic to the proxy advisory firms' business model have given rise to numerous situations in which "the interests of a proxy voting advice business may diverge materially from the interests of investors," as described in the proposing release.[27] The firms' ownership, client

---

[21] August 2019 Interpretation and Guidance, *supra* note 8, at 5.

[22] NAM March 2019 Letter, *supra* note 6, at 5.

[23] *Id.* at 6.

[24] Proposing Release, *supra* note 1, at 26 (emphasis added).

[25] *Id.*

[26] As the proposing release notes, both exemptions were adopted at a time before proxy advisory firms wielded the influence that they now do, and the firms have historically relied on one or both of the exemptions to avoid Schedule 14A's information and filing requirements. Throughout the proposed rule, the SEC applies any amendments to Rule 14a-2(b) to both the 14a-2(b)(1) and 14a-2(b)(3) exemptions, ensuring that that reforms apply irrespective of which exemption is being utilized. The NAM supports this broad application of the proposed reforms.

[27] Proposing Release, *supra* note 1, at 28.

relationships, and commercial practices all represent significant potential for conflicts of interest. Indeed, proxy firms themselves have recognized this fact – in a June 2018 letter to the Senate Banking Committee, Glass Lewis characterized ISS's business consulting service as "a problematic conflict of interest that goes against the very governance principles that proxy advisors like ourselves advocate."[28] As such, the NAM supports the proposed rule's amendments to Rule 14a-2(b) that would condition the availability of the 14a-2(b)(1) and 14a-2(b)(3) exemptions on robust disclosure of a proxy firm's material conflicts of interest.

Under the rule proposal, a proxy advisory firm relying on the Rule 14a-2(b)(1) and 14a-2(b)(3) exemptions would be required to disclose any material interests the firm has in the matter under consideration or the parties impacted, any material transaction or relationship the firm has with the issuer or shareholder proponent, and any other information about the firm and its relationships that would be material in evaluating its objectivity. The firm would also be required to provide a discussion of the policies and procedures it has in place to identify and address any material conflicts of interest. These proposed conditions to the 14a-2(b)(1) and 14a-2(b)(3) exemptions would promote consistency in proxy firms' conflicts disclosures and give investors vital information about the nature of the firms' conflicts and any steps taken to mitigate them. Accordingly, the NAM strongly supports the proposed conflicts disclosures.

We also applaud the proposing release's detailed discussion of the myriad conflicts that often arise in the proxy firms' ordinary course of business. The release highlights as significant conflicts instances in which the firms provide:

- Both voting advice about and consulting services to a given issuer;

- Voting advice on a matter in which the firm or its clients have a material interest;

- Both ratings of issuers' corporate governance practices and consulting services to help issuers improve said ratings; and

- Voting advice about a given issuer when the firm's affiliates have a relationship with the issuer and/or a shareholder proponent.[29]

The NAM respectfully encourages the SEC to maintain this detailed, instructive list in the final rule, and to codify the broader, more conceptual list from its August 2019 guidance. The guidance emphasizes the importance of proxy firms identifying, disclosing, and addressing any conflicts related to the firms' proxy advice and proxy voting services and those related to other services the firms provide, as well as any conflicts related to the firms' affiliations.[30] Maintaining the examples in the proposed rule and codifying the examples from the August 2019 guidance would validate the issues that companies have experienced with proxy firm conflicts and provide important context for the types of conflicts that A.) could impact investors' reliance on proxy firm recommendations and B.) are appropriate to disclose under the new conflicts disclosure condition to the Rule 14a-2(b)(1) and 14a-2(b)(3) exemptions.

---

[28] Glass Lewis Response to U.S. Senate Banking Committee Letter, 1 June 2018. *Available at* https://www.glasslewis.com/wp-content/uploads/2018/06/Glass-Lewis-Response-to-May-9-2018-Chairman-Heller-Letter_0601_FINAL.pdf.

[29] Proposing Release, *supra* note 1, at 27.

[30] August 2019 Guidance, *supra* note 7, at 19.

<u>Form and Function</u>

The NAM supports the SEC's efforts to ensure that the proposed disclosures are sufficiently "specific" and "prominent" and to clarify that disclosures that are "vague or boilerplate" or "do not provide sufficient information about the nature of potential conflicts" would not be adequate under the proposed rule. These clarifications will enable investors to have access to specific, meaningful disclosures about proxy advisory firms' conflicts of interest.

The proposing release solicits comment regarding the importance of including conflicts disclosures in a proxy firm's proxy voting advice and, similarly, whether the disclosures should be included in the same manner if the proxy firm uses a voting platform or other electronic medium to deliver voting advice. The NAM strongly supports the requirement that the proposed conflicts disclosures be included prominently in both the written and electronic reports provided to a proxy firm's clients. The goal of the disclosures is to enable investors to better evaluate the firm's conflicts in the context of the firm's voting recommendations, so presenting the conflicts disclosures in the voting advice report or on the voting platform is vital.

We also appreciate that the proposing release offers specific guidance on steps that proxy firms can take to ensure that their conflicts disclosures are sufficiently detailed, including by disclosing the identities of parties or affiliates involved and the approximate relevant dollar amount; similarly, we strongly support the specific clarification that "[b]oilerplate language that such relationship or interest may or may not exist would be insufficient."[31]

<u>Automatic Vote Submission</u>

The NAM agrees with the Commission that "by requiring proxy voting advice businesses to provide standardized disclosure regarding conflicts of interest, clients of these businesses would be in a better position to evaluate these businesses' ability to manage their conflicts of interest."[32] Given the significant impact that these conflicts can have on the firms' recommendations, and the degree to which manufacturers have experienced their influence, increased transparency is a welcome development.

As the Commission works to finalize the proposed rule, and specifically the condition that proxy firms disclose information about their material conflicts of interest, the NAM strongly encourages the SEC to consider the impact that certain asset managers' reliance on the proxy advisory firms to automatically vote their shares (a practice sometimes known as "robo-voting") would have on the proposed conflicts disclosures.

In the NAM's view, the value of the enhanced disclosures in the proposed rule is that investors are able to review the information about a proxy firm's conflicts of interest alongside its voting recommendations and make an informed decision about whether and how to rely on the firm's advice. If investors' shares are instead robo-voted by the firm, no opportunity for such a review exists, limiting the efficacy of the significant reforms the SEC has proposed. Disclosures designed to better inform investors are of little use if the investor never sees those disclosures before its shares are voted.

Indeed, the proposing release specifically solicits comment on whether the proposed disclosures would provide investors with adequate and appropriate information about proxy firm conflicts of interest "when making their voting determinations."[33] Unfortunately, instances in which asset

---

[31] Proposing Release, *supra* note 1, at 32.

[32] *Id.* at 34.

[33] *Id.* at 35.

managers are not making proactive voting determinations would significantly limit the utility of the proposed conflicts disclosures. The NAM supports an additional amendment to the Rule 14a-2(b) exemptions to limit the automatic submission of proxy votes in the event of a contested recommendation.[34]

***Registrants' and Other Soliciting Persons' Review of Proxy Voting Advice and Response***

As a general rule, issuers are not given sufficient time to review the draft recommendations that proxy firms make about their business. (As we have noted, companies outside the S&P 500 are usually given no such opportunity at all.) When issuers attempt to utilize the limited time they receive for review, they have found the proxy firms to be difficult to reach and disinclined to make changes that would result in a more accurate report for investors. Furthermore, the firms issue their reports so close to the issuer's annual meeting that direct communication with shareholders to correct proxy firm errors or misrepresentations is difficult (via a supplemental proxy statement or elsewise), and persistent robo-voting undercuts even that limited opportunity.

As the NAM has stated in the past, proxy firms' unwillingness to engage with the issuers on which they are conducting research and making recommendations compounds the many problems that manufacturers face when dealing with the firms. Errors, methodological weaknesses, and one-size-fits-all policy guidelines are damaging enough, but the firms' reluctance to fix mistakes or hear another side of the story ensures that these flaws persist throughout the drafting process and may ultimately taint the final voting advice. (These issues are further exacerbated when a proxy advisory firm robo-votes a client's shares. In such instances, the asset manager does not have the opportunity to review the report for itself, foreclosing the opportunity for it to identify a mistake or consider an issuer perspective that the proxy firm might have ignored.)

The NAM has called for amendments to Rule 14a-2(b) to condition the Rule's exemptions on a requirement that proxy advisory firms A.) "allow all issuers, not just the largest companies, access to draft recommendations," B.) "give issuers sufficient time to review draft recommendations," and C.) "include an issuer's dissenting opinion…in the firm's report."[35] As such, the NAM strongly supports the proposed rule's amendments to Rule 14a-2(b) to create a new issuer review and feedback process and allow issuers to submit a statement to be included in the final report via hyperlink. As the proposing release notes, these two new processes would reduce the likelihood of errors, provide investors with more complete information, and improve the reliability of proxy voting advice.

Issuer Review and Feedback

The NAM has previously called for a period of five business days for impacted businesses to review and provide feedback on draft proxy firm recommendations. This opportunity would greatly enhance the quality and accuracy of proxy firm recommendations by allowing issuers to flag mistakes and help proxy firms understand the relevant aspects of their business. A proxy firm would be under no pressure to accept any edits or make any changes proposed by the issuer; rather, such a process would encourage a healthy dialogue that improves the quality of the voting advice ultimately furnished to investors.

Under the proposed rule, issuers would be guaranteed five days for review provided they file their definitive proxy statement at least 45 days in advance of their annual meeting. The NAM supports this reasonable, commonsense condition. The NAM also supports maintaining the alternative

---

[34] Specifically, we support conditioning the availability of the Rule 14a-2(b)(1) and 14a-2(b)(3) exemptions on a proxy firm disabling the automatic submission of votes when an issuer has provided a statement in response to the firm's voting advice. *See infra* at 15 for further discussion.

[35] NAM March 2019 Letter, *supra* note 6, at 6.

timeline wherein issuers that file their definitive proxy statement less than 45 days, but more than 25 days, in advance of their annual meeting are guaranteed three days for review.

The proposing release solicits comment on the impact the proposed timeframes would have on issuers, proxy firms, and investors. The NAM is sensitive to the timing pressures intrinsic to a busy proxy season, and we support the SEC's goal of "allowing more time for proxy voting advice businesses and their clients to formulate and consider voting recommendations."[36] In our view, the proposed filing deadlines and review windows appropriately balance these timing considerations with the ability of businesses to provide useful feedback on draft proxy firm reports – which will benefit issuers, proxy firms, and investors alike by improving the quality and accuracy of the firms' recommendations.

With regard to the proposing release's specific timing questions, the NAM believes that five days is sufficient for companies to adequately review and provide useful feedback on draft proxy firm recommendations. During a busy proxy season, companies will benefit from a standardized timeline that allows for comprehensive review and response. Three days remains a viable "back up" option – unnecessarily short were it to be applied to issuers giving 45-day notice before their annual meeting, but sufficient for companies that do not to meet the 45-day deadline but still file at least 25 days before their annual meeting.

The proposing release also solicits comment on whether the proposed review and feedback period would impede the proxy firms' ability to deliver voting advice to their clients in a timely manner. The NAM believes that it is extraordinarily unlikely that the proposed processes would lead to damaging delays. Given that it is in issuers' best interests to respond to proxy firm errors or methodological weaknesses promptly, and to have annual meetings conducted on time and with a quorum, issuers will always be incentivized to complete their review in a timely fashion. Ultimately, the proposed review windows (five days out of 45, or three days out of 25) represent a small share of the full time that a proxy firm has to develop its recommendations. Additionally, issuers that file their definitive proxy statement less than 25 days before their annual meeting would be given no opportunity to provide feedback on the draft recommendations at all. This tiered framework will help ensure that issuers' and proxy firms' work can be completed and delivered to investors in advance of the annual meeting. Accordingly, the NAM does not believe that the proposed review and feedback process will impede the proxy firms' ability to meet the deadlines of proxy season.

<u>Final Notice of Voting Advice and Issuer Response Statement</u>

In addition to the review and feedback process that would take place as a proxy firm's report is being drafted, the proposed rule would also condition the Rule 14a-2(b)(1) and 14a-2(b)(3) exemptions on a proxy firm providing issuers with a "final notice of voting advice" and allowing issuers to see the final version of the report in the two days before it is published so they can submit a response statement to be included in the final report as a hyperlink. The NAM has been clear that the inclusion of a "dissenting opinion" from the company's perspective is a vital component of any issuer engagement reforms to the proxy advice process. We believe that Main Street investors can only benefit from their asset managers having an issuer statement on hand to compare with the proxy firm recommendation in order to make an informed voting decision.

As we have said, under the current process issuers have little ability to communicate to their investors a response to proxy firm recommendations. Some companies choose to file a supplemental proxy statement with the SEC, but the proxy firms typically publish their reports too close to the annual meeting for such a response to be effective. Moreover, robo-voting entirely eliminates investors' ability to review any supplemental information. Allowing companies to submit a

---

[36] Proposing Release, *supra* note 1, at 46.

response statement in the final two days[37] before a proxy firm report is published would give investors a key data point as they are considering their final voting decisions, and the NAM applauds the SEC for proposing just such a process.

The proposing release solicits comment on whether there are better methods than a hyperlink for proxy firms to share issuer response statements with their clients, and notes that the Commission considered including in the rule proposal a condition that proxy firms "include a full written statement from the registrant in the proxy voting advice delivered to clients."[38] While the proposed hyperlink is certainly a strong step in the right direction, the NAM respectfully encourages the SEC to condition the Rule 14a-2(b)(1) and 14a-2(b)(3) exemptions on a proxy firm allowing a full written statement from the issuer to be included in the final proxy firm report. The core benefit of the issuer response statement is in the ability for investors to review it side-by-side with the proxy firm recommendation; a hyperlink would make direct comparison more difficult and limit the statement's utility. Moreover, for investors that receive proxy firm materials by mail, or otherwise review the recommendations in a paper format, the hyperlink would be effectively useless.

Given the proposed rule's assurance that proxy advisory firms would not be liable for the content of the issuer's response statement (a provision that the NAM supports), there is no reason that the firms should be unable to include a full issuer statement in the text of the report. The proposing release offers formatting as a potential roadblock, but it is the NAM's view that a proxy firm could include a simple blank page in its report into which the issuer response statement(s) could be inserted (alongside the relevant proxy firm recommendation(s)), offset by disclaimers from the proxy firm that it does not endorse nor accept liability for the issuer statement. Such a simple solution would increase the chance that asset managers review the response statement and ultimately lead to more-informed voting decisions being made on Main Street investors' behalf.

First Amendment Concerns

It is worth noting that the NAM does not believe that conditioning the Rule 14a-2(b) exemptions on the inclusion of a link to an issuer response statement (or on the inclusion of the statement itself) raises any concerns with respect to the proxy firms' free speech rights under the First Amendment. The proposed reform is not a requirement in and of itself, but rather a condition to an exemption upon which the proxy firms choose to rely. It is therefore not "compelled speech."

In the context of the broad, investor-focused disclosure regime at issue, the proposed response statement does not pose a constitutional issue any more than issuers' mandated quarterly filings or corporate proxy statements that include proposals from shareholder proponents. The goal of these disclosures is to provide important information to investors – also the stated goal of the issuer response statement condition. As such, the inclusion in a proxy firm's report of a hyperlink and/or an issuer response statement is not an exercise of the firms' speech rights at all (especially given that the proposing release is clear that proxy firms are free to disclaim any liability for the content of the

---

[37] The proposing release solicits comment on the impact of the two-day timeframe for issuer review of and response to the final proxy firm report. From the issuer point of view, we believe two days is sufficient to develop and submit a response statement, especially given that most issuers will have already seen a draft copy of the recommendation and begun preparing their response statement. With regard to the two-day window's overall effect on the timeline of proxy season and the proxy firms' ability to deliver recommendations to clients in a timely manner, we would contend that the impact will be minimal. As stated above, the proposed window is a small slice of proxy season as a whole – and, in the case of the response statement, a proxy firm would not have to conduct any follow-up upon receipt other than to insert a hyperlink to the statement in its report (or, as in the NAM's proposal, insert the statement itself – either way, a simple administrative act).

[38] Proposing Release, *supra* note 1, at 54. (Such a condition is also included as a "Reasonable Alternative" at 113).

JA 518

statement), but rather a simple administrative act akin to other filings that support the flow of information in America's capital markets.[39]

However, if the Commission chooses to make the issuer response statement condition optional on First Amendment grounds, the NAM would strongly suggest subjecting a proxy firm's decision to omit an issuer response statement to antifraud liability under Rule 14a-9. The disclosures under Rule 14a-9, discussed in more detail below, are designed to ensure that solicitations do not contain false or misleading statements, *nor omit to state any material information* that would be necessary to make any statement not false or misleading. An issuer's response to a contested proxy recommendation would clearly be material to a shareholder's proxy vote decision, so a proxy firm claiming First Amendment protections in order to choose to omit such a response should be subject to Rule 14a-9 antifraud scrutiny for that decision.

<u>Application of the Proposed Issuer Feedback and Response Processes</u>

The proposing release solicits comment on a number of questions related to the applicability of both the issuer review/feedback process and the final notice of voting advice/issuer response statement process. Under the framework proposed by the SEC, proxy advisory firms would not be required to incorporate any feedback provided during the review and feedback process, nor accept liability for the issuer response statement submitted following the final notice of voting advice. As such, the NAM sees no justification for limits on the recommendations, topics, proposals, or content that would be included in either proposed process. Any such limitations would undercut standardization and predictability for issuers, proxy firms, and investors alike. Several restrictions, if adopted, would be particularly harmful to shareholders:

- **Limitations based on subject matter:** No topics nor kinds of proposals should be excluded from the review/feedback and final notice of voting advice/issuer response statement processes. Putting proxy firms in the position of regulator and allowing them to exclude issuer responses from consideration based on amorphous criteria cuts against the spirit of the rule proposal – which is to say, making proxy firms less like quasi-regulators and more like regulated market actors. Issuers can accept the responsibility of determining what feedback they think will provide useful information to their investors, and ultimately the market will decide what topics and proposals benefit most from enhanced issuer-proxy firm dialogue. Specifically, the NAM would strongly oppose any guideline or restriction to limit either process to just "disagreements on facts used to formulate the proxy voting advice"[40] given that A.) such a limitation would allow proxy firms to determine what they consider to be factual and B.) the purpose of both processes is to provide investors with more information across-the-board to make an informed voting decision.

- **Limitations based on proxy firm recommendation:** The review/feedback and final notice of voting advice/issuer response statement processes should not be limited only to instances in which a proxy advisory firm has issued an adverse recommendation. While those instances are obviously likely to generate the most issuer engagement, there is no reason to remove the ability of issuers to provide additional context on any recommendation in an effort

---

[39] Courts are further likely to uphold the proposed condition because compelled speech cases almost uniformly involve a business being forced to speak out against its own product or service. *See, e.g., American Beverage Association v. City and County of San Francisco*, 916 F.3d 749 (9th Cir. 2019). Here, by contrast, the relevant information pertains to the business or actions of the issuer rather than the proxy advisory firm. Proxy firms are not being compelled to speak about their own business; rather, they are voluntarily speaking about an issuer's business and would simply need to provide an opportunity for the issuer to respond in order to avail themselves of the 14a-2(b) exemptions.

[40] Proposing Release, *supra* note 1, at 65.

JA 519

to increase the amount of information available to investors. Also, as stated above, allowing proxy advisory firms to make a determination about whether their recommendation was sufficiently "adverse" puts them in a position of power that cuts against the spirit of the rule proposal. The uncertainty inherent in making such a categorial determination would, again, put the proxy firm in the role of regulator.

- **Limitations based on issuer participation in the review process:** The condition that proxy firms issue a final notice of voting advice and the ability for issuers to submit a response statement should not be limited only to issuers that previously participated in the review and feedback process. There are numerous reasons why an issuer might not provide comments during the review window (including issuers that file their proxy statement after the 25-day deadline and are thus ineligible to participate) that in no way undercut the effectiveness and importance of the proposed issuer response statement condition. All issuers should have the opportunity to submit a response statement for inclusion in the final proxy voting advice furnished to proxy firm clients, irrespective of whether and how they participated in the review and feedback process.

- **Limitations based on the content of issuer responses:** Given that the proposed rule specifically clarifies that proxy firms need not accept liability for the content of an issuer's response statement, there should be no restrictions on what content can be included in the hyperlinked (or, as the NAM proposes, inserted) statement. Similarly, given that proxy firms do not have to accept proposed changes during the review and feedback process, no topics should be off-limits for discussion during the five- and three-day review windows.

- **Limitations based on report type:** The review/feedback and final notice of voting advice/issuer response statement processes should not be limited just to proxy advisory firms' benchmark policy reports. As we have discussed, proxy firms offer numerous specialty reports to clients, each of which has the same potential as the benchmark report for errors, methodological weaknesses, and one-size-fits-all policies.[41] Given the investor impact that each of these reports can have, they should all be incorporated into the new feedback processes included in the proposed rule.

Additionally, proxy advisory firms should not be permitted to seek reimbursement from companies for participating in the review/feedback and final notice of voting advice/issuer response statement processes. Any sort of pay-to-play requirement would undercut the independence and impartiality of the proposed processes, raise significant conflict of interest concerns, and disproportionately burden smaller issuers. The NAM would strongly oppose giving proxy firms the ability to charge issuers to participate in the new review processes. Rather, we continue to support the proposed rule's standardized approach, which is designed to appropriately incorporate issuer feedback for the ultimate benefit of the investors who rely on accurate, comprehensive information to guide their proxy votes.

Influence on the Independence of Proxy Voting Advice

The proposing release solicits comment on whether the proposed issuer review/feedback process and the final notice of voting advice/issuer response statement process raise any concerns about "possible influencing of the proxy voting advice by the reviewing parties"[42] and how the

---

[41] We urge the Commission to consider that specialty reports may in fact be *more* susceptible to these issues given that under the current paradigm no companies have an opportunity to review them (unlike benchmark policy reports, which companies in the S&P 500 are at least afforded a limited chance to review). Moreover, specialty reports are by their nature one-size-fits-all.

[42] Proposing Release, *supra* note 1, at 61.

"independence of the advice [could] be called into question if other parties reviewed and commented on it."[43] The NAM believes there is no risk of the proxy advisory firms' independence being threatened by the proposed reforms.

First and foremost, the proposing release makes crystal clear that the ability for companies to suggest changes to a recommendation or the data upon which it is based "does not require proxy voting advice businesses to accept any such suggested revisions."[44,45] And the issuer response statement is submitted after a proxy firm report has been finalized; the proxy firm's only obligation is to include the text, or a link thereto, in the version of the report disseminated to clients. The issuer feedback would exist to point out mistakes or offer alternative perspectives – which could be freely set aside if and when a proxy firm believes its facts, or its interpretation thereof, are unassailable.

Furthermore, it is clear that the proxy firms themselves do not view issuer review as a threat to their independence. ISS has long offered limited review of draft recommendations to members of the S&P 500, while Glass Lewis has done the same for a fee. Additionally, Glass Lewis recently launched a pilot program that would allow issuers to pay to submit a "report feedback statement" similar to the SEC's proposed issuer response statement. The SEC's proposed rule would simply enhance and standardize these limited feedback mechanisms already offered by the firms, not threaten their independence.

<u>Automatic Vote Submission</u>

The proposing release solicits comment on whether the Commission should "amend Rules 14a-2(b)(1) and 14a-2(b)(3) so that the availability of the exemptions is conditioned on a proxy voting advice business structuring its electronic voting platform to disable the automatic submission of votes in instances where a registrant has submitted a response to the voting advice."[46] The NAM would strongly support such a limitation.

As with the proposed conflicts disclosures, the value of the issuer response statement is that investors are able to review the statement alongside the proxy firm's voting recommendation and utilize both perspectives to make an informed voting decision. If an asset manager allows the proxy advisory firm to automatically vote its shares (which are in actuality the shares of the Main Street investors the asset manager represents), then no opportunity for such a review exists. The NAM strongly supports the proposed rule's intent to create an opportunity for issuer feedback and allow issuers to submit a response statement, but the continued prevalence of automatic voting would undermine these welcome reforms.

The proposing release appears sensitive to this concern, soliciting comment on whether investors are "likely to review a registrant's response to voting advice" when a proxy firm provides voting execution services.[47] Unfortunately, the NAM believes that asset managers relying on robo-voting will not conduct such a review. If an asset manager enables automatic submission of all of its votes – including on contested and controversial issues – then its ability to review issuer response statements and make a proactive decision on these important matters is effectively nullified.

---

[43] *Id.* at 62.

[44] *Id.* at 51.

[45] The NAM has always been consistent on this point, specifically pointing out in our March 2019 comment letter that "proxy firms would be under no obligation to modify any recommendation" under our proposed reforms. *See* NAM March 2019 Letter, *supra* note 6, at 6.

[46] Proposing Release, *supra* note 1, at 66.

[47] *Id.*

The proposing release offers a number of suggestions to address this problem; the NAM believes the simplest and most effective would be to condition the 14a-2(b) exemptions on proxy advisory firms disabling the automatic submission of votes if a company submits an issuer response statement under the proposed rule's final notice of voting advice process.[48] Automatically submitted votes remove the asset manager from the process entirely, negating the possibility of an affirmative decision on behalf of the retail investors and pensioners they represent. In the context of the proposed rule, automatically submitted votes also effectively negate the new conflicts disclosures and issuer response statements by creating a ready vehicle for the casting of votes without investor review of the newly mandated disclosures.

The guidance released by the Commission in August 2019 regarding the proxy voting responsibilities of investment advisers addresses this important topic. The guidance encourages institutional investors to consider whether certain voting decisions "may necessitate…a more detailed analysis" than a rote application of a proxy firm's guidelines (even if the guidelines are tailored to the specific institution).[49] In instances where the matter under consideration is "highly contested or controversial"[50] or where "factors particular to the issuer"[51] are at play, the guidance suggests "a higher degree of analysis" to ensure the asset manager is representing its investors' best interests effectively.[52]

The NAM believes that the August 2019 guidance sets an appropriate standard in the context of the proposing release's request for comment on whether, when, and how automatic voting should be disabled. The NAM believes that instances in which an issuer has submitted a response statement clearly meet the guidance's standards for contested or controversial matters and matters that require issuer-specific information – both of which require greater analysis on the part of the asset manager. As such, the NAM supports disabling the automatic submission of votes in these cases as a condition of the Rule 14a-2(b) exemptions.[53]

To be clear, the NAM does not take issue with automatic voting on non-contested proposals, including instances in which non-contested and contested proposals appear on a single proxy ballot. For example, we believe it would be permissible for a proxy advisory firm to automatically vote on an asset manager's behalf in an instance in which an issuer ballot had four non-contested proposals and one contested proposal – the four votes could be cast automatically, with only the fifth requiring a proactive choice on the part of the asset manager. In such a case, the proxy firm could pre-populate the fifth vote but not cast it until the asset manager affirms or changes the pre-populated choice; alternatively, the firm could pre-populate a "blank" default vote (of either "abstain" or "do not vote") and allow the asset manager to "fill in" with an affirmative "yes" or "no" decision. Either approach (or other, similar approaches also within the proxy firms' existing voting infrastructure) would be a no-cost step for both the proxy firm and the asset manager, requiring only that

---

[48] It is worth noting that the NAM does not believe that such a prohibition need apply to proxy firms' pre-population services. In our view, pre-populated votes that still require a proactive asset manager decision to actually cast them pose much less of an investor protection threat than automatic submission – while still easing the voting process significantly, especially for smaller asset managers.

[49] August 2019 Guidance, *supra* note 7, at 14.

[50] *Id.* at 16.

[51] *Id.* at 14.

[52] *Id.* at 16.

[53] As stated previously, we see no need to apply such a prohibition to the proxy firm's pre-population services. It is also important to note that asset managers would, in all cases, retain the right and ability to disagree with management and vote in line with the proxy firm's recommendation. Limiting automatic voting would simply improve the quality of information available in advance of that vote and ensure that the institutional investor is making a proactive voting decision.

institutional investors take the single, simple step of affirmatively making a voting decision for the benefit of the Main Street investors they represent.

Importantly, we do not believe that limiting automatic voting will deter investors from submitting votes. Most proxy ballot measures are non-controversial and would be unlikely to result in a negative proxy firm recommendation and corresponding issuer response statement. Furthermore, the contested matters that do generate a response statement and a prohibition on robo-voting are the most public, most controversial, and most likely to grab investors' attention. Of course, these are the very issues that would most benefit from specific asset manager analysis and proactive decision-making. A targeted prohibition on robo-voting in these limited instances would not dissuade investors from casting proxy votes, nor would it threaten our companies' quorum requirements.[54]

In addition to soliciting comment on automatic voting in the context of the issuer response statement process, the proposing release also includes a description of the potential robo-voting-centric reforms to Rules 14a-2(b)(1) and 14a-2(b)(3) as a "Reasonable Alternative" to the proposed changes, noting that "disabling…automatic submission of votes where registrants or other soliciting persons have submitted responses to voting advice could benefit these parties to the extent that it increases the likelihood that clients of proxy voting advice businesses would review their responses."[55] The NAM certainly believes that the robo-voting limitation under consideration is "reasonable," and we strongly agree that it would increase the likelihood that issuer response statements are actually read and analyzed by asset managers. Such an outcome would not just benefit issuers, however – it would ultimately protect the investors that rely on asset managers' due diligence in managing their retirement savings.

By increasing the likelihood that asset managers review the proposed conflicts disclosures and issuer response statements, a limitation on automatic voting would enhance the efficacy of the proposed rule itself. The rule is premised in large part on the belief, with which the NAM agrees, that making more information available to asset managers via proxy firm reports will ultimately lead to better voting decisions for the benefit of America's Main Street investors. A targeted limitation on automatic voting that ensures that asset managers actually review the new information made available to them by the proposal – particularly in contested and controversial cases – would significantly strengthen the proposed rule's investor protections.

IV.    **Proposed Amendments to Rule 14a-9**

As the proposing release notes, the SEC issued an interpretation and guidance in August 2019 stating that "[a]ny person engaged in a solicitation through proxy voting advice must not make materially false or misleading statements or omit material facts, such as information underlying the basis of its advice or which would affect its analysis and judgments, that would be required to make the advice not misleading."[56] The guidance builds on Rule 14a-9's existing antifraud provisions, illustrating how they apply to proxy advisory firms given that the guidance clarifies that the furnishing of proxy voting advice constitutes a solicitation (a clarification that the proposed rule codifies and which, as discussed above, the NAM strongly supports). Notably, the prohibition on making false and misleading statements (and/or omitting material facts necessary to make a statement not false or misleading) applies to *any* soliciting entity, even those that are exempt from Schedule 14A's

---

[54] The proposing release solicits comment on the potential impact of disabling automatic voting on an issuer's ability to achieve quorum for an annual meeting. The NAM does not expect such a problem to arise and continues to strongly support a targeted robo-voting restriction when an issuer has submitted a response statement.

[55] Proposing Release, *supra* note 1, at 116.

[56] August 2019 Interpretation and Guidance, *supra* note 8, at 12.

JA 523

information and filing requirements under the Rule 14a-2(b)(1) and 14a-2(b)(3) exemptions (i.e., proxy advisory firms).

The NAM agrees with the proposing release that "subjecting proxy voting advice businesses to the same antifraud standard as registrants and other persons engaged in soliciting activities is appropriate in the public interest and for the protection of investors."[57] Furthermore, we appreciate that the proposed rule would provide helpful guidelines to proxy advisory firms, clarifying what information they may need to disclose in order to avoid violating the antifraud rules. These enhanced disclosures will provide useful data to the market, and further improve the quality of information available to investors relying upon proxy voting advice to shape their vote decisions.

The proposed rule would add to Rule 14a-9 several examples of disclosures that proxy advisory firms would generally need to provide in order for their statements not to be misleading. Specifically, the firms would need to disclose information about their methodology, sources of information, and conflicts of interests. As we have noted, these issues form the core of the flaws endemic to proxy advisory firm's current practices. Requiring fulsome disclosure of information related to these topics under Rule 14a-9 would shine a light on these problematic practices and hopefully incentivize the proxy firms to make needed reforms to their business model.[58] The NAM strongly supports these proposed disclosures.[59]

Private Right of Action

Moreover, the NAM would support a final rule that provides a private right of action for issuers to enforce the antifraud provisions in the amended Rule 14a-9. Given the impact that the firms' recommendations can have on company policies and shareholder value, it seems only appropriate for the impacted parties to have a right to file suit to seek redress for a false or misleading statement under Rule 14a-9. The proposing release notes that a proxy firm's failure to comply with the new conditions of the Rule 14a-2(b) exemptions would not create a private right of action, but in the NAM's view a violation of the Rule 14a-9 antifraud provisions would represent a more appropriate basis for legal action.

Voting Recommendations that Materially Differ from SEC Standards

The NAM greatly appreciates the proposing release's discussion of instances in which proxy advisory firms make negative voting recommendations based on standards that may not align with SEC requirements. Manufacturers have experienced time and again the exact fact pattern described in the proposing release: receiving a negative vote recommendation despite being in full compliance with the relevant SEC standard. In such cases, the proxy firms are put into the position of acting as quasi-regulators, without the transparency and administrative safeguards that accompany Commission rulemaking.[60] A proxy firm presenting its guidelines as a substitute for SEC

---

[57] Proposing Release, *supra* note 1, at 68.

[58] As an example, fulsome disclosure of a firm's methodology could include a description of how and why the firm arrived at its evaluation of key metrics like peer groups or disclosed compensation and an explanation of any significant discrepancies between the firm's understanding of an issue and the company's.

[59] We would also support enhancing the list of disclosures the firms would generally need to provide in order to avoid disseminating a misleading statement to include specific disclosures around instances in which proxy firm recommendations are not seeking to maximize shareholder value. In such instances, investors would benefit from a fuller understanding of the firm's motivations and rationale in offering such a recommendation given that proxy firms do not have an ownership stake that could be at risk if their recommendations unrelated to shareholder value creation are ultimately adopted.

[60] They also lack, of course, any statutory authority to enforce their standards – yet they are often successful in forcing companies to make their preferred changes.

requirements without clearly conveying the differences between the two raises the significant likelihood of investor confusion. Under the auspices of Rule 14a-9, such an omission clearly qualifies as a misleading statement, which the proposing release rightly points out. The NAM strongly supports the proposed rule's addition to Rule 14a-9 a clarification that "the failure to disclose the use of standards or requirements that materially differ from relevant standards or requirements that the Commission sets or approves" would be misleading under the Rule.[61]

The proposing release solicits comment on whether Rule 14a-9 should refer to standards or requirements beyond those promulgated by the Commission. The NAM respectfully encourages the SEC to broaden the scope of the rule proposal to include any relevant law or regulation to which the issuer is subject. Manufacturers have experienced proxy advisory firms insisting upon benchmarks in excess of other national standards (e.g., accounting rules promulgated by the FASB) as well as state securities law; in these instances, as with SEC standards, investors would benefit from the knowledge that the companies in which they hold shares are in fact in full compliance with the relevant laws and regulations.[62] We would also support a separate-but-related requirement that proxy advisory firms note when a given recommendation diverges from their own published guidelines – a distinct legal question, obviously, but a similar fact pattern given that investors often make decisions based on, and companies often take steps to structure their policies to be in compliance with, the firms' voting benchmarks only to see a conflicting recommendation.

\* \* \* \*

The NAM applauds the SEC for proposing a rule to reform the proxy solicitation rules and institute targeted oversight of and reforms to the practices of proxy advisory firms. Manufacturers support the proposed rule, and we encourage the Commission to expeditiously take steps to finalize it following a comprehensive review of the comments received in response to the proposing release, including our suggested enhancements to the rule proposal. A final rule that addresses proxy firms' conflicts of interests, lack of dialogue with issuers, and robo-voting practices will go a long way toward reining in the firms' outsized influence and ultimately protecting the everyday investors whose shares are voted based on their advice.

On behalf of the NAM and the 13 million men and women who make things in America, thank you for your attention to these concerns.

Sincerely,

Chris Netram
Vice President, Tax & Domestic Economic Policy

---

[61] Proposing Release, *supra* note 1, at 72.

[62] The NAM agrees with the SEC that there is no need to limit proxy firms' freedom to adopt and subsequently make recommendations based upon standards or criteria that diverge from SEC policies, nor those of other regulating entities. We simply ask for transparency when such standards are set.



February 3, 2020


VIA Electronic Delivery

Vanessa A. Countryman
Secretary
U.S. Securities and Exchange Commission
100 F Street, NE
Washington, DC 20549-1090

RE:     Comments on the Amendments to the Exemptions from the Proxy Rules for Proxy Voting Advice
        - Release No. 34-87457; File No. S7-22-19

Dear Ms. Countryman:

The Center On Executive Compensation ("Center") is pleased to submit comments to the Securities and Exchange Commission ("Commission") providing its perspective and support of the determination that proxy voting advice constitutes a solicitation and the proposed changes to the proxy advisory firm exemption to the federal proxy solicitation rules.  The Center believes the Commission has proposed a set of sensible updates which facilitate needed changes to the proxy process.

The changes proposed by the Commission add reasonable and necessary structure to the proxy advisory firm report process which will go a long way to remedying the most significant problems experienced by Center Subscribers, who are Chief Human Resources Officers and Executive Compensation professionals.  Further, the proposed changes do so in a way which recognizes the efficiencies investment managers gain through the proper use of proxy advisory firm recommendations as well as the need for proxy advisory firm impartiality.

The Center brings a unique issuer perspective to the discussion of the proxy process and proxy advisory firms.  The Center provides extensive executive compensation and corporate governance public policy insight to the top human resources and executive compensation professionals at more than 140 subscribing companies.  The commentary in this letter reflects the views and concerns of the human resources and executive compensation professionals at major U.S. public companies who regularly interact with proxy advisory firms.

## I.    __Executive Summary__

The Center On Executive Compensation fully supports the Securities and Exchange Commission's proposed changes introduced on November 5, 2019.  As a foundational point, the Center strongly supports the Commissions' straightforward and logical decision to codify through rulemaking that proxy voting advice generally constitutes a solicitation as established in the Securities Exchange Act of 1934.  Further, by engaging in a solicitation, the Commission has rightfully determined that a proxy advisory firm is subject to liability for false and misleading statements as established in Exchange Act Rule 14a-9.

Additionally, if implemented, the proposal provides *all* issuers with a defined review period for both the draft and final proxy advisory firm proxy reports prior to general publication to the proxy advisory firm's clients.  The Center *strongly supports* this needed and balanced change.

For many institutional investors, proxy advisory firm services represent the least expensive manner for evaluating management and shareholder proposals, voting proxies, and fulfilling fiduciary standards.[1] However, that same market reality for proxy advisor services gives the firms – and specifically Institutional Shareholder Services (ISS)[2] and Glass Lewis (GL)[3] – tremendous influence over proposals directing executive compensation, corporate governance, and stakeholder management practices. However, despite this level of influence, the proxy advisory firms are not required to bear responsibility for their reports and resist input from the issuers covered in the reports.

SEC oversight of proxy advisory firms occurs when the proxy advisory firm make solicitations. We support the Commission's position in the proposed rules that these recommendations are indeed solicitations and we believe the Commission should apply the criteria set out in the proposed rules as the standards by which all parties' communications should be evaluated to determine if they are solicitations.

Through the exemption to the proxy solicitation rules, the Commission has the ability to set standards of conduct and thresholds for disclosures that proxy advisors provide in these solicitations. The proxy disclosure and voting processes have evolved significantly over the last 15-20 years. The current proxy advisory firm exemption to the solicitation rules did not envision the current market or the role proxy advisory firms play within the modern proxy process framework. Thus, the current criteria to meet the solicitation exemption for proxy advisory firms are insufficient to achieve meaningful oversight of the entities.

The resulting oversight system means investors – the primary consumer of proxy advisory services – are responsible for oversight of the service provider – proxy advisory firms – when there is a demonstrated economic necessity for consumers to use the service and no real alternative service provider.[4] SEC oversight and standard-setting is therefore necessary to ensure that these solicitations meet the requirements of Rule 14a-9.

The lack of effective oversight has facilitated multiple procedural and structural defects inherent in the proxy advisory firm industry, including:

1. **Procedural Shortcomings in the Proxy Report Process**: The lack of opportunity for companies to review draft and final proxy reports prior to publication to address potential errors or a lack of rigor with proxy advisory firm analyses;

2. **Conflicts of Interest**: Major conflicts of interests inherent in the proxy advisory firm business and ownership structure; and

---

[1] See Commission Guidance Regarding Proxy Voting Responsibilities of Investment Advisers, Release No. 1A-5325; IC-33605, (Sept. 10, 2019).

[2] According to Center On Executive Compensation data of the S&P 500 from 2011 through 2018, a year-over-year change in ISS recommendation on "Say on Pay" has yielded an average percentage point change of +/- 27%

[3] External research has estimated Glass Lewis's influence at around 7%. Research by Professor David Larker at Stanford University found that among 2,008 firms in the Russell 3000, "firms that received a negative recommendation by ISS (Glass Lewis) obtained an average 68.68% (76.18%) voting support in SOP [say on pay] proposals. In contrast, firms that did not receive a negative recommendation from ISS (GL) obtained an average of 93.4% (93.7%) support in those proposals." The Larcker research is generally consistent with Center research. David F. Larcker, The Economic Consequences of Proxy Advisor Say-on-Pay Voting Policies, Harvard Law School Forum on Corporate Governance and Financial Regulation, November 12, 2012, http://blogs.law.harvard.edu/corpgov/2012/11/12/the-economic-consequences-of-proxy-advisor-say-on-pay-voting-policies/ (last visited November 12, 2018).

[4] The extreme demands of proxy season where institutional investors vote thousands of proxies for the companies in their portfolios make it difficult for the firms utilizing proxy advisory firm services to hold the firms accountable for flagrant conflicts of interest and procedural shortcomings.

3. **Lack of Transparency**:  A general lack of transparency in the reports regarding proxy advisory firm voting policies and procedures, including the reliance on opaque, non-GAAP financial metrics.

Importantly, the problems with the structural defects inherent in the proxy advisory firm industry are amplified by the immediacy in which the influence of proxy advisory firms manifests itself upon the publication of the proxy report.[5]

In recognition of the shortcomings of the proxy advisory firm status quo, the Commission introduced a set common sense reforms to the proxy advisory firm exemption to the proxy solicitation rules on November 5, 2019.

If implemented, the proposal would facilitate a much-needed re-calibration of the proxy process in a way which recognizes the economic need for proxy advisory firm services while also enhancing the credibility of the proxy process.

Specifically, if implemented, the Commission's proposal <u>would</u>:

1. Codify that proxy voting recommendations are solicitations and that 14a-9 liability attaches to such recommendations.

2. Allow <u>all</u> issuers the ability to <u>review</u> the draft proxy report for up to five business days depending on when the proxy statement was filed in relation to the annual meeting date.

3. Require that issuers be provided with a copy of the final report at least two business days prior to publication.

4. Require that issuers be provided with the ability to include a hyperlink to a company statement in the final report which is sent to the proxy advisors clients.

5. Require that proxy advisory firms must acknowledge the receipt of feedback to draft and final reports.

At the same time, it is equally as important to recognize what the proposal does **<u>not</u>** do:

1. Other than acknowledging receipt, proxy advisory firms would <u>not</u> be required to respond to, or engage with an issuer, over feedback received on either the draft or final proxy report.

2. Proxy advisory firms would <u>not</u> be required to change the underlying basis for a recommendation or any of the contents of a proxy report.

3. Place an issuer statement, analysis, viewpoint, or hyperlink <u>alongside of or in prominence with the proxy advisor's own analyses</u> of individual items covered within a proxy report.[6]

4. Issuers would have no new ability to influence or veto a proxy advisory firm vote recommendation.

As is discussed in detail in the letter below, the Center believes the Commission has created a balanced and well-structured proposal which addresses many defective aspects of the proxy process and proxy advisory firm system while preserving the important role the firms play within the process itself.

---

[5] Center Subscribers report large portions of the proxy vote are submitted within 24-48 hours of publication of the proxy report.
[6] For example, if an issuer opposes a proxy advisory firm's recommendation on say on pay, proxy advisors are not required to include anything from the issuer alongside the specific section of the proxy report covering the say on pay vote.  Only a singular hyperlink is required to be included to an issuer resource.

## II. Review of the Draft and Final Proxy Reports Necessary to Ensure Investors Receive the Full Picture of Material Information

From the perspective of Chief Human Resources Officers and their Executive Compensation professional staff, the most problematic aspects of current proxy advisory firms oversight stem from serious procedural and transparency shortcomings with the proxy advisory firms' report publication process and their prohibitive engagement policies and procedures. Specifically, the lack of any reasonable access by all issuers – not just the largest issuers – to draft and final proxy reports and the inability of those issuers to adequately review both reports before publication is highly problematic.

The problems facing issuers and the wider market occur due to the extreme difficulty in engaging with proxy advisory firms during the proxy season and the immediate and near irrecoverable impact the issuance of the proxy report has on voting results.

The ability of issuers to review and provided feedback on both draft and final proxy reports prior to publication is an important step in preserving the integrity of the proxy voting process. Proxy advisory firms must prepare in-depth reports on thousands of issuers for thousands of proxy voting issues in an severely compressed time frame. Allowing issuers to *review* – not change or alter – the draft and final proxy reports helps ensure the data within the reports is properly vetted prior to its use by investors in making fiduciary voting decisions. Notably, issuers will bear the costs of vetting and reviewing the data on behalf of the proxy advisory firm.

Separate, however, from the need to review the proxy report to ensure voting recommendation data is free of errors, is the equally important need for issuers to *understand* the underlying basis for the proxy advisory firm's recommendations prior to the report's general publication.

It is well established that proxy advisory firms have philosophies on executive compensation and corporate governance issues which differ from those of issuers. These differences can result in divergent recommendations compared to management for how investors should vote on any number of corporate governance issues. Nothing should infringe on the ability of proxy advisory firms to maintain their own unique perspectives and philosophies.

As noted earlier, proxy advisory firms wield tremendous influence over proxy outcomes.[7] Most significantly, the influence manifests itself *almost immediately* during proxy season with a significant percentage of votes cast within the first 24-48 hours after publication of the final report. Due to the concentrated number of annual meetings in proxy season, proxy advisory firm reports tend to be published closer and closer to the meeting date. That provides issuers and investors with substantially less time to address concerns with a final, published report. Further, proxy advisory firms are substantially less likely to make changes or issue alerts after the fact, especially in cases where an error may have resulted in an adverse vote recommendation.

In addition, proxy advisory firms have a financial disincentive to address errors discovered in a final report. ISS has committed to clients that it will maintain a certain level of accuracy within reports. Therefore, any error that may force them to issue an alert and/or change a vote recommendation carries a potentially high cost. Most companies do not get a chance to address any errors in the report until after publication and auto-voting has begun. As such, companies are forced to fight an uphill battle to correct errors and discuss concerns with their shareholders.

The *immediate* impact of a proxy voting recommendation's publication underscores the need for the Commission's proposed changes. By allowing the review of the draft and final report, as well as the ability to include a hyperlink in the final report, the Commission's proposed changes ensure investors will

---

[7] According to Center On Executive Compensation data of the S&P 500 from 2011 through 2018, a year-over-year change in ISS recommendation on "Say on Pay" has yielded an average percentage point change of +/- 27%

have a full picture of the information from which they can then make an informed, *proposal-specific* voting decision and avoid the pitfalls of automatic submissions.

The proposed changes will provide a procedural opportunity for issuers to proactively address concerns, and for investment managers to make informed decisions, rather than forcing issuers into a reactionary process at a point when many of the votes have already been cast on the basis of solicitations that may fail the standards of Rule 14a-9.

The Center acknowledges these changes proposed by the Commission could require proxy advisory firms to make operational changes to ensure compliance with the new requirements of the proxy advisory firm exemption to the proxy solicitation rules. These operational changes could impose new costs on proxy advisory firms as well as increase the time needed to publish a report following the filing of an issuer's proxy statement.

Given the significant need for changes to the proxy process, the challenges of the proxy advisory firm status quo, and the anticipated effectiveness of the proposed changes, the Center believes these costs are justified, particularly if considered in the context of the costs imposed by the proxy solicitation requirements and other regulatory compliance on issuers.

The Center applauds the Commission for the balanced approach adopted in the proposal. Not only do the proposed review periods of the draft and final reports remedy a major issuer concern with the proxy process from an administrative and resource allocation perspective, but the changes allow more effective shareholder engagement by preventing errors and allowing more informed conversations.

Importantly, the review of the draft and the final proxy report only function to improve the proxy process if implemented *together*. Each review functions as a necessary half to a whole framework which, *only* if implemented *together*, effectively works to ensure the integrity of the proxy process.

A. Review of the Draft Proxy Report Fundamental to Integrity of the Proxy Voting Process

In the November 5, 2019 proposed rule, the Commission added a requirement to the proxy advisory firm exception to the proxy solicitation rule which provides for the review of the draft proxy report for all issuers. The length of time for review of the draft report depends on the filing date of the company's proxy compared to the date of the annual meeting.

Currently, the two major proxy advisory firms – ISS and Glass Lewis – each maintain distinctly inadequate policies for the review of draft proxy reports.

It is the Center's understanding that ISS makes every effort, but does not guarantee, to provide each constituent of the S&P 500 Index two business days to review the report for the annual shareholder meeting. The stated two-business day review period is the maximum period, irrespective of the number of proposals or the vote recommendations. Should ISS vote recommendations be in line with management recommendations, the review period (especially during proxy season) could be shorter or not provided at all.

ISS only provides draft proxy reports to S&P 500 issuers which have registered on its website. The draft reports are emailed to S&P 500 issuers two to four weeks before an issuer's annual meeting. Center Subscribers routinely report receiving the copy of the draft report late on a Thursday or Friday and having to return it the following Monday. Further, according to Center Subscribers, ISS often does not acknowledge receipt of the feedback and efforts to engage with the analysts are rebuffed. For final reports, ISS provides all issuers with a copy only upon *publication.* Thus, issuers are often left in the dark as to whether needed feedback has been received by ISS and incorporated into the final proxy report until after their clients have received the report.

Outside of the S&P 500, issuers do not receive copies of draft reports. ISS's internal rules on which companies are eligible for a draft has been extremely challenging for "edge" companies which have moved in and out of the S&P 500 – one year they receive the draft report – the next year they do not.

Even with this policy, however, there are other exceptions to the draft proxy report policy. For example, draft reports are not provided for any meeting where the agenda includes an M&A proposal, proxy fight, or "controversial" items such as a "Vote-No" campaign.

Comparatively, Glass Lewis does not provide a draft report to any issuer and charges $5,000 for a copy of the final report. Glass Lewis does provide issuers with a data-only version of the proxy paper prior to publication. This paper, however, does not contain any analysis or voting recommendations, but does contain the data points used by Glass Lewis to conduct the analysis. The only way to view the analyses and recommendations is to purchase the report.

More recently, Glass Lewis has created a limited forum for companies to review proxy reports and provide feedback. This is certainly a positive development. However, the limited scope of the program in terms of issuer coverage necessitates the review periods included in the proposed rule.

### i. Access to Draft Report

Under the Commission's proposal, all issuers would receive copies of the draft proxy report for review. The Center fully endorses this proposal to expand the ability to access and review a draft proxy report to all issuers. As is detailed above, currently only S&P 500 companies receive copies of the draft ISS report while no issuers receive a copy of the draft Glass Lewis report.

There is no valid argument against providing all issuers with a copy of the draft proxy report. ISS, for example, already creates draft (and final) proxy reports for all issuers on which it makes voting recommendations, and thus providing them to issuers beyond the S&P 500 is feasible.

*All* interested stakeholders, and particularly the parties relying on the data to make fiduciary voting decisions, have a strong vested interest in the veracity and review of the data in the draft (as well as final) proxy reports. Providing all companies with the ability to review the draft proxy report is an important step to ensuring the integrity of the data within the proxy report.

Further, allowing issuers to understand the basis for the recommendations of a proxy advisory firm also helps facilitate effective engagement with shareholders and the proxy advisory firms themselves.

### ii. Time Period

The Center believes the Commission has provided for a workable method for determining the length of time an issuer will receive to review the draft proxy report. Specifically, the Commission created the following framework for determining the length of time an issuer will receive to review the draft report:

| Proxy Filing Date Compared to Annual Meeting Date | |
|---|---|
| More than 45 days prior to the Annual Meeting | At least five business days |
| Less than 45 days, but more than 25 days prior to the Annual Meeting | At least three business days |
| Less than 25 days prior to the Annual Meeting | No mandated review |

The Center believes the proposal provides a balanced and *predictable* framework within which issuers can effectively review draft proxy reports. First and foremost, no Center Subscriber reported any plan to alter carefully designed proxy filing preparation schedules in order to fall within a specific bracket outlined in the proposed rule.

According to feedback from Center Subscribers, most issuers will receive three business days to review the draft report based on the proxy preparation schedules currently established. The key to the success of the proposal from an issuer's perspective, according to the feedback received by the Center

was the consistency and <u>predictability</u> of knowing that the draft report would be made eligible for review for a set period.

With the knowledge of how much time an issuer would be allocated to review the draft report, issuers will be able to effectively allocate limited resources to maximize the review period window. Thus, the Commission's framework effectively addresses a key concern executive compensation practitioners and human resources executives have with the proxy advisory firm status quo.

The Commission's proposal addresses a key issuer concern while also accommodating proxy advisory firm business processes. We acknowledge that proxy season presents an operational challenge for proxy advisory firms. They must provide analyses and reports on a substantial proportion of US-listed companies and thousands of management and shareholder proposals on corporate governance, executive compensation, environmental and social concerns, as well as capital structure, economic proposals such as mergers, and proxy contests.

Center Subscribers routinely report being completely unable to engage with proxy advisory firms during the proxy season due to the extreme business demands place on proxy advisory firms. Providing a set time period for review, as proposed, allows issuers – which understand they are unlikely to engage with proxy advisors in the moment – to thoroughly review the draft report and prepare for potential shareholder engagement.

B. <u>Final Report Review Ensures Integrity of the Proxy Voting Process</u>

Proxy advisory firm proxy reports can have a significant influence over the voting results of corporate proxy votes. These outcomes can have a major impact on issuers and their employees, various stakeholders, and shareholders – both those which subscribe and do not subscribe to proxy advisory firm services – as well as the overall market in general.

The influence and impact proxy advisory firm reports – particularly those from ISS and Glass Lewis – have on proxy votes is *immediate*. Within 24 hours of publication of the report, a statistically significant percentage of proxy votes are cast by investors – often automatically – based on the proxy advisory firm recommendations. Center On Executive Compensation data shows that a year-over-year change in ISS recommendation on a shareholder say on pay vote results in an average change in shareholder support of 20-27% percentage points.

Given the immediate and significant impact of the publication of the proxy report, ensuring the report is correct and properly vetted is vital to the overall proxy voting process. Investment managers need to be aware of the underlying basis for conclusions in the proxy report and take them into consideration in their voting decisions.

The importance of the final report review amplified by the financial disincentive that proxy advisory firms – and specifically ISS – may have in issuing corrections in the case that a report is incorrect with errors or inaccuracies. ISS maintains commitments to accuracy in the service agreements with clients. As such, if a certain number of vote recommendations are changed due to errors, ISS may have a contractual, financial obligation to clients. Further, an error resulting in a vote recommendation change effectively requires ISS to re-evaluate the proposal in question, producing a new written analysis. From a workflow perspective, given the extremely tight timelines during proxy season, there is a substantial disincentive to admit errors, correct reports, and publish alerts. Therefore, if a company finds an error post-publication, engaging with ISS to change an error is an uphill battle.

Unfortunately, the current proxy advisory firm approach does not allow for any review of a final proxy report prior to its publication or recognition of the limitations of the proxy advisor analysis as the sole basis of voting decisions.

The Commission has recognized the need for change to this element of the proxy advisory firm status quo pursuant to the November 5th proposal will require proxy advisory firms to provide to all issuers a "final notice of voting advice". According to the proposal, the "final notice" must:

- Be provided at least two business days prior to the proxy report's dissemination to clients even if an issuer did not provide feedback during the review of the draft report.

- Include copy of the final proxy report which will be sent to clients/investors that includes any revisions to the proxy report made as a result of the review and feedback period.

- Provide issuers with the ability to provide a single hyperlink to a company statement in the final report which is sent to investor clients.

The Center fully endorses the Commission's proposal of the "final notice of voting advice" which must be provided to issuers. Two business days is adequate time for an issuer to review the changes included in the final proxy report compared to the draft report and to evaluate the extent to which any feedback given during the draft review process was incorporated into the final report. A key aspect of this is the ability for issuers to have an *expectation* of the time which they will have to review the final report to allow effective allocation of resources during a busy proxy season.

The combination of the review of the draft report, notice of the final report prior to publication and the ability to provide a hyperlink provide the needed tools to ensure the contents of the proxy report are fully vetted prior to use by investors in fiduciary voting decisions.

Furthermore, the final notice better allows investors to receive a full perspective of viewpoints on the proxy voting issue. Given the reliance of investors on proxy reports and feedback that proxy reports provide a quick and accessible way to evaluate a corporate proxy proposal (considering the length proxy statements), the inclusion of a link to feedback provides much needed notice of potentially contrasting viewpoints over a proxy issue.

The Center does not believe proxy advisory firms should be required to alter any philosophical approaches to the evaluation of proxy voting issues, including executive compensation, or stakeholder concerns such as environmental, social, or governance issues. Unsurprisingly, the Center and our Subscribers do *disagree* with some of the positions adopted by proxy advisory firms.

By including a link, investors will be better informed about contrasting viewpoints over a proxy vote issue in the medium many investors may heavily – or exclusively – rely upon when casting a vote as a fiduciary during a very small-time window during proxy season.

III. <u>Proxy Advisory Firm Conflict of Interest Disclosures Are Necessary to the Integrity of the Proxy Voting Process</u>

Proxy Advisory Firm conflicts of interest are well documented.[8] Unfortunately, despite the egregious nature of some of these conflicts, there is an absence of adequate disclosure provided by proxy advisory firms. What disclosure is provided is typically boilerplate and lacks needed information that issuers and investors need to appropriately evaluate the context of a proxy advisor's recommendations.

The most egregious conflict of interest in the proxy process involves ISS, the largest and most influential proxy advisory firm. ISS has two lines of business. The first, ISS Research, provides proxy voting recommendations and analyses to institutional investor clients, including clients that are publicly traded. The second, ISS Corporate Solutions, provides consulting services to corporate issuers on the

---

[8] See Subcommittee on Capital Markets and Government Sponsored Enterprises (Committee on Financial Services) Hearing: "Legislative Proposals to Enhance Capital Formation, Transparency, and Regulatory Accountability", available at https://www.youtube.com/watch?v=NIVhLQMOj24&feature=youtu.be&t=5404 (last visited Jan. 23, 2020)

same proxy voting items, corporate governance structure, and executive compensation on which ISS Research makes recommendations.

ISS is essentially playing both sides of the ball here. _Any change or addition to the approach utilized by ISS Research in how it evaluates proxies has the natural and unavoidable consequence of driving business to its consulting services as issuers strive to make sure they follow ISS Research's new or evolving perspectives._ The conflict is inherent with having this business structure and exists regardless of whether ISS has an effective firewall preventing the Research business from communicating with the Consulting business.

The Center fully supports the Commission's proposed disclosure of proxy advisory firm conflicts of interest. The Center believes any required disclosure of proxy advisory firms should be designed to accomplish three important objectives:

1. Disclosure Must Be Public: The public nature of the disclosure will allow all interested and impacted stakeholders – not just the narrow population of proxy advisory firm clients – to evaluate proxy advisory firm conflicts of interest;

2. Disclosure Must be Specific: The disclosure cannot be boilerplate and must address the unique scenario presented by the conflict; and

3. Disclosure Must Be Principles-Based: The disclosure recognizes the variance in proxy advisory firm business practices and is structured in a manner which does not reveal any proprietary information nor act as an industry barrier to entry.

By aiming to satisfy the three objectives above, the Commission would create an effective and flexible disclosure regime which effectively allows the disclosure of existing conflicts while also providing an adaptable disclosure template for future conflicts of interest which are not currently envisioned.

A. The Commission Should Include Examples of _per se_ Conflicts of Interest in the Final Rule

In the proposed rule, the Commission establishes the materiality standard as the baseline test for determining whether disclosure of a proxy advisory firm conflict of interest is warranted. The Center supports this approach and urges the Commission to provide examples of material conflicts of interest to assist proxy advisors in recognizing where disclosure is necessary. The examples should include illustrations of compliant and complete disclosures.

The Center believes the following three situations should be specifically enumerated by the Commission as rising to the materiality standard:

1. If a proxy advisory firm provides consulting services to an issuer while also providing voting research and recommendation on that same issuer.

2. If a proxy advisory firm provides consulting services to a shareholder proponent or affiliate on a shareholder proposal while also providing voting research and recommendations on that same shareholder proposal.

3. If a proxy advisory firm is owned by an investor group which is advocating for a position on a proxy vote or other corporate governance issue or practice which is subject to research and recommendations provided by the proxy advisory firm to investor clients.

As for the content of the disclosure, the SEC should specifically require that an acceptable disclosure would:

1. Identify the conflicted parties;

2. Identify the nature and subject matter of the conflict (*i.e.,* executive compensation consulting while also providing a voting recommendation on say on pay); and

3. Describe steps taken by the proxy advisory firm to reduce any actual or perceived conflict of interest.

By identifying scenarios which would be considered material and requiring the inclusion of the three elements above, the SEC creates an effective and flexible disclosure regime which allows the disclosure of existing conflicts while also providing an adaptable disclosure template for future conflicts of interest which are not currently envisioned.

Furthermore, the disclosures allow the institutional investors and advisors to adequately evaluate the proxy advisory firms to determine independence in compliance with their required fiduciary responsibilities. The completeness of the above framework also provides all interested stakeholders the ability to evaluate proxy advisory conflicts in the context of the voting recommendations they issue.

**Shareholder Resubmission Thresholds**

The Center would like to also express our strong support for the updates to the shareholder resubmission thresholds. The SEC has recognized the need to update the current resubmission thresholds which have allowed proposals rejected by nearly 90% of investors to continuously appear on the ballot. The Center strongly supports the Commission's proposal to update the resubmission thresholds from their current 3%/6%/10% levels to a more reasonable 6%/15%/25% levels of support.

The Center believes that the updated proposals will do nothing to restrain or restrict shareholder proposals which have legitimate levels of shareholder support. At the same time, the changes will eliminate proposals which sit on the proxy year after year with no real chance of adoption.

**Conclusion**

      The Center appreciates this opportunity to provide feedback on the Commission's ongoing effort to address the multifaceted issues surrounding proxy advisory firms. If you have any questions about the Center's comments, please do not hesitate to contact me at ███████████████ .

Sincerely,

Henry Eickelberg
Chief Operating Officer

cc:     Securities and Exchange Commission:

             Hon. Jay Clayton, Chair
             Hon. Hester Peirce, Commissioner
             Hon. Elad Roisman, Commissioner
             Hon. Robert Jackson, Commissioner
             Hon. Allison Herren Lee

# Appendix A



November 12, 2018

VIA Electronic Delivery

Mr. Brett J. Fields
Secretary
U.S. Securities and Exchange Commission
100 F Street, NE
Washington, DC 20549-1090

RE:     Comments on the SEC Roundtable on Proxy Process Issues – Proxy Advisory Firms and
        Shareholder Proposals

Dear Mr. Fields:

The Center On Executive Compensation ("Center") is pleased to submit comments to the Securities and Exchange Commission ("Commission") providing its perspective on proxy process issues, specifically on proxy advisory firms and shareholder proposals, in advance of the November 15 Proxy Process Roundtable.  Since the introduction of mandatory "Say on Pay" voting in 2010, shareholder engagement, participation, and interaction with corporate governance and management has evolved dramatically.[1]  The existing regulatory framework is ill-equipped to address these changes and to accommodate further evolution driven by technology, new sources of capital, and the growth in activism.

Given the disconnects due to the absence of an appropriately tailored regulatory and disclosure scheme within the current proxy process, the Center believes two specific areas warrant the attention of the Securities and Exchange Commission:

1.  The Role and Influence of Proxy Advisory Firms; and

2.  The Shareholder Proposal Process.

The Center's recommendations for the Commission on each topic provide market-driven solutions which remediate the concerns without the creation of an onerous oversight regime that negatively impacts shareholder rights or act as an industry barrier of entry.  Further, the Center's recommendations recognize the important role both proxy advisory firms and shareholder proposals play within the proxy process.

The Center brings a unique issuer perspective to the discussion of the proxy process and proxy advisory firms.  The Center provides extensive executive compensation and corporate governance public policy insight to the top human resources and executive compensation professionals at the Center's more than 140 subscribing companies.  The commentary in this letter reflects the views and concerns of the human resources and executive compensation professionals who interact with proxy advisory firms as part of their profession as executive compensation and human resources executives at major U.S. public companies.

---

[1] "Since the 2010 concept release, we have seen a dramatic increase in the number of U.S. companies reporting shareholder engagement, with 72% of S&P 500 companies reporting engagement with shareholders in 2017, compared to just 6% in 2010." Statement Announcing SEC Staff Roundtable on the Proxy Process, available at https://www.sec.gov/news/public-statement/statement-announcing-sec-staff-roundtable-proxy-process#_ftn4 (last visited August 1, 2018).

I.  **Executive Summary**

A.  **Proxy Advisory Firms**

Proxy Advisory Firms play an important role in the proxy process by providing proxy voting recommendations to institutional investors for the thousands of management and shareholder proposals for the hundreds or thousands of companies within their portfolios.  When voting on proxy proposals, institutional investors have a fiduciary obligation to vote in the best interest of their shareholders.[2]

According to the federal securities laws, this fiduciary obligation applies when utilizing proxy advisory firm services for voting recommendations and analyses.[3]  As a result, an investment advisor seeking to utilize proxy advisory firm voting recommendations and analyses to fulfill fiduciary obligations must ascertain that "the vote was not a product of a conflict of interest if it voted client securities, in accordance with a pre-determined policy, based upon the recommendations of an independent third party."[4]

For years, this commentary provided a considerable degree of fiduciary "cover" to the investment managers which chose to follow the voting recommendations of proxy advisory firms and reinforced the value of using such firms.  The practice was reinforced by two SEC Staff "No Action" letters, the Egan-Jones Proxy Services letter of May 2004 and the subsequent ISS letter.  Notably, these letters were revoked by the Commission in Mid-September.[5]  The letters effectively permitted current proxy advisory firm practices to develop, including significant conflicts of interest and severe procedural shortcomings which injure key stakeholders.

Proxy advisory firms are subject to the proxy solicitation rules.[6]  However, the firms are provided an exemption from the rules.[7]  Thus, primary oversight of proxy advisory firms is achieved indirectly through the fiduciary duties of the investment advisors and institutional investors utilizing proxy advisory firm services.  As a result, proxy advisory firm accountability exists only to the extent the customers of proxy advisory firms collectively hold them to high standards.[8]

---

[2] See Sec. Exch. Comm'n, Final Rule: Proxy Voting by Investment Advisers, Advisers Act Release No. 1A-2106, 17 C.F.R. § 275 (Jan. 31, 2003).

[3] *Id*.

[4] *Id*.

[5] The Egan-Jones letter effectively gave investors a "safe harbor" in relying on proxy advisory firm voting recommendations without running afoul of the federal securities laws.  Specifically, the letter said that an investor that relies on an "independent third party" in determining proxy votes will be viewed by the SEC to have upheld their fiduciary duty to vote proxies in their clients' best interest if the third party is "free from influence or incentive to make recommendations other than in the advisor's best interest." The ISS letter facilitated ISS's consulting services business by stating proxy advisory firms can demonstrate independence based on an evaluation of the proxy advisory firm's "conflict procedures" rather than a case-by-case analysis of individual conflicts.  ISS provides "independent" proxy voting recommendations on a company to investors while often providing the company with consulting services on how to get a better ISS voting recommendation. *See* Egan-Jones Proxy Services, SEC Staff Letter (May 27, 2004) ("Egan-Jones") and Institutional Shareholder Services, Inc., SEC Staff Letter (Sept. 15, 2004) ("ISS").

[6] See Proxy Voting:  Proxy Voting Responsibilities of Investment Advisers and Availability of Exemptions from the Proxy Rules for Proxy Advisory Firms, available at https://www.sec.gov/interps/legal/cfslb20.htm (last visited November 8, 2018)

[7] *Id*.

[8] ISS is a Registered Investment Advisor under the Investment Advisers Act.  Despite claims to the contrary, this regulatory scheme does not provide the correct framework for oversight given ISS's business model and the fundamental differences between ISS and a typical investment adviser registered under the Advisers Act.

The concerns are compounded by extreme industry consolidation whereby two firms control roughly 97% of the market share.[9] The necessary reliance on the two firms controlling such market share by institutional investors which cast tens of thousands of proxy votes during proxy season has created a scenario where the firms, and particularly ISS, have become *de facto* standard setters for corporate governance and executive compensation practices, which is reinforced by the absence of an appropriate regulatory framework.

Unfortunately, the extreme demands of proxy season make it difficult for the firms utilizing proxy advisory firm services to hold the firms accountable for flagrant conflicts of interest and procedural shortcomings. Thus, the existing indirect regulation of proxy advisory firms is ineffective.

Regardless, and perhaps more concerning, is the fact that multiple procedural and structural defects inherent in the proxy advisory firm industry would significantly impair the ability of even the most ardent institutional investor or investment advisor from effectively holding proxy advisory firms accountable. The main issues within the proxy advisory industry which stem from the lack of oversight and accountability are:

1. **Conflicts of Interest**: Major conflicts of interests inherent in the proxy advisory firm business and ownership structure;

2. **Procedural Shortcomings in the Proxy Report Process**: The lack of opportunity for companies to provide reasonable input in the proxy recommendation process, including addressing a lack of rigor and accuracy with proxy advisory firm analyses; and

3. **Lack of Transparency**: A general lack of transparency surrounding proxy advisory firm voting policies and procedures.

In this letter, the Center outlines practical steps for the Commission to consider which we believe will recalibrate the function proxy advisory firms play within the proxy process while recognizing the importance of their role. If implemented, the Center's recommendations would achieve the following important objectives:

1. Recognize the economic necessity for proxy advisory firms within the proxy process while not creating additional barriers to entry;

2. Permit market participants to effectively evaluate and mediate conflicts of interest within the proxy advisory firm industry – without the need for constant SEC oversight;

3. Enhance the ability of institutional investors to fulfill fiduciary responsibilities when voting their proxies;

4. Provide a reasonable voice for interested stakeholder groups currently excluded from the proxy advisory firm process.

The following briefly summarizes the Center's proposed solutions for addressing the problems with the proxy advisory firm industry explained in detail in our comments. For recommendations 1, 2, 4, and 5, the Center urges the SEC to add each element as a requirement to qualify for the exemption from the federal proxy solicitation rules under Exchange Act Rule 14a-2(b)(3). For recommendation 3, the Center urges the SEC to add the element to a current or new institutional investor disclosure requirement pertaining to proxy voting results.

1. **Mandatory Disclosure of Conflicts of Interest**. The SEC should require proxy advisory firms to provide detailed conflicts of interest disclosures. A wide array of stakeholders, including the investment managers utilizing proxy advisory firms, as well as other investors

---

[9] James K. Glassman and J.W. Verret, How to Fix Our Broken Advisory System, Mercatus Center (2013), http://mercatus.org/publication/how-fix-our-broken-proxy-advisory-system

and issuers, are impacted by proxy advisory firm recommendations and conflicts of interest. Individual conflict of interest disclosures should be required to be public in addition to disclosures within the proxy report materials presented to clients. A proper disclosure would include the following elements:

    a. Nature of Conflict and Subject Matter;

    b. Involved Parties;

    c. Monetary Compensation Received; and

    d. Whether Voting Recommendations Differ from Conflicted Party;

2. **The "Five-Day Rule"**: Currently, issuers are not provided with adequate opportunities to review draft and final proxy reports. The SEC should mandate that all issuers must receive a draft of the proxy report to be provided on the issuer by a proxy advisory firm to its clients. Additionally, issuers must have five business days to review the draft report. Subsequently, upon the finalization of the report by the proxy advisory firm, the final version of the report must be given to the company followed by a five-day blackout period before the report can be disseminated.

3. **Custom Voting Policy Disclosure**: Many institutional investors and hedge fund portfolio managers maintain active corporate governance teams which utilize proxy advisory firm analyses and recommendations as a part of their evaluation of how to vote the proxy. There are, however, other investors which rely upon proxy advisory firm recommendations without any review or further consideration. Investors which utilize proxy advisory firms should be required to disclose:

    a. Whether the institutional investor and their investment advisor utilize a customized voting policy when engaging proxy advisory firms for proxy voting recommendations and analyses;

    b. If a customized voting policy is used, a *brief* explanation of the proxy issues covered by the policy; and

    c. The percentage frequency in which the investor voted in unison with the proxy advisory firm on each issue covered by the customized voting policy.

4. **Methodological Reconciliation**: Currently, proxy advisory firms utilize proprietary valuation methodologies for executive compensation in their proxy reports. The SEC should require proxy advisory firms to "show their math" and provide the analysis utilizing the issuer's valuations to allow investors to view a true side-by-side comparison of the differences in assumptions.

5. **Rolling Fiscal Year Policy Implementation**: Proxy advisory firms update many of the proxy voting policies and underlying methodologies on an annual basis. However, issuers often operate, by necessity, on different timelines. This can create a disconnect between an issuer implementing changes to compensation and governance programs before proxy firm policy changes are announced and ensuring alignment with changes to the "current" proxy advisory firm policies. The SEC should mandate a rolling fiscal year approach to proxy advisory firm policy changes whereby finalized policy changes will not apply to annual meetings which take place before the start of the *next* fiscal-year. Thus, a policy change completed in December 2018 would go into effect January 1, 2020 after the completion of the fiscal year waiting period.

### B. Shareholder Proposals

The shareholder proposal framework governed by Exchange Act Rule 14a-8 serves as an important element of the proxy process by providing a shareholder(s) with a tool to engage with an issuer on matters important to the shareholder(s). The input received through the shareholder proposal process can assist an issuer's management and board with further enhancing shareholder value.

While shareholder proposals serve an important purpose, necessary limitations exist surrounding the ability of proponents to submit and re-submit proposals. Additionally, given the fiduciary responsibilities of an issuer's officers and board of directors to guide and run the business, the subject-matter scope of shareholder proposals must also be limited. The federal securities laws recognize the need for appropriate limitations which are outlined in Exchange Act Rule 14a-8.

Over the past several years, the nature and use of shareholder proposals has seen a shift in focus with social and environmental shareholder proposals garnering significant attention. Additionally, shareholder proposals on other significant areas of corporate management, like preferring buybacks as a method to return cash to shareholders, have also become more and more common.

Under the current framework, however, micro-minority shareholders which own less than one-ten-thousandth of a percent of an issuer can submit a shareholder proposal annually in perpetuity despite the fact the proposal is rejected by nearly 90% of fellow shareholders. As noted above, the ability to submit shareholder proposals is undoubtedly an important shareholder right. However, the endless re-submission of proposals which are rejected by significant majorities is simply not good policy.

The Center believes the SEC should make two needed updates to Rule 14a-8 to modernize the shareholder proposal framework to reflect the current landscape of the use of shareholder proposals. Taken together, the Center's Solutions accomplish three primary objectives:

1. Preserve the ability of shareholders to submit proposals to management;

2. Preserve the ability of shareholders and issuers to negotiate on key issues brought up by shareholder proposals; and

3. Emphasize the importance of shareholder proposals by removing frivolous proposals from the proxy ballot.

The following briefly summarizes the Center's recommendations on the shareholder proposal aspect of the proxy process:

1. **Update the Shareholder Proposal Resubmission Thresholds**: The SEC should update the shareholder resubmission thresholds from the current 3%/6%/10% standards to reflect the 6%/15%/30% standards enumerated below:

   a. If voted on once in the last five years – currently at 3% - Proposed to change to 6%;

   b. If voted on twice in the last five years – currently at 6% - Proposed to change to 15%; and

   c. If voted on three or more times in the last five years – currently at 10% - Proposed to change to 30%.

2. **Impose a Five-Vote Limit on Unsuccessful Shareholder Proposals**: The SEC should allow for the exclusion of a shareholder proposal which has been voted on by an issuer's shareholders five consecutive times without achieving majority support.

## II.    Proxy Advisory Firms

Proxy advisory firms fill an important role for institutional investors.  As the share of institutional investor ownership has grown from 46% in 1987 to over 70% today, the volume of proxy votes which investors are responsible for casting has grown into the billions.  To assist them in fulfilling their fiduciary duty to vote proxies in the best interests of their clients, most institutional investors rely on the services of Institutional Shareholder Services ("ISS"), the largest proxy advisory firm, or Glass Lewis & Co., the other major proxy advisory firm.  Together, these firms cover about 97 percent of the U.S. market for proxy advisory firm services.

For institutional investors, proxy advisory firm services represent the only cost-effective manner for voting proxies while also striving to fulfill the required fiduciary standards.  Yet, the financial necessity for proxy advisory firm services gives ISS and Glass Lewis tremendous influence over executive compensation and corporate governance practices.

According to Center On Executive Compensation data of the S&P 500 from 2011 through 2018, a year-over-year change in ISS recommendation on "Say on Pay" has yielded an average percentage point change of +/- 27%.[10]  External research has estimated Glass Lewis's influence at around 7%.[11]

Similarly, ISS's support of a shareholder initiative pertaining to compensation or governance as part of their standard policies can enhance the success of the shareholder proposals.  Further, ISS's support of various executive compensation plan metrics and structures (*i.e.*, the use of Total Shareholder Return as a compensation metric or modifier) can cause widespread adoption of the element or structure by issuers seeking to ensure ongoing compliance with ISS's expectations.

As noted above, primary oversight of proxy advisory firms is applied indirectly through the fiduciary duties of the investors and investment advisors which utilize their services.  Conceptually, the "indirect" regulation of proxy advisory firms functions by requiring the investors and advisors which utilize proxy advisory firm services to ascertain "the vote was not a product of a conflict of interest if [they] voted client securities, in accordance with a pre-determined policy, based upon the recommendations of an independent third party."[12]

By taking these steps – which presumably hold the proxy advisory firms accountable and to high standards – can the investor or advisor uphold their own fiduciary responsibilities.  In 2014, the SEC Staff issued guidance reinforcing the responsibilities of investors and advisors which utilize proxy advisory firm services.[13]  Additionally, the Guidance also reaffirmed that proxy advisory firms were subject to the federal proxy solicitation rules but can fall under an exemption from those rules.[14]

---

[10] Center On Executive Compensation Data.

[11] Research by Professor David Larker at Stanford University found that among 2,008 firms in the Russell 3000, "firms that received a negative recommendation by ISS (Glass Lewis) obtained an average 68.68% (76.18%) voting support in SOP proposals. In contrast, firms that did not receive a negative recommendation from ISS (GL) obtained an average of 93.4% (93.7%) support in those proposals."   The Larcker research is generally consistent with Center research.  David F. Larcker, The Economic Consequences of Proxy Advisor Say-on-Pay Voting Policies, Harvard Law School Forum on Corporate Governance and Financial Regulation, November 12, 2012, http://blogs.law.harvard.edu/corpgov/2012/11/12/the-economic-consequences-of-proxy-advisor-say-on-pay-voting-policies/ (last visited November 12, 2018).

[12] See Sec. Exch. Comm'n, Final Rule: Proxy Voting by Investment Advisers, Advisers Act Release No. 1A-2106, 17 C.F.R. § 275 (Jan. 31, 2003).

[13] See Staff Legal Bulletin No. 20 (IM/CF), "Proxy Voting:  Proxy Voting Responsibilities of Investment Advisers and Availability of Exemptions from the Proxy Rules for Proxy Advisory Firms", available at https://www.sec.gov/interps/legal/cfslb20.htm (last visited 10/30/2018)

[14] *Id*.

Unfortunately, the indirect oversight of proxy advisory firms through the fiduciary duties of investment institutions and their advisors fails to prevent the abuses the federal securities laws seek to prevent.

Proxy voting has changed dramatically over the last fifteen years with proxy votes regarding an issuer's operational, strategic, and governance strategy growing in frequency and importance. The closed nature of the "indirect" oversight relationship--which exists only between proxy advisory firms and the investor or advisor which utilizes their services--excludes other important stakeholders. These include issuers and their shareholders as well as other investors – *e.g.* retail investors – who are impacted but without access to proxy advisory firm reports and analyses. Additionally, proxy advisory firm recommendations impact market practices by influencing proxy votes – including important governance policies and director elections.

Much more troubling, however, is the fact that the extreme demands of proxy season, combined with the closed, two-party nature of the "indirect" oversight scheme, make it extremely difficult for the investors and advisors which utilize proxy advisory firm services to hold proxy advisory firms accountable for blatant conflicts of interest and very concerning procedural shortcomings.

Tailored additional regulatory action from the Securities and Exchange Commission, as proposed by the Center in the following sections, would effectively alleviate the most egregious of the concerns presented by the proxy advisory firm status quo. Additionally, the Center's recommendations provide a solution driven by market participants by "opening" the "closed" nature of the current indirect oversight regime.

    A.   Proxy Advisory Firm Conflicts of Interest Must Be Addressed Through Mandatory Disclosure

Proxy advisors are currently afforded a considerable degree of deference under SEC interpretations by being superficially designated as "independent" of the investment institutions that use their services by those same investment advisors. Yet proxy advisory firms have significant conflicts of interest in the services they provide and in how they are structured. These conflicts of interest are well documented.[15]

The most egregious conflict of interest in the proxy process involves ISS, the largest and most influential proxy advisory firm. ISS has two lines of business. The first, ISS Research, provides proxy voting recommendations and analyses. The second, ISS Corporate Solutions, provides consulting services to the same issuers and shareholder proponents whose proxies are evaluated by ISS Research. The dual arrangement allows ISS to drive consulting business based on the policies adopted by the research business.

Issuers often feel compelled to purchase consulting services from ISS Corporate Solutions. The pressure derives from the significant influence ISS Research has over shareholder voting outcomes. This is especially the case for company equity plan shareholder votes and advisory votes on executive compensation.

Center Subscribers universally report the sole reason for purchasing consulting services from ISS Corporate Solutions is due to ISS Research's influence over shareholder votes. Without ISS Research's ability to influence shareholder votes, it is unlikely many companies would purchase services from ISS Corporate Solutions. In other words, Center Subscribers find no value in ISS Corporate Solution's

---

[15] Proxy Advisory Firm conflicts of interest have been the subject of two reports by the federal government's auditing arm, the U.S. Government Accountability Office (GAO). See U.S. Gov't Accountability Office, Corporate Shareholder Meetings: Issues Relating to Proxy Advisory Firms That Advise Institutional Investors on Proxy Voting, GAO-07-765; and U.S. Gov't Accountability Office, Corporate Shareholder Meetings: Proxy Advisory Firms' Role in Voting and Corporate Governance Practices, GAO-17-47.

consulting services outside of the ability to assess the likelihood of securing a favorable voting recommendation from ISS Research.

ISS maintains that an effective firewall exists between ISS Research and ISS Corporate Solutions, a wholly-owned subsidiary. The experiences of Center Subscribers, however, bring the effectiveness of the firewall into question. One example occurred in September of 2013 when ISS Corporate Solutions sent an email to Motorola Solutions, referencing the fact that in the spring of 2013, when the research side of ISS recommended its clients vote against Motorola's say on pay vote (in its non-custom voting recommendation), Motorola's say on pay resolution received the support of just above 68% of its shareholders. The email said that ISS Research would be subjecting Motorola to a higher level of scrutiny in 2014 and solicited a meeting with the ISS Corporate Solutions staff.

A call was set up, during which the ISS Corporate Solutions representative referenced very high success rates (over 90%) in say on pay votes for companies that engaged ISS Corporate Solutions after receiving a low vote. The exchange left the impression that by engaging ISS Corporate Services, Motorola Solutions would receive advice and information unavailable elsewhere and that it would give the company an advantage when ISS Research analyzed its 2014 proxy.[16]

When confronted with the example at the SEC's December 2013 Proxy Advisory Firm Roundtable, ISS President Gary Retelny said "I'm disappointed they used those words," denying that there was any breach of the firewall, but acknowledging that the representative was supposed to "drum up business."[17] The email exchange and Mr. Retenly's statement about the representative trying to "drum up business" succinctly demonstrates how ISS Research's business model is used to generate revenue for ISS Corporate Solutions and summarizes why ISS's firewall fails in practice.

Perhaps more troubling, however, some problematic aspects of the arrangement cannot be prevented by a firewall. For example, ISS Research has an incentive to frequently change policy positions on proxy voting issues to drive business to ISS Corporate Solutions. Notably, even if ISS Research policy changes are not done with the intent of creating more consulting business for ISS Corporate Solutions, the practical effect is the same. Given ISS's influence, a change in policy at ISS Research creates a market need for ISS Corporate Solutions consulting services as issuers work to ensure their policies are compliant with ISS Research's updated policies.

An example of this troubling arrangement occurred in the Spring of 2018 when ISS purchased EVA Dimensions LLC, "a business intelligence firm that measures and values corporate performance based on the Economic Value Added (EVA) framework". According to ISS's press release announcing the purchase, the "acquisition will allow ISS to provide our clients a cutting-edge holistic means of assessing and defining performance of their portfolio companies."[18] Subsequently in the 2018 ISS Policy Survey, ISS Research asked a question about replacing the Financial Performance Assessment test in the pay-for-performance analysis with an EVA-based evaluation.[19] EVA is not a widely used or readily determined and disclosed metric, and the potential for its inclusion among ISS Research's analysis would have the

---

[16] The full description of the exchange is in Appendix A.

[17] See Transcript of the Securities and Exchange Commission's Proxy Advisory Firm Roundtable Section 0123 – 0124 available at https://www.sec.gov/spotlight/proxy-advisory-services/proxy-advisory-services-transcript.txt (Last visited November 12, 2018)

[18] See ISS Announces Acquisition of EVA Dimensions, available at https://www.issgovernance.com/iss-announces-acquisition-of-eva-dimensions/ (Last visited November 12, 2018)

[19] According to the results of the survey, less than a quarter of investors (ISS's clients) endorsed the use of EVA. It remains to be seen whether ISS will incorporate the metric or not, but if they do, it is clearly being done for business reasons, not due to client requests.

impact of driving issuers to ISS Corporate Solutions as they work to see if their compensation plans pass the test's new parameters.

Also problematic is ISS's practice of offering consulting services to shareholder proponents on shareholder proposals which are later evaluated by ISS Research. The blatant conflict at best creates a question of the ability of ISS Research to objectively evaluate the proposal subject to the consulting services offered by ISS Corporate Solutions. At its worst, the scheme provides an example of a pay-to-win arrangement which has no place in the federal securities laws.

In an example of another conflict, Glass, Lewis & Co. (the second largest advisor) is owned by the $170 billion Ontario Teachers' Pension Plan Board and the Alberta Investment Management Group both of which engage in public and private equity investing in corporations on which Glass Lewis makes recommendations.[20] Although Glass Lewis states that it will add a note to the research report of any company in which the Ontario Teachers' Pension Plan has a significant stake, the lack of transparency in the Glass Lewis model raises important conflict of interest concerns. Specifically, without adequate public disclosure, including the ability of issuers to review draft and final proxy reports by Glass Lewis, there is no way to evaluate the firm's conflicts of interest.

   i.   *The SEC Should Require Specific, Public Disclosures of Conflicts of Interest in Proxy Reports and on a Public Website*

The most complete solution to the conflicts of interest described above would be for the SEC to prohibit the conflicts outright. This would require ISS to spin-off ISS Corporate Solutions into a separate company while also requiring the Ontario Teachers' Pension and Alberta Investment Management Group to sell their stake in Glass Lewis. Only through these actions can the conflicts of interest plaguing the proxy advisory firm industry be completely alleviated.

Short of these actions, however, disclosures provide an avenue to address the concerns with rampant conflicts of interest in the proxy advisory firm status quo. Disclosure serves as the cornerstone of the federal securities laws. The disclosure system is founded on the concept that knowledge of all material information about an investment allows informed investment decisions. In the context of the fiduciary responsibilities of investment advisors and institutional investors casting proxy votes, appropriate disclosures by proxy advisory firms provide needed information to allow informed fiduciary decision-making.

Additionally, proxy advisory firm voting recommendations have an impact on a wide group of stakeholders as well as the market generally by virtue of the influence on shareholder voting results – not just the investor and advisor clients purchasing ISS services. Thus, in addition to proxy advisory firm clients, the public has a vested interest in knowing proxy advisory firm conflicts of interest.

Currently, proxy advisory firm disclosures are woefully inadequate. ISS's conflict of interest "disclosures" are boilerplate and provide information only on conflict of interest *policies* and not on individual conflicts of interest. As noted, Glass Lewis states that it will add a note to the research report of any company in which the Ontario Teachers' Pension Plan has a significant stake. This disclosure, however, does not provide any insight as to the conflicts resulting in the ownership of Glass Lewis by two major pension funds.

More problematic is that proxy advisory firm disclosures are "closed" in nature, meaning disclosure are only made to the clients of proxy advisory firms and are unknown to other investors, impacted stakeholder groups, and the market generally. As detailed above, the extreme demands of proxy season and the need to be economically efficient can create a disincentive for the clients of proxy advisory firms

---

[20] See http://www.glasslewis.com/conflict-of-interest/

to take conflicts of interest seriously and to hold proxy advisory firms accountable for conflicts and other process and transparency shortcomings.

**Recommendation**: To address the rampant conflicts of interest present in the proxy advisory firm industry, the Center recommends the SEC require proxy advisory firms to provide thorough and public conflicts of interest disclosures to be able to be considered "independent" under Advisers Act Release No. 1A-2106.[21] Additionally, the disclosures should be required in order for proxy advisors to qualify for the exemption from the federal proxy solicitation rules under Exchange Act Rule 14a-2(b)(3). The disclosure accomplishes three objectives:

1. The public nature of the disclosure will allow all interested and impacted stakeholders – not just the narrow population of proxy advisory firm clients – to evaluate proxy advisory firm conflicts of interest;

2. The market-driven nature of the disclosure requirement does not require SEC oversight beyond the steps needed to implement the requirement; and

3. The disclosure recognizes the variance in proxy advisory firm business practices and is structured in a manner which does not reveal any proprietary information nor act as an industry barrier to entry.

The elements of the disclosure are as follows:

- Disclosure Location: Proxy advisory firm conflict of interest disclosures should be required in two separate locations – (1) the proxy report and (2) on a public website hosted by the proxy advisory firm. The dual locations of the disclosure ensure all interested and impacted stakeholders have access to the information.

  o Proxy Report: Within the proxy report, the disclosure would be required in two separate places. On the first page or on a cover page, the proxy advisory firm would be required to provide a disclosure. In addition, if the disclosure concerns an individual management or shareholder proposal, a second disclosure would be required at the beginning of the analyses on the conflicted proxy proposal. For example, if a company sought consulting services from ISS on executive compensation, ISS would be required to provide the appropriate disclosure on the first page or cover page and then at the beginning of the say on pay recommendation analyses.

  o Public Website: To address the shortcomings of the "closed" system whereby proxy advisory firm conflicts are only disclosed to clients which lack an incentive to hold proxy advisors accountable, the new disclosure regime would require conflicts of interest to be disclosed publicly on a website hosted by the proxy advisory firm. This would allow all interested stakeholder groups and the market generally to have access to the material information.

- Nature of Conflict and Subject Matter: Proxy advisory firms would also be required to briefly describe the nature of the conflict of interest as well as the subject matter. For example, suppose a proxy advisory firm provides consulting services to a shareholder proponent on a specific shareholder proposal on which the proxy advisor issues a recommendation. The required disclosure could state "Proxy Advisory Firm provided

---

[21] See Sec. Exch. Comm'n, Final Rule: Proxy Voting by Investment Advisers, Advisers Act Release No. 1A-2106, 17 C.F.R. § 275 (Jan. 31, 2003).

consulting services to Shareholder Proponent on the Shareholder Proposal Item 7 "Name of Shareholder Proposal" which was forwarded by Shareholder Proponent."

- <u>Involved Parties</u>: The proxy advisory firm should be required to identify the party with whom the conflict of interest was formed. This would, for example, involve identifying the recipient of consulting services which created a conflict of interest. The proxy advisory firm would also be required to disclose the length of the relationship between the two parties.

- <u>Compensation Received</u>: Proxy advisory firms should be required to disclose any compensation received pursuant to the conflict of interest. For example, if a proxy advisory firm provides consulting services which create a conflict of interest, the proxy advisory firm would be required to disclose the payment received pursuant to those services. Issuers already provide similar disclosures pertaining to independent compensation consultants and auditors.

- <u>Whether Voting Recommendations Differs from Conflicted Party</u>: In order to effectively evaluate whether the conflicts of interest impact voting recommendations, the proxy advisory firm would be required to disclose whether the voting recommendation of the proxy advisory firm differed from that of the conflicted party. For example, suppose an issuer purchased consulting services relating to executive compensation. In the required disclosure, the proxy advisory firm would be required to state whether its voting recommendation on the issuer's say on pay proposal differed from that of management. In another example, if a proxy advisory firm consults with a shareholder proponent on the structure of a shareholder proposal, the proxy advisory firm would be required to disclose whether its voting recommendation on that shareholder proposal differed from the recommendation of the proponent. This framework allows proxy advisory firms to protect propriety recommendations while still allowing the conflicts to be evaluated. Proxy reports already show the proxy advisors recommendation compared to management. In instances where a conflicted party is not an issuer, the proxy advisory firm would be required to add the conflicted party's recommendation alongside its own recommendation within the report.

- <u>Disclosure Format</u>: The disclosure format would change based on where the disclosure was being made. The disclosure would be required to be made in a narrative format but would allow for the use of charts and tables. The use of charts and tables would be designated as being a permissible disclosure format for the website disclosure.

By mandating the above elements, the SEC creates an effective and flexible disclosure regime which effectively allows the disclosure of existing conflicts while also providing an adaptable disclosure template for future conflicts of interest which are not currently envisioned.

Formatted in this manner as demonstrated below, the disclosures allow the institutional investors and advisors to adequately evaluate the proxy advisory firms to determine independence in compliance with the required fiduciary responsibilities. The completeness of the above framework also provides all interested stakeholders the ability to evaluate proxy advisory conflicts in the context of the voting recommendations they issue.

- *Narrative Disclosure for Proxy Report*:

"[Proxy Advisory Firm] provides consulting services to issuers and shareholder proponents on both management and shareholder proposals. [Proxy Advisory Firm] also provides voting recommendations and analyses on these same proposals, creating a potential for a conflict of interest.

In 2018, [Proxy Advisory Firm] provided the [Shareholder Proponent] with consulting services regarding the content and format of shareholder proposal 'Item 8" in the proxy report below. The

value of the consulting services amounted to $45,450. [Proxy Advisory Firm's] voting recommendation with Item 8 aligned with the recommendation of [Shareholder Proponent]. [Shareholder Proponent] received similar consulting services in 2014, 2015, and 2017."

- *Narrative Disclosure for Proxy Report – Proposal Section*:

"[Proxy Advisory Firm] provided [Issuer] with consulting services on Item 4 during 2018 creating the potential for a conflict of interest. The value of the consulting services amounted to $31,100."

- *Website Disclosure – Tabular Format*:

| Conflicted Party | Nature of Conflict | Subject Matter | Compensation | Recommendation Differ from Conflicted Party? | Scope of Relationship |
|---|---|---|---|---|---|
| ABC Corporation | Consulting Services | Executive Compensation | $50,000 | Yes | 2012-2018 |
| ZYX Union | Consulting Services | Buybacks Proposal | $18,800 | No | 2018 |

**B.** **The SEC Should Implement a "Five-Day Rule" to Provide Needed Levels of Transparency and Review for Proxy Advisory Firm Analyses**

From the perspective of the executive compensation practitioner, the most problematic aspects of the proxy advisory firm status quo involve serious procedural and transparency shortcomings paired with an extreme difficulty in engaging with proxy advisory firms. Specifically, the lack of reasonable access by all issuers to draft proxy reports and the inability of those issuers to adequately review both the draft and final report for errors before publication is highly problematic. The specific concerns regarding the lack of reasonable review of important proxy report data are detailed below.

- *Issuers Lack Reasonable Access to Draft and Final Proxy Reports:* The most serious procedural issue with proxy advisory firms involves the ability of issuers to access both the draft and final proxy report for adequate review. Both major proxy advisory firms have separate policies regarding the review of proxy reports.

  o *ISS Only Provides Draft Proxy Reports to the S&P 500 with Certain Unclear Exceptions:* Currently, ISS provides a draft proxy report to the S&P 500 (as long as the company has registered on ISS's site) two to four weeks before the annual meeting. Outside of that population, issuers do not receive a draft report to review. Even this policy, however, is selectively applied. ISS has developed several reasons for refusing the provide companies with draft reports. For example, draft reports are not provided for any meeting where the agenda includes an M&A proposal, proxy fight or "controversial" items such as a "Vote-No" campaign. For final reports, ISS provides all issuers with a copy upon publication.

  o *Glass Lewis Does Not Provide Draft Proxy Reports, Charges $5,000 for Final Reports:* Glass Lewis does not provide draft reports to issuers and charges $5,000 for issuers to access copies of the final draft report. Glass Lewis does provide issuers with a data-only version of their Proxy Paper report prior to the full paper being provided to investors. The data-only report, which companies may access through the online Meetyl portal, does not contain the analysis or vote recommendations, but does contain the data points used by Glass Lewis to conduct the analysis, and Glass Lewis states that companies should review the data for accuracy. The only way a

company can view the voting analyses and recommendations is by purchasing the report.

- *Issuers Lack A Reasonable Opportunity to Provide Feedback to Proxy Advisory Firms*: Separate from the ability to *access* draft and final proxy reports for reasonable review is the time frame and process for the actual *review* of the content of the draft and final reports. Each proxy advisory firm provides separate frameworks for review of draft reports. Neither firm allows for the review of final reports.

  - *Center Subscribers Report Difficulty Engaging with Proxy Advisory Firms, Especially During Proxy Season*: Center Subscribers report extreme difficulty in engaging with ISS and Glass Lewis within the time constraints of proxy season. Given the workload facing both proxy advisory firms during the truncated period of proxy season, this is unsurprising. This can be problematic, however, when reaching out to the proxy advisory firms to attempt to reconcile or correct errors in data within the draft report.

  - *ISS Provides a Short Review Period for the Draft Proxy Report, No Review Period for Final Report*: According to ISS's website, "[t]he cover letter accompanying the draft report will specify the deadline for the company's comments, *generally* within 1-2 business days after it is distributed. Comments received outside of the deadline are unlikely to be considered before publication of the ISS analysis." [emphasis added]. Almost universally, Center Subscribers reported receiving the draft ISS report Friday afternoon shortly before the opening of the two-day window referenced above. The review of the report is required to be completed early the following week, often by Monday. Given the density of the proxy reports, issuers report extreme difficulties in effectively reviewing and providing the proxy advisory firm with feedback of the draft report. While issuers are provided a copy of the final report, there is no review period prior to its publication. Thus, issuers lack the ability to check to see if errors and corrections submitted to the proxy advisory firm during the draft report review process have been rectified within the final report before its publication.

  - *Glass Lewis Provides No Review Period for Draft or Final Reports*: Issuers have 48 hours to review the data-only version of the proxy paper and provide suggested corrections with the public documentation supporting such corrections. Issuers do not have any ability to review the actual voting recommendations in draft or final form. Issuers are not provided a copy of the final draft report before publication but can purchase a copy for $5,000.

*All* interested stakeholders, and particularly investment institutions and advisors relying on the data to make fiduciary voting decisions, have a strong vested interest in the veracity and review of the data within both draft and final proxy reports. As demonstrated above, however, the current system does not provide effective avenues for issuers to provide needed feedback and review. Proxy advisory firms also have a propensity for errors and inaccuracies within both draft and final reports.[22]

     i. *The SEC Should Require Proxy Advisory Firms to Provide* <u>All</u> *Issuers with a Copy of the Draft and Final Report and Provide a Five Business Day Review Period for Each*

---

[22] A 2014 survey of Center On Executive Compensation Subscribers – chief human resource officers of large companies -- found that of those responding, 55 percent said that a proxy advisory firm had made one or more mistakes in a final published report on the company's compensation programs. Half of those Subscribers reported receiving multiple instances of erroneous or inaccurate information.

Proxy advisory firms evaluate tens of thousands of proxy statements per year. A majority of the proxy statement reviews take place within a short two-month window during proxy season. The magnitude of data analyses and disclosure proxy advisory firms must conduct and review during this time is considerable.

Further, proxy reports are released within a short window before the issuer's annual meeting. The data within the reports is subsequently relied upon by institutional investors in fulfilling their fiduciary duties to vote proxies in the best interest of their shareholders. The extremely abbreviated time window provides little chance for institutional investors – which must vote tens of thousands of proxies for hundreds of companies – to effectively review underlying data of the proxy reports for accuracy and correct characterizations.

Providing issuers with a prescribed period to review both draft and final proxy reports should be a mandatory step within the proxy process. Most simply, an issuer has the capacity to effectively review the data within the proxy reports for accuracy, with the advantage of having the best first-hand knowledge of the data, unlike proxy advisory firms and their institutional investor clients.

Additionally, a mandatory *review* period does not provide an issuer with any ability to "veto" or dictate changes to the data or the recommendations of proxy advisory firms – it is only a *review* of the draft and final proxy reports. Further, given the difficulties with engaging with proxy advisory firms during proxy season and the propensity for high percentages of an issuers shares to be voted on within 24-hours of the release of the proxy report, the review period also allows issuers to establish needed engagement to ensure votes are not cast based on inaccurate data.

All interested stakeholders, including the investors and advisor clients of proxy advisory firms as well as the market in general, will benefit from this added level of review. Additionally, allowing the issuer the ability to review a critical piece of information which will dictate how shareholders vote on the issuer's management and shareholder proposals, provides an important procedural protection currently lacking in the proxy process.

Thus, the Center recommends the SEC require proxy advisory firms to provide the following in order for proxy advisors to qualify for the exemption from the federal proxy solicitation rules under Exchange Act Rule 14a-2(b)(3):

- The draft proxy report be made available to an issuer with a review period of at least five business days; and

- The final proxy report be made available to an issuer with a review period of at least five business days before general publication;

Adding this necessary level of transparency will strengthen the procedural rigor of the proxy process and ensure that votes are cast on sound information with input from all interested and impacted stakeholders.

C. <u>The SEC Should Require Institutional Investors to Disclose the Use of Customized Proxy Voting Policies and Whether Votes Cast Deviated from Proxy Advisory Firm Recommendations</u>

Given the magnitude and scope of proxy advisory firm services, significant concerns exist the regarding the influence proxy advisory firms have over institutional investor voting practices. In addition to providing proxy voting recommendations and analyses, proxy advisory firms also provide clients with the service of casting the proxy ballots on behalf of the client. This service offers an economically efficient way for investors to cast hundreds and thousands of proxy votes.

However, there are significant concerns with the practice which can occur when votes are cast by a proxy advisory firm, based on the recommendations of the proxy advisory firm, without adequate review by the investor-client. Additionally, the practice of "Robo-Voting" is also concerning. Robo-Voting

occurs when investors allow votes to be cast automatically by ISS, based on the proxy advisor's recommendations, without any, or very little review.

As is detailed previously in this letter, when voting proxies, institutional investors and their investment advisors have a fiduciary responsibility to vote in the best interest of their shareholders. The current regulatory framework allows the proxy advisory firm to execute the fiduciary activity of proxy voting without any investor review. The result amounts to a delegation of the fiduciary activity, without disclosure, to the proxy advisory firm. This practice appears widespread with Center Subscribers anecdotally reporting a large percentage of shares are voted within 24 hours of the release of the proxy advisory firm voting recommendations.[23]

The concerns over the lack of an adequate review of voting recommendations are even more significant if considered within the context of the conflicts of interest and procedural shortcomings plaguing the proxy advisory firm industry. Additionally, this current practice eliminates the ability to engage with those investors once the report has been issued because votes typically have already been cast. This is particularly concerning where material inaccuracies are found within the proxy advisory firm proxy report.

ISS offers institutional investor clients the ability to utilize customized voting policies for the purposes of providing the client with voting recommendations. Using a customized voting methodology, the proxy advisory firm can apply the client's preferences as a supplement or replacement to the proxy advisory firm's methodologies in forming proxy voting analyses and recommendations. [24]

The use of customized voting policies provides an investor with the ability to provide a set of customized voting preferences to ISS. This translates to the investor wielding levels of control over the voting recommendations and analyses covered by the policies. There is, however, a lack of transparency concerning what issues are covered by customized voting policies and, to the extent an issue is covered, as to the practical effect of the customized voting policy. Furthermore, whether a fiduciary responsibility can be adequately fulfilled without any investor review is highly questionable.

To address the concerns over Robo-Voting and the lack an adequate review of proxy advisory firm recommendations by investors, the Center recommends the SEC create a new disclosure obligation for the institutional investors which utilize proxy advisory firm voting services. The disclosure would require institutional investors to provide a publicly-filed disclosure which states:

    a)   Whether the institutional investor and their investment advisor utilize a customized voting policy when engaging proxy advisory firms for proxy voting recommendations and analyses;

    b)   If a customized voting policy is used, a *brief* explanation of the proxy issues covered by the policy (*e.g.* "Executive Compensation"); and

    c)   The percentage frequency in which the investor voted in unison with the proxy advisory firm on each issue covered by the customized voting policy.

---

[23] Also see Statement of Darla C. Stuckey, Society for Corporate Governance, available at https://www.banking.senate.gov/imo/media/doc/Stuckey%20Testimony%206-28-18.pdf (Last visited November 12, 2018)

[24] "As of January 1, 2018, approximately 85% of ISS' top 100 clients used a custom proxy voting policy. To provide further context, we note that during calendar year 2017, approximately 69% of the ballots processed by ISS on behalf of clients globally were linked to clients' custom policies, representing approximately 87% of the total shares processed by ISS during this period." See ISS Letter to Senate Banking Committee, available at https://www.issgovernance.com/file/duediligence/20180530-iss-letter-to-senate-banking-committee-members.pdf, May 30, 2018 (Last visited October 31, 2018).

The Center believes this disclosure achieves two important objectives:

1. Market participants, through a disclosure, can effectively evaluate the Robo-Voting practices of institutional investors *without* the SEC's intervention beyond implementing the requirement. A wide array of stakeholder groups is impacted by proxy advisory firm recommendations and institutional investor voting practices and thus there is a market-wide need and interest in the information included in the disclosure.

2. The disclosure recognizes the need for institutional investors to maintain a cost-effective way to vote thousands of proxy votes. The SEC could require disclosure after proxy season thus alleviating the burden of having to provide the disclosure during the year's busiest time.

If the SEC chooses not to pursue the Center's disclosure recommendations, the Center urges the SEC to, at the very least, conduct a study on institutional shareholder voting practices, including Robo-Voting, to evaluate whether investors are delegating an important fiduciary duty to proxy advisory firms without effective review of the voting recommendations and oversight of the proxy advisory firms.

D. <u>The SEC Should Require Proxy Advisory Firms to Provide Methodological Reconciliation Utilizing Disclosed Issuer Financial and Compensation Information</u>

Proxy advisory firms employ proprietary methodologies to analyze publicly disclosed issuer information for the purposes of creating voting analyses and recommendations for their clients. However, the unique nature of individual issuer financial structures, corporate strategies, and executive compensation programs effectively renders proxy advisory firms unable to thoroughly evaluate issuers' programs on an individualized basis.

Thus, the methodologies which proxy advisory firms rely upon to address the volume of voting recommendations and analyses employ a broad "cookie cutter" framework that cannot accommodate the unique nature of each individual issuer and their respective corporate governance and executive compensation strategies. As a result, the cookie-cutter approach to the methodologies proxy advisory firms utilize to evaluate issuer executive compensation decisions often yield recommendations based on a different set of assumptions and inputs than those on which the issuer acted.

The Center understands that proxy advisory firms are faced with evaluating detailed financial and executive compensation information for thousands of companies and thus need an efficient manner in which to generate voting analyses and recommendations. However, as currently structured, the proxy reports and recommendations, which are subsequently relied upon to fulfill a fiduciary proxy voting activity, do not include enough information to allow that fiduciary duty to be effectively discharged.

To allow investors to view the entire scope of the analysis of an issuer's compensation program, the Center urges the SEC to require proxy advisory firms to reconcile the proxy advisory firm's analysis by also conducting its analysis utilizing the issuer's financial information disclosed in the 10-K and compensation information (including the issuer's peer group and equity valuations) included in the proxy statement.[25] The disclosure should be required in order for proxy advisors to qualify for the exemption from the federal proxy solicitation rules under Exchange Act Rule 14a-2(b)(3).

Proxy advisory firms already include an issuer's financial and executive compensation information spread out throughout the proxy report. However, the presentation of the proxy advisory firm's analysis and recommendations based on its own methodologies does not provide any insight as to how the analysis and recommendations would differ if it had used the same information and assumptions on which the company operated.

---

[25] In parallel, issuers are already required to provide reconciliation of Non-GAAP financial figures in order to allow investors to view the entire scope of available information.

For example, ISS utilizes a peer group selection process for the purposes of the executive compensation analysis which often results in a significantly different peer group than was utilized by the issuer in making executive compensation decisions. While ISS does note how the peer groups differed, the subsequent application of its executive compensation methodology utilizes only its own custom peer group for the issuer for the purposes of creating a voting recommendation. This information, without providing the full picture of the analysis by showing the impact on the analysis of the issuer's selected peers, is relied upon by investors carrying out a fiduciary duty.

Providing a side-by-side comparison of the proxy advisory firm's pay, performance and cost analysis using the company's assumptions alongside the analysis using proxy advisory firm's own assumptions provides investors with the complete picture of the analyses to allow for informed fiduciary decision-making, which is currently lacking in the current process.

E. <u>The SEC Should Require Proxy Advisory Firms to Implement Policy Changes on a Rolling Fiscal Year Schedule</u>

Proxy Advisory Firms have an annual process by which they update the policies on which voting recommendations will be based. For ISS, this process begins after proxy season in August each year and finishes in December of the same year. Glass Lewis does not have a formal policy process and issues information about policy updates when changes are made. For calendar year issuers, however, the timing of when new policies are finalized and implemented is very problematic. Calendar year issuers begin the executive compensation process for the upcoming fiscal year in the Summer and the majority, if not all, of the major decisions for the upcoming year are completed by mid-December.

Because of the timing disconnect, many issuers are faced with having already implemented changes that diverge from or fail to account for changes in updated proxy advisory firm policies because the proxy advisory firm policy did not yet exist. The divergence this can create has the potential to significantly impact the proxy advisory firm's recommendations--and thus the issuer--given the influence of proxy advisory firm policies.

Rather than requiring proxy advisory firms to implement restrictions or changes to their policy creation process, the Center believes the SEC should require proxy advisory firms to implement any policy changes only at the beginning of the start of the next fiscal year. Thus, a policy change in ISS which is finalized and made public in December would first apply to proxy votes which take place after the completion of the fiscal year beginning in January. For example, for a calendar-year company, if the proxy advisor's policy change was announced in December 2018, the policy would apply to proxy votes in spring of 2020, based on the information filed for the 2019 fiscal year. The policy should be required in order for a proxy advisor to qualify for the exemption from the federal proxy solicitation rules under Exchange Act Rule 14a-2(b)(3).

This framework allows companies which make compensation decisions to not be judged retroactively by proxy advisory firms. At the same time, this allows proxy advisors to maintain existing policy creation strategies.

**Shareholder Resolutions**

As detailed above, the current proxy process has not evolved to appropriately accommodate the current state of shareholder proposal practices. The ability to submit proposals to an issuer for a shareholder vote provides an important governance mechanism in the proxy process. This ability is not unlimited, however. Through Exchange Act Rule 14a-8, the federal securities laws provide several parameters for the submission of shareholder proposals which are generally divided into three categories:

1. <u>Ownership Requirements</u>: Shareholders must meet minimum standards of ownership in an issuer in order to be eligible to submit a proposal to an issuer;

2. <u>Subject Matter</u>:  Shareholder proposals must fit within a permissible scope of subject matters.

3. <u>Resubmission Requirements</u>:  Shareholder proposals which are voted on can only be re-submitted to an issuer on having met minimum shareholder support thresholds.

Currently, through artificially low resubmission thresholds, the proxy process permits frivolous shareholder proposals which receive a mere 11% shareholder support to be submitted annually in perpetuity.  The repeated inclusion of these specific shareholder proposals does not positively serve shareholders and imposes unnecessary costs on issuers.  Further, given the increase in social and environmental shareholder proposals, the subject matter of many repeat proposals may only arguably be connected to an increase in shareholder or stakeholder value.  Thus, a more modern mechanism is needed for screening repeat shareholder proposals.

**The SEC Should Update the Shareholder Resubmission Thresholds to 6%/15%/30% and Create a Five Vote Cap for Unsuccessful Shareholder Proposals.**

The current Exchange Act rules allow a shareholder to resubmit a proposal even if, in some instances, over 90% of shareholders have voted against it.  And if a proposal happens to reach 11% support each year, there is no limit to how many times the proposal can be resubmitted even if support fails to increase from that level.  As noted, the repeated inclusion of a proposal which nearly nine of 10 shareholders vote against on an annual basis does not serve to benefit shareholders or other stakeholders while also imposing additional costs on issuers.

The SEC has recognized this problem in the past, and in 1997, the SEC proposed raising the thresholds under the Resubmission Rule from the current 3%/6%/10% to a more appropriate 6%/15%/30%. As the SEC stated in the proposing release: "we believe that a proposal that has not achieved these [proposed] levels of support has been fairly tested and stands no significant chance of obtaining the level of voting support required for approval."[26]  Additionally, the Center urges the SEC to cap the number of times a shareholder proposal can be unsuccessfully voted on consecutively at five.

The Center's recommendation to increase in the shareholder resubmission thresholds will not negatively impact shareholders in any manner while accomplishing three important objectives:

1. <u>Preserve the ability of shareholders to submit proposals to management</u>:  The changes in no way infringe on the ability of any shareholder – institution or retail – to submit shareholder proposals.

2. <u>Emphasize the importance of shareholder proposals by removing frivolous proposals from the proxy ballot</u>:  By eliminating a small population of frivolous shareholder proposals from the proxy, shareholders can properly focus on proposals which are important and relevant.  To illustrate, according to Center On Executive Compensation data of S&P 500 Shareholder Proposals, the retroactive application of the 6%/15%/30% shareholder proposals to the 2015, 2016, and 2017 proxy seasons would have resulted in a 9% reduction (33 of 364) in eligible shareholder proposals at meetings in 2018.  Of the 33 ineligible proposals under the new standard, 22 were voted on in 2015, 2016, and 2017.

**3.** <u>Preserve the ability of shareholders and issuers to negotiate on key issues raised in shareholder proposals</u>:  Recently, there has been a growing practice whereby shareholder proponents submit proposals to an issuer and then negotiate for changes at the issuer based on the withdrawal of the shareholder proposal.  The changes in the shareholder resubmission thresholds does not impact this or any other similar practice.  Nor would it eliminate the

---

[26] Proposed Rule: Amendments to Rules on Shareholder Proposals, available at https://www.sec.gov/rules/proposed/34-39093.htm (last visited 11/7/2018).

ability of a proponent whose proposal fails to meet the standard to engage directly with issuers concerning matters important to the proponent.

**Conclusion**

The Center appreciates this opportunity to provide feedback on the Commission's ongoing effort to streamline the proxy process. If you have any questions about the Center's comments, please do not hesitate to contact me at ███████████ .

Sincerely,

Henry Eickelberg
Chief Operating Officer

cc:      Securities and Exchange Commission:

             Hon. Jay Clayton, Chair
             Hon. Kara M. Stein, Commissioner
             Hon. Hester Peirce, Commissioner
             Hon. Elad Roisman, Commissioner
             Hon. Robert Jackson, Commissioner

# Appendix A



# Email Exchange Between ISS Corporate Services and Motorola Solutions Demonstrates Why Conflicts of Interest Must Be Addressed

*Exchange Leaves Perception That ISS Consultant Had Unique Insight Into ISS Research Team Approach*

One of the core criticisms of proxy advisory firms is the existence of conflicts of interest in their business or ownership structures. With respect to Institutional Shareholder Services, the Center On Executive Compensation and other observers have criticized the conflict of interest between providing consulting services to some of the same issuers on which ISS provides "independent" proxy voting research and recommendations to institutional clients. Despite assurances that the research and consulting arms are separate, the attached recent email exchange between an ISS Corporate Services client representative and a securities counsel at Motorola Solutions demonstrates how the marketing of ISS's consulting services blurs those distinctions.

- In 2013, Motorola Solutions received a no vote recommendation from ISS on its say on pay resolution. Just over 68 percent of Motorola Solutions' shareholders voted in favor of say on pay.

- On September 17, 2013, Motorola's ISS client representative sent an email to his contact in the securities law department of Motorola Solutions stating:

  > "[D]ue to the 2013 negative vote recommendation for [other company's][1] Advisory Vote on Executive Compensation and/or the fact that the proposal received less than 70% voting support (ballot item #2 in the attached analysis), ISS's Research division will be subjecting your next executive compensation proposal to a greater level of scrutiny.

  > I did want to offer you a chance to talk with one of our senior corporate advisors in order to better understand what this scrutiny will entail. If you'd like to do this at some point, please let me know."

- On September 25, the Motorola Solutions contact responded and asked to set up a call for October 8.

- On September 26, the Motorola Solutions contact requested that someone from the research side of ISS responsible for analyzing the company join the call.

---

[1] It appears that the representative had sent several emails to companies that had received negative ISS recommendations or say on pay votes below 70%. The representative intended to use Motorola Solution's stock ticker here but forgot to change the email. As a result, the ticker referred to another company that also received a no recommendation and had a low say on pay vote. The Center has confirmed that that company also received a similar email.

- ISS Corporate Services did not arrange for a representative from the research side to be on the call; however, the ISS representative did make it appear as if Corporate Services had unique insight into how the research side analyzed the company in 2013 and the additional scrutiny it would apply in 2014:

  > "We were going to provide you with a better understanding of the reasons for ISS's negative vote recommendation on your 2013 Advisory Vote on Executive Compensation and what you expect [*sic*] in terms of additional scrutiny from ISS's Research side on this issue next year."

- Although not articulated in the email exchange, during the phone call the ISS representative made reference to very high success rates (over 90%) in say on pay votes for companies that engaged ISS Corporate Services after receiving a low vote.

The exchange leaves the impression that by engaging ISS Corporate Services, Motorola Solutions would receive advice and information unavailable elsewhere and that it would give the company an advantage when the ISS research side goes on to analyze its 2014 proxy. In essence, some companies view retaining ISS Corporate Services as giving them a guaranty or at least a greater chance at receiving a favorable evaluation from the research side. The full email is attached. Despite the provocative language hinting at an inside view of ISS research, it contains no disclaimers or warnings that ISS Corporate Services is separate from ISS research and that there is no exchange of information between the two entities.

The exchange is a good example of why such conflicts of interest should be addressed either by the SEC or by a code of conduct.

December 4, 2013

**From:** ████ ████ [mailto:████████@isscorporateservices.com]
**Sent:** Tuesday, September 17, 2013 12:41 PM
**To:** ████ ████████
**Subject:** Alert for MSI due to ISS Negative Vote Recommendation in 2013

Hi ████ :

Just wanted to be sure that you were aware that, due to the 2013 negative vote recommendation for ████ Advisory Vote on Executive Compensation and/or the fact that the proposal received less than 70% voting support (ballot item #2 in the attached analysis), ISS's Research division will be subjecting your next executive compensation proposal to a greater level of scrutiny.

I did want to offer you a chance to talk with one of our senior corporate advisors in order to better understand what this scrutiny will entail.

If you'd like to do this at some point, please let me know.

Best Regards,

████ ████

ISS Corporate Programs

301-███ ███

**From:** ████ ████████ [mailto:████████@motorolasolutions.com]
**Sent:** Wednesday, September 25, 2013 2:00 PM
**To:** ████ ████
**Subject:** RE: Alert for MSI due to ISS Negative Vote Recommendation in 2013

████ , thank you for the offer to discuss. We would be interested in speaking with your team regarding this matter. It appears that all necessary MSI participants are available on the afternoon of Tuesday, October 8th after 1 p.m. Central Time. If your corporate advisor has availability that day, please let me know and we can schedule a call.

Thank you.



Corporate, Securities and Transactions
**Motorola Solutions, Inc.**
motorolasolutions.com
**O:** ████████
**M:**
**E:** ████████ @motorolasolutions.com



**From:** ██████ ████████████ [mailto:████████████@motorolasolutions.com]
**Sent:** Thursday, September 26, 2013 11:14 AM
**To:** █████ ████
**Subject:** RE: Alert for MSI due to ISS Negative Vote Recommendation in 2013

████,

Thank you for your response.  If possible, we would also like to have someone from the Research side familiar with our company attend the call and also ████ █████, if he is available.

Thank you.

████████ ████████

████████ ████████
Corporate, Securities and Transactions
**Motorola Solutions, Inc.**
motorolasolutions.com
**O:** ████████████
**M:** ████████████
**E:** ████████████ @motorolasolutions.com


**From:** ██████ ████████████ [mailto:████████████@motorolasolutions.com]
**Sent:** Monday, October 07, 2013 5:42 PM
**To:** █████ ███ ████
**Cc:** █████████ ████
**Subject:** RE: Alert for MSI due to ISS Negative Vote Recommendation in 2013

Great, thank you.  We can use my dial in:  1-877-███-████; passcode █ █ █ █ ██

Also, can you please provide a brief outline of the discussion topics so that we are fully prepared?

Thank you.

████████ ████████
Corporate, Securities and Transactions
**Motorola Solutions, Inc.**
motorolasolutions.com
**O:** ████████████
**M:** ████████████
**E:** ████████████ @motorolasolutions.com

**From:** ██████ ██████ [mailto:████████@isscorporateservices.com]
**Sent:** Tuesday, October 08, 2013 8:22 AM
**To:** ██████ ████████████
**Subject:** RE: Alert for MSI due to ISS Negative Vote Recommendation in 2013

Hi ██████:

Glad to help!

We were going to provide you with a better understanding of the reasons for ISS's negative vote recommendation on your 2013 Advisory Vote on Executive Compensation and what you expect in terms of additional scrutiny from ISS's Research side on this issue next year.

Best Regards,

██████ █████

**Exxon Mobil Corporation**
5959 Las Colinas Boulevard
Irving, Texas 75039-2298

Neil A. Hansen
Vice President, Investor Relations
and Secretary



February 3, 2020

Ms. Vanessa Countryman
Secretary
U.S. Securities and Exchange Commission
100 F Street, NE
Washington, DC 20549-1090
rule-comments@sec.gov

Subject:      Release No. 34-87457
              File No. S7-22-19
              Amendments to Exemptions from the Proxy Rules for Proxy Voting Advice

Dear Ms. Countryman:

I am Vice President – Investor Relations and Secretary of Exxon Mobil Corporation.  I am grateful for this opportunity to share our company's perspective on the Commission's proposed rulemaking regarding proxy advisory firms.

ExxonMobil is one of the most widely held public companies in the United States with a substantial number of long-term individual shareholders.  Many of our more than 3.4 million registered and beneficial shareholder accounts are held by Americans who depend upon their investment in us for their financial security.  ExxonMobil's dividend, which has grown for the last 37 successive years, is a mainstay of many household incomes.  We estimate that 44 percent of our outstanding shares are owned by retail investors, based on available 2018 data.  We are proud that ExxonMobil stock has remained in some families for generations.

Few of our shareholders, we believe, fully understand the role that proxy advisory firms such as Institutional Shareholder Services (ISS) and Glass Lewis currently play in the governance of public companies such as ExxonMobil.  Nor are they likely aware of the impact these firms can have on the performance of their investments.  However, among those who are managing public companies and are accountable for delivering shareholder value, ISS and Glass Lewis are well known and their influence in corporate governance is widely felt.  By virtue of the number of votes they advise – and through practices such as automatic submission of votes – these firms are effectively our largest shareholders, despite having no direct stake in ExxonMobil's success.

We commend the Commission and the Staff for addressing this underappreciated but important subject, and for the careful thought and judicious approach that clearly went into developing the proposed changes reflected in the proposed rules (the "Proposed Rules"). The current rulemaking effort on this topic is exceptional in both the breadth of voices considered and the length of time the issue has been studied. We acknowledge the extensive and thorough review of the issues undertaken in the current rulemaking process prior to and including the November 15, 2018 SEC roundtable (the "Roundtable") and through the Proposed Rules.[1]

As stated in the comment letter we submitted following the Roundtable,[2] we recognize that many of our investors value the services that proxy advisors provide. We do not advocate for the decline or elimination of these services. Instead, we continue to encourage the Commission to look for practical solutions to help ensure that investors who use proxy voting advice receive more accurate, transparent and complete information in a manner that is consistent with the anti-fraud requirements applicable to all solicitations, while not imposing undue costs or delays. The Proposed Rules largely accomplish this objective by providing a specific pathway for proxy advisors that also avoids many of the costs incurred by other parties that make solicitations. We applaud the balanced approach the Commission has taken in the Proposed Rules. We support their enactment and suggest a few enhancements, particularly in addressing automatic submissions of votes.

The Proposed Rules are rightly focused on restoring and enhancing a voting system based on material disclosure, subject to anti-fraud liability. While we support the reforms, we believe they will have no impact on the 15 to 20 percent of our vote that is automatically submitted each year because of the automatic submission process. Automatic submissions undermine shareholder engagement efforts and provide voting solely on the proxy advisor's analysis, which is often incomplete or inaccurate. The system must be corrected to provide meaningful protection for investors. Failing to address automatic submission would furthermore render other provisions of the Proposed Rules, such as the registrant review and feedback mechanism, an added expense with limited practical impact. We address this issue in our response to Question 41.

We support the Commission's position that proxy advisor reports are solicitations and encourage the Commission to evaluate similar communications under these standards. We also support the Commission's position that these solicitations can be cost-effectively enhanced through issuer review and a potential registrant's response. We believe it is important for all solicitations to meet the Commission's anti-fraud standards and we have also outlined some examples of disclosure that we believe could improve the clarity of this standard and the quality of proxy advisor solicitations.

---

[1] We understand many companies may be reluctant to submit their own comment letters on the Proposed Rules as well as the accompanying release regarding Procedural Requirements and Resubmission Thresholds under Exchange Act Rule 14a-8 due to concerns about negative repercussions from proxy advisors or others, especially with the 2020 proxy season in progress. We urge the Commission not to view a relative lack of comment letters from individual companies as indicating a lack of interest in these topics.

[2] See File No 4-725. We stand behind our prior comments. While ISS responded directly to our prior letter, we have not seen any evidence of errors or automatic submissions challenged by any party on the record. To avoid full repetition of this data, we hereby incorporate the prior letter into this letter for consideration by the Commission of File No. S7-22-19: https://www.sec.gov/comments/4-725/4725-5879063-188728.pdf.

Some commenters seem to suggest that the critique of current proxy advisory firm practices offered by public companies ("registrants") such as ExxonMobil are motivated by general animosity towards the proxy process and shareholder participation in corporate governance. They dismiss the evidence many registrants cite of proxy advisory errors as mere differences of opinion, and the data we offer of automatic submission of votes as correlation rather than causation. Such characterizations are misguided. ExxonMobil's support for the Proposed Rules draws upon extensive and intensive experience engaging with proxy advisory firms through the proxy process. Over the past 10 years, our shareholders have voted on more than 100 proposals, including 77 shareholder proposals. We have repeatedly observed errors made by proxy advisory firms during this period, mistakes that have been compounded by automatic voting practices and have had detrimental consequences. [3]

We believe registrants are uniquely positioned to discuss proxy advisor errors that need to be addressed and help improve the accuracy of the disclosures. For example, following the Roundtable, Mr. Michael Garland, Assistant Comptroller for Corporate Governance and Responsible Investment for the New York City Office of the Comptroller, stated in his December 6, 2018 testimony to Senator Crapo that their funds do not undertake a due diligence analysis of the proxy advisors' reports or perform any company-specific analysis. Instead, they check only whether their custom procedures have been properly implemented. [4] This highlights the importance of the issues registrants raise with the proxy advisors' reports, as they are outside the normal scope of what even large and active funds may be doing. Proxy advisory firms and their supporters have cited the relative lack of complaints from their investor clients about errors as evidence that any such errors are rare and of minimal consequence. But if investor clients are not routinely checking for proxy advisory errors, as the New York City Comptroller suggests, then their silence does not represent compelling evidence.

For ease of the Commission's consideration, we have aligned our specific comments with the direct questions posed in the Proposed Rules. We have grouped most of our comments under combined headings of related requests, with the exception of Question 41 regarding automatic submission of votes. We address this topic in more depth, and include new research of which the Commission may not be fully aware. Also, for the more general questions posed (53 through 60), we have sought to address them throughout our comments below rather than devote a specific section to them.

While our comments and the data provided in this letter focus only on the most recent years, these experiences are representative and consistent with what we have seen as a public company throughout the last decade on many different proposals. We share the goal of all interested parties in this process of ensuring that investors have timely access to the most accurate, transparent, unbiased and complete information possible. Our comments are offered in this spirit.

---

[3] For many years, we have sought to address many of the issues we raise in this letter through direct, year-round engagement with the proxy advisors. **Attachment 1** contains a recent letter to ISS-ESG, one of the newest arms of ISS, outlining our accuracy concerns and suggesting alternative, collaborative methods for collecting superior data.
[4] December 6, 2018 Committee Hearing of the United States Senate Committee on Banking, Housing and Urban Affairs. See timestamp 33:37-36:38 in the committee hearing:
https://www.banking.senate.gov/hearings/proxy-process-and-rules-examining-current-practices-and-potential-changes.

<u>Request for Comment Questions 1-6</u>

*Codification of SEC Interpretations and Principles is Required to Achieve More Accurate, Transparent and Complete Voting Information to Protect Investors*

In Question 6 of Staff Legal Bulletin ("SLB") 20 issued in 2014, the Commission stated that services designed to impact shareholder voting like proxy voting advice are solicitations under 14a-1(l). Unfortunately, not all market participants have accepted this guidance. ISS, for example, has argued that their recommendations are not solicitations and that SLB 20 was erroneous in suggesting that they were solicitations.[5] ISS is currently suing the SEC claiming their proxy advice is the "antithesis" of a solicitation.[6] This continued controversy surrounding the Commission's earlier guidance necessitates the codification in a rulemaking of the Commission's position that proxy advice is a solicitation.

The Commission is correct to define proxy advice as a solicitation. It is clear to us that proxy reports and recommendations are Section 14(a) communications because their purpose is to inform voting on specific proposals presented at shareholder meetings. Section 14(a) was designed, and the Commission has the authority, to ensure that communications to shareholders about their proxy voting decisions contain materially complete and accurate information. The Commission has correctly articulated the rationale for this position in stating that "[i]t would be inconsistent with the goal [of Section 14(a)] if persons whose business is to offer and sell voting advice broadly to large numbers of shareholders, with the expectation that their advice will factor into shareholders' voting decisions, were beyond the reach of Section 14(a)."[7]

We believe the potential for inaccuracies, incompleteness and other errors are a real risk in these reports and that applying the same solicitation standard to these Section 14(a) communications that is applied to other Section 14(a) communications creates a valuable safeguard that is currently lacking. We have seen errors regarding directors, unjustified manipulation of peer groups, one-size-fits-all methodologies that are inappropriate for our industry, and more. We have found that these errors are significantly compounded in ISS' "specialty reports,"[8] which have relied on unsubstantiated accusations, "controversies" and misinformation to rationalize their position to support shareholder proposals. Please see our responses to Questions 21-40 and 42-48, and Questions 49-52 below for more detail on these points.

We understand the Commission's desire to ensure that its definition of solicitation is not overly broad. We would encourage the Commission, in the final rule, to provide specific examples of the kinds of communications it does not view as solicitations. In addition, if 14a-1(l)(2) was clarified to say "unprompted request and not for compensation" we believe that could help clarify the relationship the Commission is seeking to preserve.

---

[5] The full letter is included as **Attachment 2**. See pages 4-5.

[6] ISS' email describing their reasoning for the suit is included as **Attachment 3.**

[7] See page 19 of the Proposed Rules.

[8] ISS' specialty reports are reports targeted at audiences who are interested in a specific viewpoint or issue. They differ from ISS' benchmark report by not focusing on maximizing shareholder value. They include the five following reports: Socially Responsible Investor, Sustainability, Taft-Hartley, Public Pension and Catholic Faith-Based: https://www.issgovernance.com/policy-gateway/voting-policies/.

*Market Failure Requires the SEC to Mandate a Clear, Minimum Disclosure Standard for Proxy Advice*

The practical challenges and high costs associated with changing proxy advisor voting[9] creates an impediment for other market entrants in offering proxy voting advice. Mr. Sean Egan of proxy advisory firm Egan Jones testified to this market failure in his Roundtable statement (emphasis added):

> And the third one is perhaps the most important to us, and we think it's the most pernicious. And most people in this room are over the age of 30. And so they won't understand it, but it's critical. And that is that platforms are absolutely important. They are the item in this area. When you think about a trader's desk, they refer to it as real estate. I spoke to a leader, the head of a major investment adviser and they talked about what they're doing and how they're doing it. **And they said they put in a voting platform and they will never change it. It was so difficult to put it in and to work out the kinks that they'll never change it.** And so from our perspective, it's critical to get on that platform. But you know what, we can't get on that platform. We simply can't, okay, unless things change. We've been trying to for the past 8 years and we've been stiff-armed with it. So from my perspective, we view it – it's not just mine, ours, we view it as restraint of trade. And that's not the only area where it's a restraint of trade.

In Mr. Egan's experience, competition for proxy advice is severely restricted by access to the voting platform. His insight, that implementing the voting platform is an activity with incredibly high fixed costs that discourages changes, has significant implications for how we view the market for proxy advice and regulatory efforts by the SEC. These cost barriers on the platform mean that, even if a new source of proxy advice is superior to an existing provider, funds will be heavily incentivized to remain with their current provider, often through bundled products. This means that it is possible for a fund to be satisfied with the analysis and recommendations that it is receiving, because it views this advice as the best alternative available for preserving its investors' assets, even if that advice may not meet SEC standards for accuracy, transparency and completeness.

---

[9] The Commission has asked whether to define "standalone services" to delineate what types of advice qualify as solicitations. As describe above, we believe the market for these services is complex. We believe the Commission's suggested approach in the Proposed Rules is superior to trying to define "standalone services" as a distinction here. We do not believe proxy advisor services are always "standalone services." Bundling of the platform and different recommendations services is common.

5

We believe this constitutes a potential market failure and therefore requires regulation enforcing a minimum anti-fraud standard. The primary service provided by the proxy advisor is the voting platform, not the voting analysis and recommendations. A clear regulatory standard will ensure that disclosure norms are not influenced by other market considerations. Equally, a lack of complaints by any party does not necessarily mean that current disclosures are adequate. [10]

Fortunately, these issues fit squarely within the SEC's central mission to protect investors, maintain fair, orderly and efficient markets, and facilitate capital formation. The SEC can and should ensure that the information these funds receive meets its anti-fraud standards both through its rules and enforcement efforts. [11]

*The SEC Needs to Review and Evaluate Specialty and Custom Voting Recommendations Prior to Exempting Them from These Rules* [12]

We support the Commission's position in the Proposed Rules that separate recommendations formulated under separate policies are separate communications to shareholders and each subject to compliance with the proxy rules. We believe to do otherwise would be inconsistent with both the intent of Rule 14(a) and the Commission's analysis of what constitutes a solicitation. It would effectively lead to application of a double standard in which one set of recommendations meeting the criteria established by the Commission are deemed solicitations, but another set of recommendations meeting the same criteria are not.

We believe that ISS' "specialty reports" constitute a clear example of the need for each communication to be separately analyzed. In our experience, these specialty reports default to supporting shareholder proposals and then rationalize this bias by relying on unsubstantiated "accusations" and alleged "controversies" as facts that justify the predetermined recommendations. [13] Accountability for these misleading recommendations is needed to bring accuracy, transparency and completeness to these recommendations.

---

[10] It also means that these regulations on disclosure will not hurt competition, since competition is primarily in the platform space with high fixed costs. In fact, improved disclosure standards may open up competition to the extent that a new entrant can provide the disclosure in a new platform at a lower cost. See our discussion of errors below in our responses to Questions 21-40 and 42-48 and Questions 49-52.

[11] See "*Rule 14a-8 Should Address Many Different Examples to Provide Clarity*" below.

[12] This section is also responsive to the Commission's Question #30.

[13] See "*Specialty Reports and Other Reports Not Focused on Maximizing Shareholder Value Will Require Additional Disclosures*" below.

Whether a "custom" recommendation[14] should be considered a solicitation depends on the nature of the "custom" recommendation.[15] We have never been provided a copy of these "custom" recommendations from ISS or any other proxy advisor. We believe that if "custom" recommendations are contained in a report with the same level of analysis as the specialty reports, this report is clearly a solicitation. If the "customized" recommendations are presented on the proxy advisor's voting platform and are based on the proxy advisor's analysis of a client's pre-existing guidelines, this is also a solicitation.[16] However, if "custom" recommendations are merely a confirmation by ISS to its clients that it has carried out clear proposal-by-proposal voting instructions, then this would not be a solicitation in our view.

Given the importance of the specific content and purpose of the "custom" reports in determining whether they are solicitations, we believe the SEC rules should be clear that custom reports are solicitations, unless the report is merely confirming proposal-specific instructions.[17] As stated in the Proposed Rules, "[i]t would be inconsistent with that goal if persons whose business is to offer and sell voting advice broadly to large numbers of shareholders, with the expectation that their advice will factor into shareholders' voting decisions, were beyond the reach of Section 14(a)."[18]

*ESG, or E&S, Rating Services Should Also Be Designated as Solicitations in the Rules and the Rules Should Maintain Flexibility to Address Future Market Developments*

The SEC should consider other areas where clarifying its positions in the rules would provide long-term clarity to the markets. There are a growing number of institutional investors and assets managers who use Environmental, Social and Governance (ESG), or Environmental and Sustainability (E&S), ratings in their voting decisions. These communications can have significant influence over shareholder voting, just like recommendations from proxy advisors. Including these ratings in the definition of solicitation upholds the stated purpose of Section 14(a) to provide that communications to investors on proxy voting matters do not contain "inadequate or materially misleading disclosures." As the Proposed Rules notes, this is important where communications are offered for a fee and "with the expectation that [the] advice will be part of the shareholders' voting decision-making process."[19]

---

[14] Generally, "customized" recommendations are a report or recommendation based solely on a client's predetermined custom voting policy that are provided just for that client.
[15] See "*Proxy Advisor Platforms are Highly Customizable Tools That Can Accomplish this with Minimal Cost*" below.
[16] If there is no report to review, just a list of recommendations on the proxy advisor's voting portal, there may still be analysis provided by the proxy advisor that is a solicitation. See the illustration of a proxy advisor platform on page 41 below for an example. Since the review and registrant response required in the Proposed Rules for exemptions under 14a-2 would not make sense here, those exemptions should not apply or be available for these solicitations. Instead, the Proposed Rules could allow these solicitations to be filed as a simplified supplemental proxy filing that outlined the recommendations and rationales provided by the proxy advisor. As shown in the example on page 41, we believe these solicitations are sufficiently general to avoid raising any issues of proprietary strategies, especially since funds disclose their final votes publicly.
[17] See "*Proxy Advisor Platforms are Highly Customizable Tools That Can Accomplish this with Minimal Cost*".
[18] Proposed Rules, pg. 19.
[19] Proposed Rules, pg. 17.

7

ESG ratings are a developing industry that should be addressed by the SEC's new rules. While there has been a sharp increase of ESG raters in recent years with various, and conflicting, methodologies and ratings, we have experience with Sustainalytics, MSCI and ISS that may be illustrative. The movement of Glass Lewis and ISS into this space also shows the connection between these ratings and the proxy solicitation process.

Glass Lewis has teamed up with Sustainalytics to include their ratings in the Glass Lewis proxy advisor recommendations.[20] Glass Lewis states that they include this ESG rating "to provide summary data and insights that can be efficiently used by clients as part of their process to integrate ESG factors across their investment chain, including **effectively aligning proxy voting and engagement practices with ESG risk management considerations**."[21] These ratings are provided with the understanding of Glass Lewis and Sustainalytics that clients will use this information in their proxy voting decisions.

Similarly, ISS provides an "Environmental & Social Quality Score" in its benchmark recommendation report and, separately, has recently combined ISS-OEKOM, ISS-Ethix and other services into "ISS-ESG." In our December 6, 2019 call with ISS-ESG, they confirmed that they ask questions on behalf of clients. They stated that they are looking to engage with registrants on behalf of clients who are eschewing individual engagements, but want to support an engagement on ESG matters. We believe this speaks to both the intent of ISS-ESG and their clients to consider or follow these ratings in voting on proxy matters. These communications are clearly meant to influence voting decisions and, as such, qualify as solicitations. A new rule that addresses proxy advice, as defined in the Proposed Rules, but does not address these related "ratings" solicitations would fail to apply anti-fraud accountability to an area of proxy communications.

Independent ESG rating firms also include information in their reports that is meant to influence voting. For example, MSCI's report on a registrant's practices includes whether directors are "overboarded," whether a registrant's policies have sufficient detail, how executives are paid compared to peers, whether bylaws or other company governance procedures meet their standards and an evaluation of risks facing the registrant. It is logical to expect that investors purchasing this report could use this information in making their voting decisions, including whether to vote for or against a certain director's election or other proposals. Accordingly, it is important that the Commission ensure that the information in these reports is accurate and complete.

We request that the Commission expand the proposed amendments to specify that reports published by ESG rating firms are also solicitations subject to Rule 14a-9. We also request that the rule address principles for similar types of future communications as these markets continue to grow and evolve. These changes are especially important when considering the methodologies around "controversies" sometimes used in these rating.[22]

---

[20] *Understanding Our ESG Content*, Glass Lewis (available at: www.glasslewis.com/understanding-esg-content/).
[21] *Id.* (emphasis added).
[22] See "*Errors Occur From the Use of Unreliable Sources or Limited Research by the Proxy Advisors*" below for a full discussion on the use of "controversies."

An analysis of the factors in the Proposed Rules shows that these ESG ratings are solicitations.[23] As the Commission stated in the Proposed Rules, "where these or other significant factors (or a significant subset of these or other factors) is present," the communication constitutes a solicitation.[24]

> *Factor 1: Marketing one's expertise in researching and analyzing matters that are subject to a proxy vote for the purpose of assisting clients in making voting decisions.*

ESG rating firms specifically market their expertise in researching and analyzing ESG matters for the purpose of assisting clients in making investment and voting decisions. In fact, the websites of the three most prominent ESG rating firms state the following (emphasis added):

- MSCI: "MSCI ESG Ratings aim to measure a company's resilience to long-term, financially relevant ESG risks. We leverage artificial intelligence (AI) and alternative data to deliver dynamic investment-relevant insights **to power your investment decisions**."[25]
- Sustainalytics: "Material ESG issue framework effectively supports engagement with companies on priority ESG issues and **informs voting decisions** on E&S shareholder resolutions."[26]
- ISS Environmental & Social Quality Score: "ESG ratings on companies, countries and green bonds provide investors with the in-depth insight to **effectively incorporate sustainability in their investment decision**."[27]

> *Factor 2: Charging a fee to provide a detailed analysis of various issues.*

ESG rating firms charge a fee for their analyses of ESG issues. In fact, access to the full suite of sustainability data products from one of the larger providers can cost an investor up to $50,000.[28]

> *Factor 3: Describing specific proposals that will be presented at the registrant's upcoming meeting and presenting a "vote recommendation" for each proposal.*

Although ESG rating firms may not always provide voting advice on specific proposals presented to shareholders, they provide voting advice on a topic-by-topic basis. The SEC's analysis of this factor should account for developments in the current market where topic-based ESG proposals have become more and more common. This topic-based approach shows all the hallmarks of a recommendation-style solicitation. Instead of addressing each proposal directly, these ratings provide de-facto voting advice for any proposal on the relevant ESG topic. They act

---

[23] Proposed Rules, pg. 16.
[24] *Id.*
[25] See https://www.msci.com/esg-ratings.
[26] See https://www.sustainalytics.com/esg-ratings/#1530569132662-3e9e8929-5bee.
[27] See https://www.issgovernance.com/esg/ratings/.
[28] See Jennifer Thompson, *ESG Rating Agencies FulFil the Need for Knowhow*, The Financial Times (May 12, 2019) (available at: https://www.ft.com/content/2cd37df8-a973-3f94-b498-09ee1a6ba53b).

as general voting instructions by topic and are designed to influence the voting process. Additionally, the target clients of ESG raters are the same target clients of proxy advisory firms. Institutional investors pay for their rating services to assist in their voting and investment decisions. SEC Commissioner Hester Peirce acknowledged this connection, noting that "ESG experts sell their wares to, among others, investment advisors, who then rely on them to make decisions about *how to vote* or what to buy or sell."[29] The ratings are distributed (and marketed, as discussed below) as information designed to assist investors in their voting and investment decisions by topic. Proposals are then categorized by topic and the voting connection is made. The indirect but intentional influence on investor decision-making processes on a topic by topic basis satisfies this factor for Rule 14a-1(l)(1)(iii)(A).

> *Factor 4: Providing recommendations shortly before a shareholder meeting or authorization vote, enhancing the likelihood that their recommendations will influence a client's voting determinations.*

Sustainalytics' and ISS' ratings and reports are provided shortly before a shareholder meeting when they are incorporated in Glass Lewis' and ISS' proxy voting reports, respectively, and clearly meet this factor. We believe that the SEC, at a minimum, should consider ratings published after the shareholder proposal window has closed to be solicitations. However, since these solicitations are by topic, the timing of a report should not be considered determinative of its intended purpose or expected use. In fact, one of the Commission's early amendments to Rule 14a-1(l) expanded the definition of solicitation to include "any communication reasonably calculated to result in the procurement, execution or revocation of a proxy" based on a recognition that some market participants were distributing communications "well in advance of any formal request for a proxy."[30] Therefore, the telling factor here is that such reports influence a client's voting determinations regardless of the date of the report and the proximity to an annual meeting.

> *Factor 5: Broadly distributing the communication.*

ESG rating firms broadly distribute their rating reports to subscribing investors just as proxy advisor firms broadly distribute their voting recommendations to their clients. In fact, two of the ESG rating firms distribute their reports in tandem with proxy advisory firms, as discussed above.

The applicability of these five factors to ESG rating firms' reports further demonstrate our view that the definition of solicitation should be expanded to capture these reports.

---

[29] *Scarlett Letters: Remarks Before the American Enterprise Institute*, Commissioner Hester M. Pierce (July 18, 2019) (available at: https://www.sec.gov/news/speech/speech-peirce-061819) (emphasis added).
[30] Proposed Rules, pg. 14.

*Potential Conflicts of Interest Come From Multiple Sources and Should Be Publicly Addressed*

We applaud the Commission for addressing the requirements for disclosure of conflicts of interest. Proxy advisors have conflicts of interest. These conflicts can arise in a number of ways, one of the most prominent of which is ISS' provision of consulting services to registrants when it is annually evaluating their proposals. However, potential conflicts also could arise in many other ways, including the provision of services to financial activist investors, work for social activists (both investors and non-investors), the prior work history of the report team, and the policy positions of a proxy advisor's parent company, among others.

We believe there is significant risk that the provision of other paid services could influence voting recommendations. A look at ISS' history shows the increasing importance of conflict disclosure and the potential pressure on proxy advisors' businesses from these alternative revenue streams. In 2014, ISS was sold for $364 million.[31] In 2017, it was sold again for $720 million.[32] To what extent did services that raise potential conflicts of interest contribute to the nearly doubling of ISS' market value? Public disclosure of these services – whether from issuers, activists or others – is a reasonable safeguard in addressing this continuing evolution of the business.

While ISS has argued that it has a conflicts of interest policy and holds its registrant advisory business behind a firewall that separates it from the proxy advice business, we are not aware of what firewall or corporate separateness may exist around services provided to activist investors. Public statements from an ISS employee estimate ISS supported activist campaigns in 2017 and 2016 about 60 percent of the time.[33] As such, it is no surprise that activists would want the SEC to leave proxy advisors alone.[34] It is improbable that ISS sufficiently separates its many varied and conflicting revenue streams. Regardless, the lack of public knowledge on whether this is the case is precisely why the Commission should address this issue and create a disclosure standard consistent with the intent of Rule 14a-9. This is only one example of multiple potential conflicts of interest that should be disclosed. The growth of the proxy advisor's business, as it takes on more and more practice niches, emphasizes the need for full disclosure as the pressures and potential conflicts evolve so that shareholders can make fully-informed voting decisions.

---

[31] "The Mysterious Private Company Controlling Corporate America," Michelle Celarier in Institutional Investor on January 29, 2018:
https://www.institutionalinvestor.com/article/b16pv90bf0zbj8/the-mysterious-private-company-controlling-corporate-america.
[32] Id.
[33] Id.
[34] "Let Proxy Advisors Do Their Work," Carl Icahn in the Wall Street Journal on November 18, 2019:
https://www.wsj.com/articles/let-proxy-advisers-do-their-work-11574121845.

*Market Failure Requires that the SEC Provide a Minimum Disclosure Standard for Conflicts*

A survey of the debate regarding proxy advisor conflicts of interest reveals a curious contradiction. On the one hand, proxy advisors have publicly criticized the conflict of interest policies of other proxy advisors. Registrants have also publicly criticized the lack of public conflict of interest disclosures of proxy advisors. On the other hand, some of the investor funds, and their representatives, have remained largely silent on the issue or stated that they are satisfied with the current disclosures. This contradiction points to a failure in the market for proxy advice that warrants the Commission setting a minimum disclosure standard for conflicts of interest as contained in the Proposed Rules.

As an example of the proxy advisor criticisms, Glass Lewis said the following in its opening statement to the Senate Banking, Housing and Urban Affairs Committee on June 1, 2019:

> Unlike Institutional Shareholder Services ('ISS'), Glass Lewis does not provide consulting services to issuers. We believe the provision of consulting services creates a problematic conflict of interest that goes against the very governance principles that proxy advisors like ourselves advocate. By not providing consulting services to the subjects of our reports, Glass Lewis ensures we have no financial incentive to develop policies or issue recommendations that make companies feel they need to pay for consulting services in order to achieve a favorable outcome. Further, a consulting business is not only in conflict with the interests of our clients, but in conflict with the interests of the companies who are entitled to a fair, reasonable and independent assessment.[35]

Similarly, Sean Egan of Egan Jones said the following at the SEC Roundtable:

> Regarding proxy advisory firms, I cannot defend the indefensible. What I mean by that is that there are conflicts that arise from consulting when you're also in the proxy advisory business. If you're getting paid to give corporations early indications on voting and then turn around and vote, most people consider that to be problematic, and we're probably in that camp. We don't get involved in consulting, either directly or indirectly.

---

[35] See:
https://www.glasslewis.com/wp-content/uploads/2018/06/Glass-Lewis-Response-to-May-9-2018-Chairman-Heller-Letter_0601_FINAL.pdf.

**JA 574**

These statements from proxy advisors stand in stark contrast to statements by some investment advisors that the current disclosures are adequate.[36]  We believe the market failure described above may help explain this curious contrast.[37]  If platform change is a high cost proposition and the current platform is a sunk cost, enhancing current disclosure may not seem to be worth that cost to some.[38]  This is an understandable position for fiduciaries looking to minimize costs.  It also illustrates why no party in the proxy process should be considered the gatekeeper for upholding the SEC's disclosure and anti-fraud standards other than the Commission itself.

*Cost and Other Concerns are Addressed in the Commission's Proposed Rules*

Fortunately, we believe the hypothetical cost concerns discussed above are largely addressed through the Proposed Rules.  We therefore support the Commission's desire to balance the benefits of the disclosure with the costs.  To the extent these costs exist, they are the costs that come with choosing lines of business that create potential conflicts.  We believe the information should be included in (1) the general information screen of the voting platform, (2) again in each of the registrant's reports and (3) again on the specific voting screens for each shareholder meeting.[39]  We also generally support the Commission's proposal that affiliate[40] disclosure be limited to what is publicly available, although we believe the Commission should be clear that proxy advisors must also disclose information they already have about affiliates regardless of whether it is publicly available.  If a proxy advisor holds information on a conflict of interest that, by not disclosing, it can keep from becoming public information, this should not provide the firm a safe harbor from its conflict disclosure obligations.

---

[36] We also note that past statements from funds have not been so uniform.  In 2004, the Missouri State Employees' Retirement System dropped ISS and told them they were looking for an organization with "undivided loyalty."  The Ohio Public Employees' Retirement System and the Colorado Public Employees' Retirement Association made the same moves in 2005.  See "A Call for Change in the Proxy Advisory Industry Status Quo: The Case for Greater Accountability and Oversight," by the Center on Executive Compensation, January 2011, See p. 45: https://online.wsj.com/public/resources/documents/ProxyAdvisoryWhitePaper02072011.pdf.

[37] See "*Market Failure Requires the SEC to Mandate a Clear, Minimum Disclosure Standard for Proxy Advice*" above.

[38] This viewpoint could be further impacted by the fact that review costs are immediate and observed while the costs resulting from the influence of conflicts on voting decisions may occur in the future and not be intuitive without disclosure.

[39] We describe this platform in greater detail in "*Proxy Advisor Platforms are Highly Customizable Tools That Can Accomplish this with Minimal Cost*" below.

[40] Additionally, the Commission should provide clear guidance on what qualifies as an "affiliate" under these rules beyond the definition in Rule 405 of the Securities Act.  For example, relationships with co-filers of a proposal would be appropriate to cover as well even if it may not meet the Rule 405 definition.

13

Once the information is gathered to provide in the proxy advisor's report, we do not see any additional cost to providing this disclosure publicly. We believe this could be done on the ISS website or other publicly available source. At a minimum, we believe all of these disclosures should be included in each proxy advisor report and submitted to or otherwise easily available to the Staff. If the Staff is forced to rely on third-party descriptions of the disclosures because it does not have direct access to the proxy advisor reports, the market failure described above could invite misunderstanding or even manipulation of these descriptions. We believe any rule needs to provide that the exemption is contingent upon the solicitations being provided, or in some form available, to the Staff. Enforcement of these rules will require continued SEC oversight.

We also note that a concern has been raised that public or other disclosure of these conflicts could undermine the firewalls that proxy advisors have sought to establish in the past. We note that many registrants have been public about their use of ISS' corporate governance services in the past. For example, ExxonMobil has felt a need to purchase these tools for many years and have discussed what we have learned from these tools directly with ISS during and outside of proxy season. If these discussions have not undermined this firewall, we do not believe disclosures designed to better inform and protect voters will do so. Conversely, if they have undermined the firewall, investors have even greater need to make sure conflict disclosures are clear, prominent and public. In standardizing disclosure of conflicts in the Proposed Rules, the Commission is merely extending a current market expectation to apply to cover all solicitations. Investors will benefit from full disclosure when making voting decisions.

*Some Investment Advisors Have Spoken Out on the Need for Greater Disclosures*

It is important to us to note that not all investment advisors have been silent or satisfied with the status quo. Some investment advisors, like BlackRock, have approached voting as a value-added service they provide clients. As BlackRock noted in their comment letter following the Roundtable, the SEC's disclosure framework is not consistently applied to all parties engaged in the proxy voting process. They state:

> Currently, while some participants in the proxy voting ecosystem are subject to significant reporting requirements, other participants have no requirements at all and therefore provide no transparency. For example, registered funds are required to publicly file Form N-PX on an annual basis, which discloses a fund's proxy voting record with respect to portfolio securities held by the fund. Likewise, public companies provide significant disclosure on conflicts and related party transactions in their public filings.

14

Conversely, proxy advisory firms are not subject to similar disclosure rules, even though they play an important role in the corporate governance ecosystem. These firms provide research and recommendations on the thousands of shareholder votes at U.S. public companies. For context, there were over 25,000 unique ballot items for the Russell 3000 for the year ending June 30, 2018, according to Institutional Shareholder Services (ISS). The research and recommendations of proxy advisors are an important input for many institutional investors. Yet, there currently are no standards or regulations that apply to reports prepared by proxy advisory firms to summarize proxy statements, and provide analysis and recommendations. Notwithstanding general proxy voting guidelines, proxy advisors do not disclose their methodology for their analyses and vote recommendations, and offer limited insight into which companies receive consulting services. Additional disclosure around potential conflicts of interest and how they are mitigated may be warranted.[41]

We believe BlackRock is correct in noting the significant discrepancy between the public disclosure that registrants, funds and other vote solicitors must provide and what proxy advisors claim is sufficient disclosure. Following the withdrawal of the 2004 ISS and Egan-Jones no-action letters, a public disclosure standard needs to be applied to proxy advisors to bring them in line with the basic requirements of all parties to this process.

All participants in the proxy process should be able to ascertain for their own accounts whether conflicts exist. This can only be done through disclosure of potential conflicts. Some investment advisors seem to believe this will increase their costs. However, we believe clear rules and standards will also decrease the costs of gathering disclosure for investment advisors that embrace shareholder engagement like BlackRock. There is no reason the SEC should avoid regulation to favor the business model of some investment advisors over others. We believe the SEC should instead determine what conflict of interest information would be material to an investor making an investment decision.

---

[41] See BlackRock's comment letter dated November 16, 2018: https://www.sec.gov/comments/4-725/4725-4656351-176506.pdf.

*The New Rules Should Require Clear, Detailed Disclosure that is Easy to Understand*

Registered funds such as BlackRock deserve clear disclosure in fulfilling their fiduciary duties to allow them to evaluate any conflicts that might conflict with or compromise their own customized analyses similar to what registrants provide under Item 404(a) of Regulation S-K. As the Commission has stated previously in speaking to funds, "In order for disclosure to be full and fair, it should be sufficiently specific so that a client is able to understand the material fact or conflict of interest and make an informed decision whether to provide consent."[42]

Equally, registered funds deserve to hear from registrants whether these relationships may present meaningful conflicts due to company-specific factors that may not already be available in the market. To achieve this, we do not believe that proxy advisors can meet the disclosure standards of 14a-9 without making these conflicts of interest disclosures public and clear. This clarity is also important for funds to be able to evaluate whether any firewalls or protections actually address these conflicts sufficiently. As stated in the recent Commission guidance, funds' policies and procedures are only effective to the extent they insulate decisions on how to vote from conflicts.[43]

Additionally, we recommend the Commission require the disclosure to be public so that funds can evaluate it before undertaking the significant sunk costs of adopting the proxy advisor's platform. [44] The disclosure also needs to be clear enough that funds and shareholders can understand it **before** "consenting" to it in (1) following proxy advisor recommendations or (2) incorporating their advice into fund decision-making.[45] The detailed disclosures should cover the past two proxy seasons and the current season, cover details similar to the requirements of Item 404(a) of Regulation S-K[46] and address:[47]

---

[42] See Release No. IA-5248 (June 5, 2019), page 24:  https://www.sec.gov/rules/interp/2019/ia-5248.pdf.
[43] See Release No. IA 5325 (August 21, 2019), footnote 37:  https://www.sec.gov/rules/interp/2019/ia-5325.pdf.
[44] Id., pages 18-20.
[45] Id., pages 18-20.
[46] We believe Item 404(a) of Regulation S-K provides a helpful standard that investors will have seen from registrants. These standard include (1) disclosure of the length of the relationship, (2) the nature and type of relationship, such as consulting, drafting or investment advice services provided, and (3) the approximate dollar amount of the transactions in the past fiscal year. Also, similar to Item 404, the Commission should make clear that any commercial relationships above a certain threshold should clearly require closer scrutiny and may even be presumptively material to assessing the objectivity of the proxy voting advice.
[47] This list is based upon the Commission's recent guidance. See page 19 of Release No. IA-5325: https://www.sec.gov/rules/interp/2019/ia-5325.pdf.

16

1. Potential conflicts related to the provision of proxy voting recommendations and proxy voting services generally, such as services to registrants, hedge funds and other proponents of shareholder proposals.  In addition, the amounts received from such parties in aggregate for each period.

2. Potential conflicts related to activities other than providing proxy voting recommendations and proxy voting services, such as ESG ratings, investment or divestment advice for investors.  In addition, the amounts received from such parties in aggregate for each period.

3. Potential conflicts presented by affiliations of the proxy advisor, its owners, its registrant clients (to the extent they have a controlling holder) or its clients who are proponents or co-filers of proxy voting resolutions (to the extent they have a significant individual or group financier).[48]

4. Potential conflicts related to employees' prior work experience, current remuneration, gifts, perquisites, professional relationships or family relationships with any of the groups described above.[49]

*Specialty Reports and Other Reports Not Focused on Maximizing Shareholder Value Will Require Additional Disclosures*

We also support the Commission's view that different services can require different conflict disclosures.[50]  We believe ISS' specialty reports, and similar reports from other proxy advisors, pose additional conflict challenges that also need to be disclosed.

Based on our conversations with ISS on June 7, 2019, these specialty reports default to support shareholder proposals, unless they conflict with the "theme" of the specialty report.  This contrasts with the stated shareholder value maximizing approach ISS takes towards analyzing shareholder proposals in its benchmark report.  If a report is supporting goals other than maximizing shareholder value, conflicts of interest may take significantly different forms and would not be alleviated by the disclosures described above.

---

[48] Controlling holders or significant funders are good measures for who may have "significant influence" with a registrant or proponent as set out on page 19 of Release No. IA-5325.  "Taking a position" as described can be determined by looking at public statements, court filings and donations to groups making such public statements or court filings.  This would all fit within the "public" review contemplated by the Proposed Rules.  We urge the Commission to provide clear examples in the rules of how the Commission guidance and the terms raised in Question 11 of the proposed release should be interpreted in making this "public" review.

[49] Similar to the standards placed on directors, those providing independent recommendations need to be evaluated by the proxy advisors and their clients for conflicts.  As was made clear in the vote on the merger of Compaq and Hewlett-Packard, credibility of the individual evaluator matters to funds.  See Jennifer Thompson, *ESG Rating Agencies FulFil the Need for Knowhow*, The Financial Times (May 12, 2019) (available at: https://www.ft.com/content/2cd37df8-a973-3f94-b498-09ee1a6ba53b).

[50] "Whether the disclosure is full and fair will depend upon, among other things, the nature of the client, the scope of the services and the material fact or conflict."  See Release No. IA-5248 (June 5, 2019), page 25: https://www.sec.gov/rules/interp/2019/ia-5248.pdf.

The SEC should provide examples in the rule of different types of disclosures required where the report is not focused solely on maximizing shareholder value. We believe this disclosures could take the form of risk factors that describe the potential impact of the approach and the recommendations on shareholder value.[51]

These public disclosures should include:

1. Disclosure that the report is not solely based on maximizing shareholder value and what values the report seeks to promote instead.

2. Disclosure on what default positions are held and the rationale for those positions.

3. Disclosure on how the research and methodology in these reports may differ from the benchmark report, including the use (or lack of use) of the same or different financial metrics, whether the report has been reviewed by the registrant and whether the report has been reviewed by any other third party.[52]

4. Disclosure on whether the report is intended to help a fiduciary fulfill its fiduciary duty to maximize shareholder value, a different or specialized fiduciary duty or is not intended to assist in fulfilling any fiduciary duties.

5. Disclosures on the potential consequences to shareholder value of this different approach.

Such clarity in the particular disclosure requirements for specialty reports catering to a subset of investor clients grouped by theme is necessary to prevent a loophole from arising that would undermine the express purpose of promoting transparency and full disclosure for investors. We welcome the clarity on this point offered in the Commission's Proposed Rules.

---

[51] See "*Rule 14a-9 Should Address Many Different Examples to Provide Clarity*" below for more detail.
[52] See "*Errors Occur From the Use of Unreliable Sources or Limited Research by the Proxy Advisors*" below for additional detail on how current methodologies cause proxy advisors to adopt some third parties' conflicts of interest as well.

*The Analysis of a Public Company is Materially Enhanced by Taking a Company-Specific Approach*

Each public company presents a different investment challenge. Even within the same industry, companies deal with distinct customers, brands, market forces, regulations and approaches, and achieve different results. The time-intensive nature of researching each company is perhaps why investment theories based on indexing to mitigate company-specific factors continue to gain in popularity. As just one example of these differences, ExxonMobil takes a different approach than many market participants, and our competitors, to executive compensation. It is a company-specific approach that can only be fairly understood and evaluated with a company-specific analysis.

The capital-intensive nature of our business, and the extended cost recovery and production profiles of many of our projects, means that the results of the decisions made by management (such as new projects, acquisitions or divestments) are often not experienced by shareholders until 5 to 10 years (or longer) from the time the decision was made. To recognize this fact, performance-based shares for the senior executives in our executive compensation program vest 50% at 5 years and 50% at 10 years or retirement, whichever is later. We believe this design incentivizes a long-term perspective in decision making and mitigates the risks of a shorter-term vesting period where executives could prefer to underinvest in the long term by pursuing fleeting, short-term returns that would provide an outsized impact on their compensation.

In fact, many different factors influence the development of a project beyond concerns of the price of oil and the cost of the development. The company must consider geopolitical developments, financial market risk, technology developments, government policies, and stability and security, among other factors. Our successful liquefied natural gas project in Papua New Guinea provides an example of the development process. ExxonMobil acquired an interest in the associated fields in 1993. Development proceeded until the 1997 Asian financial crisis led the project to be suspended. Efforts to develop the field restarted in 2004 before being suspended again in 2007. In 2009, full funding for the project was approved, 16 years after the initial investment. Production only began in 2014. Short-term incentives would have discouraged development of this project at several different points and also would have failed to hold management accountable for the results of the project after its eventual funding. Within this context, and given the nature of our industry, we believe our design best serves our shareholders.

19

ExxonMobil's long restriction periods also ensure that executives are required to hold shares throughout the commodity price cycle. Oil prices are highly volatile, with swings often occurring rapidly. For example, crude oil prices (Brent) fell over 50% between June and December of 2014 and 80% between June 2014 and February 2016. In this business context, formula-based compensation programs with short-term target setting and three-year vesting might encourage executives to make short-term decisions by enabling them to monetize performance shares at a much faster pace and avoid a decline in share value driven by short-term oil price fluctuations. For example, if the same number of shares were granted to an executive each year from 2008 through 2017, ExxonMobil's program only permitted 8% of these shares to be monetized prior to the 2013 downturn in oil prices versus 58% of shares in a three-year target-setting program. In effect, the design of our incentive award program is aimed at making long-term shareholders, rather than short-term shareholders, out of our executives.

The unique design element that allows for this long-term orientation of our performance shares is that the performance criteria are applied at the date of grant. While the performance share award is still subject to complete monetary loss based on the performance of our stock or the failure of the employee to meet the terms of the grant, the number of shares is fixed at grant. In fact, neither we nor any market participant has clear line of sight for 10 years in the future to set credible and practical targets that would facilitate the "performance at vest" model commonly found in other companies' compensation programs. We recognize that this approach requires careful judgment by our Board's Compensation Committee to determine the appropriate number of shares at grant, but we contend that an incentive program does not have to incorporate short-term target-setting to be performance-based. In fact, the Committee considers numerous objective factors such as financial and operating metrics, progress towards strategic objectives and benchmarking to determine the number of shares at grant. We also agree with our shareholders' feedback that the design of our incentive program will only be effective with long vesting periods, consistent with those incorporated into the ExxonMobil program.

We believe differences in executive compensation structures do impact management incentives and behavior. We understand and respect that other businesses or industries may have, or even require, a different approach to align their managements' incentives with shareholders. Because of this, applying the same formula or analysis to all public companies fails to recognize these differences and, we believe, can lead to recommendations that dilute or undermine tailored policies that benefit that company's shareholders. Company-specific analysis materially enhances the analysis investors receive by accounting for these points – either by agreeing with them or explaining why the company's analysis is incorrect. An analysis that lacks this company-specific analysis omits material information and has the potential to mislead investors.

*A Significant Portion of Proxy Advisor Errors Result from Their Use of One-Size-Fits-All Modeling That Can Be Inadequate for Multifaceted Shareholder Decisions*

We believe the largest source of errors and potentially misleading disclosures from proxy advisory firms is their reliance on surface-level analysis that does not incorporate company-specific factors.[53] These type of errors are repeated every season as they are "institutionalized" in some proxy advisors' review process. This approach has material impacts on voting, company behavior and market standards. For example, over time this approach to say-on-pay proposals has resulted in a broad market standardization for executive compensation that does not necessarily account for industry or company-specific realities and may or may not tie to shareholders' returns at all. This can result in businesses disconnecting their executive compensation from their business model and orienting behavior towards the short term, merely to earn a "FOR" recommendation.

Our experience with ISS on this issue illustrates how these errors occur. ISS measures "relative degree of alignment" between a company's CEO pay and Total Shareholder Return (TSR) over the prior three year period.[54] This benchmark, and similar measures, assumes the same standards and design features for every company's compensation program. In effect, through this singular assessment model, ISS implies that every company should use a similar target-setting executive compensation model for their business that is sensitive to short-term (three years or less) changes in TSR.

ISS' substantial influence creates an entirely different "alignment" task for our Board of Directors and undoubtedly those of other companies. Instead of aligning executive compensation with how management's decisions today will affect shareholders' returns in the long term, executive compensation must be sufficiently aligned with the broad market standard promoted by the proxy advisors or risk an "AGAINST" recommendation and a possible vote against directors in future years. This structure can in turn create a strong incentive for Boards to forgo aligning pay with long-term shareholder returns wherever it may conflict with the proxy advisor's generic modeling approach.

---

[53] The importance of company-specific analysis was highlighted by the Commission in their recent guidance to investment advisors. We believe the Commission should incorporate this principle into its rulemaking. See page 18 of Release No. IA-5325: https://www.sec.gov/rules/interp/2019/ia-5325.pdf.
[54] See ISS' "Pay for Performance Mechanics" on their website, page 4. https://www.issgovernance.com/file/policy/active/americas/Pay-for-Performance-Mechanics.pdf. The other measures listed include "multiple of median" over a one-year period, "pay-TSR alignment" over a five-year period and "financial performance assessment" over a three-year period.

Our own analysis suggests this short-term emphasis is not an accurate predictor of longer-term positive results for our shareholders. Specifically, in looking at performance over the last 51 years from 1968 to 2018, ExxonMobil's one-year TSR has less than a 1% correlation to ExxonMobil's 10-year TSR. Even three-year historical TSR predicts less than 2% of ExxonMobil's 10-year TSR. At least for analyzing our highly volatile and cyclical industry, we fail to understand why short-term TSR is used as a performance benchmark and believe analysis of our company based on this approach does not align with the interests of shareholders. We have engaged with ISS on these points each year. We believe ISS understands our position, but has a strong internal pull through their metrics and philosophy towards this generalized, one-size-fits-all approach to all companies. It therefore regards our objections as simply differences of opinion and not as evidence of the analytical shortcomings that are inevitable without a company or industry-specific approach.

*Errors Occur From the Use of Unreliable Sources or Limited Research by the Proxy Advisors*

We believe that the depth of the research conducted by proxy advisors significantly impacts the quality of the work product produced. As a simple example, the ExxonMobil 2019 Social Responsible Investor (SRI) specialty report reads as a litany of unsourced allegations that appear to have been taken from cursory internet searches. The report itself describes "controversies," "accusations," and "allegations."[55] These hearsay statements are taken as facts and evidence of company failings without speaking to the registrant[56] or, it appears, conducting any independent analysis to verify its accuracy. They are then used as the basis for justifying recommendations against the registrant, including votes against directors. The report also does not indicate where this information came from or why it is credible. The report simply sources it as "ISS-Ethix research dated May 4, 2019." We do not believe this disclosure represents careful, first-hand research by ISS or would withstand the scrutiny of a serious review under Rule 14a-9. By adopting these "controversies" as relevant considerations, the proxy advisor is telling investors that these allegations are factually relevant without undertaking the analysis to explain why or what has led to this decision. It is also not clear to us that it represents the work of an independent third-party advisor. The reliance on hearsay in ISS' specialty reports calls into question the rigor and objectivity of its research in all of its reports, including its widely used benchmark report.

---

[55] For example, in the SRI specialty report, ISS lists out a number of items under "Environmental Controversies," "Human Rights Controversies," "Labor Rights Controversies," "Corruption Controversies" and "Ethics and Governance Controversies," that reads together like a parade of horrors. Each supposed "controversy" is summarized briefly based on the statements of the advocacy group or other source making the allegations. No independent research or verification process is described. No company response is included either. ISS has never raised this "controversies" with us for discussion.

[56] We believe these specialty reports as especially susceptible to unreliable sources as they are not reviewed with the registrants. We applaud the SEC's proposal to provide a review framework and believe it will materially improve the disclosure provided to investors. See *Rule 14a-9 Should Address Many Different Examples to Provide Clarity* below.

The accuracy of the allegations or "controversies" reported by proxy advisors matters. Relying on unproven statements to say there are "controversies" in order to justify predetermined recommendations in specialty reports to support shareholder proposals, which are at times submitted by professional proponents who also write articles about ExxonMobil, is fundamentally misleading to investors. This process is ripe for abuse without reform to provide for issuer review, full disclosure on the research undertaken and appropriate liability for these statements.

At a minimum, these reports need to provide significant detail about the sources consulted and the authors of those sources. Essentially, by using "controversies" based on third-party allegations as the basis for recommendations, proxy advisors are outsourcing their own analysis of these issues to those third parties. In doing so, proxy advisors are adopting the conflicts of interest and biases of these third parties and so, at a minimum, owe a duty to investors to disclose the potential conflicts of interests of these third parties. To avoid creating misleading disclosures, the proxy advisors should also include responses to these allegations from registrants. It is not sufficient for proxy advisors to give credence to unsubstantiated allegations by third parties without first investigating those claims or at least giving due attention to responsive information from registrants refuting these allegations.[57]

Beyond this minimum standard, we believe the SEC should make clear that proxy advisors should rely on their own first hand research in analyzing and recommending shareholder votes and entirely avoid outsourcing their analysis by relying on third-party "controversies" in evaluating voting recommendations.

*Additional Errors Occur When Proxy Advisors Look to Support Predetermined Conclusions*

We have also experienced situations where it appears that a conclusion was determined before the analysis has been completed. These types of errors are not limited to the specialty reports. For example, the ISS compensation peer group for ExxonMobil has been in a constant state of flux with 19 changes made to our peer group in the last five years. We do not believe our case is unique. It is important to note that these changes occur long after the compensation to be voted on has been decided by our Board. For example, for our annual meeting on May 30, 2018, which covered compensation already paid during the year ended December 31, 2017, our peer group was finalized by ISS in its report released in May 2018. However, by contracting ISS' consulting services, we gained access to a "preview" of the ISS peer group in January 2018.

As a result of this preview, we learned that ISS added Berkshire Hathaway to our peer group. Our business, along with that of all of our other ISS-selected peers, is capital-intensive and focuses on significant engineering and manufacturing processes. Berkshire is a holding company with a finance- and insurance-based business model. Its Chairman and CEO receives a salary of $100,000 a year. Such an anomaly, if used for comparison purposes, would obviously and unfairly cast our executives' pay in an unfavorable light. In exploring the ISS-selected peer groups of other similarly situated companies, including our closest energy competitors, we determined that Berkshire had not been selected as a peer for any of them. In fact, Berkshire had not been selected as a peer for any other public company.

---

[57] See "*Rule 14a-9 Should Address Many Different Examples to Provide Clarity*" below.

We have been able to determine from our own analysis that the inclusion of Berkshire negatively impacted our compensation scores. If ISS had instead relied on the peers it used for our largest U.S. industry competitors, we would have received a more favorable score. As such, we believe the inclusion of Berkshire inappropriately contributed to the "AGAINST" recommendation we received on executive compensation in 2018. We cannot find any reasonable basis for the inclusion of Berkshire other than to support an "AGAINST" vote.

*Registrant Review Provides a Cost-Effective Way to Provide Superior Disclosure*

We have sought to provide some of the factors and conditions inherent in the reporting system that are responsible for some of the errors that occur in the analysis and recommendation process. However, we believe these systems can fail, such as in the inclusion of Berkshire in our peer group, or are otherwise inadequate to address the factors such as "one-size-fits-all" analysis or reliance upon "controversies" because these are accepted practices in the current review process.

The Proposed Rules ask for comment on what extent errors are factual in nature versus differences in opinion about methodology, assumptions, or analytical approaches. While we have seen more traditional errors, such as the report stating the wrong number of boards that a director is sitting on, we do not believe it is productive to discussions of shareholder value to argue over whether any particular issue falls into the "errors of fact" category or the "difference of opinion" category. These determinations can substitute our judgment or a proxy advisor's judgment for the judgment of shareholders. This will lead to suboptimal disclosure for shareholders. Instead, the focus should be on which approach will provide the best disclosure at the lowest cost while avoiding misleading or fraudulent solicitations. Providing investors with both viewpoints will allow them to make their own determinations of what is material and most consistent with their long-term best interest.

This objective can be achieved by providing registrants timely review of the entire report and including both proxy advisors' and registrants' responses simultaneously with the proxy advisors' reports, including through an optional hyperlink, and allowing shareholders to make their own determinations of errors and opinions in their analysis. Most registrants, and their Boards, take each voting proposal seriously and we believe this process should be properly applied to all shareholder votes. An optional hyperlink, if the proxy advisor chooses to include it, could be included both in the report and in the voting platform.[58]

---

[58] We discuss how this could work for the voting platform in more detail in "*Proxy Advisor Platforms are Highly Customizable Tools That Can Accomplish this with Minimal Cost*" below.

Timely access to both of these viewpoints each proxy season is critical for investors to make informed decisions at minimal cost.[59] Our experience is that supplemental proxy materials filed with the SEC after the release of the proxy advisors' reports, which are intended to supplement such reports, are ineffective. Generally, we have received one of three responses. First, some investors have agreed with us and said that they would consider this in their analysis. A second group agreed that our position made sense, but told us that we should continue working on the issue with ISS because it was important to them that ISS issue a "FOR" recommendation for their fund to vote with management. Finally, we had a substantial third group who declined to speak with us, citing either their workload during the height of proxy season or their vote already being cast. While we understand the time constraints of our shareholders during proxy season, we believe their unwillingness to reconsider the matter after their initial vote was cast, although it could technically be changed until the votes are tabulated, illustrates why disabling automatic submissions for a disputed proposal is so important.

We encourage the Commission to further clarify that the time when a vote is cast is the proxy equivalent of the "effective time" for securities purchased under the disclosure laws. To ensure investors benefit from the full disclosure that a company response facilitates, the company response needs to be available to them at the same time the recommendation is available. It is in all parties' interest to make sure the information available at the effective time is as complete and accurate as possible. We agree with the Commission that proxy advisors should bear no liability for the information provided by companies' in their responses. We would also support the Commission allowing proxy advisors to include this information in their defense of their analysis under Rule 14a-9 (to the extent the information was available for review, investors selected a vote and the shares in question were not automatically voted by the proxy advisor solely on the basis of the proxy advisor's recommendation).

*The Commission's Proposed Mechanics Represents a Cost-Effective Approach*

We support the Commission's proposal to make the exemptions in Rule 14a-2(b)(1) and Rule 14a-2(b)(3) conditioned upon proxy advisors' providing an opportunity for a review and feedback period. The Proposed Rules provide a standardized review period where the length depends on how far before the shareholder meeting the registrant submits their proxy materials. The Proposed Rules also provide for a two-day final notice period and the opportunity to provide a registrant response to the proxy advisors in the form of a hyperlink. We believe this final notice period and opportunity to provide a registrant response should be preserved regardless of whether the registrant qualifies for an earlier comment period or provides any comments during that period. However, we believe including the issuer response in a hyperlink should be optional for the proxy advisors, with accompanying 14a-9 liability if they choose to omit material information from their report that was included in the issuer response.

---

[59] We filed supplemental proxy materials in 2018 and 2017 with our perspective on ISS reports for those years. Those material provide additional detail on these issues. For 2018, see: https://www.sec.gov/Archives/edgar/data/34088/000119312518164959/d589753ddefa14a.htm. For 2017, see: https://www.sec.gov/Archives/edgar/data/34088/000119312517176852/d360050ddefa14a.htm.

The Proposed Rules provide a common sense approach that is designed to minimize the costs to all parties, which benefits both proxy advisors and their clients. This is especially true when compared to the alternatives the Commission has provided to other parties making solicitations, who are required to file their solicitations as proxy materials.[60] The Commission could have simply proposed a new "Form 14PA" similar to what other parties must complete, including full liability under Rule 14a-9, and would have been justified in doing so, on account of the continuing disputes over what is a solicitation. Instead, the rules are tailored to require registrants to both (1) act in certain ways to minimize the costs to proxy advisors of researching company-specific facts, and (2) incur costs themselves to demonstrate that these registrants believe additional material information exists and should be presented to shareholders. This structure is generous in minimizing the proxy advisors' need to file their solicitations and in decreasing the proxy advisors' costs to create solicitations that comply with Rule 14a-9.

Although it may impose additional burdens on some registrants, we support the proposed 45-day and 25-day cut-offs for determining the length of the registrant's review as a fair attempt at balancing the needs of investors and the practical challenges faced by proxy advisors in preparing timely recommendations. We believe the burden placed upon registrants to meet these timing deadlines will require changes in future proxy seasons, but the responsiveness of registrants will show how material registrants believe these reports are and provide further evidence of the need for continued SEC oversight over the proper use of these exemptions. We believe registrants will make the adjustments necessary to take advantage of these rules. Additionally, regardless of when a registrant files its proxy materials, we would support limiting the review period to two days, instead of five days, whenever there is no disagreement between the Board's recommendations and the proxy advisor recommendations. This would seem to us a reasonable cost- and time-saving measure to the benefit of proxy advisory firms.[61]

*Approaches for Implementing a Hyperlink*

We believe including the hyperlink should be optional and that this process can be designed to require minimal expense for the proxy advisor. For example, Rule 14a-2(b)(1) and Rule 14a-2(b)(3) exemptions could require the proxy advisors to answer two simple questions: (1) has the registrant provided any additional information for investors to consider, and (2) has the proxy advisor chosen to include a link to this information in their report and voting platform?

The only work required by the proxy advisor would be to answer these questions and, if they choose, to attach a hyperlink. We believe the proxy advisor could provide whatever disclaimer language they believe is appropriate along with the hyperlink to make clear it is not part of their analysis, though statements they make about the registrant's analysis should be subject to liability under Rule 14a-9.

---

[60] See Rule 14a-2(b)(1)(i)-(x). In addition, it is not clear to us based on the currently available information that all of the proxy advice solicitations currently made by proxy advisors fit within the current versions of Rules 14a-2(b)(1) and 14a-2(b)(3). See our discussions above under "*Specialty Reports and Other Reports Not Focused on Maximizing Shareholder Value Will Require Additional Disclosures*" and "*Errors Occur From the Use of Unreliable Sources or Limited Research by the Proxy Advisors*" for additional details.

[61] We believe this approach provides a potential additional cost-saving in a way that is consistent with the Commission's guidance to investment advisors that additional analysis (and cost) is appropriate where a matter is highly contested. See page 16 of Release No. IA-5325: https://www.sec.gov/rules/interp/2019/ia-5325.pdf.

This approach is non-invasive. It requires only two "yes"/"no" answers to make use of the exemption, and does not require inclusion of the hyperlink. We believe including the hyperlink should be at the proxy advisor's discretion. However, if the proxy advisor chooses to omit the information in the hyperlink, the proxy advisor could have liability under Rule 14a-9 if an investor casts their vote on the basis of the proxy advisors' analysis or recommendation and later decides that the information provided by the Company for inclusion in the hyperlink was material to their voting decision.[62]

We support the Commission's position that proxy advisors would not be liable for an immaterial or unintentional failure to comply with the rule in providing a working hyperlink. We do not believe it would be appropriate for the Commission to limit the information that can be included in the hyperlink as no party can foresee what information may be material to investors for a future vote. We agree with the SEC that mistakes should be corrected as soon as practicable. Since voting may be occurring immediately after the report is released, we believe the proxy advisors should be required to remediate mistakes by notifying clients whose votes have already been cast of (1) what the mistake was, (2) that additional information is available for their consideration as well as how they can access it, and (3) how they can change their votes if they wish to do so in response to this new information. Additionally, we believe this communication is an amendment to their prior solicitation. This amendment should not qualify for exemption under Rule 14a-2(b)(1) and Rule 14a-2(b)(3). Instead, this communication could be filed as a third-party supplemental proxy under the registrant's EDGAR pages just like the registrant's hyperlink response would be.

*Proxy Advisors Already Distribute Some of Their Reports to Larger Registrants*

We support the principle that proxy advisor reports that are provided to registrants prior to their public release should be kept confidential. We note that ISS provides us with drafts of their benchmark report with no confidentiality agreement. We believe proxy advisors provide these reports to larger registrants because they help the proxy advisors avoid clear or otherwise embarrassing errors, provide a sounding board for the disclosure, and serve as a courtesy to the registrant. We take seriously the confidential relationship that we have with the proxy advisors when this information is provided, and are not aware of any concerns about safeguarding confidentiality or needing an agreement to do so. We expect a very simple and straightforward confidentiality notice with a consent would be appropriate to alert registrants of their obligations to keep this information confidential for a period of time.

---

[62] Potential liability for the proxy advisor is appropriate if the hyperlink contains material information and is not included in the report because the proxy advisor will have actually and intentionally omitted material information from its solicitation.

However, we believe a complex or signed contractual agreement could undermine the review process or registrants' other legal rights under Rule 14a-9 or otherwise. For example, registrants do not know what sort of indemnities, waivers or agreements proxy advisors may agree to with their clients. Using client agreements as the standard here does not appear correct to us. There is no reason to believe that registrants are similarly situated with the proxy advisors' voting clients. Accordingly, we believe any sort of agreement that proxy advisors are allowed to require should be limited and informed with detailed guidance from the Commission. Finally, we believe the agreements should terminate at a specific date and time when the proxy advisors plan to release their reports in order to allow the registrant to file any registrant response statements as supplemental proxy filings in a timely manner.[63]

The Commission has asked whether engagement and dialogue between registrants and proxy advisors will somehow weaken the proxy advisors' recommendations or independence. We have heard complaints that in order to be independent, proxy advisors must not discuss voting proposals with companies. However, these relationships and feedback mechanisms already exist.[64] They are a current market practice, albeit in limited cases. For example, the proxy advisors engage with ExxonMobil throughout the year. The only difference under the Proposed Rules is that the public will become fully aware that these engagements are happening. Generally, we believe any concerns can be addressed through the conflict of interest rules and disclosures discussed above.[65]

If significant concerns still exist, we would welcome having the proxy advisors make these engagements public by filing the correspondence as a supplement proxy filing or including it as an attachment to their reports that their clients can review. If making the public aware of these engagement or making the issues discussed available to the public did somehow influence a proxy advisor's recommendation, we believe this would be the proper role of disclosure and ultimately benefit all parties. To provide adequate disclosure to investors, more transparency – not less – is required.

---

[63] Some reports are available for registrants to purchase and some, such as ISS' public pension specialty report, are not sold by ISS to registrants. Unless the registrant chooses and is permitted to purchase the report, the registrant may be unaware of when the report is released. Having a set date and time provides a level playing field for both parties to comply with their obligations. To the extent that the timing of the publications of the proxy advisor report slips, registrants should not be responsible for monitoring and adjusting their filings to mirror those of the proxy advisors.

[64] A review of the current proxy advisor process of sharing reports with larger registrants is also useful in evaluating the Commission's question of whether this review creates misuse or misappropriation concerns. To the extent such concerns exist, they have never been raised in our interactions with any proxy advisor. We believe any misuse of confidential information to manipulate the securities markets should be subject to SEC enforcement. To the extent that proxy advisors have new concerns for their businesses, they control this process and can determine not to comply with the exemptions.

[65] See "*The New Rules Should Require Clear, Detailed Disclosure that is Easy to Understand*" above.

The Commission has separately asked whether to allow proxy advisors to seek reimbursement for undertaking a review process with registrants. This line of reasoning suggests that registrants are the sole beneficiaries of this review process and should therefore be responsible for the costs associated with it. As the Commission has described in the proposed release, the rationale for this process is to improve the mix of information available to investors. The primary beneficiaries are (1) investors, who receive more accurate information upon which to make voting decisions to maximize their investment goals, and (2) proxy advisors, whose disclosures are improved and more likely to withstand scrutiny under Rule 14a-9. To the extent there is a cost to this process, it is the cost that is required to provide the level of disclosure necessary to make informed voting decisions. This is not an increase in costs, but an internalization of costs that have been avoided in the past through incomplete or inaccurate disclosures.

Conversely, forcing registrants to pay the proxy advisors for this privilege, beyond the work and costs that registrants are already absorbing to review and respond, would effectively subsidize proxy advisors and their clients and distort the true costs of an informed proxy advisor report. The Commission needs to carefully consider whether this is an appropriate burden to place on registrants, especially small- to mid-cap registrants. If the Commission determines this is the correct course of action, it should expand this policy to provide offsets for the multiple requests for information we receive from the proxy advisors each year. For example, our letter to ISS included in **Attachment 1** below, outlines the multiple, repeated and overlapping requests we have received from different subsidiaries of ISS each year. The work that goes into these responses is also not cost-free, but we consider these expenses to be part of the costs of shareholder engagement. Similarly, proxy advisors' costs incurred in the registrant review process are the standard costs of providing their products with complete and accurate disclosure. The product is either worth these costs or it is not.

We acknowledge that some funds may evaluate the value of the information provided against the cost of obtaining this information and determine how to best meet their fund goals, including whether informed voting on some or all matters is consistent with those goals. However, we believe an honest assessment of the value and cost of informed voting, as outlined in the recent Commission Guidance,[66] is superior to the current standard, where voting is occurring on the basis of incomplete information that does not meet the anti-fraud standards for solicitations.

We also note that proxy advisors engage with many interested parties that are not registrants. To the extent that discussions with registrants could impact the independence of the proxy advisor's analysis or create expenses that should be reimbursed, these third-party groups pose the same risks. They may even be clients of other services that proxy advisors provide. Whatever rules or suggestions are made for documenting, monitoring or limiting registrant and proxy advisor interactions should also be applied to interactions with activist shareholders, shareholder proposal proponents, non-governmental organizations and others.

---

[66] See Question 5 (pp. 22-23) and Question 1 (pp. 9-12) of SEC Release No. IA-5325: https://www.sec.gov/rules/interp/2019/ia-5325.pdf

<u>Request for Comment Question 41</u>

*Automatic Submissions of Votes Are Occurring Without Review of the Proposals or the Proxy Advisor Recommendations by Funds or Investors*

The Proposed Rules are focused on restoring and enhancing a voting system based on material disclosure, subject to anti-fraud liability. We believe these reforms, as proposed, will not have the desired impact on the 15 to 20 percent of our vote that is automatically submitted each year. We believe the Commission will need to address the process of automatic submission to make the proposed reforms long-lasting and uniformly effective. Otherwise, automatic submission will continue to undermine shareholder engagement efforts and provide voting solely on the proxy advisors' incomplete analysis. Failing to address automatic submission would furthermore render other provisions of the Proposed Rules, such as the review and feedback mechanism, an exercise for all parties with limited practical impact despite the efforts of all parties.

By automatic submissions, we do not mean prepopulated ballots, which are not necessarily problematic in our view. Instead, automatic submissions are votes that are cast consistent with the proxy advisors' recommendations without review of the proxy advisors' recommendations and confirmation of the vote by the fund. Automatic submissions can occur in two different cases. First, through funds that accept a proxy advisor's predetermined policies and authorize the proxy advisor to submit these votes without reviewing and confirming the recommendations made. Second, through funds that provide a proxy advisor with a "customized" predetermined policy[67] and authorize the proxy advisor to submit these votes without reviewing and confirming the recommendations made. In either of these cases, the fund is not reviewing the proposal on a company-specific basis or beyond the proxy advisor's analysis. Accordingly, enhancing the proxy advisors' disclosure and providing additional registrant disclosure will not change the mix of information available at the "effective time" of the vote decision.[68]

---

[67] Such policies may be substantially identical to the proxy advisor's policies with minor changes.

[68] Depending on the amount of analysis done by the proxy advisor, the "effective time" would either be when the fund submitted its predetermined policy to the proxy advisor or when the proxy advisor made its determination on what vote to recommend.

We know automatic submissions are occurring. As independent commenters have noted, investment advisors have stated that this is the case:[69]

> PIA has retained Institutional Shareholder Services, Inc. ('ISS'), an independent third party proxy server, to provide fundamental research on proxies and subsequent recommendations. Proxies are voted by ISS in accordance with their proxy voting guidelines with the intent of serving the best interests of PIA's clients.[70]

One of the ways we identify automatic submissions is the disproportionate number of shares voted immediately upon release of the proxy advisors' report. In fact, we first noticed automatic submissions because of this phenomenon.[71] ExxonMobil awaits the release of the reports each year because of the significant influence (beyond automatic submissions) that the proxy advisor reports have on our shareholder voting. We have multiple divisions within the organization that begin to read the reports as soon as they are released. In doing this, we began to notice that a substantial and disproportionate numbers of votes were submitted based on the reports before we had completed our own review and were able to respond. We believe it is practically impossible that these votes were cast after reviewing the report. By any reasonable standard, this is evidence of automatic submissions.

---

[69] See page 3 of the comment letter by Paul Rose, Professor of Law, Ohio State University, submitted on November 14, 2019: https://www.sec.gov/comments/s7-22-19/s72219-6429308-198569.pdf

[70] GuideStone Funds, Form N-1A (May 9, 2009), available at: https://www.sec.gov/Archives/edgar/data/1131013/000119312509121299/d485apos.htm

[71] However, we note that submissions in the first 24-48 hours are not necessarily all of the automatic submissions. Equally, in future years, proxy advisors could change their procedures and spread these votes out every day to mask this "bump" of votes that were not reviewed.

*The Data on Automatic Submissions is Compelling*

Below is an example of this phenomenon on our 2018 and 2017 advisory vote on executive compensation. The chart below shows the voting percentage each business day prior to the annual meeting. The day that the ISS report was released with an "AGAINST" recommendation saw a significant drop in the vote "FOR," and that drop was observed immediately on the first day.



A similar drop can be seen in our 2013 and 2012 votes. This suggests that automatic submissions are a phenomenon that has shaped voting throughout the decade.



*The Explanation That Automatic Submissions Are Not Occurring Is Flawed*

The first rebuttal to this data generally is that proxy advisors are just submitting votes that have been "pre-cleared" or somehow already reviewed by their clients. We believe this argument fails on two points. First, we know that clients are not reviewing the final proxy advisor recommendations before they are released by the proxy advisor. Second, a predetermined policy cannot "pre-clear" a specific vote because the company-specific facts are not known at the time the policy is provided to the proxy advisor. We acknowledge that there may be some votes on which an investment advisor can comfortably say they will always vote a certain way. However, this cannot be sufficient if the policy contains even one issue that provides for case-by-case analysis. Even if it did not, the topics covered in shareholder proposals continue to expand and become more detailed, which means that no policy will ever be complete and not require some analysis by the proxy advisor in applying the policy.

The second rebuttal to this data is that these numbers do not truly show the impact of an ISS recommendation, but instead are simply a function of ISS submitting votes that have already been determined by clients before the release of the ISS report. This argument seeks to muddy the waters. If this is referring to the predetermined policies, we have discussed above why this is insufficient. However, if this is seeking to suggest that funds have independently read the proposals and submitted votes on each proposal *prior* to receiving the ISS report, we believe this is extremely unlikely. First, even large investment advisors who have shown voting patterns independent of ISS wait for the release of the report prior to submitting their votes. Otherwise, they receive no benefit for paying for the report. Second, the voting evidence shows that these votes submitted with ISS change year to year based on the ISS recommendation. If they were simply early votes, they would not follow ISS in different directions each year.

The charts above show that the same amount of the vote immediately followed the ISS recommendation "AGAINST" the advisory vote on executive compensation in 2012, 2013, 2017 and 2018. Remarkably, the chart below shows this vote entirely disappeared in 2014, 2015 and 2016 when ISS recommended "FOR" the advisory vote on executive compensation. For these to be independent votes, and not automatic submissions, we would expect at least some consistency year over year regardless of ISS changing its recommendation. This was not the case.



The ISS recommendation appears to be the sole reason for this first day voting pattern in these distinct, separated periods over the last eight years. No significant design changes occurred in the structure of our pay program throughout these years. The ISS recommendation is the only change we have been able to identify to explain this difference in voting behavior, implying that it is not simply an input or additional source of information for our shareholders in the proxy process. Instead, the ISS recommendation perfectly predicts the votes of many of our shareholders each year and determines the ultimate vote of at least 15% of our shares on the very first day the report is released.[72]  Data from these first day votes is provide in **Attachment 4**.

---

[72] ExxonMobil is not the first company to provide data on this trend. Following the SEC's 2010 request for comment, Johnson & Johnson presented data in an October 19, 2010 comment letter showing that 13.4%-17.9% of their shares were voted in accordance with the ISS recommendation on the first business day following the ISS recommendation in each of 2008, 2009 and 2010:  https://www.sec.gov/comments/s7-14-10/s71410-115.pdf. Additionally, IBM, in an October 15, 2010 comment letter, provided similar data of first business day automatic submissions for IBM and at least six other Fortune 500 companies of between 10.9% and 17.8%. Both J&J's and IBM's data are consistent in size and scope with the data we present in this letter: https://www.sec.gov/comments/s7-14-10/s71410-84.pdf.

*Changes in the ISS Recommendation During a Single Year Conclusively Show That Automatic Submissions Are Occurring*

Changes in ISS recommendations during a single proxy season provide further definitive evidence of automatic submissions at work. During the 2019 proxy season, ISS originally recommended "FOR" Director A on our Board of Directors. Director A initially received similar support in 2018 and 2019, as shown below. However, ISS changed its 2019 voting recommendation for Director A from "FOR" to "AGAINST" after discovering belatedly that the director had recently exceeded the number of Board memberships permitted by ISS' overboarding policy.[73] The chart below shows that the negative impact occurred immediately once ISS changed its recommendation. The timing of the change in the vote makes clear that these were not "pre-cleared" votes, but immediate votes following the ISS recommendation.



[73] We note that ISS' overboarding policy uses "listed" companies in determining whether a director is overboarded, rather than "public" companies as the NYSE and other market standards do. This makes a significant difference for international companies, as it includes foreign subsidiary boards. In our discussions with investors, they have been surprised to learn of the difference in methodology. This is another example where (1) disclosure of methodologies and a company's response can only help investors and (2) following ISS recommendations without review or confirmation does not always lead to investors' intended outcome.

*Automatic Submissions Need to be Addressed to Restore a Disclosure-Based Approach to Voting*

We believe that the contemplated reforms to enhance the mix of information available at the time votes are cast will be undermined if proxy advisors are permitted to continue making automatic submissions while benefiting from exemptions under Rule 14a-2 that are not available to other soliciting parties.[74]  Automatic submissions short-circuit the shareholder engagement process, cause proxy advisors to undertake analysis on proposals beyond predetermined fund policies, and undermine fiduciaries' opportunities for oversight as contemplated in SEC Release No. IA-5325.[75]

Despite these issues, we acknowledge the cost-savings that come with automatic submissions.  Based on a review of voting patterns at ExxonMobil's annual meeting, up to one-fifth of all of our shares are held by funds that make use of automatic submissions.  The cost-savings that come from limited or no review of specific proxy proposals could accrue directly to our shareholders, if passed along as a result of market competition.  Additionally, different funds and shareholders could have different views on the amount of information that is necessary to cast an informed vote.[76]

To address these concerns, we believe a solution should be targeted to address only those votes where the recommendation is contested.  Such a solution should minimize costs and preserve the ability to make automatic submissions for most votes without undermining shareholder engagement or the integrity of the proxy voting process.

We believe automatic submissions can be properly addressed by focusing *only* on a very narrow set of solicitations (whether benchmark, specialty or custom).  Rule 14a-2 safe harbors would only be unavailable where:

1.  The proxy advisor submits votes after making a solicitation; and

2.  The vote matches the recommendation in the solicitation; and

3.  The proxy advisor has not confirmed each "contested" recommendation with the client.

---

[74] See Rule 14a-2(b)(1)(i)-(x) for a list of parties not receiving the special treatment being offered to proxy advisors in their solicitations.

[75] See pp. 15-16: https://www.sec.gov/rules/interp/2019/ia-5325.pdf.

[76] However, we believe that casting contested votes on the basis of *no* information (including no review of the proxy advisor's analysis of the facts in their report) is an insufficient basis and is not consistent with SEC Release No. IA-5325: https://www.sec.gov/rules/interp/2019/ia-5325.pdf.

This proposal avoids interfering with voters' rights in any way. If the investment advisor has submitted proposal-specific instructions already, there is no solicitation and no issue with automatic submissions. If the investment advisor votes in a way that does not match the recommendation in the solicitation, there is no issue with automatic submissions. If there is no contested vote, there is no issue with automatic submissions. If the proxy advisor confirms the investment advisor has reviewed each contested recommendation, there is no issue with automatic submission. This approach only regulates the proxy advisor's use of pre-population tools in contested votes. We outline how this could work below.

This proposal preserves proxy advisors' and investors' ability to use automatic submissions in two ways.[77] First, automatic submissions could continue if the proxy advisor foregoes the exemptions and files the solicitation tied to the automatic submission.[78] Second, automatic submissions could continue with most votes pre-populated to match proxy advisors' recommendations and "contested" votes being pre-populated at "ABSTAINED" or "DO NOT VOTE" until the client determines to affirmatively vote them.[79][80]

Both of these alternatives would require no change in the resources that funds are required to dedicate to voting. Additionally, the second alternative would only require a slight change in the proxy advisors' pre-population settings shown on the proxy advisors' voting platform, without any need for additional costs in services.[81] If a fund that was using automatic submissions wished to affirmatively or negatively vote on a contested issue, they could easily change the vote on the proxy advisor's platform just as they can today.[82] The next section shows examples of how this would work on the proxy advisor platform.

We recommend contested votes be defined by the Commission to be any vote where the registrant has submitted a registrant response to the proxy advisor. We believe that when registrants believe there is additional information that shareholders need, to the point that they incur the costs and anti-fraud liability to make these filings, there is a good faith presumption that additional material information exists. The number of these filings has historically been relatively low and, as noted above, this process would not impact the timing, method or cost of voting on any other proposals.

---

[77] Since ballots are still submitted under this proposal through automatic submissions, we do not believe this proposal will have any impact on a registrant's ability to meet quorum requirements.

[78] As discussed above, if the client provided instructions on each specific proposal (not just a predetermined policy), there would be no solicitation on a corresponding custom report and automatic submissions would not be an issue. Separately, a custom policy that did require filing to allow automatic submissions could potentially be filed as a limited filing. See "*The SEC Needs to Review and Evaluate Specialty and Custom Voting Recommendations Prior to Exempting Them from These Rules*" above.

[79] The proxy advisor's platform allows for a number of configurations. Additionally, proxy advisors wishing to avoid filing could modify the proxies they accept from clients to provide for this caveat for contested votes.

[80] An alternative approach of not pre-populating contested votes would be equally effective as long as it does not prevent a ballot from being submitted. Since "DO NOT VOTE" is an option, we suspect some response may be required to be submitted. In any case, we view "DO NOT VOTE" as equivalent to not pre-populating the vote at all.

[81] This solution avoids interfering with voters' rights in any way. Instead, it simply regulates the proxy advisor's use of pre-population in contested votes. Voter rights and ability to vote are entirely unaffected.

[82] In this case, the fund would have shown that it made an affirmative decision and was not making an automatic submission. In addition, the ISS voting platform contains a surprising amount of analysis and information, as discussed below.

*Proxy Advisor Platforms are Highly Customizable Tools That Can Accomplish this with Minimal Cost*

Currently, the ISS platform is a fully customizable and user-friendly tool. It is easy to see the value in this platform and why similar tools could be helpful to investment managers, especially those holding securities though indexes or in funds with different goals and priorities. This ability of ISS to customize its platform allows the Proposed Rules' changes for automatic submission that are contested to be accomplished with little or no cost. It also provides another place where registrant response statements should be included by hyperlink, if the proxy advisor decides to include the issuer response in its solicitation.

The following page provides an example of what one views when accessing the voting platform to vote on ExxonMobil's 2019 annual meeting.

1. The platform shows the meeting date, the cut-off date to vote and the record date across the top bar.

2. Looking at the left side, it shows the number of shares being voted and the different accounts the investment manager is voting for.

3. Looking at the center of the page, it provides each director and proposal separately for voting. Interestingly, the platform provides four voting options for each vote: (1) FOR, (2) AGAINST, (3) ABSTAIN and (4) DO NOT VOTE.

4. Pre-populated votes are highlighted in blue. In this picture, the investor can see that a vote "FOR" each of ExxonMobil's directors is pre-populated. This pre-population is a not determinative of the vote. It does not in any way impact how the investor may eventually choose to vote. If this pre-population was changed to "ABSTAIN" or "DO NOT VOTE" because the issue was contested, the investor would still be able to insert any other vote as part of its review.

5. In addition, there is a pulldown menu, "Quick Vote," which allows the investor to change the pre-populated voting to match a number of different standards. The first is the custom policy of the fund and the second is the ISS report recommendations. A number of different alternatives are also available from "All FOR" to "ALL WITH MANAGEMENT." This means that even if a number of votes were pre-populated "DO NOT VOTE," an investor could, with one click, change and cast these votes using the "Quick Vote" option.



The amount of information available on this page is extensive. There is much versatility in the number of ways a fund can quickly and easily vote. The Proposed Rules would simply change the pre-populated boxes to either "ABSTAIN" or "DO NOT VOTE." These options already exist and would require no significant changes to the platform. Additionally, the platform is customizable in the proposals one reviews. Investors would not even have to vote contested proposals one by one. Using the "Quick Vote" tool, they could vote them all in accordance with the custom policy, the ISS report, with management or otherwise with a single selection. The minimal effort required to do so allows complete latitude by investment advisors in how much information the fund decides to review prior to voting. Requiring the proxy advisor to modify or disable the pre-population feature for contest votes would not impact voting rights in any way. All that would be required is an affirmative action on the part of the investor that would make clear that they are making the voting decision and not the proxy advisor.

The next page shows different shareholder proposals and highlights other features.

1. Each proposal is highlighted in blue. If an investor expands the "+," the platform shows ISS' abridged summary of whatever policy the investor is applying to the vote.

2. Beneath the potential votes, different recommendations are included. In this case, these include management's recommendation, ISS' recommendation and the custom policy's recommendation.

3. As shown in the picture, if the investor hovers over the hyperlink for one of the recommendations, a bubble pops up showing the rationale for the vote under the recommendation. For example, here the bubble shows ISS' analysis on why it believes voting for this proposal is warranted.

These hyperlinks are significant. First, they make clear that this voting platform would be a solicitation for a custom policy even if no separate report were produced.[83] They meet each of the criteria set out by the Commission in the Proposed Rules. Second, they show that the registrant response to the ISS report could be linked on the platform where the management's recommendation is listed. This is important to provide proxy advisors a way to take advantage of the exemptions for solicitations based on the voting platform where no other written report may exist.

---

[83] See "*The SEC Needs to Review and Evaluate Specialty and Custom Voting Recommendations Prior to Exempting Them from These Rules*" above.



**S0107**
**Require Independent Board Chairman**

4    For    Against    Abstain    Do Not Vote

Recs: Mgmt Against ISS For ExxonMobil Investment Management Against

**S0235**
**Amend Bylaws - Call Special Meetings**

5    For    Against    Abstain    Do Not Vote

Recs: Mgmt Against ISS For ExxonMobil Investment Management Against

**S0227**
**Disclose a Board Diversity and Qualifications Matrix**

6    For    Against    Abstain    Do Not Vote

Recs: Mgmt Against ISS For ExxonMobil Investment Management Against

**S0206**
**Establish Environmental/Social Issue Board Committee**

7    For    Against    Abstain    Do Not Vote

Recs: Mgmt Against ISS Against ExxonMobil Investment Management Against

**S0731**
**Report on Risks of Petrochemical Operations in Flood Prone Areas**

8    For    Against    Abstain    Do Not Vote

Recs: Mgmt Against ISS Against ExxonMobil Investment Management Against

**S0807**
**Report on Political Contributions**

9    A vote FOR this resolution is warranted as increased disclosure concerning ExxonMobil's policies and memberships in trade associations and other political organizations would help shareholders assess the company's comprehensive political contribution activities and the company's management of associated risks and benefits.    Do Not Vote

Recs: Mgmt Against ISS For ExxonMobil Investment Management Against

41

The ease with which the voting platform could provide "ABSTAIN" or "DO NOT VOTE" as the default for pre-population of contested proposals, and the additional ease with which these pre-populated defaults could be reviewed and changed, makes clear that there is no technical or mechanical impediment to addressing automatic submissions. Proxy advisors have stated that they have the ability to "flag" different types of proposals and could easily highlight any contested votes for clients.

It is imperative that the Commission address automatic submissions in the final rules to ensure that the reforms contemplated are not undermined by automatic submissions. The proposal above shows this could be done with practically no additional cost or burden for proxy advisory firms or their investor clients. Failure to require suspension of automatic voting in contested matters through minor changes to the existing proxy advisors' platforms would render the review and feedback mechanism a charade with limited practical impact despite the efforts of all parties.

*Rule 14a-9 Should Address Many Different Examples to Provide Clarity*

We support the Commission's view that solicitations by proxy advisors should be subject to Rule 14a-9. We believe proxy advisors have not considered sufficiently what information they may need to disclose in their reports, in their current form, to avoid potential violations of Rule 14a-9. This is especially true for reports that are not designed to maximize shareholder value, like SRI specialty reports. We believe a "risk factor" approach could potentially deal with many of the issues raised in this letter.

The Commission should be clear on additional standards that apply to reports that are not seeking to maximize shareholder value. This could be done through the use of "risk factor" style disclosures about the potential consequences to the value of an investment, whenever a different standard is being applied. We believe this could be a simple and clear way for proxy advisors to provide clarity and for investors to understand in a straight-forward manner the implications involved in any set of recommendations.

We also support the Commission's proposal to clarify that Rule 14a-9 applies to material information about a proxy advisor's methodology and how it may be different from Commission standards.[84] We believe the Commission should make clear that this applies in the proxy advisors' use of non-GAAP measures as well. How proxy advisors calculate these non-GAAP terms may be different from their use by registrants, clients or the Commission. Clearly following the non-GAAP disclosure requirements the Commission has applied elsewhere would provide significant insight into what these measures truly indicate. This is an important step in clarifying to what extent these recommendations are based on a "one-size-fits-all" analysis. In addition, we would support the Commission clarifying that additional disclosure is required where proxy advisors' methodology differs from market standards, such as NYSE director independence rules based on Rule 10A-3, which are required by the Commission but not standards the Commission has set directly.[85]

We support the Commission's proposal to clarify that Rule 14a-9 applies to disclosing the sources of information used and how those sources are verified. For example, ISS' 2019 SRI specialty report relied on third-party sources to conclude that "controversies" existed that reflected a failure by the Board to guard against risks. This was then used to justify recommendations against directors.[86] We strongly believe these sources were not credible and that their existence does not in any way indicate an issue with the Board's oversight of corporate risk management. We believe this is material that impugns the character of these directors and the company without factual foundation.

---

[84] We would also support the Commission clarifying that this applies when the methodology differs from market standards.

[85] Disclosure is also necessary when the report differs from a proxy advisors' benchmark, or main, report. See *"Specialty Reports and Other Reports Not Focused on Maximizing Shareholder Value Will Require Additional Disclosures"* above.

[86] We believe these reports also imply that there are new and additional fiduciary duties beyond those that the Commission or state law have recognized, which would also be different from Commission standards and require clear disclosure under Rule 14a-9.

Real disclosure of these sources and how they were considered, along with a company response, are material facts that shareholders are entitled to under the standards of Rule 14a-9. This issue is also moving beyond the specialty reports and into the benchmark report. For example, ISS changed its policy in evaluating independent chair proposals this year from an evaluation of the powers of the chairman or lead independent director to a catch-all protest vote against the registrant. The vote considerations now include "evidence that the board has failed to oversee and address material risks facing the company."[87] Shareholders should consider any factors they believe are relevant to any vote. However, ISS' policy now includes potentially substantial charges against a company and its directors. It will need robust and detailed disclosure of what factors it is considering, how it is incorporating these factors into the analysis and what research it has done to verify these alleged Board failures to avoid creating misleading disclosures on this matter.

Clarity in both methodology and sourcing would have made clear to investors that ISS only produces two specialty reports instead of five reports. In reviewing the ExxonMobil 2019 specialty reports, we have discovered that the Sustainability and Catholic Faith-Based specialty reports are identical in every word to the SRI special report.[88] Investors should have sufficient clarity to know that they are paying for the same report and analysis three different times.

Additionally, the 2019 Public Pension specialty report was identical to the 2019 Taft-Hartley specialty report. We believe this creates a disclosure problem under Rule 14a-9 because of the methodology used in the Taft-Hartley specialty report. The Taft-Hartley specialty policy clearly states that it follows the "AFL-CIO Voting Policy."[89] However, no disclosure of this sourcing or methodology is provided in Public Pension specialty policy. Do public pensions and other funds purchasing this report know that the recommendations in the Public Pension specialty report are a repackaging of the AFL-CIO's voting preferences? Do they all share these same voting priorities lock-step so that disclosure is immaterial? Our experience shows that they do not. We believe this is a material fact that could impact their voting. **Attachment 5** shows the differences in ISS' 2019 benchmark report and 2019 special reports.

We would support the Commission clarifying when liability attaches to a report. We believe it should be at the time the vote is submitted, unless the proxy advisor affirmatively provides additional information directly to the client following the vote and files this information with the SEC. While a vote can technically be changed at any time prior to the meeting, our experience in engaging with our shareholders is that, once the vote is cast, the demands of their duties require them to move on to other matters. Providing a safe harbor for additional information that is also filed with as a third-party supplemental proxy filing allows proxy advisors to supplement the record publicly and in good faith even if votes have already been cast.

We also support the Commission's decision to clarify that conflict of interest disclosure is subject to Rule 14a-9. We recommend this information be included in the reports, at a minimum, to ensure that all information is available in one place at the time of the vote.

---

[87] See page 10: https://www.issgovernance.com/file/policy/latest/updates/Americas-Policy-Updates.pdf
[88] The only changes being the name of the reports and page breaks.
[89] See bottom of each page from 2-70:
https://www.issgovernance.com/file/policy/active/specialty/Taft-Hartley-Advisory-Services-US-Guidelines.pdf

<u>Conclusions</u>

The Proposed Rules are based on enhancing a disclosure-driven approach to proxy voting that will enhance shareholder engagement by providing more accurate, transparent and complete disclosure to shareholders while also creating additional opportunities for communication that are foreclosed under the current process. Again, we commend the Commission for the thoughtful and balanced approach taken in the Proposed Rules. We believe this approach will progress the SEC's mission to protect investors, maintain fair, orderly and efficient markets, and facilitate capital formation.

The Commission has undertaken a number of efforts and expended significant energy in seeking to find as low cost a path as possible to improve current disclosures. These efforts should be recognized by all parties. While we fully support the Commission's efforts and have suggested a few additions that we feel will materially enhance these proposals, we remain focused on making sure that our shareholders have accurate and complete disclosures. We believe these rules are, in many ways, very generous in providing proxy advisors with the ability to comply with their obligations in ways that other soliciting parties cannot.

While we would prefer the low-cost approach included in the Proposed Rules, we believe the information mix available to investors at the time they vote must be improved. Should the Proposed Rules ultimately prove unworkable, we believe the Commission should move forward with its clarifications of what constitutes a solicitation under Rule 14a-1(1) and what constitutes misleading disclosure under 14a-9 without providing for any safe harbor applicable to proxy advisors. Instead, it could provide a straightforward Form PA based on current proxy forms that would be filed with each solicitation.

We appreciate the opportunity to offer these comments.  ExxonMobil would also be pleased to address any questions the Commission may have about these comments or to provide additional information that may be helpful.

Sincerely,

Neil A. Hansen
Vice President, Investor Relations
and Secretary

**Letter to ISS-ESG**
**Proposing Alternative Engagement Procedures**
**(With Copies of 2019 Communications Between ExxonMobil and ISS)**

1. Provides Evidence ISS Needs Registrant Input on These Issues and is Not Concerned About "Independence"

   a. See page 10 where ISS emails the ExxonMobil CEO directly and commits to email the board of directors requesting this information if they do not receive it from the CEO.

   b. Provides evidence errors and unsubstantiated allegations in ISS reports are a continuing issue for ExxonMobil. See pages 5 and 15.

2. Provides Evidence of Repeated Requests by ISS for Information Already Provided and Not Incorporated in Reports

   a. See pages 1-3.

   b. Supports position that a separate company response would be superior and more cost-effective for clients of ISS and shareholders of registrants.

3. Provides Evidence that Registrants Incur Significant Costs Under the Current System Responding to Multiple Requests for the Same Information. See Page 5.

4. Provides Evidence of Continuing Attempts by ExxonMobil to Work with Proxy Advisors to Achieve Superior Disclosure and Lower Costs. See Page 1 and 5.

**Exxon Mobil Corporation**
5959 Las Colinas Boulevard
Irving, Texas 75039-2298

**Neil A. Hansen**
Vice President, Investor Relations
and Corporate Secretary



October 21, 2019

Mr. Reinhilde Weidacher and Mr. Sagar Rijal
ISS-ESG
Fleminggatan 7, Floor 5
112 26 Stockholm, Sweden


Dear ISS-ESG,

Thank you for your letter and interest in ExxonMobil.  In response to your emails of July 23, 2019 and September 25, 2019 (**Attachment B**), we would like to highlight our multiple engagements with ISS on climate-related issues over the past year, including on the issues outlined in your letter.  We addressed many of your questions in a March 22, 2019 call with ISS.  During this call, we discussed our 2019 *Energy and Carbon Summary*, received feedback from ISS, and addressed ISS's questions.  We also engaged with ISS this year in a telephone conference during the proxy season on May 9, 2019 to answer questions and receive feedback from ISS.  We interacted with ISS over the past year as part of updates to the Governance (Jan 2019) and Environment (Jun 2019) scorecards, and in drafting our response and corrections to ISS-Ethix's research/company profile report on ExxonMobil (Jan 2019).  In addition, we spoke with ISS at an in-person meeting last year on November 5th.  It appears much of the information provided in these interactions is not included in the current ISS-Ethix profile dated April 25, 2019 and many of the interactions mentioned above are not listed as "Key Sources" for the report.

As shown in the detailed responses below, all questions are answered in previously published material and / or discussed in the multiple engagements noted above.  We believe ISS is missing an opportunity to supply the independent research and analysis your clients expect.

We repeated answers to your questions below, and would also like to use this opportunity to propose a more holistic engagement process that we believe will be more efficient and better serve our investors and your clients by providing comprehensive, accurate, and transparent disclosures.  Opportunities for enhancement to the engagement process begin on page 4 of this letter.

In response to the questions from your most recent letter, we refer you to our 2019 *Energy and Carbon Summary*, which contains much of the information you seek.  We spend significant effort in preparing communications for our shareholders to address climate-related issues, such as the *2019 Energy and Carbon Summary,* the *2019 Outlook for Energy, Sustainability Report* and other information provided on our website.  As part of your research process, we recommend, and believe investors and clients likely expect, thorough review of these reports as primary sources.  To the extent that your questions are not fully addressed in these disclosures, we believe reference to these disclosures could refine your questions and allow for a more focused analysis.  We note that you include the *Outlook for Energy* as a "Key Source" in one section of your report, but include only the prior year's version of the *Energy and Carbon Summary* and do not include the latest

*Sustainability Report*.  We believe these reports are "Key Sources" and could be usefully included as a separate section of the report as "Company Disclosures" to provide additional context to clients while also showing the depth of your research.

**Question 1:** In regard to your question on our public commitment on emissions and the energy transition in light of the 2018 IPCC report, we would like to highlight that ExxonMobil has been, and continues to be, an active participant in the IPCC process since its inception.  ExxonMobil scientists have been involved in climate science research and related policy analysis for more than 30 years, with active participation and routine publications to share ongoing work with the scientific community.  ExxonMobil scientists contributed to the IPCC Fifth Assessment Report (AR5) in lead author, review editor, and reviewer roles.  In addition, ExxonMobil has consistently and publicly supported the aims of the Paris Agreement, including continued U.S. participation.

Managing the risks of climate change requires innovation and collaboration.  Due to lack of supportive policy and gaps associated with existing NDCs (Nationally Determined Contributions), large scale deployment of available solutions – including the policy and regulatory landscape, investment levels, and technically and economically viable solutions – remains challenging.  Hence, we continue to focus on advancing technology options through active research and development. We partner in-house innovation and research with universities, government agencies, and smaller firms to foster development of the next generation of technology.  We have spent more than $10 billion on developing and deploying lower-emission energy solutions since 2000.  We conduct fundamental research aimed at developing lower-GHG energy solutions that have the potential to be reliable, scalable, and economically attractive.  Our research portfolio includes biofuels, carbon capture and storage (CCS), breakthrough energy-efficiency processes, natural gas technologies, advanced energy-saving materials, and environmental life cycle assessments.  ExxonMobil has been at the forefront of many technologies that have enabled energy to be produced and delivered in a safe, affordable, and sustainable manner.  As the world demands more energy and fewer emissions, we are well-positioned to develop scalable, high-impact solutions to reduce emissions in power generation, industry, and transportation.  In particular, CCS – in which ExxonMobil is a leader - is critical to achieving the 1.5°C scenarios described in the IPCC report you reference.  Since 1970, ExxonMobil has cumulatively captured more $CO_2$ than any other company – accounting for more than 40% of cumulative $CO_2$ captured.  We have a working interest in more than one-fifth of the world's carbon capture capacity.  We are seeking to expand our capacity and are evaluating multiple technologies that have the potential to be commercially viable.

We also engage actively in climate policy.  ExxonMobil believes the objective of effective climate policy should be to reduce the risks of climate change at the lowest societal cost, while meeting the increased demand for affordable and reliable energy.  Climate change is a global issue that requires the collaboration of governments, private companies, consumers and other stakeholders to create meaningful solutions.  We engage with stakeholders directly and through trade associations around the world to encourage sound policy solutions for addressing climate change risks.  For more than a decade, ExxonMobil has supported an economy-wide price on $CO_2$ emissions as an efficient policy mechanism to address GHG emissions.  Consistent with this position, ExxonMobil is also a founding member of the Climate Leadership Council (CLC), which calls for adoption of a carbon fee, with revenues returned to Americans, coupled with regulatory simplification.  Achieving large-scale deployment of high-impact technologies for GHG reductions (such as CCS) requires supportive policies that provide equal treatment to the range of low-carbon solutions necessary to achieve the aims of the Paris Agreement, while encouraging innovation.

2

Further, we would like to highlight our recent activities in this space. The list in **Attachment A** features public announcements, providing a sampling of ExxonMobil's advancements, partnerships, contributions and initiatives related to addressing the risks of climate change.

**Question 2:** In response to your second question, our *Outlook for Energy* projects world supply and demand to 2040. We rely on the *Outlook for Energy* – an analysis we conduct every year – to calibrate business plans for anticipated future demand for energy, taking into account the most up-to-date knowledge and information we can gather. The report is our best estimate of what is likely to happen regarding the future demand for energy out to 2040. The projection for energy demand starts with an analysis of the fundamentals, including economic progress and population trends. Consumer preferences, technology and policies across the world further help to build the projection of future global energy demand - not the oil and gas produced by ExxonMobil. The analysis in the *Outlook for Energy* seeks to identify potential impacts of climate-related policies, which often target specific sectors, by using fact-based assumptions and tools including application of a proxy cost of carbon to estimate potential impacts on consumer demands. This approach assists us in assessing potential energy demand over time and among sectors, where future policy actions are unclear or may involve a significantly broad suite of policy initiatives. Contrary to the assertion in your letter, this outlook by no means represents a "business as usual" scenario. The chart on the top of page 41 of the 2019 *Outlook for Energy* clearly shows our *Outlook for Energy* is likely to meet, on aggregate, the 2030 Paris Agreement pledges and projects far lower future energy-related $CO_2$ emissions than a baseline business as usual scenario.

You also ask in Question 2 whether the Company has considered scenarios with increased GHG reductions, presumably compared to our *Outlook for Energy*. A review of our 2019 *Outlook for Energy* and the 2019 *Energy and Carbon Summary* will show those publications reflect extensive consideration of pathways to 2°C. The *Outlook for Energy* contains sensitivities requested by shareholders, including the potential impacts of electric vehicle penetration, as well as a review of a range of 2°C models. In addition, the 2019 *Energy and Carbon Summary* addresses the potential impacts of a 2°C pathway, how our company is positioning for a lower-carbon future, and how we are helping to address the risks of climate change. The specific information you are requesting on the analysis of potential impacts on reserves and resources, and how we conduct our dynamic resource development planning to assess a wide range of variables over time, is located on pages 13-15 of the 2019 *Energy and Carbon Summary*.

**Question 3:** Regarding your third question on disclosures, our 2019 *Energy and Carbon Summary*, supplemented by our 2019 *Outlook for Energy* and 2017 *Sustainability Report*, provide disclosures consistent with the framework outlined by the Task Force for Climate-related Financial Disclosures (TCFD). We believe the TCFD framework is helpful in encouraging thoughtful dialogue between companies and investors about climate risk issues, and we think the TCFD framework provides an appropriate platform for engagement with shareholders. The 2019 *Energy and Carbon Summary* in particular is aligned with the 4 core elements of TCFD:

*Summary of the 2019 Energy and Carbon Summary contents by TCFD core element*

| TCFD core elements and recommended disclosures | ExxonMobil disclosures |
|---|---|
| **Governance** | |
| a. Describe the Board's oversight of climate-related risks and opportunities. | Page 3-5 |
| b. Describe management's role in assessing and managing risks and opportunities. | Page 3-5 |
| **Strategy** | |
| a. Describe the climate-related risks and opportunities the organization has identified over the short, medium and long term. | Page 6–12, 16-23 |
| b. Describe the impact of climate-related risks and opportunities on the organization's businesses, strategy and financial planning. | Page 13-16 |
| c. Describe the resilience of the organization's strategy, taking into consideration different climate-related scenarios, including a 2°C or lower scenario. | Page 8-23 |
| **Metrics & targets** | |
| a. Disclose the metrics used by the organization to assess climate-related risks and opportunities in line with its strategy and risk management | Page 24-30 |
| b. Disclose Scope 1, Scope 2 and, if appropriate, Scope 3 GHG emissions, and the related risks. | Page 30 |
| c. Describe the targets used by the organization to manage climate–related risks and opportunities and performance against targets. | Page 25 |
| **Risk management** | |
| a. Describe the organization's processes for identifying and assessing climate-related risks. | Page 31-32 |
| b. Describe the organization's processes for managing climate-related risks. | Page 32-33 |
| c. Describe how processes for identifying, assessing and managing climate-related risks are integrated into the organization's overall risk management. | Page 32-33 |

We would also highlight that we have publicly reported GHG emissions from our operations since 1998. We believe our disclosures under the IPIECA and TCFD frameworks provide high-quality, valuable information to our investors and other stakeholders. ExxonMobil recognizes the value of having consistent, high-quality information available to investors, corporations, governments and other stakeholders. We continue to welcome feedback from our shareholders and investors on our disclosures.

**Proposal for Superior Engagement and Disclosure:** We are concerned the repeated requests for answers signals that our prior engagements have not been effective in communicating with ISS or that ISS has not preserved research records of our answers in these matters. We would welcome ways to make sure these engagements are more meaningful and long-lasting. While we

JA 613

appreciate the time that ISS has spent in seeking information from us on repeated occasions throughout the year, these engagements are not cost-free to our investors (or your clients) and constitute a significant dedication of resources from ExxonMobil and, we expect, from ISS. We believe ISS could distinguish itself from many other providers of this type of normative reporting by adopting a more collaborative approach with companies to ensure comprehensive, accurate, and transparent disclosures.

We believe inclusion of our responses to your questions in your report would provide a baseline for your analysis and also serve as a data point for internalizing these company-specific factors each year. As a draft report is prepared, we would be happy to review the report and update it with company responses to help ensure the accuracy of your disclosure. We believe this could enhance the value of our engagements and help address any inaccuracies in these normative reports.

As previously conveyed to you in our January 2019 response to the ISS-Ethix request for feedback on the company profile, we believe your report is inaccurate where it relies on unsubstantiated allegations and claims. These sections appear to be based almost entirely on internet articles without any firsthand research into the matters. As noted in our January comments, many of the website sources used are inaccurate, incomplete or outdated. In these instances, there is substantial risk that these disclosures could mislead investors on these issues. We strongly encourage you to revise your reporting and scoring to only reflect factual, proven information and highlight first-hand research such as site visits, official government documents and up-to-date scientific work. To the extent this is not possible for any reason, we would welcome the ability to include a company response to help avoid any omission or factual error that could be viewed as misleading investors.

For ease of reference, we have included your September and July emails, your February letter and your April report as **Attachments B, C and D** to this letter. We also included our January 2019 corrections as **Attachment E**. We would welcome a dialogue to incorporate these material points in your disclosure.

We appreciate your consideration of this proposal and hope these responses have been helpful. Thank you again for your interest in ExxonMobil.

Sincerely,

cc:     Chairman Jay Clayton, SEC
        Commissioner Robert J. Jackson, Jr., SEC
        Commissioner Hester M. Peirce, SEC
        Commissioner Elad L. Roisman, SEC
        Commissioner Allison H. Lee, SEC
        Director William Hinman, SEC
        Gary Retelny, President & CEO, ISS, Inc.
        Chairman of Exxon Mobil Corporation, Darren W. Woods

JA 614

**Attachment A: ExxonMobil Progress on Addressing Climate Risk, Nov. 2017-Present**

| Date | Disclosure | Advocacy | Science | Technology | GHG Reductions | Community | Source | Activity |
|------|-----------|----------|---------|-----------|----------------|-----------|--------|----------|
| 8/30/2019 | X | X | X | X | X | | EM Perspectives Blog | ExxonMobil Supports Methane Regulation |
| 8/28/2019 | X | X | X | X | X | | EM News Release | *2019 Outlook for Energy* |
| 8/26/2019 | | | X | X | X | | EM News Release | ExxonMobil and Mosaic Materials to explore new carbon capture technology |
| 7/24/2019 | | | | | | X | EM News Release | ExxonMobil beings production on Beaumont high-performance Polyethylene line |
| 6/27/2019 | | | X | X | X | | EM News Release | ExxonMobil and Global Thermostat to Advance Breakthrough Atmospheric Carbon Capture Technology |
| 6/13/2019 | | | | | | X | EM News Release | ExxonMobil, SABIC to proceed with Gulf Coast growth ventures project |
| 6/12/2019 | | | | | | X | EM News Release | ExxonMobil completes Singapore expansion to enhance group II base stocks supply |
| 5/29/2019 | | | | X | X | | EM News Release | ExxonMobil progresses growth plans and efforts to advance lower-emissions technologies |
| 5/8/2019 | | | X | X | X | | EM News Release | ExxonMobil to invest up to $100 million on lower-emissions R&D with U.S. National Labs |
| 4/24/2019 | | | | X | X | | EM News Release | Expand Ultra-low Sulfur Diesel Production at Fawley Refinery |
| 4/22/2019 | | | | | X | | EM News Release | ExxonMobil signs 20-year LNG agreement with Zhejiang Energy |
| 4/2/2019 | | X | X | X | X | X | EM News Release | ExxonMobil LNG portfolio 2019 |
| 2/5/2019 | | | | | X | | EM News Release | ExxonMobil, Qatar Petroleum to proceed with Golden Pass LNG export project |
| 1/23/2019 | | | X | X | X | | EM News Release | ExxonMobil and REG Partner with Clariant to Advance Cellulosic Biofuel Research |
| 1/8/2019 | | | X | X | X | | EM News Release | ExxonMobil and IBM to advance energy sector application of quantum computing |

6

JA 615

| Date | Disclosure | Advocacy | Science | Technology | GHG Reductions | Community | Source | Activity |
|---|---|---|---|---|---|---|---|---|
| 12/31/2018 | X | | | | X | | 2019 Energy and Carbon Summary | ExxonMobil Named Top Global Corporate Wind and Solar Buyers in 2018 |
| 12/7/2018 | | | X | X | X | | IPCC Website | 2019 Refinement to the 2006 IPCC Guidelines for National GHG Inventory |
| 12/7/2018 | | X | X | X | X | X | IPCC Website | IPCC Special Report on Global Warming of 1.5C |
| 11/1/2018 | X | | | | X | | 2019 Energy and Carbon Summary | ExxonMobil Signs Wind and Solar Purchase Agreements |
| 10/31/2018 | | | | X | X | | EM News Release | ExxonMobil Starts New Unit at Antwerp Refinery to Produce High-Value Transportation Fuels |
| 10/31/2018 | | | X | X | X | | EM News Release | ExxonMobil Supports New Singapore Energy Center Partnership with US$10 Million Commitment |
| 10/25/2018 | X | | | | | | EM News Release | ExxonMobil Statement Regarding New York Attorney General Civil Complaint |
| 10/24/2018 | X | X | X | X | X | X | EM News Release | 2017 Sustainability Report |
| 10/1/2018 | | X | X | X | X | | IOL ECS | IOL-operated Oil Sands GHG Intensity Target |
| 9/26/2018 | | | | X | X | | EM News Release | ExxonMobil Starts New Unit to Increase Ultra-Low Sulfur Fuels Production |
| 9/24/2018 | | | X | X | X | | External News Release | OGCI Announces Methane Intensity Targets |
| 9/20/2018 | | X | X | X | X | | EM News Release | ExxonMobil to Join OGCI |
| 9/4/2018 | X | X | X | X | X | | Energy Factor | Blog on Methane Regulations |
| 7/9/2018 | | | | | X | X | EM News Release | Rovuma LNG Phase 1 Development Plan Submitted to Government of Mozambique |
| 7/2/2018 | | | X | X | X | X | EM News Release | ExxonMobil Foundation invests $10M in Guyana for research, sustainable employment and conservation |
| 6/28/2018 | | | | X | X | | EM News Release | ExxonMobil Completes Acquisition of Indonesian Lubricant Manufacturer and Marketer PT Federal Karyatama |

| Date | Disclosure | Advocacy | Science | Technology | GHG Reductions | Community | Source | Activity |
|---|---|---|---|---|---|---|---|---|
| 6/27/2018 | | | | X | X | | EM News Release | Mozambique Area 4 Progressing Rovuma LNG Marketing |
| 6/25/2018 | | X | X | X | X | | External News Release | Collaboratory for Advancing Methane Science |
| 6/25/2018 | | X | X | X | X | | EM News Release | XTO Announces Progress on Methane Reductions |
| 6/25/2018 | | X | X | X | X | | EM News Release | World Gas Conference "Methane Moment" with IEA and EDF |
| 6/20/2018 | | | | X | X | | EM News Release | ExxonMobil Singapore Butyl and Resins Plants Begin Production |
| 5/30/2018 | | X | X | X | X | | EM News Release | ExxonMobil CEO Darren Woods Highlights Growth Plans and Advances in Lower-Carbon Solutions |
| 5/23/2018 | | X | X | X | X | | EM News Release | ExxonMobil Announces Greenhouse Gas Reduction Measures |
| 5/21/2018 | | | X | X | X | | EM News Release | ExxonMobil Donates $50M to 800 Universities and Colleges |
| 5/8/2018 | X | X | X | X | X | | EM News Release | 2018 Energy and Carbon Summary |
| 4/11/2018 | | | | | X | X | EM News Release | PNG LNG Expansion |
| 3/6/2018 | | | X | X | X | | EM News Release | EM and SGI Targeting 10kbd Algae Biofuels Capability |
| 12/5/2017 | X | X | X | X | X | | External News Release | API Environmental Partnership |
| 12/1/2017 | | | | X | X | | 2019 Energy and Carbon Summary | Aera Solar Thermal Plant 27 MW Project |
| 11/22/2017 | X | X | X | X | X | | External News Release | Global Methane Guiding Principles |

**Attachment B:  ISS-Ethix Emails of September 25, 2019 and July 23, 2019**

Wed 9/25/2019 12:04 PM

☐ Engagement and Communication Services - ISS Ethix <engagement@iss-esg.com>

Reminder to the attention of Mr. Darren Woods, Chairman: Investor Enquiry Letter to Exxon Mobil Corp. - Facilitated b

To    ☐ Shareholder Relations /SM

Cc    ■ Englande, Sherry M

Retention Policy   All Other 13 Months (1 year, 1 month)          Expires   Expiration Suspended (10/24/2020)

**External Sender**

| Message | 📄 2019Q1_Investor Enquiry_Exxon Mobil Corp.pdf (720 KB) |
|---------|-----------------------------------------------------------|
|         | 📄 Norm-Based Research Report_Exxon Mobil Corp._20190430.pdf (572 KB) |

Dear Mr. Woods,

ISS ESG represents institutional investors with substantial investments in the capital markets. Their responsible investment policies include Environmental, Social and Governance (ESG) criteria which are based on international norms as formulated in the UN Global Compact. Our services include assisting clients in meeting their responsible investment policies which includes their efforts to engage with companies on issues identified under their policies. To this end, we are writing to **Exxon Mobil Corp.** to facilitate dialogue on our clients' behalf with you on the Company's management of its exposure to identified ESG risks.

Attached is a copy of the investor engagement letter, concerning the Company's management of its ESG risks in its operations, that was previously sent to your Investor Relations Department. Unfortunately we have not received a response to the enquiry, and are writing to you to follow up. For your reference, we are also attaching our Norm-Based Research (NBR) Report on the Company.

We would highly appreciate your response by 25 October 2019. If you would prefer a telephone conference with our investors instead, we are very happy to organize that.

Best Regards,
Sagar  Rijal



**ISS ESG ▷**

**SAGAR RIJAL**
ESG Engagement Coordinator
Pooled Engagement

engagement@iss-esg.com
o: +1.301.556.0275

Engagement and Communication Services - ISS Ethix <engagement@iss-esg.com>

**Reminder to the CEO Mr. Darren Woods: Investor Enquiry Letter to Exxon Mobil Corp. - Facilitated by ISS ESG**

To ☐ Shareholder Relations /SM

Cc ▇ Englande, Sherry M

Retention Policy  All Other 13 Months (1 year, 1 month)          Expires  Expiration Suspended (8/21/2020)

| ✉ Message | 🔴 2019Q1_Investor Enquiry_Exxon Mobil Corp.pdf (720 KB) |
| | 🔴 Norm-Based Research Report_Exxon Mobil Corp._20190430.pdf (572 KB) |

Dear Mr. Woods,

ISS ESG represents institutional investors with substantial investments in the capital markets. Their responsible investment policies include Environmental, Social and Governance (ESG) criteria which are based on international norms as formulated in the UN Global Compact. Our dialogue with **Exxon Mobil Corp.** helps us to understand the Company's capacity to pre-empt and manage extra-financial risks, and ensures we have a greater comprehension of the Company's business.

This is a reminder of an investor enquiry letter that ISS ESG sent to your company secretary via email in February 2019 followed by a reminder in April 2019. We would highly value a response from the Company but since we have not yet heard back I am hereby resending the original letter and a recent copy of our Norm-Based Research (NBR) report on the Company to your attention.

If you need more time to prepare a response, please let us know. If a telephone conference is more convenient, we would be happy to arrange that. Our process is to first contact Investor Relations and then the CEO to get a response, followed by an inquiry to the board chairperson.

Best,
Sagar Rijal



**SAGAR RIJAL**
ESG Engagement Coordinator
Pooled Engagement Team

engagement@iss-esg.com
o: +1.301.556.0275

**Attachment C:  ISS-Ethix Letter dated February 22, 2019**



2019Q1_Investor
Enquiry_Exxon Mobi



ISS-ethix
Fleminggatan 7, floor 5,
112 26 Stockholm, Sweden

Exxon Mobil Corp.
Sherry Englande,
Manager, Shareholder Relations
5959 Las Colinas Blvd.
Irving, TX 75039-2298
UNITED STATES

22 February 2019

Dear Ms. Englande,

ISS ESG is an advisor to institutional investors in the area of responsible investment. Our clients chiefly consist of large pension funds, banks, insurance companies, foundations and municipalities. ISS ESG represents institutional investors with substantial investments in the capital markets. Their responsible investment policies include Environmental, Social and Governance (ESG) criteria which are based on international norms as formulated in the U.N. Global Compact.

Our services include assisting clients in meeting their responsible investment policies which includes their efforts to engage with companies on issues identified under their policies. To that end, we are writing to facilitate dialogue on our clients' behalf with **Exxon Mobil Corp.** on its management of its exposure to identified ESG risks. Please find their letter attached.

In conducting this outreach, ISS ESG seeks to encourage public disclosure on ESG issues identified under investors' policies. ISS ESG does not seek to receive any confidential information, any material non-public information or any information that you are not authorized to disclose to us. Further, ISS ESG does not agree to maintain in confidence any information that you may provide to us in response to this outreach. Our clients include investors who trade in publicly-traded securities and no information that is provided as part of this outreach shall in any way restrict our business and operations nor the securities trading activities of our clients.

Yours sincerely,

Reinhilde Weidacher
Head of Research

 

Exxon Mobil Corp.
Sherry Englande,
Manager, Shareholder Relations
5959 Las Colinas Blvd.
Irving, TX 75039-2298
UNITED STATES

22 February 2019

Re: Telephone conference with Mr. Mark DePaul on 6 October 2017 concerning Exxon Mobil's climate change risk and disclosure

Dear Ms. Englande,

We would like to thank Exxon Mobil Corp. for kindly taking the time to answer investor questions regarding the company's support for climate change mitigation regulations. We appreciate the insight that your communication provided on the efforts taken by Exxon Mobil to address longstanding concerns related to allegations that the company was lobbying via proxy against greenhouse gas (GHG) emissions reductions.

Public disclosures on climate is vital for all stakeholders, including ISS ESG and our clients. Therefore, we are partnering with CDP (formerly Carbon Disclosure Project) to inquire the Company specifically about its carbon data, water risk, and deforestation disclosures in accordance with internationally accepted disclosure initiatives.

We would like to continue our constructive dialogue with Exxon Mobil in order to better understand how the Company is managing the risks associated with climate change. We are encouraged by the Company's membership in the Oil and Gas Climate Initiative and the publications of '2018 Outlook for Energy: A View to 2040' and '2018 Energy & Carbon Summary' that disclose additional carbon data and scenarios. However, several stakeholders have criticized the disclosure as insufficient in providing a full range of plausible scenarios, having a long-term horizon, quantifying the climate-related impacts of reserves, and lacking clear assumptions. While we appreciate your previous communication with us and your corporate disclosure, the available material provides limited information on Exxon Mobil's long-term climate change mitigation strategy.

Given these developments, and in order for us to build on your earlier response, we would be very grateful if you could clarify some issues for us:

1. Given the October 2018 IPCC special report on Global Warming of 1.5°C calling for rapid emissions reductions across all main sectors, and an accelerated energy transition, has the Company considered a public commitment to align its policies and quantify its greenhouse gas (GHG) emissions targets with higher ambition?

2. The United Nations in December 2018 urged increased ambition in mitigating climate change as a requirement to achieve the goals of the Paris Agreement. Considering the critiques that the Company's 2018 Outlook for Energy report received predicating a business-as-usual growth in oil and gas, would the company consider scenarios with increased GHG reductions, including the implication of their implementation as a tool to achieve the Paris Agreement? In addition, would the company quantify and disclose the climate-related impacts of existing and future oil and gas resources?

3. Considering growing investor requirements for corporate disclosures of carbon data and climate strategies, does


the Company intend to publicly disclose its GHG emissions and approach to climate change in accordance with established international disclosure initiatives? Would this include GHG reduction targets referencing climate science?

We would very much welcome your insights on these issues. We thank you in advance for your time and consideration of these matters, and would very much appreciate a reply **by 22 March 2019**. Please address the response to ISS ESG Engagement and Communications Services at engagement@iss-esg.com, or by post to: ISS-ethix, Fleminggatan 7, floor 5, 112 26 Stockholm, Sweden.

Yours sincerely,

| | |
|---|---|
| 1919 Investment Counsel | Montpensier Finance |
| Achmea Investment Management B.V. | Ossiam |
| Aktia Bank Abp | Pensionfonds Horeca & Catering |
| Almbrand | Pensionfonds Wonen |
| AP Pension | Sbanken ASA |
| AP7 - Seventh Swedish National Pension Fund | Skandia Group |
| Aristotle Credit Partners, LLC | Sparinstitutens Pensionskassa |
| BPL Pensioen | Sparinvest |
| ClariVest Asset Management, LLC | Stichting Pensioenfonds Achmea |
| Coeli Asset Management AB | Strategic Global Advisors, LLC |
| Counsel Portfolio Services, Inc. | Sumitomo Mitsui Trust Asset Management |
| Danica | Swedbank Robur |
| Geode Capital Holdings LLC | The Church Pension Fund, Finland |
| Handelsbanken Asset Management | A U.S.-based asset management firm |
| Kåpan Pensioner | A U.S.-based investment management firm |
| Laegernes Pensionskasse | A U.S.-based investment management firm |
| Mandatum Life Investment Services, Ltd. | |

_____

Represented by ISS-ethix

*Reinhilde Weidacher* (signature)

**Reinhilde Weidacher**
**Head of Research**

**Attachment D: ISS-Ethix "Norm-Based Research Company Report" of April 25, 2019**



Norm-Based
Research Report_Ex



## Attachment E: ExxonMobil January 2019 Corrections to ISS-Ethix Report



ISS-ethix_Exxon       ISS-ethix_Exxon       MCFN Syncrude       Background       ISS-ethix_Exxon
Mobil Corp._DRAFT Mobil Corp._DRAFT joint news release fi information for ISS Mobil Corp._DRAFT

Wed 1/30/2019 7:59 PM

■ Englande, Sherry M

**RE: Sustainable investment enquiry**

To    ☐ Ivan Gjoshevski; ☐ Ayeela De Guia

Cc    ■ Palmer, Molly A



| Message | 📄 ISS-ethix_Exxon Mobil Corp._DRAFT_20190124_CAN draft for release.pdf |
|---|---|
|  | 📄 ISS-ethix_Exxon Mobil Corp._DRAFT_20190124_RUS draft for release.pdf |
|  | 📄 MCFN  Syncrude joint news release final.pdf |
|  | 📄 Background information for ISS Ethix ENL edited for release.pdf |

Dear Ivan and Ayeela -
Thank you for the opportunity to provide comment on these profile reports before they are released to investors.
We have incorporated needed updates and clarifications by using a comment feature and have included additional background
material separately attached in some instances. We trust that this will be useful to you.
I would be happy to facilitate a call between you (or others at ISS-ethix) and ExxonMobil to elaborate on our updates and
edits.
Please let us know how we can help going forward.

We look forward to your final reports upon release.

Thank you
Sherry

Sherry M. Englande
Shareholder Relations
Manager

Exxon Mobil Corporation
5959 Las Colinas Blvd., Room 2624
Irving, Texas 75039-2298
Phone: (972)940-6702  (new number)
Fax: (972)444-1505
My Site

**ISS Letter to the Senate Banking, Housing
and Urban Affairs Committee Dated May 30, 2018**



**Institutional Shareholder Services Inc.**
1177 Avenue of the Americas, 2nd Floor
New York, NY 10036
T: +1.646.680.6300 | F: +1.646.417.6090

May 30, 2018

The Honorable Dean Heller
Chairman
Subcommittee on Securities, Insurance and Investment
Senate Banking, Housing, and Urban Affairs Committee
United States Senate
324 Hart Senate Office Building
Washington, D.C. 20510

The Honorable Mike Rounds
Senate Banking, Housing, and Urban Affairs Committee
United States Senate
502 Hart Senate Office Building
Washington, D.C. 20510

The Honorable Thom Tillis
Senate Banking, Housing, and Urban Affairs Committee
United States Senate
185 Dirksen Senate Office Building
Washington, D.C. 20510

The Honorable Tom Cotton
Senate Banking, Housing, and Urban Affairs Committee
United States Senate
124 Russell Senate Office Building
Washington, D.C. 20510

The Honorable David Perdue
Senate Banking, Housing, and Urban Affairs Committee
United States Senate
455 Russell Senate Office Building
Washington, D.C. 20510

The Honorable Tim Scott
Senate Banking, Housing, and Urban Affairs Committee
United States Senate
717 Hart Senate Office Building
Washington, D.C. 20510

Dear Senators Heller, Tillis, Perdue, Rounds, Cotton and Scott:

Thank you for your letter dated May 9, 2018. Institutional Shareholder Services Inc. (ISS) welcomes this opportunity to answer your questions, address common misinformation about ISS and proxy advisors, and provide clarity about our business practices and the regulatory requirements to which we are subject.

First, as a general note, ISS is a Registered Investment Adviser ("RIA"). As such, we are subject to the Investment Advisers Act of 1940 ("Advisers Act") and the rules and regulations that the U.S. Securities and Exchange Commission ("SEC") has promulgated thereunder. As an RIA, ISS owes a fiduciary obligation to our investor clients, which means ISS and our employees must carry out our duties solely in the best interests of clients and free from any compromising influences and loyalties. The Advisers Act and related SEC rules provide a mature and comprehensive regulatory regime that covers virtually every aspect of our business and that subjects ISS to the SEC's continuing oversight and examination authority. We must and do comply with these rigorous federal legal requirements. Being regulated under the Advisers Act also aligns us with our investor clients, many of whom are themselves also registered and regulated under the Advisers Act.

In this context, I am confident you will find that the Advisers Act effectively addresses many of your concerns.

Our response to your letter is organized as a direct reply to each statement and question you've posed (italicized):

➢ *"For years, your organization has significantly increased it[s] influence in shareholder voting practices, and between Institutional Shareholder Services (ISS) and Glass, Lewis & Company (Glass Lewis), you now control 97 percent of the of the [sic] proxy advisory industry…"*

ISS is indeed an industry leader in the corporate governance space and we are proud to have earned our market share by virtue of the quality of our work and the level of service we have provided for more than a quarter century. The GAO report entitled "Issues Relating to Firms that Advise Institutional Investors on Proxy Voting" concluded as much when it wrote that ISS has "gained a reputation with institutional investors for providing reliable, comprehensive proxy research and



**Institutional Shareholder Services Inc.**
1177 Avenue of Americas, 2nd Floor
New York, NY 10036
T: +1.646.680.6300 | F: +1.646.417.6090

recommendations."[1]  While we have seen the widely circulated conjecture that two firms "control" 97% of the proxy advisory industry, this is not a statistic we have verified or can confirm.

There are no artificial barriers to entry into the proxy advisory industry in the United States.  We operate in a competitive market and we have seen entrants come and go within the industry.  Moreover, institutional investors are not required to purchase our services.  In the free market, institutional investors purchase our services because they choose to do so, and find value in the products we provide.

We do, however, want to draw a distinction between our market leadership and your assertion that we influence "shareholder voting practices."  ISS clients control both their voting policies and their vote decisions.  ISS is generally not a discretionary proxy voting manager, except in rare situations where a client has an actual conflict of interest (for example, a financial institution that holds and must vote the shares of its parent company), and asks ISS to make a proxy voting decision on the client's behalf.

In fact, ISS is relied upon by our clients to assist them in fulfilling their own fiduciary responsibilities regarding proxy voting and to inform them as they make their proxy voting decisions.  These clients understand that their duty to vote proxies in their clients' or beneficiaries' best interests cannot be waived or delegated to another party.  Proxy advisors' research and vote recommendations are often just one source of information used in arriving at institutions' voting decisions.  As participants in the SEC's 2013 Proxy Adviser Roundtable explained, many investors have internal research teams that conduct proprietary research and use proxy advisory research to supplement their own work.[2]  Some investors use third-party proxy research as a screening tool to identify non-routine meetings or proposals.  A number of institutional investors use the services of two or more proxy advisory firms.  These views are consistent with the results of a 2012 survey of asset managers by Tapestry Networks that found proxy advisory firms' "role as data aggregators" has become increasingly important to asset managers, and that even if smaller managers are more reliant on such advisory firms, they still acknowledge that responsibility for voting outcomes lies with investors.[3]  Said more simply, we are an independent provider of data, analytics and voting recommendations to support our clients in their own decision-making.

Moreover, in their paper, *The Power of Proxy Advisors: Myth or Reality?,*[4] University of Pennsylvania Law School Professor Jill Fisch, along with colleagues from New York University, analyzed the effect of proxy advisor recommendations on voting outcomes in uncontested director elections.  The authors estimate that, after controlling for underlying company-specific factors that influence voting outcomes, far from being determinative of outcomes, an ISS recommendation appears to shift a very small percentage (6 to 10 percent) of shareholder votes, but that this influence may stem from ISS' role as information agent:

---

[1] Jones, Y. D. (2007). *Issues Relating to Firms that Advise Institutional Investors on Proxy Voting.* (GAO-07-765). Washington, DC: Government Accountability Office (hereafter, "2007 GAO Report") at 13.

[2]  Remarks of Michelle Edkins, currently Managing Director, Global Head of BlackRock Investment Stewardship, BlackRock, Inc. Transcript of Proxy Advisory Firms Roundtable ("Roundtable Transcript"), available at www.sec.gov/spotlight/proxy-advisory-services/proxy-advisory-services-transcript.txt (December 5, 2013) at 45; remarks of Anne Sheehan, Director of Corporate Governance, CalSTRS, *Id.* at 153-54; remarks of Lynn Turner, Managing Director, LitiNomics, Inc., discussing his experience at Colorado Public Employees' Retirement Association, *Id.* at 51-52.

[3] Bew, Robyn and Fields, Richard, Voting Decisions at US Mutual Funds: How Investors Really Use Proxy Advisers (June 2012) at 2. Available at SSRN: http://ssrn.com/abstract=2084231. ("Across the board, participants in our research said they value proxy firms' ability to collect, organize, and present vast amounts of data, and they believe smaller asset managers are more reliant on those services. Nonetheless, participants emphasized that responsibility for voting outcomes lies with investors").

[4]  Choi, Stephen J., Fisch, Jill E. and Kahan, Marcel, The Power of Proxy Advisors: Myth or Reality? 59 Emory L. J. 869 (2010); University of Pennsylvania, Institute for Law & Economics Research Paper No. 10-24. Available at SSRN: http://ssrn.com/abstract=1694535.



**Institutional Shareholder Services Inc.**
1177 Avenue of Americas, 2nd Floor
New York, NY 10036
T: +1.646.680.6300 | F: +1.646.417.6090

> *[W]e find evidence that ISS's power is partially due to the fact that ISS (to a greater extent than other advisors) bases its recommendations on factors that shareholders consider important. This fact and competition among proxy advisors place upper bounds on ISS's power. Institutional Shareholder Services cannot issue recommendations arbitrarily if it wants to retain its market position. Doing so would lead institutional investors to seek the services of other proxy advisory firms.* **Thus, ISS is not so much a Pied Piper followed blindly by institutional investors as it is an information agent and guide, helping investors to identify voting decisions that are consistent with their existing preferences** *(emphasis added).*[5]

Many large institutional investors have their own customized voting and corporate governance principles that proxy advisory firms use as the basis for making tailored, client-specific vote recommendations for that particular investor. What this means is that a client with their own unique view of how to assess and vote upon proxy voting matters will look to ISS for assistance in the administration of their own customized proxy voting policy as opposed to using one of ISS' policy frameworks. As of January 1, 2018, approximately 85% of ISS' top 100 clients used a custom proxy voting policy. To provide further context, we note that during calendar year 2017, approximately 69% of the ballots processed by ISS on behalf of clients globally were linked to clients' custom policies, representing approximately 87% of the total shares processed by ISS during this period.

Moreover, in addition to both customized policies and our ISS "benchmark" proxy voting guidelines, ISS provides options for our clients in the form of multiple thematic, specialty policy options for investors who require a particular philosophical approach to proxy voting and corporate governance, including a policy set for faith-based investors and two focusing on social and environmental investing priorities. Again, the choice of which policy to use belongs to the client, not ISS. In other words, ISS does not have a monolithic view on proxy voting issues nor do we dictate how investors themselves think about these issues. Indeed, ISS has presented opposing recommendations on the same ballot proposal to different clients based on the differing policies/approaches of those clients and the proxy voting policies that they themselves select. In short, ISS provides investors with research, data and vote recommendations that enable them to implement their own proxy voting and corporate governance philosophies.

ISS is sometimes mislabeled as an "activist" organization. While the foregoing demonstrates that we are not, in fact, a monolith to which that or any similar label could apply, we think it is worth noting that for calendar years 2015, 2016 and 2017, under our "benchmark" policy guidelines, ISS recommended votes in support of the management position over 90% of the time (91.3%, 92.2% and 91.3% in each year, respectively).

As noted by the Council of Institutional Investors (CII), a leading nonpartisan and nonprofit association of public, corporate and union employee benefit funds and state and local entities with combined assets exceeding $3.5 trillion:

> Proxy advisory firm influence is exaggerated by analyses that confuse correlation with causation. ISS and Glass Lewis tend to follow investors on governance policy, not lead them. In setting their policy frameworks, the two firms have a business interest to ensure they reflect investor (client) perspectives, in part through extensive consultative processes, and to consider empirical evidence. Their franchises are built on credibility with investors. As a result, advisors' views reflect those of many funds. Indeed, if there were a sharp divergence, we would expect to see advisors punished in the marketplace.[6]

At the end of the day, institutional investors are not required to use proxy advisors' services or to use only one proxy advisory company, nor are they required to follow the vote recommendations of any proxy advisor they choose to use. The

---

[5]   *Id.* at 906.

[6] June 13, 2016 letter from the Council of Institutional Investors to Rep. Hensarling, Chair of House Committee on Financial Services and Rep. Waters, Ranking Member of House Committee on Financial Services at 2.



**Institutional Shareholder Services Inc.**
1177 Avenue of Americas, 2nd Floor
New York, NY 10036
T: +1.646.680.6300 | F: +1.646.417.6090

ultimate voting decision for each resolution at a company meeting remains the responsibility of our clients, the owners of the corporation, as we believe it should be.

## Question 1 - ISS' Voting System

➢ *"We request that you provide detailed information on how the Proxy Exchange voting service works and why you think your company is in compliance with SEC Staff Legal Bulletin 20, especially in circumstances where each client does not have to formally approve or submit the pre-populated electronic ballot that you are producing for each shareholder meeting."*

Exchange Act Rule 14a-1(l) defines a proxy "solicitation" to include the "furnishing of a form of proxy or other communication to security holders under circumstances reasonably calculated to result in the procurement, withholding or revocation of a proxy."[7]  The furnishing of a proxy pursuant to a security holder's unsolicited request is excluded from this definition.[8]

Both the SEC and its Staff have historically recognized the distinction between unsolicited and solicited proxy advice, applying the Exchange Act proxy rules to the former, but not the latter.  For example, in a 1979 release, the SEC explained that, "As a general matter, unsolicited proxy voting advice would constitute a 'solicitation' subject to the proxy rules."[9]  In making this observation, the SEC cited an earlier opinion of the SEC's General Counsel that addressed proxy advice in a broker-dealer context:

> In our view, a broker normally is not engaged in solicitation where he merely responds, whether orally or in writing, to an unsolicited request from a customer for advice as to how to vote.  Since the broker is merely responding to his customer's request for advice in his capacity as adviser to the customer and not actively initiating the communication, it may be concluded that he is not engaged in 'soliciting.'[10]

Unfortunately, the longstanding regulatory distinction between unsolicited and solicited proxy voting advice has been blurred as a result of more recent Staff guidance.  In addressing the interplay between proxy advisory services and the federal proxy rules, Staff Legal Bulletin ("SLB") 20 (issued in June 2014) paraphrased the SEC's 1979 release, but omitted the critical "unsolicited" qualifier, thereby erroneously suggesting that all proxy advice is a solicitation.[11]

ISS submits that a registered investment adviser who is contractually obligated to furnish vote recommendations based on client-selected guidelines is not providing "unsolicited" proxy voting advice, and thus is not engaged in a "solicitation" subject to the Exchange Act proxy rules.

ISS does not choose the ballots or agenda items on which we render advice.  Rather, at a client's direction, we are asked by our clients to analyze and provide a voting recommendation for each agenda item related to every equity security held in our clients' portfolios.  Furthermore, as a disinterested fiduciary, ISS has no financial stake in the outcome of a particular vote. We are agnostic as to whether clients support a proposal, reject the proposal or abstain from voting altogether.  We are similarly indifferent to whether clients choose to follow an ISS vote recommendation or not.  ISS' only job is to analyze proxy statements

---

[7] Rule 14a-1(l)(iii)

[8] Rule 14a-1(l)(2)(i).

[9] *Shareholder Communications, Shareholder Participation in the Corporate Electoral Process and Corporate Governance Generally,* SEC Release No. 34-16104 (August 13, 1979), 44 Fed. Reg. 48938 (August 20, 1979) at note 25.

[10] *Broker-Dealer Participation in Proxy Solicitations,* SEC Release No. 34-7208 (January 7, 1964).  This view was restated in a letter from Abigail Arms, Chief Counsel of the Division of Corporation Finance to Richard G. Ketchum, EVP, Legal, Regulatory & Market Policy of the NASD, Inc. dated May 19, 1992.

[11] SLB 20, Question 6.



**Institutional Shareholder Services Inc.**
1177 Avenue of Americas, 2nd Floor
New York, NY 10036
T: +1.646.680.6300 | F: +1.646.417.6090

and provide informed research and vote recommendations based on the policies and guidelines the institutional investors have selected, and in many cases developed, themselves. Given the diversity of these policies and guidelines and as already noted above, ISS may issue different recommendations on a given issue, for example, recommending voting "AGAINST" on a particular item to clients using ISS' faith-based policy guidelines, and "FOR" on that same issue to clients using ISS' "benchmark" voting policy guidelines.

ISS' fiduciary proxy research and voting advice is simply not the kind of "over-the-transom" communication that the federal proxy rules are designed to address.

Wholly apart from the question of whether the provision of proxy advice can be considered a solicitation, SLB 20 explains that Exchange Act Rule 14a-2(b)(3) exempts a proxy solicitor who renders voting advice from the information and filing provisions of the proxy rules if the solicitor:

    a. furnishes proxy voting advice in the ordinary course of business;

    b. discloses to the recipient of the advice any significant relationship with the issuer or any of its affiliates, or a security holder proponent of the matter under advisement, and discloses any material interests the solicitor has in such matter;

    c. receives no compensation for furnishing the advice from anyone other than recipients of the advice; and

    d. does not furnish the voting advice on behalf of any person soliciting proxies or on behalf of a participant in a contested election.[12]

Although ISS is confident that it is not a proxy solicitor within the meaning of Rule 14a-1(l), we have nonetheless taken steps to ensure that our proxy advisory activities would qualify for the Rule 14a-2(b)(3) exemption if such an exemption were needed. In this regard, after the publication of SLB 20, ISS enhanced our already robust suite of conflict management and disclosure policies by adopting a *Policy Regarding Disclosure of Significant Relationships*. This Policy, which is available in the Due Diligence section of our website,[13] provides a clear explanation of how ISS assesses and discloses any significant relationships that may exist between the company and the subjects of its proxy research reports.

ISS also enhanced its client facing delivery platform, ProxyExchange, to deliver the required disclosures to clients in a way that both seamlessly integrates with their workflows and protects the critical firewall between ISS and its corporate solutions subsidiary.

## Question 2 - Report Accuracy

➤ *"Currently there are no standards or regulations that apply to these reports prepared by proxy advisory firms…[T]here are often questions about the dependability, accuracy of factual material, and correct assumptions made for each company evaluated."*

---

[12] SLB 20, Question 9. Questions 10 through 13 address how a proxy advisory firm that acts as a proxy solicitor could make the facts-and-circumstances determination of whether it had a significant relationship with an issuer or security holder proponent or a material interest in the matter under advisement, and how it should make any necessary disclosures related thereto.

[13] https://www.issgovernance.com/file/duediligence/significant-relationships-disclosure.pdf. The ISS website contains a range of disclosures that satisfy ISS' regulatory requirements under the Advisers Act and assist fiduciaries who use ISS' services to satisfy their own business and regulatory obligations.



**Institutional Shareholder Services Inc.**
1177 Avenue of Americas, 2nd Floor
New York, NY 10036
T: +1.646.680.6300 | F: +1.646.417.6090

The first sentence quoted above is inaccurate. In 2010, the SEC confirmed that proxy advice is a form of investment advice subject to the Advisers Act and the rules and regulations thereunder. [14] Among other things, this means that

> as a fiduciary, the proxy advisory firm has a duty of care requiring it to make a reasonable investigation to determine that it is not basing its recommendations on materially inaccurate or incomplete information.[15]

The SEC restated this view just last month in a proposed interpretive release on investment adviser standards of conduct. In addition to confirming that the obligation to provide advice that is in the best interest of clients applies not only to advice regarding potential investments, but to all advice provided to clients, the SEC also confirmed that an adviser has a duty to conduct a reasonable investigation "sufficient to not base its advice on materially inaccurate or incomplete information."[16]

As an RIA and a fiduciary, ISS has adopted a number of policies and procedures designed to ensure the integrity of our data collection and research process, upon which our reports are founded. We have robust systems and controls designed to ensure that research reports and vote recommendations include high-quality, relevant information, are accurate, correctly based on the relevant ISS or client custom policy and are reviewed by appropriate personnel prior to publication. ISS also commissions regular SSAE 16 audits, conducted by a third-party auditor to ensure compliance with our internal control processes, including our research process.

ISS is committed to having the most complete and accurate information upon which to base our research and recommendations to our clients. As described in more detail below, ISS' approach is to use and rely only upon publicly available information in the preparation of our proxy research reports and vote recommendations, the primary source of which is the public filings of the companies that we cover. Within the parameters of that approach, ISS regularly undertakes dialogue and interacts with company representatives, institutional shareholders, shareholder proponents and other relevant stakeholders, both during and outside of "proxy season" to (1) gain the greatest possible insight for our clients and (2) maintain the overall quality of the research by ensuring full information and deeper insight into key issues. ISS' dialogue with issuers is transparent and disclosed to clients.

With respect to factual errors, ISS' research team does, infrequently, identify or receive notice of material factual errors in research reports that have already been published to our clients. These errors include those relating to agenda changes, material data or research/policy application. ISS tracks such occurrences, which are rare. For example, in 2017, ISS covered over 6,400 meetings in the United States and the error rate was approximately 0.76% as measured by post-publication "Proxy Alerts" to clients notifying them of a material error within our benchmark proxy research that resulted in a change of a vote recommendation.

We reiterate the findings of the 2007 GAO Report which concluded that our clients trust us to provide "reliable, efficient services."[17] The GAO's follow-up report in 2016 addressed this further, stating "Both corporate issuers and institutional investors [the GAO] interviewed said that the data errors they found in the proxy reports were mostly minor…"[18]

---

[14] Concept Release on the U.S. Proxy System, IA Release No. 3052 (July 14, 2010) ("Proxy Concept Release") at 110.

[15] *Id.,* at 119.

[16] Proposed SEC Interpretation Regarding Standard of Conduct for Investment Advisers, IA Release No. 4889 (April 18, 2018) ("IA Interpretive Release"), at 13, *quoting t*he Proxy Concept Release.

[17] 2007 GAO Report *supra*, note 1 at 13.

[18] Clements, M. (2016). *Proxy Advisory Firms' Role in Voting and Corporate Governance Practices.* (GAO-17-47). Washington, DC: Government Accountability Office at 29.



**Institutional Shareholder Services Inc.**
1177 Avenue of Americas, 2nd Floor
New York, NY 10036
T: +1.646.680.6300 | F: +1.646.417.6090

However, we want to underscore that there is a fundamental and important difference between factual errors and disagreements over interpretive judgment and methodology. Although the latter are often referred to as "errors," they do not entail any mistake, omission or misrepresentation. What is often portrayed as an "error" by the management and/or the board of a company may be a disagreement about the vote recommendation itself or about the underlying corporate governance guidelines applied.[19] For example, ISS was recently accused by a company of selecting inappropriate company peers for the purpose of manipulating the assessment of the issuer's executive compensation program in the context of a "say-on-pay" agenda item. However, ISS had, as always, followed its consistent and publicly-disclosed methodology for ISS peer group determinations and had also, in fact, already considered new information provided by the issuer and adjusted our initial determination to remove one peer and add a different one in line with the company's representations. In presenting the information to our clients in our report and consistent with our normal approach, we outlined in side-by-side fashion the peers selected by the issuer and the ISS-selected peers. In this particular case, there was overlap of 12 of the 16 peer companies and the variance was not an error but rather reflected ISS' thoughtful and independent assessment of the matter, precisely what our clients expect of us.

We acknowledge that policy differences on important issues such as executive compensation, overboarding (i.e. how many boards an individual can serve on effectively), and whether the CEO and Chairman of the Board should be different individuals, can sometimes generate tension between shareholders (and by extension ISS) and the companies in which they invest. However, it is the policies selected by our clients that dictate our vote recommendations and the application of those policies does not equate to our work product being erroneous or manipulative.

➤ *"We understand that your company and other proxy advisory firms hire more staff to meet the demands of proxy season by hiring temporary workers and outsourcing a significant amount of research and analytical work."*

To help meet our clients' needs during proxy season, ISS does indeed hire "temporary" employees. Temporary employees are subject to the same employment onboarding procedures that apply to "permanent" hires, including training regarding ISS' compliance program and subject matter training with respect to the tasks and issues that will fall within an employee's work responsibilities. Temporary employees do not undertake work beyond their training and experience and these employees are generally focused on data collection and capture. It is also not uncommon for some "temporary" employees to return to ISS on a recurring basis.

ISS does not outsource any of its research and analytical work.

➤ *"Why hasn't ISS expanded [its] draft review process to include more companies, in order to improve the quality of the reports for issuers not listed in the S&P 500 index? Are you willing to expand the draft review process to companies listed in the S&P 1500, [sic] with a reasonable transition period?"*

As you note, the shareholder proxy season is "short." The condensed schedule affects the process that advisors like ISS employ in producing proxy reports and formulating vote recommendations. ISS has incorporated a limited issuer review step for S&P 500 companies because these companies are the most widely held by our clients and generally have the most complex disclosures. ISS voluntarily provides most companies in this index the opportunity to review the factual accuracy of the data included in ISS' pending proxy analyses. Because we are committed to the accuracy and quality of our reports, we consider other requests for review on a case-by-case basis.

However, given the limited time between the hard start of receiving the proxy statement and the hard stop of delivering the report to our clients with sufficient review time in advance of their having to make their voting decisions, expanding the included coverage universe would require a significant increase in resources and a concurrent increase to our clients of the costs of our services (which, of course, is ultimately borne by the underlying beneficial shareowners). Moreover, even if

---

[19] As Anne Sheehan of CalSTERS observed at the SEC's Proxy Adviser Roundtable, "What I have found [is] that many times the errors are really differences of opinion." Roundtable Transcript, *supra*, note 2, at 155.



**Institutional Shareholder Services Inc.**
1177 Avenue of Americas, 2nd Floor
New York, NY 10036
T: +1.646.680.6300 | F: +1.646.417.6090

additional resources were added, the time constraints remain substantial -- we remain concerned about the value and feasibility of accommodating an expanded draft review process and still being able to meet the imperative of providing our clients with our research on a timely basis. ISS does, however, work continually to enhance the quality of all of our product/service offerings, and is open to appropriate changes that are sensible, commercially viable and which would provide additional value to our clients and other stakeholders. Expansion of the coverage universe of our current draft review process is one potential change that ISS has considered and will continue to do so.

All issuers, even if they do not receive a draft report for review, are entitled to receive a free copy of ISS' published analysis for their own shareholder meeting. This affords all issuers the opportunity to bring any factual error in the report to ISS' attention and as noted elsewhere in this response, we have a formal process to update previously issued reports where necessary and communicate those updates to our clients.

➢ *"Do you have specific policies and procedures regarding providing draft report to issuers? If so, please include a copy of those policies and procedures."*

Yes. ISS' approach to the provision of draft reports to issuers (which is available on our website), is as follows:

> There is no entitlement to review our research reports prior to publication to our clients, but draft reports are provided in certain markets as a courtesy and at the sole discretion of ISS, in order to allow an issuer to check the factual information prior to publication. For example, in the United States, companies in the S&P 500 index will generally receive a draft report for fact-checking if they have provided contact details, and for France, the process is set out in our Engagement and Draft Report Disclosure Policy for the French Market.

> To ensure consideration can be given to any review responses within the often tight publication deadlines for our reports, any comments should be sent back to ISS by e-mail, although companies are welcome to provide a hard copy as well. Note that this is not an opportunity for the issuer to lobby for a particular voting recommendation, but to check the facts that are being included in our report. Procedures for providing draft reports to companies vary on a market-by-market basis, and in any case, no drafts will be provided in markets or situations where there is insufficient time to do so whilst still respecting our clients' voting deadlines.

> For all markets, ISS does not normally allow pre-publication reviews of any analysis relating to any special meeting or any meeting where the agenda includes a merger or acquisition proposal, proxy fight, or any item that ISS, in its sole discretion, considers to be of a contentious or controversial nature. This policy is intended to safeguard the independence of our process and recommendations.

➢ *"When do you provide issuers draft reports and how much times do they have to provide their comments on factual issues?"*

Draft reports are generally emailed to company contacts in the two-to-four week period before an issuer's annual meeting. During the height of proxy season, the time frame may be closer to two to three weeks before the meeting. We will generally advise the company contacts beforehand when to expect the draft report for review, and the cover letter accompanying the draft report specifies the deadline for the issuer's comments, which typically provides the company with 2 business days to provide comments.

➢ *"If an issuer identifies an error in a draft report what corrective measure do you take?"*

If an issuer identifies an error in a draft report, the matter is reviewed by the relevant research analysts and any identified and agreed errors are corrected prior to the finalization of the report and its delivery to our clients.

With respect to final reports that have already been published, if a material error is identified (whether by ISS, the issuer or an investor), or updated relevant information is publicly released by the issuer (for example, through supplemental proxy



**Institutional Shareholder Services Inc.**
1177 Avenue of Americas, 2nd Floor
New York, NY 10036
T: +1.646.680.6300 | F: +1.646.417.6090

material filed with the SEC), ISS promptly issues an aforementioned "Proxy Alert" to inform clients of any corrections, new information available and, if necessary, any changes in the vote recommendations as result of those corrections or updates. Alerts are distributed to ISS' clients through the same ProxyExchange platform used to distribute the regular proxy analyses. This ensures that the clients who received an original analysis and recommendations will also receive the related Alert.

➢  *"Do you publicly disclose your guidelines and methodologies for preparing draft reports? If not, why not?"*

Yes.  All proprietary proxy analysis at ISS is undertaken in accordance with the publicly disclosed analytical framework which is comprised of the full voting policy guidelines for all policies offered by ISS.  The only exception to this is for the client-specific customized policies which are each client's own proprietary information.  As described above, ISS offers a wide range of proxy voting policy options, providing to our clients both a benchmark policy focused on good governance principles, shareholder protection and mitigation of governance risk, and a wide array of specialty policies that evaluate governance and other voting issues from the perspective of sustainability, socially responsible investing, public pension funds, labor unions or mission and faith-based investing. To ensure the ISS proprietary voting policies take into consideration the changing views and needs of its institutional investor clients and the perspectives of companies and the broader corporate governance community, ISS gathers input each year from institutional investors, companies, and other market constituents worldwide through a variety of channels and over many months.

Case-by-case analytical frameworks, which take into account company size, financial performance and industry practices, also drive many of ISS' vote recommendations on more complex issues, such as those pertaining to the election of corporate directors, compensation matters, and capital or shareholder rights-related proposals.

All ISS Policy Guidelines for 2018, covering the U.S., all global markets and ISS' specialty policies can be found in the "Policy Gateway" section of our website (https://www.issgovernance.com/policy-gateway/voting-policies/).

## Question 3 - Conflicts of Interest

An obligation to either eliminate, or manage and disclose, conflicts of interest is the very essence of an investment adviser's fiduciary duty of loyalty.  The SEC most recently confirmed this fact in its proposed interpretive release on investment adviser standards of conduct, saying:

> In seeking to meet its duty of loyalty, an adviser must make full and fair disclosure to its clients of all material facts relating to the advisory relationship.  In addition, an adviser must seek to avoid conflicts of interest with its clients, and at a minimum, make full and fair disclosure of all material conflicts of interest that could affect the advisory relationship.  The disclosure should be sufficiently specific so that a client is able to decide whether to provide informed consent to the conflict of interest . . . . Because an adviser must serve the best interests of its clients, it has an obligation not to subordinate its clients' interests to its own . . . Accordingly, the duty of loyalty includes a duty not to treat some clients favorably at the expense of other clients.[20]

Advisers Act Rule 206(4)-6 applies this traditional fiduciary concept to proxy voting by requiring an RIA who has expressly or implicitly assumed voting authority over its clients' portfolios to adopt written policies and procedures reasonably designed to ensure that the adviser monitors corporate actions and votes proxies in the clients' best interests; supplies those policies and procedures to clients upon request; and offers clients information about specific votes cast on their behalf.

As an RIA, ISS takes this fiduciary duty of loyalty very seriously.  ISS places primary importance on conducting our business in a transparent and responsible manner, and has developed a comprehensive program to manage potential conflicts of interest as required by the Advisers Act and related SEC rules.  In this regard, ISS has undertaken a comprehensive risk assessment to identify specific conflicts of interest related to its operations and has adopted

---

[20]  IA Interpretive Release,, *supra* note 15, at 15-16 (citations omitted).



**Institutional Shareholder Services Inc.**
1177 Avenue of Americas, 2nd Floor
New York, NY 10036
T: +1.646.680.6300 | F: +1.646.417.6090

compliance controls reasonably designed to manage those risks. Moreover and as discussed above, ISS has adopted a significant relationship disclosure policy and took robust steps to enhance transparency following the promulgation of SLB 20. At the heart of ISS' regulatory compliance program is a deliberate, carefully crafted, regularly tested and periodically updated series of measures designed to eliminate, or manage and disclose conflicts of interest.

Separate and apart from our compliance protocols, ISS addresses conflicts, in part, by being a transparent, policy-based organization, with research and voting recommendations based on publicly-disclosed information available to all shareholders. We provide our clients with an extensive array of information to ensure that they are fully informed of our policies to manage conflicts of interests, and of any potential conflicts and the steps ISS has taken to address them. Among other things, ISS supplies a comprehensive due diligence compliance package, also publicly available on our website, so that our clients can confidently and fully assess the reliability and objectivity of our voting recommendations.

➢ *"Your company has established a consulting service that charges public companies a fee to learn how to best to comply with ISS benchmark voting policies and obtain favorable recommendations in the future."*

To be clear, ISS Corporate Solutions, Inc. ("ICS"), a wholly-owned subsidiary of ISS, provides governance data, analytics and services to corporate issuer clients. ICS' stated mission is help companies design and manage their corporate governance and executive compensation programs to align with company goals, reduce risk, and manage the needs of a diverse shareholder base by delivering best-in-class data, tools, and advisory services. ICS does not and cannot provide any client with any assurance as to how ISS will recommend with respect to the matters that appear on any client's proxy statement.

➢ *"What types of conflicts do you disclose and how accessible are these disclosure[s] to your clients when voting decisions are being made?"*

As required by the Advisers Act's compliance program rule,[21] ISS has implemented, maintains and periodically updates a program designed to eliminate, or manage and disclose, conflicts of interest. In addition to appointing a chief compliance officer, establishing comprehensive compliance policies and procedures, and testing the adequacy of those policies and procedures and the effectiveness of their implementation on an ongoing basis, ISS has also adopted a comprehensive Code of Ethics as the Advisers Act regulatory regime also requires.[22] ISS' Regulatory Code of Ethics is available on our public website at https://www.issgovernance.com/file/duediligence/iss-regulatory-code-and-exhibits-june-2017.pdf. In addition to mandating disclosure regarding an RIA's Code of Ethics, the Advisers Act and related rules also dictate that we provide clients with transparency about our internal operations, including how potential conflicts of interest are addressed.

In conformance with our regulatory obligations, ISS has identified the following potential conflicts:

- Conflicts between ISS' institutional global research department and ICS
- Conflicts within the institutional advisory business
- Conflicts arising from an analyst's stock ownership
- Conflicts in connection with issuers' review of draft analyses
- Conflicts in connection with ISS' ownership structure

Conflict disclosure is addressed first and foremost in the Form ADV disclosure brochure that we must deliver to all clients at the outset of the relationship and must update periodically thereafter.[23] In addition to delivering this brochure to clients, ISS also includes the most recent version of the brochure in the due diligence compliance package available to the public

---

[21] *See* Advisers Act Rule 206(4)-7.

[22] *See*. Advisers Act Rule 204A-1.

[23] *See*. Advisers Act Rule 204-3.

on the ISS website. ISS clients can also readily identify any potential conflict of interest through ISS' primary client delivery platform, ProxyExchange, which provides information about the identity of ICS clients, as well as the types of services provided to those issuers and the revenue received from them. Similarly, each proxy analysis and research report issued by ISS contains a legend indicating that the subject of the analysis or report may be a client of ICS. This legend also advises institutional clients about the way in which they can receive additional, specific details about any issuer's use of products and services from ICS, which can be as simple as emailing our Legal/Compliance department.

➢ *"Are you willing to disclose potential and actual conflicts on the front page of company reports, as Glass Lewis does?"*

Although in our experience investment advisers typically disclose conflict-of-interest information at a macro level, ISS does more. Any institutional client that wishes to learn more about the relationship, if any, between ICS and the subject of a particular analysis or report may access this information through ProxyExchange and/or through contacting ISS' Legal/Compliance department for relevant details. This process allows ISS' proxy voting clients to receive the names of ICS clients without revealing that information to research analysts as they prepare vote recommendations and other research. Identifying an ICS relationship on the face of a proxy analysis or report would destroy the conflict-of-interest firewalls we have created in this area. While it would actually be easier for us to provide this disclosure on the report itself, we believe that eliminating such a critical conflict control would not be in our clients' best interest.

➢ *"Do your disclosures include, in monetary terms, the size of the client relationship involved and do you disclose conflicts involv[ing] more than one proponent or active supporter of a particular shareholder proposal?"*

Yes, ISS makes available to its institutional clients the identity of all ICS clients, the particular products/services they receive, and the fees paid to ICS. Again, this information can be readily accessed via the ProxyExchange platform or by emailing ISS' Legal/Compliance department. In addition to obtaining report-by-report conflict information, ISS clients can obtain lists of all ICS clients. Further, many clients meet with ISS staff on an annual basis to discuss conflicts and other due diligence matters.

Beyond the disclosure approach regarding the ICS clients, the *Policy Regarding Disclosure of Significant Relationships* referred to above explains ISS' approach for disclosing other types of potential conflicts, including those that might arise with respect to a proponent or active supporter of a particular shareholder resolution.

➢ *"Does ISS allow hedge fund clients to purchase Special Situations Research or other services at the same time that ISS is recommending for or against a pending merger, buyout, or proxy fight in which the hedge fund has an interest?"*

Yes.

➢ *"Please provide a record of each instance of proxy voting advice that your company or any regulatory body has determined constituted or may have constituted a conflict of interest over the last 10 years, and all related documents and communication. If no such record is maintained, please explain why."*

ISS is not aware of any instance in which a proxy research report or a vote recommendation was compromised by a conflict of interest, nor any instance where a regulatory body has reached that conclusion. As discussed at length above, ISS has worked hard to identify potential conflicts of interest and taken concrete steps to manage and mitigate those potential conflicts so that they do not impact the efficacy or integrity of our research and recommendations. We are heartened by the fact that the most vocal critics of ISS on this point are those who speak on behalf of corporate management, and not the investors who rely on ISS' research and vote recommendations. We see this as a strong indication that we are managing this potential conflict extremely well.

➢ *"Please provide a list of all outside entities from whom you obtain information referring or relating to your proxy voting advice, and descriptions of any evaluations that are performed to ensure such information is accurate and that*



**Institutional Shareholder Services Inc.**
1177 Avenue of Americas, 2nd Floor
New York, NY 10036
T: +1.646.680.6300 | F: +1.646.417.6090

*the information provider does not have a conflict of interest with the company with respect to which the information is being provided."*

As explained above, ISS' approach is to use and rely only upon publicly available information in the preparation of our proxy research reports and vote recommendations. The primary source of that information is the public filings of the companies that we cover, meaning, for U.S. companies, the proxy statement and other reporting materials that companies are required to file with the SEC, supplemented by press releases, information from a company's website and other generally accessible information. ISS also uses a small number of third-party vendors to provide standardized financial information and securities identifiers. ISS submits that this approach fully complies with our fiduciary duty of care described above.

➤ *"We are interested in whether you disclose two other types of conflict of interest. The first of these two conflicts involves cross-ownership, where owners or executives of your firm may have a significant ownership interest in, or serve on the board of directors of entities that have proposals on which the firm is offering vote recommendations. The second conflict involves other financial interests by your owner, Genstar Capital."*

➤ *"Are you disclosing these financial or business relationships when they involve or include a proponent or an active supporter of matters in which you are making voting recommendations?"*

ISS' executives, like all of our employees, are required to disclose to ISS and ISS will, in turn, disclose to our clients any significant (or material) ownership interest that an executive might have with regard to a company on which we are providing proxy research coverage.[24] ISS' executives are not permitted to sit on the Board of Directors of a public company except in extremely limited circumstances and only with the approval of ISS' General Counsel and the company's senior management. No such exceptions are currently in effect and so no ISS employee currently serves as a director of a public company.

ISS is a privately-held company, whose ultimate owner is affiliated with Genstar Capital, a private equity firm. ISS has adopted a Policy on Potential Conflicts of Interest Related to Genstar Capital and its affiliated funds (the "Genstar Policy"). Among other things, the Genstar Policy provides that Genstar persons (defined as Genstar directors and certain others) may not participate in the formulation, development and application of ISS voting policies, and will not have access to any data relating to the portfolio, investment strategy or securities holdings of ISS clients. In addition, as a private equity firm that owns or controls a number of operating companies, some of which may become publicly traded, and may thereafter be the subject to ISS research, we recognize that actual or potential conflicts of interest, or the appearance of conflicts, could arise in the production by ISS of research with respect to coverage of such a Genstar company (what we refer to as a "Genstar Affiliated Company"). ISS therefore provides disclosure of these relationships on its website, and includes information about any such relationship in the research report for any issuer that happens to be a Genstar Affiliated Company. Currently, there are no Genstar Affiliated Companies.

**Pertinent Legislation before the Senate Banking Committee**

Finally, we want to reiterate our strong view that both of the pertinent legislative proposals before the Senate Banking Committee – H.R. 4015, "The Corporate Governance Reform and Transparency Act," and Subtitle Q of Title IV under H.R.10, "The Financial CHOICE Act" (FCA) – are misguided attempts to improve corporate governance. Each of these proposals would only deepen your concerns about industry competition and conflicts of interest. Each proposal would eliminate a proxy adviser's existing fiduciary duties of care and loyalty to investors, the owners of the companies in which they invest, and would infuse a proxy adviser's operations with a new issuer-related conflict of interest that would be

---

[24] Note that the ISS Regulatory Code of Ethics requires all employees to provide the ISS compliance department with account statements for all securities investment accounts for the employees and members of their immediate families. Certain types of trades must be pre-cleared and ISS imposes black-out periods on trading of issuers whose proxies are currently being analyzed or acted upon by the company. This black-out period extends from the time ISS logs receipt of the subject proxy into the Global Research database of meetings, until one day after the shareholders' meeting being covered.



**Institutional Shareholder Services Inc.**
1177 Avenue of Americas, 2nd Floor
New York, NY 10036
T: +1.646.680.6300 | F: +1.646.417.6090

difficult to manage effectively. In this way, either bill, if enacted, would harm every shareholder who relies on independent research to make informed investment decisions.

Shareholders should have the right to choose the tools, services and information they need to make informed proxy voting decisions– without it being filtered through the management of the corporation in question. This is a fundamental tenet of corporate governance and it is why this bill is opposed by a number of large public sector pension fund managers, as well as many other institutional investors, including the CII, NCPERS, AFL-CIO, AFSCME and Teamsters to name a few.

The proposed new regulatory regime under both bills will do nothing to enhance competition in the industry. Indeed, it may actually erect barriers to entry and make it more difficult for smaller industry participants to compete. The proposed regulatory regime is unnecessary, burdensome and would do nothing to enhance market competition or create market conditions conducive to new proxy advisors entering the market. CII wrote in its most recent opposition letter that the proposed regulatory regime would "**increase barriers** [emphasis supplied] to new entrants and potentially lead some current proxy advisory firms to exit the industry altogether."[25]

The National Conference on Public Employee Retirement Systems (NCPERS), the largest national, nonprofit public pension advocate whose members manage more than $3 trillion in pension assets, warned that the suggested regime proposes to "bypass free-market principles by authorizing the SEC to pre-qualify industry entrants based on a set of vague and highly subjective standards."[26] Such authority would likely provide the SEC – under this and future Administrations – with broad discretion to establish criteria to further restrict, not enhance, competition.

The litmus test for any federal intrusion into the free market is whether it targets a proven problem and seeks to address it cost-effectively. The proposed bill does not pass either test. As the foregoing discussion demonstrates, the investors who use proxy advisory services do not see the "problem" the proposed legislation purports to address. Furthermore, the bill's backers fail to provide any cost-benefit analysis to support the idea of supplanting a comprehensive and mature regulatory regime with a brand new scheme that will require several years of new SEC rulemaking only to end up with something that favors entrenched corporate interests over shareholders, freedom of choice, freedom of expression and free-market capitalism.

In conclusion, ISS appreciates the opportunity to answer your questions and underscore the rigorous regulatory system and internal compliance program under which we operate. If there is any additional information I can provide, please do not hesitate to contact me.

Sincerely,

Gary Retelny, President and CEO
Institutional Shareholder Services Inc.

---

[25] Letter from the CII to Sen. Michael Crapo, Chair of the Senate Committee on Banking, Housing and Urban Affairs and Sen. Sherrod Brown, Ranking Member of the Senate Committee on Banking, Housing and Urban Affairs (February 28, 2018) at 2.

[26] Letter from NCPERS to Sen. Michael Crapo, Chair of the Senate Committee on Banking, Housing and Urban Affairs and Sen. Sherrod Brown, Ranking Member of the Senate Committee on Banking, Housing and Urban Affairs (February 16, 2018) at 2.

**Except From ISS Email on Why They Are Suing the SEC**

If you are having trouble reading this email, <u>read the online version</u>.

CONTACT US



# Governance INSiGHTS

*Governance Data, Analytics, and News from Institutional Shareholder Services*

November 8, 2019

## CONTENTS

Special Situations Research

News Roundup

ISS Updates & Links

## Why We Are Suing the SEC

By Gary Retelny, President & CEO, Institutional Shareholder Services

The U.S. Securities and Exchange Commission in August issued an interpretation of a law Congress designed for those engaged in the solicitation of a proxy and applied it to the providers

of proxy advice. More recently, the SEC on Tuesday put forward draft rules that hold the potential to hinder our ability to provide timely and independent proxy advice to our clients.

The changes embodied in the August interpretation and the proposed rulemaking — which was pushed forward despite widespread objections to its necessity and legality — will disrupt the system for proxy voting, in place for many years, and likely harm the very investors the SEC is charged with protecting. The commission's action will tilt the scales in favor of company management and degrade the important gains in corporate governance achieved since the days of Enron, WorldCom, and the financial crisis. In order to prevent this, Institutional Shareholder Services was left with only one option: to file a lawsuit challenging the interpretation.

The SEC's so-called proxy adviser reform seems to be driven by a concerted effort of corporate interests and their Washington lobbying groups to tamp down the voice of their shareholders. And the support for this business-backed campaign is simply lacking in truth.

Throughout the course of this debate, much rhetoric and misinformation has taken hold. Public companies, the subjects of proxy adviser research, have long advocated for new rules that will muffle dissent from their shareowners on corporate governance matters.

The problems they cite, for example, that proxy advisory reports are rife with errors, are simply not accurate and, critically, have been rightly debunked by the very institutions that pay for proxy advisory services.

It is against this backdrop that we were forced to take legal action to protect the rights of shareholders as well as our independent services to them. Our lawsuit makes clear that the SEC inappropriately altered the regulatory regime applicable to the voting advice provided by proxy advisory firms and that the new interpretation is unlawful.

Specifically, the SEC contends that voting advice provided by proxy firms is a "solicitation" under federal proxy rules. If allowed to stand, the August interpretation would effectively treat the advice proxy advisers provide to their fee-paying clients in the same way that the SEC treats proxy solicitations (meaning the communications, most typically made by the boards and management of public companies, advocating that shareholders vote in support of the position favored by the person doing the solicitation). In contrast, proxy advice is a specialized form of investment advice rendered for a fee at the direction, and in the best interest, of our institutional investor clients. As such, proxy advice is the antithesis of a "solicitation" under the securities laws.

Unlike a person or firm engaged in a proxy solicitation, ISS is indifferent with respect to the ultimate outcome of a shareholder vote and does not seek to achieve a certain result. Our goal in providing analysis and recommendations is to inform and empower our clients, sophisticated institutional investors, to vote their shares the way they see fit, knowing that they are free to follow our recommendations or not. Because proxy advice is not proxy solicitation, we believe the SEC's recent interpretation is contrary to law.

ISS does not object to SEC oversight of its activities. Nor does ISS object to transparency. Indeed, ISS has been registered with the SEC as an investment adviser for more than 20 years. In this capacity, ISS has assumed fiduciary duties of care and loyalty to our investor clients; transparency is a hallmark of these duties.

Investors hire us because they know we strive to be unbiased and transparent, and because we provide services that they value and deem to be cost-effective. It speaks volumes that the institutional investors that hire proxy advisers are not the ones calling for new rules. Even the SEC's investor advocate unit has cautioned against these actions. The Council of Institutional Investors and others have also called on the SEC to correct its course.

The decision to sue our regulator was not taken lightly, but the stakes are too high. Our lawsuit is designed to protect the balanced and well-functioning relationship between proxy advisers and their clients. This relationship supports an efficient system for proxy voting for the benefit of millions of shareholders who are invested in publicly traded companies.

*A version of the foregoing was featured November 4, 2019, in the Financial Times and is available here.*

*Back to top*

**[ADDITIONAL ARTICLES OMITTED FOR LENGTH]**

**For questions, comments or suggestions, email**
publications@issgovernance.com

**ABOUT THIS PUBLICATION**

Drawing on ISS' Data Desk, Governance Insights delivers news and analysis of corporate governance developments, including insights and reporting found in no other media, on a periodic basis. While we exercise due care in compiling this newsletter, we assume no liability with respect to the consequences of relying on this information for investment or other purposes.

**ABOUT ISS**

Founded in 1985 as Institutional Shareholder Services Inc., ISS is the world's leading provider of corporate governance and responsible investment (RI) solutions for asset owners, asset managers, hedge funds, and asset service providers. ISS' solutions include: objective governance research and recommendations; RI data, analytics, advisory and research; end-to-end proxy voting and distribution solutions; turnkey securities class-action claims management (provided by Securities Class Action Services, LLC); and reliable global governance data and modeling tools. Clients rely on ISS' expertise to help them make informed corporate governance and responsible investment decisions. For more information, please visit www.issgovernance.com.

This document and all of the information contained in it is the property of institutional Shareholder Services Inc. ("ISS") or its subsidiaries. The Information may not be reproduced or redisseminated in whole or in part without prior written permission of ISS. ISS MAKES NO EXPRESS OR IMPLIED WARRANTIES OR REPRESENTATIONS WITH RESPECT TO THE INFORMATION.

**Immediate Change in Proxy Voting Following the
Release of the ISS Recommendation**

Years Showing the Impact of Automatic Voting Have Been Bolded.

**Advisory Vote to Approve Executive Compensation**

| Year of Annual Meeting | ISS Recommendation | First Day Change in Vote |
|---|---|---|
| 2019 | FOR | +1.5% |
| 2018 | AGAINST | **-17.3%** |
| 2017 | AGAINST | **-15.3%** |
| 2016 | FOR | +2.7% |
| 2015 | FOR | +2.2% |
| 2014 | FOR | -0.2% |
| 2013 | AGAINST | **-17.5%** |
| 2012 | AGAINST | **-17.1%** |

## Comparison of ISS' 2019 Recommendations on ExxonMobil in the Benchmark and Specialty Reports

Differences against the Benchmark Report Have Been Bolded.

| Proposals | Benchmark | SRI/ Sustainability/ Catholic Faith-Based | Taft-Hartley/ Public Pension |
|---|---|---|---|
| Director 1 | FOR | FOR | FOR |
| Director 2 | FOR | **AGAINST** | **AGAINST** |
| Director 3 | AGAINST | AGAINST | AGAINST |
| Director 4 | FOR | FOR | FOR |
| Director 5 | FOR | FOR | FOR |
| Director 6 | FOR | FOR | FOR |
| Director 7 | FOR | FOR | **AGAINST** |
| Director 8 | FOR | **AGAINST** | **AGAINST** |
| Director 9 | FOR | FOR | FOR |
| Director 10 | FOR | **AGAINST** | **AGAINST** |
| Ratify Auditors | FOR | FOR | **AGAINST** |
| Ratify Executive Compensation | FOR | FOR | FOR |
| Independent Chair | FOR | FOR | FOR |
| Special Meeting Bylaw | FOR | FOR | FOR |
| Board Matrix | FOR | FOR | FOR |
| Separate Climate Committee | AGAINST | **FOR** | **FOR** |
| Report on Petrochemical Operations | AGAINST | **FOR** | **FOR** |
| Report on Political Contributions | FOR | FOR | FOR |
| Report on Lobbying | FOR | FOR | FOR |



THOMAS P. DiNAPOLI
STATE COMPTROLLER

STATE OF NEW YORK
OFFICE OF THE STATE COMPTROLLER

110 STATE STREET
ALBANY, NEW YORK 12236

February 3, 2020

Vanessa A. Countryman
Secretary
United States Securities and Exchange Commission
110 F Street, N.E.
Washington, D.C. 20549

Re: Comments on Proposed Rule "Amendments to Exemptions from the Proxy Rules for Proxy Voting Advice" [Release No. 34-87457; File No. S7-22-19]

Dear Ms. Countryman,

I write as Trustee of the New York State Common Retirement Fund, which is the third largest public pension fund in the United States, with an estimated $210.5 billion in assets under management as of March 31, 2019. The Fund holds and invests the assets of the New York State and Local Retirement System on behalf of more than 1.1 million members and beneficiaries and pays over $1 billion per month in benefits.

I wholeheartedly disagree with the Commission's premise, analysis, and conclusions for this Proposed Rule, so I appreciate the opportunity to provide a detailed comment outlining my opposition.[1] I hope that after the Commission completes its review and analysis of these comments and others that have been submitted, it finds that the Proposed Rule is unnecessary.

---

[1] As I communicated back in November, the Fund, and numerous other investors, requested additional time to comment on this proposal. In combination with the SEC proposal on "Requirements and Resubmission Thresholds under Exchange Act Rule 14a-8," such dramatic and controversial changes to the proxy process require additional time for all parties to provide comprehensive comments. Letter from New York State Comptroller Thomas P. DiNapoli to Chairman, Jay Clayton, Securities and Exchange Commission (November 18, 2019) https://www.sec.gov/comments/s7-22-19/s72219-6468376-199333.pdf.

**General Comments About the Proposed Rule**

I strongly oppose the Commission's current Proposed Rule to define the distribution of voting recommendations, related research and analysis by proxy advisors as a "solicitation" under the Securities Exchange Act of 1934. The Fund has long opposed rulemaking and legislation that would jeopardize the timely and independent research and voting recommendations we receive to assist us with casting proxy votes at our portfolio companies.[2] If enacted, this Proposed Rule, will unnecessarily interfere in the privately ordered relationship between investors and their advisors in a way that will increase costs, inject complexity, and possibly tilt voting recommendations toward management preference rather than a balanced analysis of the merits of an issue.

The premise of this Proposed Rule is that there is a "risk of proxy voting advice businesses providing inaccurate and incomplete voting advice."[3] However, the Commission has presented no actual evidence that proxy advisor clients are currently receiving inaccurate and incomplete voting advice. Furthermore, the Commission's purported evidence for inaccurate and incomplete voting advice is based solely on anecdotal information from registrants, analyses based upon flawed methodologies, and mischaracterizations of proxy research "errors."

For example, page 96 of the Proposed Rule includes a table with the total number of occasions on which registrants filed additional definitive proxy materials in response to proxy voting advice in calendar years 2016, 2017, and 2018. The Commission concludes that 150 filings indicated particular "errors" with proxy voting advice. At the time of submitting this letter, the Commission has failed to provide the analysis associated with the underlying data of this table. Without this analysis one is unable to conduct an independent review of these "errors."[4] It is therefore unclear whether the Commission found actual "errors" or simply issues on which company management disagreed with analyses or methodologies.

The Commission's methodology in assessing "factual errors" and "analytical errors" may contain the same flaws as the methodologies of groups representing corporate CEOs and other executives who have examined this topic. For example, the most cited "analysis" of proxy voting advice errors conducted by the American Council on Capital Formation (ACCF) is highly inaccurate and misleading. According to an analysis by the Council for Institutional Investors (CII), "most of the claimed "errors" actually are disagreements on analysis and methodologies, and that some other alleged proxy advisory firm errors derive from errors in the company proxy statements," and "...in some cases, ACCF simply misstates what the company said."[5] However, even accepting the Commission and ACCF methodologies would not support the Proposed Rule as the results would show that 99.99% of proxy advisor reports over both

---

[2]Letter from New York State Comptroller Thomas P. DiNapoli to Chairman, Jay Clayton, Securities and Exchange Commission (November 13, 2018) https://www.sec.gov/comments/4-725/4725-4646620-176466.pdf.
[3] Page 11 of Proposed Rule.
[4]Letter from Glenn Davis, Council of Intuitional Investors to SEC Office of FOIA Services (November 14, 2019) https://www.cii.org/files/issues_and_advocacy/correspondence/2019/20191114%20CII%20FOIA%20request%20to %20SEC(1).pdf; Letter from Glenn Davis, Council of Intuitional Investors to SEC Office of FOIA Services (December 31, 2019).
https://www.cii.org/files/issues_and_advocacy/correspondence/2019/20191231%20CII%20Appeal%20for%20Disp ute%20Resolution.pdf.
[5]Letter from Kenneth A. Bertsch, Council of Intuitional Investors to SEC Chairman and Commissioners (October 24, 2019).
https://www.cii.org/files/issues_and_advocacy/correspondence/2019/20191024%20SEC%20comment%20letter%20 proxy%20advisor%20accuracy.pdf.

examination periods had no errors, because the main concerns voiced by registrants are not "errors," but disagreements on analysis and methodologies. These legitimate disagreements are proper grounds for discussion and debate among investors, their proxy advisors, and issuers; they should not be the basis for justifying the adopting of this Proposed Rule.

Proxy advisors have every incentive to conduct credible research and provide accurate recommendations—their clients seek accurate advice and proxy advisors compete to provide it. Additionally, as CII noted in its October 15, 2019, letter, "[p]roxy advisors' business model depends on factual accuracy and their incentives are thus aligned with issuers and institutional investors alike."[6] While, like every other human enterprise, proxy advisors are not perfect, when they make errors, their business interests compel them to immediately correct them and notify their clients. However, there is no real evidence—as opposed to anecdotal accounts and mischaracterizations of disagreements with management as proxy research "errors"—of an accuracy problem warranting government intervention.

**Potential for Increased Litigation**

The Proposed Rule's codification of the Commission's interpretation of "solicitation" as it relates to proxy voting advice may introduce new litigation risks for proxy advisors. If this Proposed Rule is adopted, one could readily imagine a case where an issuer may threaten legal action against a proxy advisor because they believe the information provided in the recommendation is false. This litigation risk will increase due-diligence and legal costs for these companies which we may safely assume would be passed on to their investor clients. This threat of litigation could force a change in the recommendation simply to avoid legal fees, or a delay in the timeliness of the research. In both instances, the proxy advisor's clients would be adversely impacted, either by losing the independence and timeliness we expect of proxy advisors or by added legal costs that will be passed on to investor–clients.

**Problematic "Prepublication Review"**

Among its several troubling provisions, the Proposed Rule would require that proxy advisors give issuers two chances to review proxy research before it is sent to investor–clients like the Fund. This would give issuers outsized influence and place a barrier between independent researchers and their paying customers. It would significantly disrupt the proxy voting system by introducing new litigation risks for proxy advisors, increasing the cost of their services, imposing severe time constraints on the production of reports, and effectively commandeering the proxy advisory firms to provide an additional platform for companies' views, which are already communicated by companies to shareholders in several other ways.

The Fund, like other institutional investors, retains proxy advisors in order to obtain cost-efficient, informed, and independent research, analysis, and advice. The independence of that advice is absolutely essential, and if proxy advisors are required to obtain issuer review and include reference to issuer objections before releasing their research to investors, that independence would be compromised,

---

[6] Letter from Council of Institutional Investors' members to SEC Chairman and Commissioners (October 15, 2019) https://www.sec.gov/comments/4-725/4725-6308155-193468.pdf.

depriving investors of a vital resource. These concerns were also noted by Commissioner Robert Jackson in his November 5, 2019, dissenting statement.[7]

Another concern with "prepublication review" is that it treats proxy advisors differently than independent research analysts. FINRA Rule 2241, which was approved by the Commission as in the public interest, guards against issuer influence that could impair analysts' independent research. This safeguard was established in order to, as the Commission has explained, "help protect research analysts from influences that could impair their objectivity and independence."[8] Additionally, Commission Investor Advocate Rick Fleming stated that the Commission has been "reluctant to allow companies to influence the research provided to investors" by stock analysts.[9] However, the Proposed Rule takes the opposite approach and requires proxy advisors to allow issuers to review their recommendations and research twice before a client receives it. If the Commission proceeds with this Proposed Rule, an analyst and a proxy adviser could write a report on the same company and the analyst would violate the securities laws by showing it to the company in advance and the proxy advisor would violate the law if it did not show it to the company in advance. This scenario confounds logic and the Commission has provided no rationale as to why proxy advisors should be held to a different standard from analysts.

The Proposed Rule also fails to address First Amendment concerns with "prepublication review." As the Commission itself recognized in exempting proxy advice from the notice and filing requirements of the proxy rules in 1992, "[a] regulatory scheme that inserted the Commission staff and corporate management into every exchange and conversation among shareholders, their advisors and other parties on matters subject to a vote certainly would raise serious questions under the free speech clause of the First Amendment." Nothing has changed in the free speech clause nor the law of the First Amendment that would suggest a different conclusion today. These "serious questions" are even more grave under the Proposed Rule because it seeks not only to limit speech, but to *compel* speech by requiring proxy advisors to publish companies' replies to their reports. Additionally, the "prepublication review" period may pressure proxy advisors to gloss over their initial differences of opinion with company management, resulting in silencing or concealing initial differences of opinion from the view of clients. This could deprive these clients of access to information. As written, the Proposed Rule would not require clients of proxy advisors to give investors the benefit of knowing about the exchange between advisors and issuers. This would be a substantial loss to investors without any tangible benefit to them and may not lead to more accurate information, but less information. In the end, investors will ultimately have access to fewer points of view, while gaining no offsetting benefit.

Lastly, "prepublication review" may not even work in practice. As prominent corporate governance expert Robert Lamm has noted: "[G]iven the concentration of shareholder meetings in the late first/second quarters, getting draft reports to companies and fielding their comments is already a struggle, even though only larger companies are currently favored with draft reports . . . If advisory firms have to

---

[7]Robert J. Jackson, Jr., SEC Commissioner, Statement on Proposed Rules to Restrict Shareholder Voting (November 5,2019) https://www.sec.gov/news/public-statement/statement-jackson-2019-11-05-open-meeting#_ftn4, footnote [5].
[8]SEC Approves Consolidated Rule to Address Conflicts of Interest Relating to the Publication and Distribution of Equity Research Reports https://www.finra.org/rules-guidance/notices/15-30.
[9] Rick Fleming, SEC Investor Advocate, Remarks at SEC Speaks: Important Issues for Investors in 2019 (April 8, 2019) https://www.sec.gov/news/speech/fleming-important-issues-investors-2019.

provide drafts to every company, it's not clear whether or how they will be able to do this."[10] The logistical challenges would be compounded by distracting and unproductive disputes about proxy advisors' recommendations between proxy advisory firms and issuers.

**The Costs of the Proposed Rule Have Not Been Accurately Accounted For**

In terms of the potential increase in costs, I believe the Commission failed to adequately assess and reasonably estimate the costs, for both proxy advisors and their clients, associated with this Proposed Rule. The Proposed Rule's "Costs" section admits this deficiency as it is littered with statements such as "unable to provide quantitative estimates," "unable to quantify this potential cost," and "we lack the data necessary to quantify." Before imposing far-reaching regulatory burdens, the Commission should provide an adequate accounting of costs. I expect that the direct costs of the Proposed Rule to proxy advisors would be passed on to investors like the Fund.

For example, the Commission's cost–benefit analysis inexplicably assumes that, on average, only one-third of U.S. companies would be subject to proxy advisory reports each year, or 1,897 registrants, with one report per registrant. This suggests the Commission was unaware that proxy advisor business models generally require them to cover all companies their clients are invested in, and many institutional investors have widely diversified portfolios.

For example, on January 7, 2020, Glass Lewis & Co (Glass Lewis) submitted a comment letter on the Proposed Rule.[11] In the comment, Glass Lewis states that it issued 5,565 proxy research reports on U.S. companies in 2018. The letter states, "[T]he Commission's summary assertion of a 250 burden hour annual, [sic] ongoing estimate for proxy advisors is entirely unexplained, unsupported by any of the necessary estimates to begin to properly estimate the total burden, and is vastly understated." Glass Lewis concludes that its preliminary, rough estimate of its annual ongoing burden under the proposed rules would be 240 times larger than the Commission's estimate. Therefore the Commission's estimate that proxy advisory firms on average would have to expend a total of 250 hours per year on all additional requirements imposed under the new regulation fails to accurately express the costs and burdens borne by proxy advisors.

Additionally, in his November 5, 2019, dissenting statement, Commissioner Robert Jackson wrote, "[B]ut the real costs of today's new regime lie in considering the issuer's feedback, including the issuer's response in the proxy advisor's report, and facing litigation from an issuer angry about the methodology used to provide anti-management advice . . . and for present purposes I make the unremarkable assumption that corporate managers reviewing a friendly proxy-advisor recommendation will not impose these costs on the advisor issuing that opinion."[12]

Another concern I have with the Proposed Rule is that it may create new barriers to entry in what has historically been an industry with few competitors. Currently in the U.S. market, the proxy advisor

---

[10] Garry Larkin, The Conference Board, On Governance: What Does the Latest SEC Guidance Mean for Proxy Advisors, Companies? (August 26, 2019) https://www.conference-board.org/blog/postdetail.cfm?post=7124.

[11] Letter from Nichol Garzon-Mitchell, General Counsel, Glass Lewis to Alex Goodenough, Policy Analyst, Office of Management and Budget (January 7, 2020) https://www.sec.gov/comments/s7-22-19/s72219-6617071-202957.pdf.

[12] Robert J. Jackson, Jr., SEC Commissioner, Statement on Proposed Rules to Restrict Shareholder Voting (November 5,2019) https://www.sec.gov/news/public-statement/statement-jackson-2019-11-05-open-meeting#_ftn3, footnote [3].

industry is concentrated in two firms: Institutional Shareholder Services (ISS) and Glass Lewis. Those who support further regulation around proxy advisors have long expressed their discontent with this "duopoly." While I believe more competition in the industry would help improve the services provided by proxy advisors, the Proposed Rule may lead to further consolidation in the industry—increasing the market share and power of the largest firms.[13] The Commission's Proposed Rule may lead to increased costs and regulatory burdens that could exacerbate the situation, while providing no clear benefit to investors. Furthermore, these costs and burdens may potentially drive some proxy advisory firms out of business, possibly leaving a true monopoly in the industry.

The Commission has dedicated numerous resources and time to identifying problems with the proxy process, including convening a Proxy Roundtable with an entire panel devoted to proxy advisors. While I appreciate the Commission's work on these important issues, it has failed to take into account the views expressed during that Roundtable. For example, at the end of the Roundtable when the Commission staff asked if proxy advisory firms needed additional regulation, no panelist—including those speaking on behalf of the issuer community—voiced any need for new regulations. Following this, a Commission staff member said: "I can't believe . . . is there anyone on the panel [who] thinks there should be additional regulation? I haven't heard it yet, and I'm kind of surprised." Despite this consensus around the lack of need for further regulation, the Commission proceeded to publish the Proposed Rule, notably omitting the lack of response to that staff member's question.

I have a responsibility to vote proxies with diligence and integrity and in the best long-term interests of the System's participants and beneficiaries. Therefore, it is inappropriate for company management to be interposed between our investment officers and our research service providers.

**About the Fund's Proxy Voting Program**

Because the Proposed Rule contains incorrect assumptions about the proxy voting process and the experience of investors generally, I wish to provide the Commission with a brief description of the Fund's proxy voting program. I hope this information will allow the Commission to correct some of its errors regarding investors' experience with the proxy voting process.

The Fund's purpose is to ensure the availability of funds to pay public employee pensions through a balanced investment strategy and a focus on long-term, sustainable returns to provide the System's beneficiaries with a secure pension through prudent asset management. The Fund's public equities portfolio was valued at $113.3 billion as of March 31, 2019, included over three thousand public companies and represented 48.7% of the Fund's total portfolio. The public equities allocation relies on broad passive index funds.

Consistent with my fiduciary duty, I am responsible for safeguarding the Fund's investment portfolio. An essential component of safeguarding the Fund's investments is voting the proxies for the public companies in which the Fund invests and encouraging best corporate governance and sustainable business strategies to reduce risks and realize strong returns. The Fund's use of broad passive indexes means that we are invested in a large number of companies and sectors in the economy.

The Fund believes that proxy voting is an effective means to communicate with boards of directors and management on environmental, social and governance issues as these issues impact the sustainability,

---

[13] Tao Li, Outsourcing Corporate Governance: Conflicts of Interest Within the Proxy Advisory Industry (July 15,2018) https://papers.ssrn.com/sol3/papers.cfm?abstract_id=2828690.

value and performance of companies. As a result, the Fund has adopted ESG Principles and Proxy Voting Guidelines (Guidelines)[14] which provide guidance on voting practices to Fund staff, its managers, and portfolio companies, and also to other corporate engagements and policy initiatives. Fund staff reviews these Guidelines biennially to address new issues and refine positions based on updated research. The Fund makes its votes available annually on its website and releases an annual Corporate Governance Stewardship Report, which summarizes the Fund's voting during the year.[15]

Proxy voting decisions are based on reviews of available information relating to items on the ballot at each portfolio company's annual and special meetings. The Fund staff analyzes a variety of materials from publicly available sources, including but not limited to: Commission filings, analyst reports, relevant studies and materials from proponents and opponents of shareholder proposals, third-party independent perspectives and studies, and analyses from corporate governance data and proxy research providers.[16]

Because of the scope of the Fund's public equity portfolio, the Fund largely votes by proxy, instead of attending annual and special meetings in- person. The Fund votes on each proposal at annual and special meetings of all its U.S. public equity companies, as well as selected international companies. Accordingly, in 2019, the Fund voted by proxy on 28,322 total ballot items at 3,273 total meetings.

**Fund's Total Number of Meetings and Ballot Items Voted 2017–19**

| Proxy Voting | 2017 | 2018 | 2019 |
|---|---|---|---|
| Meetings | 3,249 | 3,198 | 3,273 |
| Ballot Items Voted | 29,848 | 27,701 | 28,322 |

Like many institutional investors, the Fund must manage voting at thousands of shareholder meetings each year. Even with the assistance of our proxy advisory firms, this is a challenging endeavor that requires a significant investment of staff time and resources. This is compounded by the compressed nature of the season; seventy-seven percent of all U.S. proxy votes are cast between March and June. Because of this, the Fund finds it vastly more efficient to hire proxy advisory firms to assist with proxy research than to conduct this research with Fund staff. As we discuss in greater detail below, the Fund utilizes a proxy advisor's proxy voting platform and rules-based voting, which are customized to the Fund's Guidelines. This is the most efficient and cost-effective way to vote the Fund's proxies.

---

[14] New York State Common Retirement Fund's Environmental, Social & Governance Principles And Proxy Voting Guidelines, https://www.osc.state.ny.us/pension/proxyvotingguidelines.pdf.
[15] Office of the New York State Comptroller, Corporate Governance, https://www.osc.state.ny.us/pension/corporategovernance.htm.
[16] The Fund contracts with several corporate governance data and proxy research providers including Glass Lewis and ISS.

**Fund's Total Ballot Items Voted by Month in 2017–19**

| Month | 2017 | 2018 | 2019 |
|-------|------|------|------|
| January | 848 | 851 | 536 |
| February | 644 | 502 | 691 |
| March | 835 | 1,335 | 670 |
| April | 8,318 | 8,337 | 4,219 |
| May | 11,050 | 10,426 | 13,388 |
| June | 4,442 | 2,783 | 5,306 |
| July | 997 | 780 | 660 |
| August | 538 | 634 | 542 |
| September | 571 | 537 | 551 |
| October | 556 | 623 | 514 |
| November | 670 | 587 | 717 |
| December | 379 | 306 | 528 |

As mentioned above, Fund staff spends a considerable amount of time reviewing information and researching different sources to inform its decision on voting each ballot item, all within the abbreviated timeframe between the release of a company's proxy and its voting deadline. In 2019, the Fund on average submitted its vote approximately 15 days ahead of the voting deadline.

Some ballot items require a more detailed analysis, including evaluating corporate actions, controversial directors, company mismanagement or underperformance, say-on-pay, and new shareholder proposals. In 2018, the Fund conducted detailed analysis on 8,309 ballot items, approximately 30 percent of all ballot items voted. Additionally, in 2018, the Fund conducted a review of 18,863 items, approximately 70 percent of all ballot items voted.

The idea that the investors like the Fund could fully review and research every ballot item with in-house staff is daunting, to say the least, especially given the compressed time frame during which most of the voting occurs. Therefore, the Fund relies on proxy advisory firms to provide this research. The Proposed Rule fails to consider the cost of reduced access to these services that may foreseeably result from the Proposed Rule.

Put simply, we rely on proxy advisors to do this research in a manner that can spread costs over a large group of investors because it saves a great deal of money. Since it is reasonably foreseeable that, under the Proposed Rule, the proxy advisors' research will be—at the very least—sometimes late or influenced by management preferences as a result of this Proposed Rule, the Commission must consider these costs that will be borne by investors who will have to independently research potentially thousands of ballot items if proxy advisors' research is no longer considered reliably independent or available timely.

As mentioned above, the Fund independently votes its proxies according to its Guidelines and uses proxy research to help supplement our own internal research. By no means is proxy research the only resource the Fund uses to inform its voting decision. As referenced above, the Fund also analyzes a variety of materials from publicly available sources.

Since 2011, the Fund has used a proxy voting platform to facilitate its proxy voting function. In using the electronic platform, all of Fund's ballots are "prepopulated" in accordance with our own

Guidelines. In advance of each proxy season, Fund staff performs a review to ensure that the prepopulated voting instructions match the Fund's Guidelines.

Furthermore, the Fund manually votes a variety of proxy ballots at approximately 800–1,000 companies a year. In advance of each proxy season, the Fund develops various criteria of companies or proxy items that will require manual votes.

## Fund's Current Proxy Voting Timeline

In order to shed additional light on the process of voting from the perspective of an investor, I would like to describe the Fund's proxy voting process.

The Fund's proxy advisor will prepopulate all ballots following the publishing of its research and voting recommendation. This allows for our proxy advisor to accurately prepopulate the ballot in accordance with our instructions (the Proxy Voting Guidelines). The Fund's voting deadlines are one day prior to the meeting dates, which ensures proper transmission of our voting position.

Aside from the proxy voting mechanics itself, the Fund looks to proxy advisors to provide detailed research, analysis and voting recommendations about companies through their online platforms. The proxy advisors provide information about the companies' businesses, including ESG aspects. While the Fund's Guidelines are paramount in deciding how to vote, proxy advisors' information may be used to inform the Fund's analysis of the proxy ballot.

I am extremely concerned about the practical and financial impacts of the Proposed Rule on the Fund's proxy voting program. As discussed above, in 2019, the Fund on average submitted its vote approximately 15 days ahead of the voting deadline. Additionally, the Fund receives proxy research on average 23 days before an issuer's meeting. Under the Commission's Proposed Rule, issuers could be provided up to seven business days to conduct both the "review and feedback" and the "final notice of voting advice" periods.

Further, proxy advisors would need additional time to conduct their review and address issuer feedback. ISS has concluded this could add an additional two to three calendar days to the process. Overall, ISS has claimed that if the Proposed Rule were adopted, this would result in a nine to thirteen calendar day delay (eleven days on average) in the publication of reports to clients.[17] One could assume other proxy advisors would face similar delays to its publishing of proxy research and recommendations.

If a company used both periods, this could result in a delay of up to thirteen days in the voting process. This would limit the timeframe to review and consider the Fund's votes, while pushing our vote execution date right up to the voting deadline. If Fund staff spent a week researching and determining its voting position, which is not uncommon (for example, in corporate actions or contested elections), **this delay would mean the Fund would have only 2 days before the voting deadline.** As a result, the Fund may have to expedite its review period in order to complete it in a shorter timeframe, consider eliminating aspects of its review, or further automate its voting.

---

[17] ISS also states: "This estimation is not inclusive of the time that would be required to negotiate confidentiality agreements with all issuers and to coordinate issuer hyperlinks for inclusion in reports and in platform delivery systems. It also does not include any estimate for the considerable additional administrative requirements to manage the various different timeframes and number of draft reviews dependent on issuer proxy filing dates under the proposed rules."

These unpalatable options fly in the face of the Commission's recent "Commission Guidance Regarding Proxy Voting Responsibilities of Investment Advisers," which sets out the responsibilities of investment advisors with respect to their proxy voting and the advice they receive in preparation for voting.[18] On one hand, the Commission is demanding more diligence over the proxy voting process for investment advisors; on the other, the Commission is proposing rules that would constrict the timeframe for which shareholders would have the ability to review, research, and determine its vote in the best interests of its clients. This tension serves no beneficial purpose and only serves to injure shareholders by increasing cost and limiting access to information and guidance.

**"Excessive" Influence of Proxy Advisors**

I would also like to address the arguments made by some issuers and their lobbyists and trade group representatives that proxy advisors have excessive influence over proxy voting and their clients vote in "lockstep" with their recommendations. As stated above, the Fund votes its proxies independently, in accordance with its Guidelines, and in the best interest of its members and beneficiaries. Furthermore, when our proxy advisor prepopulates the Fund's ballots in their proxy voting platform, they do so based on the Fund's Guidelines, not the advisor's recommendations.

While supporters of this Proposed Rule contend that investors vote in "lockstep" with their proxy advisors' advice, this is false. In 2019, the Fund voted with its proxy advisor recommendations 78.1 percent of the time on all ballot items (78.4 percent with recommendations on management proposals and 62.8 percent with recommendations on shareholder proposals).

Additionally, to understand how advisory firms do not exert undue influence generally over how institutional investors vote consider the following:

- In 2018, ISS recommended voting against say-on-pay proposals (SOP) at 12.3% of Russell 3000 companies. Just 2.4% of those companies received less than majority shareholder support on SOP proposals.
- In 2019, Glass Lewis recommended in favor of 89% of directors (the Fund voted in favor of 68% of directors) and 84% of SOP proposals (the Fund voted in favor of 73% of SOP proposals), while directors received average support of 96% and SOP proposals garnered average support of 93%.
- According to Proxy Insight, which analyzes the voting records and policies of over 1,800 global investors and is the world's leading source of information on global shareowner voting, "the number of investors delegating their entire policy and voting to a proxy voting advisor is actually very low—from a sample of 1,413 investors, 75% have their own dedicated proxy voting representing a significant 92% of the assets under management."[19]

Furthermore, academic research has concluded that while both ISS and Glass Lewis appear to have some impact on shareholder voting (estimated at 6%–10% of shareholder votes), supporters of this Proposed Rule often substantially overstate the extent of their influence.[20]

---

[18] Although the Fund is not an investment advisor, the SEC's description of proxy voting responsibilities is couched in the fiduciary duty those advisors have to their clients. Because that duty is at least analogous to the Comptroller's fiduciary duty as trustee, the steps recommended by the SEC are relevant considerations for the Fund.
[19] Letter from Proxy Insight to Brent Fields, Secretary, SEC (November 13, 2018) https://www.sec.gov/comments/4-725/4725-4636546-176444.pdf.
[20] Stephen Choi, Jill Fisch, and Marcel Kahan, The Power of Proxy Advisors: Myth or Reality? (January 1, 2010) https://scholarship.law.upenn.edu/faculty_scholarship/331/.

**Prepopulated and Automated Rules-Based Voting Mechanisms**

The Fund also has concerns with how the Proposed Rule describes automated voting and its inclusion of a "reasonable alternative" of disabling of prepopulated and automatic voting mechanisms. The Fund's rules-based prepopulated ballots and automated voting allows me to fulfill my fiduciary duty in the most efficient and cost-effective manner. As stated above, the Fund does not delegate any decision-making authority to its proxy advisory firm. Rather, our proxy advisor populates ballots with voting positions customized to the Fund's instructions (the Guidelines). In advance of each proxy season, the Fund performs a review to ensure that the prepopulated rules-based voting instructions for the proxy voting platform match the Fund's Guidelines. The Fund believes that employing an automated, customized prepopulation in no way compromises its independent voting or impedes its ability to conduct due diligence of its proxy voting.

The Fund's current proxy voting process is cost-effective and efficient. As mentioned above, if the Fund were required to review and execute all of its proxy votes, it would incur considerable cost. These are the potential costs to the Fund of disabling prepopulated and automatic voting mechanisms. The Commission should consider these costs and its impact on all institutional investors that seek cost-effective and efficient means for voting their proxies.

Another misconception around "automated voting" relates to the ability to modify votes following publication of research and prepopulation ballots. The Fund has the ability to change its vote at any point before a meeting. If the Fund staff acquires new information in supplemental proxy materials, corrections or additions to proxy research, or solicitations from other investors, Fund staff reviews the Fund's votes to ensure that its voting positions remain aligned with the Guidelines.

In addition to these general comments, I wish to share the following answers in response to several of your specific questions. Each of these comments should be considered in light of the fact that I believe no changes to proxy rules for proxy voting advice are necessary at this time.

**1. Should we codify the Commission interpretation on proxy voting advice and the Commission view about unprompted requests for proxy voting advice? Would the proposed codification (adding paragraph (A) to Rule 14a-1(l)(iii) and paragraph (v) to Rule 14a-1(l)(2)) provide market participants with better notice as to the applicability of the federal proxy rules?**

No, the Commission should not treat the proxy voting recommendations provided by proxy advisors to their clients in the same way that the Commission regulates a person or firm soliciting proxies. I believe the Commission is applying an extremely broad interpretation of solicitation; soliciting the authority to vote someone's shares by proxy is not remotely similar to providing research and recommendations under contract to shareholders about factual issues. When providing voting recommendations, proxy advisors do not seek to achieve a specific result and their recommendations can either be ignored or considered by their clients as the clients see fit. This is a completely different activity than an entity soliciting proxy votes for a specific outcome.

As mentioned in my general comments, the Proposed Rule's codification of the Commission's interpretation of "solicitation" as it relates to proxy voting advice, which thereby makes it subject to antifraud prohibitions under Rule 14a-9, will introduce new litigation risks for companies that provide

proxy voting research and jeopardize their independent research, which will ultimately be detrimental to shareholders who rely on this outsourced research.

**7. Is the text of proposed Rule 14a-2(b)(9)(i) sufficient to elicit appropriate disclosure of a proxy voting advice business's conflicts of interest to its clients? Are there other examples of conflicts of interest that the Commission should take into account in considering the text of proposed Rule 14a-2(b)(9)(i)? Is the principles-based requirement in Rule 14a-2(b)(9)(i)(C) sufficient to capture material information about conflicts of interest not otherwise included within the scope of paragraphs (9)(i)(A) and (B)? Is there additional material information that should be required?**

I believe the Commission's Proposed Rule is duplicative of current practices and would not deliver decision-useful information for assessing or making voting decisions.

**24. How prevalent are factual errors or methodological weaknesses in proxy voting advice businesses' analyses? To what extent do those errors or weaknesses materially affect a proxy voting advice business's voting recommendations? To what extent are disputes between proxy voting advice businesses and registrants about issues that are factual in nature versus differences of opinion about methodology, assumptions, or analytical approaches?**

As mentioned above, I do not believe factual errors or methodological weaknesses in proxy voting research are prevalent or warrant rulemaking. Analyses mentioned in the Proposed Rule are solely based on registrants' anecdotes, and they refer to situations which are not truly "errors", but, rather disagreements about analyses and methodologies. Where there are differences of opinion, debate should be encouraged to distill the truth instead of suppression of this exchange of ideas and pressure by government regulation compelling deference in favor of management views.

In the Proposed Rule, the Commission states that some private interests, such as some corporate issuers and their lobbyists and trade group representatives, raise issues with proxy advisors such as errors in published research. When one reviews the sources cited in the Proposed Rule, those sources fail to provide a reliable basis for concluding significant problems actually do exist. For example, the only issuer source noted by the Commission is a letter from the Exxon Mobil Corporation and in that letter, Exxon says it believes ISS already adequately fixes factual errors, and does so for market-driven reasons.

The Commission states that such problems "may" or "could" exist, but fails to demonstrate that more than a trivial number of factual errors have actually occurred, and the analysis does not show that any so-called "errors" were material to the outcome of an actual shareholder vote. Even if one accepts the possible methodological flaws mentioned in the Commission's analysis referenced above, the Commission's Investor Advisory Committee stated: "From over 17,000 shareholder votes over three years, the number of possible factual errors identified by companies themselves in their proxy supplements amounts to 0.3% of proxy statements—and none of those is shown to be material or to have affected the outcome of the related vote."[21] Additionally, the Commission has failed to evaluate and provide analysis regarding the significance of this 0.3% (or 3 out of every 1,000).

---

[21]Recommendation of the Investor-as-Owner Subcommittee of the SEC Investor Advisory Committee (IAC), Relating to SEC Guidance and Rule Proposed Rules on Proxy Advisors and Shareholder Proposed Rules 2 (Jan. 16, 2020) https://www.sec.gov/spotlight/investor-advisory-committee-2012/iac-recommendation-proxy-advisors-shareholder-proposals.pdf.

Furthermore, ISS has stated that its "error rate" was 0.62% in 2018 and 0.73% in 2019.[22] This led to 41 recommendation changes in 2018 and 48 in 2019. These error rates are exceptionally low and reveal that the Proposed Rule is a solution in search of a problem.

While investors demand accuracy and accountability in proxy voting research, this is already occurring through market-driven responses and private ordering. Investors, including the Fund, regularly engage with proxy advisors to survey the procedures for identifying and addressing errors. If these issues were systemic, as some may argue, clients would withdraw their business. Proxy advisors are incentivized to provide highly accurate proxy research with policies and procedures in place to address possible errors. This includes alerting clients when an error is found, explaining the correction in a specific written communication and on the front page of the research report, and allowing clients the ability for additional follow-up if they have further questions on the correction.

In fact, the Proposed Rule may create an incentive to *not* correct errors because of the risk of legal action by companies under Rule 14a-9. In a marginal case, the proxy advisor may err on the side of a minor error that favors management to avoid litigation, rather than further explaining nuances that could invite litigation from issuers.

Additionally, this burden is not solely on the shoulders of proxy advisors. Investors are also responsible for implementing internal controls to identify and mitigate possible proxy advisory firm errors. For example, the Fund has found occasional errors like incorrect names and genders of director nominees. When an error is found, the Fund communicates this to the proxy advisor and they typically correct their research report. Indeed, as remarked above, it already is in the advisors' business interests to do so.

Nevertheless, there is a clear difference between an "error of fact" and "methodological differences" or a "difference of opinion." For example, in ExxonMobil's comment letter, the company states: "Ultimately, we do not believe it is productive to discussions of shareholder value to argue over whether any particular issue falls into the 'errors of fact' category or the 'difference of opinion' category." Clients of proxy advisors contract with firms understanding their methodologies for evaluating various ballot items. Furthermore, many proxy advisors publicly report on their guidelines and how they assess proxy issues. As mentioned above, CII's analysis of the most cited "study" on proxy research errors found that most of the claimed "errors" actually are disagreements on analysis and methodologies.

One of the most frequently identified so-called "errors" in proxy research is analysis surrounding an issuers' peer group. The creation of a peer group is often a combination of fact and opinion because no two companies are exactly alike. Peer group selection can impact many facets of proxy research, including analysis regarding executive pay. While an issuer may disagree with a proxy advisor's determination of its peer group, investors benefit from hearing independent views about appropriate peer groups from a proxy advisor. Proxy advisors also make their policies for selecting peer groups public so all market participants can understand their approach.[23] The fact that issuers may disagree with proxy advisors about peer group selection, is not an adequate basis for asserting there are enough "factual errors" to warrant Commission action. Furthermore, a "prepublication review" period for issuers is not likely to address these "methodological differences" or "difference of opinion." These differences of

[22] As measured by post-publication "Proxy Alerts" to clients notifying them of a material error within a benchmark proxy research report that resulted in a change of a vote recommendation.
[23] Glass Lewis, Understand Glass Lewis' Approach to Peer Groups https://www.glasslewis.com/peer-groups/.

opinion are unlikely to be resolved by conversation between a proxy advisor and an issuer. The result would only be increased costs for clients without achieving any benefits for investors.

**25. As a condition to the exemptions in Rules 14a-2(b)(1) and 14a-2(b)(3), should registrants and certain other soliciting persons be permitted an opportunity to review proxy voting advice and provide feedback to the proxy voting advice businesses before the businesses provide the advice to clients, as proposed? If yes, how much time should be given to review and provide feedback on proxy voting advice? Are the timeframes set forth in proposed Rule 14a- 2(b)(9)(ii) appropriate? What would the impact of these proposed timeframes be on registrants, proxy voting advice businesses, and their clients? Are there alternative timeframes that would be more appropriate? Should we allow a proxy voting advice business to provide its final notice of voting advice to the registrant at any time after the registrant has provided its comments during the review and feedback period, regardless of whether the review and feedback period has expired? Are there alternative conditions to the exemptions that the Commission should consider to address the concerns regarding inaccuracies and the ability for investors to get information that is accurate and complete in all material respects?**

Issuers already have numerous venues to communicate with investors. For example, the Commission has noted that companies currently file supplemental proxy materials to counter proxy voting recommendations (however, it also said "the efficacy of this is uncertain"). These supplemental proxy materials are examples of "counter-speech," and the Commission offers no evidence or analysis for concluding that supplemental proxy materials are not an effective way for issuers to communicate their opinions regarding proxy voting recommendations. Additionally, the Commission states that while shareholders have the ability to change their vote prior to a meeting, the Commission believes this "seldom occurs." The Commission also states one explanation for this is the "inconvenience" shareholders face in changing a vote. As stated previously, the Commission has provided no evidence or analysis for concluding this. This is false and evinces the Commission's failure to understand of the process by which shareholders vote their proxies.

The Fund has the ability to withdraw its initial proxy vote and change its vote up until the voting deadline. As stated above, the Fund votes its proxies on average six days after initial proxy research is released. This provides the Fund time to conduct its own research, review proxy research, and in some cases consider issuers' supplemental proxies and possible corrections made to the proxy research.[24] Again, the Commission provides no reason or evidence to show that this process is not adequate to keep voting outcomes in line with what would occur but for the small number of possible factual errors that affect outcomes to begin with.

Another concern with the "prepublication review" period relates to the solicitation of votes. For example, if an issuer is able to preview and gain information regarding proxy advisors' recommendations as they relate to shareholder proposals, they can "game the system" using this information to devise a strategy for soliciting votes against a proposal before the proponent can even access the research. As discussed above, the Proposed Rule could severely shorten the time frame between publication of proxy

---

[24] As stated throughout this letter, the Proposed Rule would limit the time the Fund has to do this research. If the Proposed Rule is enacted, we may not be afforded appropriate time to conduct the requisite diligence before voting proxies following the release of proxy voting research.

advisors' research and the deadline to vote proxies. Because of this, the window for shareholders to file exempt solicitations highlighting or questioning proxy advisor recommendations would also be limited.

**26. Should the number of days for the review and feedback period be contingent on the date that the registrant files its definitive proxy statement? For example, should there be a longer period (e.g., five business days instead of three) if the registrant files its definitive proxy statement some minimum number of days before the shareholder meeting at which proxies will be voted, as proposed? Would registrants and other soliciting persons be likely to take advantage of the additional time by filing their definitive proxy statements early enough to qualify for this treatment?**

I do not believe the proposed timeframes related to the date that a registrant files its definitive proxy statement would compensate for the time that would be lost because of the "prepublication review" periods. It is the Fund's observation based on a sample of 2019 meetings that issuers file definitive proxy statements on the higher end of the ranges cited in the Proposed Rule's footnotes (45-50 days on average). The "prepublication review" period may lead to delays in proxy research and the timeframes provided in the rule do not increase the likelihood of issuers filing definitive proxy statements earlier. Therefore, this would not compensate for the lost time due to the "prepublication review" period.

Additionally, I have concerns with the timeframes and the discrepancies related to business days and calendar days. While the dates for filing definitive proxy statements are in calendar days, the "prepublication review" dates are in business days. Because of the use of business days for the "prepublication review," issuers may be afforded additional days to review research. For example, if a proxy advisor submitted a report to an issuer on Friday, an issuer would have two additional days to review the research. The Proposed Rule does not address this discrepancy.

**27. What impact would the proposed review and feedback period and final notice of voting advice have on the ability of proxy voting advice businesses to complete the formulation of their voting advice and deliver such advice to their clients in a timely manner? Are there additional timing considerations or logistical challenges that we should take into account?**

As stated above, the "prepublication review" periods would negatively impact the timeliness of proxy voting research. The Fund could lose eleven days of its current proxy voting process because of the Proposed Rule. The Commission should consider the overall time it takes for proxy advisors to research and draft proxy research, the time associated with application of rules-based voting population of ballots, and the time it takes shareholders to review and research proxy voting items. Additionally, the Commission should consider the possible impact the Proposed Rule may have on investors' ability to engage with issuers regarding a proxy advisors' recommendation. I am concerned the Proposed Rule would eliminate time that is currently afforded to engage with company management.

**28. Should there generally be a review and feedback period and a final notice of voting advice, as proposed? Should we allow registrants (and certain other soliciting persons) more or fewer opportunities to review the voting advice than proposed? Should a proxy voting advice business be required to provide the final notice of voting advice only if the registrant (or certain other soliciting person) provides comments to the proxy voting advice business during the review and feedback period and the proxy voting advice business's revisions are pertinent to such comments? Should the**

period allotted for the final notice of voting advice be two business days, as proposed? Should it be longer or shorter?

As stated throughout this comment, issuers should not have a "prepublication review" of proxy research and recommendations. Such review would corrupt the independent research clients receive from proxy advisors and inject new burdens, costs, and uncertainties into the proxy voting system.

**29. Are there specific ways in which, if we allow the opportunity for registrants and certain other soliciting persons to review and provide feedback on the proxy voting advice, questions may arise about possible influencing of the proxy voting advice by the reviewing parties? How, if at all, could the independence of the advice be called into question if other parties reviewed and commented on it? How could we address such concerns? For example, would disclosure of the specific comments raised by the reviewing party and the proxy voting advice businesses' responses to this feedback help alleviate concerns about the independence of the advice?**

There are three overarching concerns with allowing issuers to have "prepublication review" of proxy research. One major reason investors contract with proxy advisors is to receive third-party, independent research on its portfolio companies. The independence of proxy advisors from issuers is absolutely essential, and if issuers have the ability to influence any part of this process, the independence could be corrupted. This is the exact reason why stock analysts reports are not subject to issuer review.

Additionally, as described above, "prepublication review" introduces new legal risks for proxy advisors which could impact voting recommendations. If this Proposed Rule is adopted, one could imagine a case where an issuer may threaten legal action against proxy advisors simply because they believe the recommendations are false when, in reality, many of these types of disagreements are due to reasonably different methodologies. This could force a change in the recommendation simply to avoid legal fees, or a delay in the timeliness of the research. In both instances, the proxy advisor's clients would be adversely impacted.

**30. What effect will the Proposed Rules, if adopted, have on proxy voting advice businesses' ability to provide timely voting advice to their clients? What are the anticipated compliance burdens and corresponding costs that proxy voting advice businesses are expected to incur as a result of the proposed new conditions? What impact will these burdens and costs have on proxy voting advice businesses' clients?**

ISS has stated that the Proposed Rule would "potentially substantially reduce our delivery time by between 45 and 65 percent." While the "prepublication review" could add five to seven days as it relates to issuers review, proxy advisors would need additional time to conduct their review and address issuer feedback. ISS has concluded this could add an additional two to three calendar days to the process. As noted above, the total delay to investors due to the Proposed Rule could be thirteen days.

The delay in research and recommendations would further strain shareholders' resources in an already constricted proxy voting season and impact the Fund's ability to make timely and informed voting decisions. The Fund will lose valuable days needed to research and determine its voting positions. It would also limit the Fund's ability to engage with issuers regarding their proxy materials and the research published by proxy advisors.

**31. Should the proposed amendments allow a proxy voting advice business to seek reimbursement from registrants and other soliciting persons of reasonable expenses associated with the review and feedback period and final notice of voting advice in proposed Rule 14a–2(b)(9)(ii)? If so, what would constitute reasonable expenses and how should these amounts be calculated? Should the calculation of these amounts be dependent on the size or other attributes of the proxy voting advice business, or on the size of the registrant, or number of recommendations? Should there be limits on the amount beyond reasonable expenses for which a proxy voting advice business can seek to be reimbursed?**

If enacted, the proposed amendments should include a provision that allows a proxy advisor to seek reimbursement from registrants and other soliciting persons of the reasonable expenses associated with any required review and feedback period. As I have stated, one of my main concerns with the Proposed Rule is related to the potential costs for clients of proxy advisors. This would potentially help defray some of those costs that otherwise likely would be passed along to from investors.

**32. We proposed to limit the review and feedback period and final notice of voting advice requirements to only registrants and soliciting persons conducting non-exempt solicitations. Should the opportunity to review and provide feedback and receive final notice of voting advice also be given to other parties, such as shareholder proponents or persons engaged in exempt solicitations, such as in "vote no" or withhold campaigns?**

As a shareholder who regularly uses Rule 14a-8 to submit shareholder proposals at portfolio companies, the Fund would of course benefit from "prepublication review" of proxy advisor research regarding issuers where it has a proposal on the ballot because it would allow the Fund to plan a strategy before the formal release of the proxy research and voting recommendation. This could include preparing an exempt solicitation promoting the recommendation and encouraging shareholders to vote for the Proposed Rule. However, this kind of "prepublication review" from shareholder proponents, just like the "prepublication review" for issuers, threatens the core independence of the proxy research and can lead to interested parties "gaming the system" for their benefit. The Fund does not want any issuer, soliciting persons, shareholder proponent, or other interested parties to have "prepublication review" of proxy research and recommendations.

**33. Should the voting advice formulated under the custom policies established by clients whose specialized needs are not addressed by a proxy voting advice business's benchmark or specialty policies be subject to the proposed review and feedback period and final notice of voting advice requirements? Are there any confidentiality concerns, such as the revelation of the client's investment strategies, which would arise from the ability of registrants or others to review the advice formulated under these customized policies? If so, is there a need for a method for distinguishing voting advice formulated under a proxy voting advice business's benchmark or specialty policy from advice formulated under a client's custom policy, and what would be the appropriate method for making this distinction? We note, for example, at least one major proxy voting advice business asserts that it is not the "norm" for its clients to adopt all or some of the business's benchmark policy, with the "vast majority of institutional investors" opting for**

"increasingly more detailed policies with specific views" on the issues presented for a vote in the proxy materials.

No, custom policies established by clients should not be subject to the proposed review and feedback period and final notice of voting advice requirements. While the Proposed Rule seems to be addressing the differences between a proxy advisor's "benchmark" policy and other policies, for example, faith-based or Taft-Harley policies, one could argue the Commission may be considering allowing issuers "prepublication review" of a proxy advisors' prepopulated voting recommendations for clients with custom voting policies. There is no case in which issuers should be able to review prepopulated voting recommendations. The Fund works with our advisor to create custom rules-based voting on the Fund's Guidelines. These rules lead to the prepopulating of ballots. Additionally, the Fund already makes it Guidelines public for issuers and other market participants to review.

A "prepublication review" and final notice requirement that includes custom policies would likely dramatically impact the timeliness concerns discussed throughout this comment. For example, ISS has stated it has more than 400 custom policies for clients.

**38. Are there any risks raised by proxy voting advice businesses providing advance copies of voting advice (e.g., misuse of material, nonpublic information, or misappropriation of proprietary information), and if so, how can such risks be managed?**

Issuers and interested parties having advance copies of voting advice introduces entirely new and complex issues for all participants. I am concerned about all the risks listed above and how the process of negotiating confidentiality agreements will impact the timeliness and cost of proxy advisor services. As stated above, the determination that proxy research is a solicitation and the "prepublication review" process injects new legal risks for proxy advisors. And while the Commission states the Proposed Rule does not create a new private right of action for registrants against proxy voting advice businesses,[25] it is our expectation that proxy advisors may conclude differently. These risks can be avoided by the Commission not creating them in the first place.

**41. Should proxy voting advice businesses be required to include in their voting advice to clients a hyperlink (or other analogous electronic medium) to the response by the registrant and certain other soliciting persons, as a condition to the exemptions in Rules 14a-2(b)(1) and 14a- 2(b)(3)? Are there better methods of making the response available to the clients of proxy voting advice businesses? Should the proposed rule provide certain guidelines or limitations on the responses (e.g., responses may cover only certain topics, such as disagreements on facts used to formulate the proxy voting advice)?**

I categorically reject the idea that issuers need an additional venue to express their views to investors. As mentioned above, issuers are already afforded numerous opportunities to comment on proxy advisor research and recommendations through supplemental proxy filings. This is a low-cost and effective means for issuers to communicate directly with their shareholders. On the other hand, the "prepublication review" and hyperlink requirements could increase costs and burdens to issuers far beyond the costs of supplemental proxy filings.

---

[25] Page 60 of the Proposed Rule.

The Commission should consider the First Amendment issues I noted above before requiring a hyperlink in proxy voting research.

**44. In instances where proxy voting advice businesses provide voting execution services (pre-population and automatic submission) to clients, are clients likely to review a registrant's response to voting advice? Should we amend Rules 14a-2(b)(1) and 14a-2(b)(3) so that the availability of the exemptions is conditioned on a proxy voting advice business structuring its electronic voting platform to disable the automatic submission of votes in instances where a registrant has submitted a response to the voting advice? Should we require proxy voting advice businesses to disable the automatic submission of votes unless a client clicks on the hyperlink and/or accesses the registrant's (or certain other soliciting persons') response, or otherwise confirms any pre-populated voting choices before the proxy advisor submits the votes to be counted? What would be the impact and costs to clients of proxy voting advice businesses of disabling pre-population or automatic submission of votes? Could there be effects on registrants? For example, if a proxy voting advice business were to disable the automatic submission of clients' votes, could that deter some clients from submitting votes at all, thereby affecting a registrant's ability to achieve quorum for an annual meeting? If we were to adopt such a condition, what transitional challenges or logistical issues would disabling pre-population or automatic submission of votes present for proxy voting advice businesses, and how could those challenges or issues be mitigated?**

I unequivocally oppose the Commission amending Rules 14a–2(b)(1) and 14a–2(b)(3) so that the availability of the proposed exemptions are conditioned on a proxy advisor structuring its electronic voting platform to disable the automatic submission of votes in instances where a registrant has submitted a response to the voting advice. The Commission should not prevent shareholders from exercising their voting rights in this manner simply because they use a proxy voting advice vendor to provide an electronic platform to execute their independent votes.

As mentioned before, the Fund has the ability to change its vote at any point before a meeting. At times, the Fund has changed its voting decision based on additional information, like corrections to proxy research, solicitations, and supplemental proxy materials. Whenever the Fund receives an email from its proxy advisors regarding a correction or update to its proxy research or recommendation, the Fund will review its vote to confirm the vote is still being made based on its Guidelines and is not affected by a correction or update.

The impact of these proposals would lead to a further delay in the voting process, adding more burdensome steps. It would also interfere with our already cost-effective and efficient proxy voting program. Any actions taken to limit prepopulation or voting will add further constraints on the proxy voting process, including additional costs listed above and a delay in the Fund's voting process.

**48. Should proxy voting advice businesses be required to disclose the nature (e.g., frequency, format, substance, etc.) of their communication with registrants (and certain other soliciting persons) to their clients or publicly?**

Proxy advisors already disclose their communications with issuers, soliciting persons, investors, and shareholder–proponents on the front page of their proxy research. Proxy advisors should continue to provide clients with as much information as possible as it relates to its engagements with all market participants, but this does not rise to the level of requiring rulemaking.

**51. To what extent have factual errors or methodological weaknesses in proxy voting advice businesses' analyses resulted in impaired voting advice or adversely affected the ability of proxy voting advice businesses' clients to vote securities effectively?**

I do not believe that factual errors or methodological weaknesses in proxy voting advice businesses' analyses have resulted in impaired voting advice or have adversely affected the ability of proxy voting advice businesses' clients to vote securities effectively. As the Commission's Investor Advisory Committee stated: "From over 17,000 shareholder votes over three years, the number of possible factual errors identified by companies themselves in their proxy supplements amounts to 0.3% of proxy statements——and none of those is shown to be material or to have affected the outcome of the related vote."[26]

**52. Is the Proposed Rule to amend the list of examples in Rule 14a-9 necessary in light of the Commission's recent guidance specifically underscoring the applicability of Rule 14a-9 to proxy voting advice? Should the Proposed Rule to amend Rule 14a-9 list different or additional examples and, if so, which examples?**

I do not believe proxy advisors should be required by a Commission rule to disclose voting advice methodologies. These methodologies are part of the expertise that the Fund purchases as a client of a proxy advisor. I believe the requirement to disclose methodologies could lead to a homogenous set of recommendations from proxy advisors who could be pressured to use other publicly-available methodologies. Coupled with the other changes in the Proposed Rule, including the increased risk of litigation over methodological differences, could reduce the overall quality of the advice provided by proxy advisors.

**57. Is the proposed transition period appropriate? If not, how long should the transition period be and why? Please be specific.**

While I oppose the Proposed Rule in its entirety, if adopted, one year is not a reasonable timeframe for affected parties to comply with the Proposed Rule. This Proposed Rule fundamentally alters the proxy voting system and will impact the way thousands of investors vote and issuers solicit votes.

---

[26] Recommendation of the Investor-as-Owner Subcommittee of the SEC Investor Advisory Committee (IAC), Relating to SEC Guidance and Rule Proposed Rules on Proxy Advisors and Shareholder Proposed Rules 2 (Jan. 16, 2020) https://www.sec.gov/spotlight/investor-advisory-committee-2012/iac-recommendation-proxy-advisors-shareholder-proposals.pdf.

I appreciate the opportunity to submit comments on this important matter. I trust the Commission conducts the necessary analysis and review of these comments and others that have been submitted, and finds that rulemaking relating to proxy advisors is unnecessary. On behalf of the more than one million members, retirees and beneficiaries of the System for whom the Fund invests, thank you for your attention to these comments.

Sincerely,

Thomas P. DiNapoli
State Comptroller



**Ohio Public Employees Retirement System**

February 3, 2020

*Submitted via electronic filing: rule-comments@sec.gov*

Vanessa A. Countryman, Secretary
Securities and Exchange Commission
100 F Street, NE
Washington, DC 20549-1090

*Re: File Number: S7-22-19*

Dear Ms. Countryman:

The Ohio Public Employees Retirement System (OPERS or System) appreciates the opportunity to submit comments on the Securities and Exchange Commission's (SEC or Commission) proposed rule, entitled "*Amendments to Exemptions from the Proxy Rules for Proxy Voting Advice*," which was published in the Federal Register on December 4, 2019. OPERS is concerned that the Commission's proposal will adversely impact the objectivity and independence, cost-effectiveness, and timeliness of the research and recommendations we receive from our proxy advisory firm (Proxy Advisor). As such, OPERS is respectfully requesting that the SEC revisit and revise its proposal in an effort to address these concerns.

<u>Introduction</u>

OPERS is the largest public retirement system in Ohio, with more than one million active, inactive, and retired members. Currently, almost one out of every 11 Ohioans has some connection to our System. For many of these individuals, OPERS provides the only retirement income they will ever receive. We are trustees of their retirement security, and as they depend on us, we also depend on their continued trust and support.

In order to provide secure retirement benefits for our members, OPERS invests approximately $100 billion in capital markets around the world, including holdings in more than 9,300 public companies. Returns on these investments fund approximately two-thirds of our annual benefit payments. These payments not only sustain our members throughout their retired lives, but also the cities, towns, and villages in which they live and spend.

With so many people relying on the benefits we provide, we view our duty to act in the best interests of our members as sacrosanct. That duty permeates every aspect of our business, including the prudent investments we make with our members' retirement contributions. As a result, our focus is on maximizing the value of our investment portfolio so that we can maintain a sustainable funding source for our benefit payments well into the future.

Continually meeting this goal means that we cannot afford to be a passive investor. We learned long ago that direct and respectful interactions with public companies can help us to establish dialogues with boards of directors and management, cast informed proxy votes, and provide us with opportunities to offer our thoughts and concerns regarding the maximization of shareholder value. In



**OPERS**

our experience, positive shareholder engagement is an integral part of maximizing the value of our investments.

However, truly effective shareholder engagement requires an expenditure of resources that OPERS, as a public entity, cannot afford on its own. OPERS must cast informed votes on as many as 10,000 proxies in any given year in order to fully realize the potential of its investment portfolio, but it cannot allocate the level of resources needed to accomplish this internally. The work involved in individually voting thousands of proxies within a three- to four-month period is considerable. To complete this task on our own would require numerous seasonal staff with the skills and proficiencies to translate and vote proxy materials originating from dozens of countries and across various jurisdictions. The resources necessary to hire such a staff – even temporarily – would be well outside the means of a public entity like OPERS.

Like many other institutional investors, OPERS has chosen to address this problem by engaging the services of a proxy advisory firm. Since 2004, OPERS has benefitted greatly from the research reports, recommendations, and voting platform provided by its proxy advisor. In this time, our proxy advisor has become an important component of our shareholder outreach and engagement efforts. Their specialization and resources have allowed us to fulfill our governance obligations, as well as our fiduciary duty to our members, in a more informed, productive, and efficient manner.

As befits a responsible and conscientious investor, the OPERS Board of Trustees has deliberated on and approved a comprehensive set of proxy voting guidelines covering many of the issues that can arise in a proxy contest.[1] When our proxy advisor makes a voting recommendation, it does so according to these guidelines – there is no opportunity for the proxy advisor's discretion to enter into the voting process. As a result, OPERS maintains complete discretion and control over its proxy votes, though in most cases they are functionally being cast by our proxy advisor. Moreover, OPERS staff conduct monthly audits of our proxy advisor to ensure on-going compliance with our policies and guidelines.

It is unfortunate then, that lingering, and often unfounded, criticisms regarding proxy advisory firms' place in the proxy process have been repeated long enough and loudly enough to garner the attention of the SEC. Based on the analysis provided in the Commission's proposal, we know that issuers, either on their own or through their advocacy organizations, have expressed concerns that proxy advisors have too much influence over the voting decisions of their clients, and that they fail to fully disclose conflicts of interest and release reports filled with errors.[2]

In past letters to Congress and the SEC, OPERS has sought to provide a clearer picture of the role that our proxy advisor plays in assisting our engagement and outreach efforts. However, after reading the language of the SEC's proposal, we are left to guess whether our past comments, along with those

---

[1] OPERS Corporate Governance Policy & Proxy Voting Guidelines (October 2019),
https://www.opers.org/pdf/governance/Corporate-Governance-Policy-and-Proxy-Voting-Guidelines.pdf.
[2] Securities and Exchange Commission Proposed Rule, File No. S7-22-19: "*Amendments to Exemptions from the Proxy Rules for Proxy Voting Advice*," at 26 (noting concerns about, "(i) the adequacy of disclosure of any actual or potential conflicts of interest … ; (ii) the accuracy and material completeness of the information underlying the [proxy voting] advice; and (iii) the inability of proxy voting advice businesses' clients to receive information and views from the registrant") and 29 (see note 78 citing a letter from the Chamber of Commerce, "the largest institutional investors, pensions, and hedge funds vote based on ISS and Glass Lewis recommendations"), (Dec. 4, 2019) ("SEC Proposed Rule").



OPERS

of other institutional investors, had any moderating impact on the Commission's decision-making process.

As a participant in the Commission's recent Roundtable on the Proxy Process, we were heartened when our fellow panelists were asked whether they felt proxy advisors should be further regulated and their silence even caught the SEC staff member moderating the panel by surprise.[3]  That is why it is so difficult to make sense of many of the changes put forward for our consideration in the Commission's proposal.

Though the SEC has apparently considered this issue for several years, we are left to wonder why institutional investors – the entities that most often rely on the services of proxy advisory firms – were not adequately surveyed or studied to determine whether and to what extent their engagement and outreach efforts would be disrupted as a result of the changes proposed by the SEC.[4]  If we had experienced the lack of transparency and errors described in the proposal in our own interactions with our proxy advisor, the changes might not seem as jarring.  As it stands however, we are left to wonder why our real-world experiences do not seem to merit the extensive solutions that have been proposed.

We do agree with Commissioner Roisman that it is not beneficial to allow this long-standing debate to persist.[5]  Despite our many attempts to address questions and concerns regarding our relationship with our proxy advisor, it is now abundantly clear that our on-going defense of our interactions with proxy advisory firms and their place is the proxy voting process is getting us nowhere.  We view this comment period as an opportunity to improve the situation, and we are taking the Commission at its word that it is interested in recalibrating the current proposal.[6]

In past comments, we have said that we do not believe there is a need for further federal regulation of proxy advisory firms, and we maintain that position.[7]  But, rather than let that be our final word on the matter, we have consistently and respectfully requested that *if* the Commission believes it *must* act, that it refrain from making regulatory changes that will (1) erode the confidence we have in the independence and objectivity of the reports and recommendations we purchase from our proxy advisor, (2) increase the cost of said reports and recommendations, and (3) reduce the time we have to review any information we receive from our proxy advisor.[8]  In our estimation, the Commission's proposal fails this basic test.

---

[3] Transcript of Roundtable on the Proxy Process, at 250 (Nov. 15, 2018), https://www.sec.gov/files/proxy-round-table-transcript-111518.pdf.

[4] Statement of Chairman Jay Clayton on Proposals to Enhance the Accuracy, Transparency and Effectiveness of Our Proxy Voting System, (Nov. 5, 2019), https://www.sec.gov/news/public-statement/statement-clayton-2019-11-05-open-meeting.

[5] Statement of Commissioner Elad Roisman at the Open Meeting: Modernizing SEC Rules Governing Proxy Voting Advice (Nov. 5, 2019), https://www.sec.gov/news/public-statement/statement-roisman-2019-11-05-14a-2b.

[6] *Id.*

[7] OPERS Letter Regarding SEC Regulatory Flexibility Agenda, File No. S7-04-19, at 2 (July 24, 2019), https://www.opers.org/pdf/government/FederalResponses/2019/2019-06-24-OPERS-Comment-Letter-SEC-Regulatory-Flexibility-Agenda.pdf; OPERS Letter To SEC Division of Investment Management, at 3 (May 7, 2019), https://www.opers.org/pdf/government/FederalResponses/2019/2019-05-07-OPERS-Comment-Letter-SEC-Proxy-Advisory-Firms.pdf; OPERS Letter Regarding SEC Roundtable on the Proxy Process, File No. 4-725, at 3 (Dec. 13, 2018), https://www.opers.org/pdf/government/FederalResponses/2018/2018-12-13-OPERS-Comment-Letter-SEC-Round-Table-on-the-Proxy-Process.pdf.

[8] *Id.*



**OPERS**

We believe that a more in-depth analysis should have been performed before releasing the current proposal. For example, the proposed changes could have and, indeed should have, been tested to determine their real-world impact with less risk that institutional investors' engagement and outreach efforts would be disrupted. If the Commission's proposal is finalized and adversely impacts our ability to hold issuers accountable for decisions that will reduce the long-term value of our investments, the consequences could be severe.

Institutional investors already have relatively few options to collect the objective, independent, cost-effective, and timely information they need to cast informed proxy votes, prudently manage their investments, and, in the case of OPERS, fulfill their fiduciary duty to their members. If, as a result of the Commission's proposal, we can no longer reliably access this information through our proxy advisor, what alternatives are there? It would be problematic and certainly not ideal to say that we could just vote "no" on each proxy for which we do not have complete or timely information, as that would violate our duty to prudently manage our investments. In the same way, we cannot simply abstain from casting uninformed votes. We also cannot hire sufficient staff to vote all of our proxies internally. It is disappointing to think that we could be confronted with issues such as these at some point in the near future.

Despite all this, we have tried to identify the areas where we believe compromise is possible. A better balance between the needs of investors and the desires of issuers can and should be reached, and we encourage the SEC to work to achieve that balance as it revisits the various changes it has proposed.

**OPERS Believes the Commission's Proposal Represents an Unwarranted Intrusion into the Relationship Between Proxy Advisory Firms and Their Clients and Will Adversely Impact the Objectivity and Independence of the Research and Recommendations Provided by Proxy Advisory Firms**

Underlying OPERS' business relationship with its proxy advisor is the notion that we must be able to trust the information we are purchasing and using to inform our voting decisions. If there is a conflict of interest, error, omission, or otherwise in the information we receive from our proxy advisor, it is in our best interests to know so that we can factor that information into our decision-making processes. In this regard, we agree with the SEC that shareholders should have access to complete and accurate information from their proxy advisory firms. Where we differ however, is whether and to what degree we already receive the information we need to make informed voting decisions.

In proposing a right for issuers to preview proxy voting advice before that information is disseminated to investors, the Commission seemingly accepts that issuers' perceptions regarding proxy advisory firms (e.g., that they are conflicted, prone to errors, and lacking in transparency) are all true. However, these perspectives are not consistent with our experiences. Allowing for the fact that some issuers may decide it is not worth raising errors, inconsistencies, or otherwise after the fact, we would think it is in their best interests to bring those to our attention as part of their regular shareholder engagement and outreach efforts. Though this information would be useful to us in appraising the performance of our proxy advisor, we rarely receive these types of alerts in our interactions with issuers.

The fact that we have not experienced the level of conflicts, errors, or omissions described in the Commission's proposal is salient. The magnitude of the SEC's decision to provide issuers with a right to preview information that we, as investors, have sought and paid for demands an equally large and pressing problem. The evidence available to us does not support the existence of such a problem.



For example, OPERS has identified only three errors over the past two years (two in 2018, and one in 2019) as a result of our regular audits of the research reports and voting recommendations we receive from our proxy advisor. In each instance, we reported the error and it was addressed in a timely and professional manner. Understanding that we are only one investor, it is difficult to imagine our experience differing substantially from that of other institutional investors.

Further confounding the issue is the fact that the Commission's proposal blurs the line between actual errors (e.g., misstatements, inaccuracies), methodological weaknesses, and other perceived issues, lumping them together in a general category of "disagreements" with proxy voting advice.[9] The problem with this is that the Commission's proposal is largely silent on differentiating between legitimate 'disagreements' and mere differences of opinion regarding how the proxy advisor's analysis should be conducted. If issuers are conflating the two, the SEC should address that and consider whether, for example, proxy advisory firms' insistence on using their own methodologies, rather than those preferred by issuers, merits a change as substantial as allowing issuers to insert themselves in investors' private business relationships with third-party analysts.

The Commission's proposed right to preview proxy voting advice raises more questions than it answers, and casts doubt over the independence and objectivity of the information we receive from our proxy advisor.[10] In essence, these proposals are creating opportunities for *ex parte* communications between issuers and proxy advisory firms. Absent providing investors with every communication between an issuer and a proxy advisory firm that took place between the start of the proposed review period and the date the proxy voting advice was disseminated to clients, there is no way for us to know the extent to which the proxy advisor was encouraged to modify its advice or, in the worst-case scenario, whether it actually did.

This is all the more relevant now that the SEC has determined that proxy voting advice is a 'solicitation' for purposes of Rule 14a-9 liability. Because of this change, we are concerned that differences of opinion regarding preferred methodologies could result in accusations that a proxy advisory firm's own methodology is false or misleading. Moreover, we wonder if a private right of action for Rule 14a-9 liability might be used to threaten or pressure proxy advisory firms to incorporate issuer feedback or accept revisions to their voting advice.

In light of these questions, we are concerned that the Commission's proposal creates opportunities for issuers to meddle in investors' proxy voting decisions and to promote their own desired outcomes, regardless of whether they will actually improve shareholder value. We can certainly comprehend why issuers would want a specific period of time to review proxy voting advice, but their wishes must be considered against our rights, as investors, to increase the value of our investments by seeking out and purchasing research and recommendations from a private third-party analyst, and to do so free from the interference of the companies in which we are invested. The Commission's proposed right to preview proxy voting advice and repeated stern warnings regarding the use of false or misleading methodologies – without defining the boundaries of what that might reasonably include – will cause investors to question the independence and objectivity of the information they purchase from their

---

[9] *See* SEC Proposed Rule, *supra* note 2, at 45 ("As noted above, a registrant … may have disagreements with the proxy voting advice, whether factual, methodological or otherwise, which if available to investors would help inform their voting decisions, even in instances when the registrant['s] … voting recommendation on the matter is the same as that of the proxy voting advice business.")

[10] *See* SEC Proposed Rule, *supra* note 2, at 107 (noting that the proposed right to preview proxy voting advice "could impact perceptions about the independence and objectivity of the advice.")



**OPERS**

proxy advisory firms, thereby making it more difficult to hold companies responsible for decisions made at the expense of long-term shareholder value. As such, we believe the Commission should clarify how it will differentiate between legitimate 'disagreements' – including true methodological weaknesses – and mere differences of opinion regarding perceived errors or preferred methodologies when considering the accuracy of proxy voting advice under Rule 14a-9.

It is worth mentioning, if only in passing, that issuers already have several opportunities to bring their case directly to shareholders. The first is in the language of the proxy itself. If the issuer wishes to highlight areas of controversy or propose its own methodology for shareholder consideration, this would seemingly be the best place to incorporate that information in a manner that is easily understood by both retail and institutional investors. Such explanations would then be included as part of the research reports and voting advice we receive from our proxy advisor. Issuers may also choose to file supplemental proxy materials explaining the results of any interaction they may have sought or had with a proxy advisory firm, though the proposal seemingly dismisses this option as few issuers see the value in these supplemental filings.[11] As a third option, issuers may engage directly with shareholders on important matters related to proxy votes. We encourage these interactions. Beyond the research reports and voting recommendations we receive from our proxy advisor, OPERS also engages with portfolio companies in an effort to address questions and concerns outside of the proxy voting process. In fairness, some companies take advantage of this opportunity to engage with us directly, while others do not. We understand that it would be difficult to engage with each shareholder individually, but targeted interactions – perhaps in response to specific questions or concerns or in an open meeting – would be beneficial to all sides.

However, none of this is to say that the current system cannot be improved upon. Our opposition to the Commission's proposed right to preview proxy voting advice and questions regarding the enforcement of Rule 14a-9 are based, in part, on our perception that they will significantly and disproportionately benefit issuers at the expense of investors. As we have not experienced the conflicts, errors, or omissions described in the Commission's proposal, we do not anticipate significant improvements in the accuracy, completeness, or reliability of the work product we receive from our proxy advisor. Therefore, we are concerned that we will lose more than we gain.

As such, we are respectfully requesting that the Commission consider a more equitable solution. For example, the SEC could create a right to preview proxy voting information, but limit issuers' access to data-only versions of the proxy voting advice. These data-only reports include information collected from publicly available sources and would allow issuers to determine if the information used in the proxy advisory firm's methodologies is correct. Moreover, these reports are currently available upon request and free of charge from OPERS' proxy advisor. Alternatively, the Commission could require that full versions of the proxy voting advice (including recommendations) be provided to issuers at the same time as it is disseminated to clients. In either case, OPERS believes that issuers should be responsible for the additional costs (if any) that arise as a result of providing the information or administering these provisions.

---

[11] *See* SEC Proposed Rule, *supra* note 2, at 53 ("Although registrants are able, under the existing proxy rules, to file supplemental proxy materials to respond to negative proxy voting recommendations and to alert investors to any disagreements they have identified with a proxy voting advice business's voting advice, the efficacy of these responses may be limited, particularly given the high incidence of voting that takes place very shortly after a proxy voting advice business's voting advice is released to clients and before such supplemental proxy materials can be filed.")



**OPERS Believes the Commission's Proposal will Unnecessarily and Substantially Increase the Costs We Pay as a Client of a Proxy Advisory Firm**

OPERS is concerned that the Commission's proposal, if finalized, would result in clients of proxy advisory firms paying substantially higher costs for little tangible benefit. As noted in the previous section, we have not encountered a large number of errors in the proxy voting advice we receive from our proxy advisor. In the same way, we believe the information we currently receive is sufficiently complete and reliable to enable us to make informed voting decisions on issues affecting the value of our investments. Additionally, we do not rely solely on this information in order to cast informed votes; rather, we use it to supplement our internal analyses and other reference material. As such, we stand to gain little from the Commission's proposal. At the same time, we will be paying a high price – compromised objectivity and independence, increased financial costs, and reduced time to review our proxy voting advice – for regulations that will primarily benefit issuers. As a result, we believe issuers should bear the financial burden of creating and administering the regulatory structure that will provide them with the data they have requested.

We are fortunate that our proxy advisor, Glass Lewis, already has programs in place to (1) provide participating issuers with a data-only version of its proxy voting advice before it is provided to clients, and (2) offer participating issuers an opportunity to provide feedback ('Report Feedback Statement' or RFS) regarding an already-published research report or recommendation. As noted in the previous section, access to the data-only versions of proxy voting advice is free, while issuers pay just $2,000 per meeting in order to participate in the RFS service. However, even with these systems in place, the Commission's comments and analysis suggest that proxy advisory firms may need to expend additional resources in order to comply with its proposed disclosure and review requirements.[12] Based on conversations with our proxy advisor, we fully anticipate that all or part of these costs will be passed on to the client base. As a result, our best hope is that our proxy advisor's current efforts to allow issuers to preview information and provide feedback will at least mitigate those costs.

However, we must also be mindful of the indirect costs of the Commission's proposal. For example, to the extent the changes proposed by the SEC increase the risk that we cannot fulfill our duties to our members, OPERS must prepare contingency plans or otherwise identify how it will continue to prudently manage its investments with reductions in support or resources. This might include alternative methods of voting its shares, including hiring additional staff on a temporary basis. Further, we expect to incur additional legal costs as a result of attempting to address these uncertainties in contract negotiations with our proxy advisor.

Unfortunately, the Commission's proposal is largely silent on whether issuers may be asked to pay for the proxy voting advice they wish to view. To the extent that investors are asked to subsidize the creation and administration of new disclosure and review systems that we believe will disproportionately benefit issuers, there will be a collateral impact on investors' outreach and engagement efforts. With reduced access to independent, objective, timely, and cost-effective voting advice, it will be more difficult to hold companies accountable for decisions made at the expense of long-term shareholder value. Investors' place in the proxy voting process will be diminished as they pay higher costs for less trustworthy information that may be more difficult to access. In contrast, issuers would gain access to information and opportunities to influence investors' voting decisions that

---

[12] *See* SEC Proposed Rule, *supra* note 2, at 107 ("Alternatively, the proxy voting advice businesses may need to expend greater resources to ensure delivery by the date on which they would have delivered the advice in the absence of the requirement to allow registrants … the opportunity to review and provide feedback on the proxy voting advice.")



OPERS

they have long sought. Per the Commission's analysis, the only compensation that investors may reasonably expect to receive for these losses is uncertain improvements in the accuracy, completeness, and reliability of the information they receive from their proxy advisory firms.[13]

Issues such as these highlight the fact that the Commission's proposal lacks a meaningful cost-benefit analysis. We simply do not have sufficient data to determine the practical impacts of the various changes put forward by the SEC. We believe the Commission should know and account for the fact that if a component of its proposal (1) requires the creation of a new reporting structure or an expenditure of additional resources, (2) increases the risk that we will be unable to comply with our fiduciary duty to our members, (3) allows issuers to reduce or discontinue their current engagement or outreach efforts, or (4) provides information that we have already paid for to issuers at no additional charge, there will be a cost to investors, either directly or indirectly. We urge the Commission to consider these increased costs as it attempts to recalibrate its proposal. In addition, we respectfully request that the SEC conduct a more thorough cost-benefit analysis, multi-year review, demonstration project, or other investigation to gather data from which reasonable cost estimates can be extrapolated.

Finally, to the extent that the Commission decides to move forward with its current proposal, we believe there needs to be some reconsideration of who should pay for the various reforms it has suggested. Given that issuers have requested and advocated for many of the changes that have been proposed, we believe that they should be required to contribute to this undertaking, at least in an amount that is commensurate with the benefits they are receiving. It would be inequitable not to allow investors, through their proxy advisory firms, to limit their increased costs and recoup some of the expenditures from setting up and administering the new disclosure and reporting systems. As a result, we respectfully request that the SEC clarify that issuers can be charged a reasonable amount to access and maintain the data they wish to see.

**<u>OPERS Believes the Commission's Proposal Will Significantly Decrease the Amount of Time That Investors Have to Review the Research and Recommendations They Receive from Their Proxy Advisory Firms</u>**

OPERS is concerned that the Commission's proposal to set aside an extraordinary amount of time for issuers to preview and respond to proxy voting advice will significantly reduce the time investors have to consider the research and recommendations they receive from their proxy advisory firms. Unlike its proposed right to preview proxy voting advice, which threatens the objectivity and independence of the information we receive from our proxy advisor, the Commission's proposed review period threatens our ability to vote each and every one of our proxies in a timely manner.

In this regard, we believe the SEC would benefit from additional data explaining the intricate nature of how an institutional investor votes its proxies. On average, OPERS receives research and recommendations from its proxy advisor within approximately 24 calendar days of an annual

---

[13] *See* SEC Proposed Rule, *supra* note 2 at 44 ("In these circumstances, providing the clients of proxy voting advice businesses with convenient access to the views of the registrant and certain other soliciting persons at the same time they receive the proxy voting advice could improve the overall mix of information available when the clients make their voting decisions." "We believe that establishing a process that allows registrants and other soliciting persons a meaningful opportunity to review proxy voting advice in advance of its publication and provide their corrections or responses would reduce the likelihood of errors, provide more complete information for assessing proxy voting advice businesses' recommendations, and ultimately improve the reliability of the voting advice ... .")



OPERS

meeting.[14]  OPERS must then read and evaluate the research and recommendations and determine whether and to what extent it will follow them, conduct any subsequent research, and most importantly, cast our vote.  As noted in the Commission's proposal, we can also change our vote at any time prior to the annual meeting in response to additional information or feedback provided by an issuer or if there is a correction to the research or recommendations.  Understandably, all of this takes time, especially in a limited resource environment.

Given that we already operate under a truncated timeframe, it will be difficult to sacrifice any part of that time without also sacrificing our ability to perform the necessary due diligence regarding our votes. This outcome will increase the risk of casting uninformed votes or missing them entirely, which is unacceptable.  This concern is especially valid during the high-volume months of a proxy season in which OPERS must vote upwards of 3,000 proposals per day.[15]

It is against this backdrop that we must consider the Commission's proposal.  We do appreciate the SEC's attempts to incentivize issuers to release their definitive proxy materials earlier, thereby giving themselves, proxy advisory firms, and investors more time to review the materials and draw conclusions.  However, we wonder whether the Commission's incentives are sufficient, by themselves, to encourage issuers to release their definitive proxy materials earlier, and whether the Commission has contemplated adding enough time on the front end of the process to make up for the various delays and obligations that will surely occur leading up to the annual meeting.

According to our proxy advisor, there is an average of 39 calendar days between the release of the definitive proxy materials and the annual meeting. Using the 24-calendar day average time period that OPERS has to review and cast its votes, we can guess that it takes approximately 15 calendar days for our proxy advisor to fully digest the issuer's proxy materials, draft its report and use our guidelines to formulate a recommendation.[16]

In its proposal, the Commission acknowledged a study completed by Broadridge Financial Solutions, Inc. that suggested issuers customarily file their definitive proxy materials within 35-40 days of a annual meeting.[17]  Based on this range and the information provided by our proxy advisor, there may be an incentive for issuers to release their definitive proxy materials earlier than they currently do (45 or more calendar days in advance of the annual meeting).  We do note however, that the Commission's proposed incentive (i.e., a five-business day primary review and feedback period plus an additional two-business day final review period), may cause additional delays given that the proposed review and feedback period is measured in business, rather than calendar days.[18]

---

[14] This figure is based upon OPERS' guidelines for U.S companies.

[15] It is important to remember that each proxy ballot can include numerous proposals (e.g., separate votes for each board member), and so the actual number of proxies being voted on any given day may be much lower.

[16] This number is highly dependent on when issuers choose to release their definitive proxy materials.

[17] *See* SEC Proposed Rule, *supra* note 2, at 46, footnote 114, citing Broadridge Financial Solutions, Inc. ("Registrants customarily file their definitive proxy materials 35-40 days before a shareholder meeting."); and Ernst & Young LLP ("… registrants generally mail proxy statements 30 to 50 days before the annual meeting.")

[18] It should be noted that, in the worst-case scenario, the Commission's proposal to calculate the review and feedback period in business days could result in issuers having as many as 12 days (total) to review proxy voting advice and provide feedback, if weekends and holidays are factored into the calculation.  We have arrived at this figure by assuming a seven-business day review and feedback period (five business days for primary review plus two business days for final review) begins on a Friday and includes at least one holiday.


**OPERS**

More concerning though, is the fact that many issuers who currently release their definitive proxy materials at or below the low end of the range (i.e., between 25 and 45 calendar days prior to the shareholder meeting) will still receive three business days (plus an additional two-business day final review period) to review proxy voting advice before it is disseminated to clients.[19]

This means that many issuers will be rewarded with at least five business days in which they can examine proxy voting advice and engage with the relevant proxy advisory firm even if they maintain their current proxy material release dates. Stated another way, if issuers adhere to their customary delivery dates and *change nothing* – which may, in fact, be in their best interest – investors will still have fewer days to review the information they receive from their proxy advisory firms and cast their votes. This is not equitable.

We urge the SEC to consider what will happen if investors cannot adequately address each of the thousands of proxies they receive during any given proxy season. If, as we have repeatedly stated, we must vote each proxy in order to satisfy our fiduciary duty, but we lack the time to accurately determine whether or not the issue at hand will improve shareholder value, how do we choose between the two? We respectfully request that the SEC not put OPERS and other public institutional investors in this difficult position.

Additionally, we have concerns regarding the length of the proposed review and feedback period. As mentioned above, OPERS believes that a five- to seven-business day review period could drastically reduce the time investors have to review the information they receive from their proxy advisory firms. In our opinion, the review and feedback period should not exceed two calendar days, especially in light of the fact that many issuers will qualify for the review and feedback period regardless of whether they take steps to release their definitive proxy materials at an earlier date or not.

If the SEC intends to move forward with a longer review and feedback period, then we respectfully request that it adjusts its timeframe for determining whether an issuer will qualify for that time. In particular, we believe that only those issuers that release their definitive proxy materials at least 50 business days in advance of an annual meeting should have the ability to preview data-only versions of proxy voting materials. This would address the potentially significant reductions in the time investors have to review information from their proxy advisory firms by clarifying that both the determination of whether an issuer will receive a review period and the review period itself will be calculated using business days. Alternatively, the Commission could specify that both periods will be calculated using calendar days.

We also respectfully request that the Commission remove the additional two-business day review period granted to issuers following the delivery of the final notice of voting advice. By the Commission's own explanation, this additional period is intended to allow issuers "the opportunity to determine the extent to which the proxy voting advice has changed" as a result of feedback received from the issuer during the three- to five-business day primary review period.[20] We believe this is gratuitous and inconsistent with the Commission's insistence that proxy advisory firms are under no

---

[19] *See* SEC Proposed Rule, *supra* note 2, at 46.

[20] *See* SEC Proposed Rule, *supra* note 2, at 48 ("This [two-business day review period] would provide registrants … the opportunity to determine the extent to which the proxy voting advice has changed, including whether the proxy voting advice business made any revisions as a result of feedback from the registrant.")



obligation to accept revisions to their research and recommendations.[21]  If there is no requirement to change proxy voting advice in response to issuer concerns, there is no need for a subsequent review period for issuers to determine whether such changes were actually made.  This simply adds to the time pressure that the proposed primary review period will create and should be removed in fairness to investors.

## Other Considerations

Issuer Statement

OPERS is concerned that the Commission's proposal to require the inclusion of a hyperlinked issuer statement within the proxy voting advice and platform may actually serve to reduce issuers' engagement with shareholders.  Ideally, issuers would converse and interact directly with shareholders in an effort to provide context and share how their proposals will increase shareholder value.  However, the Commission's proposal could make these types of discussions less likely by reducing issuer engagement to a single static statement.

To be clear, we do not believe the Commission intended this result; however, we do believe it is worth noting that to the extent issuers are given opportunities to lower their costs by reducing or even discontinuing their current engagement and outreach efforts, it will harm investors by depriving them of live, dynamic conversations about issues that may currently be considered outside the proxy voting process.  Investors cannot interact with a generic issuer statement hyperlinked to their voting advice and platform, and as is the case currently, there is nothing requiring issuers to respond to investors' questions or concerns other than their own desire to be responsive to their shareholders.  As a result, we respectfully request that the SEC clarify its intentions regarding its proposal to require issuer feedback to be hyperlinked to the proxy voting advice and platform and encourage issuers to continue engaging directly with shareholders.

Enhanced Disclosure of Conflicts of Interest

OPERS is concerned that the Commission's proposal to require the creation of an enhanced disclosure system for proxy advisory firms' conflicts of interest could artificially and significantly inflate the number of conflicts reported.  Our proxy advisor, Glass Lewis, currently views each contact with an issuer after proxy materials have been published as a conflict of interest.  As such, the communications that take place between an issuer and our proxy advisor during the proposed review and feedback period would be viewed as conflicts of interest and reported in the research and recommendations we receive.

The resulting increase in the number of reported conflicts could make it appear that our proxy advisor was underreporting conflicts prior to the promulgation of the Commission's rule, when in reality it would speak more clearly about our proxy advisor's current practice of over- rather than underreporting potential conflicts of interest.  To the extent this harms our proxy advisor's reputation or otherwise adds credibility to accusations that they are substantially conflicted, we will pay a cost, either in defending our relationship with our proxy advisor or continuing to address calls for further regulation

---

[21] *See* SEC Proposed Rule, *supra* note 2, at 51 ("It is important to note that while our proposal would require … that proxy voting advice businesses provide an opportunity registrants and other parties engaged in non-exempt solicitations to review proxy voting advice and suggest revisions before the distribution of the advice, it does not require proxy voting advice businesses to accept any such suggestions.")



**OPERS**

of proxy advisory firms. As such, we respectfully request that the SEC clarify that contacts between issuers and proxy advisory firms within the review and feedback period will not be considered conflicts of interest for purposes of the proposed enhanced disclosure system.

<u>**Conclusion**</u>

We respectfully request that the Commission reconsider its decision to focus its efforts and limited resources on regulating proxy advisory firms. These entities provide a valuable service to investors that wish to fully participate in the governance process and more effectively engage as shareholders. The administrative costs of attempting to recreate or duplicate the services we receive from our proxy advisor would be prohibitive for a public institution like OPERS.

We urge the Commission to see proxy advisory firms for what they are – resources used by investors to efficiently and effectively exercise their ownership rights, including the right to raise objections regarding decisions that will negatively impact the value of their investments.

OPERS must be able to rely on the independence, objectivity, cost-effectiveness, and timeliness of the information it receives from its proxy advisor. Anything less than that will negatively impact our ability to appropriately exercise our rights as shareholders and fulfill our responsibility to the many public employees, retirees, and others who depend on us for their retirement security. For these reasons, OPERS respectfully requests that the SEC revisit and revise the various parts of its proposal that would increase our costs, compress our timelines for reviewing research reports, or diminish the objectivity and independence of the research we receive from our proxy advisor.

If you have questions or comments regarding OPERS' submission, please do not hesitate to contact us.

Sincerely,

Karen Carraher
Executive Director

Patti Brammer
Corporate Governance Officer



February 3, 2020

<u>VIA EMAIL</u>

Vanessa A. Countryman
Secretary
Securities and Exchange Commission
100 F Street NE
Washington, DC 20549


**Re: File No. S7-22-19 Amendments to Exemptions from the Proxy Rules for Proxy Voting Advice**


Dear Madam Secretary:

On behalf of the Colorado Public Employees' Retirement Association (Colorado PERA or PERA), thank you for the opportunity to file public comment regarding proposed amendments concerning proxy advisory services. I hereby conjoin the following information to our previous comments regarding potential proxy advisor regulation, which we submitted on October 30, 2019.[1] In addition to that submission, PERA was signatory to the October 15, 2019 letter from the Council of Institutional Investors (CII) regarding the same matter.[2]

In light of the related November 2019 amendment proposals by the Securities and Exchange Commission (Commission or SEC), we are submitting additional comments for consideration on the issue of rulemaking that would affect proxy advisory services that PERA utilizes in fulfillment of its fiduciary duty. The information below includes supportive evidence from the relevant public record as well as from our own analysis, and represents PERA's perspective as a large institutional investor.

Colorado PERA is the state's largest public pension plan, managing approximately $50 billion in assets under obligation to enhance the retirement security of over 600,000 current and former public employees and their beneficiaries. In fulfillment of our fiduciary duty, we vote proxies on behalf of those beneficial owners of the shares we hold. In order to effectively vote proposals in a cost-efficient manner, PERA contracts with proxy advisory firms to obtain and review their research on ballot items. Although we incorporate this third-party research into our analysis, we ultimately vote according to our own guidelines and policies, which we believe are in the best interests of plan beneficiaries.

In that fiduciary capacity, we are concerned that the SEC has not fully evaluated the necessity and implications of their proposed amendments, and that substantive support for such rulemaking is demonstrably lacking from the market participants such rules are intended to protect – investors. Specifically, we are concerned with the proposed codification of the Commission's interpretation that

---

[1] https://www.sec.gov/comments/4-725/4725-6370565-196517.pdf

[2] https://www.cii.org/files/issues_and_advocacy/correspondence/2019/201910015proxy_advisor_sign_on_final.pdf

proxy advisory services qualify as "solicitation"; that related guidance would effectively negate federal filing exemptions that preserve the independence and competitive advantages of proxy advisory services; that such impediment to reliance on those exemptions would pave the path for litigation by reaffirming proxy advisors' subjection to Rule 14a-9 through magnified claims of erroneous proxy papers - which claims cited by the SEC have since been found to be unsubstantiated by CII; and that the Commission proposes feedback mechanisms that would introduce undue influence into otherwise objective research and analysis on which investors rely in order to submit informed votes on ballot proposals concerning the companies in which they share ownership.

We respectfully urge the Commission to re-evaluate the proposed amendments, with due consideration to comments and data provided by investors, coalitions representing investor interests, and the Investor-as-Owner Subcommittee, which has submitted their own analysis and proposal to its oversight body, the SEC's own Investment Advisory Committee. The following comments and supporting data echo those in the relevant comment record which oppose the proposed rulemaking, with additional context from PERA's own perspective and analysis.

**Regarding the Proposed Codification of the Commission's Interpretation of "Solicitation" Under Rule 14a-1(l):**

According to the SEC's filing:

> *"The proposed amendment would add paragraph (A) to Rule 14a-1(l)(1)(iii)45 to make clear that the terms "solicit" and "solicitation" include any proxy voting advice that makes a recommendation to a shareholder as to its vote, consent, or authorization on a specific matter for which shareholder approval is solicited, and that is furnished by a person who markets its expertise as a provider of such advice, separately from other forms of investment advice, and sells such advice for a fee."[3]*

In the release, the Commission also recognizes that the term "solicit" has historically excluded proxy advisors: "Under such a view, 'solicitation' arguably might be limited to requests to obtain proxy authority or to obtain shareholder support for a preferred outcome."[4] Although the SEC argues the solicitation codification is consistent with broader intentions of the definition, we argue that the new interpretation of proxy advisory services as solicitation is contrary to the original and historically accepted qualification, and confuses advisors with solicitors, which definition has far-reaching implications for proxy advisors and investors.

There is a fundamental difference between the actions of proxy solicitors and proxy advisors. Proxy solicitors are persons who urge shareholders to vote in a specific manner to achieve a specific outcome. Proxy advisors are independent bodies who provide unbiased research on proxy topics and are indifferent to the outcome of the votes. Therefore, PERA does not view proxy advice as "solicitation".

PERA contracts with Institutional Shareholder Services (ISS) and Glass Lewis for various services, including research, vote recommendations, and vote submission, all of which assist us with fulfilling our fiduciary

---

[3] https://www.sec.gov/rules/proposed/2019/34-87457.pdf
[4] *Id.*

duty to vote proxies in a cost-effective, efficient manner. While these services are utilized in support of our voting process, PERA does not 'robo-vote' in harmony with any advisor's recommendations.

PERA votes proxies in accordance with its Board-adopted Proxy Voting Policy, which seeks to promote best practices in corporate governance for alignment between companies' and shareholders' interests.[5] Our Proxy Voting Policy has been in place for 40 years, and is periodically reviewed and updated in order to capture those issues which PERA believes are most impactful and relevant in corporate governance. Through the lens of our custom policy, we review the research provided by advisors, analyze the potential implications of ballot measures, and vote in line with our own guidelines.

Throughout the voting process, we exercise the right to vote in the best interests of our plan beneficiaries, regardless of how other investors vote or the recommendations made by proxy advisors. This is evidenced in PERA's voting record. Over the past 5 years, Glass Lewis's recommendations aligned with PERA's policies and guidelines on an average of 91% of proposals we voted. This majority alignment should not be misinterpreted as indicative of robo-voting. Rather, this is reflective of coalescence among proxy advisors and institutional investors on what constitutes best practices for corporate governance activities that are additive to shareholder value.

PERA attributes the 9% average balance of proposals voted against, or otherwise mixed in comparison to, Glass Lewis's recommendations to differences of opinion on ballot matters and their implications to us as investors. Just as buy-side securities analysts would not be expected to trade in accordance with sell-side analysts' recommendations 100% of the time, we do not expect that our proxy votes will align with the recommendations of proxy advisors 100% of the time. In either case, PERA values such research and recommendations as additional inputs into our own analyses, and contributory to informed decision making in line with our own investment objectives. The usefulness of proxy research and disclosures to PERA is further discussed in the sections below.


**Regarding Proposed Amendments to 14a-2(b) Rules:**

If the SEC's proposed codification of proxy advice as solicitation were to become legally effective, proxy advisors would be subject to new filing requirements. According to the Commission: "The purpose of Section 14(a) is to prevent 'deceptive or inadequate disclosure' from being made to shareholders in a proxy solicitation."[6]

On this premise, the SEC has further proposed amendments to Rules 14a-2(b)(1) and (b)(3), on which exemptions proxy advisors have historically relied in order to provide efficient communications useful to shareholders in the proxy voting process. Under qualification as solicitation by the SEC's proposed changes to Rule 14-a(1)(I), proxy advisors would no longer be able to rely on federal filing exemptions within the 14a-2(b) rules unless they complied with expanded disclosure requirements.

The Commission declares these proposed amendments would:

---

[5] https://www.copera.org/sites/default/files/documents/proxy_voting.pdf
[6] https://www.sec.gov/rules/proposed/2019/34-87457.pdf

*(i) improve proxy voting advice businesses' disclosures of conflicts of interests that would reasonably be expected to materially affect their voting advice, (ii) establish effective measures to reduce the likelihood of factual errors or methodological weaknesses in proxy voting advice, and (iii) ensure that those who receive proxy voting advice have an efficient and timely way to obtain and consider any response a registrant or certain other soliciting person may have to such advice.*[7]

As a large shareholder and client to proxy advisors, Colorado PERA would like to take this opportunity to counter the SEC's rationale for the proposed amendments to the 14a-2(b) rules.


### 1. Proposed Rule 14a-2(b)(9)(i) on Conflicts of Interest Disclosures

Under this revision, to qualify for an exemption, proxy advisors must disclose material conflicts of interests, material interest "in the matter or parties concerning which it is providing the advice", material transactions or relationships between involved parties regarding the matter, any information that would be "material to assessing the objectivity of the proxy voting advice", as well as policies and procedures that address these conflicts of interest.[8]

As stated by the SEC, the rationale for amendments to Rule 14a-2(b)(9)(i) is as follows:

*We believe that by requiring proxy voting advice businesses to provide standardized disclosure regarding conflicts of interest, clients of these businesses would be in a better position to evaluate these businesses' ability to manage their conflicts of interest, both at the time the proxy voting advice business is first retained and on an ongoing basis.*[9]

As previously mentioned, PERA utilizes research reports from Glass Lewis and ISS to assist with its evaluation of items on a proxy ballot. PERA has analyzed each firm's disclosures and management of conflicts of interest. We concluded that the potential conflicts are harmless to the independence of the research, would not sway an investor's opinion, and the existing firewalls to prevent contamination of objectivity -- where applicable to specific proxy advisors -- are sufficient.

The SEC's revision asks advisors to disclose instances where research is offered by the proxy advisors that serve the same corporate clients through separate lines of their business. ISS does disclose the names of its advisory clients upon request, a service that PERA has utilized. In addition, we requested information from ISS regarding the separation of information and physical location between their proxy service research and advisory businesses, and received a satisfactory response.

Importantly, we find that disclosed firewalls between ISS's business arms are adequate for controlling any inappropriate exchange of information that could infringe upon the objectivity of their research business. This includes the disclaimers made by ISS in their proxy papers, which broadly and consistently describe that there *may be* relationships between the subject issuer of proxy research and ISS's corporate governance consultation arm, which provides services to issuers.

---

[7] *Id.*
[8] *Id.*
[9] *Id.*

Contrary to the Commission's conclusion that such disclosures inadequately inform investors, these statements are actually intentionally broad to maintain the integrity of the firewalls that exist between ISS's proxy research and corporate consulting arms. By disclosing potential, and not actual, corporate consultant clients, ISS upholds its firewall policies to not influence its proxy research business with information about corporate clients.[10]

Likewise, upon evaluation of Glass Lewis's policies, procedures, and disclosures on conflicts, PERA has found no reason to be concerned with the number or content of disclosures.[11] Nearly half of perceived conflicts of interest disclosed by Glass Lewis to PERA represent occasions of Glass Lewis's engagement with registrants. We do not see this as a conflict to clients, nor to the registrants. On the contrary, we see this as a necessary function for Glass Lewis to obtain the issuer information necessary to conduct thorough analysis.

Furthermore, another 32% of disclosed conflicts of interest represent occasions on which a registrant purchased Glass Lewis's proxy research on their own meeting.  PERA takes a positive view on such behavior – this signifies to us that companies are trying to ascertain how proposals are understood from the view of third party, objective analysis, and this could lead to increased alignment of proposals with shareholder interests.

The remainder of these disclosures address relationships or ownership structures that could potentially be perceived as a conflict of interest. The disclosures are clear and provide adequate information for us to assess whether there are conflicts of interest that may impact the proxy research or our use thereof. While the disclosures are not standardized across proxy advisors, we find the information contained therein to be adequate for comparability.

In PERA's view, the scope, quality, and placement of disclosures made by proxy advisors are adequate in informing clients of real or potential conflicts of interest that are material for consideration in determining the independence and usefulness of purchased products. Standardized metrics of disclosure may not be equally applicable across all proxy advisor firms, as each may have different business functions which may support or contradict the necessity of some standards of disclosure. We do not believe that such requirements are necessary to boost our understanding of the conflicts of interest that are particular to each proxy advisor, nor would they enhance the usefulness of the reports and services we purchase.

By requiring not only more, but also uniform, disclosures, the Commission is effectively tasking proxy advisors with compliance burdens that do not add value from the investor client's perspective. We caution that requirements could also have the unintended effect of precluding disclosures from the standardized template which would otherwise have been made known to clients, as deemed appropriate by the proxy advisors that are party to specific relationships through courses of their unique businesses. These

---

[10] For more information on ISS's policies, see:
https://www.issgovernance.com/file/duediligence/code-of-ethics-nov-2019.pdf
https://www.issgovernance.com/file/duediligence/Disclosure-of-Significant-Relationships.pdf
[11] For more information on Glass Lewis's policies, see:
https://www.glasslewis.com/wp-content/uploads/2019/11/GL-Code-of-Ethics-051019.pdf
https://www.glasslewis.com/wp-content/uploads/2019/11/GL-Policies-and-Procedures-for-Managing-and-Disclosing-Conflicts-of-Interest-050819-FINAL.pdf
https://www.glasslewis.com/wp-content/uploads/2019/05/GL-Policies-and-Procedures-for-Managing-and-Disclosing-Conflicts-of-Interest-050819-FINAL.pdf

5

demands could also jeopardize the integrity of firewalls where they are currently beneficial to preserving objective analysis.

While PERA is an advocate for effective, material disclosures, we view the proposed changes to disclosures on conflicts of interest by proxy advisors to be unwarranted, and believe they will add cost, rather than value, as currently proposed by the Commission.

### 2. Proposed Rule 14a-2(b)(9)(ii) on Registrants' and Other Soliciting Persons' Review of Proxy Voting Advice and Response

#### a. Need for Review of Proxy Voting Advice by Registrants and Other Soliciting Persons

The Commission's proposal indicates that a number of concerns have been voiced by issuers over:

> …factual errors, incompleteness, or methodological weaknesses in proxy voting advice businesses' analysis and information… that could materially affect the reliability of their voting recommendations and could affect voting outcomes, and that processes currently in place to mitigate these risks are insufficient.[12]

In a 2018 study of proxy advisors commissioned by the American Council for Capital Formation ("ACCF"), "supplemental proxy filings during 2016, 2017 and a partial 2018 proxy seasons (though September 30, 2018)" were reviewed and 139 errors were identified.[13] In a letter to the SEC dated October 24, 2019 and including corrections made October 25, 2019, CII noted that, during the time period of the ACCF study, "ISS reported on 15,646 shareholder meetings at U.S. operating companies, and Glass Lewis reported on 16,184 U.S. company shareholder meetings."[14] If the findings of 139 errors are correct, ISS and Glass Lewis had a combined 0.4% error rate in their supplemental proxy filings, which is *de minimus*.

CII evaluated the filings referenced in the ACCF study and concluded, "it is clear that most of the claimed 'errors' actually are disagreements on analysis and methodologies, and that some other alleged proxy advisory firm errors derive from errors in the company proxy statements. Finally, in some cases, ACCF simply misstates what the company said. We think ACCF has documented no more than 18 reports with factual inaccuracies that can be blamed on proxy advisory firms, not the 39 that it claims." If only 18 of the 31,830 reports contained incorrect information, the combined error rate of Glass Lewis and ISS in these supplemental proxy filings was a mere 0.06%.

Similarly, the Commission's own analysis in the proposal indicates errors in proxy reports are immaterial in the proxy voting process. Table 2 on page 96 of the SEC's filing cites 54 out of 17,296 (or 0.3%) of registrants that filed proxies between 2016-2018 raised concerns about factual errors (as classified by the SEC) in proxy advisors' reports through additional definitive proxy materials. More importantly, zero of the claimed errors were deemed by the Commission to be material, and zero errors were determined by the SEC to have an effect the outcome of the vote.[15]

---

[12] https://www.sec.gov/rules/proposed/2019/34-87457.pdf
[13] https://accfcorpgov.org/wp-content/uploads/2018/10/ACCF_ProxyProblemReport_FINAL.pdf
[14] https://www.sec.gov/comments/4-725/4725-6357861-196392.pdf
[15] https://www.sec.gov/rules/proposed/2019/34-87457.pdf

Concerns about errors in proxy reports are not shared by PERA. In the 30 years that we have contracted with proxy advisors, we have not known of any material issues with, or errors in, the proxy reports and analysis. Additionally, PERA has never been approached by an issuer to discuss what they perceived as material issues in a proxy advisor's report.

Based upon PERA's own experience, as well as the results of the ACCF study and subsequent analysis by CII and the SEC we do not see a definitive, documented need for review of proxy voting advice by registrants and other soliciting persons. We are concerned with the Commission's acceptance of these reported errors as proof that rulemaking is necessary.

### b. Review of Proxy Voting Advice by Registrants and Other Soliciting Persons

The Commission's proposal binds unease over negligible errors with complaints from "many registrants" that:

> …(i) they lack an adequate opportunity to review proxy voting advice before it is disseminated, (ii) there are not meaningful opportunities to engage with the proxy voting advice businesses and rectify potential factual errors or methodological weaknesses in the analysis underlying the proxy voting advice before votes are cast, particularly for registrants that do not meet certain criteria (such as inclusion in a particular stock market index), and (iii) once the voting advice is delivered to the proxy voting advice business's clients, which typically occurs very shortly before a significant percentage of votes are cast and the meeting held, it is often not possible for the registrant to inform investors in a timely and effective way of its contrary views or errors it has identified in the voting advice.[16]

This portion of the proposal would allow registrants and other soliciting persons to review and respond to the proxy voting advice prior to publication, with a feedback window dependent upon the number of days before the annual meeting that a proxy is filed. The proposal acknowledges that proxy advisors are faced with a short deadline to prepare and disseminate their research; the SEC noted that this "proposed rule is intended to provide an incentive for registrants and others to file their definitive proxy statements as far in advance of the meeting date as practicable."[17]

The proposed rule would also require proxy advisors to provide issuers and solicitors with final notices of their advice "no later than two business days prior to the delivery of the proxy voting advice to its clients", regardless of whether the issuer provided feedback during the prescribed window.[18] The proposal would require the notice to include any revisions to the advice resulting from the review and feedback period.

It is interesting that this proposed regulation is the very opposite of what is mandated for securities research analysts. According to FINRA Rule 2241, "sections of a draft research report may be provided to … the subject company for factual review so long as: (a) the sections of the report submitted do not contain the research summary" and the analyst's legal or compliance personnel has been provided a

---

16 https://www.sec.gov/rules/proposed/2019/34-87457.pdf
17 Id.
18 Id.

complete draft of the report.[19] Therefore, if this proposed regulation is adopted, a research analyst would violate securities law by providing a copy of the report to the company in advance of publication, while a proxy advisor would violate securities law if they did not provide it to the company in advance.

This is an unusual and confusing contradiction of the rules applied to research reports. PERA agrees with the Investor-as-Owner Subcommittee of the SEC Investor Advisory Committee in its January 16, 2020 recommendations, "The draft rule appears to treat proxy advisors inconsistently with other advice providers and in a number of respects it could have the effect of creating unmanageable conflicts of interest by inserting the issuer in the advisory process."[20]

As stated by the SEC's release, the rationale for amendments to Rule 14a-2(b) is as follows:

> *We believe that establishing a process that allows registrants and other soliciting persons a meaningful opportunity to review proxy voting advice in advance of its publication and provide their corrections or responses would reduce the likelihood of errors, provide more complete information for assessing proxy voting advice businesses' recommendations, and ultimately improve the reliability of the voting advice utilized by investment advisers and others who make voting determinations, to the ultimate benefit of investors.*[21]

PERA does not find the above complaints and rationale to be adequate grounds for the proposed rulemaking. As it pertains to opportunities for reviewing proxy advice, registrants may currently purchase papers on their company meetings from proxy advisors. From the conflict of interest disclosures provided to us by proxy advisors, we know that issuers do take advantage of that service. Even so, we reiterate that PERA has not been approached by registrants seeking to clarify errors or misinterpretations in proxy papers, either before or after votes have been cast.

Registrants may also take advantage of formal, documented, and market-based mechanisms for engaging with proxy advisors, such as through Glass Lewis's pilot Report Feedback Statement service.[22] Such services provide issuers and shareholders with a formal communication channel through which to clarify viewpoints or to identify factual errors in voting advice, without filter.

It is important to note that companies are not frequently making use of Glass Lewis's Report Feedback Statement service. In 2019, the pilot program offered a feedback mechanism to 12 issuers and/or shareholder proponents per week. Of the 624 total offerings made by Glass Lewis during the pilot, only six issuers (or less than 1% of offered entities) utilized the Report Feedback Statement service during the 2019 proxy season.[23] If issuers are not currently taking advantage of this program, we question the true appetite of companies to review reports, and adhere to the mandatory feedback and final notice periods as proposed by the SEC.

---

[19] https://www.finra.org/rules-guidance/rulebooks/finra-rules/2241?rbid=2403&element_id=11946
[20] https://www.sec.gov/spotlight/investor-advisory-committee-2012/iac-recommendation-proxy-advisors-shareholder-proposals.pdf
[21] https://www.sec.gov/rules/proposed/2019/34-87457.pdf
[22] https://www.glasslewis.com/report-feedback-statement-service/
[23] Information privately disclosed to PERA pursuant to policies found here https://www.glasslewis.com/report-feedback-statement-service/ stating that "Upon request, Glass Lewis will provide quarterly reports that list the issuers and shareholder proponents that subscribed to the Report Feedback Statement service."

Moreover, allowing an issuer to review and respond to a proxy advice prior to its release to consumers introduces the potential for undue influence on a neutral party. PERA values independent, unbiased research. The research and analysis we receive from Glass Lewis and ISS currently meet this criteria. However, we are concerned that objectivity would be compromised were registrants granted feedback and final notice periods for additional comment.

Contrary to the Commission's intent, the mandatory feedback windows and the two day final notice period could result in delayed investor access to proxy advisor reports, which may negatively impact our ability to fulfill our responsibilities in the proxy voting process. It is imperative that investors have adequate time between receipt of proxy research and voting deadlines in order to review and vote proposals in accord with their fiduciary duty.

As stewards of pension fund assets, we strive to minimize costs to preserve the value of benefits offered to our members. If the window between publication of such research and company meetings is compressed, PERA may not have sufficient time to evaluate these reports and make an appropriate voting decision. We currently have the appropriate staff to handle our proxy process. However, if these amendments were to pass, PERA believes additional resources would be required to vote proxies in a timely fashion, especially during the proxy season, and the cost of such staffing would be significant.

### c. Response to Proxy Voting Advice by Registrants and Other Soliciting Persons

Additionally, the Commission's proposed final notice period would:

> *…allow the registrant and/or soliciting person to determine whether or not to provide a statement in response to the advice and request that a hyperlink to its response be included in the voting advice delivered to clients of the proxy voting advice business.*[24]

This portion of the proposed amendments would require proxy advisors to allow issuers and other solicitors the opportunity to provide a written response to the research that would be included as a hyperlink in the advisors' reports.

The SEC's rationale for this proposal is as follows:

> *The proposed amendments would provide a more efficient and timely means of ensuring that a proxy voting advice business's clients, including investment advisers, are able to consider registrants' views at the same time they are considering the proxy voting advice and before making their voting determinations.*[25]

Currently, when PERA reviews proxy research, we can simultaneously review registrant proxy filing materials, through the proxy advisor's submission platform, to inform our vote. We do not foresee that issuers or shareholders would add information above and beyond what they have so meticulously laid out in their proxy filings. As such, we believe the Commission's rationale for the proposed amendment is misguided.

---

[24] https://www.sec.gov/rules/proposed/2019/34-87457.pdf
[25] *Id.*

Furthermore, we see another interesting bifurcation here in requirements between research provided by proxy advisors and public market analysts. Sell-side firms are not obligated to provide a link to a written response from the subject of their analysis. The inclusion of an issuer-sponsored hyperlink in a research document, whether from a proxy advisor or an analyst, could potentially cause the recipient of such analysis to question its independence and objectivity.

To comply with this amendment, a proxy advisor would have to coordinate the hyperlink inclusion with the issuer. It is PERA's understanding that advisors currently do not have this functionality available, and would be required to build it themselves or purchase it from a software vendor. The cost of this functionality may ultimately be passed on to the clients.

Additionally, inclusion of a hyperlink would add an unnecessary layer of complexity to the proxy process. Would the advisor or the issuer bear the risk if the hyperlink were incorrect or unsupported? If the issuer were required to submit the hyperlink contents as a supplementary filing, would the advisor be exposed to liability if this process did not happen prior to publishing of the link, or perhaps at all? We respectfully request the SEC to consider these questions and their impact prior to moving forward with their proposals.

**Regarding Proposed Amendments to Rule 14a-9:**

Proxy advisors are already subject to Rule 14a-9, a fact the SEC has reaffirmed in their recent guidance and proposals. In addition to the current examples of misleading information within the Rule text, proposed amendments would ask a proxy advisor to:

> *…disclose information such as the proxy voting advice business's methodology, sources of information and conflicts of interest" to ensure their research is not "materially false or misleading."*[26]

In a January 2020 SEC comment letter from Glass Lewis, they noted that this amendment would "require proxy advisors to publicly file proprietary information - the proxy advice that is their product - even though the SEC has no apparent plans or use for the information."[27] This disclosure of their resources used in data collection, proprietary methodology, and anything that may potentially be deemed a conflict of interest could result in advisors losing their competitive advantage.

The SEC's rational for this addition is as follows:

> *By including this example, our focus is on ensuring that any advice provided to those clients is not materially misleading with respect to its underlying bases.*[28]

As described above, Glass Lewis and ISS have been forthcoming regarding real or perceived conflicts of interest. Both firms have readily discussed the matter with PERA, and we are satisfied with the quality of information and disclosures received. We are also satisfied with the factual inputs and thorough analysis

---

[26] *Id.*
[27] https://www.glasslewis.com/wp-content/uploads/2020/01/GL-PRA-Letter-01072020.pdf
[28] https://www.sec.gov/rules/proposed/2019/34-87457.pdf

provided by proxy advisors. Where there is need to revise those inputs and/or resulting recommendations, we appreciate that proxy advisors provide prompt access and full disclosure of the amended reports, regardless of the level of materiality they may present to our voting decisions.

PERA does not need the details of an advisory firm's proprietary methodology or sources of information to be publicly disclosed in order to benefit from the ensuing product. On the contrary, we foresee such public disclosure requirements could reduce the benefits via increased costs and limited market competition.

PERA appreciates market competition, which motivates proxy advisors to be accurate, unbiased, and thorough in their research. A healthy number of service providers also promotes price competition, which helps keep costs manageable for investors. There are currently only a handful of U.S.-based proxy advisory firms; further contraction in this industry would lead to less price competition and higher costs for clients.

PERA believes these potential regulations would unnecessarily increase compliance burden on proxy advisors, and the resulting costs would ultimately be passed on to investors. If these amendments were to pass, proxy advisors could see additional and undue burdens on their processes.

In 2018, Glass Lewis filed 5,565 U.S. proxy research reports. By their calculations, compliance with these regulations would prompt the firm to "make in excess of 21 SEC filings each business day of the year on an ongoing basis."[29] That is a significant number. Additionally, Glass Lewis' "Estimated Annual, Ongoing Compliance Burden of SEC Exemptive Conditions" would amount to 59,999 burden hours.[30] The SEC has estimated compliance at 250 hours, after the first year in which the requirements become effective.[31] There is a clear disconnect between the two estimates.

In addition to operational costs, the SEC acknowledges that proxy advisors may also incur litigation costs: "Compliance with the proposed amendments may require the use of professional skills, including legal skills."[32] Such operational, legal, and compliance costs will ultimately be borne by investors. It is evident that more work needs to be done to fully assess the impact of these amendments.

In sum, we agree with ISS' statement that "The net effect of the [proposals] will be to not only diminish important investor protections but also impair what is now a balanced, independent, transparent, and well-functioning relationship between proxy advisers and their clients that over recent decades has resulted in an efficient and effective system for proxy voting."[33] As an institutional investor, we support free market operations, balance, and transparency in all aspects of the investment business.

PERA champions the SEC's mission to protect investor interests. However, we do not believe the proposed amendments in their current form are aligned with that pursuit. We again urge the Commission to heed comments from investors, proxy advisors, CII, and the SEC Investment Advisory Committee's Investor-as-Owner Subcommittee in a more dutiful consideration of the potential impacts of its proposed rulemaking.

---

[29] https://www.glasslewis.com/wp-content/uploads/2020/01/GL-PRA-Letter-01072020.pdf
[30] *Id.*
[31] https://www.sec.gov/rules/proposed/2019/34-87457.pdf
[32] *Id*
[33] https://www.issgovernance.com/iss-files-suit-over-august-sec-guidance/

Thank you for considering public comment in your reflection on these amendments. We appreciate the Commission's devotion of time and consideration to Colorado PERA's perspective as an institutional investor.

Sincerely,

Ron Baker
Executive Director
Colorado Public Employees' Retirement Association



Ms. Vanessa Countryman, Secretary
U.S. Securities and Exchange Commission
100 F Street, NE, Washington, DC 20549-1090
February 3, 2020

**Subject: Amendments to Exemptions from the Proxy Rules for Proxy Voting Advice; Exch. Act Release No. 34-87457 (File No. S7-22-19)**

**Dear Secretary Countryman,**

On behalf of the California Public Employees' Retirement System (CalPERS), we write to comment on the Securities and Exchange Commission's (SEC or Commission) proposed rule entitled Amendments to Exemptions from the Proxy Rules for Proxy Voting Advice (Proposed Rule or Release). As the largest public defined-benefit pension fund in the United States, we manage approximately $400 billion in global assets on behalf of more than 1.9 million public employees, retirees, and beneficiaries. Our duty to pay benefits decades into the future requires that we take a long-term view when assessing whether the companies that we hold in our portfolio are effectively managed.

As of December 31, 2019, CalPERS owned 3,600 U.S. companies. In the 2019-2020 proxy season, we have thus far been asked to vote on 3,313 proxies covering a wide range of areas. In determining how to vote on these proxy issues, CalPERS seeks to ascertain the most accurate, reasonably available information.[1] Because we cannot possibly be experts in all areas upon which we may be asked to vote, we also seek out research from third parties, including proxy advisors. While we generally want more information from companies and have petitioned the SEC to expand and enhance issuer disclosures in a number of material ways,[2] the Proposed Rule would go in the opposite direction. Instead of providing us with more useful and reliable information, the Proposed Rule would make the process more complicated and expensive for clients/customers that use proxy advisor research services without materially improving the quality, quantity, or timeliness of information.

Worse, the Proposed Rule lacks key details,[3] which we do not believe can be adequately addressed through voluntary, cross-industry collaboration (as the Release suggests), and which would require significant subsequent SEC determinations. The lack of implementation details makes it impossible for us to adequately assess the full impact of the Proposed Rule on

---

[1] The standard articulated in the Release that, "proxy advice be based on the most accurate information reasonably available,"[1] is already being met by the current system.
[2] See, e.g., Letter from Cynthia Williams, et al, to Brent J. Fields, SEC, Oct. 1, 2018, at https://www.sec.gov/rules/petitions/2018/petn4-730.pdf.
[3] Release at 59, stating, "Because there may be a number of implementation details to resolve, effective coordination between proxy voting advice businesses and registrants (and certain other soliciting persons, as applicable) would be needed."

CalPERS, much less on the markets overall. Furthermore, the paucity of relevant details raises questions regarding the accuracy and utility of the limited (and arguably misleading) economic analysis that was provided in the Proposed Rule. Accordingly, we urge the Commission to abandon its effort to disenfranchise shareholders through this insufficiently supported Proposed Rule, and instead look to enhance the access to or/the availability of information for investors like CalPERS.

## I. PURPOSE OF THE PROPOSED RULE

While the Release suggests that the Proposed Rule is necessary to protect investors from potentially incomplete or conflicted advice, the reality is that there has been no investor demand for the Proposed Rule. The push for reforms in this area is not from investors who are obtaining the advice (like CalPERS), but instead is from the companies that are subjects of the advice sought. The Release is facially not an effort to protect shareholders but is instead a clear effort to protect company executives from shareholders.

The Release explicitly acknowledges companies' complaints that the proxy experts we hire are somehow not sufficiently considering their side of the story when providing research information and analyses. However, there is no relevant economic analysis or data to support that assertion. Nevertheless, the Proposed Rule would create a massive new process through which proxy advisors would have to engage with companies and communicate with us. So, while the SEC has offered no details regarding any potential benefits, we know for certain that the new proposed process would add significant complexity, time, and costs for us.

Put simply, company executives and their allies are now using the federal regulatory apparatus to make the proxy evaluation process more costly, complex, and less useful to us—the clear objective of which is to ensure company executives receive investor support for management proposals more often. In reality, management often has little to fear. Some of those who provide us with proxy voting advice recommend voting in favor of management approximately 85 percent of the time. But the differences (often involving Board director elections and executive compensation decisions) are typically materially impactful to executives.

## II. CALPERS' CONCERNS WITH THE PROPOSED RULE

The Proposed Rule would weaken proxy advisor services and make existing processes more difficult and more expensive for shareholders. The one-sided Proposed Rule appears to embrace changes requested by business trade groups without materially addressing concerns raised by shareholder interest groups—the firms that voluntarily hire the advisers to help us. As we read through the Proposed Rule, we are concerned that the industry as depicted or implied in the Proposed Rule may not accurately reflect the actual processes for informing the proxy voting system. The reality is that third parties that provide us with proxy voting advice side with company executives around 85 percent of the time. [4] Company executives and their allies have long pressed the SEC to reduce the ability of the proxy advisors that we hire to provide us with timely information which we need to make informed proxy decisions and simultaneously reduce our ability to rely on that advice.

---

[4] Directors won 98.6 percent of the time in Russell 3000 and shareholder proposals failed 82 percent of the time in Russell 1500 in recent elections according to Georgeson/Proxy Insight 2019 Annual Corporate Governance Review.

The Proposed Rule would force proxy voting advice businesses to operate differently or risk losing their businesses. When the market provides votes in favor of management 90 percent of the time, it is pragmatically very difficult for a company to lose a proxy vote. Our experience is that when a company loses a vote, there are generally material issues that the company should address. The Proposed Rule would provide relief to the most deficient companies when the better course would be for companies to enhance disclosures, communicate better with shareholders, and make changes to corporate culture or operations. The Proposed Rule would weaken our ability to act when a company falls short of a baseline requirement, so we will have to pursue additional/alternative methods to effectuate change that will likely be more critical of corporate practices and more expensive to implement.

If adopted, the proxy voting process will take longer and likely result in more shareholders failing to vote on time at some companies. One way for investors to reduce this timing constraint would be to vote at fewer companies. This may be accomplished by abstaining from voting or divesting, which removes the requirement to vote. Some investors will critically examine their portfolios and may decrease the number of companies they are invested in to reduce voting requirements. Such divestment will most often adversely impact smaller companies. Additionally, while a portion of the Proposed Rule addresses conflicts, the changes may create a system that will make proxy advisors captive to registrants, in a way that will likely make the advice we receive far more conflicted because proxy advisor independence is weakened.

Below, we address each section of the amendments included in the Proposed Rule.

### A. Proposed Codification of the Commission's Interpretation of "Solicitation" Under Rule 14A-1(L) and Section 14(A)

The market for proxy voting advice has matured over the past 36 years. Treating this advice as a "solicitation" constitutes a fundamental shift and may have a chilling effect on shareholder communications. The Proposed Rule's explanation for this shift is not clear to us. Each time it addresses the shift/change, the reader is referred to the definition of a "solicitation" without providing an example or explanation. For example, page 15 of the Release states, "the definition of a solicitation may result in proxy advisory firms being subject to the federal proxy rules because they provide recommendations that are reasonably calculated to result in the **procurement, withholding, or revocation of a proxy.**"[5] Repeatedly, the same highlighted phrase is used in the Release without making a connection as to how proxy voting advice constitutes either "procurement, withholding, or revocation."[6] It appears to us that the three terms appear to actually apply to a "proxy statement" rather than a proxy vote;[7] however, the Release equates proxy voting advice with the right to vote on another's behalf and in a manner that would benefit a particular party without explanation.

Since the change will shift an entire market, the SEC should provide greater detail regarding the connection. In our view, if the conclusion were obvious that proxy voting advice is a solicitation, this interpretation would have been the standard decades ago which would have allowed another

---

[5] Release at 15.
[6] Release at 15, 16, and 85.
[7] Release at 136 (including the current definition of solicitation (iii) The furnishing of a form of proxy or other communication to security holders under circumstances reasonably calculated to result in the procurement, withholding or revocation of a proxy.)

system of proxy voting information to develop. In other words, even if correct, the SEC should explain more regarding the benefits of shifting an entire market now.

### B. Proposed Amendments to Rule 14A-2(B)

#### a. Conflicts of Interest

The Proposed Rule presents a solution to an academic problem that poses no practical threat. We see no evidence that conflicts of interest with proxy advisors have led to voting advice that conflicts with our voting policies. In other words, proxy advisors are not calling balls and strikes differently for clients and non-clients. Proxy voting advice businesses help lead their registrant clients to the strike zone. We have noted no proxy voting recommendations that threaten our view of proxy advisors' "objectivity or reliability."[8] We have sought no help from the SEC in monitoring proxy advisors or in enhancing the information we receive regarding conflicts of interest. Interestingly, while investors who are clients have not sought the assistance, the SEC has moved to enhance such requirements for the apparent benefit of non-clients. Disclosures of conflicts of interest are important for participants in the financial markets to protect clients which makes the SEC's leap to protect non-clients more interesting given the SEC never explains its enhanced duties in this situation or where it might so intervene in the future to protect non-clients.

CalPERS evaluates proxy voting advice businesses by reviewing how well those proxy advisors follow our voting guidelines, so the advice can be compared against a stable standard, that if followed, would not include conflicting advice. We operate in a market that we know well and are comfortable with the existing state of the market. We see no impact in our votes or in the voting outcomes on company issues based on proxy voting advice businesses' potential conflicts. As such, we find it confusing that resources and attention are focused on proxy advisors who pose little danger.

We are generally happy with our proxy voting advice services and are comfortable with the current level of disclosures regarding conflicts of interest, given we check the actual advice against our voting guidelines. We also note that proxy advisors do a great job of influencing registrant clients to adopt good practices in corporate governance and assist in getting registrants to meet baseline standards. The Proposed Rule 14a-2(b)(9)(i) requirements are not necessary and will not improve the advice that we receive. The existing disclosures already address the concerns raised. It is not clear to what extent the SEC has reviewed all of the disclosures that proxy voting advice businesses already provide. The Proposed Rule creates a substantial amount of additional paperwork, while providing no benefits to proxy voting advice provided to business clients. The additional requirements would enhance the barriers to entry for other potential proxy advisory participants in the market making future competition less likely. While providing institutional investor clients no new information, Proposed Rule 14a-2(b)(9)(i) exists to make disclosures readily available to non-institutional investor clients.

Proxy advisor clients are primarily institutional investors with substantial capacity to review the voting advice and hire consultants or lawyers when a problem arises. We believe the SEC's resources could be better applied to improve disclosures of conflicts in other areas of the

---

[8] Release at 27.

financial market with greater potential to enhance transparency and investor protections. The approach could follow the model proposed for proxy advisors. Additional procedures should be applied to accountants,[9] credit ratings agencies, investment advisors, broker-dealers, securities analysts, lawyers, and corporate directors.

          b. Registrants' and Other Soliciting Persons' Review of Proxy Voting Advice and Response

Making proxy advisors have to clear proxy voting advice with management of companies creates far more conflicts than the existing system because it diminishes independence for proxy voting advisors. Enabling a non-client to review the work product before actual clients is a unique proposal that arguably violates the Constitution by taking private property for public use without compensation. It seems counterproductive to attempt reduce conflicts by making proxy advisors provide additional disclosures and then add a feature that has more significant conflicts which compromise independence. Institutional investor clients will then have to pay substantially more for the less valuable conflicted advice and have less time to review the voting information and vote. Under this proposed system, proxy advisors become substantially less independent, more costly, much more conflicted, and less useful.

As we have repeatedly stressed, proxy advisors already make recommendations favoring management more than 85 percent of the time. Table 2 of the Release places the number of factual errors among 17,296 companies at 54 or 0.3 percent.[10] Stated differently, that is an accuracy rate of 99.7 percent. There is no indication that any of the votes containing errors caused a different voting outcome. The primary votes against management occur in votes on non-binding shareholder proposals where management has the power to ignore the outcome using its veto. Under the current system, a registrant can review proxy advisor recommendations and protest the outcome to the proxy advisor without reducing the amount of time that shareholders have to vote. Registrants may also choose to engage shareholders and explain significant or problematic issues more thoroughly to get its shareholder base comfortable with certain votes. In no case are registrants made to be victims without recourse under the current system, so there is no reason to create a system of conflicted advice and make institutional investors pay more for it.

We acknowledge that the Business Roundtable, Center on Executive Compensation, Society for Corporate Governance, and Wachtell Lipton have all advocated for mandatory review periods for registrants,[11] but it is worth noting that no institutional investors have suggested that such review would enhance the quality, quantity, or timeliness of advice. Registrants appear to be silent on the issue, but most do not want the additional obligations to review recommendations given the existing overwhelming pro-management votes. Management loses few votes, so the additional requirement wastes company time.

---

[9] Amendments to Rule 2-01, Qualifications of Accountants. https://www.sec.gov/rules/proposed/2019/33-10738.pdf (SEC proposes amendments to reduce auditor independence requirements moving in the opposite direction from that of proxy advisers.)
[10] Release at 84.
[11] Release at 43, footnote 109. (Each organization mentioned has recommended this change.)

Proxy advisors publicly disclose their positions on key voting items with the annual publication of guidelines.[12] Many companies choose to ignore this valuable information that proxy advisors make publicly available. In our experience, when a company loses a vote, it isn't because of an error by a proxy adviser. Rather, when management loses a vote, it is because they generally have not addressed a major concern that needs to be addressed. Thus, the Proposed Rule provides additional protection for the most deficient registrants rather than encouraging better performance. Proxy advisory businesses provide detailed information on the key issues for proxy season. A registrant doing basic due diligence can find the institutional investor proxy voting guidelines online.[13] A better approach may be to encourage registrants to review the publicly available information and use it to inform their processes and disclosures.

Given that proxy advisors make key information public and highlight what they are looking for, it seems useless to let a registrant review proxy voting advice based on guidelines that went unreviewed though were publicly available. The registrant may argue it is unique and has reasons for diverging from the known standard, but the onus is on such registrant to communicate that to its shareholders in its proxy statement. The new registrant requirements are the equivalent of letting a company retake a test when an outline with all of the answers had been previously made available. Therefore, the proposed process will discourage additional participants from entering the proxy voting business market; slow down voting; increase vote failures; cost more for proxy voting advice business clients; create information overload when companies include additional information; and force shareholders to develop other systems.

On page 50, the Release partially acknowledges the magnitude of the problem when it says, "[w]e are mindful of the potential disruptions and costs that the proposed review and feedback period and final notice requirements could have on the current practices of proxy voting advice businesses and their clients."[14] The proposed fix is to limit the review and feedback period to registrants and "soliciting persons who intend to deliver their own proxy statements and proxy cards to shareholders."[15] This intentionally hinders shareholder proponents from getting a second chance to review and provide a hyperlink as well. In the shareholder proposal process, the registrant speaks last because it writes a response to the shareholder proposal and includes it in the proxy. Under the proposal, the proxy advisor would provide its voting advice to the registrant, and the registrant could then provide additional information. It is not necessary to allow the registrant an additional opportunity to comment because it already had the last word. On the most basic level, this is not fair to shareholders, especially when registrants have a final veto on non-binding proposals and can ignore the outcome of the vote.

We recognize that the proxy advisors are not required to revise advice, but a heavy hammer is placed over their heads by the added emphasis on Rule 14a-9 liability.[16] Each proxy advisor will face lawsuits in such a system given the large number of votes. Proxy advisors will have to account for the increased risks of lawsuits by charging clients more and asking clients to indemnify them in certain situations. Costs and risks to investors and proxy advisors will

---

[12] See e.g. https://www.glasslewis.com/2020-policy-guideline-updates-u-s-u-k-canada-europe-china-and-more/us-guidelines-cover-2020/
[13] Id.
[14] Release at 50.
[15] Id.
[16] Release at 51.

increase while actual oversight goes down substantially, leaving institutional investors more vulnerable.

Notably, proxy voting advisory businesses will only experience penalties when they recommend voting against management, because most companies will not correct proxy advisors when the recommendations favor management. Under such circumstances, the most effective and cost-efficient method of complying with the SEC's new requirements would be to simply advise voting with management 100 percent of the time in order to reduce litigation risks.[17]

Further, we have not been able to fully assess what it will mean for shareholders when they share voting advice. Many others may get caught in the new regulations unintentionally, so there is a substantial need to further clarify the definitions and determine the extent to which market participants will be silenced from communicating when companies fall short.

The Proposed Rule acknowledges that there are details to resolve and places it on proxy advisors and registrants and other soliciting parties to figure out the "number of implementation details."[18] This understates the degree of effort required by market participants to complete the work of the SEC. In fact, this creates a gap in the Proposed Rule that, in our opinion, is too large to overcome. It is not reasonable to expect opposing parties to work together to solve a collective action problem and develop the details of such a complex system. That is the role of the government, which should be an impartial arbiter and regulate accordingly. The SEC must fully develop the amendments and then present those amendments for review and comment. This has not happened with the Proposed Rule because the most significant details and costs born of the Proposed Rule have not been ironed out.

Although the Release states there is no new private right of action created by the new Rule 14a-2(b)(9), the process and greater focus on the Rule 14a-9 will make it more likely that proxy voting advice businesses will be sued under the new rules. It is not clear whether the proxy voting advice must produce a majority vote against management to be held liable. If mistaken advice produces a resubmission, a registrant may have grounds to sue a proxy advice business. If the information is wrong, a registrant will likely be able to successfully sue regardless of intent. This sets up proxy voting advice businesses for failure and makes them, for purely business reasons, less likely to recommend voting against management. Therefore, the voting advice would be compromised in a way that makes it less independent than it is today. It will also make it less likely that there will be new participants selling proxy voting advice. Shareholder proponents would be left out of the review system completely.

The Proposed Rule asks if registrants should enter confidentiality agreements with proxy advisors. This issue is never dealt with in the economic analysis because such confidentiality agreements would not be difficult to produce.[19] We disagree with the Release's conclusion. Entering 5,000 confidentiality agreements is a significant endeavor even if the agreements were simple. On the contrary, most of the large registrants will initially demand that their form and

---

[17] Release at 58. (The SEC states that it will "allow the parties the flexibility to determine the most effective and cost-efficient methods of compliance.)

[18] Release at 59.

[19] Release at 49, stating, "The terms of such agreement would apply until the proxy voting advice business disseminates its proxy voting advice to one or more clients and could be no more restrictive than similar types of confidentiality agreements the proxy voting advice business uses with its clients."

chosen forum dictate the agreement which in the best case will mean a given proxy voting advice business will have hundreds of different confidentiality agreements to manage. Each of the proposed agreements would also become a part of the detailed conflict disclosures. It is hard to develop all of the detailed processes that would need to be implemented to comply with the proposed process. It is exceptionally hard when the Release is lacking the details necessary to implement complete confidentiality agreements.[20] As part of the cost-benefit analysis, we recommend that the SEC survey law firms to determine how much would be charged to produce the contracts required to properly operate the system that has been proposed. Additionally, we ask that the SEC provide more details regarding the proposed system in order to allow any such estimates to be produced.

### C. Proposed Amendments to Rule 14a-9

We are keenly interested in any discussion of materiality at the Commission, such as the proposed amendments to Rule 14a-9:

> Rule 14a-9 prohibits any proxy solicitation from containing false or misleading statements with respect to any material fact at the time and in light of the circumstances under which the statements are made. In addition, such solicitation must not omit to state any material fact necessary in order to make the statements therein not false or misleading.[21]

Moving forward, proxy voting advice businesses will more clearly be subject to the same anti-fraud standard as registrants.[22] This will likely produce more suits against proxy voting advice businesses as well as registrants because the materiality bar is lowered. Registrants will lose more arguments that particular information is not material because the Release more firmly connects materiality to voting than it did in a recent release, Modernization of Regulations S-K Items, 101, 103 and 105. Moreover, registrants will not be able to claim certain information is material when suing proxy voting advice businesses and then claim it is not material when they are sued.

The character and construction of the proposed changes broadens materiality in a way that we embrace. Under the Proposed Rule, a proxy voting advice business could be held accountable for failing to disclose its methodology, sources of information or conflicts of interests to registrants.[23] So, without making payments to proxy voting advice businesses, those businesses will owe greater loyalty to registrants because of the new solicitation rules. In addition, if fair, registrants will be responsible if they fail to correct mistakes that run in their favor. Based on the tenor of the Proposed Rule, this may not be the intent, but it must be the logical outcome given that the registrants will have a direct role in the proxy voting advice.

Page 70 of the Release appears to suggest that proxy advisor business clients may mistakenly infer that a "negative voting recommendation is based on a registrant's failure to comply with the applicable Commission requirements when, in fact, the negative recommendation is based on the determination that the registrant did not satisfy the criteria used by the proxy voting advice

---

[20] Release at 59.
[21] Release at 68 referencing 17 CFR 240.14a.9.
[22] Id.
[23] Release at 70.

business."[24] We think it would be rare for the professionals that actually use proxy voting advice to make such a mistaken inference. Page 70 limits registrant requirements to meeting SEC standards and eliminates tactics used by practitioners to encourage board members to do their jobs. This would leave little room for private ordering,[25] and eliminate the need for shareholders to create their own principles and voting policies. Carrying the discussion that starts on page 70 to its end challenges the notion that any shareholder proposal would ever be proper. The only changes in corporate governance could come from the SEC.[26] The argument turns the entire notion of corporate governance on its head to attempt to further limit what information can be shared among shareholders and what issues can be addressed with a proxy vote.

The discussion in pages 70 to 73 provide examples highlighting a problem that does not exist in reality because proxy voting advice businesses already distinguish their advice from SEC guidance. In publicly available information, for example, on page 5 of the Glass Lewis Guidelines, it reads, "we apply our own standards when assessing the independence of directors."[27] The three-page discussion seems unfamiliar because it does not reflect our experience using proxy voting advice businesses. Practitioners understand where the information comes from and why it is in place. Competent lay people doing a minimal amount of research will find that proxy advisors routinely inform clients about where the standards come from because clients want to know. The proposal, beginning on page 70, expects proxy voting advice businesses to treat their institutional clients as lay people when dealing with basic knowledge within their profession. Proxy voting advise businesses should not be penalized by what the advocates against them failed to read about them online. Existing clients have few complaints about the quality of proxy voting advice and already know when proxy voting advice businesses produce their own guidance as opposed to report on the minimal requirements of the SEC.

*D. Transition Period*

Given the Release does not provide the details required to make the Proposed Rule work, leaving the development to the more than 5,000 registrants and existing proxy advisors,[28] a transition will take much longer than one-year. In fact, it is not clear that the required details will ever be developed. It is unclear how a given proxy voting advice business might work through such details with each available registrant without additional guidance. In order to develop the guidance, the SEC should engage experts with detailed knowledge of the proxy voting system. Once complete, the detailed rules should be circulated to the market for review. After analyzing a complete Proposed Rule, we could assess how long a transition might take. Without the detailed information, we cannot anticipate what the new system will require.

III. ECONOMIC ANALYSIS

The purported economic analysis contained in the Release is facially inadequate to support the Proposed Rule. In fact, the Release includes an acknowledgement of the limitations of its economic review, stating, "[m]any of the effects discussed below cannot be quantified.

---

[24] Release at 70.
[25] Private ordering takes place when shareholders agree how corporate governance will work at a particular company or many companies
[26] Release at 70 - 73.
[27] Glass Lewis at 5.
[28] Release at 59.

Consequently, while we have, wherever possible, attempted to quantify the economic effects expected from this proposal, much discussion remains qualitative in nature."[29] The statement actually minimizes the lack of economic analyses. Frankly, given that the Proposed Rule lacks key details, there is simply no way to conduct anything close to an adequate analysis. For example, other than acknowledging the reality that the Proposed Rule would increase the costs, complexity, and time needed by us, we cannot make any detailed analyses. We simply don't have the needed parameters.

One of the likely costliest (in terms of time and money) requirements would be to companies review of proxy voting recommendations. Yet, the Release does not quantify this cost. Furthermore, the Release does not clarify whether registrants will be held liable for failing to correct mistaken information that leads to proxy voting advice that runs in their favor. As we mention elsewhere, a large portion of the errors in proxy-related information and analyses provided to us by third parties arises from errors made by the companies they are studying. Nevertheless, from our view, it appears likely that they would be liable for these types of errors that are clearly not their fault. As such, the cost of the Proposed Rule could far exceed the stated expectations.

It is clear to us that the Proposed Rule would make fulfilling our fiduciary duties to vote our shares much more complex and expensive while reducing our potential benefits. We cannot provide an estimate of additional costs because details of the Proposed Rule are not complete. The SEC should provide a supplement containing complete details so that we – and it -- could estimate the potential costs. Further, the Release does not examine the risk of institutional and index investors divesting from certain small investments if the increased voting costs cannot be justified by expected returns on such investments. Like with the proposed rule on shareholder proposals, there is a possibility that certain investors may reallocate investments because of the Proposed Rule. Thus, in providing certain relief to large companies, the Proposed Rule may very well change investment patterns that will reduce investments in smaller companies. This possibility should be included in the economic analysis.

## IV. CONCLUSION

The Proposed Rule would undermine our efforts to fulfill our fiduciary duty to make informed proxy voting decisions. Under the guise of protecting investors, the Proposed Rule would make the process more complicated and expensive without materially improving the quality, quantity, or timeliness of information provided to investors. The Proposed Rule offers no data to support the theory that the proxy advisors we hire provide us with systematically inaccurate or misleading information. On the contrary, we value their advice or we would provide other sources.

Further, the Proposed Rule would produce a system that is arguably more conflicted, as it would provide registrants the right to review proxy voting advice prior to it being disseminated to the clients that pay for it. The assumption is that this would give registrants an opportunity to make certain the information is accurate, but currently, there are extremely few factual mistakes. And of those, the vast majority are because the information used by our experts has been obtained directly from erroneous company disclosures.

---

[29] Release at 107.

But these are not the only problems with the Proposed Rule. Our instant, pragmatic problem is that we cannot fully analyze its impact on CalPERS because many of the details simply aren't provided. Instead, the SEC essentially punted many key decisions to be subsequently voluntarily determined by registrants and proxy voting advice businesses.[30] Thinking through the complex details that will establish the rules for more than 5,000 businesses without further guidance is not likely to get completed in the near term, especially when factoring the varied interests.

As written, the Proposed Rule leaves investors (like CalPERS) that seek to make informed voting decisions worse off than we are today. We recommend that the SEC make no changes without developing the missing details and providing market participants an opportunity to review and comment on a completed Proposed Rule, including a detailed economic analysis. This information should include, at a minimum, a clear identification and quantification of the "problem" being addressed, how that would be improved by the approach taken, as well as the impact of the increased cost and complexity on institutional investors and registrants subject to the enhanced liability.

We welcome the opportunity to discuss this release in more detail. Please contact Anne Simpson, Investment Director, at ████████ if you have any questions or wish to discuss in more detail.

Sincerely,

MARCIE FROST
Chief Executive Officer
CalPERS

---

[30] Release at 59.



February 3, 2020

Ms. Vanessa A. Countryman
Secretary
U.S. Securities and Exchange Commission
100 F Street, N.E.
Washington, D.C. 20549-0609

> Re:   Amendments to Exemptions from the Proxy Rules for Proxy Voting Advice
>       Release No. 34-87457
>       SEC File No. S7-22-19

Dear Ms. Countryman:

  Thank you for the opportunity to comment on the "Amendments to Exemptions from the Proxy Rules for Proxy Voting Advice," recently proposed by the Securities and Exchange Commission.[1]  Glass Lewis shares the Commission's goal of making sure that the proxy process functions properly and enables shareholders to exercise their right to vote at annual and special meetings.  To that end, Glass Lewis has engaged with the Commission on numerous occasions during its continuing efforts to explore how to improve the proxy process, a critical component of the corporate governance system.

  Glass Lewis also fully supports and embraces the stated objectives of the Commission's proposal with respect to proxy advice — promoting the accuracy, conflict management and disclosure, and transparency of that advice.  This includes appropriate engagement with the companies that are the subject of proxy advice.  In fact, we have committed to follow the internationally-endorsed Best Practices Principles for Shareholder Voting Research Providers, which address these critical issues, and annually report on our compliance with those principles.

  Regrettably, however, we believe that the proposed rules would not further those objectives, but instead would have severe adverse consequences for investors and the public interest.  In particular, we are deeply concerned that the costly and rigid "review and feedback" mechanisms in the proposed rules would introduce significant and unmanageable delays into the already compressed annual meeting time frame and threaten to impair proxy advisors'

---

[1] U.S. Securities and Exchange Commission, Amendments to Exemptions from the Proxy Rules for Proxy Voting Advice, Release No. 34-87457 (Nov. 5, 2019) (the "Proposing Release" or "Release").

**GLASS, LEWIS & CO., LLC** 255 California Street, Suite 1100, San Francisco, CA 94111  WWW.GLASSLEWIS.COM

1

JA 700


independence. Both effects could hamper Glass Lewis' ability to meet its institutional investor clients' needs, while at the same time detracting from the limited time available for investors' deliberations and ability to engage with companies on critical corporate governance issues. These adverse consequences would be compounded by the Commission's plan to codify its August 2019 Interpretation that proxy advice is a solicitation, which introduced the specter of companies filing lawsuits to challenge matters of judgment, including proxy advisors' methodologies, opinions and recommendations.

We are also concerned that the rushed process that has been followed in this rulemaking is not sufficient to adequately consider the legal issues its novel approach would raise and to fully understand and analyze the consequences — economic and otherwise — of the untested, unprecedented regulatory regime it would introduce. Accordingly, we respectfully submit that the Commission should not adopt the proposed rules and, instead, should continue to work with proxy advisors, investors and other stakeholders to develop a balanced and thoughtful approach to this area that better serves the interests of all market participants.

## I. Background.

### A. Glass Lewis.

Founded in 2003, Glass Lewis is a leading independent proxy advisor. As a proxy advisor, the Glass Lewis provides proxy research and vote management services to institutional investor clients throughout the world. While, for the most part, investor clients use Glass Lewis research to help them make proxy voting decisions, these institutions also use Glass Lewis research when engaging with companies before and after shareholder meetings. Further, through Glass Lewis' Web-based vote management system, Viewpoint®, Glass Lewis provides investor clients with the means to receive, reconcile and vote ballots according to custom voting guidelines and record-keep, audit, report and disclose their proxy votes.

Glass Lewis serves more than 1,300 institutional investor clients — primarily pension funds, mutual funds and other institutions that invest on behalf of individual investors and have a fiduciary duty to act, including through proxy voting, in the best interests of their beneficiaries. In 2018, Glass Lewis issued 23,210 proxy research reports, including 5,565 reports on U.S. issuers and 17,550 reports on non-U.S. issuers.[2]

---

[2] This letter uses 2018 numbers for consistency with our earlier submission on the Release's Paperwork Reduction Act ("PRA") analysis. See Letter from Nichol Garzon-Mitchell, Senior Vice President and General Counsel, Glass Lewis to Alexander Goodenough, Office of Management and Budget (Jan. 7, 2020), available at https://www.sec.gov/comments/s7-22-19/s72219-



In addition, a significant majority of Glass Lewis' clients have their own custom voting policies. Glass Lewis helps these clients implement their policies by applying them to the circumstances presented by companies in their proxy statements and recommending how they vote accordingly. During the policy formulation process, an institution will review Glass Lewis' policies to assess the similarities and differences between the institution's views and Glass Lewis' "house policy." Glass Lewis engages extensively with institutional investors and aims to have policies that reflect the views of its clients. Accordingly, it is not uncommon for an investor client to elect to implement the same policy as Glass Lewis for some or all of the issues up for vote. Institutional investors are increasingly opting for more detailed policies with specific views on how to address the issues that may come up on a proxy (e.g., U.S. companies alone have approximately 250 issues), and, as noted above, most therefore have custom voting policies. In many instances, their views are so specific to each unique situation that they will often opt for case-by-case analysis.

Glass Lewis also executes votes on behalf of investor clients in accordance with the specific instructions of those clients. To that end, Glass Lewis implements client voting policies on its vote management system so that each ballot populates with recommendations based on the specific policies of the client, enabling the client to submit votes in a timely and efficient manner. (Under no circumstance is Glass Lewis authorized to deviate from a client's instructions or to determine a vote that is not consistent with the policy specified by the client.) When a preliminary ballot is ready for review, the voting system will alert the client and provide such client with relevant disclosures and other information needed to review and evaluate the matters up for a vote. Clients can choose to restrict the submission of a ballot until after their authorized personnel have reviewed and approved the votes. Clients can also make — and often do make — changes to their preliminary ballots before signing off. And, assuming the voting deadline has not passed, they can even change their votes and resubmit them.

**B. The role of proxy advisors.**

Glass Lewis believes that proxy advisors play an important support role, providing resources and technical, subject-matter expertise to help institutional investors meet their fiduciary responsibility to vote securities on behalf of their participants and beneficiaries in a cost-effective way. As the Commission itself has explained, "When making voting determinations on behalf of clients, many investment advisers retain proxy advisory firms to perform a variety of functions and services . . . . Contracting with proxy advisory firms to

---

6617071-202957.pdf ("PRA Submission"). In 2019, Glass Lewis issued 26,198 reports, including 5,460 reports on U.S. issuers and 20,738 reports on non-U.S. issuers.

**GLASS, LEWIS & CO., LLC**  255 California Street, Suite 1100, San Francisco, CA 94111    W W W . G L A S S L E W I S . C O M

3

JA 702



provide these types of functions and services can reduce burdens for investment advisers (and potentially reduce costs for their clients) as compared to conducting them in-house."[3]

As an increasing share of American investors own stock indirectly, such as through mutual and pension funds, these individual investors are dependent on those institutional investors to vote on their behalf and act in their best interest. In order to do so both effectively and efficiently, those institutional investors often leverage their resources by using the services of a proxy advisor. As the Council of Institutional Investors and a coalition of investors have explained:

> Retail holders now invest much of their capital with institutional investors because they understand that institutional investors' expertise and size bear the expectation of higher returns, lower costs and mitigated risks. Importantly, retail investors also understand that aggregating their individual holdings into larger, concentrated blocks through an institutional manager allows for more effective monitoring of company management.

> Even so, institutional investors themselves face challenges in spending significant time and resources on voting decisions because the funds and other vehicles they manage receive only a portion of the benefits conveyed on all investors of the relevant enterprise.

> *Proxy advisors are a market-based solution to address many of these practical cost issues.* Proxy advisors effectively serve as collective research providers for large numbers of institutional investors, providing these investors an affordable alternative to the high costs of individually performing the requisite analysis for literally hundreds of thousands of ballot proposals at thousands of shareholder meetings each proxy season.[4]

---

[3] U.S. Securities and Exchange Commission, Commission Guidance Regarding Proxy Voting Responsibilities of Investment Advisers, Release No. IA-5325 at 5 (Aug. 21, 2019) ("August 2019 Guidance"); see also comments of Chairman Jay Clayton at the U.S. Chamber of Commerce event on "Corporate Governance: Making the Case for Reform" (July 16, 2019) ("Outsourcing . . . in itself is not a bad thing. All the time in America we create value through outsourcing, outsourcing ministerial tasks, in this case, of going through filings and crunching the data, providing data reports, that's good. It probably saves shareholders, saves investors money."), available at https://www.centerforcapitalmarkets.com/event/corporate-governance-making-the-case-for-reform/.

[4] Letter of Ken Bertsch, Executive Director, Council of Institutional Investors and 60 institutional investors to Chairman Jay Clayton, at 2 (Oct. 15, 2020) ("CII October 15 Letter").; see also Michael Cappucci, Harvard Management Company, "The Proxy War Against Proxy Advisors," at 7-8 (Nov. 16, 2019) ("Importantly, [proxy advisors] economize the proxy research and voting



Even the largest asset managers can benefit from the work of proxy advisors. As Professor S.P. Kothari, now the Commission's Chief Economist, has explained:

> Although large asset managers typically have a unit responsible for recommending proxy votes, it's usually small and hard-pressed to review the more than 1,000 proxies it might be sent during proxy season. Staffers in such units readily admit they lack the time and expertise to conduct in-depth analyses of complex issues like non-GAAP criteria and peer group composition. That's why most asset managers subscribe to proxy advisory services, such as Institutional Shareholder Services (ISS) and Glass Lewis (GL).[5]

In addition, proxy advisors can help asset managers and other investors mitigate their own conflicts of interest in voting shares on behalf of their participants or beneficiaries. As the SEC has noted, an investment adviser "may look to the voting recommendations of a proxy advisory firm when the investment adviser has a conflict of interest, such as if, for example, the investment adviser's interests in an issuer or voting matter differ from those of some or all of its clients."[6] While the investment adviser, of course, remains responsible for voting in its clients' best interests, the SEC has also noted that "this third-party input into such an investment adviser's voting decision may mitigate the investment adviser's potential conflict of interest."[7]

**C. The regulatory environment of proxy advisors.**

Proxy advisors are hired by and work to assist institutional investors in voting shares on behalf of their clients and beneficiaries. Existing SEC rules establish a robust regulatory

---

functions by spreading the costs of tracking, analyzing, and processing many thousands of proxy votes over a larger pool of shareholders."), available at https://corpgov.law.harvard.edu/2019/11/27/the-proxy-war-against-proxy-advisors/.

[5] Robert C. Pozen and S.P. Kothari, "Decoding CEO Pay," Harvard Business Review (July-Aug 2017); see also United States Department of Treasury report to President Trump on "A Financial System that Creates Economic Opportunities, Capital Markets," at 31 (Oct. 2017) ("institutional investors, who pay for proxy advice and are responsible for voting decisions, find the [proxy advisory firm] services valuable, especially in sorting through the lengthy and significant disclosures contained in proxy statements").

[6] August 2019 Guidance at 5-6.

[7] Id. at 6.

**GLASS, LEWIS & CO., LLC**    255 California Street, Suite 1100, San Francisco, CA 94111        W W W . G L A S S L E W I S . C O M

5

JA 704



framework for investment advisers' voting of proxies on behalf of their clients, including imposing specific responsibilities for their oversight of third-party service providers they use in the voting process.

First, advisers must comply with Rule 206(4)-6 under the Investment Advisers Act of 1940, which is specifically "designed to ensure that advisers vote proxies in the best interest of their clients."[8]  Under this rule, investment advisers must: 1) adopt policies and procedures to ensure proxies are voted in the best interest of clients; 2) disclose to clients how they can obtain information from the adviser on how their securities were voted; and 3) describe the adviser's proxy voting policies and procedures to clients, and, upon request, provide clients with a copy of those policies and procedures.  Investment advisers must also annually review the adequacy of their proxy voting policies.[9]

Second, investment companies must disclose how they vote proxies relating to portfolio securities they hold and file with the SEC and make available to shareholders information about specific proxy votes cast.[10]  Public disclosure of votes creates market discipline, allowing current and potential investors to evaluate how mutual funds and others are voting their shares on issues of concern to them.[11]

The SEC has also specifically and repeatedly addressed investment advisers' regulatory responsibilities to oversee the work of any proxy advisors they hire to aid their proxy voting. First, the Staff issued guidance in 2014 with its expectations for adviser due diligence and oversight of proxy advisors.[12]  Among other things, the Staff outlined a number of steps advisers can take before retaining a proxy advisory firm, including evaluating  the proxy advisor's: 1) staffing and personnel; 2) ability to identify and address any conflicts of interest;

---

[8]  U.S. Securities and Exchange Commission, Proxy Voting by Investment Advisers, SEC Release No. IA-2106 (Jan. 31, 2003).

[9]  Rule 206(4)-7 under the Advisers Act, 17 C.F.R. 275.206(4)-7.

[10]  U.S. Securities and Exchange Commission, Disclosure of Proxy Voting Policies and Proxy Voting Records by Registered Management Investment Companies, SEC Release No. 33-8188 (Jan. 31, 2003).

[11]  See, for example, Jeff Sommer, "Want a Bigger Say on Corporate Behavior? Move your Money," New York Times (Dec. 12, 2019).

[12]  U.S. Securities and Exchange Commission, Staff Legal Bulletin No. 20, Proxy Voting: Proxy Voting Responsibilities of Investment Advisers and Availability of Exemptions from the Proxy Rules for Proxy Advisory Firms (June 30, 2014).

**GLASS, LEWIS & CO., LLC**   255 California Street, Suite 1100, San Francisco, CA 94111       W W W . G L A S S L E W I S . C O M

6

JA 705



and 3) policies and procedures to ensure that its voting recommendations are based on accurate information. The Staff conveyed that it expects advisers to engage in ongoing oversight of the proxy advisor on these issues.

Most recently, just this past August, the Commission issued a release with further guidance for investment advisers on their proxy voting responsibilities, including their use of proxy advisory firms to assist them in exercising these responsibilities. Building on the Staff's 2014 guidance, the Commission release outlines a number of steps an investment adviser can take to fulfill its regulatory responsibilities when it retains a proxy advisor. In addition to more specific, detailed questions relating to the proxy advisor's capacity and potential conflicts, the August 2019 Guidance suggests investment advisers consider:

- Whether the proxy advisory firm has an effective process for seeking timely input from issuers and proxy advisory firm clients with respect to its proxy voting policies, methodologies and peer group constructions;

- Whether a proxy advisory firm has adequately disclosed to the investment adviser its methodologies in formulating voting recommendations;

- The nature of any third-party information sources that the proxy advisory firm uses as a basis for its voting recommendations;

- When and how the proxy advisory firm would expect to engage with issuers and third parties;

- The effectiveness of the proxy advisory firm's policies and procedures for obtaining current and accurate information relevant to matters included in its research and on which it makes voting recommendations;

- The proxy advisory firm's engagement with issuers, including the firm's process for ensuring that it has complete and accurate information about the issuer and each particular matter, and the firm's process, if any, for investment advisers to access the issuer's views about the firm's voting recommendations in a timely and efficient manner;

- The proxy advisory firm's efforts to correct any identified material deficiencies in the proxy advisory firm's analysis;

- The proxy advisory firm's disclosure to the investment adviser regarding the sources of information and methodologies used in formulating voting recommendations or executing voting instructions; and



- The proxy advisory firm's consideration of factors unique to a specific issuer or proposal when evaluating a matter subject to a shareholder vote.[13]

The August 2019 Guidance also explains that "an investment adviser is not required to accept the authority to vote client securities, regardless of whether the client undertakes to vote the proxies itself," and, in fact, gives a number of examples of arrangements an investment adviser could reach with a client that do not involve voting on all or even most proxy matters.[14]  Finally, the guidance conveys the SEC's expectations for investment advisers to engage in ongoing oversight of proxy advisors on relevant issues.

Glass Lewis' experience is that its clients take their oversight responsibilities very seriously.   Glass Lewis devotes substantial resources to regularly engaging with its clients as they carry out their due diligence by answering oral and written questions, providing written materials and facilitating visits to its office sites.

In addition to oversight by their investment adviser clients, proxy advisors hold themselves accountable to a set of best practices principles designed specifically for the proxy advisor industry.  These principles have grown out of a number of regulatory consultations around the globe on the role of proxy advisors in recent years.  Recognizing that proxy advisors are a voluntary, private-market response to investors' need for independent, cost-effective advice, most jurisdictions to study these issues have concluded that encouraging the development of best practices, rather than government regulation, was the appropriate response.

Most notably, in 2013, after a public consultation, the European Securities and Markets Authority ("ESMA") found no evidence of a market failure and therefore did not see a need for binding or quasi-binding regulation of proxy advisors.[15]  Instead, ESMA said the "appropriate

---

[13]  August 2019 Guidance.

[14]  August 2019 Guidance at 9-12.  In late 2018, the SEC Staff also withdrew two no-action letters that corporate commenters had criticized as effectively encouraging investment advisers to use an independent proxy advisor as part of fulfilling their fiduciary duty when they may have a conflict in voting on behalf of a client.  See U.S. Securities and Exchange Commission, IM Information Update, Statement Regarding Staff Proxy Advisory Letters, IM-INFO-2018-02 (Sept. 2018).

[15]  See Press Release, "ESMA recommends EU Code of Conduct for proxy advisor industry," (Feb. 19, 2013), available at https://www.esma.europa.eu/sites/default/files/library/2015/11/2013-240.pdf.; see also U.S. General Accountability Office, Report to Congress, Corporate Shareholder Meetings—Proxy

**GLASS, LEWIS & CO., LLC**   255 California Street, Suite 1100, San Francisco, CA 94111       W W W . G L A S S L E W I S . C O M

8

JA 707



approach" was for the industry to develop a code of conduct, to be applied on a comply-or-explain basis that would address two areas of concern raised in the consultation: 1) identifying, disclosing and managing conflicts of interest; and 2) fostering transparency to ensure the accuracy and reliability of the advice.

In response, Glass Lewis and other leading proxy advisors formed the Best Practice Principles Group ("BPPG") to develop a code of conduct ("Principles" or "Code") for the industry, which the signatories to the Principles said they would apply globally. The BPPG developed the Principles with input from ESMA and other stakeholders, including numerous issuer respondents to the consultation from both Europe and North America. Following a global, public consultation, the Principles were officially launched in March 2014.[16]

The Principles encourage transparency, conflict management and disclosure and engagement with companies when appropriate. Glass Lewis meets the Principles' standards by making the following publicly available on its website: full guidelines; research approach and methodologies; conflict avoidance and disclosure policies; and public-company engagement procedures. Since the launch of the Principles, Glass Lewis and the other charter signatories have each published their Statements of Compliance, featuring detailed information on how the organizations comply with the Principles. Glass Lewis applies the Code to its activities globally, including in the United States, and updates its Statement of Compliance annually.

---

Advisory Firms' Role in Voting and Corporate Governance Practices, at 11 (Nov. 2016) ("GAO 2016 Report") ("In recent years, [ESMA and the Canadian Securities Administrators] conducted reviews of the proxy advisory firm industry and concluded that *regulatory intervention was not needed*. Specifically, the European Securities and Markets Authority concluded that regulation was not justified because there was *no evidence of a market failure in relation to how proxy advisory firms interact with institutional investors and corporate issuers*. However, both entities proposed guidance and recommendations for the firms to enhance transparency, among other issues.") (emphases added).

[16] More information on the BPPG is available on its website, see https://bppgrp.info/. In 2017, the charter signatories to the Principles conducted another public consultation to elicit market feedback on the extent to which the Principles were achieving their original objectives and to identify opportunities for improving understanding and transparency. An advisory panel, comprised of stakeholders from companies, asset owners, asset managers and other constituencies, provided input to the preparation of the consultation under the guidance of an independent chairman. Among other things, the latest update to the Principles addresses the transparency requirements for proxy advisors outlined in the EU DIRECTIVE 2017/828 of 17 May 2017 ("SRD II") amending Directive 2007/36/EC as regards the encouragement of long-term shareholder engagement.

**GLASS, LEWIS & CO., LLC**   255 California Street, Suite 1100, San Francisco, CA 94111     W W W . G L A S S L E W I S . C O M

9

JA 708



To enhance its governance, per the recommendation of ESMA and complementary to the requirements of SRD II as well as stewardship developments in other markets globally, the BPPG is in the process of forming an Independent Oversight Committee. The Committee will be comprised of both investor and issuer representatives, as well as independent members, including an independent oversight Chair, to provide an annual independent review of the Principles and the public Statements of Compliance of each signatory and to hold all members accountable.

Glass Lewis continues to believe, consistent with the approaches chosen by ESMA, the Canadian Securities Administrators, the Securities and Exchange Board of India,[17] and most recently, the Financial Services Agency and the Tokyo Stock Exchange, through the Council of Experts on Japan's Stewardship Code,[18] that a market-based solution to proxy advisor oversight and accountability is appropriate. In particular, Glass Lewis believes that an industry code of best practices is the appropriate means to address the issuer concerns raised in the Proposing Release – namely accuracy, conflict management, transparency of policies and methodologies, and engagement. In our view, the existing standards of conduct, coupled with a mechanism to monitor and ensure compliance, would be a more appropriate way to address these issues and would best serve the interest of all market participants.

**II. There is no need for the proposed rules.**

Our first concern with the proposed rules is perhaps the most basic — the Commission has not shown any need for them. The Release contains no empirical evidence showing a proxy advice error rate that warrants regulation, nor are we aware of any. In fact, the available evidence is to the contrary. Likewise, the Commission has not explained what is deficient about proxy advisors' current conflict disclosure practices to warrant the breadth and extent of the very prescriptive disclosures that would be required. Nor does it explain why proxy advisors' current issuer engagement practices, which include the ability for issuers to fact check the data

---

[17] See "SEBI seeks public comments on Report submitted by the working group on Issues related to Proxy Advisers (PA)" (July 29, 2019) ("Establishment of and adherence to a global code of conduct, coupled with proper oversight by investors, has proven to be effective in ensuring the quality and integrity of proxy advisory research – without adding an undue burden on investors or inhibiting competition."), available at https://www.sebi.gov.in/reports/reports/jul-2019/report-of-working-group-on-issues-concerning-proxy-advisors-seeking-public-comments_43710.html.

[18] See newly proposed "Principle 8 of the Principles for Responsible Institutional Investors," (proposing a principles-based "comply or explain" approach in Japan's Stewardship Code), available at https://www.fsa.go.jp/en/refer/councils/stewardship/20191220/01.pdf.

**GLASS, LEWIS & CO., LLC**   255 California Street, Suite 1100, San Francisco, CA 94111   W W W . G L A S S L E W I S . C O M

10

JA 709



used in the formulation of the proxy voting advice as well as the opportunity to provide feedback on the advice itself, are inadequate.

### A. There is no basis for claims of inaccuracy other than issuer concerns.

The Proposing Release is premised on the proposition that radical changes are needed to how investors get proxy advice because of the current level of inaccuracy in proxy advisors' work. While Glass Lewis, of course, shares the Commission's goal of promoting proxy advice accuracy, the Commission has not come forward with evidence that proxy advisor inaccuracy is a problem, let alone one sufficient to warrant this regulatory response. The Proposing Release cites issuer "concerns" about inaccuracy — a term invoked dozens of times in the Release — but the Release does not evaluate or substantiate these issuer concerns in any meaningful way. In fact, as discussed further below, even the economic analysis only tabulates the number of instances in which issuers *claimed* there was a proxy advisor error, without purporting to confirm that any of these alleged mistakes were in fact errors. As one commenter has pointed out, "The paucity of evidence of systematic factual errors by proxy advisors suggests that, in fact, the opposite is true."[19]

As Commissioner Lee noted in dissenting from issuing the proposal, "What is missing in this proposal, however, are two critical underpinnings for the policy choices it reflects. First, it is missing data *demonstrating an error rate in proxy advice sufficient to warrant a rulemaking*." In fact, not only is empirical evidence of a problem with proxy advisor accuracy missing, but, as Commissioner Lee noted, "[T]he proposal relies in large part not on specific instances of material factual inaccuracies, but on generalized, unsubstantiated allegations of inaccuracies."[20]

Nor did the Commission consider and rationally respond to evidence contradicting the issuer concerns cited in the Release. As Commissioner Lee again noted, "In fact, as the comment file shows, assertions of widespread factual errors have been methodically analyzed and largely disproven." Specifically, shortly before the proposal was issued, the Council of Institutional Investors ("CII") submitted a detailed analysis of the only industry report cited in the Release that purported to study proxy advisor errors (as opposed to surveys or generalized allegations). That industry report had found 39 claimed errors in proxy advisor reports over a

---

[19] CII October 15 Letter at 3.

[20] See Statement of the Honorable Allison Herren Lee at SEC Open Meeting (Nov. 5, 2019), available at https://www.sec.gov/news/public-statement/statement-lee-2019-11-05-shareholder-rights.

---

JA 710



nearly three year period.[21]  CII analyzed each of the 39 situations, however, and reported its findings:

> From our review of the filings that ACCF references, **it is clear that most of the claimed "errors" actually are disagreements on analysis and methodologies, and that some other alleged proxy advisory firm errors derive from errors in the company proxy statements. Finally, in some cases, ACCF simply misstates what the company said.** We think ACCF has documented no more than 18 reports with factual inaccuracies that can be blamed on proxy advisory firms, not the 39 that it claims.[22]

> As CII pointed out, this amounts to "a factual error rate on a report basis of 0.057% to 0.123% (18 to 39 reports with one or more factual errors in 31,830 reports)."[23]

Nor does the Proposing Release account for the self-interest inherent in such issuer concerns.  Proxy advisors are hired by investors to provide an expert, independent perspective on management recommendations.  And while evidence shows proxy advisors generally agree with management recommendations 80-90% of the time, the remainder of the situations are instances where the proxy advisor sees the issue differently than management did.  As one commentator noted, "Almost by definition, this means that recommendations that don't agree with management are viewed as inaccurate, uninformed and value destroying."[24]  This obvious dynamic calls out for some agency scrutiny of these issuer claims.  Instead, the Release credits those concerns without accounting for their holders' perspective or the countervailing evidence.

---

[21]  Even these remarkably few reported errors were not substantiated; the report's methodology involved assuming that if an issuer claimed a proxy advisor error, there was an error.  See American Council for Capital Formation, "Are Proxy Advisors Really a Problem?," at 11 (Oct. 2018), available at https://accfcorpgov.org/wp-content/uploads/2018/10/ACCF_ProxyProblemReport_FINAL.pdf.

[22]  Letter of Ken Bertsch, Executive Director, Council of Institutional Investors to Chairman Jay Clayton, at 3 (Oct. 24, 2020) ("CII October 24 Letter") (emphasis in original).

[23]  CII October 24 Letter at 3.  Of course, each report contains many different issues and even more individual data elements.  On a per issue or data element basis, the error rate would be even lower.

[24]  See Cappucci, "The Proxy War Against Proxy Advisors," at 30.

---



In sum, faced with issuer "concerns" and evidence that those concerns were overstated, the Commission did not evaluate whether the concerns were valid. The Commission simply noted the discrepancy and moved forward with proposing an unsubstantiated, costly and harmful new regulatory system to address the asserted concerns. We respectfully submit that reasoned agency decision-making requires more than this.

Nor did the Commission assess the significance of the claimed errors in any way. Here, too, the Commission did not grapple with disconfirming evidence in its rulemaking record. In 2016, GAO conducted an extensive review of issuers' concerns about proxy advisors and specifically found that "[b]oth corporate issuers and institutional investors we interviewed said that the data errors they found in the proxy reports were mostly minor, but . . . some errors can lead to negative recommendations."[25] The Release, however, despite extensively relying on GAO's report, makes no mention of this. The SEC's approach of merely relying on issuer concerns and not validating or evaluating the asserted concerns in any way does not shed any light on the significance of the asserted problem.[26]

To be sure, proxy advisors — however rigorous their processes and quality controls — do inevitably make some mistakes and not all mistakes are as trivial as the one cited above.[27]

---

[25] GAO 2016 Report at 29; see also Broc Romanek, "Proxy Advisers Handbook for In-House Counsel," at 22 (Jan. 2015) ("There's a realm of type of errors, some significant — some not. Some are merely a matter of interpretation — differences in opinion — and not really errors. And some "errors" are really updates as developments occur at a company. Some might be changes not reflected in a company's disclosures — so they are just additional data points not reflected in a SEC filing so the proxy advisers weren't aware of them."); see also Cappucci, The Proxy War Against Proxy Advisors, at 19 (describing an industry report that had included a survey of its members to find examples of proxy advisors' inaccuracy: "Evidence of inaccuracies in proxy advisors' research ranges from the trivial to the legitimately troubling. For example, on the lighter end, one executive noted that ISS' report stated that 'our CEO was 'entitled' to use company aircraft for personal travel, when in fact he is required to do so.'").

[26] Cf. Hester Peirce & Jerry Ellig, "SEC Regulatory Analysis: A Long Way to Go and a Short Time to Get There", 8 Brook. J. Corp. Fin. & Com. L. at 423-24 (2014) (criticizing basis for SEC rulemaking because "The SEC did not provide evidence . . . to support the proposition that inaccurate information is a significant problem."), available at: https://brooklynworks.brooklaw.edu/bjcfcl/vol8/iss2/.

[27] Glass Lewis' error rate is less than 1%. Its main competitor discloses a similar error rate. When Glass Lewis is notified of a purported factual error or omission in one of its research reports, Glass Lewis immediately initiates a review process of the notification and the report. If a report is updated to reflect any material revisions, new publicly-available disclosures by the



But this would be true of any professional adviser, especially one producing tens of thousands of reports on complex subjects a year. If the mere occurrence of some errors were enough, every professional service would warrant regulation. What is absent here is any evidence that there is a systemic or significant problem that warrants a regulatory response. Indeed, we note that even a group of House members who support proxy advisor regulation have written to the SEC as part of this rulemaking asking the SEC to produce empirical evidence of proxy advisor errors.[28]

The reality is that proxy advisors' clients already have the proper incentive to seek out accurate advice. After all, why would anyone — let alone a sophisticated institutional investor — voluntarily pay for advice that is rife with inaccuracies, especially when they are using it to inform how they vote on important matters that can affect their shareholder value? In fact, proxy advisors compete based on the accuracy of their advice. As one commenter put it, "Proxy advisors' business model depends on factual accuracy and their incentives are thus aligned with issuers and institutional investors alike."[29]

If market incentives were not enough, the SEC has repeatedly told investment advisers — most recently and definitively this past August — that they have a responsibility as a legal matter to evaluate the accuracy of proxy advisors' recommendations and their processes for correcting errors as part of their due diligence in using them as a service provider. Given the market incentives and legal responsibilities already in place, the SEC should have produced a

---

issuer or the correction of a factual error, Glass Lewis notifies all clients that accessed the report or have corresponding ballots, regardless of whether the update affected any recommendations. There is no deadline for notification of a purported material factual error. Additionally, the exact nature of the report's updates and revisions are clearly described in the republished report. If an issuer notifies Glass Lewis of a relevant factual error or omission in a report, Glass Lewis will respond and address the issuer's comments and/or questions.

[28] See Comments of the Honorable Bryan Steil et al., U.S. House of Representatives, at 3 (Jan. 6, 2020) ("What does the empirical evidence suggest as to the prevalence of factual errors in proxy advisory services?"), available at https://www.sec.gov/comments/s7-22-19/s72219-6616198-202955.pdf

[29] CII October 15 Letter at 3; see also Cappucci, The Proxy War Against Proxy Advisors at 32-33 ("If proxy advisory services were really as riddled with errors, transparency problems, and conflicts as their critics allege, one might expect their clients to be leading the charge for reform. After all, they are the ones paying for the supposedly faulty research and it is their shareholder value that is being harmed. But institutional investors and asset managers are not complaining.")



compelling conceptual and empirical basis for believing proxy advisor inaccuracy was a sufficient concern to warrant a new regulatory regime. Instead, the Release provides neither.

**B. The SEC has not explained why current conflict disclosures are inadequate.**

The Release is similarly vague about why current conflict disclosures are inadequate. As to conflicts, like accuracy, there are both market incentives and existing legal requirements to promote conflict avoidance and disclosure. Today, proxy advisors actively compete on the basis of the rigor of their conflicts policies and Glass Lewis takes pains to fully and prominently disclose even potential conflicts of interest.[30] In addition, investment advisers that vote proxies on behalf of their clients have a legal responsibility under SEC rules to monitor and understand their proxy advisor's ability to identify and address any conflicts of interest, including a responsibility to monitor this issue on an ongoing basis. Also, Exchange Act Rule 14a-2(b)(3) — an existing exemption available to proxy advisors — already requires disclosure of significant relationships and material interests.[31]

Given this background, one would expect there to be a compelling reason for instituting a new disclosure regime. But the Release does not clearly explain what is deficient about current proxy advisor conflict disclosures. In fact, in explaining the conflicts disclosure provision, the Release says that the "Commission's primary concern in proposing these amendments to Rule 14a-2(b) is with the recipients of proxy voting advice, including investment advisers who use that advice to make voting decisions on behalf of clients with whom they have a fiduciary relationship."[32]

This statement is hard to reconcile with the administrative record before the agency, however, which shows that those investment adviser clients are satisfied with current proxy advisor conflict disclosure practices. As the Investment Adviser Association stated:

> Some commentators point to conflicts of interest as grounds for regulation of proxy advisory firms. However, . . . proxy advisory firms currently disclose their conflicts of interest transparently in a manner sufficient for investment advisers to review and evaluate them. Accordingly, this issue does not present a basis for a wholesale new and

---

[30] See Glass Lewis' Policies and Procedures for Managing and Disclosing Conflicts of Interest (May 9, 2019), available at https://www.glasslewis.com/wp-content/uploads/2019/11/GL-Policies-and-Procedures-for-Managing-and-Disclosing-Conflicts-of-Interest-050819-FINAL.pdf.

[31] See Exchange Act Rule 14a-2(b)(3)(ii), 17 C.F.R. 240.14a-2(b)(3)(ii).

[32] Release at 34 n. 91.

---



burdensome regulatory regime that would raise costs substantially and make it more difficult for other proxy advisory firms to enter the marketplace.[33]

Nor does the Release give any reason to think that proxy advisor clients could not insist on better conflict disclosures if they thought the current ones were inadequate. They could and would, of course, if they thought more extensive or detailed conflict disclosures would be helpful or warranted.[34]

Instead, the Release here too cites the concerns of issuers, their advisers and advocacy groups.[35] What the Release does not explain is why they — and not the proxy advisors' clients — should be the ones to evaluate whether those clients are receiving enough information or what additional disclosure would be useful. As one commentator has noted, "It is not clear what, if any, additional information critics are looking for when they call for greater disclosure,

---

[33] See Letter from Gail C. Bernstein, General Counsel, Investment Adviser Association, at 5 (Dec. 31, 2018), available at https://www.sec.gov/comments/4-725/4725-4840960-177135.pdf.

[34] See also Comments of Simon Frechet, Chair, Pension Investment Association of Canada (Jan. 23, 2020) ("we agree that it is beneficial to receive disclosure of relationships, transactions, or other interests that might result in a conflict between the interests of a proxy advisor and those of shareholders. However, we have found the disclosures already provided to be adequate and have not encountered significant conflict of interest problems with proxy advisors, so do not believe that specific rulemaking is necessary to address disclosures of conflicts by proxy advisors."); Comments of Sarah Wilson, Chief Executive Officer, Minerva Analytics (Jan. 2, 2020) ("If fund managers or institutional investors need protecting from proxy analysts, then we should be extremely worried for the rest of the investment management process for which they are responsible. Asset managers and institutional investors make many significant and demanding decisions every day – the allocation of trillions of Dollars, Pounds and Euros is their daily routine. Are issuers really suggesting that when it comes to ownership decisions that investors suddenly become ignorant?").

[35] The only apparent non-issuer group cited in this section of the Release is a letter filed in a rulemaking on compensation consultant disclosure over ten years ago in which a fund group expressed concern about proxy advisor consulting for issuers (while recognizing that not all proxy advisors engage in this practice) and recommended that *issuers* be required to disclose consulting services they receive from proxy advisors. In fact, the commenter seemed to recognize that additional disclosure from the proxy advisor in the circumstances would have been counterproductive. See Release at 29 n. 78 (citing the comment letter of John Okray, Vice President and Assistant Counsel, Oppenheimer Funds, Inc. (Sep. 24, 2009)).

---

**GLASS, LEWIS & CO., LLC**   255 California Street, Suite 1100, San Francisco, CA 94111     W W W . G L A S S L E W I S . C O M

16

JA 715



and whether they would ever be satisfied that the proxy advisors have provided enough disclosure."[36]

Indeed, the Release itself is not clear about what additional information proxy advisor clients need.[37] The most specific references are to "observers" asserting that there are "vague" or "boilerplate" disclosures. This appears to be a reference to ISS's deliberate conflict mitigation practice of saying that it may have provided consulting services to an issuer in order to prevent its analysts from knowing that is the case. In any event, if there was a legitimate concern about some proxy advisors using boilerplate, the SEC could have addressed that issue in more direct and less intrusive and costly ways. For example, it could have simply added this as an interpretation of either investment advisers' existing responsibility or the existing solicitation exemption in its August releases or even used less formal and costly measures than a new rule to achieve its objectives.[38] The Commission has not adequately explained this concern and why it necessitates a costly, overly broad and highly prescriptive new disclosure regime.

### C. The SEC has not explained why existing mechanisms for issuers to express their views are inadequate.

Similarly, the Release talks about providing "more complete" information to justify the new mandate that proxy advisors include a hyperlink to any issuer response in their proxy voting advice. The Release notes that issuers today can make a supplemental proxy filing to respond to proxy advice, and that, in fact, a number of issuers use this existing mechanism

---

[36] Cappucci, The Proxy War Against Proxy Advisors, at 29.

[37] For example, the Release states, "Although proxy voting advice businesses have described various measures they believe mitigate this risk,[citing ISS and Glass Lewis conflict disclosure policies] the voting decisions of persons who rely on these businesses would be better informed if they received information sufficient for them to understand and assess these potential risks and measures." Release at 28-29. This is a circular statement and simply begs the question of what information not being supplied today should be provided. If investors are not receiving sufficient conflict disclosures, it is incumbent on the agency to articulate how and why they are not sufficient (notwithstanding investors' lack of concern) and how the proposed rules would address that problem.

[38] Cf. Peirce and Ellig, 8 Brook. J. Corp. Fin. & Com. L. at 424-25 ("To the extent adequate information is not being provided, the SEC could have considered working with the industry on a voluntary effort to establish best practices for disclosure to investors and potential investors.").

---

**GLASS, LEWIS & CO., LLC**   255 California Street, Suite 1100, San Francisco, CA 94111          W W W . G L A S S L E W I S . C O M

17

JA 716


every year.  But the Release says, "The efficacy of these responses may be limited" because investors may choose to vote before those responses are sent.[39]

The SEC does not, however, say how often this is the case or purport to identify any useful, important new information in these supplemental proxy filings that was ignored.  Most tellingly, the SEC offers no explanation as to why institutional investor shareholders would be acting contrary to their economic interest by voting on corporate governance matters at companies they own without useful information.  Absent identification by the SEC of important, new information in these supplemental proxy filings that is not being considered today, the SEC has no rational basis, let alone a compelling reason, to mandate the novel and intrusive hyperlink requirement.[40]

* * *

In sum, despite the clamoring of interested parties, there is little evidence of a need for any new rule, let alone the sort of compelling empirical evidence that would justify risking this wholesale, new and untested regulatory intrusion into institutional investors' access to proxy advice.

**III.  The proposed rules would impair Glass Lewis' ability to provide timely and independent advice to its clients.**

To meet investors' needs, proxy advice must be timely and independent.  We are concerned that the proposed rules could impair both of these critical elements of our work.

     **A.  The two-stage issuer review and feedback procedures, if workable at all, would significantly impair proxy advisors' ability to provide timely advice.**

---

[39]  Release at 53.

[40]  Nor has the SEC explained why, if it did have evidence that investment advisers were ignoring important information in voting, that would not be better and more directly addressed through additional guidance on investment advisers' duty to vote in the best interest of their clients.

**GLASS, LEWIS & CO., LLC**   255 California Street, Suite 1100, San Francisco, CA 94111        W W W . G L A S S L E W I S . C O M

18

JA 717



We do not believe that the two-stage issuer review mechanisms are workable.[41]  For the 4,912 companies that would be eligible for one of the two review periods,[42] the rule would impose a minimum of five and, depending on how weekends fall, potentially up to eleven days of issuer review time into the middle of what is already a highly compressed process.  There simply is not enough time for a week or more of issuer review in the process as it exists today.  As the Investment Adviser Association warned at the Commission's Proxy Process Roundtable, mandatory issuer advance review of proxy advisors' reports "is not likely to work in practice."[43]

The lengthy mandatory periods, combined with the logistical challenges of administering the review processes, risk compromising investors' ability to obtain proxy advice based on their selected policies and submit their votes.  The "best case scenario" will be material, adverse effects on investors' time to consider reports, engage with management and make their voting decisions.[44]  It will also impose significantly increased costs.  And, because the rule operates in a mandatory, rigid fashion, these delays and adverse effects will occur even when the issuer has no intention or interest in reviewing the proxy advice.

The unworkability of the mandatory review and feedback periods is exacerbated by the seasonality of the proxy advice business.  Glass Lewis statistics show that more than half of the

---

[41]  We recognize that the Release refers to the second review stage as provision of a "final notice."  There is no prohibition on issuers responding to this notice with additional comments or even new arguments, however.  And the Release explicitly warns proxy advisors that failure to incorporate issuer comments could precipitate legal action under Rule 14-9.  As Commissioner Lee noted, "There are two levels of review. The second one is called a "final notice" but it will function in the same way as the first review."  See Statement of the Honorable Allison Herren Lee at SEC Open Meeting, at n. 6 (Nov. 5, 2019), available at https://www.sec.gov/news/public-statement/statement-lee-2019-11-05-shareholder-rights.

[42]  Glass Lewis' analysis of the timing of proxy statement filings indicates that approximately 4,912 of the 5,565 companies it issued proxy research reports on in 2018 would have been eligible for one of the two review periods.  See Glass Lewis' PRA Submission at 20.

[43]  See Comments of Gail C. Bernstein, General Counsel, Investment Adviser Association at 5 (Dec. 31, 2018).

[44]  See Comments of Scott M. Stringer, Comptroller, City of New York, at 2 (Nov. 20, 2019) ("Our capacity to fulfill our proxy voting responsibilities, particularly during the peak of U.S. proxy season in the spring, requires a high-quality, efficient process which rests in large part on the timely receipt of the independent, expert research we receive from our two proxy advisors (presently ISS and Glass Lewis).")

---

**GLASS, LEWIS & CO., LLC**    255 California Street, Suite 1100, San Francisco, CA 94111    W W W . G L A S S L E W I S . C O M

19



annual meetings it advises on in the U.S. each year take place in April and May.[45]  And the number of meetings that must be covered over those two months is over six times as high as Glass Lewis' average workload over the ten months outside the peak of "proxy season."  Glass Lewis data below illustrates how pronounced the concentration of proxy work in the late Spring is:



Administering the mandatory review and feedback processes during the peak time period would be, at best, extraordinarily challenging.

Yet the time periods in the proposed rules are fixed; issuers would be entitled to the same number of review days — potentially up to 11 — whether it is the busiest or least busy time of the year for corporate annual meetings.  And the Release, while it does note in passing that a "significant portion of [investment advisers'] voting decisions [are] concentrated in a period of a few months," does not otherwise engage with this issue, let alone provide a compelling, reasoned explanation of how the fixed review periods would be workable during peak proxy season.

---

[45]  In 2018, 3,096 of 5,565 meetings or 55.6%.



Nor does the Proposing Release adequately consider the adverse effects these review periods would have on investors. The point of the proxy voting process, after all, is to facilitate shareholders' decisions on important corporate governance matters. A direct consequence of the proposal, however, would be to significantly decrease the time available for institutional investor shareholders to conduct their own analysis (including directly engaging with the company, if warranted) and make those decisions.[46]

Specifically, Glass Lewis studied the current timelines for its provision of proxy advice to its clients for the time periods used in the SEC's proposed rule, and a subset of one period where time pressure is most acute. Assuming that Glass Lewis' preparation time remained constant and responding to issuer feedback and carrying out the other administrative steps required by the proposed rules, including entering into confidentiality agreements with issuers, would take Glass Lewis three calendar days, the proposed rule would have the following effect on its clients' time:

| Time Period (Calendar Days Before AGM Proxy Statement is Filed) | Investor Lead Time with Glass Lewis Research Today (Calendar Days to AGM) | Best-Case Average Lead Time Under Proposed Rules (Calendar Days to AGM) | Worst-Case Average Lead Time Under Proposed Rules (Calendar Days to AGM) |
|---|---|---|---|
| >45 days | 27 | 17 | 13 |
| 25-45 days | 24 | 16 | 12 |
| 25-30 days | 21 | 13 | 9 |

As can be seen, in all but the best-case scenarios, the rule will often cut investors' time for analysis, engagement and deliberation by half or more. Because there are only five days in the work week, it will not be uncommon for one or both issuer review periods to include a weekend. In the critical segment of companies that file their proxy statements between 25 and 30 days before the annual meeting — a segment that the SEC speculates could grow as

---

[46]   Beyond the lost time, investors and others are concerned that focusing the process on proxy advisor-issuer exchanges would exacerbate the misconception that companies should be concerned with proxy advisors' views, rather than those of their shareholders. See Comments of Sarah Wilson, Chief Executive Officer, Minerva Analytics (Jan. 2, 2020) (" Issuers will feel that in having dealt with proxy analysts there will be less need for them to engage directly with their shareholders."); see also Securities and Exchange Board of India, Report of Working Group on Issues Concerning Proxy Advisors, at 25 (July 29, 2019) ("SEBI Working Group Report"), available at https://www.sebi.gov.in/reports/reports/jul-2019/report-of-working-group-on-issues-concerning-proxy-advisors-seeking-public-comments_43710.html.

**GLASS, LEWIS & CO., LLC**   255 California Street, Suite 1100, San Francisco, CA 94111      W W W . G L A S S L E W I S . C O M

21

JA 720



companies seek to take advantage of the review periods — investors would lose between 38 and 57 percent of the time they have today before the meeting.[47]

Ironically, the SEC just this past August issued guidance conveying enhanced expectations for investment advisers' diligence in exercising voting responsibilities on behalf of their clients. Among other things, the August 2019 Guidance talked about situations where advisers may need to "conduct a more detailed analysis than what may be entailed by application of its general voting guidelines," and "to consider factors particular to the issuer or the voting matter under consideration."[48] At the same time, the proposed rules would dramatically shorten the time for investment advisers to comply with these responsibilities. As the New York City Comptroller stated, "We do not want company management interposed between us and our research service providers, and this is even more problematic if it involves additional cost and delay, giving us less time for our due diligence on each proxy vote."[49]

This is not only unwise, but unnecessary. Glass Lewis, like other proxy advisors, already has incentives to produce accurate research and therefore has designed and implemented processes where it can check key facts with issuers without compromising its time to research and write its reports or cutting into its clients' time to review the analysis and vote. Specifically,

---

[47] Glass Lewis' data shows that report preparation and delivery timing varies significantly for mergers and acquisitions and other special situations. On average, proxy research reports were delivered to clients 14 days before the meeting date on M&A transactions and 13 days in contested situations. The review and feedback periods would obviously reduce the available time for our clients in these situations dramatically. In addition, our experience is that contested situations are often much more fluid with both sides making supplemental filings on a continuing basis as the meeting date approaches. In light of this, it is important for a proxy advisor, when appropriate to best meet its clients' needs, to be able to defer providing its advice until near-final information is available and to be able to quickly amend already-provided advice, as needed. For these reasons, we believe the review and feedback periods are particularly unworkable in this context. In addition, we note that commentators have raised significant questions about how the advance knowledge gained in the review processes could be misused in contested situations that should be addressed and resolved before adopting any rule mandating review in this context. See Ronald Orol, "Activist Spotlight: SEC Rule Could Give Activists an Advantage" (Dec. 2, 2019) (noting that proxy solicitation experts said there would be "many unintended consequences associated with the early access" in contested Board elections, including potential trading based on material non-public information).

[48] See August 2019 Guidance at 14.

[49] Comments of Scott M. Stringer, Comptroller, City of New York, at 3 (Nov. 20, 2019.

---

**GLASS, LEWIS & CO., LLC**   255 California Street, Suite 1100, San Francisco, CA 94111        W W W . G L A S S L E W I S . C O M

22

JA 721



in 2015, Glass Lewis began to provide the subjects of its research with its Issuer Data Report ("IDR"), which details the key facts underlying the relevant report for their review before the report is finalized. This practice is deliberately limited. Glass Lewis finds that by providing the facts underlying the report, it can gain any benefit of company review without inviting time-consuming and unproductive debates about Glass Lewis' methodology or what result that methodology should lead to in the context of a particular recommendation.[50] This free service has been available for several years and more than 1,400 companies currently participate in it on an annual basis. The proposed rule, however, would replace this carefully designed, tested and efficient workflow with two mandatory rounds of issuer review of both facts and recommendations.

Moreover, the SEC has invited companies to use their review periods to challenge proxy advisors' methodology, with the suggestion that lawsuits could be based on proxy advisors not incorporating issuer "feedback." This means that, along with the five to eleven days of issuer review time, proxy advisors will need to devote time during this compressed period to respond to distracting and unproductive challenges by management to its methodology and potentially document its reasons for why it did not revise its proxy advice, in anticipation of litigation.

The review and feedback mechanisms are not workable and should be abandoned. If they are not, the SEC should explain its basis for believing that this major change would not disrupt the proxy voting process, even during the peak proxy season. In addition, having a reasoned basis for the rule requires accounting for the opportunity costs of: 1) constricting the time for investors to conduct their own proxy review process, including reviewing proxy advisor reports, engaging with companies, and determining how to vote; and 2) making it more difficult for proxy advisors, if needed, to expand the amount of work they do to engage in deeper research on particularly complex issues. Absent seeing such a compelling explanation, we respectfully submit that the risks and adverse consequences of the rule far exceed any benefits to issuers.

**B. The issuer review and feedback procedures would compromise proxy advisors' independence.**

Independence is fundamental to the proxy advisor's role. Most parties involved in the proxy solicitation process have an interest in the outcome. As annual meetings approach, company management and sometimes others try to persuade shareholders to support their position. In contrast, institutional investor shareholders hire proxy advisors to be a neutral,

---

[50] We note that this is similar to the approach taken in the context of research analysts, where, as further discussed below, SEC-approved FINRA rules allow them to check the facts in their reports with companies, but not share the full reports.

**GLASS, LEWIS & CO., LLC**   255 California Street, Suite 1100, San Francisco, CA 94111        W W W . G L A S S L E W I S . C O M

23

JA 722



disinterested arbiter. They want an expert who can sort through dense, lengthy and complex proxy statements and, with no interest other than aiding the shareholder client, help them come to a vote consistent with their investment philosophy and voting policy.[51]

The rule, however, seems intended to — and almost certainly would — damage this very independence and neutrality. The proposal's new regime would create three new ways for company management to try to influence the work of or even punish proxy advisors who recommend against their proposals: the review and feedback procedures; the mandate to publish management views; and the Damocles' sword of potential company litigation. In other words, as Commissioner Jackson put it in dissenting from issuing the proposal, the proposed rule "imposes a tax on firms who recommend that shareholders vote in a way that executives don't like."[52]

From an investor's perspective, the previously objective advice they paid for would now be potentially conflicted. As the Comptroller of the City of New York and trustee of the New York City Retirement Systems commented on this proposal: "While proxy advisory firms should, and do, have procedures in place to mitigate any potential conflicts of interest, I can conceive of no conflict of interest more insidious than the one created by a Proposal that would

---

[51] See Nell Minow, Value Edge Advisors, "Response to the Chamber of Commerce's Outrageous Comment to DOL, Harvard Law School Corporate Governance Blog (Oct. 30, 2019) ("Proxy advisory firms are the only independent source for evaluation of proxy issues."), available at https://corpgov.law.harvard.edu/2019/10/30/response-to-the-chamber-of-commerces-outrageous-comment-to-dol/.

[52] Statement of the Honorable Robert J. Jackson, Jr. at SEC Open Meeting (Nov. 5, 2019), available at https://www.sec.gov/news/public-statement/statement-jackson-2019-11-05-openmeeting; see also Matt Levine, "Advice is Different than Solicitation," Bloomberg Opinion (Nov. 6, 2019) ("if [proxy advisors] get stuff wrong by [] managers' standards, those managers can now make life hard for them. Whereas if they just do what the managers want there's no problem."), available at https://www.bloomberg.com/opinion/articles/2019-11-06/advice-is-different-from-solicitation; Cappucci, The Proxy War Against Proxy Advisors, at 30-31 ("Further, giving companies an additional say in the process could have a chilling effect on proxy advisors' willingness to issue truly independent advice. If they believe that every disagreement over a subjective determination like a say-on-pay vote is likely to lead to a messy confrontation with management, they may be less inclined to issue negative advice.").

**GLASS, LEWIS & CO., LLC**   255 California Street, Suite 1100, San Francisco, CA 94111          W W W . G L A S S L E W I S . C O M

24

JA 723



grant a company that is the subject of proxy voting advice the right to review and provide feedback on that advice."[53]

In fact, the SEC has acknowledged that issuer review presents a conflict of interest in an analogous context. At the Open Meeting at which the Commission proposed these rules, Chairman Clayton noted that proxy advisors' services to investment advisers "are comparable to the services of other significant third-party market participants on whom shareholders rely, including auditors, rating agencies and research analysts."[54] But the SEC was presented with this very issue in the context of regulating analysts[55] and, rather than *mandating* issuer review, agreed that it should be *prohibited* because of the conflict it presents.

With the SEC's oversight and express approval, the Financial Industry Regulatory Authority ("FINRA") has promulgated rules that regulate the conflicts of interest research analysts face in researching and reporting on the advisability of investing in public companies.[56] While many of its research analyst rules are disclosure-based, FINRA Rule 2241 requires broker-dealers to have policies and procedures that "prohibit prepublication review of a research

---

[53] Comments of Scott M. Stringer, Comptroller, City of New York, at 3 (Nov. 20, 2019); Comments of Sarah Wilson, Chief Executive Officer, Minerva Analytics (Jan. 2, 2020) ("Various commentators have claimed that lack of objectivity and independence and so therefore issuers must have the last word. This does not make sense. If research becomes conflicted or tainted by the involvement of issuers in the research process because they are buying, receiving or commenting on research then surely there should be less involvement, not more?").

[54] Statement of the Honorable Jay Clayton at SEC Open Meeting (Nov. 5, 2019) (footnote omitted), available at https://www.sec.gov/news/public-statement/statement-clayton-2019-11-05-open-meeting#_ftn13.

[55] Analysts are third parties who produce research reports for investors with investment recommendations. Proxy advisors are third parties who produce research reports for investors with corporate governance recommendations.

[56] As FINRA has explained, "[t]he aim of FINRA's equity and debt research analyst and research report rules is to foster objectivity and transparency in research reports and public appearances and provide investors with more reliable and useful information to make investment decisions." FINRA, Rules and Guidance, Research Analyst Rules, available at https://www.finra.org/rules-guidance/key-topics/research-analyst-rules.

---



report by a subject company for purposes other than verification of facts."[57]  As a senior SEC official explained at the time the rule was promulgated:

> Analysts will also be prohibited from sharing draft research reports with the target companies, other than to check facts after approval from the firm's legal/compliance department. *This provision helps protect research analysts from influences that could impair their objectivity and independence.*[58]

But here, the proposed rules would require the very conflict that is prohibited in this comparable situation.  In other words, under the federal securities laws, it is illegal for an analyst to do what proxy advisers would be required to do by the proposed rule.  Administrative law, fundamental fairness and common sense require that comparable services should be regulated in comparable fashion.[59]  At a minimum, the SEC should not mandate something that presented a sufficient problem in a comparable context that it had to be prohibited.[60]

### C.  Treating methodology the same as facts is conceptually flawed and will lead to unproductive disputes.

---

[57]  FINRA Rule 2241(b)(2)(N).  Our understanding is that the SEC has approved this rule twice, first as NASD 2711 and then, slightly amended, as FINRA 2241 in 2015.  See U.S. Securities and Exchange Commission, Release No. 34-34-75471 (July 16, 2015).

[58]  Speech of Lori Richards, Director, Office of Compliance Inspections and Examinations, U.S. Securities and Exchange, "Analysts Conflicts of Interest: Taking Steps to Remove Bias," (May 8, 2002) (emphasis added), available at https://www.sec.gov/news/speech/spch559.htm.

[59]  See also Statement of the Honorable Elad L. Roisman at SEC Open Meeting (Nov. 5, 2019), ("the same activity should be regulated consistently across our markets"), available at https://www.sec.gov/news/public-statement/statement-roisman-2019-11-05-14a-2b#_ftnref4.

[60]  Among the comparable professional services Chairman Clayton referred to, only proxy advisors would be singled out for mandatory pre-review of their reports by the subject companies.  In fact, these other services are primarily regulated to **prevent** direct or indirect management influence on the objectivity of their advice.  Nor would it would suffice for the SEC to seek to distinguish research analysts because of the history of scandals in that field.  Just because FINRA and the SEC had to step in and prohibit a conflict after a scandal in one context does not make it rational to mandate that same conflict for a comparable service that has not been ridden with scandals.

**GLASS, LEWIS & CO., LLC**   255 California Street, Suite 1100, San Francisco, CA 94111     W W W . G L A S S L E W I S . C O M

26

JA 725



Implicitly conceding that the oft-heard criticism of proxy advisors' work as being error-prone was baseless or at least misleading,[61] the Release consistently refers to "factual errors or methodological weaknesses" in describing issuers' concerns and what the rule is meant to address. For example, the Release states that companies "may have disagreements that extend beyond the accuracy of the data used, such as differing views about the proxy advisor's methodological approach or other differences of opinion that they believe are relevant to the voting advice."[62]

The Proposing Release does not define the term "methodological weakness" or give any examples of them. Nor does the economic analysis try to identify methodological weaknesses as a category of issuer complaints, although it does identify what are called "analytical errors" and "general or policy dispute[s]." (We note that there were nearly five times as many of these as purported "factual errors" in the analysis' sample.) But issuers are nonetheless invited to review and provide feedback on "methodological weaknesses." There are at least three problems with this.

First, methodology does not lend itself to this type of review. Methodology is different than facts in the sense that it is judgmental. For the most part, the issues that are put up for shareholder vote on corporate proxy statements are matters of opinion on which there is not a right or wrong answer.

In fact, this very point has been made by the Commission. In 1992, the SEC was confronted with management arguments for a "role to play in rebutting any misstatements or mischaracterizations" made about their company in the proxy process. Companies maintained that this was necessary for "the benefit of shareholders as a whole in ensuring that proxies are

---

[61] This is widely recognized outside of corporate-funded studies. See, for example, SEBI Working Group Report, at 10 ("While there have been arguments that proxy advisors are not open to factual corrections, we found factual errors both rare and non-contentious. The most contentious issues where a company strongly dis-agreed with a recommendation is almost always an opinion formed by the proxy advisor."); Broc Romanek, Proxy Advisers Handbook for In-House Counsel, at 11 ("There's a realm of type of errors, some significant - some not. Some are merely a matter of interpretation-differences in opinion-and not really errors.").

[62] Release at 43-44. Similarly, the Commission's August 2019 Interpretation maintained that the Rule 14a-9 cause of action extends to "opinions, reasons, recommendations, or beliefs." Commission Interpretation and Guidance Regarding the Applicability of the Proxy Rules to Proxy Voting Advice, Release No. 34-86721 (Aug. 21, 2019) ("August 2019 Interpretation").



executed on the basis of 'correct' information."[63]  But the SEC rejected this argument because the types of issues that come up on corporate proxy statements are not the sort that lend themselves to this kind of review.  As the Commission explained at that time:

> Of course, much commentary concerning corporate performance, management capability or directorial qualifications or the desirability of a particular initiative subject to a shareholder vote is by its nature judgmental.  As to such opinions, there typically is not a 'correct' viewpoint.[64]

This is no less true today.  But the SEC has not acknowledged this prior position, let alone provided a reasoned basis for its change of position.

The judgmental nature of many issues on the corporate proxy is confirmed by evidence of major investors' voting patterns.  Today, "[t]here is considerable variation in asset manager voting on shareholder proposals," even among the largest and most sophisticated institutional investors.[65]  In the frequent scenario when even the largest investors disagree on the merits of a shareholder proposal, it would be naive to attribute those differences to "methodological weakness" on the part of one of the investors.  Rather, major investors' voting patterns reflect the judgmental nature of many issues up for proxy voting, which is precisely why encouraging company-proxy advisor disputes about methodology — up to and including litigation about proxy advisors' opinions and recommendations — would be unproductive and wasteful.

Second, discussions on methodology are best conducted outside proxy season.  A proxy advisor's methodology is almost always applicable to more than one company.  Accordingly, Glass Lewis finds it most efficient to obtain issuer input on its methodology outside of the peak proxy season, when its resources need to be focused on specific analysis and application of that methodology to annual meeting proposals.[66]  But the review and feedback procedures would

---

[63] U.S. Securities and Exchange Commission, Regulation of Communication among Shareholders, Release Nos. 34-31326 (Oct. 22, 1992), 57 Fed. Reg. 48,276 ("SEC Shareholder Communications Release").

[64] Id. at 48,278.

[65] See Barbara Novick, BlackRock, Inc., "Proxy Voting Outcomes: By the Numbers, Exh. 5 (showing data from N-PX filings), Harvard Law School Corporate Governance Blog (July 24, 2019), available at https://corpgov.law.harvard.edu/2019/07/24/proxy-voting-outcomes-by-the-numbers/.

[66] For the year ended June 30, 2019, Glass Lewis analysts met with more than 1,600 companies on methodology and contacted more than 37,500 companies for feedback and input.

---

**GLASS, LEWIS & CO., LLC**   255 California Street, Suite 1100, San Francisco, CA 94111          W W W . G L A S S L E W I S . C O M

28

JA 727



force these conversations to happen when there is the least time for them, with the attendant costs and risks for the proxy advice process discussed above.

Third, the focus on issuer-proxy advisor dialogue on methodology is misplaced. Proxy advisors are agents of and exist to serve their clients, the shareholders who actually vote on corporate proxies. Much of what proxy advisors do is to understand their clients' positions and voting policies, reflect the consensus positions in their house policies, and then, through careful review of proxy statements, apply those positions to the thousands of factual situations in which they arise each year. In other words, much of what proxy advisors do is to implement client voting preferences, whereas the proposal seems to assume that proxy advisors are causing investors to have those preferences.[67] Seen in this light, much of the feedback about "methodological weaknesses" that the proposed rule would steer to proxy advisors would be misdirected, particularly since "there typically is not a correct viewpoint" on these matters.

For this reason, the Release's asking whether the proposed rules should apply to custom voting policies is especially problematic and confusing. To begin with, we fail to see how this would work in practice. Glass Lewis administers custom voting policies on one or more issues for hundreds of clients, with none of those custom policies being reflected in a proxy research paper that could be provided to an issuer for its review. Doing this in some way would also have significant ramifications for the cost, time and paperwork burdens the rules would impose.[68]

Even if this could be operationalized, it would serve no apparent purpose. When a proxy advisor is implementing a client's custom policy, the vote recommendation reflects the client's position, not the proxy advisor's. Forcing a delay in that recommendation's delivery to the shareholder so that an issuer can explain to the proxy advisor why it thinks the client's policy has "methodological weaknesses" would be beside the point. By definition, the methodology being applied is different than the proxy advisor's benchmark policy. Under the proposed rules, would the proxy advisor be making a false or misleading proxy "solicitation" if it implemented the client's custom policy, just because that methodology is different than the one in its house policy? Because the proxy advisor is not exercising its own judgment when it

---

[67]  See Stephen Choi, Jill E. Fisch, and Marcel Kahan, "The Power of Proxy Advisors: Myth or Reality?," 59 Emory L.J. 869 (2010) ("Thus, ISS is not so much a Pied Piper followed blindly by institutional investors as it is an information agent and guide, helping investors to identify voting decisions that are consistent with their existing preferences.").

[68]  Glass Lewis' PRA Submission assumed the proposed rules did not apply to implementation of a client's custom policy.



implements a client's custom policy, applying the proposed rules to that function would not make sense. The SEC should clarify in any final rule that "advice that makes a recommendation" does not include application of a client's custom voting policy.[69]

### D. The conflicts, review and feedback, and publication requirements need important technical fixes and clarifications to be operational.

#### 1. The conflicts disclosure provision.

Glass Lewis supports the Commission's objective of ensuring that proxy advisors appropriately manage and disclose conflicts and has always taken a rigorous approach to conflict avoidance and disclosure. In light of this and the existing legal requirements around proxy advisor conflict oversight and disclosure, we are not clear why a new, highly prescriptive conflict disclosure regime is warranted. If the Commission does move forward with this part of the proposal, however, we suggest that the proposed rule and accompanying release be revised in two respects to avoid unintended consequences.

First, we are concerned that the breadth of the definition of "affiliate" in the Proposing Release would have the unintended consequence of making Glass Lewis research analysts aware of relationships they are specifically shielded from today in order to avoid conflicts. Specifically, each of the three sub-sections of the proposed rule describing potential conflicts extends to any "affiliate" of the proxy voting advice business (as well as "affiliates" of the registrant or shareholder proponent it may have a material transaction or relationship with). And the Release explains that "affiliate" is meant to have the same meaning as Exchange Act Rule 12b-2, where it is defined as "a person that directly, or indirectly through one or more

---

[69] As Question 33 in the Release seems to recognize, forcing "advice" in the form of implementation of a client's custom voting policy to be shared with issuers would also expose some investors' confidential, proprietary information. Many Glass Lewis clients publish or are comfortable making their voting policies public. Other clients, however, do not make their voting policies public and expect Glass Lewis to maintain their confidentiality. Mandating that custom voting recommendations go through the issuer review and feedback mechanisms would expose these investors' confidential, proprietary information and force Glass Lewis to breach its commitments to these clients. Carving custom policy implementation out of the proxy advice covered by the rule would avoid this problem. See also Comments of Pension Investment Association of Canada (Jan. 23, 2020) (applying the rules to custom policy implementation "would be extremely inappropriate. PIAC members have the right to make their own voting determinations and to keep their voting intentions private if they desire.").

**GLASS, LEWIS & CO., LLC**   255 California Street, Suite 1100, San Francisco, CA 94111      W W W . G L A S S L E W I S . C O M

30

JA 729



intermediaries, controls, or is controlled by, or is under common control with, the person specified."[70]

Glass Lewis is co-owned by the Ontario Teachers' Pension Plan Board ("OTPP") and Alberta Investment Management Corp. ("AIMCo"). Neither OTPP nor AIMCo is involved in the day-to-day management of Glass Lewis' business; Glass Lewis operates as an independent company separate from OTPP and AIMCo. Moreover, Glass Lewis excludes OTPP and AIMCo from any involvement in the formulation and implementation of its proxy voting policies and guidelines, and in the determination of voting recommendations for specific shareholder meetings. To help maintain this separation, Glass Lewis' policy on conflicts of interest provides in part: "Restricted Access to Owner Information. Glass Lewis research analysts are blocked from any access to the holdings files, custom policies, and/or voting activity of Glass Lewis' owners."[71]

As we understand the proposed rule, however, any company controlled by a Glass Lewis controlling owner would be considered an affiliate and therefore even an interest, transaction or relationship of that company with a registrant *or any registrant affiliates* would require conflict disclosure.[72] And the Release conveys the SEC's expectation that "publicly-available information" would be used to search for affiliate relationships. This would seem to require an unnecessarily broad inquiry into matters Glass Lewis and its analysts are deliberately not given access to – with potentially significant associated costs and delay – and lead to disclosure of situations that would not present even an appearance of a conflict, particularly given the structural mechanisms in place.[73]

---

[70]   17 C.F.R. 240.12b-2.

[71]  Glass Lewis' Policies and Procedures for Managing and Disclosing Conflicts of Interest (May 9, 2019), available at https://www.glasslewis.com/wp-content/uploads/2019/11/GL-Policies-and-Procedures-for-Managing-and-Disclosing-Conflicts-of-Interest-050819-FINAL.pdf.

[72]   To be clear, Glass Lewis does disclose today when either of its owners has a stake in a company it reports on that is significant enough to be publicly disclosed in accordance with a local market's regulatory requirements or is a Top 20 shareholder. Our point here is about the effect of using the broad "affiliate" definition on both the proxy advisor and the subject of its advice.

[73]   Moreover, in certain situations, the interests, relationships and transactions required to be disclosed by such a broad definition of "affiliate" may implicate proprietary or potentially material non-public information.



Second, we question whether one aspect of the proposed disclosure is overbroad and therefore may risk obscuring the important information in the conflict disclosure. Specifically, sub-section (D) would require each proxy advisor report and electronic medium noting a conflict to include disclosure of "[a]ny policies and procedures used to identify, as well as the steps taken to address, any such material conflicts of interest arising from such interest, transaction, or relationship." The Release describes this as requiring:

> a discussion of the policies and procedures, if any, used to identify and steps taken to address such potential and actual conflicts of interest. Such disclosure should include a description of the material features of the policies and procedures that are necessary to understand and evaluate them. Examples include the types of transactions or relationships covered by the policies and procedures and the persons responsible for administering these policies and procedures.[74]

Although it is not clear to us exactly what is expected here,[75] we are concerned that including a "discussion" of Glass Lewis' conflict policies and procedures twice with each conflict disclosure would be wasteful and potentially obscure the important information investors expect and would want to focus on. Glass Lewis has one set of policies and procedures that describes how it identifies and addresses conflicts, which it makes available on its website. The document is fairly lengthy and it is not readily apparent to us how it could be significantly condensed while still describing the "material features of the policies and procedures that are necessary to understand and evaluate them," as the Release says each disclosure should. Moreover, since these policies and procedures apply to all conflicts, we do not see what value would be added by repeating them with each conflict disclosure as opposed to maintaining them on the website and perhaps including a reference to them with each conflict disclosure.[76]

---

[74] Release at 32.

[75] We note that the SEC's Investor Advisory Committee read this provision to require proxy advisors to disclose their detailed compliance manuals. If that is what is intended by this provision, it would be inappropriate and problematic for the reasons identified in the IAC submission. See Recommendation of the SEC Investor Advisory Committee (IAC) Relating to SEC Guidance and Rule Proposals on Proxy Advisors and Shareholder Proposals, at 10 (Jan. 24, 2020).

[76] Moreover, the Release does not explain what purpose would be served by this disclosure including the name of the person or persons responsible for administering the policies and procedures. Glass Lewis discloses the management roles included on its Compliance Committee, which has overall responsibility for its conflicts program, as part of its conflict policies and procedures.

---



### 2. The issuer review and feedback mechanisms.

As noted above, Glass Lewis believes the issuer review and feedback mechanisms are unworkable and inadvisable. If the Commission nonetheless proceeds with this part of its proposal, we are also extremely concerned that these mechanisms fail to account for a number of basic, administrative details that would be critical for the rules to be operational. Having designed and managed our own factual review and comment mechanism (Glass Lewis' IDR program[77]), we are mindful of the complexity involved and the importance of designing the necessary processes in an efficient manner. Given the scale and novelty of extending two rounds of issuer review of facts and methodology to some 5,000 reports a year, we strongly encourage the Commission to address these issues and seek supplemental comment on their practical operation before finalizing any rules.[78]

Today, issuers seeking to participate in Glass Lewis' IDR process must indicate their interest a set period of time before the data is ready for their review. This facilitates Glass Lewis' planning and avoids wasted effort and lost time seeking factual review from issuers that have no interest in reviewing Glass Lewis' proxy advice. While many issuers sign up for and participate in the process, many others do not. In contrast, the rule would mandate three or five business days of review for most issuers. The review and feedback mechanisms should give proxy advisors' flexibility to not jump through these hoops when they would serve no purpose.

Including an opt-in on the issuer's part would also solve another seemingly mundane, but critical part of trying to carry out the review and feedback processes for some 5,000 issuers a year — knowing whom to provide the proxy advice to. The issuers covered by the proposed rule often have thousands of employees and the rule provides no guidance on whom it should be provided to or any assurance that sending it to any appropriate company employee whose contact information can be obtained would satisfy its requirements. Having issuers opt in would allow proxy advisors to collect this information before the process begins. Absent that, the Commission should amend the proxy statement to require issuers to specify a contact

---

[77] Glass Lewis operates a program today where issuers have the opportunity to review a data-only version of the proxy research report – for free – prior to publication of the report to Glass Lewis' clients. See https://www.glasslewis.com/issuer-data-report/.

[78] Alternatively, if the Commission determines to move forward with the issuer review and feedback mechanisms, a pilot program outside peak proxy season would be an appropriate vehicle to test the rule's practical operation before extending these untested requirements to the entire proxy advice market.


person and clarify in the rule that proxy advisors need only provide a copy to the designated contact and consider feedback from that designated contact.

Both the three- and five-day issuer review periods require the proxy advisor to "provide[] . . . a copy" of the proxy advice to the registrant for review.  The "final notice" requirement is phrased similarly.  Given the enormous logistical burden the proposed rule's mechanisms would cause, proxy advisors would almost certainly need to develop and implement software to try to carry out this back and forth process.  For example, it might require developing an issuer-facing electronic platform that could host the drafts and facilitate the review and feedback process.[79]  Framing this requirement in more general terms, such as "makes available to," rather than "provides," would enable proxy advisors to attempt to carry out the rule's requirements in a less inefficient and costly manner.

Similarly, the rule should allow proxy advisors to specify how the feedback is transmitted, with express assurance in a note that proxy advisors are not obligated to consider feedback not provided through the designated channel.  Issuers participating in Glass Lewis' IDR process provide their comments in a specified format that increases the efficiency and auditability of the process.  Failing to allow the proxy advisor to specify an appropriate channel for the communication of feedback puts the proxy advisor in the position of having to potentially query its entire workforce for any communication from any company employee (or their outside lawyers) before it can conclude an issuer has not provided feedback, which would be time-consuming and a recipe for missed communications.

The SEC should also clarify that the initial review period runs from when the proxy advisor makes the proxy advice available to the company, subject to the company signing a confidentiality agreement that is consistent with Note 2.  The rule should also clarify that a registrant that does not agree to the proxy advisor's standard confidentiality agreement for these purposes — not just "such an agreement," as sub-section (B) of Note 2 in the proposed rule reads — would not be entitled to the review mechanisms.  As highlighted by Glass Lewis' PRA Submission, the vagueness of the current rule raises the prospect of proxy advisors having to negotiate confidentiality agreements with issuers, which could consume significant amounts of time.  Moreover, if the review period does not commence while this negotiation is taking place, it could cause significant, further delays and potentially be used in an opportunistic manner by companies anticipating an adverse proxy advisor recommendation.[80]

---

[79]  The Release seems to recognize this might be the most efficient way to carry out the review mechanisms.  See Release at 58-59 (discussing a 2018 BlackRock letter).

[80]  Likewise, we fail to see what would be accomplished by forbidding provision of a final notice, assuming it was ready, before the initial review period ends even if the issuer has

**GLASS, LEWIS & CO., LLC**     255 California Street, Suite 1100, San Francisco, CA 94111          W W W . G L A S S L E W I S . C O M

34

JA 733



Likewise, the rule's unexplained statement that any confidentiality agreement "[s]hall cease to apply once the proxy voting advice business provides its advice to one or more recipients" is inconsistent with proxy advisors' standard business terms and should be stricken. Proxy advisors' advice is their product. Accordingly, Glass Lewis' clients, whether they purchase an individual report or a subscription, are not allowed to redistribute its proxy research reports. There is no reason non-paying issuers should not be subject to the same restrictions and any final rule should strike this sentence and clarify that a proxy advisor has a right to protect its intellectual property in the same manner as it does with its paying clients.

The SEC should also clarify that multiple rounds of "final notices" are not required. The rule, as proposed, states the proxy advisor must give companies two business days with a final notice that "must include a copy of such proxy voting advice that the proxy voting advice business will deliver to its clients." The Release explains that "'will deliver to its clients' [] effectively requires that the version of voting advice included in the final notice of voting advice will be the actual voting advice that will be disseminated to clients."[81]

This is not workable, however. As we have previously noted, nothing in the rule prevents an issuer from commenting on the final notice and other events may happen that require changes to the proxy advice included in the final notice. As proposed, the rule would require that each time the intended final proxy advice changes (whether in response to issuer comment, an update, to correct an error, or otherwise), it triggers another requirement to transmit it to the company for another two business days of review, further delaying the client's receipt of the advice or even potentially inviting gamesmanship at the final notice stage. The rule should not penalize or discourage updates, corrections or just accommodation of issuer suggestions at this stage, when appropriate, and the Commission should therefore clarify that there is only one final notice stage, even if the proxy advice changes.[82]

If it preserves the two rounds of review, the Commission should also provide that standard "exhaustion" principles apply. Companies should be deemed to have waived any objections that they could have raised at the initial review stage, but did not, and should not be

---

already provided its feedback. This seems to impose an arbitrary delay in the process, with no corresponding benefit we can discern.

[81] Release at 48 n. 121.

[82] As noted in our PRA Submission, we understand that the SEC Staff has acknowledged that the rule should not require multiple final notices and that this would be corrected in any final rule. Accordingly, our paperwork burden hour estimates assumed that revision will be made.

**GLASS, LEWIS & CO., LLC**   255 California Street, Suite 1100, San Francisco, CA 94111   W W W . G L A S S L E W I S . C O M

35

JA 734



allowed to press these objections for the first time at the final notice stage (or, for that matter, in an action under Rule 14a-9).[83] As the Commission knows from its role as an appellate body, standard requirements that an argument be raised when a party is first aware of it — and the party it is presented to has the best opportunity to respond to it — are critical to the efficiency of any review process. Not including this standard principle would increase the chances objections are first raised at the final notice stage, reducing the opportunity for the proxy advisor to fully consider the objection, risking further delays to the delivery of proxy advice and inviting opportunistic misuse of what we understand the Commission intended by including the final notice.

The proposed rule should also contain appropriate guardrails around the use of non-public information. Glass Lewis' analysis and reports are based solely on publicly-available information; under no circumstance does Glass Lewis develop its research or make vote recommendations based on non-public information. As drafted, however, there does not seem to be any prohibition in the proposed rule on an issuer providing non-public information as part of its feedback. The rule should require that any issuer information provided as part of the feedback process be publicly available, with the company's feedback including appropriate citations to the public source for the information, such as the company's filings. At the same time, proxy advisors cannot be in the position of having to research and assure themselves of the public nature of any issuer feedback they receive and decide to incorporate in their proxy advice. Accordingly, any final rule should make clear that the proxy advisor may incorporate into its analysis and distribute to its clients any information provided by the company as part of its feedback and that the proxy advisor is in no way liable for any adverse consequences stemming from dissemination of any information provided by the company as part of its feedback.

Many of these practical concerns could be addressed by moving to a principles-based rule and using Commission or Staff guidance to ensure that the mechanisms are being administered in a fair and efficient manner.[84] If the Commission determines to go forward with a detailed, prescriptive rule, we believe that successful resolution of these operational issues is

---

[83]  Glass Lewis, like other proxy advisors, obviously has an incentive to correct factual errors whenever it becomes aware of them and would do so whenever and however it learns of them. We focus here on the claims of "methodological weakness" that we suspect, based on our experience, will be the primary focus of the review periods.

[84]  For example, the exemptive condition could be as concise as a requirement that proxy advisors "maintain policies and procedures that provide registrants (and certain other soliciting persons) a meaningful opportunity to comment on proxy advice and final notice of any proxy advice," with Staff or Commission guidance filling in the timing and other elements.



critical to the workability of the resulting regime and we encourage the Commission to consider our suggestion that supplemental comment and/or a pilot program would be prudent given the scale and untested nature of the proposed requirements, as well as the importance of the continued, effective functioning of the proxy voting process to our corporate governance system.

### 3. The mandate to carry the issuer's hyperlinked response.

We also have practical concerns about the mandate to publish a hyperlink to the issuer's response. Most importantly, this part of the rule should clearly indicate that the requested hyperlink must be "provided to" the proxy advisor before the end of the relevant period.[85] As proposed, the rule merely requires that the company has "requested" this by the deadline, which could be understood to allow a timely request to be made with the actual hyperlink to follow. This is not what the Commission seems to have intended,[86] and it would present serious difficulties in practice, including allowing a company to indefinitely delay adverse proxy advice.

We would also ask the Commission to reconsider the practicality of its expectations that the hyperlink would be "activated concurrently" with publication of the proxy advisor's report. While we understand that the Staff is trying to reconcile the proposal's unusual third-party publication mechanism with its existing rules on the filing of supplemental proxy materials, this sort of intricate coordination between the proxy advisor and company on a regular basis would be time-consuming, at best, and likely prone to error and delay. For issuers to avail themselves of this opportunity, they should provide the proxy advisor with an active, functional hyperlink within the two-day period, with no further obligation on the proxy advisor's part other than including the link in its proxy advice and electronic medium.

The proposed rule should also contain some reasonable guidelines and limitations on the communications that proxy advisors would be required to hyperlink to in their reports and

---

[85] This part of the proposed rule's reference to "the period described in paragraph (b)(9)(ii)" is also ambiguous and conceivably could refer to any of three different periods of time. We assume what was intended here was the two business day period specified in paragraph (b)(9)(ii)(B). See Release at 55.

[86] See Release at 55 ("registrants would be required *to provide* the hyperlink (or other analogous electronic medium) to the proxy voting advice business no later than the expiration of the two-day final notice period that would be required under proposed Rule *14a-2(b)(9)(ii)(B)*") (emphases added).



thereby transmit to their clients.[87]  At a minimum, the response should: 1) be relevant to the matter at hand; 2) exclude any libelous or defamatory material; 3) exclude non-public information; and 4) exclude any unnecessary personal names or other personally-identifiable information.  Also, as noted above, for basic reasons of fairness and efficiency, companies should not be allowed to use their response to present arguments (whether alleged factual errors or methodological weaknesses) that were not first presented to the proxy advisor during the initial review period or other earliest opportunity.

Much of this could be accomplished through a general proviso in the rule that the hyperlinked response is only available to companies that agree, in advance, to a proxy advisor's reasonable terms and conditions.  (Issuers participating in Glass Lewis' Report Feedback Statement ("RFS") service[88] must agree to both terms and conditions and an etiquette guide.)  Absent that, the Commission should include the points above in the rule and proxy advisors should also be allowed, as a condition of posting the hyperlink, to require the company to fully indemnify them for any loss or claim arising out of the content of the company's response or from distributing the hyperlink and its clients' subsequent use of the hyperlinked site.

The Release does say, "In our view, proxy voting advice businesses would not be liable for the content of the registrant's (or certain other soliciting person's) statement solely due to inclusion of a hyperlink (or other analogous electronic medium) to such a statement in their voting advice."[89]  While we certainly agree that proxy advisors should not be liable for the mandated dissemination of third parties' statements, the only basis for this view cited in the Release is a Commission interpretation on companies' use of electronic media and the federal securities laws. The rule should include express liability protection for proxy advisors on this point, including preemption of any applicable state law (e.g., defamation).  Absent that sort of meaningful protection, allowing proxy advisors to require reasonable terms and conditions, such as indemnification, becomes all the more important.

Finally, as noted above, it is important that the Commission clarify that changes to the proxy voting advice at this point in the process do not trigger new two-day notice periods.  In particular, if the proxy advisor feels it necessary to respond in some way to a company's response (for example, to rebut what it sees as a false or misleading statement about its

---

[87]  Cf. Release at 65 Q. 38.

[88]  Glass Lewis operates a service today where issuers can sign up to have their responses to proxy research reports transmitted to Glass Lewis clients.  See https://www.glasslewis.com/report-feedback-statement-service/.

[89]  Release at 65-66; see also Release at 55 n. 140.

**GLASS, LEWIS & CO., LLC**   255 California Street, Suite 1100, San Francisco, CA 94111     W W W . G L A S S L E W I S . C O M

38

JA 737



advice), that should not restart a new final notice review period. If this were not made clear, the rule could lead to repeated cycles of responses and responses to responses.

### E. Other Issues.

#### 1. Transition.

We appreciate the Commission's recognition that there should be an appropriate transition period for proxy advisors to develop and implement the systems and processes that would be needed to comply with the proposed rules. We have two comments on the proposed period. First, in light of the pendency of litigation raising, at a minimum, significant issues about the statutory and constitutional bases for this rulemaking, we believe the appropriate course would be to delay the effectiveness of any final rules until these threshold legal issues are resolved by the courts. Absent that, proxy advisors may be required to begin to make substantial investments to develop the necessary systems while uncertain whether these systems will ultimately be needed. These costs, of course, could not be later recovered and may have to be passed on to proxy advisors' clients and, in turn, those clients' participants and beneficiaries. Second, given our expectations for what would be required to develop, implement and test the necessary systems and processes,[90] we believe an 18-month transition period after publication of the final rule in the Federal Register would be more appropriate. Also, given the intense seasonality of proxy advisors' work, the Commission should ensure that the transition period does not end during or shortly before the Spring proxy season and consider a phased implementation schedule.

#### 2. Rule 14a-9 interpretation.

The Commission also proposes to add four examples of how a proxy advisor's failure to disclose information could be a misleading statement under Rule 14a-9. Specifically, the rule would codify three examples briefly noted in the August 2019 Interpretation – "the proxy voting advice business's methodology, sources of information, [and] conflicts of interest." The rule would also add failure to disclose material information regarding "use of standards that materially differ from relevant standards or requirements that the Commission sets or approves" as another example of a misleading statement.

This is a significant change in the law, effectively requiring proxy advisors to make compliant disclosures or face SEC enforcement or private litigation. But, as to the first three — on methodology, sources of information and conflicts – the new rules are barely mentioned in the Release. The Release contains no discussion of the Commission's bases for adding these to

---

[90] See note 138 below.

**GLASS, LEWIS & CO., LLC**    255 California Street, Suite 1100, San Francisco, CA 94111        W W W . G L A S S L E W I S . C O M

39

JA 738



Rule 14a-9 or what would be required by the new rule text.  Nor does the August 2019 Interpretation include any description of the Commission's basis for concluding that a lack of disclosure on these topics could be misleading or its expectations for non-misleading disclosure, beyond a few short and general footnotes.[91]  Absent any such explanation, there will be significant, harmful uncertainty about the scope of Rule 14a-9 for proxy advisors, as well as unanswered questions about the implications of these interpretations for other parties that file proxy materials and face potential liability under Rule 14a-9 — and who, of course, have their own conflicts and use their own methodology and information sources.  The Commission should withdraw this rule change or repropose it with a detailed description of what the Commission expects and its basis for adding these examples to its rules.

Likewise, while it does discuss the issue, the Release does not explain why an investor would have been misled by proxy advisors' past recommendations that were based on standards other than legal requirements.  Specifically, the Release states, "clients may mistakenly infer that the negative voting recommendation is based on a registrant's failure to comply with the applicable Commission requirements when, in fact, the negative recommendation is based on the determination that the registrant did not satisfy the criteria used by the proxy voting advice business."[92]

Many of Glass Lewis' clients expect their portfolio companies to exceed minimum legal requirements (including Commission requirements) in some respects and Glass Lewis' house policy reflects that expectation.  Also, as noted throughout this letter, vote recommendations issued by a proxy advisor may vary and mirror the custom policy selected by the client itself and many of Glass Lewis' clients' voting policies are also based on some standards that exceed minimum legal requirements.  Given how common this is, the Commission's assumption that a client would be misled if a proxy advisor did not specifically point this out is unfounded and arbitrary.  We believe compliance with Commission requirements is both the norm for public companies and reasonably expected by most parties involved in the proxy voting process; if a company were in violation of SEC requirements in some respect, that would likely warrant

---

[91]  See August 2019 Interpretation at 12-13.  For example, there is no explanation of what the Commission expects to be disclosed about a proxy advisor's "methodology" for its advice to not be misleading, other than a footnote in the August 2019 Interpretation related to peer group construction.  Glass Lewis makes its house voting policies publicly available, but the details of some aspects of its methodology are Glass Lewis' proprietary information and accordingly are not publicly disclosed.

[92]  Release at 70.

**GLASS, LEWIS & CO., LLC**   255 California Street, Suite 1100, San Francisco, CA 94111     W W W . G L A S S L E W I S . C O M

40

JA 739



specific mention in the proxy advice.[93]  The Commission should withdraw this rule change or adequately explain how and why a shareholder would be misled by the common practice of evaluating companies against proxy advisors' and shareholders' own voting policies, rather than just compliance with law.

**IV.  The economic analysis does not comply with the Commission's Current Guidance.**

To its credit, the Commission has made rigorous economic analysis a centerpiece of its rulemaking process.  And, while economic analysis is always important, surely it is most vital in atypical rulemakings like this one, where the Commission is not implementing a statutory directive or making incremental changes to an existing rule, but is instead electing to use its discretionary rulemaking authority to intervene in the private market and take a service it has not regulated directly and subject it to a new and detailed regulatory regime.

Nor is this a rulemaking where the relevant data is outside the Commission's purview or the rule is intended to further a non-economic goal outside of the Commission's area of expertise.  Proxy advisors' primary role is to review public companies' SEC filings and advise entities, many of whom are subject to SEC regulation, on how to vote on corporate governance matters.  In fact, the SEC has previously used its examination authority to review in detail how investors use proxy advice in their voting.  Countless public company letters and trade group-funded studies have been submitted to the SEC trying to make corporate managers' case for the Commission to regulate proxy advisors.  As Commissioner Roisman emphasized at the Open Meeting, the Commission and Staff engaged in "extensive study" to put together its proposal on this issue that the SEC and others "have grappled with for well over a decade."[94]

It is all the more surprising then how little the economic analysis included in the Release says about why this new regulatory regime is needed and what its consequences would be from an economic perspective.  In fact, the economic analysis included in the Release falls short of the Commission's responsibilities and its own standards on almost every count.  No market failure is identified.  No data or even information from the Commission's examinations was used to establish the baseline in practice.  Reasonable alternatives — including ones

---

[93]  See Comments of the Pension Investment Association of Canada (Jan. 23, 2020) ("Any noncompliance with SEC rules should be a matter for SEC enforcement rather than a shareholder vote.  It does not appear from our perspective that there is confusion as to whether proxy advisors are making recommendations based on legal non-compliance.").

[94]  Statement of the Honorable Elad L. Roisman at SEC Open Meeting (Nov. 5, 2019), available at https://www.sec.gov/news/public-statement/statement-roisman-2019-11-05-14a-2b#_ftnref4.



chosen by coordinate regulators and even raised by the SEC itself in its 2010 Concept Release — were ignored. No benefits or even costs are quantified, except for the burdens that had to be quantified for the PRA analysis. (And, as to those, Glass Lewis has already explained how they were vastly understated.) In fact, other than general market statistics, the only data in the economic analysis is a tabulation of issuer complaints in SEC filings, with no effort made to analyze whether those complaints were justified. The Release says little on the significant issue of competition, ignoring the concerns of other regulators. Nor does the analysis discuss or reconcile the proposed rules with the broader academic literature on the balance of power between management and shareholders in corporate governance. And the economic analysis sidesteps what may be the most significant economic consequence of the proposal, claiming that subjecting proxy advisors to potential litigation by companies was the result of an August 2019 Commission interpretation (with no economic analysis or public comment) and need not be economically analyzed now because the interpretation was already in place before this rule was proposed.[95]

### A. No market failure has been identified.

The first, most basic principle of economic analysis of regulation is that the government should identify a market failure before intervening in the private market.[96] As a former SEC Chief Economist has explained, ""the first element of [] an SEC . . . economic analysis is to identify the need for a rule. Often, this will involve a market failure."[97] But the economic

---

[95] We also note that the entire economic analysis ignores the implications of subjecting proxy advice to the information and filing requirements of the SEC's proxy rules and only discusses the consequences of the new exemptive conditions. The economic analysis should consider all consequences of the new rules, however, which subject proxy advice to the information and filing requirements and add new exemptive conditions. See Glass Lewis' PRA submission at 5-9. If the Commission considers proxy advisors' compliance with the information and filing requirements impossible or so impractical as to not be worth analyzing, it should state that explicitly and explain why.

[96] See U.S. Securities and Exchange Commission RSFI and OGC, Current Guidance on Economic Analysis in SEC Rulemaking, at 4-5 (March 16, 2012) ("Current Guidance").

[97] Speech of Mark Flannery, Director, Division of Economic and Risk Analysis, U.S. Securities and Exchange, "Economic Analysis: Providing Insight to Advance the Missions of the SEC and the PCAOB" (Oct. 22, 2015), available at https://www.sec.gov/news/speech/keynote-address-pcaob-missions-of-sec-and-pcaob.html; see also Exec. Order No. 12,866, sec. 1[b][1] ("each agency shall identify the problem that it intends to address (including, where applicable, the failures of private markets or public institutions that warrant new regulatory action) as well as assess the significance of that problem").



analysis in the Proposing Release does not identify a market failure that provides the need for the rule. The term "market failure," or recognizable variations of it, simply do not appear in the Release.[98]

This absence is particularly striking given that some of the Commission's fellow regulators have studied the proxy advisor industry and concluded that there was no market failure. Most notably, ESMA, after an "extensive analysis" of proxy advisors, specifically said that it "found no evidence of a market failure requiring regulatory intervention."[99]

Commentators have also made this point to the Commission. As one of the nation's foremost corporate governance experts put it:

> So, what we have is the most sophisticated institutional investors in the world, with access to the greatest resources for researching portfolio companies ever assembled, making a free market decision to pay for outside, objective analysis, no different from other securities analysis reports they may purchase, to help them better understand their holdings and better meet their obligation as fiduciaries for the people whose money they are investing to respond to corporate initiatives appropriately. There is no monopoly and no requirement to buy these services; they can buy from one, all, or none. There could not be a better example of market efficiency or a worse argument for government interference. And yet, here we are.[100]

---

[98] The SEC's Current Guidance on economic analysis in rulemaking further explains: "Traditional market failures include market power, externalities, principal-agent problems (such as economic conflicts of interest), and asymmetric information." Again, however, the Release does not use these terms or clearly identify any of them as the market failure warranting this intervention. (While the Release does talk about proxy advisor conflicts, it does not identify these as a market failure warranting regulation, nor, as discussed below, could it make this case.)

[99] See Comments of Steven Maijoor, ESMA Chair, "ESMA recommends EU Code of Conduct for proxy advisor industry," (Feb. 19, 2013), available at https://www.esma.europa.eu/sites/default/files/library/2015/11/2013-240.pdf.

[100] See Nell Minow, "Regulating Proxy Advisors is Anticompetitive, Counterproductive, and Possibly Unconstitutional," Harvard Corporate Governance Blog (Mar. 2, 2018), available at https://corpgov.law.harvard.edu/2018/03/02/regulating-proxy-advisors-is-anticompetitive-counterproductive-and-possibly-unconstitutional/; see also CII October 15 Letter at 2 ("[p]roxy advisory firms provide market-based solutions, and the SEC policy initiatives have the potential

**GLASS, LEWIS & CO., LLC**   255 California Street, Suite 1100, San Francisco, CA 94111          W W W . G L A S S L E W I S . C O M

43

JA 742



Faced with this record, the Release does not grapple with these issues, let alone reach and provide a reasoned conclusion that there is a market failure or other need for this rule.

To be sure, there are passages in the Release on the importance of proxy voting and advice, as well as issuers' concerns about accuracy and conflicts. But even if proxy advisors' critics' claims were substantiated — which, as discussed above and below, they are not — this is not a sufficient basis to warrant government involvement under the SEC's economic analysis guidance. Many fields — law, management consulting, academia, journalism and countless others — are no less important and their practitioners sometimes make errors and face conflicts. What is missing from the analysis is a market failure — that is, the Release should explain why the market would not care about and address any accuracy or inadequate conflict disclosure issues over time. As a foreign regulator concluded after its own study: "[T]he overwhelming evidence supports the positive impact of proxy advisors. The criticisms of the workings are issues which can easily be resolved through market forces and are part of the evolution of both proxy advisors and investors."[101]

In contrast, the types of economic conflicts warranting SEC regulation are structural issues that result in misaligned incentives. As a former SEC Chief Economist has explained:

> For example, consider credit ratings agencies and audit firms . . . . [T]he *raison d'etre* for credit rating and auditing firms has embedded within it a potential information problem of the sort they are intended to correct. Both types of agents are selected and paid by the affected firm, for the purpose of conveying information to third parties, i.e., investors. To whom do auditors and rating agencies ultimately owe their allegiance? Are their economic incentives consistent with this allegiance? Relevant policies in this area can seek to improve incentives without compromising the value of the services being provided.[102]

to adversely affect the voluntary, uncoerced, private contracts between investors and their proxy advisors").

[101] SEBI Working Group Report at 10.

[102] See Speech of Mark Flannery, Director, Division of Economic and Risk Analysis, U.S. Securities and Exchange, "Economic Analysis: Providing Insight to Advance the Missions of the SEC and the PCAOB" (Oct. 22, 2015), available at https://www.sec.gov/news/speech/keynote-address-pcaob-missions-of-sec-and-pcaob.html; see also Cezary Podkul, "SEC Urged to End Ratings Firms Conflicted Business Model," Wall Street Journal (Nov. 4, 2019) (industry advisory group urging SEC to change payment model for CRAs to user-pays (i.e., the same as proxy advisors) in order to improve the reliability of ratings), available at

**GLASS, LEWIS & CO., LLC**   255 California Street, Suite 1100, San Francisco, CA 94111      W W W . G L A S S L E W I S . C O M

44

JA 743



Here, however, there is no such conflict in the payment model or other structural misalignment of incentives. Proxy advisors are paid by the investors they advise.[103] Or, as CII put it, "Proxy advisors' business model depends on factual accuracy and their incentives are thus aligned with issuers and institutional investors alike."[104] The Commission should recognize, as other regulators have, that there is no market failure here and decline to intervene in this market.

**B. Evidence for claims of inaccuracy is lacking.**

As noted above, the Release references issuers' "concerns" dozens of times. And foremost among those concerns are claims of proxy advisor inaccuracy. But SEC rules must be based on evidence, not just assertions.[105]

---

https://www.wsj.com/articles/sec-urged-to-end-ratings-firms-conflicted-business-model-11572911797.

[103] See SEBI Working Group Report at 10 ("the level of conflict is substantially lower than other intermediaries like auditors and credit rating agencies, where the company being scrutinised is itself paying the intermediary").

[104] CII October 15 Letter at 3. Apparently sensing this problem in the SEC's economic analysis, an industry-funded group submitted a comment letter arguing, based on an academic study from 1982, that shareholders face a "collective action problem" in voting proxies. See Comments of Bernard Sharfman, Chairman, Advisory Council, Main Street Investors Coalition (Dec. 20, 2019). But, to the extent this is meant to provide the missing economic need for this rulemaking, there are at least two problems with it. First, there have been significant changes in the size and share of securities held by institutional investors over the last 40 years, greatly mitigating the issue discussed in the article. Second, SEC guidance says: "Frequently, the proposed rule will be a response to a market failure **that market participants cannot solve because of collective action problems**." Current Guidance at 5 (emphasis added). Here, proxy advisors are a private market solution that helps address the collective action problem Sharfman describes (which exists much less today than 1982). This is not a logical reason to regulate proxy advice.

[105] See Current Guidance; see also Peirce and Ellig, 8 Brook. J. Corp. Fin. & Com. L. at 388 (criticizing SEC rulemaking for being "more willing than executive branch agencies to base decisions on beliefs or assertions rather than evidence").

**GLASS, LEWIS & CO., LLC**   255 California Street, Suite 1100, San Francisco, CA 94111      W W W . G L A S S L E W I S . C O M

45

JA 744



Here, that evidence is missing.  To begin with, commenters have provided no logical explanation as to why proxy advice purchasers would not care if the advice was rife with errors.  They do care and would be concerned if this was the case, which it is not.  Both Glass Lewis and its largest competitor disclose an error rate of less than 1%.  More to the point, commenters have not provided actual evidence of a concerning error rate.  After all, whether proxy advisors commit frequent errors is an empirical question, but no empirical evidence has been provided to answer it.

The closest the economic analysis comes to providing evidence on this central issue is a table in the economic analysis that compiles situations in which a company filed supplemental proxy materials over a three-year period expressing various "concerns" about proxy advisors ("Table 2").  For four reasons, however, Table 2 does not provide a basis for the rules.

First, the SEC has not actually substantiated any of these concerns.  The economic analysis only describes these as the views expressed in the company filing and we understand that the Staff have confirmed that they did not do any work to evaluate whether these claims were valid or baseless.  This begs the question why Table 2 was included in the Release.  Proxy advisors are hired to critically evaluate management recommendations, and they do sometimes recommend against these recommendations.  It is therefore not particularly notable or significant that some companies — 264 of a possible 17,296 in the SEC's sample[106] — expressed some sort of continued disagreement or concern about proxy advice.

Second, commenters cannot evaluate and provide meaningful comments on Table 2 because the SEC has not provided basic details about the analysis it summarizes.  Seeking comment on a proposed economic analysis is only meaningful if the SEC provides enough detail for commenters to understand and react to the Commission's analyses.[107]  To that end, another former SEC Chief Economist has explained that "[o]ur goal is to be transparent about our methodologies, assumptions, and data sets and we hope that commentators will provide rigorous feedback on our analyses."[108]  But, here, the SEC has not been transparent.  Despite repeated requests and explanations of why these details are needed, the Staff have not

---

[106]  Based on our count of the reclassified information in the DERA supplemental memo.

[107]  See Portland Cement Association v. Ruckelshaus, 486 F.2d 375, 394 (D.C. Cir. 1973) ("It is not consonant with the purpose of a rule-making proceeding to promulgate rules on the basis of inadequate data, or on data that, [to a] critical degree, is known only to the agency.").

[108]  See Speech of Craig M. Lewis, Director, Division of Economic and Risk Analysis, U.S. Securities and Exchange, "The Expanded Role of Economists in SEC Rulemaking," (Oct. 16, 2012), available at https://www.sec.gov/news/speech/2012-spch101612cmlhtm.

**GLASS, LEWIS & CO., LLC**   255 California Street, Suite 1100, San Francisco, CA 94111        W W W . G L A S S L E W I S . C O M

46

JA 745



divulged basic information about their analysis — most notably, which companies they categorized as expressing concern about factual errors. This has frustrated commenters' ability to evaluate whether these were or were not factual errors, a central issue in this rulemaking.[109]

Third, the SEC has not adequately explained why it included the categories it did, particularly "Amended or modified proposal." The Release describes this category as situations where the "registrant responds to a current or prior year negative recommendation from a proxy voting advice business by indicating that it has amended or modified proposals or existing governance practices prior to the annual meeting and requests investor consideration of these facts in making their vote."[110] To be fair, the SEC did only describe this as a "registrant concern." But, by classifying it with factual errors and other registrant concerns, the economic analysis suggests the SEC sees it as a problem the proposal would address. Other regulators have considered the adoption of corporate governance best practices to avoid adverse proxy advisor recommendations a positive development: "Boards are therefore ensuring support of shareholders when endeavouring to meet the parameters within proxy advisers' recommendations. This is appropriate and aligns the interests of the shareholders with the board and management of their companies, which are sometimes not fully aligned."[111] If the SEC has a different view and sees a company adopting such a practice as akin to a factual error, it should explain that view and support its contention with evidence of the harm resulting from these situations.[112]

---

[109] While the DERA staff did add a memorandum to the file towards the end of the comment period, after a FOIA request and multiple other letters and in-person requests, that memorandum does not include basic information like which companies claimed factual errors or were included in the SEC's other categories.

[110] Release at 96 n. 239.

[111] SEBI Working Group Report at 17; see also id. at 9 ("In fact, some of the benefits of proxy advisors may be invisible, as people would have altered their actions to escape the critical analysis of proxy advisors. So, a person sitting on too many boards may opt to give up her board seat by withdrawing from the slate of directors up for election. In other words the impact of possible proxy advisor's recommendation would have altered behaviour even though no one will notice the impact.").

[112] Similarly, the supplemental DERA memo states that the Staff included in its sample of "concerns" situations in which the "registrant identified changes of circumstance that should warrant reconsideration of an adverse voting recommendation." Again, this does happen, but we are not clear why the Staff would categorize it as a concern or how it provides a basis for this new regulatory regime.

---

**GLASS, LEWIS & CO., LLC**   255 California Street, Suite 1100, San Francisco, CA 94111          W W W . G L A S S L E W I S . C O M

47

JA 746


Fourth and finally, Table 2 shows at most that 54 of 17,296 or .3% of company filings over this time period claimed a factual error and 260 or 1.5% contained a more general "concern," broadly defined, with some aspect of some proxy advisors' proxy advice.[113]  The Release suggests there may be some other companies that believed there was an error or had other concerns with proxy advice during this time period, but did not say anything.[114]  At the same time, it is likely that some of these claimed errors or concerns were exaggerated or just unfounded.  Glass Lewis has long disclosed that its error rate is less than 1%.  Nothing in Table 2 gives any reason to believe errors are more frequent than that.

In short, the economic analysis lacks empirical evidence on the empirical question at the foundation of the proposed rules.  The Commission should answer this empirical question before imposing a costly, untested, new regulatory regime premised on concerns about proxy advisor accuracy.

## C.  The economic analysis fails to understand the baseline.

As the SEC Staff's Current Guidance recognizes, the second element of a good economic analysis is understanding the baseline, which is "the best assessment of how the world would look in the absence of the proposed action."[115]  As a SEC Chief Economist explained:

> A baseline . . . is vital to understand how a market is functioning before we can identify what might be wrong within it. This goes beyond a simple recitation of current

---

[113]  Based on Table 2 data since the additions and reclassifications in the DERA supplemental memorandum are not classified.  We note that both these rates are for all proxy advisors.  The rate for any individual proxy advisor would be lower.

[114]  There is no reason to think this would be a significant number.  As the IAC notes, company management can use the company's resources and has strong incentives to bring any material proxy advice errors to their shareholders' attention.  Recommendation of the SEC Investor Advisory Committee (IAC) Relating to SEC Guidance and Rule Proposals on Proxy Advisors and Shareholder Proposals  at n. 21 (Jan. 24, 2020) ("It is insufficient to claim, as do some commentators, that the supplemental proxies filed by corporate managers establish a lower bound on the number of errors in proxy reports. There is nothing to suggest that proxy advisors ever retaliate against companies for correcting factual errors, and if potentially material to vote outcomes, corporate managers have ample incentives to seek corrections, and they can use investor funds to do so.").

[115]  Current Guidance at 6.

---

**GLASS, LEWIS & CO., LLC**     255 California Street, Suite 1100, San Francisco, CA 94111          W W W . G L A S S L E W I S . C O M

48

JA 747



regulatory requirements or an overview of general market statistics. It is incumbent upon regulators to understand fully the complexities of the markets we regulate. Only then can we make a theoretical market failure concrete and specific.[116]

Here, however, the economic analysis does little beyond reciting some general market statistics.  Even though accuracy appears to be the Commission's primary concern, the economic analysis, as noted above, does not even claim to evaluate whether that is a problem.  Nor does it contain any original information about proxy advisor conflict policies and conflict disclosures, instead just noting, based on letters, that "some proxy voting advice businesses have disclosure practices and procedures regarding conflicts of interest that may be similar to these proposed disclosure requirements,"[117] without further discussing what those practices are or what may be wrong with them.[118]  Nor did the SEC use any original information on the timing of companies' filing of proxy statements or when investment advisers typically vote, critical start and end points for evaluating the effect of the proposed rules on the timing of proxy advice and voting.

Here, the failure to provide evidence of actual market practices is all the more surprising because the SEC conducted focus examinations of proxy advisors and investment advisers' use of proxy advisors in 2015.[119]  While the resulting examination reports are not available to the public, GAO reported in November 2016 that "SEC staff also considered some of the issues discussed previously [i.e., accuracy, conflicts disclosure, "over-reliance" on proxy advisors] through examinations of proxy advisory firms registered as investment advisers and registered investment companies using proxy advisory firms."[120]  GAO further explained that, while the

---

[116]  Speech of Mark Flannery, Director, Division of Economic and Risk Analysis, U.S. Securities and Exchange, "Economic Analysis: Providing Insight to Advance the Missions of the SEC and the PCAOB" (Oct. 22, 2015), available at https://www.sec.gov/news/speech/keynote-address-pcaob-missions-of-sec-and-pcaob.html.

[117]  Release at 92.

[118]  The Release does cross-reference an earlier footnote that notes that "there is no uniform set of standards" for conflicts mitigation and that "concerns remain about the adequacy of these firms' conflicts of interest disclosures."  This obviously falls far short of a full understanding of current market practices and why and how they need to be improved.

[119]  See Office of Compliance Inspections and Examinations, National Examination Priorities for 2015 at 4, available at https://www.sec.gov/about/offices/ocie/national-examination-program-priorities-2015.pdf.

[120]  GAO 2106 Report at 35.

**GLASS, LEWIS & CO., LLC**   255 California Street, Suite 1100, San Francisco, CA 94111        W W W . G L A S S L E W I S . C O M

49

JA 748



2015 proxy advisor priority examinations were ongoing, GAO reviewed 41% of them completed as of August 2016 and "confirmed that the SEC examined risk areas related to conflict of interest, proxy voting policies and procedures, and oversight of proxy advisory services, among other issues.  None of the examinations we reviewed resulted in serious violations leading to an enforcement action."[121]

The SEC should use its direct evidence from these examinations to understand the baseline-in-practice and evaluate for itself both the concerns precipitating this rulemaking and the proposed rules' potential consequences.[122]  Information collected in examinations could provide actual evidence on issuers' claims of inaccuracy and lack of adequate conflict disclosure.  It also would give the SEC a factual basis to understand the consequences of the regulatory approach chosen, including its effect on the timing of a complex, time-sensitive process.  If the SEC somehow has no relevant data from its 2015 or other examinations, it should state so and explain why and how it could nonetheless reach a sufficient, reasoned understanding of the market practices of proxy advisers and investment advisers' proxy voting.

The SEC also failed to adequately consider the regulatory baseline.  First, the economic analysis' discussion of the regulatory baseline does not mention the SEC's recent expansion of investment advisers' responsibilities to oversee proxy advisors.  As discussed above, however, in guidance issued just this past August, the SEC addressed a number of the issues in this rulemaking, including proxy advisors' conflicts policies, engagement with issuers and accuracy.  The SEC conveyed its expectation that investment advisers would review their oversight of proxy advisors in response to this guidance and commentators agreed that it would lead to changes for both proxy advisors and investment advisers.[123]

---

[121]  Id. at 36 (footnote omitted).  GAO's report indicated that SEC Staff reviewed and provided technical comments on the report before it was issued.

[122]  See Marc Wyatt, Director, Office of Compliance Inspections and Examinations, "Inside the National Exam Program in 2016" (Oct. 17, 2016) ("As the SEC's "eyes and ears" in the field, OCIE strives to use our perspective to provide support to the rule-making process and inform other guidance issued by the SEC, and its Divisions and Offices. . . .  Based on our exams, we provide our rule-writing colleagues information about the evolution of market practices and the most common exam observations."), available at https://www.sec.gov/news/speech/inside-the-national-exam-program-in-2016.html.  Of course, the SEC can also ask for other information it needs to understand the need for or potential consequences of a rule and also has other authority to obtain such information.  See, for example, 15 U.S.C. 77s(e).

[123]  See The Conference Board, "On Governance: What Does the Latest SEC Guidance Mean for Proxy Advisors, Companies?," (Aug. 26, 2019) ("It looks like both the [proxy] advisors and their



Nor does the economic analysis — or any other part of the Release, for that matter — mention the Best Practices Principles for Shareholder Voting Research instituted in response to ESMA's consultation. As noted above, the Best Practices Principles focus on identifying, disclosing and managing conflicts of interest and fostering transparency to ensure the accuracy and reliability of proxy advice, the same concerns at issue here. And signatory proxy advisors apply and measure themselves against these principles on a global basis annually.

The baseline, of course, "includes both the economic attributes of the relevant market and the existing regulatory structure."[124] But the baseline — and the economic analysis as a whole — does not discuss either the August 2019 Guidance or the Best Practices Principles, let alone consider them adequately to show that it "understand[s] fully" the regulatory baseline. The SEC should not institute a significant new regulatory regime without first considering and understanding the effect of existing regulatory measures that address the same issues.

### D. The economic analysis fails to consider reasonable alternative approaches.

As the Current Guidance explains, the Commission is required to consider reasonable alternative regulatory approaches, including "reasonable alternatives raised during the rulemaking."[125] To his credit, Chairman Clayton told the Senate Banking Committee when he testified on December 10, 2019 about this proposed rulemaking that he was "very open" to alternative ways to promote proxy advisor accuracy.

This is not reflected in the economic analysis, however. While six "reasonable alternatives" are mentioned, the first four are variations on the chosen regulatory approach — issuer pre-review, mandated publication of the issuer's response and prescribed conflicts

---

clients will need to adopt and implement some new policies and procedures, and that in some cases existing policies and procedures will need to be modified and/or documented.") (quoting Robert Lamm, Esq.), available at https://www.conference-board.org/blog/environmental-social-governance/SEC-Addressing-Proxy-Advisor-Influence.

[124]  Current Guidance at 7.

[125]  Current Guidance at 9 (citing the D.C. Circuit decision in Chamber I); see also Speech of Craig M. Lewis, Director, Division of Economic and Risk Analysis, U.S. Securities and Exchange, "The Expanded Role of Economists in SEC Rulemaking," (Oct. 16, 2012) ("when the Commission adopts a rule, the rule release must articulate why the Commission chose the alternative it did, fully engaging with those reasonable alternatives raised in the proposing release or suggested by commentators"), available at https://www.sec.gov/news/speech/2012-spch101612cmlhtm

**GLASS, LEWIS & CO., LLC**   255 California Street, Suite 1100, San Francisco, CA 94111          W W W . G L A S S L E W I S . C O M

51

JA 750



disclosure.  While the details of the proposed rules need to be explored in other parts of the Release, we do not believe this is what the Current Guidance meant in saying that the Commission should consider "alternative regulatory approaches."  The fifth alternative discussed is a tangentially-related concern of companies about shareholders voting before reading company responses.  The last "alternative" — exempting smaller proxy advisors — is already covered in the Release's mandatory regulatory flexibility analysis.  Notably, none of the alternatives included in the Release even contemplates the possibility proxy advisor accuracy could be enhanced in some way other than government-mandated issuer pre-review.[126]

In reality, there are a number of genuine "alternative regulatory approaches" that the Commission should consider.  In fact, the SEC itself has previously raised other alternatives to address these issues.

In its 2010 Concept Release on the Proxy Process, after noting issuers' concerns with proxy advisors, the Commission specifically sought comment on:

> whether proxy advisory firms operate the kind of national business or have an impact on the securities markets that Advisers Act Section 203A(c) was designed to address, and whether, as a result, we should establish an additional exemption from the prohibition on federal registration for proxy advisory firms to register with the Commission as investment advisers.[127]

The Concept Release then discussed how guidance could be used in that framework to enhance conflict of interest disclosures.

---

[126]     As the IAC has noted, with one exception, the alternatives are all more burdensome on proxy advisors and their clients.   See Recommendation of the SEC Investor Advisory Committee (IAC) Relating to SEC Guidance and Rule Proposals on Proxy Advisors and Shareholder Proposals, at 8 (Jan. 24, 2020).  Tellingly, the SEC does not consider an alternative of mandating that issuers file their proxy statements sufficiently early to avoid the compression of investor time the proposal would create.  For example, the SEC should have considered an alternative of mandating that companies either file proxy statements a sufficient number of weeks before their annual meeting (or just adjusting the thresholds for review and feedback period eligibility enough), so as to allow investors the same time they have today to consider proxy advice and vote.  The SEC should then have assessed the costs and benefits of that approach relative to the proposal.

[127]     2010 Concept Release at 120 (citation omitted).

**GLASS, LEWIS & CO., LLC**     255 California Street, Suite 1100, San Francisco, CA 94111          W W W . G L A S S L E W I S . C O M

52

JA 751



Likewise, the Concept Release discussed "potential approaches that might address concerns about accuracy or transparency in the formulation of voting recommendations," and specifically suggested that "proxy advisory firms could provide increased disclosure regarding the extent of research involved with a particular recommendation and the extent and/or effectiveness of its controls and procedures in ensuring the accuracy of issuer data."[128]  The Concept Release further noted a suggestion that the Commission's NRSRO rules "may be useful templates for developing a regulatory program addressing conflicts of interest and other issues with respect to the accuracy and transparency of voting recommendations provided by proxy advisory firms."[129]  The Commission here noted that the NRSRO regulatory regime includes measures such as disclosure of performance measurement statistics.[130]  Both of these alternatives should have been considered in the economic analysis.[131]

In addition, there are at least two other reasonable alternatives, in addition to the status quo, that should have been fully explored.  First, as Glass Lewis has previously suggested,[132] the Commission should have considered a market-based approach that builds on the existing, industry-developed Best Practices Principles.  In fact, ESMA chose this very approach.  Adding a regulatory compliance, reporting or assurance mechanism to the current Best Practices Principles could add rigor and ensure consistency, while still preserving the benefits of this approach.

Critically, these alternatives would provide a more complete and balanced framework to advance the Commission's stated goal of improving proxy advisor accuracy.  After all, the issuer review and feedback periods at best only address accuracy from the company's point of view — a one-sided approach that will not address any other type of factual error.  In fact, there is no reason to think companies would even bother to review for accuracy roughly half of proxy

---

[128]  2010 Concept Release at 122.

[129]  Id. at 121 n. 287

[130]  Id.

[131]  See, for example, <u>Chamber of Commerce of the United States v. Securities and Exchange Commission</u>, 412 F.3d 133, 144 (D.C. Cir. 2005) ("Chamber I") (finding an APA violation when the Commission chose a mandate as an exemptive condition and did not consider a suggested disclosure alternative).

[132]  See Letter of Katherine Rabin, Chief Executive Officer, Glass Lewis to Chairman Jay Clayton (Nov. 14, 2018), available at <u>https://www.sec.gov/comments/4-725/4725-4649188-176490.pdf</u>.

**GLASS, LEWIS & CO., LLC**   255 California Street, Suite 1100, San Francisco, CA 94111          W W W . G L A S S L E W I S . C O M

53

JA 752



research reports, which typically do not contain any recommendation adverse to management's recommendations, meaning there would not even be a potential for accuracy improvement in those situations. At the same time, the delays associated with the issuer review periods would greatly compress the time for investor due diligence before voting. If the Commission determines it has a sufficient basis to regulate proxy advisors to enhance the accuracy of their work and elects to do so through issuer review and feedback, it should explain why choosing a regulatory approach that only affects one dimension of accuracy is a better alternative than more holistic approaches.

Second, if the Commission felt only an issuer-review mandate could address its concerns about accuracy, it should have considered having issuers review just the facts that would go into the proxy advice. In fact, this would be more consistent with the approach chosen in the context of analyst regulation, where, with appropriate safeguards, analysts are permitted to verify facts with the companies that are the subject of their reports, but are prohibited from sharing their full reports.[133] As noted above, Glass Lewis has a current practice of sharing the key facts in its reports, free of charge, with all U.S. companies through its IDR. Glass Lewis finds that through this practice it can get any benefit of company review without compromising the independence of its advice or inviting time-consuming and unproductive debates about Glass Lewis' methodology or what result that methodology should lead to in the context of a particular recommendation. This approach would also have been consistent with the Commission's prior recognition that, on most corporate governance questions, there "typically is not a correct viewpoint."

### E. The economic analysis fails to quantify any costs or benefits.

The economic analysis does not quantify any costs or benefits of the proposed rule. Nor does it make any of the underlying estimates that would be essential to understanding the costs and potential benefits of the proposed rules, such as the number of reviews that would be required, the time they would take, the number of conflicts that would be disclosed, and projections of decreased errors. In fact, other than some general market statistics, the only effort at quantifying anything in the economic analysis is the table showing the number of issuer complaints about proxy advice discussed above.[134]

---

[133] See the discussion of FINRA Rule 2241 above.

[134] While the Release's PRA analysis does, as required, make some estimates of paperwork burdens, these are incomplete and vastly understated, as explained in Glass Lewis' PRA Submission.



This does not meet the Commission's standards for economic analysis. As the Current Guidance explains, the economic analysis should "quantify [the] expected benefits and costs to the extent possible . . . and [] for those elements that are not quantified, explain why they cannot be quantified."[135] Courts have imposed similar obligations. When, as here, data is available, the Commission must estimate and quantify the costs it expects parties to incur.[136]

When the Commission first explicitly exempted proxy advice, it acknowledged that forcing parties to comply with proxy solicitation rules was "very costly."[137] And, as illustrated in Glass Lewis' PRA Submission,[138] just the paperwork burdens of the exemptive conditions on proxy advisors — a subset of the direct costs imposed by the proposed rules — would be substantial. Other direct costs and indirect costs — such as the opportunity costs discussed above and the effect on competition discussed below[139] — should also be considered and estimated to the extent possible.

---

[135] Current Guidance at 9-10.

[136] <u>Business Roundtable v. Securities and Exchange Commission</u>, 647 F.3d 1144, 1150 (D.C. Cir. 2011).

[137] SEC Shareholder Communications Release at 49,278.

[138] See PRA Submission at 10-20. Subsequent to our PRA Submission, we have made further efforts to estimate the first-year costs of developing and deploying the customized software that we think would be needed to efficiently carry out the two-stage issuer reviews contemplated in the proposed rules. Glass Lewis does not, of course, have existing systems that would be sufficient to track the time periods and manage the necessary workflows to carry out the review processes in the proposed rules. Cf. Release at 106. Our estimate at this point is that it would take six people twelve months to build such a platform. That level of effort translates to about 13,000 development hours. At $100/hour, we expect this would require approximately $1.25M in development costs. If such a system could be developed and deployed, that could affect some of our other time estimates for some of the ongoing administrative tasks that would be involved in carrying out the rules.

[139] The Current Guidance also notes that costs include "negative collateral consequences, such as the potential misuse of newly created rights." Current Guidance at 11. This issue, which as noted above is implicated here, is not considered in the economic analysis.

---

**GLASS, LEWIS & CO., LLC**   255 California Street, Suite 1100, San Francisco, CA 94111          W W W . G L A S S L E W I S . C O M

55

JA 754


The Commission should make the necessary estimates, quantify the costs and benefits of its proposed rules to the extent possible, and seek supplemental comment on its revised analysis.[140]

### F. The economic analysis fails to seriously consider the effect on competition.

The Commission, of course, has an explicit statutory requirement to consider the effect on competition in its rulemaking under the Exchange Act. Here, that obligation should have special resonance given the long-standing questions about competition in this space.

Despite this, the Proposing Release's effect on competition analysis consists of two pages, a significant part of which is devoted to speculating — contrary to the evidence before the agency of proxy advisors' customers' actual views — that the proposed rules might increase demand and stimulate competition because the advice will be more accurate and conflicts more apparent. A revised economic analysis should give this issue serious consideration and account for two significant items in the administrative record.

First, this is the unusual case where the Commission has actual, first-hand evidence that the rule would adversely affect competition. Minerva Analytics, a UK-based proxy advisor, has commented that the prospect of the proposed rules being adopted has, in fact, deterred it from entering the U.S. proxy advisor market:

> The proposed rules will not, as argued by the pro-regulation lobby, enhance competition; they will kill it outright. For as much as Minerva would like to make a formal entry into the US market with a local presence, the implicit threat of expensive and burdensome litigation as proposed by the regulations for "errors" together with the mandating of free and prior distribution of our research at the expense of our clients' contractual rights renders that possibility highly unlikely for the foreseeable future.[141]

---

[140] The Commission should also consider the significance of the costs and benefits it cannot quantify. Much of the Commission's economic analysis reads like its drafter sought to pair each very real and substantial cost it acknowledges with a countervailing benefit, however speculative, abstract or minor, such as the "benefit" of "more clear notice" that rules apply to certain conduct. And the paired costs and benefits are often followed with a statement that the Commission cannot quantify either, leaving a false sense of equivalence. A meaningful economic analysis would genuinely and candidly assess and convey the significance of the qualitative costs and benefits it discusses, even if they cannot be quantified.

[141] Comments of Sarah Wilson, Chief Executive Officer, Minerva Analytics (Jan. 2, 2020).

---

**GLASS, LEWIS & CO., LLC**    255 California Street, Suite 1100, San Francisco, CA 94111    W W W . G L A S S L E W I S . C O M

56

JA 755



Second, over 60 prominent finance and legal scholars, with a range of ideological perspectives, have submitted a comment letter expressing concern about the anti-competitive effect of the proposed rules. The letter states:

> We share the Commission's concerns about concentration in the proxy advisory market. Yet, we disagree with the following proposed remedies: 1) forcing proxy advisors to share their opinions with managers ahead of time and 2) treating opinions on proxies as proxy solicitations. By increasing the cost of opining on proxy statements such proposals will only discourage new entry into the proxy advisory market and exacerbate the problem of market concentration in this sector. We ask the Commission to strike these proposed changes.[142]

The Commission should take this direct evidence and strong academic consensus into account and engage in a serious consideration of the effect of the proposed rules on proxy advisor competition.[143]

The Commission should also consider the effect of the proposed rules on competition among asset managers. As the Release recognizes, in order to save costs, many asset managers choose to outsource much of the data collection, research tasks and other administrative functions associated with proxy voting to proxy advisors.[144] As one commentator explained, proxy advisors "economize the proxy research and voting functions by spreading the costs of tracking, analyzing, and processing many thousands of proxy votes over a larger pool of shareholders."[145] And, as the Release also notes, smaller asset managers are more dependent

---

[142]  See Comments of Anat Admati, Luigi Zingales et al. (Jan. 15, 2020).

[143]  In addition to its broader obligation to consider the economic implications of its rules, the Commission is specifically required to consider the impact that any rule promulgated under the Exchange Act would have on competition and to include in the rule's statement of basis and purpose "the reasons for the Commission's . . . determination that any burden on competition imposed by such rule or regulation is necessary or appropriate in furtherance of the purposes of [the Exchange Act]."  Exchange Act Section 23(a)(2), 15 U.S.C. 78w(a)(2).

[144]  Release at 79-80.

[145]  Cappucci, The Proxy War Against Proxy Advisors at 7; see also id. at 7-8 ("If asset managers or owners had to perform these functions themselves, they would face an unattractive choice between bearing the costs of additional staff to perform the research and not adding resources and being less informed and less responsible voters.").

---


on outsourcing these functions to proxy advisors than the largest asset managers.[146] Accordingly, a reduction in competition and/or increase in costs of proxy advice could disproportionately affect smaller asset managers.[147] The Release does not consider this effect on competition, however. Particularly in light of the trend toward asset manager concentration, the Commission should consider the potential effect of the rules on the asset management industry.

### G. The economic analysis fails to consider any effects of exposing proxy advisors to private litigation by issuers.

As Commissioner Jackson recognized at the Open Meeting, "[T]he real costs of today's new regime lie in considering the issuer's feedback, including the issuer's response in the proxy advisor's report, and facing litigation from an issuer angry about the methodology used to provide anti-management advice."[148] But this prospect of issuer litigation against proxy advisors is not even mentioned in the economic analysis. Instead, the Release explains, "Overall, we do not expect this proposed amendment [amending the definition of solicitation in the Commission's rules to include proxy advice] to have a significant economic impact because it codifies an already-existing Commission interpretation." In fact, the only mention of litigation in the entire release is a question. After noting CII's concern about subjecting proxy advisors to increased litigation through the August 2019 Interpretation, the Release asks: "Would these concerns similarly apply to aspects of the proposed amendments, or is this concern overstated in that the aspects of the interpretation and guidance that are encompassed in the proposed amendments reflect current legal obligations regarding solicitation activities?"

In other words, the Commission is disclaiming any responsibility to assess the costs and benefits and other economic consequences of exposing proxy advisors to the unprecedented prospect of litigation by companies displeased with their advice. This is because the proposed rules would codify the August 2019 Interpretation that proxy advisors are subject to this litigation threat — an interpretation adopted 3-2 over the dissent of a Commissioner who said it should have been the subject of public comment and economic analysis. Through this two-

---

[146] Release at 80.

[147] If smaller managers more frequently chose not to vote, that could also have adverse consequences for our system of corporate governance that the Commission should consider.

[148] Statement of the Honorable Robert J. Jackson, Jr. at SEC Open Meeting (Nov. 5, 2019), available at https://www.sec.gov/news/public-statement/statement-jackson-2019-11-05-openmeeting.



step process,[149] the Commission could end up with a rule on its books exposing an industry to a new type of private litigation without ever having to follow its "statutory obligation to determine as best it can the economic implications of the rule."[150]

Establishing this precedent would allow an easy end run around the National Securities Markets Improvement Act considerations in similar circumstances, in the future. In fact, by the Release's logic, an interpretation imposing exorbitant costs could be issued the day before a rule proposal with no economic analysis and then the rule proposal issued the next day could simply say the rules have no costs because the rules would only codify the interpretation. We do not believe this is good administrative practice or consistent with the Commission's responsibilities.

Here, the Commission is engaged in rulemaking that would result in an Exchange Act rule exposing proxy advisors to Rule 14a-9 litigation. To our knowledge, the Commission has never previously examined the costs, benefits and other economic consequences of doing so and it has the opportunity to do so as part of this rulemaking.[151] And this is not some technical defect in process; the prospect of issuer litigation poses very real and significant risks and costs to proxy advisors that should be analyzed and considered. If these costs are outweighed by the benefits, in the Commission's view, the economic analysis should explain how and why the Commission came to that conclusion.

### H. The economic analysis fails to engage with broader literature on executive compensation and corporate governance.

---

[149] When the Commission adopted the August 2019 Interpretation, the Chairman described it as "just a first step," and disclosed that he had "asked the staff to also consider whether the current rule definition of the term 'solicitation' under the federal proxy rules should be amended to codify today's interpretation." See Statement of the Honorable Jay Clayton at Open Meeting (Aug. 21, 2019), available at https://www.sec.gov/news/public-statement/statement-clayton-082119.

[150] Chamber I, 412 F.3d at 143.

[151] See also Motion of the U.S. Securities and Exchange Commission, at 3-4 in ISS v. Clayton, Case No. 1:19-cv-3275-APM (D.D.C. Jan. 17, 2020) ("Because the challenged Interpretation and Guidance has been incorporated into the rulemaking, **the rulemaking will enable ISS to raise any of its objections to the Interpretation and Guidance during the rulemaking process, and it will afford the Commission an opportunity to consider those objections**. If the Commission adopts the proposed amendments after notice and comment, this Court would have the benefit of a more robust administrative record.") (emphasis added).

---



Finally, the economic analysis should have considered the effect the proposed rule could have on corporate governance and executive compensation practices and reconciled the Commission's proposal with the broader academic literature on these points.[152]  As Commissioner Jackson noted at the Open Meeting, "Proxy advisors play an important role in striking the right balance in allocating power between corporate executives and investors."[153]  And, as he also noted, there is a well-established body of legal and economic scholarship examining that issue that was not considered in the Proposing Release.  Given the implications of the proposed rules for the balance of power between management and shareholders, the Commission should have considered this literature and reconciled its policy choices with it.[154]

For example, the Commission's Chief Economist has argued that investors need to be more skeptical than they are today about executive pay recommendations.  Writing in the Harvard Business Review, then-Professor S.P. Kothari and Robert Pozen explain that: "More than 95% of the time, shareholders overwhelmingly approve the pay recommendations.  Yet our research suggests that investors should be more skeptical.  Compensation committees frequently adjust company performance numbers in complex and even obscure ways, for a variety of reasons."  Although he notes the challenges they face in doing so, Kothari concludes

---

[152]  The economic analysis does contain an overview of some of the academic literature specifically on proxy advisors.  See Release at 81-83.  Our point here is that the analysis did not engage with the broader economic literature the proposed rules implicate, especially in light of the scope of some of its analysis.  See, for example, Release at 113 (arguing, with no reference to the literature, that investors may make better voting decisions, thereby leading to better investing outcomes and promoting capital formation).

[153]  Statement of the Honorable Robert J. Jackson, Jr. at SEC Open Meeting (Nov. 5, 2019) ("Taxing anti-management advice in this way makes it easier for insiders to run public companies in a way that favors their own private interests over those of ordinary investors."), available at https://www.sec.gov/news/public-statement/statement-jackson-2019-11-05-openmeeting.

[154]  See Peirce and Ellig, 8 Brook. J. Corp. Fin. & Com. L. at 400 (criticizing the say on pay rulemaking mandated by Dodd-Frank: "the SEC could have taken advantage of a large literature on executive compensation and corporate governance.  Among other things, academics have looked extensively at issues related to agency problems and asymmetric information in the governance of publicly held corporations.  The SEC would have had to look at this literature in the context of its existing mandates, including extensive compensation disclosure requirements.") (footnote omitted).

---



that, among other things, investors should engage in "meaningful dialogue" with companies about "overly generous compensation" practices. The proposed rules, by shortening the time an investor has to vote, would drastically limit the investor's ability to engage with a company on a compensation issue, if required. Yet the Commission's Release does not mention this article or reconcile its approach with the costs to shareholders of compressing their review and voting time and the resulting risk of inadequate oversight of management compensation practices.

## V. The proposed rules have fundamental legal flaws.

### A. Proxy advice is not a proxy solicitation.

Absent a legislative framework for proxy advisor regulation, the Commission proposes to regulate proxy advisors as proxy solicitors. As we understand it, the sole statutory term providing the foundation for the new proxy advisor regulatory framework is the verb "solicit" in Section 14(a) of the Exchange Act. Proxy solicitation is fundamentally different than proxy advice, however; the simple, unavoidable fact is that solicit and advise mean two different things.

To "solicit" means to "[a]sk for or try to obtain (something) from someone."[155] Here, that something is a proxy — i.e., the authority to vote on that party's behalf in a corporate election. Consistent with this, there are two fundamental characteristics of proxy solicitors' work that makes it a solicitation:

1) Proxy solicitors ask for or try to obtain proxy authority from shareholders; and

2) Proxy solicitors have an interest in the outcome (or are hired by someone with an interest in the outcome) and therefore play an advocacy role to "try to obtain" shareholders' proxy authority.

In contrast, proxy advisors do not meet either of these two characteristics of a solicitation. Proxy advisors do not ask for or try to obtain proxy authority from their shareholder clients. And proxy advisors have no stake in the outcome. They are simply hired by the shareholder to provide them with objective research and advice as a disinterested party.

---

[155] Lexico, Oxford University Press (2019); see also Oxford English Dictionary (2020) ("To entreat or petition (a person) for, or to do, something"; "To request, petition, or sue for (some thing, favour, etc.); to desire or seek by petition"; "Of things: To call or ask for, to demand").



The SEC's approach depends on conflating these two, quite different roles. In fact, the interpretation blurs the fundamental distinction in this process — between the side campaigning for an outcome on the vote and the side actually voting. Proxy solicitors are the ones asking for votes and shareholders, with the assistance of their proxy advisor agents, are the ones voting.

This common sense difference in meanings is reflected in industry practice. Proxy solicitors and proxy advisors have long been understood to have separate roles, indeed separate industries. When the SEC itself described the players in the proxy landscape in its 2010 Concept Release, its background included one section on "proxy solicitors" and another on "proxy advisory firms."[156] And the fundamental difference between these two activities is reflected in the reaction of knowledgeable industry participants, who have reacted with surprise and concern to the SEC's efforts to conflate the two.[157]

The SEC's new interpretation also does not fit with the overall statutory scheme of the Exchange Act's regulation of the proxy voting process. The "words of the statute should be read in context, the statute's place in the overall statutory scheme should be considered, and the problem Congress sought to solve should be taken into account to determine whether

---

[156]  See 2010 Concept Release at 23-25 (explaining, in part, that "Issuers sometimes hire third-party proxy solicitors to identify beneficial owners holding large amounts of the issuers' securities and to telephone shareholders to encourage them to vote their proxies consistent with the recommendations of management.").

[157]  See Comments of Dana Investment Advisers Letter (Dec. 5, 2019) ("The characterization of proxy-voting advice provided by proxy-advisory firms as "solicitation" is blatantly false and demonstrates a grave misinterpretation (or misrepresentation) of the process."); Comments of Theresa Whitmarsh, State of Washington Investment Board (Jan. 22, 2020) ("WSIB's proxy advisors are providing guidance, data, tracking and timely execution of our voting on proxy resolutions. Our advisors are NOT soliciting us to vote in support of particular policies or in a particular direction."); see also Nell Minow, Comment on Ted Allen, "A 'Draft Review' as a Safeguard on Proxy Advisors," Harvard Law School Corporate Governance Blog (May 18, 2019) ("The reference to proxy solicitation rules is so inapposite as to be absurd. The proxy solicitation rules are a safeguard against the advocacy of parties with a clear incentive to provide only one side of the story on matters that are fundamental to a company's continuing operations and structure. Proxy advisors are independent third parties who sell a product no one has to buy with recommendations no one has to follow."), available at https://corpgov.law.harvard.edu/2019/05/18/roundtable-on-proxy-voting-process/.

---



Congress has foreclosed the agency's interpretation."[158]  Here, the SEC's proposed construction does not fit with the statute's scheme or its purpose.  The federal securities laws' proxy solicitation information and public filing requirements are wholly unsuited to proxy advice. Where solicitors want their communications to be public — because they are soliciting proxy authority, after all — proxy advisors only provide their research and advice to their paying clients.[159]  And, unlike soliciting parties, proxy advisors produce thousands of proxy research reports a year.  In fact, the Proposing Release implicitly concedes this by not even discussing the possibility that proxy advisors would seek to comply with the information and filing requirements for proxy solicitations.[160]  And the statute's underlying purpose — deterring the deceptive speech self-interested "[i]nsiders" had used to defraud investors in proxy campaigns[161] — is irrelevant to disinterested proxy advice.

    In defense of its new interpretation, the SEC invokes its prior "broad" interpretations of the statute, particularly an amendment to its rules in 1956 that provided a catch-all in the SEC's definition of solicitation.  The August 2019 Interpretation puts a broad gloss on this broad catch-all, expansively reading it to cover "any person seeking to influence the voting of proxies

---

[158]  Goldstein v. SEC, 451 F.3d 873 (D.C. Cir. 2006) (quoting  PDK Labs. Inc. v. DEA, 362 F.3d 786, 796 (D.C.Cir. 2004)) (internal quotation marks omitted); see also Abbott Labs. v. Young, 920 F.2d 984, 988 (D.C.Cir. 1990) ("The 'reasonableness' of an agency's construction depends on the construction's 'fit' with the statutory language as well as its conformity to statutory purposes.").

[159]  See the longer discussion of this at pages 5-10 of our PRA Submission.

[160]   The Release does assert: "We further believe that the regulatory framework of Section 14(a) and the Commission's proxy rules, with their focus on the information received by shareholders as part of the voting process, is well-suited to enhancing the quality and availability of the information that clients of proxy voting advice businesses are likely to consider as part of their voting determinations."  Release at 17-18.  This statement is not explained, however, and it is hard to reconcile with the reality of those requirements or the fact that the possibility of proxy advisors complying with them is not otherwise discussed in the Release.

[161]   See H.R. Rep. No. 1383, 73d Cong., 2d Sess., at 14 (Apr. 27, 1934) ("Insiders have at times solicited proxies without fairly informing the stockholders of the purposes for which the proxies are to be used and have used such proxies to take from the stockholders for their own selfish advantage valuable property rights . . . .  For this reason the proposed bill gives the Federal Trade Commission power to control the conditions under which proxies may be solicited with a view to preventing the recurrence of abuses which have frustrated the free exercise of the voting rights of stockholders.").

---

**GLASS, LEWIS & CO., LLC**   255 California Street, Suite 1100, San Francisco, CA 94111        W W W . G L A S S L E W I S . C O M

63

JA 762



by shareholders, regardless of whether the person itself is seeking authorization to act as a proxy."[162]

There are at least two problems with this, though. First, the SEC has previously recognized that its catch-all definition was "sweeping" and "excessive" — potentially covering, among other things, newspaper op-eds and legal advice. As the SEC put it in 1992, "the [1956] definition of solicitation was so great as potentially to turn almost every expression of opinion concerning a publicly-traded corporation into a regulated proxy solicitation."[163] In fact, the SEC called this overbreadth a "distortion of the purposes of the proxy rules."[164] None of this is mentioned in the Proposing Release or August 2019 Interpretation, however. Instead, the SEC now has not only embraced that "sweeping" and "excessive" definition, but actually proposes to expand it through its new interpretation and a specific rule provision covering proxy advice.

Second, even if the overbroad definition in the SEC's rules were a valid reading of the Exchange Act, properly read, it would not cover proxy advice. The SEC's catch-all in the rules covers a "communication to security holders under circumstances *reasonably calculated to* result in the procurement, withholding or revocation of a proxy" (emphasis added). But, as unmoored as this is from the statutory phrase "solicit any proxy," even this broad formulation includes an element of intent to achieve an outcome that is absent with proxy advice. "Calculated" means "planned or contrived to accomplish a purpose."[165] And "procurement" is "the act or process of procuring," which, in turn, is defined as "to get possession of

---

[162] See August 2019 Interpretation at 5. In the wake of the August 2019 Interpretation, some of the Commissioners have started referring to the "proxy solicitation umbrella." See, for example, Statement of the Honorable Hester M. Peirce at the Open Meeting (Nov. 5, 2019) ("proxy voting advice falls under the proxy solicitation umbrella"), available at https://www.sec.gov/news/public-statement/statement-peirce-2019-11-05-proxy-voting-advice.

[163] SEC Shareholder Communications Release at 48,278; see also id. at 48,279 ("As a result of [the 1956] definition, almost any statement of views could be alleged to be a solicitation").

[164] While the SEC addressed this problem by exempting these types of communications from the information and filing requirements, rather than creating a more reasonable regulatory definition, its action had the effect of eliminating any practical effect of its overbroad definition on most groups of persons that otherwise would have been covered by it. The proposed rules would undo those exemptions for proxy advisors.

[165] Merriam-Webster Dictionary (2019); see also American Heritage Dictionary (5th ed. 2018) ("Made or planned to accomplish a certain purpose").

---



(something): to obtain (something) by particular care and effort."[166]  In contrast, a proxy advisor is a disinterested third-party who is not planning or contriving to achieve any outcome and who is not trying to obtain any shareholder's proxy authority.  Proxy advisors simply assist their shareholder clients through research and advice (as well as the mechanical casting of votes) — essentially an outsourced version of what a sufficiently large institutional investor would ask its own staff to do. [167]

       In short, the SEC interpretation ignores the distinction between an advocate with its own interest trying to achieve an outcome — with the attendant risks Congress saw in that sort of speech —  and a disinterested third party providing advice.  Both might "influence" the shareholders' vote, as the August 2019 Guidance strains to redefine the issue.[168]  But at that level of generality, any number of disparate types of communications might be covered.  In a court, both a counsel's argument and a law clerk's legal research might "influence" the judge's decision, but that in no way makes the two roles equivalent.

       If this reading were not clear on its face — and it is — basic principles of statutory construction would compel it.  Courts construe statutes narrowly, rather than broadly and flexibly, when an expansive reading would either: 1) raise a serious constitutional issue; or 2) expand the scope of an implied private right of action.  Here, the SEC's proposed interpretation would do both.

---

[166]  Merriam-Webster Dictionary (2019).

[167]  Just because proxy advisors at times act as shareholders' agents in administrative parts of the proxy voting process does not make them "proxy solicitors."  State corporate law clearly recognizes a distinction between granting a proxy to a party and a shareholder authorizing an agent to act on its behalf in a voting matter, such as granting that proxy.  See DEL Code 8-212(c)(1) ("A stockholder may execute a writing authorizing another person or persons to act for such stockholder as proxy.  Execution may be accomplished by the stockholder or such stockholder's authorized officer, director, employee **or agent** signing such writing or causing such person's signature to be affixed to such writing by any reasonable means including, but not limited to, by facsimile signature.") (emphasis added).

[168]  Nor do the new, historical definitions of "solicit" brought forth in the Release help this argument. Release at 19 n. 48.  These, too, include an element of intent to achieve an outcome, with the exception of the outlier "[t]o take charge or care of, as business."  But this meaning does not make sense in the statutory context "solicit" is used and, taken literally, would seem to turn any business related to the proxy process, such as a print shop or vote counter, into a proxy solicitor.  In any event, we note that the Oxford English Dictionary (1933) describes this meaning of the term as "obsolete."

---



First, as further discussed below, the SEC has already acknowledged that interpreting the statute as broadly as it now proposes to do would raise "serious questions under the free speech clause of the First Amendment." Courts construe statutes to avoid such issues, not to invite them.[169]

Second, the SEC's interpretation would expand an implied private right of action. In fact, the SEC's initial reason for making this new interpretation was to do just that,[170] thereby subjecting proxy advisors to this implied cause of action. As the Supreme Court has said in the context of reviewing a prior SEC interpretation, "[c]oncerns with the judicial creation of a private cause of action caution against its expansion." Accordingly, the Court said, in reviewing

---

[169] See Ashwander v. Tennessee Valley Authority, 297 U.S. 288, 348 (1936) ("When the validity of an act of the Congress is drawn in question, and even if a serious doubt of constitutionality is raised, it is a cardinal principle that this Court will first ascertain whether a construction of the statute is fairly possible by which the question may be avoided.") (Brandeis, J. concurring). Reading the statute in this broad a manner would also create a serious constitutional problem under the non-delegation doctrine, since there is no intelligible principle in the Exchange Act for how to regulate proxy advisors. Proxy advisors are not mentioned in the Exchange Act. Instead, purporting to use its exemptive authority, the SEC proposes to create an entirely new regulatory scheme of its own design for proxy advisors — similar to ones Congress considered, but did not enact into law. In doing so, the SEC would be making all the major policy decisions — beginning with whether to regulate proxy advisors down to every detail of the review periods — on its own with no Congressional direction or guidance beyond a general "necessary or appropriate in the public interest" standard and consistent with the protection of investors' standard. This is a far cry from a situation where an agency is being asked to "fill up the details" or address a "statutory gap." See Gundy v. United States, 588 U.S. ___ (2019) (Gorsuch, J. dissenting) (reviewing the history of the non-delegation doctrine); see also id. (Alito, J. concurring) ( indicating support for revisiting the Court's approach to nondelegation questions). For this reason also, the statute should not be read in such a broad manner as to invite this problem. See Utility Air Regulatory Group v. EPA, 573 U.S. 302 (2014) ("When an agency claims to discover in a long-extant statute an unheralded power to regulate a significant portion of the American economy, we typically greet its announcement with a measure of skepticism.") (internal citation and quotations omitted).

[170] See August 2019 Interpretation at 11 ("Does Exchange Act Rule 14a-9 apply to proxy voting advice? **Response:** Yes.").

---

**GLASS, LEWIS & CO., LLC**     255 California Street, Suite 1100, San Francisco, CA 94111          W W W . G L A S S L E W I S . C O M

66

JA 765



the SEC's interpretation, "we are mindful that we must give narrow dimensions . . . to a right of action Congress did not authorize when it first enacted the statute . . . ."[171]

The SEC has previously acknowledged that what it called a literal reading of the solicitation definition in its rules would be "sweeping" and "excessive."[172]  But now the SEC seeks to expand that "sweeping" and "excessive" definition even further, to explicitly cover proxy advisors.  But no amount of breadth and flexibility can turn the term "solicit" into "advise."[173]  The interpretation at the foundation of this rulemaking is simply not consistent with the statute.

**B.  The proposed rules violate the First Amendment.**

The issuer review and feedback and compelled access mechanisms — which, as far as we know, have no precedent in other contexts of securities regulation — also violate the First Amendment.

**1.  Requiring government or issuer review.**

The SEC itself has recognized the First Amendment implications of its broad definition of solicitation.  The SEC's "solution" to this in 1992 was to create multiple exemptions that cover that speech and therefore keep it outside the regulatory scheme for proxy solicitations.  As the SEC said 28 years ago when it exempted proxy advice and other types of shareholder communications from the notice and filing requirements of the proxy rules:

> A regulatory scheme that inserted the Commission staff and corporate management into every exchange and conversation among shareholders, their advisors and other parties on matters subject to a vote certainly would raise serious questions under the free speech clause of the First Amendment, particularly where no proxy authority is being solicited by such persons. This is especially true where such intrusion is not necessary to achieve the goals of the federal securities laws.

---

[171]  See <u>Janus Capital Group v. First Derivative Traders</u>, 564 U.S. 135 (2011) (internal quotations and citations omitted).

[172]  SEC Shareholder Communications Release at 48,277-78.

[173]  <u>Goldstein</u>, 451 F.3d at 882 ("That the Commission wanted a hook on which to hang more comprehensive regulation of hedge funds may be understandable.  But the Commission may not accomplish its objective by a manipulation of meaning.").

**GLASS, LEWIS & CO., LLC**    255 California Street, Suite 1100, San Francisco, CA 94111        W W W . G L A S S L E W I S . C O M

67

JA 766



The purposes of the proxy rules themselves are better served by promoting free discussion, debate and learning among shareholders and interested persons, than by placing restraints on that process to ensure that management has the ability to address every point raised in the exchange of views.[174]

Now, though, the SEC proposes to add onerous conditions to those exemptions for a particular type of speaker whose speech some market participants do not like. As previously discussed, the proposed rules would force proxy advisors to submit their research and advice to issuers for their prior review and feedback before they can publish it to their clients in order to avoid having to comply with a government filing requirement that is wholly impractical and incompatible with their business model.

As the Supreme Court has explained, "Any system of prior restraints of expression . . . bear[s] a heavy presumption against its constitutional validity."[175] The "Government thus carries a heavy burden of showing justification for the imposition of such a restraint."[176] The proposed rules' effective mandate that proxy advisors clear their reports with issuers amounts to a prior restraint on speech and there is nothing close to such a justification here.[177]

Even if not analyzed as a prior restraint, the proposed rules would chill proxy advisors' speech in a manner incompatible with the First Amendment. The First Amendment prevents the government from imposing overbroad measures that discriminate based on the content of the speech or tilt the marketplace of ideas in favor of a preferred view or party. Here, by deputizing one group (corporate management) to review and police the speech of another group (proxy advisors), the proposed rules would single out a type of speech and skew the marketplace of ideas in favor of a preferred group's preferred speech. Of all the types of solicitations the SEC purports to regulate, only proxy advisors are covered by the proposed

---

[174] SEC Shareholder Communications Release at 48,279.

[175] New York Times v. United States, 403 U.S. 713, 714 (1971).

[176] Id.

[177] Following the approach of this proposal, the SEC could attach similar exemptive conditions to other things it has found to be "solicitations," such as newspaper op-eds or legal advice. For example, the SEC could mandate that newspaper opinion pieces that might influence a proxy vote first be reviewed by the company involved before being published. Few would deny that such a requirement would be antithetical to the First Amendment, but that is the regime the SEC proposes here for proxy advice.



rules.  And only the soliciting party — corporate management in the vast majority of cases — gets to review and provide feedback on proxy advisors' speech.[178]  Accordingly, the rules only work to complicate and deter recommendations expressing one type of view — an anti-management recommendation.[179]  In fact, the Proposing Release even raises the concept of only requiring review when the proxy advisor's opinion is anti-management, but then dismisses that idea — not because it is incompatible with the rule's intended purposes — but for practical reasons.[180]  Thus, the proposed rules are content-based and viewpoint-based restrictions on speech.[181]  Content-based restrictions "are presumptively unconstitutional and may be justified only if the government proves that they are narrowly tailored to serve compelling state interests."[182]  Here, for all the reasons discussed above, the proposed rules cannot survive strict scrutiny; they are far from narrowly tailored to serve compelling state interests.[183]

---

[178]  This viewpoint bias is reflected in the decision to not afford pre-review rights to shareholder proponents.

[179]  As the IAC Recommendation explains: "If [the rules were adopted], the effect would not be viewpoint neutral – the views that would be advanced would be those of corporate managers, not anyone else's views. The rule proposal cannot reasonably be expected to cause proxy advisors to revise initial opinions further away from or against those of corporate managers, because the only new information (except in a rare proxy contest) will be from managers and will favor managers. Peer groups will make performance look better, and executive pay look lower. To the extent proxy advisors draw an opinion out of a spectrum of plausible opinions, the rule proposal will push in one and only one direction – towards corporate managers. The result would be to bias the analysis."

[180]  Release at 45 n. 112.

[181]  Reed v. Town of Gilbert, 576 U.S. __ (2015) ("Government regulation of speech is content based if a law applies to particular speech because of the topic discussed or the idea or message expressed."); id. ("Our precedents have also recognized a separate and additional category of laws that, though facially content neutral, will be considered content-based regulations of speech: laws that cannot be " 'justified without reference to the content of the regulated speech,' " or that were adopted by the government "because of disagreement with the message [the speech] conveys").

[182]  Id.

[183]  See Richard A. Kirby and Beth-ann Roth, "A Step Too Far: The SEC's Attempt to Regulate Proxy Advisory Services Violates the First Amendment," at 5 (Jan. 2020) ("Demanding disclosure of methodology and making proxy advisory firms give prior notice of the content of their advice is perhaps the most intrusive rather than the least intrusive alternative that could have been



Nor does the "commercial speech" doctrine apply here.  Just because speech is on a commercial topic does not make it commercial speech.[184]  Instead, as the Supreme Court has repeatedly explained, commercial speech is "speech which does no more than propose a commercial transaction."[185]  That is plainly not what is at issue here.  Likewise, "professional speech" is not entitled to lesser First Amendment protection.  The "Court has not recognized 'professional speech' as a separate category of speech. Speech is not unprotected merely because it is uttered by 'professionals.'"[186]

As the SEC recognized in 1992, the type of speech at issue here — proxy advisors' disinterested research and advice on matters of fact and opinion about important corporate governance matters at public companies — is entitled to First Amendment protection. Content-based restrictions on such speech, like those that would be imposed here, are presumptively unconstitutional and must be narrowly tailored to serve compelling state interests.  Here, the overbroad and unnecessarily intrusive measures in the proposed rules cannot withstand any level of First Amendment scrutiny, much less the strict scrutiny they are subject to under longstanding Supreme Court precedent.

### 2.  The mandate to publish the issuer's rebuttal.

The proposed rules' requirement that proxy advisors publish the company's reply to its report in the form of a hyperlink also violates the First Amendment.  As the Supreme Court held in unanimously striking down a state "right of reply" statute that granted a political candidate a

---

chosen by the Commission.").  For similar reasons, the SEC's extension of Rule 14a-9 to cover "opinions" and "beliefs" and proposed promulgation of multiple interpretations of that rule directed toward proxy advisors also amounts to a content-based and viewpoint-based regulation of speech that violates the First Amendment.

[184] Cent. Hudson Gas & Elec. Corp. v. Pub. Serv. Comm'n of New York, 447 U.S. 557, 571 (1980); Virginia State Board of Pharmacy, 425 U.S. 748 (1976).

[185] Virginia State Board of Pharmacy at 762 (internal quotations and citation omitted).

[186] Nat'l Inst. of Family and Life Advocates v. Becerra, 578 U.S. __ (2018).  As the Supreme Court held in a different case involving an investment advice and research publication, "To the extent that the chart service contains factual information about past transactions and market trends, and the newsletters contain commentary on general market conditions, there can be no doubt about the protected character of the communications."  Lowe v. SEC, 472 U.S. 181, 210 (1985).

**GLASS, LEWIS & CO., LLC**   255 California Street, Suite 1100, San Francisco, CA 94111       W W W . G L A S S L E W I S . C O M

70

JA 769



right to equal space to answer criticism in a newspaper, "any such a compulsion to publish that which reason tells [the publisher] should not be published is unconstitutional."[187] In fact, the Supreme Court has applied this principle in a case with circumstances remarkably similar to those presented here and found, for three separate reasons, that the state action violated the First Amendment.

In <u>Pacific Gas & Electric v. Public Utility Commission</u>,[188] a state agency permitted a public interest group to use "extra space" in a utility's billing envelope to convey its own messages, including criticism of the utility, so long as there was a disclaimer making it clear those were not the utility's views. As here, the state agency reasoned that access to multiple viewpoints would benefit ratepayers:

> Our goal . . . is to change the present system to one which uses the extra space more efficiently for the ratepayers' benefit. It is reasonable to assume that the ratepayers will benefit more from exposure to a variety of views than they will from only that of PG&E.[189]

The Court, however, had no trouble concluding that this "compelled access" violated the First Amendment. First, the Court found that it infringed the utility's First Amendment rights by forcing it "to help disseminate hostile views." As the Court noted, the utility "might well conclude" that, under these circumstances, "the safe course is to avoid controversy, thereby reducing the free flow of information and ideas that the First Amendment seeks to promote."[190]

Second, the law also abridged the First Amendment because it required the utility –

> to assist in disseminating [the public interest group's] views; it does not equally constrain both sides of the debate about utility regulation. This kind of favoritism goes well beyond the fundamentally content-neutral subsidies that we sustained in *[Buckley and Regan]*. Unlike these permissible government subsidies of speech, the Commission's order identifies a favored speaker "based on the identity of the interests

---

[187] <u>Miami Herald Publishing Co. v. Tornillo</u>, 418 U.S. 241, 256 (1974) (internal quotations omitted).

[188] 475 U.S. 1 (1986).

[189] Id. at 6.

[190] Id. at 14.

**GLASS, LEWIS & CO., LLC**   255 California Street, Suite 1100, San Francisco, CA 94111    W W W . G L A S S L E W I S . C O M



that [the speaker] may represent," . . . and forces the speaker's opponent — not the taxpaying public — to assist in disseminating the speaker's message. Such a requirement necessarily burdens the expression of the disfavored speaker.[191]

Third, the Court found that the law "impermissibly requires [the utility] to associate with speech with which [the utility] may disagree." Since the public interest group can discuss any issue, the utility may be forced to either appear to agree or respond:

Especially since [the public interest group] has been given access in part to create a multiplicity of views in the envelopes, there can be little doubt that [the utility] will feel compelled to respond to arguments and allegations made by [the public interest group] in its messages to [the utility's] customers. That kind of forced response is antithetical to the free discussion that the First Amendment seeks to foster.[192]

Each of the reasons the Court gave for striking down the state order in PG&E applies here. Proxy advisors would be "forced to help disseminate hostile views," which might have a chilling effect on their speech to begin with. Second, as in PG&E, the compelled access is only available to one specific actor — the soliciting party, who in the vast majority of cases will be corporate management. A shareholder or employee of the company cannot have its views distributed through the proxy advisor's report, and neither can an investor group that agrees with the proxy advisor recommendation or one that thinks a proxy advisor should not have recommended in favor of a management proposal. Third, it requires proxy advisors to associate with speech they might disagree with, which, in turn, might compel them to use their space, time and resources to respond to views that they disagree with.

For all the same reasons identified by the Court in PG&E, this is content-based, compelled access of the sort that violates the First Amendment.[193]

---

[191] Id. at 14-15.

[192] Id. at 16.

[193] Nor does it somehow make a difference for constitutional purposes that the rule requires the proxy advisor to publish a hyperlink, rather than the entire text of the issuer's reply, in its report. The speech-altering and chilling effects the Court identified as infringing the First Amendment in PG&E apply to the hyperlink, no less than they did to the slip of paper at issue there.


**C.  The SEC's reliance on dubious "comment letters" has corrupted the notice and comment process.**

The rulemaking is also tainted by the Commission's reliance on apparently fraudulent evidence.  The Commission's Proposing Release — the vehicle for conveying the substance and basis for the SEC's proposal in order to facilitate public comment — relied on evidence that has been shown to be suspect and potentially fraudulent.  Specifically, the Proposing Release states that "representatives of the registrant and retail investor communities have expressed concerns about the oversight and accountability over proxy voting advice businesses."  Cited as support for this statement are several letters purportedly from retail investors.  These letters, however, have had their authenticity called into question and they and others are reportedly now the subject of an SEC Inspector General investigation.  For example, this statement in the Proposing Release cites the views of Pauline Yee, whose two-page letter explains that she is a retired teacher with concerns about the effect of proxy advisors on her pension.  As Bloomberg News later reported, however: "That retired teacher?  Pauline Yee said she never wrote a letter, although the signature was hers."[194]

Most importantly, this is not just any another statement in the Release.  A majority of the Commissioners who voted to propose the rules have indicated that the point made in this statement was central to their support for the initiative.  Most notably, at the Open Meeting where these rules were proposed, Chairman Clayton gave remarks summarizing the proposed rules, explaining their basis and encouraging public comment.  In doing so, the Chairman explained his rationale, after receiving extensive, conflicting input in connection with the Commission's Proxy Roundtable, for proceeding to regulate proxy advisors:

> Some of the letters that struck me the most came from long-term Main Street investors, including an Army veteran and a Marine veteran, a police officer, a retired teacher, a public servant, a single Mom, a couple of retirees who saved for retirement, all of whom expressed concerns about the current proxy process.  A common theme in their letters was the concern that their financial investments — including their retirement funds — were being steered by third parties to promote individual agendas, rather than to further their primary goals of being able to have enough money to lessen the fear of "running out" in retirement or to leave money to their children and grandchildren. These letters are a helpful reminder that the issues the Commission grapples with in this

---

[194]   See Zachary Mider and Ben Elgin, "SEC Chairman Cites Fishy Letters in Support of Policy Change," Bloomberg News (Nov. 19, 2019) ("Bloomberg I").

**GLASS, LEWIS & CO., LLC**   255 California Street, Suite 1100, San Francisco, CA 94111     W W W . G L A S S L E W I S . C O M

73

JA 772



area are not a matter of (1) shareholders versus companies or (2) businesses that provide proxy voting advice versus companies.  These are false dichotomies.[195]

Likewise, in supporting the related August 2019 Interpretation and Guidance, Commissioner Roisman rejected institutional investors' supportive views about proxy advisors, noting that, in contrast, retail investors had expressed concerns about proxy advisors in letters that he "encourage[d] everyone to look at."[196]  All seven letters cited by the Chairman, as well as the letters cited by Commissioner Roisman, were apparently produced as part of an effort to deceive the Commission that is now under investigation.

In the wake of the disturbing revelations about the apparent fraud at the heart of this rulemaking, however, the Commission took no action to preserve the integrity of the notice and comment process.  Although the Bloomberg article came out in mid-November 2019, several weeks before the Proposing Release appeared in the Federal Register and despite being asked

---

[195]  Statement of the Honorable Jay Clayton at SEC Open Meeting (Nov. 5, 2019) (footnotes omitted), available at https://www.sec.gov/news/public-statement/statement-clayton-2019-11-05-open-meeting#_ftn13.

[196]  See Statement of the Honorable Elad L. Roisman at SEC Open Meeting (Aug. 21, 2019), available at https://www.sec.gov/news/public-statement/statement-roisman-082119 ("I have heard the warnings that any action, regulation, or oversight that directly or indirectly constrains proxy advisory firms will be viewed by some as a gift to the management and directors of public companies, resulting in harm to investors.  For example, I have heard that the Commission should not take any action related to proxy voting advice provided by proxy advisory firms because "…the investors themselves…the ones paying for proxy advice…are not asking for protection."  To be clear, in this context, I do not consider asset managers to be the "investors" that the SEC is charged to protect.  Rather, **the investors that I believe today's recommendations aim to protect are the ultimate retail investors**, who may have their life savings invested in our stock markets.  These Main Street investors who invest their money in funds are the ones who will benefit from (or bear the cost of) these advisers' voting decisions. In essence, I believe it is our job as regulators to help ensure that such advisers vote proxies in a manner consistent with their fiduciary obligations and that the proxy voting advice upon which they rely is complete and based on accurate information.  **I encourage everyone to look at the public comments received in connection with the Staff Roundtable on the Proxy Process last year.  We have heard not only from hundreds of public companies, but from investor groups and individual investors.  These commenters have expressed varying concerns relating to the influence that proxy advisory firms appear to have over proxy voting decisions in our markets."**) (footnotes omitted).  In making these comments, Commissioner Roisman cited the same retail investor comment letters as the Proposing Release.

**GLASS, LEWIS & CO., LLC**   255 California Street, Suite 1100, San Francisco, CA 94111     W W W . G L A S S L E W I S . C O M

74

JA 773



to "repair the rulemaking record,"[197] the Commission did not amend its release to remove the suspect information.  Nor did the SEC revise or annotate the Chairman's Open Meeting statement, or, to our knowledge, take any other action that would lessen the risk of commenters also being deceived by the misinformation.[198]

Predictably, commenters picked up on the misinformation they had been encouraged to look at and commented assuming the genuineness of those statements.  For example, on December 6, 2019, Ken Blackwell wrote a comment letter quoting at length from the part of Chairman Clayton's Open Meeting remarks on individual investor support for the proposal and exclaiming, "*This* is the issue . . . .  I completely agree with the Chairman."[199]  In fact, Mr. Blackwell quoted from the "couple of retirees" highlighted by the Chairman, even though, as the SEC knew by this point, when contacted by Bloomberg the purported author of that letter had said, "I never wrote a letter. . . . What's this all about?"

Nor was the harm limited to just an isolated comment letter.  Others also relied on this dubious information.[200]  And Mr. Blackwell seems to have raised enough concern with others that they, too, wrote in support of the SEC's rule.[201]  In fact, the corruption of the comment process has spread beyond this original batch of dubious letters and the misunderstandings that stemmed from their promotion.  Perhaps emboldened by the success of this initial effort, a significant percentage of the unique comment letters filed to date show signs of having been orchestrated by organizations that conduct "astroturf" campaigns and were presumably paid to

---

[197]  Better Markets Press Release, "The SEC and Justice Department Should Investigate Allegations That Fraudulent Comment Letters Were Submitted in Support of Recent Rule Proposals Favoring Vested Corporate Interests," (Dec. 9, 2019), available at https://bettermarkets.com/newsroom/sec-and-justice-department-should-investigate-allegations-fraudulent-comment-letters-were

[198]  In fact, in response to the Bloomberg article, a SEC spokesperson dismissed the issue, saying "[t]he various letters we received on the proxy process highlighted the importance of these issues.  We welcome all interested parties, particularly our Main Street investors, to comment on our proposals." Bloomberg I.

[199]  Comments of Ken Blackwell (Dec. 6, 2019) (emphasis in original).

[200]  See also Comments of Benjamin Zycher, Ph.D. (Jan 17, 2020) (quoting Chairman Clayton's statements at the Open Meeting about the concerns of these "Main Street investors").

[201]  See, for example, Comments of Nathan Martin (Dec. 30, 2019) ("I had read something from Ken Blackwell which alerted me that the SEC was considering this rule to regulate proxy advisors.").

**GLASS, LEWIS & CO., LLC**   255 California Street, Suite 1100, San Francisco, CA 94111   W W W . G L A S S L E W I S . C O M

75

JA 774



generate support for the rules.[202]  The result has been a further corruption and politicization of the SEC's notice-and-comment process for this rulemaking.

Under the Administrative Procedure Act, an agency engaged in informal rulemaking must provide interested persons a reasonable and meaningful opportunity to participate in the rulemaking process.[203]  And, for there to be such a meaningful opportunity, the agency must provide adequate notice of what the agency is proposing to do **and its basis** for doing so.[204]  This principle has obvious implications for the unusual situation presented here — when an agency learns before the comment period even starts that part of the basis for its proposal, especially the part its Chairman said was particularly significant to his thinking about the rule, was likely fabricated.  But the Commission took no action to amend its Proposing Release or otherwise alert commenters to the misinformation it had highlighted.  By not doing so, commenters could be, and in fact were, misled by the same false information.  Other individual commenters perhaps did not weigh in at all, having been told that a number of their fellow retail investors were concerned about proxy advisors and that this disproved that this was an issue of corporate versus shareholder interests.  Either way, the result of not correcting this misinformation was to deprive the public of a meaningful opportunity to comment on the rules based on genuine, non-fraudulent information.[205]

---

[202]  See Andrew Ramonas and Andrea Vittorio, "SEC Proxy-Firm Rules Spur YouTube Call to Stop 'Liberal Agenda'," Bloomberg Law (Jan. 17, 2020) (describing efforts of groups to spread misinformation that proxy advisors are supporting "liberal causes" like abortion and "sanctuary cities" to generate SEC comment letters supporting proxy advisor regulation).

[203]  See Forester v. CPSC, 559 F.2d 774 (D.C. Cir. 1977); United Steelworkers v. Marshall, 647 F.32d 1189 (D.C. Cir. 1980).

[204]  See Portland Cement Association v. Ruckelshaus, 486 F.2d 375, 394 (D.C. Cir. 1973) ("In order that rule-making proceedings to determine standards be conducted in orderly fashion, information should generally be disclosed as to the basis of a proposed rule at the time of issuance.").

[205]  See Howard Fischer, "INSIGHT: Fact and Fantasy in SEC Rules—The Battle Over Proxy Contests Relies on Imaginary Soldiers," Bloomberg Law (Jan. 13, 2020) ("Fischer") ("While these are not yet approved rules, simply proposals, the claimed reliance on the letters has infected the rule-making process.  The letters represent not merely statements of fact, but reflect statements about what ordinary investors want and believe—statements that have proven to be false."), available at https://news.bloomberglaw.com/securities-law/insight-fact-and-fantasy-in-sec-rules-the-battle-over-proxy-contests-relies-on-imaginary-soldiers.

---

**GLASS, LEWIS & CO., LLC**    255 California Street, Suite 1100, San Francisco, CA 94111          W W W . G L A S S L E W I S . C O M

76

JA 775



To be sure, mass and fake comment letters are becoming an issue in agency rulemakings across the government.[206] Here, however, the issue is different and more significant than just trying to keep fake emails out of the comment file. In this case, the problematic information was relied upon by the SEC as a pivotal part of the basis for the proposed rules and, through individual Commissioner's statements, was actually highlighted as a specific and important point about their basis for supporting the rule and who would benefit from it. In these circumstances, providing a meaningful comment period required correcting the record.

Related but separate from the legal considerations at issue here, we would encourage the Commission to consider the potential ramifications of these events for its rulemaking processes and the public's faith in those processes. The SEC has a deserved reputation for the quality of its administrative practices and the non-partisan nature of its work. At a minimum, what happened here has harmed the integrity of this rulemaking — which, after all, is intended to address issues of accuracy, transparency and disclosure of conflicts — as well as public perceptions of the rulemaking's integrity and fairness.[207]

Perhaps even more concerning, though, are its future implications. The unfortunate effect of not correcting the rulemaking record and just proceeding to rule adoption would be to reward the misconduct of those who deceived the Commissioners and thereby tainted the administrative record. And, if successful here, the purveyors of this misinformation and others like them will only be encouraged, risking this sort of deception becoming a regular feature of SEC rulemakings. In addition to the obvious harms of this, it could also cause the agency and others to question the authenticity of actual individual investors who take the time and make the effort to write in with their genuine comments. These would be grave harms to the Commission's processes and we encourage the Commission to take strong remedial measures to avoid them, including repairing the rulemaking record in this proceeding and inviting additional comment on a basis that does not include fabricated letters.

---

[206] See, for example, Administrative Conference of the United States, Forum on Mass and Fake Comments in Agency Rulemaking (Oct. 15, 2018).

[207] See Fischer (the Commission's reliance on these letters "undermines the integrity of the rule-making process").



**Conclusion.**

      For all the reasons stated above, Glass Lewis respectfully requests that the Commission not adopt the proposed rules and, instead, continue to work with proxy advisors, investors and other stakeholders to develop a balanced and thoughtful approach to this area that better serves the interests of all market participants.  Thank you for your consideration of our comments.

                                             Sincerely,

                                             Kevin Cameron
                                             Executive Chair

                                             Nichol Garzon-Mitchell
                                             Senior Vice President, General Counsel

cc:     Chairman Jay Clayton
        Commissioner Robert J. Jackson, Jr.
        Commissioner Hester M. Peirce
        Commissioner Elad L. Roisman
        Commissioner Allison Herren Lee

**GLASS, LEWIS & CO., LLC**   255 California Street, Suite 1100, San Francisco, CA 94111   W W W . G L A S S L E W I S . C O M

78

JA 777



Via Email

February 4, 2020

Vanessa A. Countryman
Secretary
Securities and Exchange Commission
100 F Street NE
Washington, DC 20549

> **Re:** **Data Analysis Supporting Proposed Regulation of Proxy Advisors**
> **File No. S7–22–19: Proposed Amendments to Exemptions from the Proxy**
> **Rules for Proxy Voting Advice (the "Amendments" or the "Release")**

Dear Madam Secretary:

The Council of Institutional Investors ("CII"), appreciates the opportunity to provide comments to the U.S. Securities and Exchange Commission ("SEC" or "Commission") in response to the above-referenced Release.[1] CII is a nonprofit, nonpartisan association of U.S. public, corporate and union employee benefit funds, other employee benefit plans, state and local entities charged with investing public assets, and foundations and endowments with combined assets under management of approximately $4 trillion. Our member funds include major long-term shareowners with a duty to protect the retirement savings of millions of workers and their families, including public pension funds with more than 15 million participants – true "Main Street" investors through their pension funds. Our associate members include non-U.S. asset owners with about $4 trillion in assets, and a range of asset managers with more than $35 trillion in assets under management.[2]

This letter supplements comments we made in our letter of Jan. 30, 2020.[3] This letter focuses on claims by certain corporate representatives that there are pervasive factual inaccuracies in proxy advisors' reports, claims that we believe were relied on in the Release and in the decision of a majority of SEC commissioners to support proposing a new regulatory regime for independent proxy advisors. We believe that the claims of pervasive errors are unfounded and misleading and do not provide a basis for rulemaking. As CII and other investor organizations and various

---

[1] Amendments to Exemptions From the Proxy Rules for Proxy Voting Advice, Exchange Act Release No. 87,457, 84 Fed. Reg. 66,518 (proposed rule December 4, 2019), https://www.govinfo.gov/content/pkg/FR-2019-12-04/pdf/2019-24475.pdf (Release).
[2] For more information about the Council of Institutional Investors ("CII"), including its board and members, please visit CII's website at http://www.cii.org. We note that the two largest U.S. proxy advisory firms, Glass Lewis & Co. (Glass Lewis) and Institutional Shareholder Services (ISS), are non-voting associate members of CII, paying an aggregate of $18,000 in annual dues—less than 1.0 percent of CII's membership revenues. In addition, CII is a client of ISS, paying approximately $19,600 annually to ISS for its proxy research.
[3] Kenneth A. Bertsch and Jeffrey P. Mahoney, Letter, Jan. 30, 2020, at https://www.sec.gov/comments/s7-22-19/s72219-6729687-207381.pdf.

investors have indicated, the paucity of evidence of pervasive factual errors by proxy advisors suggests that, in fact, no regulatory intervention is necessary or justified.[4]

Shortly after the Commission issued the Release, CII requested that the SEC provide the underlying data for Table 2 in the Release ("Table 2"), which classifies what the table describes as company "concerns" on proxy advice drawn from certain supplemental proxy materials (DEFA14As) filed in the period 2016 to 2018. The SEC so far has not provided that underlying data.[5] These company "concerns" compiled in Table 2 clearly played a significant role in the SEC's development and consideration of the Amendments, and therefore we believe access to the data underlying the concerns is important for meaningful public comment. We appreciate that on January 16, 2020, shortly before the February 3 close of the comment period, the SEC's Division of Economic and Risk Analysis added to the comment file a memo providing some additional information (the "DERA Memo").[6] But it was filed too close to the comment deadline for many commenters to digest and respond to the additional information. Moreover, in any event, the DERA Memo did not provide critical information that would be necessary to understand why the Commission believes its proposal is justified, such as the underlying data set that would tie the categories in Table 2 back to the underlying company statements that Table 2 purports to count. Any review or analysis of the table's merits as a basis for rulemaking would require such information.

In the absence of the underlying data, we have done our best to describe in this letter some of the questions we have about the company "concerns" listed in Table 2 as well as our own concerns about Table 2. Specifically, we believe Table 2 does not demonstrate a high rate of errors. Only one of the categories provided in Table 2 even purports to count factual errors. It is a judgmental count, without underlying support to assess whether it is a fair judgment. It is also an extremely low number that does not justify rulemaking, especially rulemaking that presents a significant risk of promoting error by exacerbating time pressure on research and development of advice.

In addition, as described in detail below, we have attempted to analyze the matters that may underlie Table 2, to the extent possible, and have found that:

- **Most of the purported "concerns" actually are policy disputes or communications that a company has changed a proposal or is providing more or clarified information** to address an issue raised in a proxy advisor report.

- **The number of claimed inaccuracies is a very small: 0.3 percent.**

---

[4] *See, e.g.,* Letter from Kenneth A. Bertsch, Executive Director, Council of Institutional Investors, et al. to The Honorable Jay Clayton, Chairman, Securities and Exchange Commission 3 (Oct. 15, 2019), at https://www.cii.org/files/issues_and_advocacy/correspondence/2019/201910015proxy_advisor_sign_on_final.pdf; and Letter from Kenneth A. Bertsch, Executive Director, Council of Institutional Investors to The Honorable Jay Clayton, Chairman, Securities and Exchange Commission et al. 4 (Oct. 24, 2019), at https://www.cii.org/files/issues_and_advocacy/correspondence/2019/20191024%20SEC%20comment%20letter%20proxy%20advisor%20accuracy.pdf.
[5] Release at.66,546 (Table 2).
[6] SEC Division of Economic and Risk Analysis, Memorandum Regarding Data Analysis of Additional Definitive Proxy Materials Filed by Registrants in Response to Proxy Voting Advice (DERA Memo), page 1, at https://www.sec.gov/comments/s7-22-19/s72219-6660914-203861.pdf.

- **Matters classified in Table 2 as "Analytical errors" are disagreements on methodology, far from "factual errors" and not even mathematical errors.**

- **Some of the filings cited by the SEC do not actually express any "concerns."** *E.g.*, in some cases, a company merely disclosed additional information or amended its proposal, without criticizing a proxy advisor.

- **Company expression of concern about proxy advice would reflect personal self-interest.** 67 of the filings covered by Table 2 made arguments on a question in which the CEO had a clear personal interest in the outcome. In many of those cases, the CEO had a direct financial interest.

- **Finally, some of the claims appear to be incorrect and/or misleading in their own right.**

**The Amendments Are Based on an Unsupported Idea that There is a Systemically High Incidence of Error in Proxy Advisor Reports**

In the Release, the SEC proposed to place a series of requirements that would compel a proxy advisor to provide draft research, analysis and recommendations – and then later the final research, analysis and recommendations – to management of subject companies before the proxy advisor can distribute this advice to its paying clients.[7] Specifically, the Amendments impose a period for review of reports and feedback by company management ( "Review and Feedback Period"), an additional period during which company management is provided with the final report, analysis and voting recommendations ( "Final Notice Period"), and provision by the proxy advisor of a hyperlink to management's statement on the advice ( "Hyperlinked Statement").

The compelled Review and Feedback Period, Final Notice Period and Hyperlinked Statement provisions are largely premised on an assumed (but not substantiated) high rate of factual errors and methodical weaknesses in proxy voting advice.[8] For example, consider the following five paragraphs from the Release providing a direct link between alleged factual and methodical weaknesses in proxy voting advice and the Release provisions providing for the Review and Feedback Period, Final Notice Period or Hyperlinked Statement:

[1] We believe that our proposed rule amendments would . . . establish effective measures to reduce the likelihood of *factual errors or methodological weaknesses* in proxy voting advice . . . .[[9]]

[2] However, in recent years concerns have been expressed by a number of commentators, particularly within the registrant community, that there could be

---

[7] Our primary focus in this letter is on proxy analysis, and SEC requirements related to, companies registered under the Securities Act of 1933. We do not focus particular attention on investment companies, or on "other soliciting persons" in this letter. We use the terms "registrant," "issuer" and "company" interchangeably in this letter.
[8] Release at 66,525, 66,529-30, 66,533, 66,545, 66,547.
[9] *Id.* at 66,525 (emphasis added).

*factual errors, incompleteness, or methodological weaknesses* in proxy voting advice businesses' analysis and information underlying their voting advice that could materially affect the reliability of their voting recommendations and could affect voting outcomes, and that processes currently in place to mitigate these risks are insufficient. These concerns are coupled with the perception of many registrants that . . . there are not meaningful opportunities to engage with the proxy voting advice businesses and *rectify potential factual errors or methodological weaknesses* in the analysis underlying the proxy voting advice before votes are cast, particularly for registrants that do not meet certain criteria . . . and . . . once the voting advice is delivered to the proxy voting advice business's clients, which typically occurs very shortly before a significant percentage of votes are cast and the meeting held, it is often not possible for the registrant to inform investors in a timely and effective way of its contrary views *or errors* it has identified in the voting advice. Although communication between proxy voting advice businesses and registrants may have improved over time, recent feedback and studies suggest that many registrants remain concerned about the limited ability of registrants to provide input that might address *errors, incompleteness, or methodological weaknesses in proxy voting advice*. . . . Although we recognize that some proxy voting advice businesses have policies in which they would issue alerts informing their clients of *errors* in their voting advice or updated information released by the registrant, such policies result in the proxy voting advice businesses, not the client, determining whether the *errors* or information are material to a voting decision and sharing such information only after their advice has already been published. . . . Although we recognize that some proxy voting advice businesses have policies in which they would issue alerts informing their clients of *errors* in their voting advice or updated information released by the registrant, such policies result in the proxy voting advice businesses, not the client, determining whether the *errors* or information are material to a voting decision and sharing such information only after their advice has already been published.[10]

[3] We believe that establishing a process that allows registrants and other soliciting persons a meaningful opportunity to review proxy voting advice in advance of its publication and provide their corrections or responses would reduce the likelihood of *errors*, provide more complete information for assessing proxy voting advice businesses' recommendations, and ultimately improve the reliability of the voting advice utilized by investment advisers and others who make voting determinations, to the ultimate benefit of investors.[11]

[4] In formulating the proposed review and feedback period and notice of voting advice requirements, we have sought to improve the quality of information available to investors while balancing, on the one hand, the need for registrants and certain soliciting persons to conduct a meaningful assessment of the advice and communicate any concerns or *errors* regarding the advice with, on the other hand, the concerns about imposing an undue delay or otherwise jeopardizing the ability

---

[10] *Id.* at 66,528-30 (footnotes omitted & emphasis added).
[11] *Id.* at 66,530 (emphasis added).

of proxy voting advice businesses to meet their contractual commitments to clients and their clients' ability to make timely and informed voting decisions.[12]

[5] These amendments are intended to give registrants and other soliciting persons an opportunity to engage with the proxy voting advice business and identify *factual errors or methodological weaknesses* in the proxy voting advice before it is disseminated to clients.[13]

In addition, all three Commissioners who voted in favor of the proposal at the Commission's November 5, 2019, open meeting explicitly cited concerns about factual errors as a motivating factor in their deliberations. Specifically, SEC Chairman Jay Clayton said:

The proposal also would provide an opportunity for a brief period of review and feedback through which registrants will be able to identify any *factual errors or methodological weaknesses* in the proxy voting advice and proxy voting advice businesses would have an opportunity to amend and supplement their reports to the extent they believed necessary, if at all.[14]

Commissioner Hester Peirce said:

The proposals also respond to concerns that issuers have raised with us about their difficulty in timely flagging and responding to factual errors contained in proxy voting recommendations. The proposals seek to ensure that all registrants, not just the biggest firms, have the opportunity to identify these *factual inaccuracies* in time for them to be corrected.[15]

Commissioner Elad Roisman said:

Many have worried that their publication of *voting advice containing errors* has the ability to go unchecked, and the widespread use of their voting advice by asset managers has made the governance principles they propound de-facto standards, despite no regulatory oversight or public notice and comment process. . . . . To the extent an issuer or other soliciting party believes the firm's voting advice contains *errors or methodological biases*, it would have an opportunity to note that in a way that proxy voting advice business clients can more easily access than they can today. . . . . beyond these principles, our staff has crafted a detailed policy framework that would (i) improve proxy voting advice businesses' disclosures of material conflicts of interests, (ii) establish effective measures to reduce the likelihood of *factual errors or methodological weaknesses in proxy voting advice*, and (iii) ensure that those who receive proxy voting advice have an efficient and

---

[12] *Id.* at 66,533 (emphasis added).

[13] *Id.* at 66,545 (emphasis added).

[14] Statement, SEC Chairman Jay Clayton, Nov. 5, 2019, at https://www.sec.gov/news/public-statement/statement-clayton-2019-11-05-open-meeting (emphasis added).

[15] Statement, SEC Commissioner Hester Peirce, Nov. 5, 2019, at https://www.sec.gov/news/public-statement/statement-peirce-2019-11-05-proxy-voting-advice (emphasis added).

timely way to obtain and consider any response an issuer or other soliciting person may have to such advice.[16]

In fact, the evidence suggests the rate of factual errors in proxy advice is extremely low, and the mechanisms that proxy advisors have in place to correct any such errors are prompt and effective. Proxy advisors have strong incentives to provide clients accurate, high quality advice, and the absence of significant errors shows those incentives are working.

## CII Has Requested the Data Underlying Table 2 to Understand the SEC's Rationale for the Amendments

Table 2 tallies and organizes into categories certain unspecified company management concerns about proxy advice that the Commission's staff gleaned from supplemental proxy materials filed, among other reasons, to respond to proxy advisor reports. Only one of the categories purports to count factual errors. The other categories are "analytical errors," "general or policy dispute," "amended or modified proposal," and "other." In order to test Table 2's assertions and comment on its analysis, as mentioned above, on November 7, 2019, CII requested that the SEC staff provide its underlying data used for Table 2.[17]

CII repeatedly re-requested this information after November 7, including through filing a Freedom of Information Act (FOIA) request.[18] On January 16, 2019, the SEC included the

---

[16] Statement, SEC Commissioner Elad Roisman, Nov. 5, 2019, at https://www.sec.gov/news/public-statement/statement-roisman-2019-11-05-14a-2b (emphasis added).

[17] Release, Table 2., op. cit.

**On Nov. 7, 2019, CII requested that the SEC staff show the underlying data for Table 2.** The request was made (1) by email to SEC Division of Corporation Finance staff (email on file with CII), and (2) in a meeting that day with SEC staff. Our particular goal was to obtain detail on how the SEC categorized "concerns" by company management about proxy advisor reports. The Nov. 7, 2019, meeting included staff members from the Division of Corporation Finance, the SEC Division of Investment Management, the SEC Division of Economic and Risk Analysis (DERA) and from the office of SEC Chairman Jay Clayton.

SEC staff indicated (1) by email on Nov. 7, 2019, (email on file with CII), and (2) verbally in the Nov. 7 meeting that the staff would consider the request.

[18] **CII reiterated its request for underlying data for Table 2 (see previous footnote) in a Nov. 14, 2019, letter** to SEC Chairman Jay Clayton, along with additional requests for information and clarifications on 12 other subjects on which CII believed the SEC proposal may have been unclear and/or on which more information was needed, in CII's view, in order to comment on the proposal. *See* Letter from Kenneth A. Bertsch and Jeffrey P. Mahoney, Nov. 14, 2019, at https://www.cii.org/files/issues_and_advocacy/correspondence/2019/November%2014%202019%20letter%20to%20SEC%20Chairman.pdf. In this letter, **CII asked that supplemental, clarifying information be added to rulemaking record**, so that it would be available to all commentators, as the information was necessary to provide useful responses to many of the questions posed by the SEC in the Release.

In the absence of an indication from the SEC staff that it would provide this data, **on Nov. 14, 2019, CII also filed a FOIA request for the underlying data used for Table 2**. See Letter to SEC Office of FOIA Services from Glenn Davis, Nov. 14, 2019, available at https://www.cii.org/files/issues_and_advocacy/correspondence/2019/20191114%20CII%20FOIA%20request%20to%20SEC(1).pdf.

**On Dec. 4, 2019 CII reiterated its request for the Table 2 data** in an email to Division of Corporation Finance staff (email on file with CII). SEC staff responded that day that staff members "are actively considering the data request as well as other items mentioned" in CII's letter of Nov. 14, 2019 (email on file with CII).

DERA Memo with limited additional information in the comment file. This was produced 70 days after our initial request and 18 days before the end of the comment period for this proposal However, the DERA Memo did not provide the key information sought by CII, which is the SEC classifications of specific company claims.[19]

---

**On Dec. 10, 2019, in a meeting with SEC Chairman Jay Clayton and members of his staff, CII reiterated the request**. Chairman Clayton said he was aware of our request for underlying data, and expressed surprise that anyone would challenge DERA research. Chairman Clayton and members of his staff did not indicate whether the information would be provided.

**On Dec. 31, 2019, CII appealed for dispute resolution services on the FOIA request** in a letter to SEC General Counsel Robert Stebbins. See Letter from Glenn Davis, Dec. 31, 2019, at https://www.cii.org/files/issues_and_advocacy/correspondence/2019/20191231%20CII%20Appeal%20for%20Dispute%20Resolution.pdf.

**On Jan. 1, 2020, CII reiterated its request for the Table 2 data** in an email to Division of Corporation Finance staff (email on file with CII). On Jan. 2, 2020, SEC staff responded by email that "we are still in the process of considering your data requests" (email on file with CII).

**On Jan. 2, 2020, CII wrote to SEC staff that CII staff members had devoted significant time to an attempt to replicate the SEC analysis for 2018, and "are unable to do so"** (email on file with CII). In that email, CII provided SEC staff with preliminary summary information on CII's attempt to recreate the SEC analysis on 2018 DEFA14A filings as presented in Table 2.

SEC staff agreed to meet with CII on this and other matters on Jan. 7, 2020. On January 7, shortly before the scheduled time for the meeting, the SEC postponed the meeting due to the threat of snow. The meeting was rescheduled for Jan. 15, 2020.

**CII met with SEC staff on Jan. 15, 2020, at which time SEC staff members said they still were reviewing the CII request**.

**On Jan. 16, 2020, the SEC posted a memo from the SEC Division of Economic and Risk Analysis (the DERA Memo and DERA)** to its webpage that provides links to "Comments on Proposed Rule: Amendments to Exemptions from the Proxy Rules for Proxy Voting Advice." Later that day, SEC staff sent an email alerting CII staff to the DERA Memo.

**In an email CII sent to SEC staff later on Jan. 16, 2020, CII staff said the DERA Memo appeared to lack the key information that CII had requested – specific information on the SEC's classification of issuer concerns**.

On Jan. 22, 2020, the SEC Office of FOIA Services by email that **informed CII that the DERA Memo "have been identified as being responsive to your [FOIA] request."** *See* Letter from Clarissa Anderson to Glenn Davis, Jan. 22, 2020, at https://www.cii.org/files/issues_and_advocacy/correspondence/2020/1-22-20%20Response%20to%20appeal.pdf.

**On Jan. 28, 2020, CII wrote to the SEC Office of FOIA Services to appeal the Jan. 22, 2020, FOIA determination that the DERA Memo was responsive to the CII request**. *See* Letter from Glenn Davis to the SEC Office of FOIA Services, at https://www.cii.org/files/issues_and_advocacy/correspondence/2020/1-28-20%20CII%20FOIA%20Appeal.pdf ("CII wishes to appeal the responsiveness determination . . . . As indicated in our FOIA request, CII seeks SEC staff's analysis and related materials pertaining to Table 2 of "Amendments to Exemptions from the Proxy Rules for Proxy Voting Advice ("Proposed Rule"). Specifically, our FOIA request sought "any and all documents, spreadsheets and other material produced by SEC staff, as well as any lists of proxy advisory firm shareholder meeting reports or SEC filings reviewed by SEC staff, in connection with obtaining some degree of assurance that the Table contains an accurate depiction of proxy advisory firm errors suitable for inclusion in the 'Economic Analysis' section of the Proposed Rule." The DERA Staff Memo stops short of this request. It provides a description of DERA's methodology in creating Table 2, a list of registrants involved and a list of amended proxy statement filings analyzed. Missing from the DERA Staff Memo is the analysis itself—how each allegation was ultimately categorized by DERA into one of five DERA-defined groups.")

**Also on Jan. 22, 2020, CII staff spoke by phone with SEC staff, who indicated that the SEC was reluctant to provide the requested classifications, as the staff judgments were "subjective," and providing the information could focus too much attention on the issue of claims about proxy advisor errors**. CII staff reiterated the goal of seeing the underlying analysis for Table 2.

[19] DERA Memo, *op. cit.*

The DERA Memo did not provide underlying data other than identifying the Form DEFA14As that DERA examined. The Memo indicated that further DERA review of filings after the Release was published on Nov. 5, 2019, led DERA to reclassify some of the items, but DERA did not provide a revised Table 2.[20] In an Excel spreadsheet, DERA identified 36 DEFA14s on which it believed it erred in Table 2 as to including or excluding filings, but it provided no information as to how it classified specific filings either in the original Table 2 or to enable the public to create a corrected Table 2.

With this letter, **we again request that the SEC provide in the public comment file its classification(s) for each case of registrant "concern" as reported in Table 2, plus any adjustments made when it corrected underlying information on the DERA Memo.**

**Table 2 Analysis**

CII tried but was unable to replicate the SEC analysis of management concerns as expressed in 2018 Forms DEFA14A.

Moreover, the DERA Memo acknowledged that its analysis was subjective:

> DERA recognizes that reviewers of the registrant filings may reach different conclusions about the classifications (for example, what one reviewer or registrant characterizes as a factual error may be viewed by another reviewer or registrant as a perceived methodological deficiency, or both a factual error and a methodological deficiency). DERA notes that the Table should be viewed in light of these and other considerations applicable to the aggregation and classification of data of this type.[21]

The DERA Memo also stated that "Different reviewers may reach different conclusions about the classifications."[22] As we note above, DERA did not provide its classifications, either in the Release or in the subsequent DERA Memo.

DERA described its methodology in the Release and, more clearly, in the later DERA Memo.[23]

---

[20] *Id.*, page 2 ("Since the date of the Proposing Release, in the relevant filings identified from the keyword search DERA classified additional DEFA14A filings as expressing a registrant concern and reclassified other filings as not expressing a concern. The accompanying data file lists these additional filings and reclassifications.")

[21] *Id.*, pages 1-2.

[22] *Id.*, page 4.

[23] *Id.*, pages 2-4:

> DERA manually reviewed each filing discussed above to classify it as either (i) a qualifying registrant response addressing particular concerns with respect to proxy voting advice or (ii) a non-qualifying registrant response referring to proxy voting advice but not addressing such concerns or some other supplemental proxy materials with no relationship to proxy voting advice. DERA used the following general categories for DEFA14As to qualify a filing for inclusion in our dataset:
> - The registrant substantively disputed or addressed proxy voting advice that provided a voting recommendation against one or more of the registrant's proposals.
> - The registrant expressed disagreement with the adverse voting recommendation and made a generalized attempt to persuade investors to vote for the proposal, but without directly addressing or critiquing the proxy voting advice business's rationale.

## CII Analysis on 2018 Claims

### Table: Summary of Analysis on Table 2 Data for 2018

| | Number of registrants | Number of filings | Number of filings expressing "concerns" | Factual errors | Analytical errors | General or policy dispute(s)* | Amended or modified proposal | Other | Additional disclosure** |
|---|---|---|---|---|---|---|---|---|---|
| | | | | Company Claims on Proxy Advisors in 2018 DEFA14As | | | | | |
| SEC | 78 | 84 | 84 | 17 | 28 | 58 | 6 | 2 | NA |
| CII | 78 | 84 | 71 | 7 | 13 | 50 | 7 | 9 | 21 |

*Both the SEC and CII classified some supplemental filings as fitting in more than one category.*
*\* In Table 2, the SEC labels "General or policy dispute" as a singular, while in its definition, it refers to "General or policy disputes" (that is, plural).*
*\*\* SEC does not use this category.*

Analysis of Table 2 appears above.[24]

------------------------------------------

- The registrant identified explicit changes it made in the current year in response to an adverse voting recommendation that occurred in the current year or prior year.
- The registrant identified changes of circumstance that should warrant reconsideration of an adverse voting recommendation.

DERA used the following general categories for DEFA14As when concluding that a filing did not qualify for inclusion in our dataset:

- The registrant referred to the adverse voting recommendation and indicated some disagreement but did not make any attempt to persuade investors with additional information other than to perhaps reiterate its position on the proposal and urge investors to vote accordingly.
- The registrant cited to the positive voting recommendations provided by a proxy voting advice business and only briefly acknowledged any adverse voting recommendations.
- The registrant identified explicit changes it made to its proposal either in response to discussions with a proxy voting advice business or based on general knowledge of a proxy voting advice business's guidelines but did not cite to a specific adverse voting recommendation.
- The registrant offered additional clarification or information to a proxy voting advice business for the purpose of securing a specific recommendation without reference to any prior adverse recommendation.
- The filing contained a registrant response that was followed by an identical or nearly identical DEFA14A filed by the same registrant. . . .

After identifying each DEFA14A that qualified as a registrant response addressing particular concerns with proxy voting advice, DERA classified each filing into categories based on the type of concern that appeared to be expressed by the registrant. Specifically, each registrant's response was classified into one or more of the following categories:

- factual errors;
- analytical errors;
- general or policy disputes;
- amended or modified proposal; and
- other.

The method for the classification of registrant concerns is set forth in footnote 239 of the Proposing Release. Different reviewers may reach different conclusions about the classifications. As noted above, the Table provides a list designed to describe generally the types of concerns with respect to proxy voting advice expressed by registrants in the additional definitive proxy materials reviewed by DERA.

[24] DERA conceded some errors, but did not do so prominently or with clear labeling, and buried the DERA Memo spreadsheet file. In reviewing its work, aside from changing a handful of assessments, DERA discovered some additional DEFA14As criticizing proxy advisory firms. There were seven additional filings that DERA found for 2018. Because of the short comment period for the Release, and the slow production of the DERA Memo, we have

The SEC defined its categories as follows:

1. **Factual errors**: "when the registrant identifies what it considers to be incorrect data or inaccurate facts that the proxy voting advice business uses in some part as a basis for its negative recommendation"

2. **Analytical errors**: "when the registrant identifies what it considers to be methodological errors in the proxy voting advice business's analysis that it used as a basis for its negative recommendation"

3. **General or policy disputes**: "when the registrant does not dispute the facts or the analytical methodology employed but instead generally espouses the view that specific evaluation policies or the evaluation framework established by the proxy voting advice business are overly simplistic or restrictive and do not adequately or holistically capture the merits of the proposal"

4. **Amended or modified proposal**: "when the registrant responds to a current or prior year negative recommendation from a proxy voting advice business by indicating that it has amended or modified proposals or existing governance practices prior to the annual meeting and requests investor consideration of these facts in making their vote"

5. **Other**: "where the registrant objects to the proxy voting advice business's negative recommendation but does not specifically cite nor respond to the rationale for the negative recommendation and *instead* makes a generalized argument in favor of the proposal" (*emphasis added*)

In general, CII did not classify a concern as "Other" if it also fit in another SEC category, relying on the word "instead" in the SEC definition of "Other" to mean the "Other" label excludes from that designation any filing that made another claim.

CII added a sixth category not used by the SEC: that the company provides "**Additional disclosure**." Provision of additional disclosure occurred with some frequency, at least in comparison with total number of supplemental filings cited by the SEC. We believe the DERA categories appear to be unsatisfactory in several respects, but particularly in not noting that some filings simply provide additional information. It is conceivable that the SEC considers a company's provision of additional information to be modification of a "practice," and therefore within the SEC's definition of "Amended or modified proposal." But this is not clear in the SEC's description of Table 2. We designated this category (sometimes in addition to one or more other category) where provision of additional information was a key aspect of the registrant filing, intended to help satisfy concerns raised in one or more proxy advisor reports. In 10 of the filings identified by the DERA Memo, we see additional disclosure but no other "concerns" that fit in any of the SEC's categories.

---

not analyzed most of these claims, or the overall Table 2 claims and DERA Memo corrections for 2016 and 2017. We may submit additional information after the comment deadline.

We have these observations:

- **Most of the purported "concerns" actually are policy disputes or communications that a company has changed a proposal (or governance practice) or is providing more or clarified information** to address an issue raised in a proxy advisor report. We would expect complicated questions of analysis and opinion to involve differing approaches to analysis and differing opinions. The only categories used by the SEC that appear to be relevant for purposes of the Commission's regulation based on frequency of factual errors are, at most, the categories on company assertions of "factual errors" and "analytical errors."

- **The number of claimed inaccuracies is very small:** If we try to use the SEC's classifications to the extent information is available, we count 57 ISS and Glass Lewis reports criticized for either "factual error" or "analytical error" in 2018, out of more than 11,000 published by those firms in the year on U.S. registrants. [25] This would constitute an "error rate" on a report basis of 0.5%. And this appears to be exaggerated, both because some of these company assertions appear to be in error, and because the SEC's counts for these categories appear high. We count 26 filings that claim error in 38 reports, an "error rate" of 0.3% on a report basis.

- **"Analytical errors" are disagreements on methodology, not "factual errors."** The SEC defines "analytical error" as "methodological error," and does not seem to include in the "analytical error" category actual analytical mistakes, such as math errors. (We assume therefore that the SEC classified the latter as "factual errors.") Institutional investors retain proxy advisors to do their own analysis, relying on their own methodologies, not to simply validate every company according to each company management's preferred methodology for evaluating its pay, or other matters. The SEC identifies only 17 filings that claim "factual errors." Below, we identify the 12 filings that the SEC was most likely to have found as asserting factual error, but we think no more than seven actually do so (0.06%). And the company assertions of factual errors appear to be incorrect in most of those seven filings.

- **Some of the filings cited by the SEC do not actually express any "concerns."** Table 2 indicated that issuers expressed "concerns" on proxy advice in 84 filings in 2018. The data file linked with the later DERA Memo conceded that one of these was an error by DERA (in that filing, the company cited Glass Lewis support for management in a proxy fight, which in no way was a management complaint about Glass Lewis). In at least 12 other filings, the SEC appears to have attributed to the company, which usually provided additional information, expression of "concern" that was not actually expressed by the company in the filing. In a few other filings, one could impute concern. Most of these amended proposals or provided more disclosure.

---

[25] We cannot determine with confidence which supplemental filings the SEC classifies as containing accusations of factual or analytical error, and the SEC so far has declined to show its work. As noted below, we were not able to find as many such claims as the SEC asserted in Table 2. But we did identify 45 supplemental filings with claims of factual or analytical error, and 12 criticisms of information or advice in proxy reports by both ISS and Glass Lewis (thus, the total of 57 reports).

- **Company expression of concern about proxy advice would reflect personal self-interest.** CII identified 67 filings that made arguments on a question in which the CEO had a clear personal interest in the outcome. In many of those cases, the CEO had a direct financial interest. In all 67 of those filings, the company argued in favor of the position that served the CEO's personal interest. In no cases (zero) did the company argue against the CEO's interest. This is relevant in that the SEC is seeking to compel proxy advisors to show their work to management of the companies that are subject of the research, so those companies can provide "feedback." From the precedent offered by supplemental proxy filings, it appears that the "feedback" provided will be one-sided if the CEO's interests are at stake. It is unrealistic to believe that company management will correct "errors" or critique methodologies where the errors or misguided methodologies serve the interests of the CEO.

- **Finally, some of the claims appear to be incorrect and/or misleading.** We discuss this further below.

### Accuracy of Company Claims of Proxy Advisor Inaccuracy Relied on by DERA

We discussed inaccuracies in claims by corporate management representatives in our October 24, 2019, letter to the SEC.[26] Most of these questionable claims have filtered into the Release as part of the Table 2 evidence. The SEC staff told CII that DERA made no attempt to assess accuracy of management complaints, even while categorizing the complaints.

We believe it is likely that the SEC classified the following company claims in 2018 as asserting factual error, based on language used by company management in the company's DEFA14As, and the fact that the DERA Memo indicated that these DEFA14As were included in the Table 2 classifications. We think some may not actually have been claims of proxy advisor factual inaccuracy, notwithstanding sometimes heated language, and that others are misleading. Of course, we cannot know whether the SEC classified these DEFA14As as claiming factual error, because the SEC so far has declined to disclose its specific assessments. We believe it is worth discussing these in some detail, because the detail shows how tenuous most of these few accusations of inaccuracy really are.

- **Abbott Laboratories**: ISS shared a pre-publication draft of its report on the Abbott Laboratories (Abbott) annual meeting with company management. Abbott, unhappy with recommendations against its say-on-pay proposal and for a shareholder proposal requesting an independent board chair, asserted that the ISS draft report had various flaws and inaccuracies. It seems probable that the SEC classified Abbott as claiming factual error, analytical error and general policy disagreement. ISS agreed there were two factual inaccuracies in the draft and corrected them in the published report.[27] Subsequently, Abbott filed a DEFA14A[28] that made a number of assertions that we believe were

---

[26] Letter, Oct. 24, 2019, *op. cit.*

[27] ISS, ISS Proxy Analysis & Benchmark Policy Voting Recommendations on Abbott Laboratories, April 5, 2018 (on file at CII).

[28] Abbott Laboratories, DEFA14A, April 5, 2018, at
https://www.sec.gov/Archives/edgar/data/0000001800/000110465918022657/0001104659-18-022657-index.htm.

inaccurate, aside from being notably heated in defending the pay of Chairman and CEO Miles D. White. The Abbott filing, featuring a letter from Abbott Compensation Committee Chair Roxanne Austin, was rebutted by ISS in a response letter[29] dated April 16, 2018. We find the ISS rebuttal entirely persuasive, including on descriptions of inaccuracies in the Abbott DEFA14A.[30]

- **Ambarella**: An October 2018 American Council for Capital Formation (ACCF) Study (the ACCF Study) said that Ambarella alleged factual errors in a DEFA14A.[31] This ACCF characterization appears to be inaccurate. The company appeared to disagree with elements of reporting on say-on-pay proposals by Glass Lewis (which recommended clients vote for the proposal) and ISS (which recommended that clients vote against). ACCF characterized some portion of the following as a "factual error" by one or both proxy advice firms: "The Company argued that CEO target pay had decreased (not increased); annual incentives required stretch performance; and PRSU strategic goals helped position the Company for future growth and success." But the company did not assert that either ISS or Glass Lewis reported that CEO target pay had increased, or that annual incentives did not require stretch performance, or that as a factual matter the PRSU strategic goals did not position the company for future growth and success. The

---

[29] Letter from ISS to Abbott Laboratories, April 16, 2018, on file with CII.

[30] The errors and misleading comments from Abbott and Austin included: (a) Abbott said that ISS "disregarded" management attempts to correct alleged inaccuracies and flaws in the report, which is false; (b) Abbott said it made "multiple requests to ISS for a meeting" and that "contrary to their [ISS's] stated policies…ISS refused to engage Abbott." ISS said it engaged Abbott before drafting the report and received one request to do so after it send the draft report. We cannot know whether Abbott or ISS is correct on the company's "multiple request" claim, but ISS is clear and public that its policies do not require meeting with every issuer that requests a meeting ("that determination is at ISS's sole determination. During proxy season, companies should expect that only truly exceptional situations will warrant engagement immediately prior to, or following, publication of ISS's reports."); (c) Abbott incorrectly called standard ISS analysis conducted in accordance with clearly described ISS methodologies as "manipulation" and "distorted"; (d) Abbott ignored the stated grounds on which ISS opposed the company's say-on-pay proposal in finding the ISS vote recommendation to be "absurd that in the face of these facts" [cited by Abbott to show strong performance and alignment of CEO pay] that ISS did not recommend in favor on the say-on-pay vote, which recommendation "should be objective and based on facts"; (e) Abbott falsely claimed that the ISS quantitative assessment resulted in a "low concern," whereas that assessment resulted in a "medium concern"; (f) Abbott falsely alleged that ISS did not follow its own criteria for selecting peer companies (which substantially overlapped management's preferred peer group), "purposely manipulating the outcome," an *ad hominem* attack delivered wholly without evidence; (g) Abbott falsely accused ISS of "manipulation" of GAAP and non-GAAP measures, and in so doing asserted several inaccurate claims, including that ISS stated that "EBITDA is the most important measure for our GICS code"; (h) Abbott charged that ISS's standard valuation model for stock options led to an "incorrect" calculation of CEO pay and "inflation of CEO compensation" – an argument over methodology, not accuracy; (i) Abbott described ISS criticisms of aspects of the company's disclosure as "false," while not confronting specific criticisms made by ISS and inaccurately stating ISS's concerns; (j) Abbott incorrectly described the basis for ISS's support for a shareholder proposal to separate the roles of chair and CEO; (k) Abbott asserted that the CEO's 2018 equity award was "irrelevant to 2017's Say on Pay recommendation," which appears incorrect at best given that Abbott said the award was based in part on 2017 performance (and proxy advisors and investors have a right to take into account recent developments and forward-looking awards in deciding on say-on-pay votes).

[31] Frank M. Placenti, "Are Proxy Advisors Really A Problem?", American Council for Capital Formation, October 2018, at http://accfcorpgov.org/wp-content/uploads/2018/10/ACCF_ProxyProblemReport_FINAL.pdf. In this letter, we examine the detailed ACCF information on which Placenti's report is based, which is available at http://accfcorpgov.org/wp-content/uploads/2018/10/Analysis-of-Proxy-Advisor-Factual-and-Analytical-Errors_October-2018.pdf

ACCF claim may relate to an ISS assertion that the CEO long-term equity pay grant increased year-over-year. The company said "equity grant levels" actually decreased since FY 2016, which the ISS report actually indicates.[32] However, ISS showed an increase between FY 2017 and FY 2018, which is factually accurate based on the company's proxy statement. The company explains that it changed the performance year, which resulted in the increase between FY 2017 and FY 2018. It appears to be correct that the company criticizes the ISS analysis, but the ACCF claim of factual inaccuracy appears to be factually incorrect, from what we can see. We are unsure whether the SEC, like ACCF, classified the company as asserting factual inaccuracy.

- **American Outdoor Brands**: American Outdoor Brands filed two supplemental proxy filings in 2018 that are included in SEC Table 2.[33] One complaint was on Glass Lewis reporting from a shareholder that the company did not disclose certain donations and should have under its policy on disclosure of political contributions. In fact, Glass Lewis reported on what the company said and what the proponent said, and specifically did not oppose directors on this basis.[34] Glass Lewis did oppose some directors based on non-disclosure of a public company board on which a director was serving that Glass Lewis believed raised particular conflict of interest issues. The company said that omission of disclosure of that board was an error in the proxy statement, caused by failure of the director to disclose the board service, and argued why there was no conflict of interest. Glass Lewis acknowledged the argument and reversed its position on some directors, but maintained a recommendation to oppose the director who the company said had failed to disclose his board service. In another filing, American Outdoor Brands said an ISS recommendation "is based on misinformation." The company asserted that it would not be possible for it "to monitor violent events associated with our firearms," and that ISS "erroneously" suggested that such monitoring (even if feasible according to the company) would help "mitigate potential damage to the company's reputation among law-abiding owners and other members of the public." The company may be right, but these are not factual errors. We assume the SEC probably classified the company's assertions as claims of factual errors since the company couched some of them as such.

- **Ameriprise Financial:** The company (1) noted an ISS assertion that pay decisions are overly discretionary, and said the discretion historically has been used mainly to reduce the incentive pool.[35] The company (2) also said that "classifying our Balance Sheet or our Strategic and Business metrics as discretionary is incorrect." The SEC may have called the latter a claim of factual error on the part of a proxy advisor, but it is not clear to us that the company was making such a claim. In any case, ISS did not say the balance sheet

---

[32] ISS, ISS Proxy Analysis & Benchmark Policy Voting Recommendations on Ambarella, Inc., May 24, 2018 (on file with CII).

[33] American Outdoor Brands DEFA14A, Sept. 6, 2018, at
https://www.sec.gov/Archives/edgar/data/0001092796/000119312518267792/0001193125-18-267792-index.htm;
and American Outdoor Brands DEFA14A, Sept. 10, 2018, at
https://www.sec.gov/Archives/edgar/data/0001092796/000119312518270028/0001193125-18-270028-index.htm.

[34] Glass Lewis, Proxy Paper on American Outdoor Brands, Sept. 20, 2018, and earlier editions for which Glass Lewis supplemented information (on file with CII).

[35] Ameriprise Financial DEFA14a, April 6, 2018, at
https://www.sec.gov/Archives/edgar/data/0000820027/000104746918002622/0001047469-18-002622-index.htm.

or strategic and business metrics were discretionary. In fact, ISS specifically noted that these metrics are "absolute."[36] On the first issue (presumably not interpreted by the SEC as a claim of factual error), the company was clear in its proxy statement that it leaves room for discretion in setting the bonus pool, and that there is discretion in individual awards.

- **CNX Resources:** The company said that ISS "incorrectly calculated our EBITDA for the year by failing to properly account for the transformational spin-off transaction of our coal business."[37] It appears to us that CNX may have a valid concern about how ISS applied Compustat-reported EBITDA. It seems likely that the SEC classified this as a claim as a factual error, since the company's language misleadingly implies as such, and the SEC did not look beyond the company's statements. We think it would be reasonable if the SEC classified this as an analytical error.

- **FMC:** The company filed a letter from FMC Chairman and CEO Pierre Brondeau defending his pay, saying that ISS had "relied on factual errors in its analysis."[38] In our view, Brondeau's letter misstated ISS's objection to reduced short-term incentive targets, pointing to reduction of an EBITDA target not specifically discussed by ISS.[39] As Brondeau said this was a "glaring error," we think it likely that the SEC analysis considered this a claim of "factual error." But it is not a factual error, notwithstanding the CEO's heated language. As ISS indicated more than once, its relevant objection was that payout opportunities were not reduced when performance goals were lowered. It is true that the business was shrinking due to the expected sale of the company's Health and Nutrition business, but it is not clear to us why it is not a legitimate question to ask why shrinking a company's business would not reduce CEO pay opportunities. The company argued with other aspects of the ISS analysis, which from FMC's standpoint made analytical errors, but these were not factual errors. For example, the CEO was concerned that ISS did not adequately, in his view, note anomalies in the SEC-mandated methodology for the summary compensation table that led to a reported increase in his pay from $10.4 million in 2016 to $13.0 million in 2017. He said his pay actually went down if the SEC mandated "total" compensation figure as adjusted in a manner that he thought it should be adjusted. ISS did send clients a Proxy Alert after FMC filed its DEFA14A, indicating that the company in that supplemental filing provided additional information on the goal-setting process for the annual incentive program, which mitigated certain ISS concerns. However, ISS continued to oppose management on say on pay, due to what ISS viewed as an inadequate company response to a low say on pay vote the previous year.

---

[36] ISS, ISS Proxy Analysis & Benchmark Policy Voting Recommendations on Ameriprise Financial, March 29, 2018 (on file with CII).
[37] CNX Resources, DEFA14A, April 30, 2018, at
https://www.sec.gov/Archives/edgar/data/0001070412/000119312518143184/0001193125-18-143184-index.htm.
[38] FMC DEFA14A, April 4, 2018, at
https://www.sec.gov/Archives/edgar/data/37785/000130817918000126/lfmc2018_defa14a.htm.
[39] ISS, ISS Proxy Analysis & Benchmark Policy Voting Recommendations on FMC Corporation, April 7, 2018 (on file with CII).

- **Interface:** The company noted in a DEFA14A cited by DERA that the ISS report indicated the company paid dividends on unvested performance shares.[40] The company said this was incorrect. ISS then corrected the error in a Proxy Alert.[41] The company also provided additional disclosure on engagement with shareholders on executive pay, leading ISS to reverse its earlier recommendations against two directors and the 2018 say on pay vote, which ISS had made based on lack of responsiveness to a 2017 say on pay vote. We presume that the SEC included this DEFA14A in its count on claims of factual error, notwithstanding the later correction, which would make sense to us.

- **Macquarie Infrastructure:** In a DEFA14A cited by DERA, the company (MIC) said ISS that relied "substantially on the incorrect assertions of Moab Capital Partners" (a dissident).[42] We think it likely that DERA classified this as a complaint about proxy advisory report inaccuracy. The company identified various Moab assertions that the company asserts are inaccurate. MIC said that "By adopting Moab's misleading version of events and not considering all of the publicly available information to the contrary disclosed by MIC, MIC believes that ISS has reached the wrong conclusion." But the company seemed to imply that ISS endorsed the dissident's version of events entirely, which is not correct. In recommending for three of six dissident nominees, ISS actually devoted more text to presenting MIC's views than to views of the dissident, and ISS clearly did not agree with the dissident on all matters.[43]

- **STAG Industrial:** We suspect the SEC classified a STAG Industrial DEF14A included in the DERA data set as raising issues of factual accuracy because the company calls an ISS valuation methodology inaccurate (but that appears to actually be an analytical disagreement) and because the company suggests (without using the word "incorrect") that ISS incorrectly found that the compensation plan's "muting design" creates volatility in payout levels for same levels of performance.[44] (The company said, "Muting design decreases volatility by leveling year-over-year compensation," says company.) ISS reported that the muting design "creates volatility in payout levels for the same levels of performance," which seems to us to be a different point, although not as clear as it could

---

[40] Interface, DEFA14A, May 2, 2018, at
https://www.sec.gov/Archives/edgar/data/%200000715787/000071578718000014/0000715787-18-000014-index.htm.
[41] ISS, ISS Proxy Analysis & Benchmark Policy Voting Recommendations on Interface, May 4, 2018 (on file with CII).
[42] Macquarie Infrastructure, DEFA14A, May 7, 2018, at
https://www.sec.gov/Archives/edgar/data/0001289790/00011442041825761/0001144204-18-025761-index.htm.
[43] ISS, ISS Proxy Analysis & Benchmark Policy Voting Recommendations on Macquarie Infrastructure Corporation, May 4, 2018 (on file with CII). The ISS analysis concluded: "Where MIC's rebuttal appears weakest is in regard to the utilization decline timeframe posited by the dissident. The company has indicated that it only provides disclosure of aggregate utilization, rather than more granular details on capacity, for competitive reasons. Although the board asserts that Moab's allegations are misplaced because the dissident's calculations assume that utilization has declined in linear fashion, it has thus far failed to provide a conclusive, fact-based argument that definitively disproves the dissident's assumptions or calculations. Given the severity of the recent stock price decline, the board may want to reconsider whether the competitive benefits of limited disclosure continue to outweigh the mistrust discount being applied by the market."
[44] STAG Industrial DEFA14A, April 20, 2018, at
https://www.sec.gov/Archives/edgar/data/1479094/000110465918025636/a18-11296_1defa14a.htm.

be.[45] In any case, we also find the company's discussion of "muting" in its proxy statement to be confusing (see proxy statement, pages 31-32).[46] We believe this DEFA14A discussed analytical differences and general policy differences, but would be skeptical about a DERA decision to classify this as a claim of "factual inaccuracy."

- **Stifel Financial Services:** Stifel asserted in a DEFA14A included in the Table 2 data set that ISS's recommendation against SOP "rests on a number of factually inaccurate conclusions," particularly related to tax "gross-ups."[47] The company also provided additional disclosures on special grants to three executives. ISS revised its report and changed the recommendation, saying that it interpreted "tax mitigation" cash payment as tax gross-up payments, which the company filing makes clear is not correct.[48] (The payments were inducements for executives and other employees to make individual tax elections that would lead the individual to incur additional tax liability but provide tax savings to the company). The initial ISS report did appear to contain inaccuracies, although in our view the same is true of the company's additional filing (for example, that ISS claimed that each named executive officer received $2 million in tax payments, which is not correct). Both the ISS and Stifel inaccuracies related at least in part to less-than-clear language by the other party.

- **Virtus Investment Partners Inc.:** The company said in a DEFA14A included in Table 2 data set that ISS and Glass Lewis used "incorrect peer groups."[49] and did not understand the rigorous nature of performance metrics used by Virtus, or changes made based on feedback from shareholders. The company also said that ISS and Glass Lewis were "incorrect" in indicating that the executive compensation program uses "a high degree of discretion," although the programs do provide for use of discretion "Incorrect peer groups" and the characterization of the of extent for discretion appear to be judgment calls, colored of course by how the company described its own programs in its proxy statement. In our view, these were analytical differences, with legitimate points by both the proxy advisors and the company.[50] We suspect that the SEC classified Virtus as making claims of factual error, which we think is not accurate despite use of the word "inaccuracy." We note that Glass Lewis used the Equilar peer group, based on an algorithm that incorporates peer groups as defined by a broad group of public companies. We also would note that the company peer group appeared to skew toward larger companies on a revenue basis (the company included three "peers" larger than any named

[45] ISS, ISS Proxy Analysis & Benchmark Policy Voting Recommendations on STAG Industrial, Inc., May 16, 2018 (on file with CII).
[46] STAG Industrial DEF 14A, March 21,2018,pages 31-32, at
https://www.sec.gov/Archives/edgar/data/1479094/000110465918019321/a18-2942_1def14a.htm
[47] Stifel Financial, DEFA14A, May 23, 2018, at
https://www.sec.gov/Archives/edgar/data/0000720672/000119312518171118/0001193125-18-171118-index.htm.
[48] ISS, ISS Proxy Analysis & Benchmark Policy Voting Recommendations on Stifel Financial Corp., May 23, 2018 (on file with CII).
[49] Virtus Investment Partners, Inc., DEFA14A, May 7, 2018, at
https://www.sec.gov/Archives/edgar/data/883237/000119312518154548/d582385ddefa14a.htm.
[50] Glass Lewis, Proxy Paper on Virtus Investment Partners, April 30, 2018 (on file with CII); and ISS, ISS Proxy Analysis & Benchmark Policy Voting Recommendations on Virtus Investment Partners, Inc., April 30, 2018 (on file with CII).

by ISS). The company did not address relevance of company size in peer groups. We note that Glass Lewis revised its report to reflect a correction and more information, but well before the company filed its DEFA14A. It appears the company means to apply its commentary to the GL report as revised.

****

In conclusion, we would emphasize that the SEC's own evidence suggests the rate of factual errors in proxy advice is extremely low, and the mechanisms that proxy advisors have in place to correct any such errors are prompt and effective. Proxy advisors have strong incentives, through the market for their research and analysis, to provide clients accurate, high quality advice, and the absence of significant errors shows those incentives are working.

SEC staff involved in the rulemaking have suggested, in meetings with us, that what matters most is that the regulatory approach ensure the lowest possible incidence of error, whatever the actual rate of errors in recent reports. This implicitly is an argument for a "perfection standard," which is neither economically justified nor likely to be attainable given the nature of the requirements the SEC has proposed

In our view, the SEC staff's suggestion that the point is to reduce errors, no matter how low their present frequency, is a fallback argument that belies awareness that error rates are low and that many of the complaints are, instead, differences of opinion and preferences on methodologies.[51]As others have said, this makes the Amendments a clear example of a solution in search of a problem. But as important, there is no evidence that the proposal is calculated to attain a lower rate of error.

Rather, what the proposal seems designed to do is ensure that management will "be comfortable" that its perspectives will be reflected in the proxy advice that investors procure. That is the point of the hyperlink, which the Release's economic analysis treats as indispensable, albeit disruptive to the proxy advisors.[52] We submit that the goal of management comfort is both itself unattainable and inappropriate, given that investors privately order the advice specifically to obtain independent, critical analyses of management proposals, just as they might have sought advice from independent, buy-side stock analysts before purchasing their shares and might read independent financial analyst reports when considering whether to continue to hold the shares. Moreover, the Release ignores strong reasons to expect that the Commission's proposals will lead to more errors, and lower quality proxy advice – even setting aside clear costs from jeopardizing the independence of advice and introducing major new conflicts of interest. With the time for proxy voting decisions already compressed and subject to very large seasonal

---

[51] We question whether making sure executives are comfortable with independent, third-party advice on proxy voting matters that investors privately arrange for should be a *sine qua non* for proxy advice. Indeed, given the personal interest any executive would have in some of the topics – such as board composition and management pay – the Commission should expect tension with unvarnished, independent advice. At the very least, we believe that investors who pay for proxy voting advice should be comfortable with the process, which we believe most definitely will not be the case if the SEC's Amendments are enacted.
[52]  Release at 114-115.

burdens, the SEC Review and Feedback and Final Notice requirements will subtract substantially from the time that proxy advisors and/or investor clients have to review proxy voting research, analysis and decisions.

That said, we think that the argument for new, costly and intrusive regulation that compromises free speech rights must, at a minimum, be based on evidence beyond a contention that proxy voting advice is not perfect or error-free.

If you have any questions on this letter or need additional information, please do not hesitate to contact me at ▆▆▆▆▆▆▆ or ▆▆▆▆▆▆▆ .

Sincerely,

Kenneth A. Bertsch
Executive Director

Jeffrey P. Mahoney
General Counsel