# UNITED STATES COURT OF APPEALS
## FOR THE D.C. CIRCUIT

INSTITUTIONAL SHAREHOLDER SERVICES INC.,

*Plaintiff-Appellee,*

v.

SECURITIES AND EXCHANGE COMMISSION, ET AL.,

*Defendants-Appellants,*

NATIONAL ASSOCIATION OF MANUFACTURERS,

*Intervenor-Appellant,*

On Appeal from the U.S. District Court for the District of Columbia, No. 1:19-cv-3275-APM

## FINAL RESPONSE BRIEF OF PLAINTIFF-APPELLEE INSTITUTIONAL SHAREHOLDER SERVICES

Mari-Anne Pisarri
PICKARD DJINIS AND PISARRI LLP
1818 N Street NW, Suite 515
Washington, DC 20036
(202) 223-4418
map@pickdjin.com

Jeffrey M. Harris
James F. Hasson
CONSOVOY MCCARTHY PLLC
1600 Wilson Boulevard, Suite 700
Arlington, VA 22209
703) 243-9423
jeff@consovoymccarthy.com

April 3, 2025

*Counsel for Appellee*

# CERTIFICATE AS TO PARTIES, RULINGS & RELATED CASES

## A. Parties and Amici and Disclosure Statement

Appellant is the National Association of Manufacturers ("NAM"). NAM is a membership organization that intervened as a defendant in the district court on behalf of its members.

Appellee is Institutional Shareholder Services Inc. ("ISS"). Under Federal Rule of Appellate Procedure 26.1, Appellee ISS states that it is 100% owned by ISS Holdco Inc., a privately held Delaware corporation. ISS STOXX GmbH, a privately held foreign company, holds a 100% interest in ISS Holdco Inc, and, in turn, ISS. Deutsche Börse AG, a publicly held company, holds a 10% or greater ownership interest in ISS STOXX GmbH, and, in turn, ISS.

The amici in support of Appellant in this Court are: Chamber of Commerce of the United States of America, Business Roundtable, the Center on Executive Compensation, Society for Corporate Governance, National Investor Relations Institute, Joseph Grundfest, Troy Paredes, Michael Piwowar, Daniel Gallagher, Chester Spatt, Adam Pritchard, and Lucas Moskowitz.

The following parties submitted a joint amicus brief in support of Plaintiff ISS in the district court: The Council of Institutional Investors,

the California Public Employees' Retirement System, the California State Controller, the California State Teachers' Retirement System, CFA Institute, the Colorado Public Employees' Retirement Association, the Comptroller of the City of New York, Change to Win Investment Group, and the Los Angeles County Employees Retirement Association.

## B. Ruling Under Review

Appellant seeks review, pursuant to 28 U.S.C. §1291 and Fed. R. App. P. 3 and 4, of the final order issued by U.S. District Judge Amit P. Mehta of the District Court for the District of Columbia, Dkt. 70, *Institutional Shareholder Services v. SEC*, No. 1:19-cv-03275 (APM) (D.D.C. Feb. 23, 2024), and the accompanying memorandum opinion, *Institutional Shareholder Services v. SEC*, No. 1:19-cv-03275 (APM), 2024 WL 756783 (D.D.C. Feb. 23, 2024), both of which were entered on the court's docket on February 23, 2024.

## C. Related Cases

Appellee is unaware of any related cases under D.C. Circuit Rule 28(a)(1)(C).

# TABLE OF CONTENTS

Table of Authorities .................................................................... v

Glossary ................................................................................ xi

Introduction ........................................................................... 1

Jurisdictional Statement ........................................................... 3

Issue Statement ....................................................................... 4

Statement of the Case .............................................................. 4

   I.    The statutory framework governing proxy solicitation. ............. 4

   II.   Independent proxy voting advice is fundamentally different from proxy solicitation and is separately regulated under the Advisers Act. ................................................................. 6

   III.  From 1934 to 2019, proxy voting advice was not subject to the proxy solicitation regulations. ........................................... 10

   IV.  The Commission adopts an unprecedented interpretation of Section 14(a) to regulate proxy voting advice as proxy solicitation. ........................................................................ 14

       A.   The Commission issues sub-regulatory "guidance" declaring that voting advice is now proxy solicitation. ... 14

       B.   The Commission codifies the new definition of solicitation. ....................................................................... 16

       C.   Delays and amendments to the Final Rule ..................... 18

   V.   The District Court's decision ..................................................... 20

Summary of Argument ............................................................. 23

Standard of Review .................................................................. 28

Argument ............................................................................... 29

   I.    The district court correctly held that the Commission's attempt to regulate proxy voting advice as proxy solicitation was contrary to law. ................................................................. 29

A.    The Commission's classification of proxy voting advice as proxy solicitation is foreclosed by the plain text of Section 14(a). ................................................................ 29

B.    The history and purpose of the Exchange Act confirm that voting advice is not "solicitation" for purposes of the Act. ............................................................... 34

C.    NAM's counterarguments are unavailing. ...................... 36

    1.    "Robo-voting." ........................................................ 36

    2.    Marketing. ............................................................... 38

    3.    Influence. ................................................................. 40

    4.    Silence plus rulemaking authority. ......................... 43

    5.    "Permissible-but-uncommon" definitions. .............. 46

    6.    Acquiescence/ratification. ....................................... 48

    7.    Interest in the outcome. .......................................... 50

II.    NAM's arguments about an alleged regulatory gap or deficiencies with proxy voting advice are baseless. .................. 57

A.    Proxy voting advice is comprehensively regulated under the Advisers Act. .................................................... 57

B.    There is no evidence that errors or inaccuracies in proxy advice are common or widespread. ........................ 63

Conclusion. ................................................................................... 66

Certificate of Compliance. ............................................................ 67

Certificate of Service ................................................................... 67

# TABLE OF AUTHORITIES

## Cases

*Aaron v. SEC,*
446 U.S. 680 (1980) ............................................................. 45

*Aid Ass'n for Lutherans v. U.S. Postal Serv.,*
321 F.3d 1166 (D.C. Cir. 2003) .......................................... 46

*Allegheny Def. Project v. FERC,*
964 F.3d 1 (D.C. Cir. 2020) ........................................ 29, 30

*Am. Clinical Lab. Ass'n v. Azar,*
931 F.3d 1195 (D.C. Cir. 2019) .......................................... 24

*Ass'n of Civilian Technicians v. FLRA,*
269 F.3d 1112 (D.C. Cir. 2001) .......................................... 36

*Atl. City Elec. Co. v. FERC,*
295 F.3d 1 (D.C. Cir. 2002) ............................................... 45

*Chamber of Com. of United States v. SEC,*
115 F.4th 740 (6th Cir. 2024) ............................................. 20

*Citizens for Responsibility & Ethics in Washington v. FEC,*
316 F. Supp. 3d 349 (D.D.C. 2018) .................................... 49

*Citizens for Responsibility & Ethics in Washington v. FEC,*
971 F.3d 340 (D.C. Cir. 2020) ............................................ 49

*Dir., Off. of Workers' Comp. Programs v. Newport News Shipbuilding
& Dry Dock Co.,* 514 U.S. 122 (1995) ................................ 45

*Encino Motorcars, LLC v. Navarro,*
584 U.S. 79 (2018) ............................................................. 46

*First Nat'l Bank & Tr. Co. v. Nat'l Credit Union Admin.,*
90 F.3d 525 (D.C. Cir. 1996) .............................................. 49

*Golden & Co. v. Justice's Court of Woodland TP., Yolo County,*
140 P. 49 (Cal. Ct. App. 1914) ........................................... 31

*Initiative & Referendum Inst. v. U.S. Postal Serv.,*
417 F.3d 1299 (D.C. Cir. 2005) ..................................... 32, 50

*J.I. Case v. Borak,*
377 U.S. 426 (1964) ............................................. 12, 23, 35

*Kiefer v. State,*
106 Ohio St. 285 (1922) ..................................................... 31

*Knight v. Comm'r,*
552 U.S. 181 (2008).......................................................... 42

*La. Pub. Serv. Comm'n v. FCC,*
476 U.S. 355 (1986).......................................................... 29

*Lamar, Archer & Cofrin, LLP v. Appling,*
584 U.S. 709 (2018).......................................................... 50

*Long Island Lighting Co. v. Barbash,*
779 F.2d 793 (2d Cir. 1985) .............................................. 52

*Loper Bright Enters. v. Raimondo,*
144 S. Ct. 2244 (2024).................................... 28, 29, 44, 45

*Lowe v. SEC,*
472 U.S. 181 (1985).......................................................... 62

*MCI Telecomms. Corp. v. Am. Tel. & Tel. Co.,*
512 U.S. 218 (1994).......................................................... 47

*Merck & Co. v. U.S. Dep't Health & Human Servs.,*
385 F. Supp. 3d 81 (D.D.C. 2019)..................................... 45

*N.Y. Stock Exch. v. SEC,*
962 F.3d 541 (D.C. Cir. 2020)...................................... 27, 44

*Nat'l Ass'n of Manufacturers v. SEC,*
105 F.4th 802 (5th Cir. 2024) ........................................... 20

*New York v. EPA,*
964 F.3d 1214 (D.C. Cir. 2020).................................... 36, 37

*NLRB v. S.W. Gen., Inc.,*
580 U.S. 288 (2017).......................................................... 42

*People v. Rice,*
383 Ill. 584 (1943) ............................................................ 31

*Perrin v. United States,*
444 U.S. 37 (1979)............................................................ 30

*Ramirez v. U.S. Immigr. & Customs Enf't,*
338 F. Supp. 3d 1 (D.D.C. 2018)....................................... 44

*Regions Bank v. Legal Outsource PA,*
936 F.3d 1184 (11th Cir. 2019)........................................... 47

*SEC v. Capital Gains Rsch. Bureau, Inc.,*
375 U.S. 180 (1963).......................................................... 57

*SEC v. Chenery Corp.,*
318 U.S. 80 (1943)............................................ 26, 36, 37, 41

*SEC v. Saltzman,*
127 F. Supp. 2d 660 (E.D. Pa. 2000) ................................. 62

*Sierra Club v. EPA,*
551 F.3d 1019 (D.C. Cir. 2008)......................................... 43

*Solid Waste Agency of N. Cook Cnty. v. U.S. Army Corps of Eng'rs,*
531 U.S. 159 (2001) ......................................................... 49

*Taniguchi v. Kan Pac. Saipan, Ltd.,*
566 U.S. 560 (2012) ......................................................... 48

*Transamerica Mortg. Advisors, Inc. v. Lewis,*
444 U.S. 11 (1979).......................................................... 58

*Transohio Sav. Bank v. Dir., Off. of Thrift Supervision,*
967 F.2d 598 (D.C. Cir. 1992)........................................... 29

*Union Pacific RR Co. v. Chicago & N.W. Ry. Co.,*
226 F. Supp. 400 (E.D. Ill. 1964) ...................................... 11

*Verizon v. FCC,*
740 F.3d 623 (D.C. Cir. 2014)........................................... 29

*Walsh & Levine v. Peoria & E.R. Co.,*
222 F. Supp. 516 (S.D.N.Y. 1963) ..................................... 52

## Statutes

15 U.S.C. §78j ................................................................. 42

15 U.S.C. §78n(a)............................................... 6, 24, 30, 44

15 U.S.C. §78n-1 ............................................................... 4

15 U.S.C. §80b-2 ..................................................... 9, 57, 61

15 U.S.C. §80b-6 ................................................... 10, 57, 58

15 U.S.C. §80b-9 ............................................................. 59

28 U.S.C. §1291 ...................................................... ii, 3

28 U.S.C. §1331 ........................................................... 3

5 U.S.C. §706(2) ......................................................... 28

**Other Authorities**

Antonin Scalia & Bryan A. Garner, Reading Law (2012) ..................... 50

Black's Law Dictionary (3d ed. 1933) ................................. 30, 31, 33, 50

CalPERS Comments, File No. S7-22-19.................................... 17, 54, 64

CII Comments, File No. S7-22-19...................................... 64, 65

CII Letter re Data Analysis (Feb. 4, 2020).............................. 64

Colorado Public Employees Retirement System Comments,
    File No. S7-22-19 ................................................. 17

Florida State Board of Administration Comments, File No. S7-22-19.. 64

Glass Lewis Comments, File No. S7-22-19 ............................. 62

H.R. Rep. No. 73-1383, 73d Cong., 2d Sess. (Apr. 27, 1934) ............. 5, 35

ISS Comments, File No. S7-22-19 ......................... 7, 8, 38, 54, 55, 64, 65

New York State Comptroller Comments, File No. S7-22-19................. 17

Ohio Public Employees Retirement System Comments,
    File No. S7-22-19 ................................................. 17

Rick A. Fleming, SEC Investor Advocate, Report on Activities for FY
    2019 (Dec. 19, 2019), bit.ly/4gZj5xK .............................. 66

Roget's 21st Century Thesaurus (3d ed. 2013) ........................ 33

S. Rep. No. 73-1455 (1934) ...................................... 5, 35

The Concise Oxford Dictionary of Current English (1931) .............. 30

Webster's New International Dictionary (2d ed. 1934) .................. 46

**Rules**

17 C.F.R. §206(4) ...................................................... 61

17 C.F.R. §240.14a...................................... 6, 7, 11, 14

17 C.F.R. §240.14a-1 .................................... 6, 10

17 C.F.R. §240.14a-2 ................................................ 12

17 C.F.R. §240.14a-3 .................................................. 6

17 C.F.R. §240.14a-6 .................................................. 6

17 C.F.R. §240.14a-9 .................................................. 6

17 C.F.R. §275.206(4)-1 ............................................ 39

17 C.F.R. §275.206(4)-6 ............................................ 59

*Amendments to Exemptions from the Proxy Rules for Proxy Voting Advice*, 84 Fed. Reg. 66,518 (Dec. 4, 2019) ("Proposed Rule") ..... 15, 63

*Amendments to Proxy Rules*, 21 Fed. Reg. 577 (Jan. 26, 1956) ........................................ 10

*Applicability of the Investment Advisers Act to Financial Planners, Pension Consultants, and Other Persons Who Provide Investment Advisory Services as a Component of Other Financial Services*, 52 Fed. Reg. 38,400 (Oct. 16, 1987) .................................... 58

*Broker-Dealer Participation in Proxy Solicitations*, 29 Fed. Reg. 341 (Jan. 15, 1964) ........................................ 11

*Commission Interpretation and Guidance Regarding the Applicability of the Proxy Rules to Proxy Voting Advice*, 84 Fed. Reg. 47,416 (Sept. 10, 2019) ("Proxy Guidance") .............. 2, 14

*Commission Interpretation Regarding Standard of Conduct for Investment Advisers*, 84 Fed. Reg. 33,669 (July 12, 2019) ("Fiduciary Standard Release") .................................... 57, 60

*Concept Release on the U.S. Proxy System*, 75 Fed. Reg. 42,982 (Jul. 22, 2010) ............................... 60, 62

*Exemptions from the Proxy Rules for Proxy Voting Advice*, 85 Fed. Reg. 55,082 (Sept. 3, 2020) ("Final Rule") .. 2, 7, 16, 17, 36, 37, 38, 39, 40, 41, 46, 51, 56, 63, 64

*Investment Adviser Marketing*, 86 Fed. Reg. 13,024 (Mar. 5, 2021) .................................... 62

*Proxy Voting by Investment Advisers*, 68 Fed. Reg. 6,585 (Feb. 7, 2003) ........................................ 59

*Regulation of Communications Among Shareholders*,
   57 Fed. Reg. 48,276 (Oct. 22, 1992) ("1992 Release")............... 8, 12, 13

*Securities and Exchange Commission Release Notice*,
   1935 WL 29,270 (Sept. 24, 1935) ....................................................... 10

*Shareholder Communications, Shareholder Participation In the
   Corporate Electoral Process and Corporate Governance Generally*,
   44 Fed. Reg. 68,764 (Nov. 29, 1979)................................................... 12

*Statement of Comm'r Allison Herren Lee* (Aug. 21, 2019) ...................... 15

*Statement of Comm'r Allison Herren Lee* (July 22, 2020) ............... 18, 65

## GLOSSARY

| | |
|---|---|
| Advisers Act | Investment Advisers Act of 1940 |
| APA | Administrative Procedure Act |
| Exchange Act | Securities Exchange Act of 1934 |
| ISS | Institutional Shareholder Services Inc. |
| NAM | The National Association of Manufacturers |
| SEC or Commission | Securities and Exchange Commission |

# INTRODUCTION

Institutional Shareholder Services Inc. is a registered investment adviser and the world's largest "proxy adviser." ISS's core advisory business is to help its clients—institutional investors such as pension funds, mutual funds, and other investment advisers—make informed decisions about how to vote their shares in corporate ballot measures. To that end, ISS provides its clients independent analysis and vote recommendations based on the voting criteria chosen or customized by each client. But one thing ISS emphatically does not do is *solicit* proxy votes. ISS does not assist proponents or opponents of a ballot measure in achieving their desired outcome. Indeed, ISS routinely offers different recommendations about the *same vote* depending on each client's investment goals and voting criteria.

Publicly traded companies and their advocates—which sometimes disagree with proxy advisers' voting advice—have waged a longstanding campaign to diminish the role proxy advice plays in the corporate governance process. Their efforts succeeded in August 2019, when the Securities and Exchange Commission adopted an unprecedented interpretation of Section 14(a) of the Securities Exchange Act of 1934 that—for the first time in the law's 85-year history—regulated independent proxy

voting *advice* under the statutory framework governing *solicitation* of proxy votes. *See Commission Interpretation & Guidance Regarding the Applicability of the Proxy Rules to Proxy Voting Advice*, 84 Fed. Reg. 47,416 (Sept. 10, 2019) ("Proxy Guidance") (JA214-18). The Commission later codified that position through notice-and-comment rulemaking. *See Exemptions from the Proxy Rules for Proxy Voting Advice*, 85 Fed. Reg. 55,082 (Sept. 3, 2020) ("Final Rule") (JA808-81).

ISS immediately challenged these novel interpretations of the solicitation statute as contrary to law and in excess of statutory authority. In February 2024, Judge Mehta held in a careful and comprehensive opinion that the Commission's redefinition of proxy voting advice as proxy solicitation is foreclosed by the plain text of Section 14(a), which limits the Commission's authority to persons who "solicit any proxy." Both in 1934 and today, "solicit" means to pursue a certain objective by pleading or asking; to "solicit any proxy" thus requires the solicitor to be *pursuing a certain outcome* in a shareholder vote. No reasonable user of English would say that a proxy adviser "solicits" votes from its own clients, who retain and pay the adviser to provide advice and recommendations based on criteria selected or customized *by the client*.

Since the district court's decision, this case has assumed an unusual posture. The Commission has dropped its appeal, leaving only the National Association of Manufacturers (an intervenor below) as the appellant. Put differently, the sole remaining appellant is an industry group that is arguing for expansive SEC statutory and rulemaking authority.

NAM's arguments fare no better than the Commission's did below. NAM and its supporting amici treat the statutory text as an afterthought and primarily offer a hodgepodge of policy arguments and *Chenery*-barred theories never endorsed (and sometimes affirmatively rejected) by the Commission in the Final Rule. None of those arguments changes the basic reality that it strains the statutory text beyond its breaking point to suggest that a proxy adviser offering voting advice based on criteria selected or customized by its clients is somehow "soliciting" votes.

## JURISDICTIONAL STATEMENT

The district court had jurisdiction under 28 U.S.C. §1331 and entered final judgment on February 23, 2024. This Court has jurisdiction under 28 U.S.C. §1291 because NAM timely appealed the final judgment of the district court.

## ISSUE STATEMENT

Whether the district court correctly held that the SEC acted contrary to law and in excess of statutory authority when it redefined "solicit any proxy" under Section 14(a) of the Exchange Act to include independent proxy voting advice.

## STATUTES AND REGULATIONS

The addendum contains the relevant statutory and regulatory provisions.

## STATEMENT OF THE CASE

**I.  The statutory framework governing proxy solicitation.**

Public companies are generally required by state law to hold annual shareholder meetings to address matters that require shareholder approval, such as the election of directors. Under the Dodd-Frank Act, public companies must also periodically give shareholders the right to a nonbinding vote on executive compensation. *See* 15 U.S.C. §78n-1. A company may also call a special meeting to seek shareholder approval of time-sensitive transactions such as mergers or acquisitions. Shareholders cast their votes by appearing at such meetings in person or authorizing a "proxy" to vote on their behalf.

During a contested vote, proponents or opponents of a ballot measure may solicit shareholders to encourage them to support or oppose the

measure. Proxy solicitation carries a clear risk of abuse. Those seeking to have their preferred directors elected or have a ballot measure passed or rejected could, for example, seek to achieve their preferred outcome through fraudulent or manipulative practices.

After the stock market crash of 1929 and the Great Depression, Congress concluded that abusive proxy solicitation posed a significant threat to investors. *See* H.R. Rep. No. 1383, 73d Cong., 2d Sess., at 13 (Apr. 27, 1934). Congress was especially concerned about abuse from "irresponsible outsiders seeking to wrest control of a corporation [and] … unscrupulous corporate officials" who "conceal[ed] and distort[ed] facts" while soliciting votes. S. Rep. No. 73-1455 at 77 (1934).

To protect shareholders' "fair suffrage" rights, Congress granted the Commission "power to control the conditions under which proxies may be solicited with a view to preventing the recurrence of abuses which have frustrated the free exercise of the voting rights of stockholders." H.R. Rep. No. 73-1383, at 13-14. To that end, Section 14(a) of the Exchange Act makes it "unlawful for any person … in contravention of such rules and regulations as the Commission may prescribe … to solicit or to permit the use of his name to solicit any proxy or consent or authorization

in respect of any security." 15 U.S.C. §78n(a). In short, those who "solicit any proxy" must comply with the Commission's rules regulating such solicitation.

The Commission promulgated those rules in 17 C.F.R. §240.14a-1, *et seq*. Under Rule 14a-3, a person who solicits a proxy must furnish each person solicited with a "publicly-filed preliminary or definitive proxy statement" that contains mandatory disclosures about the nature and date of the shareholder vote and "a clear and impartial identification of each separate matter" to be voted on. *Id.* at §240.14a-3(a). Rule 14a-6 further requires anyone soliciting a proxy to file with the Commission for public release "copies of the proxy statement, form of proxy and all other soliciting materials, in the same form as the materials sent to securities holders." *Id.* at §240.14a-6(b). And Rule 14a-9 makes it unlawful for a person to solicit proxies through any communication that contains material misstatements or omissions. *See id.* at §240.14a-9.

## II. Independent proxy voting advice is fundamentally different from proxy solicitation and is separately regulated under the Advisers Act.

**A.** Many institutional investors participate in a significant number of shareholder votes every year but lack the in-house resources to independently analyze each individual vote. A large mutual fund or index

fund may have the right to vote on ballot measures across thousands of publicly traded companies in their portfolios, often over a short period of time. *See* 85 Fed. Reg. at 55,083, 55,123 (JA809, 849). Those institutional investors may accordingly hire proxy advisers such as ISS to help navigate those issues and make informed voting decisions. *Id.*

ISS's core advisory business is to provide voting recommendations to its investor clients based on criteria the investors themselves create or select. ISS currently implements over 400 custom voting policies that are tailored to each investor's specific goals and priorities. *See* ISS Comments, File No. S7-22-19 at 1 (JA342). Alternatively, an investor might select, based on its investment goals and strategy: (1) ISS's "benchmark" voting policy that focuses on promoting long-term shareholder value, good governance, and risk mitigation; or (2) a "thematic" ISS policy that evaluates voting issues from the perspective of sustainability, socially responsible investing, board-aligned voting, labor-friendly investing, Catholic-faith-based investing, or other criteria. *Id.*; *see also* 85 Fed. Reg. at 55,083 (JA809).

As reflected by the sheer diversity of policy criteria under which clients might direct ISS to analyze a corporate ballot measure, there is

no "correct" viewpoint on matters such as "corporate performance, management capability or directorial qualifications or the desirability of a particular initiative subject to a shareholder vote." *Regulation of Communications Among Shareholders*, 57 Fed. Reg. 48,276, 48,278 (Oct. 22, 1992) ("1992 Release"). A shareholder's vote necessarily turns on each investor's particular goals and priorities, and investors retain ISS to help them ensure their votes are consistent with their investment strategy and objectives. ISS Comments at 1-2 (JA342-43).

Unsurprisingly, due to the diversity of investment and voting priorities among its clients, ISS routinely issues different recommendations about the *same vote* depending on the criteria selected by each client. *Id.* For example, ISS may advise clients using its benchmark policy to vote for a certain proposal, while advising clients who employ sustainability-based or faith-based criteria to vote against that same proposal. At bottom, ISS's role is to help its clients make fully informed voting decisions in light of *their own* priorities and objectives. *Id.*

ISS provides voting advice only to institutional investors that specifically retain ISS and pay for its services. Once engaged, ISS is contractually obligated to provide a voting recommendation for each vote

conducted by each company in the client's portfolio, in accordance with the criteria the client designates. *Id.* One thing ISS emphatically does not do is *solicit* proxies. ISS does not choose the companies or votes about which it renders advice; does not hold securities for its own account; and does not work at the behest of proponents or opponents of a ballot measure. *Id.* Indeed, ISS provides voting advice in a fiduciary capacity which means it is required by law to act solely in its clients' best interests—not its own. *Id.* at 3 (JA344).

**B.** Although proxy voting advice is not properly subject to regulation under the solicitation framework, it is comprehensively regulated under the Investment Advisers Act of 1940, which applies to those who "for compensation and as part of a regular business" issue "analyses [and] reports concerning securities." 15 U.S.C. §80b-2(a)(11); *see infra* Section II.A.

ISS has been registered as an investment adviser with the SEC since 1997 and is subject to the full sweep of regulations that govern investment advice. Most notably, ISS is subject to the same fiduciary duties, conflict-of-interest rules, and prohibitions on "fraudulent, deceptive,

or manipulative" acts that apply to other types of investment advisers such as retirement advisers and financial planners. *See id.* at §80b-6(4).

### III. From 1934 to 2019, proxy voting advice was not subject to the proxy solicitation regulations.

For the first 85 years of the Exchange Act's existence, there was no indication that the proxy solicitation regime would apply to independent voting advice provided to a paying client. Shortly after the Act was passed, the Commission adopted a narrow definition of "solicitation" that covered only a request, consent, authorization, or furnishing of a form of proxy. *See Securities and Exchange Commission Release Notice*, 1935 WL 29,270 (Sept. 24, 1935).

In 1956, the Commission expanded that definition to include the "furnishing of a form of proxy or other communication to security holders under circumstances reasonably calculated to result in the procurement, withholding or revocation of a proxy." *See* 17 C.F.R. §240.14a-1(*l*). The Commission explained that "statements made for the purpose of inducing security holders to give, revoke or withhold a proxy with respect to a matter to be acted upon by security holders of an issuer … by any person who has solicited or intends to solicit proxies … may involve a solicitation." *Amendments to Proxy Rules*, 21 Fed. Reg. 577 (Jan. 26, 1956).

In 1964, the Commission's General Counsel addressed whether voting advice from broker-dealers could constitute proxy solicitation. *See Broker-Dealer Participation in Proxy Solicitations*, 29 Fed. Reg. 341 (Jan. 15, 1964). This guidance stated that voting advice provided by brokers to investors could constitute a solicitation if the broker "goes beyond [his] advisory function" and "voluntarily" distributes solicitation-type material "to *persons who have not asked for it* whether they are his customers or not." *Id.* (emphasis added); *accord Union Pacific R.R. Co. v. Chicago & N.W. Ry. Co.*, 226 F. Supp. 400 (E.D. Ill. 1964) (finding solicitation where broker working with one suitor in a merger contest mass-distributed report favoring that suitor). Conversely, the opinion emphasized that a broker-dealer is *not* engaged in solicitation when he simply gives proxy voting advice "in his capacity as adviser to the customer." 29 Fed. Reg. at 341.

In 1979, the Commission adopted an explicit exemption from the proxy solicitation regulations for persons who render financial advice in the ordinary course of business and meet certain conditions. *See Shareholder Communications, Shareholder Participation In the Corporate Electoral Process and Corporate Governance Generally*, 44 Fed. Reg.

68,764, 68,767 (Nov. 29, 1979). The Commission titled its discussion of the exemption "Unsolicited Voting Advice Furnished by Financial Advisors," thereby reiterating that advisers engage in "solicitation" only when they disseminate voting advice to *persons who had not asked for it*. *Id.*

In 1992, the Commission announced additional reforms to ensure the solicitation rules would not inappropriately stifle shareholders' communications. 1992 Release, 57 Fed. Reg. 48,276. The Commission explained that Section 14(a)'s goal is to "prevent management or others from obtaining authorization for corporate action by means of deceptive or inadequate disclosure in proxy solicitations." *Id.* at 48,277 (quoting *J.I. Case v. Borak*, 377 U.S. 426, 431 (1964)). The Commission feared that the "literal breadth of the [1956] definition of solicitation was so great as potentially to turn almost every expression of opinion concerning a publicly-traded corporation into a regulated proxy solicitation," which would lead to a "distortion of the purposes of the proxy rules." *Id.* at 48,278.

To address those concerns, the Commission created a new exemption applicable to persons who do not seek proxy authority and whose only interest in the ballot proposal is a general interest as a shareholder. *See* 17 C.F.R. §240.14a-2(b)(1). In doing so, the Commission reaffirmed

that "compliance with the proxy rules is necessary only if the communication constitutes a proxy solicitation within the meaning of those rules." 57 Fed. Reg. at 48,279. The Commission also reaffirmed that "advice provided to clients on voting issues," including by "proxy advisory services" was *exempt* from the solicitation rules. *Id.* at 48,282 n.41.[1] And the Commission emphasized the importance of shareholders "having access to as many sources of opinions relating to voting matters as possible" without the "unnecessary costs" imposed by the proxy solicitation rules. *Id.* at 48,280.

---

[1] NAM suggests (at 14) that the existence of an exemption from the solicitation rules for voting advice was an "implicit classification" that proxy advisers do solicit votes. But until the agency actions challenged here, the Commission had never specifically held (or even discussed) whether proxy voting advice fell within the ordinary meaning of "solicit any proxy" under Section 14(a). Indeed, the Commission emphasized in the 1992 Release that one reason for adopting new exemptions was to give parties *up front* clarity about whether they were subject to the solicitation regime, not just after being "exposed to litigation" about whether their communications "will or will not be deemed to constitute a solicitation." 57 Fed. Reg. at 48,279.

## IV. The Commission adopts an unprecedented interpretation of Section 14(a) to regulate proxy voting advice as proxy solicitation.

### A. The Commission issues sub-regulatory "guidance" declaring that voting advice is now proxy solicitation.

In August 2019, the Commission, by a 3-2 vote, issued a purported "interpretation and guidance" that transformed the regulatory regime applicable to proxy voting advice. Proxy Guidance, 84 Fed. Reg. at 47,417 (JA39). The Proxy Guidance decreed—for the first time—that advice rendered by a proxy adviser in the course of a fiduciary relationship with its clients constitutes "solicitation." *Id.* at 47,417 & n.17 (JA39).

The Commission made no attempt to justify its new interpretation under the text, purpose, or history of Section 14(a). Rather, it asserted that the Proxy Guidance reflected existing law. The Commission reasoned that proxy advisers engage in solicitation because they "market ... their expertise in researching and analyzing proxy issues for purposes of helping clients make proxy voting determinations." *Id.* at 47,418 (JA40). It also asserted that proxy advice may be regulated as solicitation because "[t]he fact that proxy advisory firms typically provide their recommendations shortly before a shareholder meeting ... enhances the

likelihood that the recommendations are designed to … influence" share-holders' votes. *Id.*

Commissioner Lee dissented, arguing that the new interpretation would "create serious risks to our system of corporate democracy by adding cost, adding time pressure, and potentially compromising the independence of voting recommendations." *Statement of Comm'r Allison Herren Lee* (Aug. 21, 2019) (JA206-13).

On October 31, 2019, ISS brought suit in district court challenging the Proxy Guidance under the APA. *See* Dkt. 1 (JA13-42). ISS argued that the Proxy Guidance was contrary to law, arbitrary and capricious, and violated notice-and-comment requirements. *Id.* at ¶¶61-83 (JA31-36).

In November 2019, the Commission issued a notice of proposed rulemaking that would formalize the new interpretation of solicitation and impose several new restrictions on proxy advisers. *Amendments to Exemptions from the Proxy Rules for Proxy Voting Advice*, 84 Fed. Reg. 66,518 (Dec. 4, 2019) ("Proposed Rule") (JA232-73). Because the Proposed Rule implicated many of the same issues ISS raised in its challenge to

the Proxy Guidance, the district court stayed this case pending completion of the rulemaking. *See* Dkt. 14.

**B.    The Commission codifies the new definition of solicitation.**

On July 22, 2020, the Commission finalized its new regulatory scheme for proxy voting advice by a 3-1 vote (with one seat vacant). The Final Rule had three basic components.

First, the Commission formally rewrote the definition of proxy solicitation to include "proxy voting advice that makes a recommendation to a shareholder as to its vote, consent, or authorization on a specific matter" but only if that advice "is furnished by a person who markets its expertise as a provider of such advice, separately from other forms of investment advice, and sells such proxy voting advice for a fee." 85 Fed. Reg. at 55,091 (JA817). The Commission claimed that its new definition of solicitation was merely codifying the 1964 and 1979 releases, *see id.* at 55,093 (JA819), but it ignored altogether the fact that those sources limited "solicitation" to unprompted voting advice rendered to persons *who had not asked for it. See supra* 11-12.

Second, having redefined voting advice as proxy solicitation, the Final Rule amended the conditions under which voting advice may remain

exempt from the proxy rules' information-and-filing requirements. To maintain their exemption, the Final Rule required proxy advisers to share their reports and recommendations with corporate issuers and disseminate the issuers' "views" to their clients, even if those views were contrary to the proxy advisers' own analyses and recommendations. 85 Fed. Reg. at 55,107-12 (JA833-38).

Finally, the Commission expanded the scope of potential liability for proxy advisers by amending Rule 14a-9 to include examples of information that, if omitted from their proxy advice, could serve as the basis of anti-fraud claims against them. *Id.* at 55,121 (JA847).

The Commission's explanation for this overhaul of its proxy solicitation rules was tenuous, at best. Investors—the actual clients of proxy advisers and direct consumers of proxy voting advice—overwhelmingly *opposed* the changes.[2] Nearly all the support for the rules came from large, publicly traded companies and their representatives that, unsurprisingly, wanted to give more power to corporate management.

---

[2] *See*, *e.g.*, Comments of New York State Comptroller 1-3 (JA644-46); Ohio Public Employees Retirement System 2-3 (JA666-67); Colorado Public Employees Retirement System 3-6 (JA679-82); California Public Employees Retirement System ("CalPERS") 2-8 (JA690-97) (all comments regarding File No. S7-22-19).

Commissioner Lee again dissented, arguing that the Final Rule was "unwarranted, unwanted, and unworkable." *Statement of Comm'r Allison Herren Lee* (July 22, 2020) ("Lee Dissent") (JA798). She found any concerns about the "accuracy and soundness" of proxy voting advice to be "unwarranted" and emphasized that "there was almost universal opposition from investors, the supposed beneficiaries of this rulemaking." *Id.*

## C. Delays and amendments to the Final Rule.

The district court lifted its stay after the Final Rule was published, and ISS amended its complaint on September 18, 2020. *See* Dkt. 19. The amended complaint alleged that the Commission acted contrary to law by regulating proxy voting advice as proxy solicitation; that the Commission's new regulations were arbitrary and capricious; and that certain provisions of the new regulations compelled speech, in violation of the First Amendment. On October 15, 2020, NAM moved to intervene as a defendant, *see* Dkt. 27, and the district court granted permissive intervention, *see* Minute Order, July 27, 2022. The parties completed briefing on cross-motions for summary judgment in December 2020.

On June 1, 2021, with summary judgment motions still pending, the Commission—now under new leadership—moved to hold the case in abeyance to "consider whether the proxy rule amendments challenged by

[ISS] should be revisited through further rulemaking." Dkt. 53 at 1. The district court agreed to stay the case "until the earlier of December 31, 2021, or the promulgation of final rule amendments." Dkt. 56.

On November 17, 2021, the Commission proposed to "eliminat[e] the requirements that proxy advisory firms disclose their advice to corporate issuers and provide their clients with the issuers' responses," and the proposed "amendment to the anti-fraud provision, Rule 14a-9." Op.11 (JA179). But the Commission did not propose any changes to the provisions of the Final Rule that codified the new definition of "solicitation."

The district court later extended the stay through March 31, 2022, but declined further extensions, holding that "the case should move forward as to the claims challenging the definitional amendment, because the SEC had not proposed to withdraw proxy voting advice from the amended definition of 'solicit' and 'solicitation.'" Minute Order, Apr. 17, 2022.

In mid-July 2022, the Commission "rescinded the two conditions the agency had proposed to excise in November 2021." Op.12 (JA180). That action mooted ISS's challenges to the rescinded provisions and left only ISS's "challenges to the agency's definitional amendment of the

terms 'solicit' and 'solicitation' to include proxy voting advice by proxy advisory firms." *Id.*[3]

## V.   The District Court's decision.

On February 23, 2024, the district court granted ISS's motion for summary judgment and vacated the Commission's redefinition of proxy solicitation. The district court thoroughly reviewed the text, history, and structure of the Exchange Act and found that the Commission acted contrary to law by regulating independent proxy voting advice as proxy solicitation.

"Congress did not define the term 'solicit' in the Act" so the district court "look[ed] to the ordinary meaning of that term at the time of the Exchange Act's enactment, as well as the history and purpose of the statute." Op.19 (JA187). Based on an exhaustive survey of contemporaneous

---

[3] Further complicating things, NAM and others subsequently challenged the SEC's rescission of the exemption conditions requiring that proxy advisers disclose their advice to corporate issuers and disseminate the issuers' responses. Courts have split over whether the SEC's rescission was arbitrary and capricious. *Compare Nat'l Ass'n of Mfrs. v. SEC*, 105 F.4th 802 (5th Cir. 2024) (invalidating rescission), *with Chamber of Com. of United States v. SEC*, 115 F.4th 740 (6th Cir. 2024) (upholding rescission). But those decisions have no bearing on the resolution of this appeal, which solely addresses the threshold definition of solicitation. Because Judge Mehta correctly held that ISS does not engage in solicitation, ISS would not be subject to these additional exemption conditions even if they are reinstated.

dictionaries, the court found that "[i]n 1934, many dictionaries defined the term 'solicit' to mean some variant of endeavoring to secure an action or object from another by actively pleading or asking." Op.20 (JA188). Applying that ordinary meaning here, a proxy adviser "offers advice on *how* to vote, but it does not seek to obtain a proxy" nor does it "'vigorously importune' clients to vote in a certain way to benefit themselves." *Id.* at 24, 27 (JA192, 195).

The Commission "acknowledge[d] this common definition of 'solicit.'" Op.21 (JA189). But it insisted "that the term 'solicit' is inherently vague" and lends itself to "'competing, plausible interpretations.'" Op.18 (JA186). The Commission pointed to two other definitions of "solicit"— "to move to action," and "to urge (one's cause, point, etc.)"—that appeared in a single dictionary from 1934. Op.21 (JA189). But those alternate meanings were labeled as "*rare*." *Id.* The district court rejected the Commission's reliance on outlier definitions because "[t]hat a definition is broad enough to encompass one sense of a word does not establish that the word is *ordinarily* used in that sense." Op.22 (JA190) (citation omitted).

NAM offered additional definitions of "solicit," including "'serve as a lure to,' 'bring about,' 'attract,' and 'tempt,'" arguing that "'proxy voting advice serves as a lure to an investor to vote in a certain way; it tends to bring about a vote by attracting or tempting the shareholder.'" Op.25 (JA193). The district court disagreed, holding "NAM's alternative definitions either do not reflect the ordinary meaning of 'solicit' in 1934, or their meaning in context is a poor fit for describing proxy voting advice." *Id.*

In the alternative, NAM made the same argument it principally relies on here: that even if the ordinary meaning of "solicit" is "endeavor to obtain," proxy advisers "'endeavor[] to obtain' a vote in line with [their] recommendations." As "'proof positive'" for this theory, NAM "point[ed] out that Plaintiff has a practice of 'robo-voting,' in which it automatically casts votes for some clients." Op.26 (JA194). The district court found NAM's "robo-voting" theory to be both an "awkward" fit textually and barred by the *Chenery* doctrine because the Commission did not rely on this theory when setting forth the reasons for the Final Rule. Op.26-27 (JA194-95).

As to the purpose and history of the Exchange Act, the district court found that ISS had the better of the argument there, too. "Section 14(a)

stemmed from the congressional belief that fair corporate suffrage is an important right," and the law's purpose was to curb "'abuses which had frustrated the free exercise of the voting rights of stockholders.'" Op.30 (JA198) (quoting *Borak*, 377 U.S. at 431 (cleaned up)). Regulating proxy advisers—who are hired and paid by investors to help them navigate the voting process—under the solicitation regime "would seem to do little to advance these legislative purposes." *Id.*

In sum, "[b]y defining the terms 'solicit' and 'solicitation' in the proxy rules to include proxy voting advice for a fee, the SEC acted contrary to law and in excess of statutory authority." Op.34 (JA202) (cleaned up). The district court thus vacated the SEC's new definition of solicitation.

NAM and the Commission both timely appealed, *see* Dkt. 72 (JA204); Dkt. 74 (JA205), but the Commission subsequently dismissed its appeal, leaving NAM as the sole appellant defending the SEC's asserted statutory authority.

## SUMMARY OF ARGUMENT

The district court correctly held that the Final Rule and Proxy Guidance are contrary to law and in excess of statutory authority because

they rest on an interpretation of Section 14(a) of the Exchange Act that contravenes the statute's plain text and ordinary meaning.

In statutory interpretation cases, "[w]e start with the text." *Am. Clinical Lab. Ass'n v. Azar*, 931 F.3d 1195, 1204 (D.C. Cir. 2019). And here, the text of Section 14(a) is clear. The SEC can prescribe "rules and regulations" that apply when "any person … solicit[s] any proxy" regarding a security. 15 U.S.C. §78n(a).

Contemporaneous dictionaries show that the ordinary meaning of "solicit" when the Exchange Act was passed in 1934 was to plead, beg, beseech, importune, or "endeavor to obtain" something. Inherent in these definitions is the concept that the person "soliciting" necessarily has some goal or objective that the solicitation is designed to accomplish. In the context of shareholder votes, this means that someone "soliciting" is seeking to *obtain votes* for one side or the other.

Proxy voting advice is categorically distinct from proxy solicitation. ISS, as a registered investment adviser, owes fiduciary duties to its clients, which means it is required by law to act in *its clients'* best interests, not its own. ISS offers its clients an expansive array of voting policies that, by their very nature, analyze votable items under different—and

sometimes conflicting—criteria. Indeed, many of ISS's largest clients employ "custom" policies under which ISS makes voting recommendations tailored to that client's specific investment goals and strategy. It stretches the notion of solicitation beyond its breaking point to suggest that ISS is "soliciting" votes from its own clients who retain (and pay) ISS for independent advice based on criteria selected or developed by the clients themselves.

Statutory history and purpose confirm that it makes little sense to treat third-party proxy voting advice as proxy solicitation. Congress' goal in enacting Section 14(a) was to prevent management from entrenching itself or unscrupulous outsiders from seizing control through fraudulent or deceptive solicitation of votes. There is no indication whatsoever that Congress intended the solicitation regime to cover the relationship between investors and the advisers they specifically retain to provide independent advice about voting decisions.

In defending the SEC's unprecedented approach to solicitation, NAM gets one thing right: "This case presents a question of statutory construction" about "whether the SEC's definitional amendment regarding 'solicit' is consistent with the Exchange Act." NAM-Br. 37. But NAM's

primary response to this question is a slate of policy arguments loosely draped in the garb of statutory interpretation. NAM-Br. 22-36.

NAM's lead argument about so-called "robo-voting" is *Chenery*-barred several times over. The Commission not only did not rely on that theory to support its interpretation of solicitation but also affirmatively *rejected* attacks lodged by NAM and others about this routine voting service. NAM also proffers a hodgepodge of other theories about the "influence" of proxy advisers or their "interest" in shareholder votes. But none of NAM's baseless attacks on ISS can overcome the core flaw of the SEC's reasoning: that a third-party adviser retained and paid for its advice—*based on criteria chosen or designed by the clients*—is not in any sense of the word "soliciting" votes from its own clients.

Only deep into its brief does NAM finally turn to the meaning of solicitation. But its textual arguments fare no better than its policy arguments. NAM urges the Court to endorse "permissible-but-uncommon definition[s]" of solicitation, but Judge Mehta extensively addressed why "rare" definitions could not justify the SEC's position. And the handful of contemporaneous judicial opinions NAM cites—none of which were cited

by any party below—merely reference solicitation in passing and never purport to give an authoritative definition of that term.

NAM further asserts that the Commission has rulemaking authority to define "solicitation" as it deems appropriate. But, as the SEC well knows, "the mere reference to necessary or appropriate in a statutory provision authorizing an agency to engage in rulemaking" does not grant the agency carte blanche "to adopt regulations as it sees fit" notwithstanding statutory constraints on its actions. *N.Y. Stock Exch. v. SEC*, 962 F.3d 541, 554 (D.C. Cir. 2020).

Finally, NAM is flat wrong to suggest that ISS would "prefer not to be regulated at all" or that the district court's ruling would leave rogue voting advice unregulated. Proxy advisers like ISS are subject to comprehensive regulation under the Advisers Act, which imposes the highest fiduciary duties of care and loyalty on voting advice, including duties to act in the best interests of each client and to disclose and mitigate potential conflicts of interest. And NAM's suggestion throughout its brief that proxy voting advice is riddled with "errors and inaccuracies" was so thoroughly rebutted in the rulemaking record that the SEC itself declined to make any such finding in the Final Rule.

## STANDARD OF REVIEW

The APA requires federal courts to "hold unlawful and set aside agency action" that is "not in accordance with law" or "in excess of statutory jurisdiction." 5 U.S.C. §706(2). "[C]ourts, not agencies, will decide 'all relevant questions of law' arising on review of agency action—even those involving ambiguous laws—and set aside any such action inconsistent with the law as they interpret it." *Loper Bright Enters. v. Raimondo*, 144 S. Ct. 2244, 2261 (2024) (cleaned up). The Constitution "prescribes no deferential standard for courts to employ in answering those legal questions." *Id.*[4] This Court reviews a district court's decision that an administrative rule is contrary to law or in excess of statutory authority *de novo*. *See id.*

---

[4] *Loper Bright* was still pending when the district court issued its decision, but the court stated that the outcome here would have been the same either way since the statute unambiguously foreclosed the SEC's interpretation. Op.19 (JA187).

## ARGUMENT

I. **The district court correctly held that the Commission's attempt to regulate proxy voting advice as proxy solicitation was contrary to law.**

   A. **The Commission's classification of proxy voting advice as proxy solicitation is foreclosed by the plain text of Section 14(a).**

Because "an agency literally has no power to act … unless and until Congress confers power upon it," *La. Pub. Serv. Comm'n v. FCC*, 476 U.S. 355, 374 (1986), "[a]gency actions beyond delegated authority are '*ultra vires*' and courts must invalidate them," *Transohio Sav. Bank v. Dir., Off. of Thrift Supervision*, 967 F.2d 598, 621 (D.C. Cir. 1992). The "task [of] a reviewing court is not to assess the wisdom of [challenged] regulations, but rather to determine whether the [agency] has demonstrated that the regulations fall within the scope of its statutory grant of authority." *Verizon v. FCC*, 740 F.3d 623, 634-35 (D.C. Cir. 2014).

When assessing the validity of an agency action, "courts must exercise independent judgment in determining the meaning of statutory provisions." *Loper Bright*, 144 S. Ct. at 2262. "Supreme Court precedent emphatically establishes that courts must take statutory language at its word. Doing so requires courts to start with the statutory text, and to end there as well when, as here, the statute speaks clearly." *Allegheny Def.*

*Project v. FERC*, 964 F.3d 1, 18 (D.C. Cir. 2020) (en banc) (citation omitted).

Section 14(a) of the Exchange Act makes it "unlawful for any person … in contravention of such rules as the Commission may prescribe … to solicit or to permit the use of his name to solicit any proxy or consent or authorization in respect of any security." 15 U.S.C. §78n(a). There is no ambiguity about whether Congress authorized the Commission to regulate independent proxy voting advice through a statute that governs proxy "solicit[ation]." It did not.

"A fundamental canon of statutory construction is that, unless otherwise defined, words will be interpreted as taking their ordinary, contemporary, common meaning … at the time Congress enacted the statute." *Perrin v. United States*, 444 U.S. 37, 42 (1979). As the district court explained, "[i]n 1934, many dictionaries defined the term 'solicit' to mean some variant of endeavoring to secure an action or object from another by actively pleading or asking." Op.20 (JA188); *see also* The Concise Oxford Dictionary of Current English, 1150 (1931) (defining "solicit" as to "[i]nvite, make appeals or requests to, importune"); Black's Law Dictionary, 1639 (3d ed. 1933) ("[t]o ask for with earnestness, to make petition

to, to endeavor to obtain, to awake or excite to action, to appeal to, to invite").

Contemporaneous judicial decisions also embrace this plain meaning of "solicit." The Supreme Court of Ohio explained that "[t]he word solicit is defined in the standard dictionaries as meaning: 'to apply to for obtaining something;' 'to try to obtain;' 'to seek to acquire,' etc." *Kiefer v. State*, 106 Ohio St. 285, 290 (1922). The Illinois Supreme Court likewise observed that the "universally understood" definition of "solicit" is to "to make petition to, to entreat, importune" or to "endeavor to obtain by asking or pleading." *People v. Rice*, 383 Ill. 584, 588 (1943). And, as the district court explained, the California Court of Appeal held in 1914 that mailing letters offering alcoholic items for sale to residents of dry counties "constituted a 'solicitation' because they 'vigorously importuned' a person to make a purchase that would financially benefit the letter's sender." Op.24 (JA192) (citing *Golden & Co. v. Justice's Court of Woodland TP., Yolo County*, 140 P. 49, 58 (Cal. Ct. App. 1914)).

Putting all this together, a solicitor—one who "endeavors to obtain" something by "asking or pleading"—necessarily has a certain objective or goal (e.g., make a sale, win a vote, raise money for charity, etc.) and

engages in solicitation (e.g., asking or pleading) to *achieve* that objective. *Accord Initiative & Referendum Inst. v. U.S. Postal Serv.*, 417 F.3d 1299, 1314 (D.C. Cir. 2005) (defining "solicitation" as the "act or an instance of requesting or seeking to obtain something; a request or petition"). Reading Section 14(a) consistent with its ordinary, contemporaneous meaning, "solicit any proxy" thus refers to actions in which someone seeks to *achieve a certain outcome* in a shareholder vote by asking or pleading for votes.

The district court was exactly right that the common meaning of solicitation does not encompass "the act of advising a client on how to vote on corporate ballot measures." Op.24 (JA192). Proxy voting *advice* is fundamentally distinct from proxy *solicitation*. Independent proxy advisers like ISS provide advice, analysis, and recommendations to help inform their clients' decisions about how to vote. Those recommendations are based on criteria specified or chosen *by each client* based on *the client's* investment goals and objectives. *See supra* 7-9. Indeed, as a registered investment adviser, ISS owes its clients a fiduciary duty of loyalty, which means any advice it provides must be in *the client's* best interests, not ISS's. *See infra* 57-58.

If one described what ISS does to an ordinary speaker of English and asked them to sum it up in one word, the most frequent response would surely be *advise*. *Accord* Black's Law Dictionary (3d ed. 1933) (defining "advise" as "[t]o give an opinion or counsel, or recommend a plan or course of action"). Other responses may be words such as *counsel*, *recommend*, *assist*, or *guide*. But no one familiar with the English language (today or in 1934) would describe ISS as "soliciting" votes from its own clients, who retain and pay ISS for advice about how to vote based on criteria chosen by the client. *Advising* and *soliciting* are distinct concepts with distinct meanings. *Compare* Roget's 21st Century Thesaurus (3d ed. 2013) (synonyms for "solicit" include "seek," "beg," "beseech," "demand," "implore," "importune," "pray," and "supplicate"), *with id.* (synonyms for "advise" include "admonish," "point out," "recommend," "suggest," and "warn").

That ISS does not "solicit" votes is starkly illustrated by the undisputed fact that ISS routinely makes different recommendations about *the same vote* depending on the criteria selected by, and often customized by, each client. In a shareholder vote over whether a company should adopt carbon-reduction targets, ISS may recommend "YES" based on a policy

chosen by a mutual fund that prioritizes sustainability-based goals, but

"NO" based on a different policy chosen by a hedge fund that prioritizes

investments in carbon-intensive energy companies. It would be facially

absurd—and stretch the concept of "solicitation" beyond recognition—to

suggest that ISS is somehow "soliciting" votes both for and against the

same proposal. Yet that is the upshot of the SEC's new definition, which

the district court correctly recognized does not comport with how anyone

would actually use the word "solicit." "[A] proxy advisory firm offers ad-

vice on *how* to vote, but it does not seek to obtain a proxy." Op.27 (JA195).

## B. The history and purpose of the Exchange Act confirm that voting advice is not "solicitation" for purposes of the Act.

The plain meaning of "solicit any proxy" is sufficient to resolve this

case because it unambiguously forecloses the SEC's position. But the his-

tory and purpose of the Exchange Act remove all doubt. *See* Op.29-30

(JA197-98) (district court concluding that ISS "has the better" of purpose

and history arguments).

Congress enacted Section 14(a) to eliminate the kinds of abuses

that were deemed to have contributed to the stock market crash of 1929

and the Great Depression. Section 14(a) reflects Congress's belief that

"[a] renewal of investors' confidence in the exchange markets can be

effected only by a clearer recognition upon the part of the corporate managers of companies whose securities are publicly held of their responsibilities as trustees for their corporations." H.R. Rep. No. 73-1383, at 13.

Congress's goal in authorizing the Commission to regulate proxy solicitation was to prevent "the recurrence of abuses which have frustrated the free exercise of the voting rights of shareholders." *Id.* at 13-14. To that end, Congress was specifically concerned about two classes of individuals:

> It is contemplated that the rules and regulations promulgated by the Commission will protect investors from promiscuous solicitation of their proxies, on the one hand, by *irresponsible outsiders seeking to wrest control of a corporation* away from honest and conscientious corporation officials; and on the other hand, by *unscrupulous corporate officials seeking to retain control of the management* by concealing and distorting facts.

S. Rep. No. 73-1455 at 77 (emphasis added).

There is a clear risk of abuse when "irresponsible outsiders" or "unscrupulous corporate officials" engage in proxy solicitation in an attempt to sway the outcome of a shareholder vote. *Id.*; *see also Borak*, 377 U.S. at 431 (goal of Section 14(a) is to "prevent management or others from obtaining authorization for corporate action by means of deceptive or inadequate disclosure in proxy solicitation"). But it is positively backward

to say that a statute designed to protect investors from those seeking to entrench or take control of a company should be construed to protect them from *their own advisers* whom they retain to help understand shareholder votes.

### C.    NAM's counterarguments are unavailing.

#### 1.    "Robo-voting."

NAM's lead argument is that ISS solicits proxies "in the most literal sense" through what NAM calls "robo-voting." NAM-Br. 23-24. NAM claims that ISS "determin[es] how its client should vote" and then "automatically cast[s] the client's vote." *Id.* That contention is not properly before the Court, is factually inaccurate, and is meritless as a textual matter.

NAM's "robo-voting" theory is foreclosed by *SEC v. Chenery Corp.*, 318 U.S. 80, 93-95 (1943), because the Commission did not rely on it in finding that proxy advisers engage in "solicitation," *see* 85 Fed. Reg. at 55,091-96 (JA817-22) (SEC's rationale). NAM cannot justify the SEC's rule on grounds the Commission itself did not invoke. "Post-hoc rationalizations, developed for litigation are insufficient." *Ass'n of Civilian Technicians v. FLRA*, 269 F.3d 1112, 1117 (D.C. Cir. 2001); *see also New York v. EPA*, 964 F.3d 1214, 1225 (D.C. Cir. 2020) ("Because the agency did

not rest its decision on either of those bases, we reject both [of intervenor's] arguments.").

Indeed, NAM's "robo-voting" argument fares even worse than a garden-variety *Chenery* problem because the Commission *expressly rejected* requests by NAM and others to "require disabling or suspension of pre-populated and automatic submission of votes." 85 Fed. Reg. at 55,144 & n.671 (JA870) (cleaned up). As the Commission explained, "disabling these functions permanently under certain circumstances could increase costs for clients if they need to devote greater resources to managing the voting process as a result, which may in turn also reduce the value of the services of the proxy voting advice businesses." *Id.* at 55,144 (JA870). It is telling that NAM's lead argument is premised on attacking a service that even the Commission found to be helpful to clients and not worthy of additional regulation.[5]

---

[5] NAM's argument is also inconsistent with the Commission's actions elsewhere in the Final Rule. The Commission held that an adviser does *not* engage in solicitation to the extent it "is not providing any voting recommendations and is instead exercising delegated voting authority on behalf of its clients." 85 Fed. Reg. at 55,095 (JA821). NAM's position here would lead to the absurd result that a company exercising delegated authority to *actually vote its clients' shares* would not be deemed to solicit, while an adviser that merely makes recommendations that can be overridden by the client would be considered a solicitor.

In all events, what NAM ominously calls "robo-voting" is merely an administrative feature ISS offers its clients that assists with some of the operational aspects of proxy voting. ISS's ProxyExchange electronic voting platform enables (but does not require) investors to pre-populate their voting instructions based on criteria *chosen by the investors*. *See* ISS Comments at 2 (JA343). Critically, this tool also allows investors to flag votes for manual review, *override* any recommendation, and even change votes already cast up to the cut-off deadline. *Id.* ProxyExchange also includes sophisticated recordkeeping and reporting features to allow investors to study their past voting decisions. *Id.* at 2-3 (JA343-44).

NAM is thus wrong to suggest that investors must "go along with whatever the proxy firm decides" once they choose their initial criteria. NAM-Br. 24. The district court correctly explained that ISS's voting platform no more reflects solicitation than a situation where an attorney conveys her client's position to a court after obtaining instructions and authorization from the client to do so. Op.27 (JA195).

## 2.   Marketing.

NAM next contends that proxy advisers engage in solicitation because they "market themselves as experts" and "*offer* to give proxy voting advice." NAM-Br. 24-26; *see also* 85 Fed. Reg. at 55,095 (JA821) (SEC

endorsing similar theory); *id.* at 55,091 (JA817) (proxy adviser "markets its expertise as a provider of such [voting] advice").

But that theory is doubly flawed. First, it does not align with the text of Section 14(a), which applies only to persons who "solicit *any proxy*." To the extent a proxy adviser markets its expertise to potential clients, the adviser may be soliciting new *business* or *clients* but is not soliciting "any proxy" (i.e., is not asking or pleading for votes in contested ballot measures).

Second, even if NAM were correct that ISS "solicits" business by marketing to new clients, nothing in the Final Rule took issue with—or sought to regulate—*that* specific aspect of the business. The Final Rule sought to impose new restrictions only on *voting advice itself*, not how proxy advisers market or advertise their services to prospective clients. *See* 85 Fed. Reg. at 55,098-115 (JA824-41) (discussing new exemption conditions). Moreover, any such client marketing *is* regulated by an antifraud marketing rule under the Advisers Act, which is the proper regulatory umbrella for voting advice. *See* 17 C.F.R. §275.206(4)-1; *infra*. 57-63.

### 3. Influence.

NAM further asserts that proxy advisers engage in solicitation because their advice is "persuasive" and can "'influence' a shareholder vote." NAM-Br. 27-32; *see also* 85 Fed. Reg. at 55,092 (JA818) (SEC stating that proxy advisers "solicit[] a proxy by influencing a shareholder to act"); *id.* at 55,088 & n.76 (JA814).

Those theories, too, remain unmoored from the plain meaning of "solicit." There is no question a proxy adviser's recommendations might "influence" the decisions of its investor-clients. Why else would the investors hire the proxy adviser? But the fact that the adviser's recommendations might *influence* the voting decision does not convert that recommendation into a *solicitation* of votes in support of one side or the other.

Again, consider the routine situation in which ISS offers different advice about the same vote depending on the criteria chosen or customized by each client. There, ISS's advice might influence some investors to vote yes and others to vote no, but it would be nonsensical to say that ISS is "soliciting" votes both for and against the same proposal. NAM's fixation on voting outcomes suggests that its true grievance is with the content of the advice ISS provides rather than the legal question of whether

it is "soliciting" votes. *E.g.*, NAM-Br. 29 (complaining that proxy advisers purportedly "offer one-size-fits-all recommendations").

NAM and its amici argue that "[t]hose who advise shareholders on how to vote their proxies 'solicit' those proxies under any understanding of the term." Chamber Br. 23; *see also* NAM-Br. 27 (adviser solicits if it "propose[s] a certain action" and "provide[s] the reasons why"). But that theory goes beyond even the SEC's conception of solicitation and is thus *Chenery*-barred. The new definition of solicitation in the Final Rule does *not* apply to advisers who may "discuss their views on proxy voting" in connection with "portfolio management services or other common investment advisory services." 85 Fed. Reg. at 55,091 n.124. Instead, the Final Rule carves out and targets as solicitors only those who offer voting advice "separately from other forms of investment advice." *Id.* at 55,091.

Relatedly, NAM's "influence" argument proves too much. Imagine that during a contested vote over a corporate takeover, a large investor in the target company retains a business valuation expert to help advise it about how to vote. The valuation firm carefully researches and studies the proposed transaction and concludes: "This is a great deal with tremendous value to unlock. I recommend that you vote for it." That advice

may well be *persuasive* and will certainly *influence* the investor's vote but no one familiar with the English language would say the valuation expert was *soliciting* the vote of the client that retained and paid the firm for its advice.

Finally, if Congress wanted the Commission to have plenary authority to regulate any communication that might *influence* a shareholder vote, the language of Section 14(a) would have been an exceedingly odd way to confer such authority. *See, e.g.*, *NLRB v. S.W. Gen., Inc.*, 580 U.S. 288, 300 (2017) (rejecting textual argument where Congress "could easily have chosen clearer language" to achieve such a result); *Knight v. Comm'r*, 552 U.S. 181, 188 (2008).

Consider Section 10(b) of the Exchange Act, which prohibits any person from employing "*in connection with* the purchase or sale of any security … any manipulative or deceptive device or contrivance …." 15 U.S.C. §78j(b) (emphasis added). Congress could have easily crafted Section 14(a) to grant the Commission comparable authority to regulate manipulative or deceptive practices "*in connection with*" any shareholder vote. Instead, however, Congress limited the Commission's authority under Section 14(a) to persons who "solicit any proxy." That intentional

choice of language must be given effect. *See Sierra Club v. EPA*, 551 F.3d 1019, 1028 (D.C. Cir. 2008) (agency "'may not construe [a] statute in a way that completely nullifies textually applicable provisions meant to limit its discretion'").

### 4. Silence plus rulemaking authority.

The SEC never argued below that Section 14(a) *unambiguously* supported its new definition of proxy solicitation. At most, it asserted that Section 14(a) *did not foreclose* its position and asked for *Chevron* deference. *See*, *e.g.*, SEC SJ Mot., Dkt. 35-1 at 21 (JA144) (arguing that Congress "did not speak" to the "precise question" of the meaning of solicitation).

NAM argues that the SEC was not limited to the "otherwise ordinary meaning" of solicitation. NAM-Br. 39-43. Put differently, NAM suggests that Congress wrote a provision forbidding "any person" from doing *something* regarding proxy voting and then handed the pen to the SEC to fill in the blank. *See* NAM-Br. 40-41; *id.* 45-46 (arguing that Congress delegated the Commission "broad authority" to "prescribe rules and regulations to govern proxy solicitations as necessary or appropriate in the public interest and to protect investors").

But that is no answer to the fundamental problem with the Commission's textual theory: even this grant of rulemaking authority is contained within a provision that limits its coverage to persons who "solicit any proxy." 15 U.S.C. §78n(a)(1). That necessarily reflects a constraint on the agency's authority. As this Court previously reminded the Commission, "the mere reference to 'necessary' or 'appropriate' in a statutory provision authorizing an agency to engage in rulemaking does not afford the agency authority to adopt regulations as it sees fit." *N.Y. Stock Exch.*, 962 F.3d at 554. "[T]hat an agency has broad authority in a realm does not give it license to ignore Congress's specific directions or restrictions on its authority." *Ramirez v. U.S. Immigr. & Customs Enf't*, 338 F. Supp. 3d 1, 29 (D.D.C. 2018).

Moreover, even if NAM and the Commission were right that the Exchange Act is merely *silent* about proxy voting advice, statutory silence is not an "implicit delegation[] to agencies" to regulate however they see fit, nor does an agency's "discretionary authority" to administer a statute relieve it of its obligation to "exercise [that] discretion consistent with the [law]." *Loper Bright*, 144 S. Ct. at 2265, 2268. Resolving the scope of that authority "involves legal interpretation. That task does not suddenly

become policymaking just because a court has an 'agency to fall back on.'" *Id.* at 1268. "Were courts to presume a delegation of power absent an express withholding of such power, agencies would enjoy virtually limitless hegemony, a result plainly out of keeping with" Supreme Court precedent "and quite likely with the Constitution as well." *Atl. City Elec. Co. v. FERC*, 295 F.3d 1, 9 (D.C. Cir. 2002); *see also Merck & Co., Inc. v. U.S. Dep't Health & Human Servs.*, 385 F. Supp. 3d 81, 92 (D.D.C. 2019) ("[a]n agency's general rulemaking authority plus statutory silence" does not "equal congressional authorization").

NAM further contends that Section 14(a) must be construed "broadly" to achieve its "remedial purpose." NAM-Br. 50-51. But the Supreme Court has unanimously described the remedial-construction canon as "that last redoubt of losing causes," emphasizing that courts "have no right to play favorites" between the two sides to a dispute and may not "add features [to a statute] that will achieve the statutory 'purposes' more effectively." *Dir., Off. of Workers' Comp. Programs v. Newport News Shipbuilding & Dry Dock Co.*, 514 U.S. 122, 135-36 (1995); *see also Aaron v. SEC*, 446 U.S. 680, 695 (1980). A reviewing court must give a "fair reading" to statutory text, not a reading in favor of one party or the other

based on purported statutory purposes. *Encino Motorcars, LLC v. Navarro*, 584 U.S. 79, 89 (2018).

At bottom, the district court correctly held that "the ordinary meaning of the statutory text controls, and it cannot be overcome by a broad grant of rulemaking authority." Op.31 (JA199) (quoting *Aid Ass'n for Lutherans v. U.S. Postal Serv.*, 321 F.3d 1166, 1174 (D.C. Cir. 2003)).

### 5. "Permissible-but-uncommon" definitions.

Like the Commission in the Final Rule, NAM proffers alternative definitions of solicitation that it describes as "permissible-but-uncommon." NAM-Br. 41-42. For example, NAM argues that "solicit" could also mean "[t]o move to action," to "urge," and to "insist upon." NAM-Br. 43-44; *see also* 85 Fed. Reg. at 55,092 & n.137 (JA818). But, as the district court explained, contemporaneous dictionaries labeled such definitions "rare." Op.21-22 (JA189-90); *see* Webster's New International Dictionary (2d ed. 1934). The relevant definitions that Webster's does *not* list as "rare" are the exact ones cited by the district court in assessing the ordinary meaning of "solicit," including "make petition to," "entreat," "importune," "approach with a request or plea," "endeavor to obtain by asking or pleading."

In all events, Supreme Court precedent is clear that a word with a well-established meaning does not become ambiguous just because the agency can find one alternative definition that might support its position if you squint hard enough. *See*, *e.g.*, *MCI Telecomms. Corp. v. Am. Tel. & Tel. Co.*, 512 U.S. 218, 225-227 (1994) ("Most cases of verbal ambiguity in statutes involve … a selection between accepted alternative meanings shown as such by many dictionaries," not "a meaning set forth in a single dictionary" that is inconsistent with "virtually all other dictionaries.").

NAM declares that the district court "was wrong to rely on dictionary usage notes" in rejecting certain definitions as "rare." NAM-Br. 44 n.3. NAM cites two cases in support of this notion. Its first citation quotes language that comes from a *dissenting* portion of an opinion that argued—unsuccessfully—that courts may not adopt a narrow definition of a word "just because a dictionary indicates that the narrower meaning is the more common one." *Regions Bank v. Legal Outsource PA*, 936 F.3d 1184, 1214 n.20 (11th Cir. 2019) (Rosenbaum, J., concurring in part and dissenting in part). The majority in *Regions Bank* held, as Judge Mehta did here, that it would be inappropriate to rely on rare definitions that "push the bounds of ordinary usage." *Id.* at 1191.

NAM also cites *Taniguchi v. Kan Pac. Saipan, Ltd.*, for the proposition that a less common definition may "control" if Congress "indicates that it does." 566 U.S. 560, 568 (2012). Absent such a statement from Congress, however, courts should not adopt a definition—like the ones proffered by the Commission and NAM here—where the relevant dictionary "expressly designated that meaning as obsolete." *Id.*

NAM attempts to bolster its textual arguments with citations to seven judicial opinions from the 1930s that purportedly treat solicitation as synonymous with "advising" or "suggesting." NAM-Br. 44-45. NAM and the SEC cited none of those cases in their 140 combined pages of summary judgment briefing (or in the 74-page Final Rule). For good reason. Not one of the cited cases involved the interpretation of "solicit" in a statute or attempted to parse the best meaning of that word. Those courts' passing references to solicitation do not remotely suggest that advice provided by a retained third-party adviser would be described—in either common parlance or a legal sense—as "solicitation" of its own clients.

### 6.   Acquiescence/ratification.

NAM suggests (at 47-49) that Congress has acquiesced in and/or ratified its preferred interpretation of solicitation, but the district court

properly rejected those arguments. *See* Op.32-33 (JA200-01). As explained above, it was not until 2019 that the Commission first explicitly stated that fiduciary proxy voting advice can constitute solicitation. *See supra* 10-15.

Regardless, claims of congressional acquiescence must be approached "with extreme care." *Solid Waste Agency of N. Cook Cnty. v. U.S. Army Corps of Eng'rs*, 531 U.S. 159, 169 (2001). After all, Congress's failure to override an agency interpretation "frequently betokens unawareness, preoccupation, or paralysis." *Citizens for Responsibility & Ethics in Washington v. FEC*, 316 F. Supp. 3d 349, 410 n.47 (D.D.C. 2018), *aff'd*, 971 F.3d 340 (D.C. Cir. 2020). "[T]he silence of a later Congress says nothing about the intent of the earlier Congress that spoke directly to the question here at issue." *First Nat'l Bank & Tr. Co. v. Nat'l Credit Union Admin.*, 90 F.3d 525, 530 (D.C. Cir. 1996).

NAM also makes a convoluted argument (at 48-49) that Congress somehow ratified the Commission's interpretation of Section 14(a) when it made various other amendments to the Exchange Act, including adding the phrase "solicit any proxy" to Section 14(h) in 1993. But, once again, there is no "uniform interpretation by the lower courts or the responsible

agency" to justify treating those amendments as implicitly enacting the interpretation urged by NAM. *See* Antonin Scalia & Bryan A. Garner, Reading Law 324 (2012); *see also Lamar, Archer & Cofrin, LLP v. Appling*, 584 U.S. 709, 721-22 (2018) (reenactment canon applies only to "longstanding" and "settled" interpretations). NAM cites nothing in the text or history of any of the cited statutory amendments to suggest that Congress was contemplating proxy voting advice *at all*—or was even aware of the Commission's purported interpretations—at the time it made the cited amendments.

### 7.    Interest in the outcome.

Finally, NAM argues that a proxy adviser can solicit votes even if it is "agnostic about ballot outcomes," and that the district court erred by holding that the solicitor must have "an interest in the outcome" of a vote. NAM-Br. 52-57.

That argument overlooks the central inquiry and misunderstands the district court's analysis. The district court correctly recognized that the word "solicit" necessarily contemplates a *goal* or *object* being solicited. *E.g.*, Black's Law Dictionary, *supra*, ("to endeavor to obtain"); *see Initiative & Referendum Inst.*, 417 F.3d at 1314 ("requesting or seeking to obtain something"). One does not "solicit" with no aim or purpose, and no

one would ever use the word to describe that situation. Instead, one so-licits (e.g., asks, pleads, begs) to *obtain* or *achieve* something. Whether one is soliciting a shareholder's vote, a charitable contribution, a sale of a product, or something illegal, the solicitor necessarily has a predeter-mined goal he is seeking to achieve.

Like the SEC, NAM misses the point by suggesting that ISS (and the district court) are endorsing a test that turns on "the speaker's sub-jective intent." NAM-Br. 53; *accord* 85 Fed. Reg. at. 55,092 (JA818) (claiming solicitation does not turn on one's "subjective intent to obtain a proxy, but rather the effect on a [shareholder's] proxy vote"). The unam-biguous meaning of solicitation requires the solicitor to have a goal or objective he or she is seeking to achieve. *See supra* 29-34. That core mean-ing is unchanged regardless of whether the inquiry is "objective" (would a reasonable person think this was solicitation?) or "subjective" (did this particular person intend to engage in solicitation?). The district court cor-rectly recognized that it "blinks reality" to endorse a concept of

solicitation that does not consider the alleged solicitor's "interest and motivation." Op.29 (JA197).[6]

NAM cites *Long Island Lighting Co. v. Barbash*, 779 F.2d 793 (2d Cir. 1985), but that case provides no help for its position. In *Long Island Lighting Co.*, the Second Circuit held that a shareholder who "initiated a proxy contest" to *elect his preferred slate of directors* remained covered by the proxy rules even though he was engaging in solicitation through public advertising rather than direct communication with shareholders. The court explained that the proxy rules "apply not only to direct requests to furnish, revoke or withhold proxies, but also to communications which may indirectly *accomplish such a result* or constitute a step in a chain of communications designed ultimately to *accomplish such a result*." *Id.* at

---

[6] NAM suggests (at 57-58) that interpreting solicitation in accordance with its plain meaning would jeopardize other aspects of the proxy solicitation rules, e.g., those regarding securities held in "street name." This argument should be viewed with skepticism given that *the Commission* did not believe any such concerns were weighty enough to pursue its own appeal. Regardless, the "street name" rules merely ensure that proxy materials are delivered to the actual beneficial owners of securities when a broker-dealer holds securities on behalf of its customers. *See*, *e.g.*, *Walsh & Levine v. Peoria & E.R. Co.*, 222 F. Supp. 516, 519 (S.D.N.Y. 1963). That unique situation, involving a separation of legal ownership and beneficial ownership, would be unaffected by a holding that a fiduciary investment adviser does not "solicit" votes from its own paying clients.

796 (emphasis added). If anything, the court's reasoning undermines NAM's position, as it makes clear that proxy solicitation—whether direct or indirect—must be designed to "accomplish" a certain "result." *Accord* Op.28-29 (JA196-97) (discussing *Long Island Lighting Co.*).

NAM proffers the example of an amicus in support of neither party as someone who solicits despite having no interest in the outcome. NAM-Br. 55. But there is no question that such an amicus still has an *objective* or *goal*: to get the court to adopt its view of the law. A better analogy for a proxy adviser is a court-appointed expert. Consider a case involving an insanity plea where the court orders an independent psychiatric evaluation to determine whether the defendant is competent to stand trial. The psychiatrist will study and analyze the issues and give the court advice and recommendations about how to proceed. But no one would reasonably say that the court is being *solicited* by the expert it selected and retained to provide independent analysis and guidance.

In the alternative, NAM argues that even if solicitation requires an objective, "proxy firms *do* sometimes have a horse in the race" in shareholder votes. NAM-Br. 32-37. NAM accuses ISS of having conflicts of interest between its consulting business and its advisory business and

alleges that ISS "implicit[ly]" suggests "that a company engaging ISS as a consultant will earn better ISS ratings." *Id.* at 32.

There are several flaws with this theory. The rulemaking record contains ISS's point-by-point response to allegations of conflicts of interest. *See* ISS Comments at 31-37 (JA381-87). ISS's clients similarly emphasized that "[w]e see no evidence that conflicts of interest with proxy advisors have led to voting advice that conflicts with our voting policies." CalPERS Comments at 4 (JA672).

As NAM concedes (at 33), ISS has a firewall between its advisory and its consulting businesses that involves "physical and functional separation" to "keep the ISS Global Research team from knowing the identity of [consulting] clients, thereby ensuring the objectivity and independence of ISS's research process and vote recommendations." ISS Comments at 32. This is not just "self-regulation" as NAM asserts. NAM-Br. 33-34. As a registered investment adviser, ISS is required to maintain comprehensive policies and procedures designed to disclose and mitigate any potential conflicts of interest, and it is subject to remedial action by the Commission if it fails to do so. *See infra* 57-61.

NAM further asserts that ISS has an interest in the outcome of shareholder votes because it "benefits when its clients follow its voting advice" which makes its advice "more potent" and "more valuable." NAM-Br. 33. But the same can be said of any business whose success depends on gaining clients' trust. Doing a good job such that clients are more likely to follow one's advice cannot magically transform fiduciary voting advice into a solicitation of votes.

NAM's argument that ISS "benefits when its clients follow its voting advice" also runs headlong into the sheer diversity of policies and criteria under which ISS analyzes votes. In addition to its benchmark and thematic policies—each of which employs distinct criteria to analyze ballot measures—ISS implements more than 400 *custom* voting policies that are tailored to each client's specific goals and priorities. ISS Comments at 1. On matters ranging from executive compensation to sustainability to good corporate governance to labor- or faith-based priorities, ISS's clients have voting interests that span the full spectrum—and can be diametrically at odds with each other.

For example, in a shareholder vote urging a healthcare company to report on its abortion-related activities, ISS may advise a Catholic

university's endowment fund to vote "YES" but a non-religious university's endowment to vote "NO." Does NAM think ISS has an "interest" in both sides of that ballot measure? As a fiduciary investment adviser, ISS's role is not to pursue its own "ideological" agenda, NAM-Br. 34, but to offer advice and guidance based on criteria chosen or selected by its clients.

The district court was correct that, contrary to NAM's arguments here, no part of the SEC's "definitional amendment" turned on proxy advisers having an "interest" in the outcome of a vote. Op.27 (JA195). In one footnote, the Commission *agreed* that "it may be true in many instances" that proxy advisers "do not have an interest in the outcome of matters being voted upon." 85 Fed. Reg. at 55,093 n.141 (JA819). The Commission stated that this was not "necessarily" true and may not "always" be the case. But given undisputed evidence regarding the sheer diversity of ISS's policies, clients, and voting criteria—and the undisputed fact that ISS routinely offers different advice about the same votes—the Commission's hedging hardly gives rise to an inference that ISS "solicits" votes under the proper meaning of that term.

## II. NAM's arguments about an alleged regulatory gap or deficiencies with proxy voting advice are baseless.

### A. Proxy voting advice is comprehensively regulated under the Advisers Act.

NAM's suggestion that "ISS would rather not be regulated at all" and that the district court's decision would have "dire consequences" strains credulity. NAM-Br. 3, 56; *accord* Chamber Br. 1 (asserting that proxy advisers are the "least regulated ... parties involved in the shareholder voting process"). The fact that proxy voting advice cannot be regulated under the solicitation framework hardly means it lacks regulatory oversight. Quite the opposite. Regardless of the outcome of this case, ISS is—and will remain—subject to comprehensive regulation under the Investment Advisers Act of 1940.

**1.** The Advisers Act establishes a federal fiduciary standard of conduct for investment advisers based on equitable principles of common law. *See SEC v. Capital Gains Rsch. Bureau, Inc.*, 375 U.S. 180, 191-92 (1963). The Act defines an "investment adviser" broadly as "any person who, for compensation, engages in the business of advising others, either directly or through publications or writings, as to the value of securities, ... or who, for compensation and as part of a regular business, issues or promulgates analyses or reports concerning securities." 15 U.S.C. §80b-

2(a)(11). The Act's standards apply to all parties who meet the definition of an investment adviser, regardless of the type of advice they render, unless a statutory exclusion applies. *See* 15 U.S.C. §80b-6; *Commission Interpretation Regarding Standard of Conduct for Investment Advisers*, 84 Fed. Reg. 33,669, 33,670-71 (July 12, 2019) ("Fiduciary Standard Release"); *Transamerica Mortg. Advisors, Inc. v. Lewis*, 444 U.S. 11, 17 (1979).

The Advisers Act's fiduciary standard of conduct entails duties of care and loyalty. The duty of care obliges ISS to render advice "in the best interest of its client, based on the client's objectives." *See* 84 Fed. Reg. at 33,671. And the duty of loyalty requires ISS to make "full and fair disclosure of all material facts relating to the advisory relationship," *id.* at 33,676, and "eliminate or at least to expose, all conflicts of interest which might incline [the] adviser—consciously or unconsciously—to render advice which [is] not disinterested," *id.* at 33,670.

The Advisers Act also establishes an antifraud standard that makes it unlawful for ISS "to employ any device, scheme, or artifice to defraud any client or prospective client," or "to engage in any transaction, practice, or course of business which operates as a fraud or deceit upon

any client or prospective client." 15 U.S.C. §80b-6 (1)-(2). Under that standard, ISS must "disclose material facts to his clients whenever the failure to do so would … operate as a fraud or deceit upon any client or prospective client." *Applicability of the Investment Advisers Act to Financial Planners, Pension Consultants, and Other Persons Who Provide Investment Advisory Services as a Component of Other Financial Services,* 52 Fed. Reg. 38,400, 38,404 (Oct. 16, 1987).

A person who violates the Advisers Act is subject to a wide range of SEC enforcement actions, including injunctions, civil monetary penalties, and disgorgement. *See* 15 U.S.C. §80b-9(d)-(e). And, as the district court recognized, "[a] proxy advisory firm that deceives a client or fails to act in a client's interests presumably is subject to common law torts, including malpractice and fraud." Op.31 (JA199).

**2.** The Commission has long recognized that the Advisers Act encompasses proxy voting advice. In 2003, the Commission adopted a new Advisers Act anti-fraud rule for proxy voting. *See* 17 C.F.R. §275.206(4)-6. In doing so, the Commission confirmed that an adviser is subject to the Advisers Act's anti-fraud provision even if it merely makes

voting recommendations (instead of casting votes directly). *Proxy Voting by Investment Advisers,* 68 Fed. Reg. 6,585, 6,587, n. 11 (Feb. 7, 2003).

In 2010, the Commission reaffirmed the applicability of the Advisers Act's fiduciary standards to proxy advisers like ISS, emphasizing that proxy advisers "meet the definition of investment adviser because they, for compensation, engage in the business of issuing reports or analyses concerning securities and providing advice to others as to the value of securities." *Concept Release on the U.S. Proxy System*, 75 Fed. Reg. 42,982, 43,010 (Jul. 22, 2010). Proxy advisers "provide analyses of shareholder proposals, director candidacies or corporate actions and provide advice concerning particular votes in a manner that is intended to assist their institutional clients in achieving their investment goals with respect to the voting securities they hold." *Id.* The Commission further reiterated that a proxy adviser, like all investment advisers, must eliminate or disclose potential conflicts of interest and "make a reasonable investigation to determine that it is not basing its recommendations on materially inaccurate or incomplete information." *Id.* at 43,011-12; *see also* Fiduciary Standard Release, 84 Fed. Reg. at 33,674 n.40.

ISS has been registered with the SEC as an investment adviser for almost thirty years. As such, ISS is subject to the Advisers Act's fiduciary principles, anti-fraud provisions, and related rules including rules governing the marketing of advisory services, *see* 17 C.F.R. §206(4)-1, and a rule requiring the implementation of a comprehensive regulatory compliance program, *id.* §206(4)-7.

**3.** Remarkably, NAM and most of its amici ignore the Advisers Act altogether. The only amici who do mention the Act concede ISS is a registered investment adviser but assert that the Act is inadequate to regulate proxy voting advice. *See* Former SEC Officials Br. 22-25. At the outset, those arguments should be viewed with skepticism given the SEC's absence. If the district court's decision actually left a regulatory void, one would expect the Commission to be the party raising it. But the Commission is nowhere to be found.

Amici's suggestion that the Advisers Act is inadequate also fails on its own terms. Amici argue that one of ISS's competitors (Glass Lewis) may attempt to rely on the "publisher" exclusion from the Advisers Act. That exclusion applies to "the publisher of any bona fide newspaper, news magazine or business or financial publication of general and regular

circulation." 15 U.S.C. §80b-2(a)(11)(D). Critically, however, the publisher exclusion applies only to firms that render *impersonal* advice not tailored to any particular client. *See Lowe v. SEC*, 472 U.S. 181 (1985). The publisher exclusion thus does not apply to any proxy adviser—including ISS and Glass Lewis—that renders advice based on a client's custom policies, which are neither "impersonal" nor of "general ... circulation." *See* Glass Lewis Comments, File No. S7-22-19 at 3 (JA702) (noting that "a significant majority of Glass Lewis' clients have their own custom voting policies").

Nor is it relevant that not all proxy advisers are registered investment advisers. The SEC acknowledged in its proposed rules that three of the five "major" proxy advisers are registered with the Commission as investment advisers. *See* 84 Fed. Reg. at 66,543. As to the others, "[i]f a person meets the definition of 'investment adviser' ... such person has a fiduciary duty to clients, regardless of whether the adviser is registered or required to be registered, and thus is liable under the anti-fraud provisions of the Advisers Act." *Investment Adviser Marketing*, 86 Fed. Reg. 13,024, 13,051, n.327 (Mar. 5, 2021); s*ee also* Concept Release, 75 Fed. Reg. at 43,010; *SEC v. Saltzman*, 127 F. Supp. 2d 660, 668 (E.D. Pa. 2000)

(SEC adequately pled that unregistered person acted as an investment adviser and was thus subject to Section 206). Regardless, if the Commission had concerns about any proxy adviser not being registered, the proper solution would be to make that company register—not to shoehorn all such advisers, including those already registered with the Commission as investment advisers, into the ill-fitting and textually inapplicable solicitation framework.

## B. There is no evidence that errors or inaccuracies in proxy advice are common or widespread.

NAM suggests throughout its brief that proxy advisers need to be regulated under Section 14(a) because they offer "unreliable" advice that is based on "errors and methodological flaws." NAM-Br. 12; *see also id.* at 2, 4, 13-14, 30, 51. This argument, too, is *Chenery*-barred. In its proposed rules, the Commission suggested that more regulation of proxy advice may be needed due to "errors and inaccuracies." 84 Fed. Reg. at 66,520, 66,528 (JA234, JA242). But that allegation was so thoroughly debunked that the Commission ultimately conceded in the Final Rule that research about "the quality of voting advice" provided by proxy advisers was "inconclusive." 85 Fed. Reg. at 55,125 (JA851).

The Council of Institutional Investors and others comprehensively analyzed allegations of so-called "errors and inaccuracies" and found them to be "unfounded and misleading." CII Letter re Data Analysis, 1 (Feb. 4, 2020) (JA778); *see also* CII Comments at 20-24, 46-47 (JA296-300, 322-23); Florida State Board of Administration Comments at 3-4 (JA504-05) (pension fund has "not encountered a single error that was … significant"); ISS Comments at 38-42 (JA388-92). The Council's analysis of the public record found "a factual error rate on a report basis of 0.057 to 0.123%." CII Comments at 4 (JA280). Moreover, although NAM and others have suggested that proxy advisers are insufficiently attentive to management's views, proxy advisers make recommendations favoring management approximately 85% of the time. *See* CalPERS Comments at 2-3, 5 (JA690-91, 693).

Indeed, much of what NAM and its allies call "errors or inaccuracies" merely "reflected a disagreement with the opinions reached by ISS and/or the methodological framework(s) used by ISS to analyze the issues at hand." ISS Comments at 41 (JA391). For example, one of the "methodological weaknesses" alleged by Exxon merely involved "a different

perspective" about "how executive pay should be analyzed." ISS Comments at 22 (JA372).

Finally, in addition to comprehensive SEC regulation of investment advice, ISS and other proxy advisers face significant market discipline. Nothing requires an investor to retain a proxy adviser. If an investor is not satisfied with the advice ISS is providing, it can choose another adviser or use in-house resources to analyze how to vote its shares. *See* CII Comments at 5 (JA281) (the Commission "seems to entirely ignore the value of market-based solutions").

ISS's institutional investor clients are some of the largest and most sophisticated entities in the financial markets. The fact that they continue to hire ISS notwithstanding NAM's false allegations of "errors and inaccuracies" shows that these investors derive considerable value from the advice ISS provides—and that the SEC's entire rulemaking here was a solution in search of a problem. *See* Lee Dissent (JA799) (noting that "there was almost universal opposition from investors, the supposed beneficiaries of this rulemaking"). Even the Commission's own Investor Advocate questioned the need for these rules, emphasizing that "the prevailing view of institutional investors … is that the proxy advisory firms

perform essential services relatively well, and that there is no market failure warranting further regulatory intervention." Rick A. Fleming, SEC Investor Advocate, Report on Activities for FY 2019 at 5 (Dec. 19, 2019), bit.ly/4gZj5xK.

## CONCLUSION

The judgment of the district court should be affirmed.

Mari-Anne Pisarri
PICKARD DJINIS AND PISARRI LLP
1818 N Street NW, Suite 515
Washington, DC 20036
(202) 223-4418
map@pickdjin.com

Jeffrey M. Harris
James F. Hasson
CONSOVOY MCCARTHY PLLC
1600 Wilson Boulevard, Suite 700
Arlington, VA 22209
703) 243-9423
jeff@consovoymccarthy.com

April 3, 2025

*Counsel for Appellee*

## CERTIFICATE OF COMPLIANCE

This brief complies with Rule 32(a)(7) because it contains 12,997 words, excluding the parts that can be excluded. This brief also complies with Rule 32(a)(5)-(6) because it is prepared in a proportionally spaced face using Microsoft Word 2016 in 14-point Century Schoolbook font.

Dated: April 3, 2025                    */s/ Jeffrey M. Harris*


## CERTIFICATE OF SERVICE

I filed this brief on the Court's electronic filing system, which will email everyone requiring notice.

Dated: April 3, 2025                    */s/ Jeffrey M. Harris*

**ADDENDUM**

**TABLE OF CONTENTS**

15 U.S.C. §78n(a) ................................................................ Add. 2

15 U.S.C. §80b-2(a)(11) ..................................................... Add. 2

15 U.S.C. §80b-6 ................................................................. Add. 4

**15 U.S.C. §78N(a) provides**

(a) Solicitation of proxies in violation of rules and regulations

> (1) It shall be unlawful for any person, by the use of the mails or by any means or instrumentality of interstate commerce or of any facility of a national securities exchange or otherwise, in contravention of such rules and regulations as the Commission may prescribe as necessary or appropriate in the public interest or for the protection of investors, to solicit or to permit the use of his name to solicit any proxy or consent or authorization in respect of any security (other than an exempted security) registered pursuant to section 78l of this title.

> (2) The rules and regulations prescribed by the Commission under paragraph (1) may include—

>> (A) a requirement that a solicitation of proxy, consent, or authorization by (or on behalf of) an issuer include a nominee submitted by a shareholder to serve on the board of directors of the issuer; and

>> (B) a requirement that an issuer follow a certain procedure in relation to a solicitation described in subparagraph (A).

**15 U.S.C. §80b-2(a)(11) (the Advisers Act) provides**

(a) In general
When used in this subchapter, unless the context otherwise requires, the following definitions shall apply:

...

> (11) "Investment adviser" means any person who, for compensation, engages in the business of advising others, either directly or through publications or writings, as to the value of securities or as to the advisability of investing in, purchasing, or selling securities, or who, for compensation and as part of a regular business, issues or promulgates analyses or reports concerning securities; but does not include (A) a bank, or any bank holding company as defined in the Bank Holding Company Act of 1956 [12 U.S.C. 1841 et seq.]

which is not an investment company, except that the term "investment adviser" includes any bank or bank holding company to the extent that such bank or bank holding company serves or acts as an investment adviser to a registered investment company, but if, in the case of a bank, such services or actions are performed through a separately identifiable department or division, the department or division, and not the bank itself, shall be deemed to be the investment adviser; (B) any lawyer, accountant, engineer, or teacher whose performance of such services is solely incidental to the practice of his profession; (C) any broker or dealer whose performance of such services is solely incidental to the conduct of his business as a broker or dealer and who receives no special compensation therefor; (D) the publisher of any bona fide newspaper, news magazine or business or financial publication of general and regular circulation; (E) any person whose advice, analyses or reports relate to no securities other than securities which are direct obligations of or obligations guaranteed as to principal or interest by the United States, or securities issued or guaranteed by corporations in which the United States has a direct or indirect interest which shall have been designated by the Secretary of the Treasury, pursuant to section 3(a)(12) of the Securities Exchange Act of 1934 [15 U.S.C. 78c(a)(12)], as exempted securities for the purposes of that Act [15 U.S.C. 78a et seq.]; (F) any nationally recognized statistical rating organization, as that term is defined in section 3(a)(62) of the Securities Exchange Act of 1934 [15 U.S.C. 78c(a)(62)], unless such organization engages in issuing recommendations as to purchasing, selling, or holding securities or in managing assets, consisting in whole or in part of securities, on behalf of others;; [1] (G) any family office, as defined by rule, regulation, or order of the Commission, in accordance with the purposes of this subchapter; or (H) such other persons not within the intent of this paragraph, as the Commission may designate by rules and regulations or order.

**15 U.S.C. §80b-6 provides**

It shall be unlawful for any investment adviser by use of the mails or any means or instrumentality of interstate commerce, directly or indirectly—

(1) to employ any device, scheme, or artifice to defraud any client or prospective client;

(2) to engage in any transaction, practice, or course of business which operates as a fraud or deceit upon any client or prospective client;

(3) acting as principal for his own account, knowingly to sell any security to or purchase any security from a client, or acting as broker for a person other than such client, knowingly to effect any sale or purchase of any security for the account of such client, without disclosing to such client in writing before the completion of such transaction the capacity in which he is acting and obtaining the consent of the client to such transaction. The prohibitions of this paragraph shall not apply to any transaction with a customer of a broker or dealer if such broker or dealer is not acting as an investment adviser in relation to such transaction; or

(4) to engage in any act, practice, or course of business which is fraudulent, deceptive, or manipulative. The Commission shall, for the purposes of this paragraph (4) by rules and regulations define, and prescribe means reasonably designed to prevent, such acts, practices, and courses of business as are fraudulent, deceptive, or manipulative.