No. 24-5105

_____

*In the*

# United States Court of Appeals

## *for the*

# District of Columbia Circuit

_____

INSTITUTIONAL SHAREHOLDER SERVICES, INC.,
*Plaintiff-Appellee,*

− v. −

SECURITIES & EXCHANGE COMMISSION,
and GARY GENSLER, in his official capacity as Chair of the SEC
*Defendant-Appellant,*

NATIONAL ASSOCIATION OF MANUFACTURERS,
*Intervenor-Appellant.*

_____

On Appeal from the United States District Court
for the District of Columbia
Case No. 19-cv-3275, Hon. Amit P. Mehta, United States District Judge

_____

## FINAL BRIEF FOR INTERVENOR-APPELLANT
_____

ERICA T. KLENICKI
MICHAEL A. TILGHMAN II
  *NAM Legal Center*
  *733 10th Street NW*
  *Suite 700*
  *Washington, DC 20001*
  *(202) 637-3000*

PAUL W. HUGHES
ANDREW A. LYONS-BERG
EMMETT WITKOVSKY-ELDRED
  *McDermott Will & Emery LLP*
  *500 North Capitol Street NW*
  *Washington, DC 20001*
  *(202) 756-8000*

*Counsel for Intervenor-Appellant*

## CERTIFICATE AS TO PARTIES, RULINGS, AND RELATED CASES

**Parties and amici.** The parties before the court are intervenor-appellant the National Association of Manufacturers and appellee Institutional Shareholder Services Inc.

The parties before the district court included the above parties, as well as the Securities and Exchange Commission, defendant and Gary Gensler, in his official capacity as Chairman of the SEC, defendant. Amici in the district court were Council of Institutional Investors; Chamber of Commerce of the United States of America; Business Roundtable; Center on Executive Compensation; and National Investor Relations Institute.

**Rulings under review.** The ruling under review is *Institutional Shareholder Services Inc.* v. *Securities and Exchange Commission, et al.* No. 19-cv-3275, Dkt. 69 (Feb. 23, 2024) (Hon. Amit P. Mehta, United States District Judge). The opinion is reported at 718 F. Supp. 3d 7 and is reproduced at JA169-202).

**Related Cases.** This case has not previously been before this Court, and there are no related cases pending before this or any other court.

_/s/ Paul W. Hughes_

## CORPORATE DISCLOSURE STATEMENT

The National Association of Manufacturers is a 501(c)(6) non-profit organization and has no parent corporation. No publicly held corporation owns an interest in the NAM. It is a trade association within the meaning of Circuit Rule 26.1(b).

_/s/ Paul W. Hughes_

# TABLE OF CONTENTS

Certificate as to Parties, Rulings, and Related Cases ................................i

Corporate Disclosure Statement ................................................. ii

Table of Authorities.............................................................v

Glossary .....................................................................xi

Introduction ................................................................1

Jurisdiction ................................................................3

Issue Statement..............................................................5

Statutes and Regulations.......................................................5

Statement....................................................................5

    A.   Factual and legal background........................................5

        1.   The Exchange Act authorizes the SEC to regulate proxy solicitation. ........................................5

        2.   Proxy firms become dominant players in the proxy voting system.................................................9

        3.   The 2020 rulemaking codifies the SEC's longstanding view that proxy firms "solicit" proxies and implements modest reforms. .................................15

    B.   Procedural background ................................................18

Summary of Argument..................................................19

Argument ................................................................21

I.   The record demonstrates that proxy firms "solicit" proxies under any reasonable construction of the word...........................22

    A.   Proxy firms "endeavor to obtain" their clients' voting authority and thereby obtain votes aligned with their recommendations................................................23

    B.   Proxy firms market themselves as experts and tell clients how to vote. ................................................24

    C.   Proxy firms sometimes have an interest in the outcome............32

II.   The district court's narrow construction of the statute was wrong. ...............................................................37

    A.   The district court applied an interpretive approach that is precluded by binding precedent.....................................38

B.   Properly understood, the Exchange Act comfortably permits the SEC's definitional regulation. .................................................. 43

C.   The district court's "interest in the outcome" requirement is atextual judicial supplementation. ................................................. 52

Conclusion ........................................................................................ 59

# TABLE OF AUTHORITIES[†]

**Page(s)**

**Cases**

*Ali v. Fed. Bureau of Prisons,*
  552 U.S. 214 (2008) ...................................................................46

*Altman v. S.E.C.,*
  666 F.3d 1322 (D.C. Cir. 2011) ...........................................49

*Am. Coal Co. v. Fed. Mine Safety & Health Rev. Comm'n,*
  796 F.3d 18 (D.C. Cir. 2015) ................................................42

*Ameren Servs. Co. v. Fed. Energy Reg. Comm'n.,*
  893 F.3d 786 (D.C. Cir. 2018) ................................................4

*Ass'n of Civilian Technicians v. Fed. Lab. Rels. Auth.,*
  269 F.3d 1112 (D.C. Cir. 2001) ...........................................35

*Ass'n of Data Processing Orgs., Inc. v. Bd. of Govs. of Fed.
  Reserve,*
  745 F.2d 677 (D.C. Cir. 1984) ..............................................36

*Batterton v. Francis,*
  432 U.S. 416 (1977) ...............................................................40

*Bldg. & Const. Trades Dep't, AFL-CIO v. U.S. Dep't of Lab.
  Wage Appeals Bd.,*
  829 F.2d 1186 (D.C. Cir. 1987) ...........................................37

*Bloate v. United States,*
  559 U.S. 196 (2010) ...............................................................43

*Bureau of Alcohol, Tobacco and Firearms v. FLRA,*
  464 U.S. 89 (1983) .................................................................48

*Canonsburg Gen. Hosp. v. Burwell,*
  807 F.3d 295 (D.C. Cir. 2015) ..............................................37

*CFTC v. Schor,*
  478 U.S. 833 (1986) ...............................................................49

*Consumer Product Safety Comm'n v. GTE Sylvania, Inc.,*
  447 U.S. 102 (1980) ...............................................................49

---

[†] Authorities upon which we primarily rely are marked with asterisks.

**Cases—continued**

*Cowin v. Bresler*,
741 F.2d 410 (D.C. Cir. 1984) ........................................ 51

*Dolan v. U.S. Postal Serv.*,
546 U.S. 481 (2006) ........................................................ 42

*Dyer v. SEC*,
291 F.2d 774 (8th Cir. 1961) .......................................... 53

*F.T.C. v. Ken Roberts Co.*,
276 F.3d 583 (D.C. Cir. 2001) ........................................ 57

*Feller v. Loc. 144 Int'l Ladies Garment Workers Union*,
121 N.J. Eq. 452, 191 A. 111 (1937) ............................... 45

*Fund Democracy, LLC v. SEC*,
278 F.3d 21 (D.C. Cir. 2002) ............................................ 4

*Golden & Co. v. Justice's Ct. of Woodland Tp.*,
140 P. 49 (Cal. App. 1914)............................................... 55

*Home Depot U. S. A., Inc. v. Jackson*,
587 U.S. 435 (2019) ........................................................ 47

*Int'l Dark-Sky Ass'n, Inc. v. FCC*,
106 F.4th 1206 (D.C. Cir. 2024)......................................... 5

*J. I. Case Co. v. Borak*,
377 U.S. 426 (1964) ........................................................ 51

*Jawad v. Gates*,
832 F.3d 364 (D.C. Cir. 2016) ........................................ 53

*Lake Charles Stevedores v. Mayo*,
20 F. Supp. 698 (W.D. La. 1935)...................................... 45

*Liberty Prop. Tr. v. Republic Properties Corp.*,
577 F.3d 335 (D.C. Cir. 2009) ........................................ 51

*\*Lindeen v. SEC*,
825 F.3d 646 (D.C. Cir. 2016) ............................. 39, 42, 43

*Long Island Light Co. v. Barbash*,
779 F.3d 793 (2d Cir. 1985).............................................. 53

*\*Loper Bright Enterprises v. Raimondo*,
144 S. Ct. 2244 (2024) ...................... 21, 37, 38, 40, 41, 42, 43, 46, 48

Cases—continued

*Mills v. Elec. Auto-Lite Co.*,
  396 U.S. 375 (1970) ..................................................50, 51, 58

*N.Y. Stock Exch. LLC v. SEC*,
  962 F.3d 541 (D.C. Cir. 2020) ...............................................22

*Nat'l Ass'n of Manufacturers v. SEC*,
  105 F.4th 802 (5th Cir. 2024).............................................5, 18

*Nat'l Ass'n of Mfrs. v. SEC*,
  631 F.Supp.3d 423 (W.D. Tex. Sept. 28, 2022) ........................18

*New LifeCare Hosps. of N. Carolina, LLC v. Becerra*,
  7 F.4th 1215 (D.C. Cir. 2021)..................................................22

*NLRB v. Noel Canning*,
  573 U.S. 513 (2014) .................................................................48

*NLRB v. SW Gen., Inc.*,
  137 S. Ct. 929 (2017) ..............................................................47

*State ex rel. Pugh v. Meredith*,
  167 N.W. 626 (Iowa 1918).......................................................47

*Pulsifer v. United States*,
  601 U.S. 124 (2024) .................................................................42

*Regions Bank v. Legal Outsource PA*,
  936 F.3d 1184 (11th Cir. 2019) ..............................................44

*In re Riley's Est.*,
  163 Wash. 119 (1931) (en banc)..............................................45

*Roe v. Duty*,
  115 Wash. 313 (1921) ..............................................................45

*Rotkiske v. Klemm*,
  589 U.S. 8 (D.C. Cir. 2019)......................................................53

*Rush Univ. Med. Ctr. v. Burwell*,
  763 F.3d 754 (7th Cir. 2014) ............................................40, 42

*Sargent v. Genesco, Inc.*,
  492 F.2d 750 (5th Cir. 1974) ..................................................53

*SEC v. Chenery Corp.*,
  318 U.S. 80 (1943) ...................................................................35

## Cases—continued

*Sec'y of Lab. v. Knight Hawk Coal, LLC,*
991 F.3d 1297 (D.C. Cir. 2021) .................................................. 36

*Sierra Club v. FERC,*
827 F.3d 36 (D.C. Cir. 2016) ...................................................... 37

*Smallwood v. Pearl Brewing Co.,*
489 F.2d 579 (5th Cir. 1974) ..................................................... 29

*Solid Waste Agency of N. Cook Cnty. v. U.S. Army Corps of*
*Engineers,*
531 U.S. 159 (2001) .................................................................. 49

*State v. Bissell,*
106 Vt. 80, 170 A. 102 (1934) .................................................... 45

*State v. Harris,*
158 A. 848 (N.J. Sup. Ct. 1932) ................................................ 45

*Taniguchi v. Kan Pac. Saipan, Ltd.,*
566 U.S. 560 (2012) ......................................................... 41, 44

*Tcherepnin v. Knight,*
389 U.S. 332 (1967) .................................................................. 51

*TIG Ins. Co. v. Republic of Argentina,*
110 F.4th 221 (D.C. Cir. 2024) ................................................. 46

*In re Vicksburg Bridge & Terminal Co.,*
29 F. Supp. 225 (S.D. Miss. 1938) ............................................ 45

*Walsh & Levine v. Peoria & E. Ry. Co.,*
222 F. Supp. 516 (S.D.N.Y. 1963) ............................................ 58

*In re Wayne Pump Co.,*
9 F. Supp. 940 (N.D. Ind. 1935) ............................................... 45

*Women Involved in Farm Econ. v. USDA,*
876 F.2d 994 (D.C. Cir. 1989) .................................................. 39

## Statutes, Rules, and Regulations

5 U.S.C.
§ 706(2)(A) ............................................................................... 22
§ 706(2)(C) ............................................................................... 22

**Statutes, Rules, and Regulations—continued**

15 U.S.C.

    § 78b ........................................................................6, 50

    *§ 78c(b).............................................................7, 20, 41

    § 78n(a) .......................................................6, 46, 52

    § 78n(h)(1) ....................................................................49

17 C.F.R.

    § 240.14a ......................................................................38

    § 240.14a-1(*l*).................................................. 7, 8, 27, 48, 57

    § 240.14a-1(*l*)(1) ................................... 5, 8, 17, 25, 27, 39, 41, 45, 48, 57

    § 240.14a-1(*l*)(2) .....................................................25

    § 240.14a-2(a).................................................................7

    § 240.14a-2(b)(1) ...........................................................9

    § 240.14a-2(b)(3) ...........................................................9

    § 240.14a-2(b)(9) .........................................................17

    § 240.14a-3 .....................................................................7

    § 240.14a-9 ...............................................................7, 56

Pub. L. 73-291, 48 Stat. 881 § 3(a)(4)-5 (1934) ...........................................47

Pub. L. No. 98-38, § 2, 97 Stat. 205 (1983) ........................................48

Pub. L. No. 103-202, § 302, 107 Stat. 2344 (1993) ......................................49

Pub. L. No. 111-203, § 953, 124 Stat. 1376 (2010) ......................................48

**Legislative Materials**

H.R. Rep. No. 1383, 73d Cong., 2d Sess., 13 (1934) ................................6, 50

S. Rep. No. 792, 73d Cong. 2d Sess., 12 (1934)........................ 6, 7, 50, 51, 58

**Agency Materials**

21 Fed. Reg. 577 (Jan. 26, 1956)........................................................8

29 Fed. Reg. 341 (Jan. 15, 1964)....................... 8, 9, 25, 27, 48, 58

44 Fed. Reg. 68,764 (Nov. 29, 1979) ........................................9

57 Fed. Reg. 48,276 (Oct. 22, 1992).....................................9, 15, 48

75 Fed. Reg. 42,982 (July 22, 2010) ................................ 10, 14, 15, 29, 30

84 Fed. Reg. 47,416 (Sept. 10, 2019) .......................................... 16, 25, 26, 29

*84 Fed. Reg. 66,518 (Dec. 4, 2019)........ 10, 11, 16, 18, 23, 24, 26, 28, 30–32

**Agency Materials—continued**

*85 Fed. Reg. 55,082 (Sep. 3, 2020) . 10–15, 17, 18, 26–33, 35, 36, 39, 41, 47

86 Fed. Reg. 67,383 (Nov. 26, 2021)........................................................18

*SEC No-Action Letter, Institutional Shareholder Services, Inc.,*
    1991 WL 179448 (Dec. 15, 1988) ......................................................14, 15

*SEC Release Notice*, Release No. 378, 1935 WL 29270 (Sept. 24,
    1935)........................................................................................................8

**Dictionaries**

Proxy, Black's Law Dictionary (12th ed. 2024) ..........................................24

*Solicit, Black's Law Dictionary (3d ed. 1933) ........ 23, 24, 29, 34, 35, 44, 55

Solicit, Concise Oxford Dictionary of Current English (1931) ..............23, 56

Solicit, Oxford English Dictionary, Volume X..............................................29

Solicit, Webster's New International Dictionary (2d 1934)...... 23, 39, 44, 52

**Other Authorities**

Antonin Scalia & Bryan A. Garner, *Reading Law* (2012) .....................44, 53

Chair Jay Clayton, *Statement Announcing SEC Staff
    Roundtable on the Proxy Process* (July 30, 2018) ...................................16

Ertimur et. al, *Shareholder Votes and Proxy Advisors: Evidence
    from Say on Pay* (Feb. 25, 2013)..........................................................1, 32

ISS, *United States Proxy Voting Guidelines Benchmark Policy
    Recommendations* (Nov. 18, 2019).............................................................34

NAM Manufacturers' Outlook Survey, Fourth Quarter 2018
    (Dec. 20, 2018)..........................................................................................13

Paul Rose, *Proxy Advisors & Market Power: A Review of
    Institutional Investor Robovoting* (Apr. 2021) ..........................................23

S. Bernstein & H. Fischer, *The Regulation of the Solicitation of
    Proxies*, 7 Univ. of Chi. L. Rev. 226 (1940) ..........................................8, 48

# GLOSSARY

APA        Administrative Procedure Act

ISS         Institutional Shareholder Services Inc.

NAM      The National Association of Manufacturers

SEC        Securities and Exchange Commission

# INTRODUCTION

Under our system of corporate democracy, shareholders of public companies vote on matters of corporate governance. Most do so by proxy, authorizing others to vote for them.

Arguably, no individual player in today's proxy voting system has more power than Institutional Shareholder Services Inc ("ISS"), the powerhouse of the "proxy voting advice" industry. Firms like ISS ("proxy firms") advise shareholders on how to vote their proxies. Most votes are controlled by institutional shareholders—behemoth investors comprising 80% of equity market capitalization—whose large investment portfolios make it impossible to cast informed votes without guidance. Proxy firms promote themselves as experts-for-hire—seeking to be the trusted voice on how these shareholders should vote.

As a result, firms like ISS are tremendously powerful. As ISS has put it, it is a "market-mov[er]." ISS Comment at 61 (JA411). Indeed, the duopoly of ISS and its main competitor, Glass Lewis, control 97% of the proxy advice market and together influence nearly 40% of the U.S. shareholder vote. U.S. Chamber of Commerce Comment at 1 (JA431) (citing Ertimur et. al, *Shareholder Votes and Proxy Advisors: Evidence from Say on Pay* (Feb. 25, 2013), perma.cc/B29K-KK9N). And their impact is not limited to their clients, but reaches *all* investors.

Since the passage of the Securities Exchange Act of 1934 in the wake of the Great Depression, the Securities and Exchange Commission ("SEC") has regulated proxy solicitation, so shareholders can confidently vote based on transparent and reliable information. Accordingly, since the proxy voting advice industry emerged four decades ago, those firms have been subject to SEC regulation. After all, their entire business is telling shareholders how to vote. Influencing proxies is the coin of their realm. Indeed, through the process of automated "robo-voting," proxy firms often obtain prospective authority to cast their client's vote as the proxy firm sees fit, with no further input or supervision by the client.

As proxy firms have grown in influence, the need for greater oversight became apparent. In addition to being powerful, proxy firms have well-documented conflicts of interest. ISS, for instance, provides fee-based consulting to corporations on how to improve corporate governance (that is, how to get favorable ISS ratings), while also telling shareholders how to vote on those corporations' ballot measures. And proxy voting advice is sometimes unreliable, with firms' opaque, one-size-fits-all methodologies yielding dubious recommendations. Accordingly, the SEC reassessed its approach through a decade-long, bipartisan regulatory process, ultimately codifying in a 2020 Rule its longstanding interpretation that proxy firms "solicit"

proxies and are thus subject to SEC regulation. The SEC also imposed modest reporting requirements designed to increase transparency and promote the free flow of information.

ISS, however, would rather not be regulated at all. It therefore brought a sweeping facial challenge to the SEC's rulemaking, arguing that it does not "solicit" proxies, though its whole business model is to tell shareholders how to vote—and it will even literally vote on their behalf. Thus, ISS asserts, proxy firms are outside the SEC's regulatory ambit altogether.

The district court agreed. But in so holding, it misread the record, which shows that proxy firms "solicit" proxies under any reasonable definition. It also misconstrued the statute, disregarding the SEC's explicit authority to define terms like "solicit", adopting an artificially narrow definition, and imposing a severe limitation on the SEC's regulatory power that finds no footing in the statutory text whatsoever. This Court should reverse.

## JURISDICTION

**a.** The district court had jurisdiction under 28 U.S.C. § 1331 and entered final judgment on February 23, 2024. Intervenor-appellant the National Association of Manufacturers ("NAM") noticed this appeal on April 16, 2024. This Court has jurisdiction under 28 U.S.C. § 1291.

**b.** As an intervenor in the proceedings below, the NAM "may maintain an appeal even [though] the [SEC] does not appeal." *Ameren Servs. Co. v.*

*Fed. Energy Reg. Comm'n.*, 893 F.3d 786, 791 (D.C. Cir. 2018). The nation's largest manufacturing trade association, with numerous publicly traded members, the NAM has standing to appeal. *See, e.g., Fund Democracy, LLC v. SEC*, 278 F.3d 21, 25 (D.C. Cir. 2002) (an association has standing if its members would have standing, the litigation is germane to its purpose, and the individual participation of members is unnecessary).

The NAM's members would have standing, as they suffer a direct, concrete harm from the vacatur of regulations promoting proxy voting based on accurate and reliable information. Several of NAM's members attested to this harm during the SEC's rulemaking process. *See* Netram Declaration at 2 (JA75) (citing specific members). As the district court noted, the NAM's members "ha[ve] a direct informational interest" at stake, as the final rule "provide[s] registrants with an opportunity to learn additional information from proxy advisers and put[s] them in a position to be able to respond." July 27, 2022 Tr. at 39 (JA920). Vacating the rule would "impede that interest" (*id.*) and defending it is thus germane to the NAM's purpose of "advocat[ing] for the interests of America's manufacturers." Netram declaration at 6 (JA79). And the individual participation of its members is unnecessary as the "relief sought [does not] involve individualized grievances." *Int'l Dark-Sky Ass'n, Inc. v. FCC*, 106 F.4th 1206, 1218 (D.C. Cir. 2024).

In fact, the NAM has already represented its members in affirmative litigation successfully setting aside the SEC's attempted recission of the same 2020 Rule challenged here. *See Nat'l Ass'n of Mfrs. v. SEC*, 105 F.4th 802, 806 (5th Cir. 2024). It has standing to defend the regulation here, too.

## ISSUE STATEMENT

Whether the district court erred in vacating the definitional amendment codified at 17 C.F.R. § 240.14a-1(*l*)(1)(iii)(A) based on its conclusion that proxy firms do not "solicit" proxies within the meaning of Section 14(a) of the Securities Exchange Act of 1934, 15 U.S.C. § 78n(a).

## STATUTES AND REGULATIONS

The addendum contains the relevant statutory and regulatory provisions.

## STATEMENT

### A. Factual and legal background

#### 1. *The Exchange Act authorizes the SEC to regulate proxy solicitation.*

**a.** Following the 1929 stock market crash, Congress reformed federal securities law to protect investors. Chief among these reforms was the Securities Exchange Act of 1934 (the "Exchange Act"), which established the SEC and charged it with "insur[ing] the maintenance of fair and honest markets." 15 U.S.C. § 78b. One area of concern was proxy voting, the process

by which most shareholders vote on corporate governance questions. As legislators explained, "[f]air corporate suffrage is an important right that should attach to every equity security bought on a public exchange." H.R. Rep. No. 1383, 73d Cong., 2d Sess., 13 (1934). It was thus "essential that [the shareholder] be enlightened not only as to the financial condition of the corporation, but also as to the major questions of policy, which are decided at stockholders' meetings." S. Rep. No. 792, 73d Cong., 2d Sess., 12 (1934).

Congress enacted Section 14(a) of the Exchange Act to achieve that result. This section provides:

> It shall be unlawful for any person … in contravention of such rules and regulations as the Commission may prescribe as necessary or appropriate in the public interest or for the protection of investors, to solicit … any proxy … in respect of any security.

15 U.S.C. § 78n(a).

Congress contemplated "that the rules and regulations promulgated by the Commission" to implement this section "will protect investors" from all comers: "promiscuous solicitation" by "irresponsible outsiders seeking to wrest control of a corporation away from honest and conscientious corporation officials," "unscrupulous corporate officials seeking to retain control of the management by concealing and distorting facts," and third parties, like brokers, who, despite having "no beneficial interest in a security" might "usurp the franchise power of their customers and thereby deprive [them] of their voice in the control of the corporation[.]" S. Rep. No. 73-1455 at 77.

**b.** Over the ensuing 90 years, pursuant to this expressly delegated authority, the SEC has promulgated rules to safeguard the proxy voting system. *See* 17 C.F.R. § 240.14a-1 *et. seq*. Today, those who "solicit" proxies must comply with a robust reporting regime. *Id.* §§ 240.14a-3 to 240.14a-15. And while certain categories of solicitations are exempted from the full scope of these proxy rules (*see id.* § 240.14a-2(b)), nearly all who solicit proxies are subject to Rule 14a-9's prohibition of false or misleading statements. *Id.* § 240.14a-9; *cf. id.* § 240.14a-2(a) (exempting narrow categories of solicitations from Rule 14a-9).

Pursuant to its rulemaking authority—and an express delegation of definitional authority (*see* 15 U.S.C. § 78c(b))—the SEC has occasionally clarified the definition of "solicit" through regulation. *See* 17 C.F.R. § 240.14a-1(*l*). The Commission originally focused on literal proxy solicitation—that is, seeking to take over a shareholder's voting authority. *See, e.g., SEC Release Notice*, Release No. 378, 1935 WL 29270 (Sept. 24, 1935). But observers understood that "the Congressional expression and the need for adequate and fair disclosure to security holders connotes something of greater significance than the disclosure of information in connection with solicitation of authority per se." S. Bernstein & H. Fischer, *The Regulation of the Solicitation of Proxies*, 7 Univ. of Chi. L. Rev. 226, 228 (1940). Rather,

solicitation also encompassed the "transmission to security holders of a document containing information at the time of mailing intended to create a disposition favoring a matter." *Id.* at 231.

To that end, in 1956, the SEC clarified that solicitation included any "communication to security holders reasonably calculated to result in the procurement, withholding or revocation of a proxy." *Amendments to Proxy Rules* ("*1956 Release*"), 21 Fed. Reg. 577 (Jan. 26, 1956) (codified at 17 C.F.R. § 240.14a-1(*l*)(1)(iii)). As the agency later explained, "Section 14 and the proxy rules apply to any person—not just management, or the opposition," and thus the Exchange Act authorizes the agency to supervise "all materials specifically directed to stockholders and which are related to, and influence their voting." *Broker-Dealer Participation in Proxy Solicitation* ("*1964 Release*"), 29 Fed. Reg. 341, 341 (Jan. 15, 1964). Otherwise, third parties who "may become involved [in proxy debates] for various reasons and in various ways in efforts to influence the voting" could frustrate the law's purpose of "secur[ing] reliable and fair disclosure to security holders so their exercise of the corporate franchise may be informed." *Id.* Accordingly, the agency specified that proxy voting "advice" was solicitation, unless in response to an unprompted request. *Id.*

The SEC refined its approach in subsequent amendments. In 1979, the Commission exempted from reporting requirements (but not from the

definition of "solicit") certain voting advice given by a shareholder's financial advisor, confirming its view that voting advice *is* solicitation. *See Shareholder Communications, Shareholder Participation in the Corporate Electoral Process and Corporate Governance in General* ("*1979 Release*"), 44 Fed. Reg. 68,764, 68,766-67 (Nov. 29, 1979); *see also* 17 C.F.R. § 240.14a-2(b)(3). Likewise, in 1992, the agency exempted from reporting (but, again, not from the definition of "solicit") certain communications by persons not seeking proxy authority. *See Regulation of Communications Among Shareholders* ("*1992 Release*"), 57 Fed. Reg. 48,276, 48,280 (Oct. 22, 1992); *see also* 17 C.F.R. § 240.14a-2(b)(1). Notably, however, the agency declined to broadly exempt all "disinterested" parties. *Id.*

In sum, the SEC's proxy rules have long applied to a broad swath of communications that may influence proxy voters, an understanding unchallenged for sixty years. ISS does not appear to disagree, generally speaking, that communications likely to influence proxy votes constitute solicitation. Just not its own.

### 2. *Proxy firms become dominant players in the proxy voting system.*

**a.** Today, proxy voting is the "fundamental infrastructure of shareholder suffrage since the corporate proxy is the principal means by which shareholders exercise their voting rights." *Concept Release on the U.S. Proxy Sys.* ("*Concept Release*"), 75 Fed. Reg. 42,982, 43,020 (July 22, 2010). And

the shareholder landscape is dominated by institutional investors, such as pension funds, mutual funds, and banks. *See Amendments to Exemptions From the Proxy Rules for Proxy Voting Advice* ("*Proposed Rule*"), 84 Fed. Reg. 66,518, 66,519 & n.7 (Dec. 4, 2019) (JA233) (citing studies showing institutional investors control up to 80% of the equity market cap); *Exemptions From the Proxy Rules for Proxy Voting Advice* ("*Final Rule*"), 85 Fed. Reg. 55,082, 55,085 n.36 (Sep. 3, 2020) (JA811) (similar). These investors often control shares in thousands of companies. *Proposed Rule*, 84 Fed. Reg. at 66,519 & n.8 (JA233). Understandably, they lack the time, resources, and expertise to make considered decisions on every corporate ballot.

Enter proxy firms. Proxy firms market themselves as authorities on how corporations should be run and thus on how shareholders should vote, promoting their services to institutional investors and investment advisors as experts-for-hire, and promising to analyze proxy debates and provide voting recommendations. *Final Rule*, 85 Fed. Reg. at 55,083 n.7 (JA809). The basic building block of a proxy firm's advice is its proprietary "benchmark" voting policy reflecting the proxy firm's own views on optimal corporate governance. *Id.* at 55,083 (JA809). Proxy firms also offer supplementary "specialty" policies using other subjective criteria, like good environmental stewardship or social responsibility. *Id.* at 55,083 & n.11 (JA809) (citing ISS's specialty policies). Some clients also use "custom" policies based on their

values and priorities, though the "benchmark policy … contains the bulk of the data, research, and analysis underlying custom policy proxy voting advice." *Id.* at 55,115 (JA841).

Proxy firms even ask clients to hand over their votes for the proxy firm to cast as it deems best. Such "robo-voting" allows clients to "have [their ballots] submitted automatically" once the proxy firm decides the proper vote, "without further client review." *Proposed Rule*, 84 Fed. Reg. at 66,520 (JA234).

Given the rise of institutional investors, "proxy voting advice businesses"—that is, proxy firms—"have become uniquely situated in today's market to influence, and in many cases directly execute … investors' voting decisions." *Final Rule*, 85 Fed. Reg. at 55,083 & nn.17-18 (JA809). And, as the SEC observed, proxy firms' impact extends to countless retail investors whose holdings are managed by institutions and whose investments are affected by the outcomes the proxy firms influence. *Id.* at 55,086 (JA812). In fact, proxy voting advice "potentially affects the interests of *all* shareholders of the registrant, the registrant [itself], and the proxy system in general." *Id.* (emphasis added).

**b.** Proxy firms' growing influence has engendered widespread concern. For one thing, the industry is highly concentrated. Two firms, ISS and Glass Lewis, control 97% of the market. *Final Rule*, 85 Fed. Reg. at 55,127 n.517 (JA853).

In addition, proxy firms are rife with conflicts of interest. When the 2020 Rule was finalized, Glass Lewis was owned by an investor that actively participated in corporate ballot debates. NAM Comment at 4 (JA510). And ISS has a consulting arm that provides governance advice for the *very same* companies whose governance issues it evaluates for shareholders. *See Final Rule*, 85 Fed. Reg. at 55,126 (JA852). In other words, while ISS is telling a client how to vote on a corporation's ballot, it may sell advice to that same corporation's management on how to get a favorable recommendation. Indeed, one survey reveals that, among 172 public companies, ISS approached 58 percent to market corporate consulting services the same year it gave the company an adverse rating. U.S. Chamber of Commerce Comment at 3-4 (JA433-434). One company reported that ISS tried to "drum up business" by emphasizing its recent adverse vote recommendation that had led to a poor vote outcome. Center on Executive Compensation Comment at 8 (JA533).

Proxy firms' advice can also be unreliable. Throughout the decade-long rulemaking process, commenters noted errors and methodological flaws that produced bad advice, sometimes compelling registrants to correct

the record. *See, e.g., Final Rule*, 85 Fed. Reg. at 55,085 n.40, 55,103 & nn.254, 258 (JA811, JA829) (collecting examples); ExxonMobil Comment at 21-24 (JA583-586); U.S. Chamber of Commerce Comment at 9 (JA439); Braemar Hotel Comments at 1-3 (JA450-452). In one survey, only 39% of registrants agreed that proxy firms conduct careful research. U.S. Chamber of Commerce Comment at 10 (JA440). In another, 56% of companies reported expending resources to correct flawed recommendations. NAM Manufacturers' Outlook Survey, Fourth Quarter 2018 8, 13 (Dec. 20, 2018), perma.cc/9CNE-HSYU. And the SEC referenced other data showing that *95% of respondents* encountered errors. *Final Rule*, 85 Fed. Reg. at 55,103 n.255 (JA829).

Though factual errors are part of the problem, flawed methodology is another. Proxy firms employ a one-size-fits-all approach, plugging inputs into algorithms with no consideration of individualized circumstances. *See Concept Release*, 75 Fed. Reg. at 43,012; ExxonMobil Comment at 4 (JA566). Registrants also have little recourse to correct errors before shareholders vote. That is especially true of clients using robo-voting, which "enable[s] proxy voting advice business clients to vote their proxies prior to registrants being able to provide a response to the proxy voting advice." *Final Rule*, 85 Fed. Reg. at 55,144. In any event, aside from strict factual error, proxy firms

generally refuse to entertain registrant feedback, standing by mistakes owing to flawed assumptions, hearsay, or missing context. *See, e.g.,* ExxonMobil Comment at 22-24 (JA584-586); NAM Comment at 3-4 (JA509-510); Garmin Comment at 1-2 (JA274-275). Indeed, according to one survey, many companies have simply stopped trying. U.S. Chamber of Commerce Comment at 3-4 (JA433-434).

**c.** Since the proxy advice industry's inception 40 years ago (ISS was founded in 1985), the SEC and market observers, including proxy firms themselves, have maintained that proxy firms "solicit" proxies. *See, e.g., Final Rule*, 85 Fed. Reg. at 55,094 n.157 (JA820) (citing scholarship to that effect). Indeed, in 1988, ISS asked the SEC if it qualified for an *exemption* to the proxy solicitation rules, an implicit admission that it solicits proxies. *See SEC No-Action Letter, Institutional Shareholder Services, Inc.,* 1991 WL 179448, at *2 (Dec. 15, 1988). Though the agency responded that proxy firms are not exempt (*id.* at *1-2), in 1992 it did extend an exemption. *1992 Release*, 57 Fed. Reg. at 48,282 n.41. In creating that exemption, the agency confirmed its unmistakable view that proxy firms do "solicit" proxies.

That exemption, and the implicit classification of proxy firms as solicitors, has remained in place for three decades. In fact, in 2016, the CEO of one proxy firm admitted before Congress that proxy firms fall under the

SEC's solicitation rules. *See Final Rule*, 85 Fed. Reg. at 55,094 & nn.160-61 (JA820).

### 3. The 2020 rulemaking codifies the SEC's longstanding view that proxy firms "solicit" proxies and implements modest reforms.

**a.** In 2010, the SEC decided to revisit its approach to proxy firms. The Commission reiterated that, "[a]s a general matter, the furnishing of proxy voting advice constitutes a 'solicitation,'" and, thus, "proxy advisory firms may be subject to our proxy rules because they provide recommendations that are reasonably calculated to result in the procurement, withholding, or revocation of a proxy." *Concept Release*, 75 Fed. Reg. at 43,009. After recounting the widespread concerns about proxy firms (*id.* at 43,011-43,012), the Commission sought comment on appropriate steps to ensure that "voting recommendations of proxy advisory firms serve the interests of investors in informed proxy voting." *Id.* at 43,013.

That request kicked off a decade-long bipartisan regulatory process, during which the SEC heard from stakeholders on topics like "the transparency and accuracy of recommendations by proxy advisory forms," SEC, *SEC Announces Agenda, Panelists for Roundtable on Proxy Advisory Services* (Nov. 27, 2013) perma.cc/UE9F-KZRZ, and "[w]hether issuers are being given an appropriate opportunity to raise concerns if they disagree with a

proxy advisory firm's recommendations, including, in particular, if the recommendation is based on erroneous, materially incomplete, or outdated information," Chair Jay Clayton, *Statement Announcing SEC Staff Roundtable on the Proxy Process* (July 30, 2018), perma.cc/2D93-VGR4.

In 2019, after issuing guidance confirming its longstanding position that proxy firms "solicit" proxies (*see Commission Interpretation and Guidance Regarding the Applicability of the Proxy Rules to Proxy Voting Advice* ("*Interpretive Release*"), 84 Fed. Reg. 47,416, 47,419 (Sept. 10, 2019)), the agency proposed to formally codify that understanding. *Proposed Rule* (84 Fed. Reg. at 66,521 (JA235)). It also proposed modest requirements for proxy firms, including the disclosure of conflicts of interest and steps to give registrants a chance to review and respond to voting recommendations. *Id.* at 66,526, 66,531 (JA240, 245)

**b.** In 2020, the SEC issued its final rule. Most pertinent here, the agency amended its definition of proxy solicitation to include "[a]ny proxy voting advice that makes a recommendation to a security holder as to its vote, consent, or authorization on a specific matter for which security holder approval is solicited, and that is furnished by a person that markets its expertise as a provider of such proxy voting advice, separately from other forms of investment advice, and sell such proxy voting advice for a fee." 17 C.F.R. § 240.14a-1(I)(1)(iii)(A).

The Commission also reaffirmed that proxy firms are eligible for exemptions, under Rule 14a-2(b)(1) and (3), from the proxy solicitation rules' otherwise applicable information and filing requirements. As amended, however, proxy firms must satisfy several modest requirements to qualify. First, the firm must disclose conflicts of interest. *See Final Rule*, 85 Fed. Reg. at 55,099 (JA825) (codified at 17 C.F.R. § 240.14a-2(b)(9)(i) (2020)). Second, "to facilitate more complete and robust dialogue and information sharing," the firm generally must share its voting recommendation with the company whose ballot measure is at issue once the recommendation is disseminated to clients and, in a timely manner, make the company's response available to clients. *See id.* at 55,107 (JA833) (codified at 17 C.F.R. § 240.14a-2(b)(9)(ii) (2020).

These reforms were considerably less ambitious than initially proposed, reflecting the Commission's considered, compromise-oriented approach. For instance, the 2019 proposal would have required proxy firms to share their recommendations with registrants *before* sending them to clients. *Proposed Rule*, 84 Fed. Reg. at 66,530 (JA244). The final rule, however, merely requires proxy firms to disclose their advice to registrants at the same time as to their clients. *Final Rule*, 85 Fed. Reg. at 55,112 (JA838).

**c.** Following a change in SEC leadership, the Commission suspended the 2020 Rule—without notice and comment—before it took effect, leading

a district court to invalidate the suspension. *See Nat'l Ass'n of Mfrs. v. SEC*, 631 F.Supp.3d 423 (W.D. Tex. Sept. 28, 2022). The SEC did not appeal that decision.

The SEC later moved to formally rescind elements of the 2020 Rule—though *not* the definitional amendment challenged here. *See generally Proxy Voting Advice*, 86 Fed. Reg. 67,383, 67,385-67,386 & n.24 (Nov. 26, 2021). Ultimately, over sharp dissent, the agency did so, abandoning its prior position without explanation. In June of 2024, the Fifth Circuit set this rescission aside as arbitrary and capricious. *See Nat'l Ass'n of Mfrs.*, 105 F.4th at 811. The agency did not seek further review. As a result, absent the decision below, the 2020 Rule would currently be in force.

Despite attempting to rescind the specifics of the 2020 Rule, the Commission has never abandoned its view that proxy firms do "solicit" proxies and are therefore subject to SEC regulation in general.

### B. Procedural background

In this lawsuit, ISS seeks not only to invalidate the modest reforms of the 2020 Rule, but to put itself beyond the scope of the SEC's regulatory authority over proxy solicitation altogether.

ISS filed the operative complaint in September of 2020. Most relevant here, ISS alleges that the SEC's definitional amendment treating proxy vot-

ing advice as solicitation exceeds the agency's statutory authority. The district court granted the NAM's motion to intervene, and all parties moved for summary judgment.

The district court granted ISS summary judgment on its statutory claims. *See* Op. 34 (JA202). The court opined that the "the ordinary meaning of 'solicit' at the time of Section 14(a)'s enactment does not reach proxy voting advice for a fee. Nor does the Exchange Act's history and purpose support the SEC's reading." *Id* (JA202). In so holding, the court defined "solicit" narrowly, holding that a person "with no interest in the outcome of the vote" cannot "solicit" proxies. *Id.* at 3 (JA171). The district court declined to reach ISS's remaining arbitrary-and-capricious and First Amendment claims. *Id.* at 34 n.10 (JA202).

The SEC and the NAM both entered timely notices of appeal. The SEC, however, later voluntarily dismissed its appeal without explanation.

## SUMMARY OF ARGUMENT

**I.** The record overwhelmingly establishes that proxy firms "solicit" proxies under any reasonable definition. *First,* and most obviously, they literally seek to assume their clients' voting authority through robo-voting. *Second*, proxy firms insert themselves into the proxy voting process, marketing themselves as experts to be trusted—currying influence over shareholders for profit. They then produce persuasive reports telling clients how

they should vote. Inexorably, that voting advice reflects the proxy firm's idiosyncratic views about good corporate governance. And, in practice, proxy firms are highly influential. *Third*, as the SEC expressly found, proxy firms sometimes even have an interest in ballot outcomes, due to conflicts of interest and ideological ambitions. The district court simply refused to consider that agency factfinding. Thus, *whatever* the governing definition of "solicit" may be, proxy firms fall within its ambit; the decision below erred by failing to appreciate the SEC's robust factual findings regarding the role proxy firms play in the marketplace.

**II.** Separately, the district court's statutory analysis suffered from three fatal errors. *First*, the court misapprehended the inquiry, overlooking Congress's express delegation of authority to the SEC to define statutory terms like "solicit." *See* 15 U.S.C. § 78c(b). The SEC plainly acted within the boundaries of that delegation by adopting a definition of "solicit" that falls within the word's acknowledged range of meanings. As the Supreme Court very recently reaffirmed, the district court should have "respect[ed]" Congress's explicit delegation, not overridden it in favor of a narrower interpretation. *Loper Bright Enterprises v. Raimondo*, 144 S. Ct. 2244, 2268 (2024).

*Second*, the ordinary tools of statutory interpretation support a broad reading of "solicit" that authorizes the SEC to regulate all forms of proxy

solicitation—not, as the district court held, merely a sliver of them. Contemporaneous authorities show that solicitation encompasses a wide array of activity geared towards getting *someone* to do *something*. And the structure of Section 14(a), which speaks in sweeping terms, shows that Congress intended for "solicit" to also convey a broad scope. The historical circumstances and remedial purpose of the Exchange Act also yield a broad construction of "solicit," as does the near-century worth of enforcement that has proceeded on that understanding.

*Finally*, the district court rewrote the statute by concluding that the SEC may only regulate proxy solicitors who have an interest in the underlying corporate ballot measure. The Exchange Act contains no such requirement. Nor does the word "solicit," even narrowly defined, necessarily imply an interest in the underlying ballot issue. If a person asks a shareholder for their proxy—soliciting it in the most literal sense—and then votes based on a coinflip, that person would surely be subject to SEC regulation, despite lacking an interest in the measure's outcome. The district court's conclusion to the contrary yields disastrous and absurd results.

The Court should reverse.

## ARGUMENT

When this Court "review[s] an administrative decision" under the Administrative Procedure Act ("APA"), its "task is the same as that performed

by the district judge"—to resolve the APA challenge *de novo*. *New LifeCare Hosps. of N. Carolina, LLC v. Becerra*, 7 F.4th 1215, 1222 (D.C. Cir. 2021).

The APA authorizes courts to set aside agency action "not in accordance with law" or "in excess of statutory jurisdiction, authority, or limitations, or short of statutory right." 5 U.S.C. § 706(2)(A), (C). Thus, "[w]hen an agency acts pursuant to its rulemaking authority, [the] reviewing court [must] determine[] whether the resulting regulation exceeds the agency's statutory authority." *N.Y. Stock Exch. LLC v. SEC*, 962 F.3d 541, 546 (D.C. Cir. 2020).

## I.   The record demonstrates that proxy firms "solicit" proxies under any reasonable construction of the word.

The district court cast this case as nothing more than a battle between competing dictionary definitions of "solicit," with the SEC and the NAM advancing a broad reading, and ISS a narrow one. That approach was fundamentally mistaken. Not only (as we will explain, *see infra* pages 37-59) because the court ultimately adopted the wrong definition, but because it altogether disregarded the overwhelming record support underpinning the SEC's conclusion that proxy firms do "solicit" proxies—however that term is understood—and are thus subject to regulation under the Exchange Act.

That is, whether "solicit" encompasses meanings like "to move to action," or "urge," (Webster's New International Dictionary 2393-94 (2d

1934)), as the SEC has suggested, or is limited to meanings like "make appeals or requests to, importune" (The Concise Oxford Dictionary of Current English, 1150 (1931)) or "endeavor to obtain" (Black's Law Dictionary 1639 (3d ed. 1933)), as the district court concluded, proxy firms "solicit" proxies all the same.

### A. Proxy firms "endeavor to obtain" their clients' voting authority and thereby obtain votes aligned with their recommendations.

First, proxy firms solicit proxies in the most literal sense. One of their services is automated "robo-voting," which allows the proxy firm, after determining how its client should vote, to automatically cast the client's vote in line with that determination, "without further client review." *Proposed Rule*, 84 Fed. Reg. at 66,520 (JA234). In 2020, institutional investors managing over *$5 trillion* in assets employed robo-voting services to "vote[] in lockstep alignment with either ISS or Glass Lewis," giving these proxy firms effective control of those institutions' votes on over 100,000 individual corporate resolutions that year. *See* Paul Rose, *Proxy Advisors & Market Power: A Review of Institutional Investor Robovoting* at 10-11 (Apr. 2021), perma.cc/U2HV-DMRN; *see also Proposed Rule*, 84 Fed. Reg. at 66,538 n.160 (JA252) (similar); Letter from Paul Rose to Vanessa Countryman, Secretary, SEC at 2 (Nov. 14, 2019), perma.cc/9AR2-H6TG (JA220) (similar).

Quite clearly, when proxy firms ask their clients to give them unilateral voting authority, they "endeavor to obtain" a proxy. Solicit, Black's Law Dictionary 1639 (3d ed. 1933). When clients provide proxy firms this authority, the firm also thus "obtains" a vote in line with its recommendation. *Id.*

 The district court brushed aside this paradigmatic example of solicitation, comparing robo-voting to a defense lawyer "communicat[ing] [his] client's decision [regarding a plea deal] to the government." Op. 27 (JA195). That analogy betrays a fundamental misunderstanding: in the case of robo-voting, the client has made no decision at all, other than to go along with whatever the *proxy firm* decides. That is the very definition of obtaining a proxy. Proxy, Black's Law Dictionary (12th ed. 2024) ("The grant of authority by which a person is … authorized" "to vote another's stock shares").

### B. Proxy firms market themselves as experts and tell clients how to vote.

Even putting robo-voting aside, proxy firms' advisory services easily satisfy any reasonable definition of solicitation.

**1.** The SEC's definitional amendment stating that proxy firms "solicit" proxies focuses on two elements of their services: marketing and providing recommendations. *See* 17 C.F.R. § 240.14a-1(*l*)(1)(iii)(A). Each element reflects an aspect of how proxy firms "solicit" proxies, even if "solicit" is narrowly defined.

24

***Marketing.*** By marketing their services, proxy firms insert themselves into the proxy voting process, taking the sort of assertive, affirmative step inherent to solicitation. The SEC has long observed this line, making clear that voting advice constitutes solicitation only when it is initiated by the person giving the advice. *See 1964 Release*, 29 Fed. Reg. at 341 ("a broker normally is not engaged in solicitation where he merely responds … to an unsolicited request from a customer for advice as to how to vote"); *see also* 17 C.F.R. § 240.14a-1(*l*)(2)(i). In other words, when a shareholder approaches someone out of the blue for voting advice, that person does not solicit the shareholder's proxy by responding.

Proxy firms are not approached out of the blue for voting advice. To the contrary, "[r]ather than merely responding to client inquiries," proxy firms "invite[]" the communication "through the marketing of their expertise in researching and analyzing proxy issues for purposes of helping clients make proxy voting determinations." *Interpretive Release*, 84 Fed. Reg. at 47,419. In other words, proxy firms *offer* to give proxy voting advice. And they have so successfully inserted themselves into the proxy voting ecosystem that, in the SEC's words, they have "system-wide significance" and "have come to occupy a unique and important position in the process." *Final*

*Rule*, 85 Fed. Reg. at 55,096 (JA822). Accordingly, their influence over corporate governance issues extends beyond the clients they advise to the securities market as a whole. *Id.* at 55,086 (JA812).

Additionally, proxy firms market themselves as expert voices who should be consulted and trusted. *See Proposed Rule*, 84 Fed. Reg. at 66,522 (JA202) (noting that proxy firms market themselves as experts); *Final Rule* 85 Fed. Reg. at 55,088 (JA814) (similar); ISS Comment at 7 (JA357) (agreeing that ISS "markets its expertise to potential clients"). ISS, for example, "promotes itself as 'a recognized industry leader in the field of corporate governance and proxy voting' and explains to investment advisers that they should consider ISS' 'proven capacity and competence in analyzing proxy issues.'" *Interpretive Release*, 84 Fed. Reg. at 47,418 n.18. And to great effect: proxy firm clients reported to the SEC that they "rely" on proxy firms, that the firms are "crucial," and "indispensable, and that without them, "investment advisers of all sizes would face extreme logistical difficulty." *Proposed Rule*, 84 Fed. Reg. at 66,520 n.17 (JA234); *see also id.* at 66,541 n.179 (JA255).

By inculcating an air of authority—indeed, indispensability—proxy firms assert that shareholders should not only seek out their recommendations, but follow them. After all, the more trusted (and therefore influential) a proxy firm's advice, the more business the firm will attract. More influence

means more profit. Solicitation involves persuasion—trying to get someone to do something. For proxy firms, persuasion begins with marketing: they cultivate an ethos of expertise, so clients will seek out their fee-based advice, with an expectation that the firm's advice should be followed.

***Recommending.*** A proxy firm's primary act of persuasion is its voting recommendation. These recommendations are, by any account, persuasive documents. They tell the client how to vote, and then they "provide a detailed analysis" explaining why. *Final Rule*, 85 Fed. Reg. at 55,088 (JA814). The reports "are very extensive" and "detailed," "much more" so than an investor could hope to produce on its own. *Id.* at 55,141 n.645 (JA867) (quoting proxy firm client). For seventy years, the SEC has employed a commonsense definition of solicitation observing this persuasive element: a communication is solicitation if it is "reasonably calculated to result in the procurement, withholding or revocation of a proxy" (17 C.F.R. § 240.14a-1(*l*)(1)(iii)), or will "influence" a shareholder vote (*1964 Release*, 29 Fed. Reg. at 341).

ISS cannot credibly argue that its recommendations lack persuasiveness. Firms propose a certain action, and they provide the reasons why. That is persuasion in its platonic ideal. In practice, proxy firm recommendations *are* highly persuasive. *See Final Rule*, 85 Fed. Reg. at 55,083

(JA809) (their advice "is often an important factor in the clients' proxy voting decisions"); *Id.* at 55,124 n.481 (JA850) (citing studies documenting their influence). The issuance of a recommendation triggers an avalanche of votes—as much as 45% of the shareholder vote in 48 hours—demonstrating the great weight clients place in that recommendation. *Proposed Rule*, 84 Fed. Reg. at 66,545 n.235 (JA259). Indeed, this "spike in voting," which particularly follows "adverse voting recommendations" is by design: proxy firms "typically provide their recommendations shortly before a shareholder meeting or authorization vote, enhancing the likelihood that their recommendations will influence their clients' voting decisions." *Final Rule*, 85 Fed. Reg. at 55,088 & n.76 (JA814).

"This high incidence of voting immediately on the heels of the publication of proxy advisory reports suggests, at best, that investors spend little time evaluating proxy advisory firms' guidance … and, at worst, that they simply outsource the vote to the proxy advisor." *Proposed Rule*, 84 Fed. Reg. at 66,529 n.96 (JA243) (quoting comment). Proxy firms deploy this tactic knowing that their clients often have fiduciary duties to clients of their own and will be hard-pressed to disregard the advice of their hired 'expert' delivered on the eve of a shareholder vote. *Interpretive Release*, 84 Fed. Reg. 47,418. *Accord Smallwood v. Pearl Brewing Co.*, 489 F.2d 579, 600 (5th Cir.

1974) (a communication is more likely a solicitation when it comes soon before a shareholder vote). Relatively small institutional investors, in particular, "depend heavily on the research reports [of] proxy advisory firm[s]." *Final Rule*, 85 Fed. Reg. at 55,141 n.645 (JA867) (quoting proxy firm client).

Unsurprisingly, therefore, proxy firms' recommendations can sway a vote by as much as 25%. GAO Report at 16. In short, proxy firms quite plainly "petition[] [clients to do[] something" (Oxford English Dictionary, Volume X, at 395) producing a document that "endeavor[s] to obtain" that action—*i.e.* a vote in line with the recommendation (Black's Law Dictionary 1639).

**2.** Other elements of the record confirm as much. *First*, firms' voting policies are proprietary documents reflecting each firm's idiosyncratic views on corporate governance. *See Concept Release*, 75 Fed. Reg. at 42,989 (proxy firms "qualitatively rate or score issuers, based on judgments about the issuer's governance structure, policies, and practices"). Indeed, one common criticism of proxy firms is that they offer one-size-fits-all recommendations, that are, first and foremost, a representation of the firm's philosophy. *See Id.* at 43,012; U.S. Chamber of Commerce Comment at 3 (JA433). For example, the SEC has noted that proxy firms evaluating the independence of a board nominee may apply a standard that "is more limiting than the Com-

mission's rule," risking a "misleading" perception that a proxy firm's determination that a nominee is insufficiently independent derives from SEC rules rather than the proxy firm's judgement. *Proposed Rule*, 84 Fed. Reg. at 66,538 (JA252). In other words, a proxy firm makes recommendations "based on its own … criteria." *Id.*

And though proxy firms sometimes provide advice based on "custom policies" that also account for client values, the SEC found that most often the firm's "benchmark policy proxy voting advice contains the bulk of the data, research, and analysis underlying custom policy proxy voting advice." *Final Rule*, 85 Fed. Reg. at 55,115 (JA252). In fact, even when a client uses a custom voting policy, proxy firms generally provide the client their benchmark voting recommendation as well. *Id.*

*Second,* proxy firms aggressively champion their point of view. The SEC found, for instance, that proxy firms "distribute[]" their advice "broadly," thereby giving it extra force. *Final Rule*, 85 Fed. Reg. at 55,088 n.78. (JA814). And ISS has drawn criticism for consulting with corporations about how to improve corporate governance, sending the message that conforming to the firm's program is the best way to obtain a favorable rating. *Id.* at 55,093 n.141 (JA819). Proxy firms, moreover, bristle when registrants try to engage with them about their recommendations, providing, at best, a "limited window" for registrants to respond to proxy voting advice and seek

corrections (*id.* at 55,103 n.256 (JA829)) and refusing to entertain feedback outside a narrowly defined category of factual errors. In fact, ISS will not engage with registrants at all on matters it deems "contentious." *Proposed Rule*, 84 Fed. Reg. at 66,529 n.101 (JA243). Proxy firms have also refused to engage with smaller publicly traded registrants (*id.* at 66,529 (JA243)) or elected to wait until *after* the solicitation period to engage (*id.* at 66,549 n.254 (JA263)).

Proxy firms even use their platforms to advance ideological positions about corporate governance issues on which they frequently opine. *See Final Rule*, 85 Fed. Reg. at 55,093 n.141 (JA819) (referencing proxy firm executive's public comments urging lower executive compensation). In fact, they outright celebrate their influence, asserting that having such cachet is important to their mission of shaping corporate governance. *Id.*

*Third*, proxy firms are enormously influential. ISS covers 44,000 shareholder meetings annually worldwide, on behalf of clients who collectively control 4.2 trillion shares, and, accordingly, cast millions of votes in U.S. proxy debates every year. *Final Rule*, 85 Fed. Reg. at 55,126 (JA852). Glass Lewis's 1,300 institutional investor clients manage assets worth $35 trillion. *Id.* at 55,127 (JA853). Proxy firms' clientele controls up to 80% of shares. *Proposed Rule* 84 Fed. Reg. at 66519 & n.7 (JA233). And studies

show that, by extension, ISS and Glass Lewis alone exert tremendous influence over nearly 40% of the U.S. shareholder vote. *See* U.S. Chamber of Commerce Comment at 1 (citing Ertimur et. al, *Shareholder Votes and Proxy Advisors*) (JA431). In other words, as the SEC found, "proxy voting advice businesses have become uniquely situated in today's market to influence … and in my any cases directly execute, [institutional] investors' voting decisions"—accordingly, proxy firms are "market-moving." *Final Rule*, 85 Fed. Reg. at 55,083 & n.18 (JA809).

There is simply no credible way for a handful of enormously influential firms to insist that they do not "endeavor to obtain" proxies, when the essence of their business is to influence the vast majority of shareholder votes cast in corporate elections.

## C.   Proxy firms sometimes have an interest in the outcome.

Finally, though the district court was wrong to adopt an "interest-in-the-outcome" requirement (*see* pages 52-59, *infra*), proxy firms *do* sometimes have a horse in the race. Indeed, the SEC expressly found as much (*Final Rule*, 85 Fed. Reg. at 55,093 n.141 (JA819)) and the district court disregarded that finding.

**1.** *First,* proxy firms have well-documented conflicts of interest. ISS advises shareholder clients on how to vote on corporate ballot measures,

while consulting for the same corporations on corporate governance practices. *Final Rule*, 85 Fed. Reg. at 55,126 (JA852). Implicit in this business model is the suggestion that a company engaging ISS as a consultant will earn better ISS ratings. After all, who is more expert on ISS's benchmark than ISS itself? Unsurprisingly, companies report feeling pressure from ISS to hire its consultants. U.S. Chamber of Commerce Comment at 3-4 (JA433-434). Under this business model, ISS also benefits when its clients follow its voting advice, especially its benchmark policy. The more client votes align with ISS recommendations, the more potent those recommendations become, and thus the more valuable its consulting services.[1]

ISS will likely protest that it maintains a firewall between its vote advising and corporate consulting arms—though the record raises concerns about the firewall's effectiveness. *See, e.g.,* Center on Executive Compensation Comment at 8 (JA533). But ISS's self-regulation is irrelevant, particularly in a facial challenge like this one. The SEC's regulatory mandate is to

---

[1] ISS's conflict of interest is far from the only one. When the SEC finalized its rule, Glass Lewis was owned by a shareholder who also participates in proxy debates, raising a concern that it could use its services to advance its parent's interests. NAM Comment at 4 (JA510). Other conflicts include proxy firms "providing voting advice on a matter which [their] affiliates or one of [their] clients have a material interest" and "providing voting advice with respect to a registrant[] … while affiliates of the proxy [firm] hold a significant ownership interest in the registrant, sit on [its] board of directors" or have other ties. *Final Rule*, 85 Fed. Reg. at 55,096 (JA822).

ensure the integrity of the proxy voting process. Even if that mandate extends only to those interested in a proxy vote's outcome, that authority surely extends to firms who *could* use their influence over proxy votes for personal gain. The SEC is empowered to promulgate prophylactic rules, like the conflict-of-interest disclosure rule, to prevent that from happening.

*Second,* proxy firms have an ideological stake in the outcome of certain proxy debates. Proxy firms are well-positioned to use their influence to advance an ideological agenda, and commenters raised concerns that proxy firms already do exactly that. ISS's benchmark policy, for example, evaluates ballot issues based on a broad array of considerations, including an "environmental and social quality" score. ExxonMobil Comment at 8 (JA570). Its guidelines also stake out positions on numerous hot-button topics. *See* ISS, *United States Proxy Voting Guidelines Benchmark Policy Recommendations* ("2020 ISS Guidelines") (Nov. 18, 2019), perma.cc/3WJC-LNSQ. For instance, ISS recommends voting "for" increased disclosure of fracking operations and political contributions (*id.* at 61, 64) but "against" reporting foreign military weapons sales (*id.* at 64). It favors companies assessing their climate change risks (*id.* at 58) but disfavors phase outs of animal testing (*id.* at 56). And so on.

Glass Lewis, likewise, incorporates into its benchmark policy an "Environmental, Social, and Governance" ("ESG") score to allow clients to "integrate ESG factors across their investment chain, including effectively aligning proxy voting and engagement practices with ESG risk management considerations." ExxonMobil Comment at 8 (JA570) (emphasis omitted) (quoting *Understanding Our ESG Content*, Glass Lewis, perma.cc/D8LQ-GEYJ).

As the SEC noted, proxy firms relish in their influence because "they want to have a positive influence on their clients [and] view that as part of their responsibility—to promote good governance." *Final Rule*, 85 Fed. Reg. at 55,093 n.141 (JA819) (providing citations). As one example, a proxy firm leader has publicly "criticiz[ed] executive compensation of certain registrants and ma[de] policy-based recommendations to regulate executive compensation," an issue upon which proxy firms regularly advise clients. *Id.*

**2.** The district court refused to consider these interests, asserting that "such concerns were not part of the agency's rationale for the definitional amendment." Op. 27 (JA195) (citing *Ass'n of Civilian Technicians v. Fed. Lab. Rels. Auth.*, 269 F.3d 1112, 1117 (D.C. Cir. 2001)); *see SEC v. Chenery Corp.*, 318 U.S. 80, 87 (1943). That refusal was error, for two reasons.

**a.** First, the district court's statement about the SEC's rationale is simply incorrect. Though the SEC rejected the legal contention that its regulatory authority is limited to parties with an interest in the underlying ballot measure, the Commission also "reject[ed] … as a matter of fact" the notion that proxy firms "necessarily do not have an interest in the outcome of matters being voted upon at shareholder meetings or do not seek proxy authority for themselves." *Final Rule*, 85 Fed. Reg. at 55,093 n.141 (JA819). It found that this is not "always the case," citing evidence that proxy firms favor policy outcomes and have conflicts of interest. *Id.* In other words, the SEC's factual finding that proxy firms sometimes do "have an interest in the outcome of matters being voted upon" (*id.*) *was* "part of the agency's rationale for the definitional amendment" (Op. 27 (JA195)).

The district court was not entitled to disregard this finding, absent a conclusion that it was unsupported by substantial evidence. *Cf., e.g.*, *Ass'n of Data Processing Orgs., Inc. v. Bd. of Govs. of Fed. Reserve*, 745 F.2d 677, 683-687 (D.C. Cir. 1984) ("When the arbitrary or capricious standard is performing [the] function of assuring factual support" it "demands a quantum of factual support no different from that demanded by the substantial evidence provision of the APA."). The court did not even attempt to overcome this "highly deferential" standard. *Sec'y of Lab. v. Knight Hawk Coal, LLC*, 991 F.3d 1297, 1308 (D.C. Cir. 2021). Its refusal to consider any argument

regarding the self-interested nature of proxy firms' activities is reason enough for reversal.

**b.** The district court's reliance on the *Chenery* rule was also legally incorrect. It is black-letter law that "[t]he *Chenery* rule … does not apply when the question presented is one of statutory construction." *Bldg. & Const. Trades Dep't, AFL-CIO v. U.S. Dep't of Lab. Wage Appeals Bd.*, 829 F.2d 1186, 1189 (D.C. Cir. 1987). That is, *Chenery* does not govern a court's assessment of an agency's "interpretation of [a statute]," as this analysis does not "trench upon a 'determination specially entrusted to [the Commission's] expertise.'" *Sierra Club v. FERC*, 827 F.3d 36, 49 (D.C. Cir. 2016) (second alteration in original) (quoting *Canonsburg Gen. Hosp. v. Burwell*, 807 F.3d 295, 304 (D.C. Cir. 2015)).

This case presents a question of statutory construction: whether the SEC's definitional amendment regarding "solicit" is consistent with the Exchange Act. That is the Court's domain, not the SEC's. *See Loper Bright*, 144 S. Ct. 2273. This Court may consider everything in the record that sheds light on the correctness of the agency's interpretation of the statute—and demonstrates the unworkability of ISS's sweeping challenge.

## II. The district court's narrow construction of the statute was wrong.

Despite the overwhelming record evidence discussed above, the district court held, counterintuitively, that firms whose entire business model

is telling institutional shareholders how they should vote their shares do not "solicit" proxies. *See* Op. 3 (JA171) ("The ordinary meaning of ['solicit' and 'solicitation'] when Congress enacted the Exchange Act in 1934 did not encompass voting advice delivered by a person or a firm with no interest in the outcome of the vote.").

In reaching that conclusion, the district court committed three legal errors, each of which requires reversal: *First,* the court misunderstood the proper interpretive inquiry when a statute "expressly delegate[s] to an agency the authority to give meaning to a particular statutory term" (*Loper Bright*, 144 S. Ct. at 2263); *second*, it adopted an unjustifiably narrow definition of "solicit"; and *third*, it created an atextual "interest in the outcome" requirement out of whole cloth (Op. 3 (JA171)). Once the court's erroneous analysis is set right, the SEC's conclusion that providing "proxy voting advice for a fee" counts as proxy solicitation (17 C.F.R. § 240.14a) fits comfortably within the statutory scheme.

## A. The district court applied an interpretive approach that is precluded by binding precedent.

The district court primarily reached its interpretive conclusion by embracing some dictionary definitions of "solicit" and rejecting others. *See* Op. 17-29. But its decision to do so violates the methodological precedents of both this Court and the Supreme Court.

**1.** The Final Rule explains that, among many other things, in 1934, "solicit" meant "[t]o move to action" or "[t]o urge" or "insist upon." *Final Rule*, 85 Fed. Reg. at 55092 (JA818) (quoting Webster's New International Dictionary (2d ed. 1934)). These broad definitions plainly encompass "mak[ing] a recommendation to a security holder as to its vote … on a specific matter" by "a person that markets its expertise as a provider of such voting advice." 17 C.F.R. 240.14a-1(*l*)(1)(iii)(A). A proxy firm providing proxy voting advice "urge[s]" a vote in line with its recommendations and "move[s] [the shareholder] to action."

The district court did not dispute that the definitions the SEC cited would encompass proxy voting advice. Instead, it concluded that, because the SEC's cited definitions include the usage note "now rare," they "were no longer ordinary meanings of 'solicit' when Congress enacted the Exchange Act in 1934." Op. 22-23 (JA190-191). It thus rejected these definitions out of hand. *Id.* at 22 (JA190).

**2.** That was error. "When the 'Congress explicitly authorizes' an agency to 'define a term,'" the agency is *not constrained* to the otherwise ordinary meaning of the naked text—if anything, such a delegation "suggests that Congress did *not* intend the word to be applied in its plain meaning sense." *Lindeen v. SEC*, 825 F.3d 646, 653-654 (D.C. Cir. 2016) (quoting *Women Involved in Farm Econ. v. USDA*, 876 F.2d 994, 1000 (D.C. Cir.

1989)) (rejecting argument that an explicitly authorized agency definition was contrary to "the commonly understood definition" of the defined term).[2]

*Loper Bright* confirms as much. While overruling *Chevron*—which had "forc[ed] courts to … pretend that [statutory] ambiguities are necessarily delegations"—the Court underscored that *actual* delegations of interpretive authority must be "respect[ed]." 144 S. Ct. at 2268.

As the Court explained, sometimes "the best reading of a statute is that it delegates discretionary authority to an agency," such as when "statutes 'expressly delegate[]' to an agency the authority to give meaning to a particular statutory term." *Loper Bright*, 144 S. Ct. at 2263 (quoting *Batterton v. Francis*, 432 U.S. 416, 425 (1977)); *see also id.* at 2263 n.5 (collecting examples). In such a case, "the reviewing court … fulfils [its proper] role by recognizing constitutional delegations, fix[ing] the boundaries of the delegated authority, and ensuring the agency has engaged in reasoned decisionmaking within those boundaries." *Id.* (quotation marks omitted).

Thus, when Congress expressly gives an agency definitional authority, the court must "independently identify and respect such delegations of

---

[2]  *Accord Rush Univ. Med. Ctr. v. Burwell*, 763 F.3d 754, 760 (7th Cir. 2014) ("We cannot accept" the argument "that the 'plain language' of a law still controls the meaning of a term even when Congress expressly delegates authority to define the supposedly 'plain' term to an agency": "[T]he statute delegates definitional authority to the [agency]; to excise that portion would give the statute a new and unintended meaning.").

authority, police *the outer statutory boundaries* of those delegations, and ensure that agencies exercise their discretion consistent with the APA." *Loper Bright*, 144 S. Ct. at 2268 (emphasis added). An agency definition within those "outer statutory boundaries" controls.

**3.** Congress has explicitly empowered the SEC "by rules and regulations to define technical, trade, accounting, and other terms used in this chapter, consistently with the provisions and purposes of this chapter." 15 U.S.C. § 78c(b); *see also id.* ("The Commission … *shall have power*" to do so) (emphasis added). In other words, the SEC has explicit definitional authority, which it plainly exercised here to adopt a definitional amendment to the term "solicit" that encompasses fee-based proxy voting advice. 17 C.F.R. § 240.14a-1(*l*)(1)(iii)(A); *see also Final Rule*, 85 Fed. Reg. at 55088 n.65 (JA814) (invoking Section 78c(b) as authority for the definitional amendment).

As a result, the district court's task here—as opposed to a case not involving an explicit grant of definitional power—was not to determine the single best meaning of "solicit" as it was used in 1934. *Cf.* Op. 22-23 (JA190-191) (relying on a principle applicable in normal cases: "That a definition is broad enough to encompass one sense of a word does not establish that the word is *ordinarily* understood in that sense.") (quoting *Taniguchi v. Kan Pac. Saipan, Ltd.*, 566 U.S. 560, 568 (2012)), *but see* note 3, *infra*. Whatever

it means to "police the outer statutory boundaries" of Congress's delegation of term-defining power (*Loper Bright*, 144 S. Ct. at 2268), it cannot include rejecting an agency's choice of a definition that is indisputably within "the outer limits of its definitional possibilities" (*Dolan v. U.S. Postal Serv.*, 546 U.S. 481, 486 (2006)), just because it is not the most common meaning.

Indeed, restricting an agency's explicit definitional authority to a term's otherwise ordinary meaning would "excise" that delegation from the statute altogether (*Rush Univ. Med. Ctr.*, 763 F.3d at 760), as the ordinary meaning already controls by default. *Lindeen*, 825 F.3d at 653-654; *cf., e.g.*, *Pulsifer v. United States*, 601 U.S. 124, 143 (2024) ("When a statutory construction thus renders an entire subparagraph meaningless, this Court has noted, the canon against surplusage applies with special force.") (quotation marks omitted; alteration incorporated).

Preserving agencies' expressly conferred power to select a permissible-but-uncommon definition is all the more important where, as here, a statute is inherently technical, since "general-usage dictionaries … cannot and do not account for" the "specific technical context" of such a statute. *Am. Coal Co. v. Fed. Mine Safety & Health Rev. Comm'n,* 796 F.3d 18, 25 (D.C. Cir. 2015) ("General-usage dictionaries cannot invariably control our consideration of statutory language, especially when the 'dictionary definition

of … isolated words[] does not account for the governing statutory context.'")
(quoting *Bloate v. United States*, 559 U.S. 196, 205 n.9 (2010))).

Rejecting the agency's preferred dictionary definitions—which plainly encompass and therefore would justify regulating the business of proxy advice—solely because those usages are "now rare" (Op. 22-23 (JA190-191)) was thus contrary to *Loper Bright* and this Court's precedents. Rather than "respect[ing]" Congress's "delegation of authority" to the SEC to define undefined terms (*Loper Bright*, 144 S. Ct. at 2268), the court selected the meaning of "solicit" it thought best. While that may be the court's task in a normal statutory interpretation case, *Loper Bright* confirms that where a statute "expressly delegate[s] to an agency the authority to give meaning to a particular statutory term," the court's role is limited to "polic[ing] the outer statutory boundaries of those delegations" and ensuring reasoned decisionmaking. *Id.* at 2263, 2268; *accord Lindeen*, 825 F.3d at 653-654.

The district court exceeded that limited role by rejecting the Commission's permissible construction of the word "solicit." The court therefore legally erred, and its conclusions cannot stand.

## B. Properly understood, the Exchange Act comfortably permits the SEC's definitional regulation.

In fact, all the traditional tools of statutory construction—text, context, history, and interpretive aids—point toward a broad interpretation of

"solicit" that easily includes selling advice on how shareholders should vote their shares.

**1.** Contemporaneous dictionary definitions show that, when Congress adopted the Exchange Act in 1934, the word "solicit" was defined broadly, encompassing a spectrum of activity: "to move to action," "[t]o urge," to "incentive[ize]," to "incite," to "insist upon," to "plead for," "lure to," "bring about," or "attract" (Webster's New International Dictionary 2393-94 (2d 1934)), or "awake or excite to action" (Black's Law Dictionary 1639 (3d ed. 1933)).[3] And legal authority of that era reflects the same broad senses of "solicit" in common legal usage. *See, e.g.*, Antonin Scalia & Bryan A. Garner, *Reading Law* 73 (2012) ("[W]hen law is the subject" of a statute or other written instrument, "ordinary legal meaning is to be expected, which often differs from common meaning.").

One 1935 case, for instance, discusses "solicit[ing] holders of securities not to go along with a company reorganization, *suggesting* a better method

---

[3]   As noted, the district court disregarded these definitions because they included the usage note "now rare." Beyond overlooking the SEC's express definitional authority (*see supra*), the court was wrong to rely on dictionary usage notes as dispositive. *See Regions Bank v. Legal Outsource PA*, 936 F.3d 1184, 1214 (11th Cir. 2019) ("[W]e ought not to pluck words out of their context and define them narrowly just because a dictionary indicates that the narrower meaning is the more common one."); *Taniguchi*, 566 U.S. at 568 (even a non-"ordinary" meaning "control[s]" if supported by "the context in which the word appears.").

to be proposed and *advising* the revocation of assents already made." *In re Wayne Pump Co.*, 9 F. Supp. 940, 941 (N.D. Ind. 1935) (emphasis added). Likewise, many other cases use "solicit" alongside words like "urge," "persuade," "counsel," and "advise." *See, e.g., In re Vicksburg Bridge & Terminal Co.*, 29 F. Supp. 225, 237 (S.D. Miss. 1938) (discussing "solicit[ing] or advis[ing] the actual owners of … securities"); *Lake Charles Stevedores v. Mayo*, 20 F. Supp. 698, 703 (W.D. La. 1935) (allowing union representatives "to peaceably solicit or urge workers entering not to do so, in view of [a] strike"); *Feller v. Loc. 144 Int'l Ladies Garment Workers Union*, 121 N.J. Eq. 452, 455, 191 A. 111, 113 (1937) (discussing "[a]n order restraining the defendants from 'persuading, soliciting, or attempting to persuade or solicit any person employed by the complainant … either to join the union or leave complainant's employ'"); *State v. Bissell*, 106 Vt. 80, 170 A. 102, 105 (1934) ("soliciting and counseling"); *In re Riley's Est.*, 163 Wash. 119, 135 (1931) (en banc) ("persuad[ing] or solicit[ing] his mother to award him the greater part of the estate") (quoting *Roe v. Duty*, 115 Wash. 313, 317 (1921)); *State v. Harris*, 158 A. 848, 849 (N.J. Sup. Ct. 1932) ("solicit, urge and advise").

Again, these legal usages indicate a broad meaning encompassing efforts to get *someone* to do *something*—to include "mak[ing] a recommendation to a security holder as to its vote … on a specific matter." 17 C.F.R. § 240.14a-1(*l*)(1)(iii)(A).

**2.** Section 14(a)'s surrounding text and overall structure confirm Congress's intent to authorize the SEC to regulate all forms of "solicit[ation]."

Beyond "solicit," the remaining text of Section 14(a) demonstrates the broad authority Congress intended to confer: the SEC "may prescribe" "such [proxy] rules and regulations" as are "necessary or appropriate in the public interest or for protection of investors." 15 U.S.C. § 78n(a)(1); *see Loper Bright*, 144 S. Ct. at 2264 & n.6 (recognizing that the phrase "appropriate and necessary" signals Congress's intent to "leave[] agencies with flexibility"). That authority reaches "*any* person" using "*any* means" to solicit "*any* proxy" concerning "*any* security." 15 U.S.C. § 78n(a) (emphases added); *see Ali v. Fed. Bureau of Prisons*, 552 U.S. 214, 219 (2008) ("[T]he word 'any' has an expansive meaning" and leaves "no basis in the text for limiting [the modified] phrase.").

These expansive phrases indicate that Congress aimed to broadly empower the SEC to regulate the proxy solicitation process from start to finish. And as this Court has emphasized, "[w]e must read the statutory text as a whole and assess the words in the context in which they are used." *TIG Ins. Co. v. Republic of Argentina*, 110 F.4th 221, 231 (D.C. Cir. 2024).

Here, where every other word in Section 14(a) sweeps broadly, the district court erred by adopting an artificially narrow construction of just

"solicit." *Home Depot U. S. A., Inc. v. Jackson*, 587 U.S. 435, 441 (2019) (isolated statutory words "cannot be construed in a vacuum," as "[i]t is a fundamental canon of statutory construction that the words of a statute must be read in their context and with a view to their place in the overall statutory scheme."). If it intended "solicit" to be so construed, Congress would have given the SEC goalposts a mile wide, but only an inch tall. Nothing in the text supports that result.

If Congress wanted to define "solicit" narrowly, it could have easily done so. Lawmakers of the time knew how. *See, e.g., State ex rel. Pugh v. Meredith*, 167 N.W. 626, 627 (Iowa 1918) (noting that, under Iowa law, "[s]oliciting of proxies *by an agent of the company* either for personal use or *for the use* of officers of the company or association, or for any other persons, is forbidden") (emphasis added). Indeed, when Congress drafted the Exchange Act, it adopted numerous narrowing constructions. *See, e.g.,* Pub. L. 73-291, 48 Stat. 881 § 3(a)(4)-5 (1934) (excluding banks from the definition of "broker" and "dealer"); *see also Final Rule*, 85 Fed. Reg. at 55,092 n.139 (JA818) (collecting numerous examples). Notably, Congress opted here not to use a "readily available apparent alternative[]." *NLRB v. SW Gen., Inc.,* 137 S. Ct. 929, 939 (2017).

**3.** The statute's subsequent history also supports reading "solicit" broadly. Soon after its passage, SEC attorneys understood that solicitation

included "any document … intended to create a disposition" on a ballot issue. Bernstein & Fischer, *The Regulation of the Solicitation of Proxies, supra*, at 231. Accordingly, the SEC soon confirmed that solicitation included "communication to security holders reasonably calculated to result in the procurement, withholding or revocation of a proxy." 17 C.F.R. § 240.14a-1(*l*)(1)(iii). In 1964, it confirmed that "proxy voting advice" constitutes solicitation. *Broker-Dealer Participation in Proxy Solicitation*, 29 Fed. Reg. at 341. It has held, for as long as proxy firms have existed, that their services meet that definition. *See, e.g., 1992 Release*, 57 Fed. Reg. at 48,282 n.41.

For one thing, this decades-long history is itself evidence of statutory meaning. Just last Term, the Supreme Court reaffirmed that "'the longstanding practice of the government'—like any other interpretive aid—'can inform [a court's] determination of what the law is.'" *Loper Bright*, 144 S. Ct. at 2258 (internal quotation marks omitted) (quoting *NLRB v. Noel Canning*, 573 U.S. 513, 525 (2014)). That is especially so when, as here, "an agency's interpretation of a statute … rests on factual premises within [the agency's] expertise.'" *Id.* at 2267 (quoting *Bureau of Alcohol, Tobacco and Firearms* v. *FLRA*, 464 U.S. 89, 98, n.8 (1983)).

For another, Congress has repeatedly amended the surrounding statutory text in the shadow of the agency's interpretation, never second-guessing it. *See, e.g.*, Pub. L. No. 111-203, § 953, 124 Stat. 1376, 1903 (2010); Pub.

L. No. 98-38, § 2, 97 Stat. 205, 205 (1983). Indeed, in one amendment, Congress borrowed the language at issue here. *See* Pub. L. No. 103-202, § 302, 107 Stat. 2344, 2359 (1993) (codified at 15 U.S.C. § 78n(h)(1). "It is well established that when Congress revisits a statute giving rise to a longstanding administrative interpretation without pertinent change, the 'congressional failure to revise or repeal the agency's interpretation is persuasive evidence that the interpretation is the one intended by Congress.'" *Altman v. S.E.C.*, 666 F.3d 1322, 1326 (D.C. Cir. 2011) (quoting *CFTC v. Schor*, 478 U.S. 833, 846 (1986)).

The district court dismissed this argument, stating that courts are "loath to replace the plain text and original understanding of a statute with an amended agency interpretation." Op. 32 (JA200) (quoting *Solid Waste Agency of N. Cook Cnty. v. U.S. Army Corps of Engineers*, 531 U.S. 159, 169 n.5 (2001)). That rebuttal is non-responsive. In *Solid Waste Agency*, the agency attempted to "override a reasonable interpretation of a statute that can be gleaned from its language." 531 U.S. at 169 (quoting *Consumer Product Safety Comm'n v. GTE Sylvania, Inc.*, 447 U.S. 102, 118, n. 13 (1980)). Our argument is more modest: when Congress legislates with a well-established and textually permissible agency interpretation in the background—one that does *not* "override" the text—Congress's decision to leave that interpretation undisturbed suggests the agency's reading is correct.

**4.** Lastly, the purpose and historical context of the Exchange Act support reading "solicit" broadly.

For starters, a broad reading resonates with the statute's express purpose: to "insure the maintenance of fair and honest markets" in securities transactions. 15 U.S.C. § 78b. It is no mystery why Congress, in the aftermath of history's worst stock market crash, sought to protect investors and prevent "manipulation." *Id.* at §§ 78b(3), (4). Section 14(a), accordingly, "ensur[es] full and fair disclosure to shareholders" so they benefit from accurate, reliable information when exercising corporate suffrage. *Mills v. Elec. Auto-Lite Co.*, 396 U.S. 375, 381 (1970).

Legislators announced their ambition to promote "the free exercise of voting rights of stockholders by encouraging 'explanation to the stockholder of the real nature of the questions for which authority to cast his vote is sought.'" S. Rep. No. 792, 73d Cong. 2d Sess., 12 (1934). In other words, because "[f]air corporate suffrage is an important right that should attach to every equity security bought on a public exchange" (H.R. Rep. No. 1383, 73d Cong., 2d Sess., 13 (1934)) Congress "contemplate[d] that the rules and regulations promulgated by the Commission will protect investors" from *anyone*—from "irresponsible outsiders" to "unscrupulous corporate officials," to their own brokers—who by "concealing and distorting facts" could "usurp

the franchise" or otherwise "deprive [them] of their voice in the control of the corporation." S. Rep. No. 73-1455 at 77.

Understanding these goals is essential for understanding the text. Indeed, "the Supreme Court[ ] has instruct[ed] that the Securities [Exchange] Act 'should be construed broadly to effectuate its purpose[ ] ... to protect investors." *Liberty Prop. Tr. v. Republic Properties Corp.*, 577 F.3d 335, 340 n.2 (D.C. Cir. 2009) (quoting *Tcherepnin v. Knight*, 389 U.S. 332, 336 (1967)). Accordingly, this Court and the Supreme Court have construed the SEC's authority to regulate proxy solicitation harmoniously with the statute's broad remedial purpose. *See Cowin v. Bresler*, 741 F.2d 410, 427 (D.C. Cir. 1984) (rejecting atextual limitation on SEC authority that would "frustrate congressional policy"); *Mills*, 396 U.S. at 391 (rejecting heightened causation standard that "would subvert the congressional purpose of ensuring full and fair disclosure to shareholders"); *J.I. Case Co. v. Borak*, 377 U.S. 426, 433 (1964) (construing Section 14 broadly "to make effective the congressional purpose").

This case shows why Congress adopted a broad approach. Congress wrote the Exchange Act half a century before the proxy advice industry emerged. It is unthinkable that the drafters, when authorizing the SEC to regulate any and all proxy "solit[ation]" to promote the flow of accurate in-

formation, would have meant to exclude highly influential firms whose entire business is giving shareholders information, telling them how to vote, and even voting for them. The text requires no such construction.

* * *

In sum, construing "solicit" narrowly, as the district court did, yields an impoverished construction at odds with text, context, and history. The traditional tools show that Congress used "solicit" broadly, encompassing definitions like "mov[ing] to action," "urg[ing]," or "insist[ing] upon" (Webster's New International Dictionary 2393) upon which the SEC relied when clarifying in its definitional amendment that proxy firms do solicit.

### C. The district court's "interest in the outcome" requirement is atextual judicial supplementation.

The district court also wrongly imposed an extratextual requirement that proxy solicitation can *only* occur when the solicitor has an interest in the outcome of the underlying proxy debate. *See* Op. 3 (JA171) ("The ordinary meaning of those terms when Congress enacted the Exchange Act in 1934 did not encompass voting advice delivered by a person or firm *with no interest in the outcome of the vote*.") (emphasis added). But nothing in the text of the Exchange Act even remotely suggests such a limitation.

**1.** The Exchange Act focuses on a single action performed on a single object: "solicit … any proxy." 15 U.S.C. § 78n(a). It says nothing about *who*

solicits, or *why*. And it certainly expresses no intent to exempt from regulation actors who hold enormous sway over proxy votes but happen to be agnostic about ballot outcomes. If anyone seeks to "solicit … any proxy," no matter their reason, they must abide by SEC regulations. Full stop.

In holding otherwise, the district court violated a fundamental tenet of statutory interpretation: A court "will not 'read a phrase into the statute when Congress has left it out.'" *Jawad v. Gates*, 832 F.3d 364, 370 (D.C. Cir. 2016); *see also, e.g.*, *Rotkiske v. Klemm*, 589 U.S. 8, 360-361 (D.C. Cir. 2019) ("'[A]bsent provision[s] cannot be supplied by the courts.'") (quoting Scalia & Garner, *supra*, at 94). And it disregarded a long line of authority suggesting that solicitation turns on a communication's objective nature and its likelihood to influence a shareholder vote, not the speaker's subjective intent. *See*, *e.g., Long Island Light Co. v. Barbash*, 779 F.3d 793, 796 (2d Cir. 1985) ("Determination of the purpose of the communication depends upon the nature of the communication and the circumstances under which it was sent."); *Sargent v. Genesco, Inc.*, 492 F.2d 750, 767 (5th Cir. 1974) (similar); *Dyer v. SEC*, 291 F.2d 774, 777-78 (8th Cir. 1961) (similar).[4]

---

[4]   The district court reasoned that "a speaker's interest and motivation are part of the circumstances under which a message is distributed." Op. 29 (JA197) (emphasis omitted). That simply begs the question whether the statute restricts the SEC's regulatory authority to certain interests. It does not.

The district court's atextual interest requirement simply makes no sense. Consider the most literal iteration of proxy solicitation: asking to assume a shareholder's voting authority. The SEC's power to regulate that act does not turn on the solicitor's underlying interest. If a person asks for a shareholder's proxy, and promises to vote based on a coinflip, that person obviously falls within the scope of Section 14(a), even though they have no interest in the ballot outcome. They have "endeavor[ed] to obtain" the proxy (Black's Law Dictionary 1639 (3d ed. 1933)), and that is enough.

By the same token, there is no basis in the text to impose an "interest-in-the-outcome" limitation on the SEC's authority to regulate efforts to *influence* shareholder votes. In both cases, the agency's regulatory authority derives from the same text, which contains no mention of the solicitor's interest in the outcome. Again, if someone "importuned" a shareholder to vote based on a coinflip, that person would fall within the plain scope of Section 14(a).

**2.** To justify its textual leap, the district court concluded that this interest requirement is necessarily implied by the word "solicit." That is wrong.

While the court canvassed dictionary definitions that "defined the term 'solicit' to mean some variant of endeavoring to secure an action or object from another by actively pleading or asking" (Op. 20 (JA188)), it never

explained why those definitions require a personal interest in the outcome of the action being solicited. Seemingly the closest it came was highlighting the statement that "[t]he term [solicit] implies personal petition and importunity addressed to a particular individual to do some particular thing" (Op. 23 (JA191) (quoting Black's Law Dictionary (3d ed. 1933)), and then observing that "[t]he case that Black's cites … illustrates" solicitation "to make a purchase that would financially benefit the letter's sender" (*id.* at 24 (citing *Golden & Co. v. Justice's Ct. of Woodland Tp.*, 140 P. 49, 58 (Cal. App. 1914)). Putting it mildly, this aspect of *Golden*—not referenced in the dictionary definition—is a slender reed upon which to restrict the term beyond the definition the dictionary actually develops.

Even construing "solicit" narrowly, it is possible—indeed, commonplace—to "endeavor" to get someone to do something, or "make appeals or requests" for them to do so (Op. 20 (JA188)), without an agenda regarding downstream consequences. To use a familiar example, parties frequently appear in this Court and others as *amicus* in support of neither party. That these *amici* do not take a position on a case's outcome does not mean they have not "solicited" the Court. Anything but. *Amici* in support of neither party frequently offer their expert insights, suggest a methodological approach, caution about unintended consequences, or add clarity to a confusing topic. They solicit the Court not by asking it to resolve the case in a

particular way, but by "appeal[ing]" to it and "request[ing]" that it consider their input when it votes however it will. Concise Oxford Dictionary 1150.

Firms like ISS, as described in detail above, do the same. They may not always care about a ballot measure's outcome. *But see* pages 32-37, *supra*. But they volunteer their input on how shareholders *should* vote. Proxy firms market themselves as having the expertise to ensure the client reaches the "correct" vote for that client. They "endeavor to obtain" the client's trust, whereupon they "appeal to" the client to vote in a particular way. Black's Law Dictionary 1639 (3d ed. 1933).

**3.** Imposing an atextual "interest-in-the-outcome" requirement also portends dire consequences by sharply limiting the SEC's regulatory authority over interlopers who seek to influence or manipulate proxy votes. Under the current rules, the SEC enforces a prohibition on false and misleading statements against most everyone who influences shareholder votes (*see* 17 C.F.R. § 240.14a-9), exercising policy judgment to determine when it should impose additional requirements. The district court's interpretation, by contrast, prohibits the agency from imposing even the most modest requirement—that a person tells the truth when trying to influence shareholder voters—over parties who enter the proxy voting arena with no clear interest in the outcome of corporate ballot measures.

The notion that Congress would have sought to categorically exempt *anyone* involved in proxy solicitation from the cardinal rule of avoiding false and misleading statements, let alone the industry that circulates information to shareholders comprising 80% of the equity market, is the quintessential "absurd result" that must be avoided whenever "alternative interpretations consistent with the legislative purpose are available." *F.T.C. v. Ken Roberts Co.*, 276 F.3d 583, 590 (D.C. Cir. 2001).

The district court's interpretation thus yields other absurdities that would radically undermine the agency's power to safeguard the proxy voting system. For instance, under the district court's view, the SEC would be powerless to prevent bad actors from disrupting or subverting a proxy vote by spreading disinformation, if their intent was simply to sow chaos rather than swing the vote count. Anyone reading the Exchange Act would be confident that the agency does have that power.

Similarly, the current proxy rules make clear that trying to induce a shareholder to abstain from voting qualifies as solicitation. *See* 17 C.F.R. § 240.14a-1(*l*)(1)(iii) ("'solicitation include[s]: … "communication to security holders under circumstances reasonably calculated to result in the procurement, *withholding* or revocation of a proxy") (emphasis added). Textually speaking, that interpretation is obviously correct. But under an "interest-in-the-outcome" requirement, it would be hard to justify.

More, most shareholders own their securities in "street name," in which a broker-dealer holds the security in his own name on an investor's behalf. Under SEC rules, when a broker-dealer forwards proxy solicitation materials to the actual shareholder (as is required), that act of forwarding is *itself* a solicitation. *See 1964 Release*, 29 Fed. Reg. at 341; *see also Walsh & Levine v. Peoria & E. Ry. Co.*, 222 F. Supp. 516, 519 (S.D.N.Y. 1963). After all, "Section 14 and the proxy rules apply to any person—not just management, or the opposition." *1964 Release*, 29 Fed. Reg. at 341. The drafters of the Exchange Act specifically highlighted "street name" stocks as a problem that motivated their adoption of Section 14(a) (S. Rep. No. 73-1455 at 76) though broker-dealers lack any "beneficial interest" in the stock (*id.* at 77). In aiming to prevent broker-dealers from "usurp[ing] a shareholder's proxy," their concern was not the broker-dealer's motivation, but protecting shareholders from being "deprive[d] … of their voice." *Id.* Despite this clear evidence that Congress wanted the SEC to regulate this disinterested party, the district court adopted an atextual requirement that renders the agency powerless to regulate *any* disinterested party *at all*.

At bottom, the "interest-in-the-outcome" requirement flouts statutory text and frustrates the broad "congressional purpose" of the Exchange Act: "ensuring full and fair disclosure to shareholders." *Mills*, 396 U.S. at 382.

* * *

When Congress charged the SEC with safeguarding the proxy voting system, it surely authorized the agency to regulate firms that tell shareholders how they should vote—and often simply vote for them. Congress delegated to the Commission the authority to regulate any form of proxy solicitation. And the Act's text and context—and what the record reveals about proxy firms—confirm that the SEC was correct to conclude that proxy firms "solicit' proxies. Its definitional amendment thus has a plainly legitimate sweep, and ISS comes far short of showing that amendment's illegality. Accordingly, ISS's challenge to the SEC's authority to regulate proxy firms *at all* must fail.

## CONCLUSION

The Court should reverse.

Dated: April 3, 2025

Respectfully submitted,

/s/ *Paul W. Hughes*

ERICA T. KLENICKI
MICHAEL A. TILGHMAN II
  *NAM Legal Center*
  *733 10th Street NW*
  *Suite 700*
  *Washington, DC 20001*
  *(202) 637-3000*

PAUL W. HUGHES
ANDREW A. LYONS-BERG
EMMETT WITKOVSKY-ELDRED
  *McDermott Will & Emery LLP*
  *500 North Capitol Street NW*
  *Washington, DC 20001*
  *(202) 756-8000*

*Counsel for Intervenor-Appellant*

## CERTIFICATE OF COMPLIANCE

Pursuant to Federal Rule of Appellate Procedure 32(g), I hereby certify that this brief:

(i)     complies with the type-volume limitation of Rule 32(a)(7) because it contains 12,997 words, excluding the parts of the brief exempted by Rule 32(f); and

(ii)     complies with the typeface requirements of Rule 32(a)(5) and the type style requirements of Rule 32(a)(6) because it has been prepared using Microsoft Office Word 2016 and is set in New Century Schoolbook LT Std font in a size equivalent to 14 points or larger.

Dated: April 3, 2025                    */s/ Paul W. Hughes*

## CERTIFICATE OF SERVICE

I hereby certify that on November 15, 2024, I electronically filed the foregoing brief with the Clerk of this Court using the CM/ECF system, and counsel for all parties will be served by the CM/ECF system.

Dated: April 3, 2025                    */s/ Paul W. Hughes*

**ADDENDUM**

## Addendum
## Table of Contents

**15 U.S.C. § 78n(a)**—Proxies ...................................................................Add. 2

**15 U.S.C. § 78c(n)**—Definitions and application ................................Add. 2

**17 C.F.R. § 240.14a-1(*l*)**—Definitions ..................................................Add. 3

**15 U.S.C. § 78n(a) provides**:

(a) Solicitation of proxies in violation of rules and regulations

> (1) It shall be unlawful for any person, by the use of the mails or by any means or instrumentality of interstate commerce or of any facility of a national securities exchange or otherwise, in contravention of such rules and regulations as the Commission may prescribe as necessary or appropriate in the public interest or for the protection of investors, to solicit or to permit the use of his name to solicit any proxy or consent or authorization in respect of any security (other than an exempted security) registered pursuant to section 78l of this title.

> (2) The rules and regulations prescribed by the Commission under paragraph (1) may include—

>> (A) a requirement that a solicitation of proxy, consent, or authorization by (or on behalf of) an issuer include a nominee submitted by a shareholder to serve on the board of directors of the issuer; and

>> (B) a requirement that an issuer follow a certain procedure in relation to a solicitation described in subparagraph (A).

**15 U.S.C. § 78c(b) provides:**

(b) Power to define technical, trade, accounting, and other terms

> The Commission and the Board of Governors of the Federal Reserve System, as to matters within their respective jurisdictions, shall have power by rules and regulations to define technical, trade, accounting, and other terms used in this chapter, consistently with the provisions and purposes of this chapter.

**17 C.F.R. § 240.14a-1(*l*) provides:**

(*l*) Solicitation.

(1) The terms "solicit" and "solicitation" include:

(i) Any request for a proxy whether or not accompanied by or included in a form of proxy:

(ii) Any request to execute or not to execute, or to revoke, a proxy; or

(iii) The furnishing of a form of proxy or other communication to security holders under circumstances reasonably calculated to result in the procurement, withholding or revocation of a proxy, including:

(A) Any proxy voting advice that makes a recommendation to a security holder as to its vote, consent, or authorization on a specific matter for which security holder approval is solicited, and that is furnished by a person that markets its expertise as a provider of such proxy voting advice, separately from other forms of investment advice, and sells such proxy voting advice for a fee.

(B) [Reserved]

(2) The terms do not apply, however, to:

(i) The furnishing of a form of proxy to a security holder upon the unsolicited request of such security holder;

(ii) The performance by the registrant of acts required by § 240.14a–7;

(iii) The performance by any person of ministerial acts on behalf of a person soliciting a proxy;

(iv) A communication by a security holder who does not otherwise engage in a proxy solicitation (other than a solicitation exempt under § 240.14a–2) stating how the security holder intends to vote and the reasons therefor, provided that the communication:

> (A) Is made by means of speeches in public forums, press releases, published or broadcast opinions, statements, or advertisements appearing in a broadcast media, or newspaper, magazine or other bona fide publication disseminated on a regular basis,

> (B) Is directed to persons to whom the security holder owes a fiduciary duty in connection with the voting of securities of a registrant held by the security holder, or

> (C) Is made in response to unsolicited requests for additional information with respect to a prior communication by the security holder made pursuant to this paragraph (*l*)(2)(iv); or

(v) The furnishing of any proxy voting advice by a person who furnishes such advice only in response to an unprompted request.