No. 24-5105

―――――――――――――

*In the*

# United States Court of Appeals
## *for the*
## District of Columbia Circuit

―――――――――――――

INSTITUTIONAL SHAREHOLDER SERVICES, INC.,
*Plaintiff-Appellee,*

– v. –

SECURITIES & EXCHANGE COMMISSION,
and MARK T. UYEDA, in his official capacity as Acting Chair of the SEC
*Defendant-Appellant,*

NATIONAL ASSOCIATION OF MANUFACTURERS,
*Intervenor-Appellant.*

―――――――――――――

On Appeal from the United States District Court
for the District of Columbia
Case No. 19-cv-3275, Hon. Amit P. Mehta, United States District Judge

―――――――――――――

## FINAL REPLY BRIEF FOR INTERVENOR-APPELLANT

―――――――――――――

ERICA T. KLENICKI
MICHAEL A. TILGHMAN II
  *NAM Legal Center*
  *733 10th Street NW*
  *Suite 700*
  *Washington, DC 20001*
  *(202) 637-3000*

PAUL W. HUGHES
ANDREW A. LYONS-BERG
EMMETT WITKOVSKY-ELDRED
  *McDermott Will & Emery LLP*
  *500 North Capitol Street NW*
  *Washington, DC 20001*
  *(202) 756-8000*

*Counsel for Intervenor-Appellant*

# TABLE OF CONTENTS

Glossary ....................................................................................................vi

Introduction and Summary of Argument ......................................................1

Argument ...................................................................................................3

I.    Solicitors need not be interested in the outcome of particular
      votes—but proxy firms are. ................................................................3

      A.    ISS disregards the SEC's explicit definitional authority. ..............4

      B.    At best, a solicitor must "endeavor to obtain" authority or
            influence over a vote, not a downstream outcome. .......................11

      C.    In any event, proxy firms are interested. ...................................13

II.   Proxy firms solicit proxies under any definition. ...............................19

      A.    Many aspects of proxy firms' services constitute solicitation. ......20

      B.    Occasional conflicting advice does not disprove that proxy
            firms solicit proxies. ..................................................................26

III.  The Advisers Act is irrelevant and inadequate. .................................27

Conclusion..................................................................................................28

# TABLE OF AUTHORITIES[†]

**Cases**

*Am. Coal Co. v. Fed. Mine Safety & Health Rev. Comm'n*,
796 F.3d 18 (D.C. Cir. 2015) ....................................................10

*Ass'n of Civilian Technicians v. FLRA*,
269 F.3d 1112 (D.C. Cir. 2001) ................................................18

*BDPCS, Inc. v. F.C.C.*,
351 F.3d 1177 (D.C. Cir. 2003) ................................................15

*Bldg. & Const. Trades Dep't v. U.S. Dep't of Lab.*,
829 F.2d 1186 (D.C. Cir. 1987) ................................................17

*Council for Urological Ints. v. Burwell*,
790 F.3d 212 (D.C. Cir. 2015) ..................................................17

*Dolan v. U.S. Postal Serv.*,
546 U.S. 481 (2006) ...................................................................5

*Envt'l Def. Fund, Inc. v. Costle*,
631 F.2d 922 (D.C. Cir. 1980) ..................................................17

*Golden & Co. v. Justice's Ct. of Woodland Tp.*,
140 P. 49 (Cal. App. 1914)........................................................13

*Lindeen v. SEC*,
825 F.3d 646 (D.C. Cir. 2016) ....................................................6

*Long Island Lighting Co. v. Barbash*,
779 F.2d 793 (2d Cir. 1985)................................................12, 13

*Loper Bright Enters. v. Raimondo*,
603 U.S. 369 (2024) ....................................... 2, 5, 6, 7, 8, 9, 16

*MCI Telecomms. Corp. v. Am. Tel. & Tel. Co.*,
512 U.S. 218 (1994) ...................................................................7

---

[†] Authorities upon which we primarily rely are marked with asterisks.

## Cases—continued

*Mills v. Elec. Auto-Lite Co.*,
　396 U.S. 375 (1970) ....................................................9

*New York Stock Exchange LLC v. SEC*,
　962 F.3d 541 (D.C. Cir. 2020) ...................................9

*New York v. EPA*,
　964 F.3d 1214 (D.C. Cir. 2020) ...............................18

*Rush Univ. Med. Ctr. v. Burwell*,
　763 F.3d 754 (7th Cir. 2014) .....................................6

*SBC Communications Inc. v. F.C.C.*,
　138 F.3d 410 (D.C. Cir. 1998) .................................17

*SEC v. Chenery Corp.*,
　332 U.S. 194 (1947) ..................................................16

*Sec'y of Lab. v. Knight Hawk Coal, LLC*,
　991 F.3d 1297 (D.C. Cir. 2021) ...............................16

*Sierra Club v. FERC*,
　827 F.3d 36 (D.C. Cir. 2016) ...................................17

*Taniguchi v. Kan Pac. Sai-pan, Ltd.*,
　566 U.S. 560 (2012) ..................................................10

*Transp. Div. v. Fed. R. Admin.*,
　10 F.4th 869 (D.C. Cir. 2021) ..................................23

*United Video, Inc. v. FCC*,
　890 F.2d 1173 (D.C. Cir. 1989) .........................17, 18

*In re Wayne Pump Co.*,
　9 F. Supp. 940 (N.D. Ind. 1935) ................................8

*Wisc. Cent. Ltd. v. United States*,
　585 U.S. 274 (2018) ....................................................8

*Women Involved in Farm Econ. v. USDA*,
　876 F.2d 994 (D.C. Cir. 1989) ...................................6

## Statutes, Rules, and Regulations

15 U.S.C.
*§ 78c(b)........................................................5, 6, 9
*§ 78n(a) ............................................. 1, 2, 9, 11, 12
§ 78w.....................................................................9

8 Del. Code § 212(e).....................................................22

17 C.F.R. § 240.14a-1(*l*)(1)(iii) ..............................20, 23, 25

## Legislative Materials

S. Rep. No. 792, 73d Cong. 2d Sess., 12 (1934)...........................10

## Agency Materials

29 Fed. Reg. 341 (Jan. 15, 1964).....................................12, 25

84 Fed. Reg. 47,416 (Sept. 10, 2019) ....................................20

*85 Fed. Reg. 55,082 (Sep. 3, 2020).......... 2, 14, 15, 21, 22, 23, 24, 25, 26, 27

85 Fed. Reg. 55,155 (Sept. 3, 2020) .....................................21

## Dictionaries

Proxy, Black's Law Dictionary (3d ed. 1933)..............................12

Proxy, Black's Law Dictionary (12th ed. 2024) ...........................11

## Other Authorities

ISS, *United States Proxy Voting Guidelines Benchmark Policy Recommendations* (Nov. 18, 2019)............................14

**GLOSSARY**

| | |
|---|---|
| APA | Administrative Procedure Act |
| ISS | Institutional Shareholder Services Inc. |
| NAM | The National Association of Manufacturers |
| SEC | Securities and Exchange Commission |

**INTRODUCTION AND SUMMARY OF ARGUMENT**

ISS, among the most influential voices in the proxy voting process, believes that Congress exempted it from the SEC's authority to regulate proxy solicitation. But, as we explained, the notion that the SEC cannot adopt commonsense measures to protect investors influenced by proxy firms, and thus ensure robust dialogue and information exchange on corporate ballot issues, is wrong for two reasons. First, under *any* of the dictionary definitions of "solicit" disputed below, proxy firms' activities fall comfortably within the statutory term "solicit … any proxy." 15 U.S.C. § 78n(a); NAM Br. 22-37. And second, the district court's statutory interpretation was wrong. *Id.* at 37-59.

Seeming to concede that it cannot win otherwise, ISS narrows the dispute to a single theory: Because ISS's preferred definitions of "solicit" involve "endeavor[ing] to obtain something," proxy solicitation (it says) includes only "actions in which someone seeks to *achieve a certain outcome* in a shareholder vote"—that is, not just to influence the vote, but to advance "a certain objective or goal"—which it claims proxy firms do not do. ISS Br. 31-32 (quotation marks omitted).

For reasons already explained, that analysis fails at every step. *First*, Congress expressly empowered the SEC to define statutory terms like proxy solicitation. As the Supreme Court has reaffirmed since the district court's

1

decision, that means the relevant inquiry is simply whether its definition falls within "the outer statutory boundaries of [the] delegation[]" (*Loper Bright Enters. v. Raimondo*, 603 U.S. 369, 404 (2024))—which no one disputes the SEC's definition does—*not* whether the court would independently choose a different one. NAM Br. 38-43. Bafflingly, ISS does not respond *at all* to this fatal shortcoming in its position.

*Second*, even assuming solicitation requires "endeavor[ing] to obtain *something*," ISS's conclusion—that the "something" must be a substantive "outcome in [the] shareholder vote" (ISS Br. 31-32 (emphasis added))—does not follow from the premise. Instead, what must be "solicit[ed]" under the statute's plain language is the "proxy" itself. 15 U.S.C. § 78n(a). Thus, endeavoring to obtain authority and influence over the vote (*i.e.*, the proxy) is enough, regardless of any interest in outcomes. NAM Br. 23-24, 52-58.

*Third*, even if an interest in outcomes is required, the SEC expressly "*reject[ed]* … as a factual matter" the notion that proxy are free from such interests. *Final Rule*, 85 Fed. Reg. at 55,093 n.141 (JA819) (emphasis added). The district court refused to consider this argument under the *Chenery* rule, but it overlooked the SEC's contrary factual finding. And *Chenery* does not apply to statutory-authority challenges like this one—another point ISS fails to rebut. NAM Br. 32-37.

ISS is also unsuccessful in its scattershot objections to our demonstration that—setting aside ISS's atextual insistence that a solicitor must have a financial, ideological, or other interest in the outcome—proxy firms solicit proxies under even the district court's preferred dictionary definitions. And the Advisers Act sheds no light on the meaning of the earlier-enacted Exchange Act—and is not a sufficient policy substitute, as the SEC expressly concluded following a decade-long, bipartisan policymaking process.[1]

In sum, the SEC was well within its statutory authority over the proxy process to regulate the entities that exert perhaps the greatest influence on that process. The Court should reverse.

## ARGUMENT

### I. Solicitors need not be interested in the outcome of particular votes—but proxy firms are.

As we explained (at 52-58), the district court based its invalidation of the Final Rule on an extratextual and erroneous requirement that in order

---

[1] ISS observes that the SEC "is nowhere to be found" in this appeal, leaving the NAM to defend its authority. ISS Br. 3, 61. It appears that is because the Commission changed its views on the *content* of its own rule—a rule it spent a decade refining and promulgating—to such an extent that it ultimately acquiesced to restrictions on its statutory *authority* in order to be rid of it. NAM Br. 17-18 (discussing the SEC's multiple unsuccessful attempts to rescind the Final Rule on policy grounds, none of which claimed a lack of authority). If the NAM wins this appeal, the SEC will retain the ability to amend the rule to suit its policy views (so long as it does so lawfully). If ISS prevails, the Commission will forever lose the policymaking discretion that it has exercised for decades.

to "solicit … any proxy" under the Exchange Act, one must have an interest in the downstream outcome of a particular vote. Op. 3 (JA171) ("The ordinary meaning … did not encompass voting advice delivered by a person or firm with no interest in the outcome of the vote.").

For its part, ISS doubles down on this notion, premising its defense of the judgment on the conclusion that "'solicit any proxy' … refers to actions in which someone seeks to *achieve a certain outcome* in a shareholder vote." ISS Br. 30-32; *id.* at 31 ("[A] solicitor … necessarily has a certain objective or goal (e.g., make a sale, win a vote, raise money for charity, etc.)."); 50-51 ("[T]he word 'solicit' necessarily contemplates a *goal* or *object* being solicited. … [O]ne solicits (e.g. asks, pleads, begs) to *obtain* or *achieve* something.").

But as we have already explained, that is wrong, for multiple independent reasons: (1) ISS disregards the SEC's express statutory authority to define terms like solicit, which changes the Court's interpretive task; (2) even if "solicit" implies endeavoring to obtain *something*, it does not follow that the something is a second-order outcome, rather than influence over the vote; and (3) proxy firms often *are* interested in particular outcomes, as the SEC expressly found.

### A.     ISS disregards the SEC's explicit definitional authority.

**1.** First, as we explained, this is not an ordinary statutory interpretation case, and the district court's task was therefore not the ordinary one of

selecting the best meaning of "solicit" by the court's own lights. Instead, where a "statute 'expressly delegate[s]' to an agency the authority to give meaning to a particular statutory term," the reviewing court's role is "to independently identify and respect such delegations of authority, police *the outer statutory boundaries* of those delegations, and ensure that agencies exercise their discretion consistent with the APA." *Loper Bright*, 603 U.S. at 394, 404 (emphasis added); NAM Br. 38-43.

Here, the Exchange Act explicitly empowers the SEC "to define technical, trade, accounting, and other terms used in this chapter" (15 U.S.C. § 78c(b)), a category that self-evidently encompasses the term "solicit … any proxy." As a result, the court's proper role was to "police the outer statutory boundaries" of that term-defining power (*Loper Bright*, 603 U.S. at 404), not to reject the agency's chosen definition because—although within "the outer limits of [the word's] definitional possibilities" (*Dolan v. U.S. Postal Serv.*, 546 U.S. 481, 486 (2006))—it may not have been the most common definition in 1934. NAM Br. 40-43, *see* Op. 22-23 (rejecting SEC's dictionary definitions because they bore the usage note "now rare").

Even before *Loper Bright*, this Court explained that "[w]hen the 'Congress explicitly authorizes' an agency to 'define [a] term,'" the agency is not limited to the otherwise ordinary meaning of that term, because the delegation "suggests that Congress did *not* intend the word to be applied in its

plain meaning sense." *Lindeen v. SEC*, 825 F.3d 646, 653-654 (D.C. Cir. 2016) (quoting *Women Involved in Farm Econ. v. USDA*, 876 F.2d 994, 1000 (D.C. Cir. 1989)). To hold otherwise would read the delegation of term-defining authority out of the statute, and that delegation is just as much part of the enacted text as is the term to be defined. *Rush Univ. Med. Ctr. v. Burwell*, 763 F.3d 754, 760 (7th Cir. 2014).[2]

**2.** Tellingly, ISS does not directly address the SEC's explicit definitional authority *at all*. *See generally* ISS Br. 43-48. Instead, it attacks a straw man about whether "statutory silence" is "an implicit delegation to agencies to regulate however they see fit." ISS Br. 44 (quotation marks omitted; alteration incorporated). But that is non-responsive: this statute is *not* silent; as just described, it *expressly* empowers the SEC to define terms like "solicit … any proxy" (*see* 15 U.S.C. § 78c(b)), and the very case on which ISS relies—*Loper Bright*—explains the reviewing court's more limited role in that circumstance. *See* pages 4-5, *supra*. Indeed, *Loper Bright*'s reasoning

---

[2] To be sure, the agency is constrained by "the outer statutory boundaries" of the term in question (*Loper Bright*, 603 U.S. at 395); it therefore could not define "red" to mean "blue." But the district court accepted that the SEC's preferred definitions were permissible meanings of "solicit," rejecting them because—although permissible—they were "rare." Op. 22-23 (JA190-191).

was based precisely on a distinction between implicit delegations (disfavored, *see* 603 U.S. at 404)) and explicit ones (which judges must "identify and respect," *id.*).

This also puts to bed ISS's contention that "a word with a well-established meaning does not become ambiguous just because the agency can find one alternative definition." ISS Br. 46-47 (citing *MCI Telecomms. Corp. v. Am. Tel. & Tel. Co.*, 512 U.S. 218, 225-227 (1994)). The word "ambiguous" gives the game away: *MCI* was a *Chevron* case; it rejected the argument that, at *Chevron* step one, an outlier dictionary definition "establishes sufficient ambiguity to entitle the Commission to deference." 512 U.S. at 226. That is, courts need not "pretend" that statutory words with outlier definitions "are necessarily delegations" of term-defining "discretionary authority." *Loper Bright*, 603 U.S. at 404. But as we have repeatedly explained, that is not this case, where Congress has *explicitly* delegated term-defining power and the judicial task is therefore only to "police the outer statutory boundaries of those delegations, and ensure that agencies exercise their discretion consistent with the APA." *Id.*

Finally, ISS offers that the phrase "solicit any proxy" itself "reflects a constraint on the agency's authority." But that is question-begging, as the *scope* of that constraint is the central question of this appeal. Congress showed, first and foremost by authorizing the SEC to define the term, that

that scope is broad enough to cover more than just the dictionary definitions preferred by ISS. The district court's disregard of its proper "role" in reviewing a statutorily authorized definitional regulation (*Loper Bright*, 603 U.S. at 385) is reason enough to reverse.

**3.** Moreover, as we explained, the SEC's conception of proxy solicitation is not only a permissible exercise of definitional authority, but also the best reading of the statute under any interpretive regime. NAM Br. 43-51. Contemporaneous dictionaries support the SEC's broad reading of "solicit," with definitions like "move to action," "incite," "bring about," "attract" and "awake or excite to action." NAM Br. 43-44. And judicial opinions of that era—including cases involving solicitation of shareholders—use "solicit" side-by-side with words like "suggest," "advise," "counsel," and "urge." *E.g., In re Wayne Pump Co.*, 9 F. Supp. 940, 941 (N.D. Ind. 1935); NAM Br. 44.[3]

Statutory context likewise shows that Congress meant to give the SEC a broad mandate to regulate *all* expressions of solicitation. NAM Br. 45-47. The Act authorizes the SEC to prescribe all "necessary or appropriate" rules and uses expansive language reinforcing that the SEC may regulate any

---

[3] ISS protests that these cases do not *define* "solicit." ISS Br. 48. Our point is that they demonstrate how the term was used and understood, particularly in the securities context, in 1934. *Wisc. Cent. Ltd. v. United States*, 585 U.S. 274, 277-278 (2018) ("[O]ur job is to interpret the words consistent with their ordinary meaning … at the time Congress enacted the statute.").

and all proxy solicitation—indeed, the Act's prohibition on solicitation is defined entirely by reference to non-compliance with whatever regulations the SEC chooses to promulgate. 15 U.S.C. § 78n(a)(1)

Citing *New York Stock Exchange LLC v. SEC*, 962 F.3d 541 (D.C. Cir. 2020), ISS argues that the SEC may not adopt regulations "as it sees fit" merely because of this "necessary and appropriate" phrase. ISS Br. 44. But there, the SEC invoked nothing but its catch-all authorization to adopt "necessary or appropriate" regulations under 15 U.S.C. § 78w. *See* 962 F.3d at 554. Here, by contrast, the SEC grounded its action in specific statutory authorizations, including to promulgate the proxy rules (15 U.S.C. § 78n(a)) and to define statutory terms (*id.* § 78c(b)). That the SEC has long embraced an expansive definition of proxy solicitation—one that always logically swept in proxy firms—only adds weight to that reading. *Loper Bright*, 603 U.S. at 386 ("'[T]he longstanding practice of the government' … 'can inform [a court's] determination of what the law is.'").

The Exchange Act's historical context also supports the SEC's broad reading. Congress passed the Act following the Great Depression to ensure that shareholders could access reliable information. Mindful of this, this Court and the Supreme Court have emphasized that a broad reading of the Act—and Section 14 in particular—is generally the correct reading. *E.g., Mills v. Elec. Auto-Lite Co.*, 396 U.S. 375, 381 (1970); *see* NAM Br. 49-51.

ISS thinks this Court should not consider the Act's purpose. ISS Br. 45. But purpose merely confirms what text, context, and history already show.

Like the district court, ISS largely disputes the SEC's construction because contemporaneous dictionaries state that the definitions cited by the SEC were by then "rare." ISS Br. 46-47. But, as the district court's only authority acknowledges, such notes are not determinative when "the context in which the word appears" suggests otherwise. *Taniguchi v. Kan Pac. Sai-pan, Ltd.*, 566 U.S. 560, 569 (2012); *see also, e.g., Am. Coal Co. v. Fed. Mine Safety & Health Rev. Comm'n,* 796 F.3d 18, 25 (D.C. Cir. 2015) ("[G]eneral-usage dictionaries cannot invariably control our consideration of statutory language, especially when the 'dictionary definition of … isolated words[ ] does not account for the governing statutory context.'"). Contrary to ISS's argument (at 47), there need be no express "statement" to "indicate[] that" a "less common definition" controls; *Taniguchi* confirms that statutory "context" alone may provide the necessary indication. 566 U.S. at 569.

ISS's only argument about context is that Congress was primarily concerned with preventing abuse by "irresponsible outsiders" and "unscrupulous corporate officials" ISS Br. 35 (quoting S. Rep. No. 73-1455 at 77), not shareholders' "own advisors" (*id.*). But legislators wanted to protect shareholders from *everyone*, *including* their own brokers, who, "despite having "no beneficial interest in a security" might lead their "customers" astray.

S. Rep. No. 73-1455 at 77. Section 14 was enacted to promote the free flow of accurate and reliable information. Congress could not possibly have sought to exempt the most influential participants in that system.

### B. At best, a solicitor must "endeavor to obtain" authority or influence over a vote, not a downstream outcome.

Second, even if ISS were right that "'solicit' necessarily contemplates a *goal* or *object* being solicited" (ISS Br. 50-51), it does not follow that that goal or object must be a particular substantive outcome of a vote. *Cf. id.* at 32 (contending that "'solicit any proxy' thus refers to actions in which someone seeks to *achieve a certain outcome* in a shareholder vote").

To the contrary, the statute itself specifies the direct object of the word "solicit": it is "any proxy." 15 U.S.C. § 78n(a) ("It shall be unlawful for any person … to solicit … any proxy" in contravention of SEC regulations). Thus, what must be "be[] solicited" (ISS Br. 51) is not a particular voting outcome, but the shareholder's proxy itself—that is, *authority* or *influence* over the shareholder's vote. *See* Proxy, Black's Law Dictionary (12th ed. 2024) ("The grant of authority by which a person" "is authorized to vote another's stock

shares"); Proxy, Black's Law Dictionary 1458-1459 (3d ed. 1933) ("the in-strument containing the appointment of" a "person who is substituted or deputed by another to … act for him").[4]

Again, we explained this in our brief. NAM Br. 23-24, 52-58. But ISS provides no textual or policy reason in response—beyond its own unrea-soned assumption—to believe that the use of the word "solicit" in the Ex-change Act requires some object *other than* the actual grammatical object of that verb: "any proxy." 15 U.S.C. § 78n(a).

To the contrary, its only real attempt to do so backfires. ISS Br. 52 (discussing *Long Island Lighting Co. v. Barbash*, 779 F.2d 793 (2d Cir. 1985)). Yes, *Long Island Lighting* suggests "that proxy solicitation … must be designed to 'accomplish' a certain 'result'" (ISS Br. 52), but it also speci-

---

[4]   As the SEC has long held, proxy solicitation includes seeking to influence votes in addition to literally obtaining a proxy. *E.g.*, *Broker-Dealer Partici-pation in Proxy Solicitation* (*"1964 Release"*), 29 Fed. Reg. 341, 341 (Jan. 15, 1964) ("Material distributed during a period while proxy solicitation is in progress, which comments upon the issues to be voted on or which suggests how the stockholder should vote, would constitute soliciting material."); NAM Br. 7-9. This construction therefore applies to proxy firms' recommen-dations even where they do not literally obtain voting authority—although they sometimes do. NAM Br. 23-24; pages 21-23, *infra*.

fies exactly what kind of "result" it is talking about: "furnish[ing], revok[ing], or withhold[ing] proxies" as such (779 F.2d at 796)—not some downstream result of the vote.[5]

Thus, when a proxy firm "endeavor[s] to secure" (ISS Br. 30) from shareholders *authority or influence* over their votes, any "goal or object" requirement that may be inherent in solicitation (*id.* at 50-51) is satisfied. A chaos agent spreading disinformation, a gambler suggesting shareholders vote on a coinflip, a nihilist telling shareholders to abstain, and a "street name" broker forwarding solicitation material to a shareholder all perform solicitation, though none care how the vote comes out. *See* NAM Br. 53-54. Because the district court's analysis nonetheless turned on a further requirement of interest in the outcome, this, too, is an independent basis for reversal.

### C.    In any event, proxy firms are interested.

Finally, even if *both* of our above arguments were wrong, and "solicit … any proxy" really meant "solicit any proxy because of an interest in the

---

[5]   We have already explained that the district court's only support for the interest-in-the-outcome requirement—Black's Law Dictionary's silent citation of a case that in turn happened to involve a financially interested solicitor—is simply too slender a reed to bear any weight. NAM Br. 54-55 (discussing *Golden & Co. v. Justice's Ct. of Woodland Tp.*, 140 P. 49, 58 (Cal. App. 1914)); *cf.* ISS Br. 31 (repeating the district court's flawed analysis of *Golden*).

outcome of the vote," the judgment *still* could not stand, because the record reveals that proxy firms are at times interested in how their clients vote—thus enabling SEC regulation under even ISS's construction. NAM Br. 32-35.

**1.** Proxy firms have well-documented conflicts of interest, which were one of the major drivers of the SEC's regulation. NAM Br. 32-33. And even more fundamentally, they also have idiosyncratic ideological views about good corporate governance and pursue those views through their voting recommendations. *Id.* at 34.[6] Indeed, proxy firms have celebrated their influence over how corporations are run. *Final Rule*, 85 Fed. Reg. at 55,093 n.141 (JA819) (proxy firms "want to have a positive influence on their clients [and] view that as part of their responsibility—to promote good governance.").

The district court did not engage with these concerns, on the *Chenery*-based view that they "were not part of the agency's rationale." Op. 25 (JA193). ISS, unsurprisingly, agrees. ISS Br. 56. But as we explained, that is wrong, for two reasons.

---

[6] For example, among scores of other granular positions, ISS believes shareholders should "vote for" disclosure of animal welfare standards, but should "vote against" labeling of genetically engineered ingredients. ISS, *United States Proxy Voting Guidelines Benchmark Policy Recommendations* 55-56 (Nov. 18, 2019), perma.cc/3WJC-LNSQ; NAM Br. 34.

**2.** First, the SEC did not more explicitly base its action on proxy firms' interest in outcomes because it rejected the atextual premise that such an interest is a necessary component of solicitation. *Final Rule,* 85 Fed. Reg. at 55,093 (JA819). But the SEC also specifically found the following (from which ISS selectively quotes):

> Although we do not believe that Section 14(a) requires that a party have an interest in the outcome of a vote, ***we also do not accept*** commenters' assertion that, ***as a matter of fact***, proxy voting advice businesses ***necessarily do not have an interest in the outcome*** of matters being voted upon at shareholder meetings or do not seek proxy authority for themselves. While this may be true in many instances, we do not think this is always the case.

*Id.* at 55,093 n.141 (JA819) (emphases added). The agency then cited examples of (1) proxy firms asserting that their "influence is good and ultimately they want to have a positive influence on their clients," (2) proxy firm executives publicly criticizing corporate registrants on issues upon which they often advise shareholders, and (3) conflicts of interest. That reasoning is not *Chenery*-barred, even assuming *Chenery* applies. *See, BDPCS, Inc. v. F.C.C.,* 351 F.3d 1177, 1183 (D.C. Cir. 2003) ("When an agency offers multiple grounds for a decision," courts will affirm if "any one of the grounds is valid.").

To the contrary, the SEC's finding that proxy firms sometimes *do* "have an interest in the outcome of matters being voted upon" (*Final Rule,* 85 Fed. Reg. at 55,093 n.141 (JA819)) is binding on a reviewing court unless

unsupported by substantial evidence. NAM Br. 36. Thus, while ISS points to comments downplaying conflicts of interest (ISS Br. 53-54), it cannot escape the SEC's finding without surmounting the "highly deferential" substantial-evidence standard (*Sec'y of Lab. v. Knight Hawk Coal, LLC*, 991 F.3d 1297, 1308 (D.C. Cir. 2021))—which it does not attempt to do.

**3.** In any event, as we explained, *Chenery* does not apply in statutory interpretation cases like this one. NAM Br. 36-37.

**a.** *Chenery* holds that "a reviewing court, *in dealing with a determination or judgment which an agency alone is authorized to make*, must judge the propriety of such action solely by the grounds invoked by the agency." *SEC v. Chenery Corp.*, 332 U.S. 194, 196 (1947) ("*Chenery II*") (emphasis added). Where *Chenery* applies, "the court is powerless to affirm the administrative action by substituting what it considers to be a more adequate or proper basis." *Id.*

But interpreting a statute and applying that application to a closed record is not "a determination or judgment which an administrative agency alone is authorized to make." *Chenery II,* 332 U.S. at 196. To the contrary, "Courts must exercise their independent judgment in deciding whether an agency has acted within its statutory authority." *Loper Bright*, 603 U.S. at 412.

Thus, "[t]he *Chenery* rule … does not apply when the question presented is one of statutory construction." *Bldg. & Const. Trades Dep't v. U.S. Dep't of Lab.*, 829 F.2d 1186, 1189 (D.C. Cir. 1987). *See also Envt'l Def. Fund, Inc. v. Costle*, 631 F.2d 922 (D.C. Cir. 1980) (rejecting applicability of *Chenery* because "we deal solely with a question of statutory construction, an issue within the court's expertise"); *Sierra Club v. FERC*, 827 F.3d 36, 49 (D.C. Cir. 2016) (similar).[7]

Indeed, this Court has held specifically that *Chenery* is no obstacle where an agency "was correct to read [the statute] as not prohibiting" regulations it adopted, "but not precisely for the reasons it gave." *United Video, Inc. v. FCC*, 890 F.2d 1173, 1189-1190 (D.C. Cir. 1989); *see also id.* (because "[t]he purpose of *Chenery* is to insure that courts do not trespass on agency discretion, … *Chenery* reversal is not necessary where, as here, the agency has come to a conclusion to which it was bound to come as a matter of law, albeit for the wrong reason."). That—under ISS's interpretation—is just this

---

[7]   This Court did previously apply *Chenery* under step two of *Chevron*. *E.g., Council for Urological Ints. v. Burwell*, 790 F.3d 212, 222 (D.C. Cir. 2015). *Chenery* was relevant there because step two was a deference doctrine that "largely 'overlap[ped]' with arbitrary-and-capricious review." *Id.* By contrast, at *Chevron* step *one*—involving *de novo* statutory interpretation—the Court agreed that "we must determine on our own whether the statute is ambiguous without regard to the [agency's] reasoning," notwithstanding *Chenery*. *SBC Communications Inc. v. F.C.C.*, 138 F.3d 410, 418 (D.C. Cir. 1998).

case: If the SEC "was correct" in its conclusion that the statute empowers it to regulate proxy firms, the Court is not limited to "precisely … the reasons [the agency] gave." *Id.*

**b.** We explained all this in our opening brief. NAM Br. 36-37. And ISS agrees that this is a pure statutory interpretation case. ISS Br. 25. Yet ISS, even while positioning the *Chenery* rule as a principal rebuttal to our record-based arguments, makes *no attempt* to explain *Chenery*'s relevance to the statutory interpretation issues presented here.[8]

Again, this appeal does not involve any claim that the SEC exercised discretion inappropriately; rather, ISS claims that the SEC *had no* discretion, because the statute does not permit regulation of proxy firms. The Court would not "trespass on agency discretion" (*United Video*, 890 F.2d at 1190) by confirming that the Commission does have that power. ISS's *Chenery*-based arguments, and the rationale of the district court, fail for this reason, too.

* * *

---

[8]   Neither case ISS cites invoking *Chenery* involves statutory interpretation. *New York v. EPA*, 964 F.3d 1214, 1225 (D.C. Cir. 2020) (applying *Chenery* during arbitrary-and-capricious review); *Ass'n of Civilian Technicians v. FLRA*, 269 F.3d 1112, 1117 (D.C. Cir. 2001) (applying *Chenery* where agency invoked different grant of authority).

In sum, ISS's theory of the case—that solicitation encompasses only "actions in which someone seeks to *achieve a certain outcome* in a shareholder vote" (ISS Br. 32)—fails three times over. Congress's express delegation of definitional authority entitled the SEC to select a definition of "solicit" that contains no such requirement (which is also the best reading); even if solicitation requires the actor to seek *something*, the something specified by the statute is "any proxy," meaning simply authority or influence over the vote as such; and in any event, the SEC found that proxy firms *do* sometimes have substantive interests. Any one of these reasons is enough to require reversal.

## II. Proxy firms solicit proxies under any definition.

Our opening brief drew on the administrative record to demonstrate that the SEC's regulation is permissible because—based on that record—proxy firms' activities broadly meet any of the proffered dictionary definitions of "solicit" disputed below. NAM Br. 22-37. This was not a "hodgepodge of policy arguments" (ISS Br. 3) but an application of law to fact to demonstrate that, regardless of which definitions the Court chooses to emphasize, proxy firms solicit proxies.

As noted, however, ISS's brief has distilled the issues in this appeal. It defends the judgment on a single theory: that proxy solicitation occurs only when "someone seeks to *achieve a certain outcome* in a shareholder

vote" because of some underlying interest in that outcome (ISS Br. 32; *see also id.* at 24, 20-21), which it claims proxy firms do not do. As we have described, that is wrong for three independent reasons, requiring reversal. *See* pages 3-18, *supra*.

More, the quibbles ISS raises against our record-based analysis each fail. Proxy advisory firms are within the heartland of SEC's regulatory authority.

### A. Many aspects of proxy firms' services constitute solicitation.

**1.** Proxy firms' business model involves jumping into proxy battles, touting themselves as trustworthy experts on corporate governance. NAM Br. 24-26. They produce persuasive communications recommending particular votes—the hallmark of proxy solicitation. 17 C.F.R. § 240.14a-1(*l*)(1)(iii) (proxy solicitation includes "communication[s] to security holders under circumstances reasonably calculated to result in the procurement, withholding or revocation of a proxy"); NAM Br. 27-29. They even automatically cast their clients' votes "without further client review." *Proposed Rule*, 84 Fed. Reg. at 66,520 (JA234); NAM Br. 23-24.

Because of these efforts, proxy firms wield tremendous power. Their clients control up to 80% of shares. *Proposed Rule* 84 Fed. Reg. at 66519 & n.7 (JA233). The two top proxy firms alone directly influence over 40% of the U.S. shareholder vote. U.S. Chamber of Commerce Comment at 1

(JA431); NAM Br. 31-32. In short, proxy firms are "market-moving." *Final Rule*, 85 Fed. Reg. at 55,083 & n.18 (JA809).

**2.** ISS has little to say about this record information. What few rebuttals it offers are unconvincing.

**Robo-voting.** Automated robo-voting is proxy solicitation by any other name. NAM Br. 23-24. That practice involves proxy firms "[p]opulat[ing] each client's votes shown on the proxy advisory firm's electronic voting platform with the proxy advisory firm's recommendations," and then "automatically submit[ting] the client's votes to be counted" unless the client takes action to change the pre-populated votes. *Supplement to Commission Guidance Regarding Proxy Voting Responsibilities of Investment Advisers*, 85 Fed. Reg. 55,155, 55,155 (Sept. 3, 2020). In other words, the proxy firm assumes the shareholder's voting authority, absent active override from the shareholder—making the proposal of such an arrangement a paradigmatic case of proxy solicitation. *See* pages 11-13, *supra*.

ISS first suggests that the Court cannot consider robo-voting "because the Commission did not rely on it." ISS Br. 36. Aside from *Chenery*'s inapplicability to ISS's facial statutory-authority challenge (*supra* pages 16-18), ISS's assertion is incorrect. The SEC relied on the fact that proxy firms "in many cases directly execute[] [institutional] investors' voting decisions," an obvious reference to robo-voting. *Final Rule,* 85 Fed. Reg. at 55,083 (JA809)

(emphasis added). Robo-voting, moreover, represents the most extreme expression of proxy firms' influence over shareholder votes—among the agency's primary rationales for concluding that such firms solicit proxies. *Id.* at 55,088 (JA814).

ISS also points out that the SEC did not outright *prohibit* robo-voting. ISS Br. 37 (citing 85 Fed. Reg. at 55,144). But that has nothing to do with whether robo-voting contributed to the agency's determination that proxy firms solicit proxies. Indeed, when declining to prohibit robo-voting, the SEC acknowledged potential abuses; it simply found them to be outweighed "at this time," opting to "see how practice develops" before taking action. 85 Fed. Reg. at 55,144 (JA870).

Apart from its misguided *Chenery* arguments, ISS notes that robo-voting "allows" for manual review if the shareholder chooses. ISS Br. 38. But as we explained, robo-voting smacks of solicitation because, by *offering* to assume and submit a shareholder's vote "without further client review," proxy firms "endeavor to obtain" a proxy in the most literal sense. NAM Br. 23-24. Whether the shareholder may sometimes choose to override the proxy firm's choices—essentially, revoking its proxy—is beside the point. *Cf.* 8 Del. Code § 212(e) (proxies are revocable by default).

Additionally, whatever authority shareholders retain over their votes in theory, practically speaking, robo-voting results in many shareholders

voting in lockstep with proxy firms' recommendations. NAM Br. 23 (clients managing trillions of dollars vote in lockstep with proxy firms across more than 100,000 ballot measures). Robo-voting is potent evidence that proxy firms solicit proxies.[9]

**Marketing.** Proxy firms have positioned themselves as key players in the proxy solicitation process, obtaining "system-wide significance" by portraying their services as indispensable expert guidance. *Final Rule*, 85 Fed. Reg. at 55,096 (JA822). These efforts to obtain a high-profile voice in proxy debates confirm that proxy firms solicit proxies. NAM Br. 25-27.

---

[9] ISS also claims that the SEC determined that "an adviser does not engage in solicitation to the extent it 'is not providing any voting recommendations and is instead exercising delegated voting authority on behalf of its clients.'" ISS Br. 37 n.5 (quoting 85 Fed. Reg. at 55,095 (JA821)). That is incorrect. The SEC actually said that when a business "is exercising delegated voting authority" but "is not providing any voting recommendations," those services "generally will not constitute 'proxy voting advice'—and therefore will not be a 'solicitation'—*under Rule 14a-1(l)(1)(iii)(A)*." 85 Fed. Reg. at 55,095 (JA821) (emphasis added). In other words, the SEC explained that such non-recommendation firms are outside the scope of the definitional amendment because—unlike proxy firms—they do not provide proxy voting advice. This statement—that one type of business is not covered by a regulation targeting a different type—does *not* imply that such businesses do not solicit proxies under the statute. Like all agencies, the SEC "do[es] not ordinarily have to regulate a particular area all at once" (*Transp. Div. v. Fed. R. Admin.*, 10 F.4th 869, 875 (D.C. Cir. 2021)), and it was entitled to regulate proxy firms without creating a negative implication that other businesses are beyond the scope of the Exchange Act.

ISS asserts that marketing is unrelated to proxy solicitation because "soliciting new *business* or *clients* … is not soliciting 'any proxy.'" ISS Br. 39. But ISS does not explain how soliciting "new business"—when that "business" is influencing shareholder votes—meaningfully differs from soliciting proxies.

ISS also argues that "the Final Rule sought to impose new restrictions only on voting advice itself, not how proxy advisers market or advertise their services to prospective clients." ISS Br. 39. But this appeal is about the SEC's conclusion that proxy firms "solicit" proxies. It has nothing to do with the policies the SEC adopted after concluding that they do.

**Influence.** Proxy firms also hold tremendous sway over shareholders. NAM Br. 27-29, 31-32. They produce persuasive reports sure to influence shareholder votes. *Id.* at 27. They release those reports with timing that "enhance[s] the likelihood that their recommendation will influence their clients' voting determinations." *Final Rule*, 85 Fed. Reg. at 55,088 & n.77 (JA814). And shareholders overwhelmingly rely on proxy firm advice. NAM Br. 28-29. In all, proxy firms' influence is breathtaking. *Id.* at 31-32.[10]

---

[10] ISS passingly suggests that *Chenery* forecloses our arguments about influence (ISS Br. 41), but the SEC expressly grounded its conclusion partly in "the likelihood that [proxy firms'] recommendations will influence their clients' voting determinations." 85 Fed. Reg. at 55,088 (JA814); *see also id.*

ISS admits that proxy firms influence shareholder votes, but contends that such influence is irrelevant to the question of proxy solicitation. ISS Br. 40-42. That assertion strikes at the core of the SEC's proxy solicitation rules. Since 1956, the SEC has maintained that proxy solicitation includes any "communication to security holders under circumstances reasonably calculated to result in the procurement, withholding or revocation of a proxy." 17 C.F.R. § 240.14a-1(*l*)(1)(iii); *see also 1964 Release*, 29 Fed. Reg. at 341 (Section 14 covers "all materials specifically directed to stockholders and which are related to, and influence, their voting.").

The Court should reject ISS's collateral attack on the seven-decade-long, commonsense notion that influencing shareholder votes amounts to proxy solicitation. ISS offers the example of a "business valuation expert" as someone whose advice might influence a vote on a takeover bid, but who does not solicit proxies. ISS Br. 41-42. But the Final Rule identifies an obvious distinction between such professionals and proxy firms: Solicitation does not include "communications made in the normal course of business by other professionals to their clients that may relate to proxy voting," because they, unlike proxy firms, do not "market their proxy voting advice as a ser-

at 55,086 (JA812) (proxy firms are "uniquely situated … to influence investors' voting decisions," and the SEC proposed the Final Rule "[i]n recognition of" this "unique role").

vice that is separate from other forms of investment advice to clients or prospective clients and sell such advice for a fee." 85 Fed. Reg. at 55,091 n.124 (JA817). In other words, proxy firms—unlike business valuation experts—actively aim to be consulted during proxy debates, and thereby solicit.

### B. Occasional conflicting advice does not disprove that proxy firms solicit proxies.

ISS leans heavily on the fact that proxy firms occasionally give conflicting advice to different clients, because some clients use "custom" policies molded around their preferences. ISS Br. 1, 8, 24-25, 33-34, 56. As we explained (at 30), ISS vastly overstates the importance of "custom" voting recommendations, as a proxy firm's "benchmark policy proxy voting advice contains the bulk of the data, research, and analysis underlying custom policy proxy voting advice." *Final Rule*, 85 Fed. Reg. at 55,115 (JA841). Indeed, "[c]lients that receive proxy voting advice pursuant to their custom policies generally also receive the businesses' voting advice based on the businesses' benchmark policies," and often rely on benchmark policies for all but a few issues. *Id*. And even when a proxy firm gives conflicting advice, its vote recommendation represents *the proxy firm's* own idiosyncratic view, filtered through the lens of the client's values, of how the client "should" vote. The recommendation rests on the same assumptions, methodology, and philosophy that a proxy firm bakes into all its recommendations.

Ultimately, that proxy firms sometimes cater their recommendations in client-specific ways does not change that they (a) market themselves as experts on shareholder votes; (b) insert themselves into proxy debates as trusted vote pickers; (c) produce persuasive voting recommendations designed and delivered to influence shareholder votes; (d) offer to determine and automatically cast shareholder votes; and (e) do all this with a profit motive premised on getting the client to accept the recommendation.

ISS is thus wrong that because "[a]dvising and soliciting are distinct concepts with distinct meanings," nobody would say that proxy firms "solicit" shareholders rather than "advise" them. ISS Br. 33. The SEC correctly found that the character, presentation, and impact of proxy firms' advice compelled a different conclusion.

## III. The Advisers Act is irrelevant and inadequate.

Finally, ISS asserts that the SEC need not regulate proxy firms through its proxy rules because another statute, the Advisers Act, imposes other regulatory constraints. ISS Br. 56-62. But the Advisers Act, enacted in 1940, sheds no light on the meaning of the Exchange Act, enacted in 1934. ISS does not attempt to argue otherwise.

In any event, the SEC correctly concluded that the Advisers Act is insufficient. *Final Rule*, 85 Fed. Reg. 55,086 (JA812). As ISS admits, not all

proxy firms even register as advisers under the Act, or otherwise claim exemptions. ISS Br. 61. Moreover, the Advisers Act and the Exchange Act are not mutually exclusive. They serve complementary, but ultimately distinct, roles. Specifically, the proxy rules cover *all* communications likely to influence shareholder votes, whether or not the speaker violates a fiduciary obligation, including flawed voting advice given in good faith.

ISS disputes that proxy firms make mistakes. ISS Br. 63-65. But its arguments fixate on a narrow category of mistake attributable to factual error. NAM Br. 13-14. ISS's methodology, however, is not beyond reproach—it is built on *ISS*'s views of good and bad corporate governance. The proxy rules exist to ensure that when an influential actor shares such views, investors are protected by robust dialogue and information exchange.

Ultimately, the SEC's policy judgment that such concerns warrant regulation is beyond the scope of this appeal. This case is simply about whether proxy firms "solicit" proxies. The rulemaking record, as well as the text, context, and history of the Exchange Act, confirm that they do.

## CONCLUSION

The Court should reverse.

Dated: April 3, 2025

Respectfully submitted,

/s/ *Paul W. Hughes*

ERICA T. KLENICKI

PAUL W. HUGHES

MICHAEL A. TILGHMAN II

ANDREW A. LYONS-BERG

*NAM Legal Center*

EMMETT WITKOVSKY-ELDRED

*733 10th Street NW*

*McDermott Will & Emery LLP*

*Suite 700*

*500 North Capitol Street NW*

*Washington, DC 20001*

*Washington, DC 20001*

*(202) 637-3000*

*(202) 756-8000*

*Counsel for Intervenor-Appellant*

## CERTIFICATE OF COMPLIANCE

Pursuant to Federal Rule of Appellate Procedure 32(g), I hereby certify that this brief:

(i) complies with the type-volume limitation of Rule 32(a)(7) because it contains 6,500 words, excluding the parts of the brief exempted by Rule 32(f); and

(ii) complies with the typeface requirements of Rule 32(a)(5) and the type style requirements of Rule 32(a)(6) because it has been prepared using Microsoft Office Word 2016 and is set in New Century Schoolbook LT Std font in a size equivalent to 14 points or larger.

Dated: April 3, 2025                    */s/ Paul W. Hughes*

## CERTIFICATE OF SERVICE

I hereby certify that on March 13, 2025, I electronically filed the foregoing brief with the Clerk of this Court using the CM/ECF system, and counsel for all parties will be served by the CM/ECF system.

Dated: April 3, 2025                    */s/ Paul W. Hughes*