# United States Court of Appeals
### FOR THE DISTRICT OF COLUMBIA CIRCUIT

———

Argued May 2, 2025                    Decided July 1, 2025

No. 24-5105

INSTITUTIONAL SHAREHOLDER SERVICES, INC.,
APPELLEE

v.

SECURITIES AND EXCHANGE COMMISSION AND PAUL S.
ATKINS, IN HIS OFFICIAL CAPACITY AS CHAIR OF THE
SECURITIES AND EXCHANGE COMMISSION,
APPELLANTS

NATIONAL ASSOCIATION OF MANUFACTURERS,
APPELLANT

———

Appeal from the United States District Court
for the District of Columbia
(No. 1:19-cv-03275)

———

*Paul W. Hughes* argued the cause for appellant. With him
on the briefs were *Michael A. Tilghman II*, *Andrew A. Lyons-Berg*, and *Emmett Witkovsky-Eldred*.

*Elaine J. Goldenberg* was on the brief for *amici curiae*
Former Commissioners and Staff of the Securities and
Exchange Commission in support of appellant.

2

*Niels C. Holch* was on the brief for *amici curiae* Society for Corporate Governance and National Investor Relations Institute in support of appellant.

*Jordan L. Von Bokern* and *Jeffrey B. Wall* were on the brief for *amici curiae* Chamber of Commerce of the United States of America, et al. in support of appellant.

*Jeffrey M. Harris* argued the cause for appellee Institutional Shareholder Services, Inc.  With him on the brief were *Mari-Anne Pisarri* and *James F. Hasson.  Matthew R. Pociask* entered an appearance.

*Ryan P. Bates* and *Matthew Jacobs* were on the brief for *amici curiae* the Council of Institutional Investors, et al. in support of appellee.

Before: HENDERSON, RAO and GARCIA, *Circuit Judges*.

Opinion for the Court filed by *Circuit Judge* HENDERSON.

KAREN LECRAFT HENDERSON, *Circuit Judge*:  This case involves a challenge to the Securities and Exchange Commission's (SEC) interpretation of the word "solicit" in section 14(a) of the Exchange Act of 1934.  In the context of corporate governance, shareholders vote on various proposals that shape a company's strategic direction and operations. Given the volume and complexity of those shareholder votes, institutional investors—which hold numerous shares across numerous companies—often retain proxy advisory firms to research proposals and issue voting recommendations tailored to each investor's specific criteria and investment strategy. Beginning in 2019, the SEC began regulating proxy advisory firms through an interpretation of section 14(a) that treated their recommendations as "solicitations" of the proxy votes of

3

institutional investors. Institutional Shareholder Services (ISS), a leading proxy advisory firm, sued, arguing that it does not "solicit" within the meaning of the Act. The district court agreed and entered summary judgment for ISS. The National Association of Manufacturers (NAM), an intervenor on behalf of the SEC's position, appeals. We affirm.

## I. BACKGROUND

### A. Statutory & Regulatory Background

Section 14(a) of the Securities Exchange Act prohibits "any person, . . . in contravention of such rules and regulations as the [SEC] may prescribe as necessary or appropriate in the public interest or for the protection of investors, to solicit . . . any "proxy" regarding registered securities. 15 U.S.C. § 78n(a)(1). Since its enactment in 1934, that provision has formed the statutory basis for a comprehensive set of SEC regulations governing proxy solicitations. The Congress did not define "solicit" in the Exchange Act. The SEC has thus defined the term for itself. Since 1956, it has generally described "solicit" and "solicitation" to include any "communication to security holders under circumstances reasonably calculated to result in the procurement, withholding or revocation of a proxy." 17 C.F.R. § 240.14a-1(*l*)(1)(iii); *Amendments to Proxy Rules*, 21 Fed. Reg. 577-78 (Jan. 26, 1956). This case involves whether proxy voting advice "solicits" a proxy within the meaning of section 14(a) of the Exchange Act. Proxy voting advice is often given by proxy advisory firms, which offer their clients research, analysis and voting recommendations on shareholder proposals. *See Exemptions from the Proxy Rules for Proxy Voting Advice*, 85 Fed. Reg. 55,082, 55,083 (Sept. 3, 2020). Proxy advisory firms play a significant role in the modern securities industry. They primarily serve institutional investors, which collectively own a large proportion of the market value of publicly traded

4

companies.  *See* 85 Fed. Reg. at 55,123.  The proxy advisory market is largely shaped by only two firms, ISS and Glass Lewis.  *See* 85 Fed. Reg. at 55,127.  As the district court explored in greater detail, the SEC has issued various opinions at different times regarding whether proxy-voting advice constitutes "solicitation" under its definition.  *See ISS v. SEC*, 718 F. Supp. 3d 7, 12-15 (D.D.C. 2024).

In September 2019, the SEC distributed guidance suggesting that proxy advisory services constituted "solicitation" under the proxy rules.  *Commission Interpretation and Guidance Regarding the Applicability of the Proxy Rules to Proxy Voting Advice*, 84 Fed. Reg. 47,416, 47,417 (Sept. 10, 2019) (2019 Guidance) (citing 17 C.F.R. § 240.14a-1(*l*)(1)(iii)).  The SEC then issued a notice of proposed rulemaking to codify that interpretation.  *Amendments to Exemptions from the Proxy Rules for Proxy Voting Advice*, 84 Fed. Reg. 66,518, 66,522 (Dec. 4, 2019).

The Commission issued its rule in September 2020. 85 Fed. Reg. at 55,082 (2020 Rule).  It explained that the 2020 Rule was intended to "help ensure that investors who use proxy voting advice have access to more complete, accurate, and transparent information and are able to benefit from a robust discussion of views" when voting.  *Id.* at 55,122-23.  The SEC correspondingly amended its regulations to define "solicit" and "solicitation" as:

> [a]ny proxy voting advice that makes a recommendation to a security holder as to its vote, consent, or authorization on a specific matter for which security holder approval is solicited, and that is furnished by a person that markets its expertise as a provider of such proxy voting advice, separately from other forms of

5

> investment advice, and sells such proxy voting
> advice for a fee.

*Id.* at 55,154; 17 C.F.R. § 240.14a-1(*l*)(1)(iii)(A).  It excluded from that definition advice given in response to an unprompted request.  17 C.F.R. § 240.14a-1(*l*)(2)(v).

The SEC's new interpretation meant that proxy advisory firms had to file their proxy recommendations with the SEC as proxy solicitations unless they could claim an exemption.  The Rule provided an exemption if a firm complied with three conditions:  (1) disclosing conflicts of interest and the steps taken to address them; (2) adopting procedures to make their proxy advice available to the companies that are the target of that advice at least by the time the advice is disseminated to the adviser's clients; and (3) establishing a mechanism to inform clients of the company's response to the firm's advice before the applicable shareholder meeting.  *See* 85 Fed. Reg. at 55,154.  The SEC amended the rule in 2022 to rescind the latter two conditions.  *Proxy Voting Advice*, 87 Fed. Reg. 43,168, 43,174 (July 19, 2022).[1]  The 2020 Rule also amended the Notes to the antifraud provision of the regulations to

---

[1] NAM and the U.S. Chamber of Commerce separately challenged that *volte face* in the Western District of Texas and the Middle District of Tennessee, respectively, arguing that the SEC's 2022 rescission was arbitrary and capricious under the APA.  Both district courts disagreed.  *See Nat'l Ass'n of Mfrs. v. SEC*, 644 F. Supp. 3d 342 (W.D. Tex. 2022); *Chamber of Com. v. SEC*, 670 F. Supp. 3d 537 (M.D. Tenn. 2023).  The Fifth and Sixth Circuits split on the question:  the Fifth held that the rescission violated the APA and partially vacated the 2022 Rule but the Sixth upheld the rule, finding no violation.  *Contrast Nat'l Ass'n of Mfrs. v. SEC*, 105 F.4th 802 (5th Cir. 2024) (partly invalidating rescission), *with Chamber of Com. v. SEC*, 115 F.4th 740 (6th Cir. 2024) (upholding rescission).  That divide does not affect our analysis because neither decision dealt with the SEC's definitional rule at issue here.

6

provide that a firm's "failure to disclose material information" about its proxy-voting advice can constitute a false or misleading statement. 85 Fed. Reg. at 55,155; 17 C.F.R. § 240.14a-9.

## B. Procedural Background

ISS initiated this action in October 2019 after the SEC issued its 2019 Guidance, arguing that the agency had unlawfully expanded "solicit" to encompass proxy-voting advice and that the 2019 Guidance was improperly issued without notice and comment. *See* J.A. 13-37. The district court stayed the case at the parties' request pending completion of the SEC's related rulemaking. *See* J.A. 6. After the SEC adopted its 2020 Rule, the court lifted the stay and ISS filed an amended complaint asserting six claims based on the Administrative Procedure Act (APA), arguing that: proxy advice is not solicitation under Section 14(a) (Count 1); the SEC lacks statutory authority to regulate proxy advisers (Count 2); both the 2019 Guidance and the 2020 Rule are arbitrary and capricious (Counts 3 and 4); the two new disclosure requirements infringe the First Amendment (Count 5); and the 2019 Guidance is procedurally invalid (Count 6). *See* J.A. 43-72. Later, the district court also granted NAM's motion to intervene. J.A. 10-11.

In June 2021, the SEC sought to hold the case in abeyance, announcing its intention to revisit the 2020 Rule and suspend its enforcement in the interim. The court again held the case in abeyance. *See* J.A. 9. In November 2021, the SEC proposed rescinding two of the 2020 Rule's three exemption conditions—those requiring advance disclosure of voting advice to issuers (*i.e.*, companies that issue publicly traded securities) and access to issuer responses—while preserving the definitional amendment and the conflict-disclosure

7

provision. *See Proxy Voting Advice*, 86 Fed. Reg. 67,383, 67,387 (Nov. 26, 2021).

By March 2022, the SEC had yet to complete its rulemaking process and sought a further stay, which ISS opposed. The district court lifted the stay as to the definitional amendment (as it was not expected to change in the new rulemaking). *See* J.A. 10. The SEC later rescinded the two exemption conditions, mooting two of ISS's claims (Counts 3 and 5). *See* 87 Fed. Reg. at 43,174; *ISS*, 718 F. Supp. 3d at 17. ISS's challenges to the definitional amendment remained. The district court later raised *sua sponte* whether ISS still had standing and whether its claims were ripe for review. *Id.* The SEC, NAM and ISS all moved for summary judgment.

The district court first determined that ISS had standing to pursue its claims and those claims were ripe for review. *Id.* at 18-20. On the merits, it found that the SEC's definitional classification of proxy advice as solicitation was foreclosed by the text of section 14(a). *Id.* at 20-24. Rejecting the SEC's reliance on a broad regulatory definition and more expansive— and, as the court noted, "now rare"—dictionary meanings, the court concluded that the term "solicit" could not reasonably be stretched to include disinterested voting advice. *Id.* at 23, 29.[2] Accordingly, it granted summary judgment to ISS on Counts 1 and 2 of the complaint. *Id.* at 29. It did not reach ISS's arbitrary-and-capricious claims (Counts 3 and 4). *Id.* at 29 n.10.

---

[2] The district court used step one of the *Chevron* framework to review the pertinent language. *See id.* at 21. *Chevron* has since been overruled. *Loper Bright Enters. v. Raimondo*, 603 U.S. 369, 412 (2024). That change, however, does little to disturb the district court's decision because it found no statutory ambiguity and thus did not accord the agency's interpretation deference.

8

Initially, both NAM and the SEC timely appealed. J.A. 204, J.A. 205. The SEC dismissed its appeal in August 2024 (without explanation), leaving NAM as the sole appellant defending the definitional change in the amended rule. The district court had jurisdiction under 28 U.S.C. § 1331 and we have jurisdiction under 28 U.S.C. § 1291.

## II. JURISDICTION

Although not questioned by the parties, we have an "independent obligation to assure ourselves that jurisdiction is proper before proceeding to the merits." *Plains Com. Bank v. Long Family Land and Cattle Co.*, 554 U.S. 316, 324 (2008).

Article III grants federal courts the power to adjudicate only "Cases" and "Controversies." U.S. Const. art. III, § 2. "That power includes the requirement that litigants have standing." *California v. Texas*, 593 U.S. 659, 668 (2021). The requirement "must be met by persons seeking appellate review, just as it must be met by persons appearing in courts of first instance." *Arizonans for Off. Eng. v. Arizona*, 520 U.S. 43, 64 (1997). "[F]ederal courts of appeals lack jurisdiction if the appellant has not shown standing to pursue the appeal." *Lewis v. Becerra*, 111 F.4th 65, 69 (D.C. Cir. 2024). A party that properly intervenes "becomes a full participant in the lawsuit and is treated just as if it were an original party." *Schneider v. Dumbarton Devs., Inc.*, 767 F.2d 1007, 1017 (D.C. Cir. 1985). "The Supreme Court has therefore concluded that an intervenor may maintain an appeal even if the original party does not appeal, as long as the intervenor has standing to invoke the appellate court's jurisdiction." *Ameren Servs. Co. v. FERC*, 893 F.3d 786, 791 (D.C. Cir. 2018) (citing *Diamond v. Charles*, 476 U.S. 54, 68 (1986)).

The district court granted NAM's motion to intervene as a defendant based, in part, on its determination that NAM was not required to establish its own Article III standing because it

9

was seeking the same relief as the SEC.[3]  In this court, the SEC dismissed its appeal, leaving NAM as the sole appellant. Accordingly, NAM is now required to show it has constitutional standing to invoke our jurisdiction.  *See Ameren Servs. Co.*, 893 F.3d at 791.

Because NAM asserts associational standing on behalf of its members, it must show that "(1) at least one of its members

---

[3] Intervenors seeking relief broader than or different from that sought by existing parties must possess constitutional standing, *see Town of Chester v. Laroe Ests., Inc.*, 581 U.S. 433, 440 (2017), but intervenors that seek the same relief sought by at least one existing party need not do so, *see Little Sisters of the Poor Saints Peter & Paul Home v. Pennsylvania*, 591 U.S. 657, 674 n.6 (2020) (explaining that the circuit court "erred by inquiring into [intervenors'] independent Article III standing" when they sought the same relief as the federal government, which "clearly had standing"). That distinction is in tension with some of our court's precedent requiring an intervenor to demonstrate Article III standing even if pursuing the same relief as an existing party.  *See, e.g.*, *Yocha Dehe v. Dep't of the Interior*, 3 F.4th 427, 430-32 (D.C. Cir. 2021) (applying circuit precedent predating *Little Sisters*); *Old Dominion Elec. Coop. v. FERC*, 892 F.3d 1223, 1232 n.2 (D.C. Cir. 2018) (noting that *Town of Chester* alone did not require overruling circuit precedent as to other types of intervenor); *Crossroads Grassroots Pol'y Strategies v. Fed. Election Comm'n*, 788 F.3d 312, 316 (D.C. Cir. 2015); *Deutsche Bank Nat'l Tr. Co. v. FDIC*, 717 F.3d 189, 193 (D.C. Cir. 2013); *Fund for Animals, Inc. v. Norton*, 322 F.3d 728, 732-33 (D.C. Cir. 2003).  That tension has led to some confusion at the district court level.  *E.g.*, *Signal Peak Energy, LLC v. Haaland*, No. 24-cv-366, 2024 WL 3887386, at *3-4 (D.D.C. Aug. 21, 2024) (discussing the conflict).  The district court in this case did not grapple with the issue and simply found that, because NAM sought the same relief as the SEC, it did not need to establish Article III standing.  *See* Hearing Tr. at 38-39, *ISS*, No. 19-cv-3275 (D.D.C. Oct. 29, 2024), Dkt. 77.  We need not resolve that question because NAM plainly must establish its own standing to press this appeal.

10

has standing to sue in her or his own right, (2) the interests it seeks to protect are germane to its purpose, and (3) neither the claim asserted nor the relief requested requires the participation of an individual member in the lawsuit." *Wash. All. of Tech. Workers v. DHS*, 50 F.4th 164, 175 (D.C. Cir. 2022) (quoting *Save Jobs USA v. DHS*, 942 F.3d 504, 508 (D.C. Cir. 2019)). There is no question that NAM satisfies the latter two components; thus, we focus on the first.

To establish Article III standing on appeal, NAM must demonstrate that at least one of its members has an injury fairly traceable to the district court's judgment that could be redressed by a favorable ruling from this court. *See West Virginia v. EPA*, 597 U.S. 697, 718 (2022) (quoting *Food Mktg. Inst. v. Argus Leader Media*, 588 U.S. 427, 433 (2019)). To qualify as an injury-in-fact, a harm must be "concrete and particularized" and "actual or imminent." *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560 (1992) (citation modified). In determining whether a harm is sufficiently concrete, "history and tradition offer a meaningful guide to the types of cases that Article III empowers federal courts to consider." *Sprint Commc'ns Co. v. APCC Servs., Inc.*, 554 U.S. 269, 274 (2008). "[T]raditional tangible harms, such as physical harms and monetary harms" are paradigmatic concrete Article III injuries. *TransUnion LLC v. Ramirez*, 594 U.S. 413, 425 (2021). "[A] material risk of future harm can [also] satisfy the concrete-harm requirement" if equitable relief is sought. *Id.* at 435.

Here, NAM asserts that its members "suffer a direct, concrete harm from the vacatur of regulations promoting proxy voting based on accurate and reliable information," which allows members to gain more information from proxy advisers and position themselves to respond to it. *See* Appellant Br. 4. In district court, NAM submitted a declaration prepared by its vice president of tax and domestic economic policy, which stated that, among various purported harms, in 2018 "56% of

11

[its members] . . . were having to divert resources from their core business functions in order to respond to the actions of proxy advisory firms" when seeking market investments. J.A. 76. That was necessary, he said, because proxy advisory recommendations could be "misleading or inaccurate," lack transparency, involve "undisclosed conflicts of interest," and effectively exclude NAM's members from the decisionmaking process of shareholder voting. J.A. 78-79. But according to the declaration, "[t]he regulatory restraints imposed by the [2020 Rule] would address the harms NAM members have experienced," J.A. 79, because the 2020 Rule would virtually force any proxy adviser to seek an exemption under the Rule (rather than become subject to the SEC filing requirements), which in turn would require significant disclosures to NAM's members about their recommendations ahead of any vote. *See* 85 Fed. Reg. at 55,154. ISS agrees that, if the Rule were in effect, it would be forced to seek an exemption to stay in business. Oral Argument at 31:11.

That showing is sufficient to satisfy the requirements of Article III. The vacatur of the 2020 Rule removes disclosure obligations that NAM contends directly mitigated misleading proxy advice, thereby reimposing the same monetary and operational burdens its members previously faced.[4] Those harms are not intangible or only informational but have a direct impact on NAM's members' businesses—a prototypical injury-in-fact. *Cf. TransUnion*, 594 U.S. at 425. A decision from this court reinstating the Rule would alleviate those harms by restoring the framework that NAM alleges required proxy advisers to provide timely, transparent disclosures. Accordingly, NAM has standing to pursue its appeal.

_____

[4] Those obligations include disclosing conflicts of interest as adopted by the 2020 Rule and left undisturbed by the 2022 amendment. *See* 85 Fed. Reg. at 55,154; 87 Fed. Reg. at 43,174.

12

### III.  MERITS

NAM makes two claims on appeal.  First, it contends that the district court's definition of "solicit" was overly narrow and the SEC's reading was within the bounds of its interpretive authority.  Second, it asserts that even if the district court's definition is correct, because "solicit" can mean "endeavor to obtain," advisory firms solicit proxies by seeking to obtain client votes aligned with their recommendations.

We review a district court's grant of summary judgment *de novo* and, like the district court, will set aside the agency action if it is arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law.  5 U.S.C. § 706(2)(A).  In considering whether an agency's interpretation of its governing statute is contrary to law, we must "exercise independent judgment in determining the meaning of statutory provisions."  *Loper Bright*, 603 U.S. at 394, 412-13; *see also Util. Air Regul. Grp. v. EPA*, 573 U.S. 302, 328 (2014) ("[A]n agency may not rewrite clear statutory terms to suit its own sense of how the statute should operate.").[5]

---

[5] Additionally, if an "agency is authorized to exercise a degree of discretion" in defining statutory terms, our role under the APA is "to independently interpret the statute and effectuate the will of Congress subject to constitutional limits" by "recognizing constitutional delegations, fixing the boundaries of the delegated authority, and ensuring the agency has engaged in reasoned decisionmaking within those boundaries."  *Loper Bright*, 603 U.S. at 394-95 (citation modified).  NAM argues that the SEC was delegated authority to define the term "solicit" by a provision empowering it to "define technical, trade, accounting, and other terms used in this chapter, consistently with the provisions and purposes of this chapter."  15 U.S.C. § 78c(b); Appellant Br. 39-43.  We need not resolve whether "solicit" is the sort of term that provision empowered the SEC to define.  Regardless, the SEC's definition is not only incorrect as a matter of *de novo* statutory

13

"We begin, as in any case of statutory interpretation, with the language of the statute." *CSX Transp., Inc. v. Ala. Dep't of Revenue*, 562 U.S. 277, 283 (2011) (citation omitted). Again, section 14(a) prohibits "any person, . . . in contravention of such rules and regulations as the [SEC] may prescribe as necessary or appropriate in the public interest or for the protection of investors, to solicit . . . any proxy" regarding registered securities. 15 U.S.C. § 78n(a)(1). The Act itself does not define "solicit" so we look to the "word's ordinary definition" at the time the Exchange Act was enacted in 1934. *CSX Transp.*, 562 U.S. at 284. "To determine the ordinary meaning of a legal term, we may look to contemporaneous dictionaries." *Greenbaum v. Islamic Republic of Iran*, 67 F.4th 428, 432 (D.C. Cir. 2023) (citing *Taniguchi v. Kan Pac. Saipan, Ltd.*, 566 U.S. 560, 566-68 (2012)).

Contemporaneous dictionaries suggest that "to solicit" and "solicitation" entail seeking to persuade another to take a specific action. For example, *Webster's Dictionary* defined "solicit" to mean "[t]o make petition to; to entreat; importune . . . now, often, to approach with a request or plea, as in selling, begging, etc." and "[t]o endeavor to obtain by asking or pleading; to plead for . . . to seek eagerly or actively." *Webster's New International Dictionary of the English Language* 2393 (2d ed. 1934). It also could mean "to endeavor to obtain by asking or pleading; to plead for; as, to solicit an office, a favor, alms." *Id.* The *Oxford English Dictionary* defined the term as "[t]o entreat or petition (a person) for, or to do, something; to urge, importune; to ask earnestly or persistently." 10 *The Oxford English Dictionary* 395 (1933). An "obscure" secondary definition was "[t]o urge or press (a matter)." *Id.* Other dictionaries gave "solicit" the same understanding. *See, e.g.*, 2 *The New Century Dictionary* 1764

---

interpretation but also beyond "the boundaries of [any] delegated authority." *Loper Bright*, 603 U.S. at 395 (citation modified).

14

(1927) ("To make petition or request, as for something desired."). Legal dictionaries similarly reflected a sense that solicitation involves advocacy on one's own behalf. *See, e.g.*, *Solicit*, *Black's Law Dictionary* (3d ed. 1933) ("[t]o ask for with earnestness, to make petition to, to endeavor to obtain, to awake or excite to action, to appeal to, or to invite"); *A Dictionary of the Law* 959 (1913) ("[t]o importune, entreat, implore, ask, attempt, try to obtain"). In short, extending the term "solicit" to encompass voting recommendations requested by another would go beyond the 1934 meaning.

And the same is true today. Between a proxy adviser and its client, it might be reasonable to say that the client "solicits" the adviser's recommendation but that interpretation does not suggest that, in providing that recommendation, the adviser has "solicited" the client's vote. The adviser, although it holds itself out to attract clients, does not initiate the exchange; it provides advice only in response to the client's request. In other words, the solicitation runs in the opposite direction to the one suggested by NAM. By contrast, a company director who hopes to obtain a particular outcome from a particular vote might "solicit" the proxy votes of shareholders in order to achieve his goal. Based on that understanding, we conclude that the ordinary meaning of "solicit" does not include entities that provide proxy voting recommendations requested by others, even if those recommendations influence the requestors' eventual votes.

Our conclusion is reinforced by the structure of the statute. Section 14 supplies a broader set of provisions designed to ensure the integrity of shareholder voting processes by regulating the exercise of proxy authority. *See generally* 15 U.S.C. § 78n. The statute presupposes that proxy solicitation involves parties actively seeking to secure votes or voting authority. *See id.* Nothing in section 14 indicates that it was intended to reach those entities that merely advise others how

15

to vote, without themselves seeking votes or acting on behalf of those who do. *See id.*

"[O]ther contextual clues" add to NAM's problems. *Henson v. Santander Consumer USA Inc.*, 582 U.S. 79, 85 (2017). If the Congress in one provision uses a specific term—in this case, "solicit"—and in neighboring provisions regulates broader or different conduct using broader language, we may infer that the Congress meant something different in its choice of the specific term. *Cf. id.* at 85-86. That inference is permissible here because the Exchange Act does contain more expansive formulations in regulating other kinds of conduct. For example, section 10(b) prohibits "*any person* . . . [t]o use or employ . . . *any* manipulative or deceptive device or contrivance" in connection with the purchase or sale of securities. 15 U.S.C. § 78j(b) (emphasis added). Section 14(a), in comparison, limits its reach to those who "solicit" proxy votes, not simply those who might influence those votes or provide recommendations. 15 U.S.C. § 78n(a)(1). More broadly, as ISS accepts, *see* Appellee Br. 27, proxy advisers also are subject to a different statute—the Investment Advisers Act of 1940—which separately amended the statutory scheme to include different standards for investment advisers who "for compensation and as part of a regular business" issue "analyses or reports concerning securities." 15 U.S.C. § 80b-2(a)(11); *see generally* 15 U.S.C. §§ 80b-1 *et seq.*

The role of a proxy in the context of shareholder voting is also informative. A proxy is a formal authorization given by a shareholder to another person to vote on his behalf. *See Proxy*, *Black's Law Dictionary* (3d ed. 1933) ("a writing authorizing one to vote for another"). The concept entails agency: a person solicits a proxy when he seeks to be, or to place someone else in the position of being, an agent empowered to cast votes. Communications that provide analysis or guidance upon request, by contrast, do not involve such a relationship. They

16

may affect *how* the principal votes but they do not seek to supplant his authority *to* vote.

It is thus no answer to say, as the SEC did in its rulemaking and NAM repeatedly emphasizes, that proxy advisers "influence" shareholder votes or that they "affect" voting outcomes. *See* 85 Fed. Reg. at 55,086; Appellant Br. 27-32. That argument has surface appeal, particularly when considering the modern proxy voting system. But it fails as a matter of statutory interpretation. The question is not whether proxy advisers are influential—that point is undisputed—but whether the Congress chose to regulate *influence* or *solicitation*. Influence, even substantial influence, is distinct from solicitation.

NAM also argues that the district court improperly injected an extratextual "interest-in-the-outcome requirement" into section 14(a). Appellant Br. 52-58. Not so. The district court properly interpreted the term "solicit" to reach only conduct that involves *seeking* a shareholder's vote, rather than providing advice requested by a client. It did not introduce a "test" for the intent of solicitors.

Nor do NAM's alleged "dire consequences" result from that clear definition. First, the SEC remains free to regulate false or misleading information *in solicitations*. *See* 17 C.F.R. § 240.14a-9. That the term's scope does not encompass everything that might be persuasive to a shareholder is a consequence of the statute's reach, not a result of the district court's improper interjection. Second, there is nothing unusual about the Congress limiting the scope of a statute to reach only certain kinds of conduct—here, solicitation rather than influence. Third, the SEC is separately empowered to regulate the provision of proxy-voting advice through the Investment Advisers Act, 15 U.S.C. §§ 80b-1 *et seq.*, which imposes fiduciary duties on most proxy advisory firms. *See* Appellee

17

Br. 57-63.  Fourth, inducing a shareholder to cast, withhold or revoke a vote can still constitute solicitation if it meets the statutory requirement of obtaining that action for the would-be solicitor's separate purpose.  *See* 17 C.F.R. § 240.14a-1(*l*)(1)(ii)-(iii).  Fifth, NAM's invocation of the rules governing broker-dealers holding legal title to "street name" securities is irrelevant—those rules simply ensure that proxy materials reach a beneficial owner of securities—unless they become active solicitors themselves.  *See* 17 C.F.R. § 240.14a-2(a)(1); *see also* 3 Thomas Lee Hazen, *Treatise on the Law of Securities Regulation* § 10:68 (May 2025 update).

In sum, the best reading of section 14(a), grounded in the ordinary meaning of "solicit" in its statutory context, is that the term refers to a request for proxy authority or a directed plea to exercise such authority in a particular manner.  Proxy-voting advice rendered by a third party for a fee falls outside that definition.  It is simply a recommendation.  The SEC's effort to expand "solicitation" to include such advice cannot be reconciled with the statutory text and its adoption of that definition in the 2020 Rule was contrary to law.

\* \* \*

For the foregoing reasons, the judgment of the district court is affirmed.

*So ordered.*